**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JAMES A. BURK, JR., et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF COLUMBUS, OHIO, et al., <br><br> Defendants. | Case No. 2:20-cv-6256 <br><br> Judge James L. Graham <br><br> Magistrate Judge Chelsey M. Vascura <br><br> **EXPERT REPORT OF PATRICK J. VEHR** |

I submit this expert report to Plaintiff James A. Burk, Jr. (Mr. Burk) on behalf of Defendants City of Columbus, Joseph Fihe, and Kevin Winchell. My name is Patrick J. Vehr. I am an employee of Defendant City of Columbus. I am an Officer with the Columbus Division of Police, assigned to Advanced Training, and a Defensive Tactics Instructor with the Division's Training Bureau.

I have been employed by the Columbus Division of Police for 14 years. I have been an Ohio Peace Officers Training Academy (OPOTA) Subject Control and Impact Weapons Instructor for 11 years. I currently serve on the OPOTA Subject Matter Expert committee for Subject Control and a Subject Matter Expert in Defensive Tactics for the Columbus Division of Police. I am a certified Master Taser Instructor by Axon Enterprise, Inc. My regular assignment is a full-time Defensive Tactics Unit instructor which is part of the Advanced Training Section. I train police officers, police recruits, and officers throughout the State of Ohio in all areas of defensive tactics. My area of expertise includes subject control, taser, impact weapons, striking and ground defense. I am certified by the Columbus Division of Police to apply these principles to the analysis of use of force incidents. My personal resume is attached to this report.

I have been asked by the Columbus City Attorney's Office to review an incident that occurred in the City of Columbus, Franklin County, Ohio. The incident involved Mr. Burk and defendant Officers Joseph Fihe and Kevin Winchell. The basis for the below listed opinions are from an intensive review of all materials submitted to me by the City of Columbus City Attorney's Office, as well as the education, training, and experience I have obtained through a career in law enforcement. My opinions are held to a reasonable degree of certainty in the field of law enforcement.

### I.   SUMMARY OF CONCLUSIONS

I conclude, based on the materials reviewed, during the incident on July 7th, 2020 at 1:55 p.m., given the totality of the circumstances, the defendants' uses of force complied with generally accepted police practices and procedures.

## II. OVERVIEW OF THE INCIDENT

The involved officers are all certified law enforcement officers employed by the City of Columbus Division of Police. They swore an oath to uphold the laws of the City of Columbus, the State of Ohio and of the United States. Both officers were assigned to Zone 1 working a day mid-watch shift. Officers Fihe and Winchell were on routine patrol when dispatched at 1:55 p.m. to 3359 Edgebrook Dr. on the call of a burglary in-progress. The dispatched run was classified as a priority 1 call for service, the highest possible classification. Both officers responded utilizing lights and siren, indicated the immediate nature of the call for service. Upon arrival at 2:03 p.m., Officer Fihe observed a male matching the description standing outside the residence of 3359 Edgebrook Dr.

Officer Fihe approached the male, whom was later identified as Mr. Burk, and gave several verbal commands to Mr. Burk. Officer Fihe maintained a proper distance and positioned himself behind the front of a parked vehicle. Officer Fihe attempted to resolve the situation by positioning Mr. Burk in a prone position. Mr. Burk refused to comply with the verbal commands of Officer Fihe. Officer Fihe then aired an "officer-in-trouble" and maintained his position until another officer arrived on scene.

Officer Winchell arrived on-scene at approximately 2:05 p.m. Officer Winchell observed Mr. Burk refusing the commands of Officer Fihe. Officer Winchell then approached Mr. Burk and echoed the commands toward Mr. Burk to get on his stomach. Mr. Burk finally complied with these orders. Officers Fihe and Winchell then attempted to secure Mr. Burk in handcuffs. Mr. Burk began to actively resist the actions of the two officers. As a result of Mr. Burk's actions, both officers responded by applying physical force in order to secure Mr. Burk. The force that was used included joint manipulations and a taser drive-stun.

After officers were able to apply the handcuffs, they position Mr. Burk in a seated position and attempted to gather additional information related to the call for service. Mr. Burk continued to be argumentative and would not initially comply with the officers' order to sit in the back seat of the cruiser. Officers were able to pull Mr. Burk into the backseat of the cruiser and verify Mr. Burk's identifying information and credentials. Officers determined Mr. Burk was an ATF agent and requested a medic respond due to Mr. Burk advising that he was having trouble breathing. Mr. Burk was treated by CFD Medic #11 on-scene and was released from custody. Officer Fihe sustained minor cuts to both knees and a minor cut to a finger on his left hand as a result of the struggle.

## III. CPD DIVISION POLICY AND TRAINING

Columbus Police Officers are trained extensively on use of force. This training begins in the Columbus Police Academy with a minimum of 80 hours devoted to defensive tactics, exceeding the requirement of 70 hours mandated by the Ohio Police Officers Training Commission (OPOTC). Additionally, officers receive annual 8-hour in-service training on defensive tactics. The annual in-service training far exceeds the standard set forth by the Commission for Accreditation for Law Enforcement Agencies, Inc. (CALEA). Officers are taught techniques to control a resistive subject. These techniques include striking methods, joint manipulations, grounding techniques, the use of taser, and de-escalation. Furthermore, officers are trained on

2

departmental use of force policy and any legal updates relating to police use of force. In short, the Defendants' training complies with current law enforcement best practices.

### A. DIVISION POLICY

The Columbus Division of Police Directive 2.01 defines a use of force as, "The exertion of energy or the actions of personnel in the performance of their duties used to direct or control another's movements or actions." Further, "A use of force may be implemented to control resistive or aggressive behavior toward the involved personnel, other personnel, third parties, or property, and results in the following Levels of Control." The controls listed in the Directive 2.01(B) are a progression of techniques used to control a suspect's actions. Use of force levels of control used by the CPD are:

| | |
|---|---|
| Level 0: | Officer presence, verbal and non-verbal commands, searching, handcuffing, sparking a Taser for compliance, use of flashbangs and multiple baton rounds as diversions |
| Level 1: | Empty hand control, pressure points, grounding techniques, and joint manipulations |
| Level 2: | Use of chemical spray |
| Level 3: | Use of electronic device (electronic custody belt, taser or Electronic Control Weapon (ECW)) |
| Level 4: | Hard empty hand control (strike/punch/kick) |
| Level 5: | Use of impact weapon (baton/flashlight) |
| Level 6: | Police K-9 bite |
| Level 7: | Less lethal weapons (beanbag/multiple baton rounds/stinger cartridges) |
| Level 8: | Deadly Force |

Officers are not required, by law or policy, to run through a laundry list of various force options. The standard that all law enforcement officers must follow in the use of any type of force against a citizen is derived from the U.S. Supreme Court case *Graham v. Connor*, 490 U.S. 386, (1989). As the Supreme Court stated:

> all claims that law enforcement officers have used excessive force - deadly or not- in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" approach.
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than

3

> with the 20/20 vision of hindsight.  The calculus of reasonableness must embody an allowance for the fact that police officers are often forced to make split-second judgments, in circumstances that are tense, uncertain and rapidly evolving about the amount of force that is necessary in a particular situation.

The U.S. Supreme Court has provided some general guidance as to what should be viewed as relevant when law enforcement officers are alleged to have used excessive force during an arrest/seizure.  This guidance is the facts and circumstances confronting the officers at the moment in the form of a four-pronged test:

      a)      The severity of the crime suspected

      b)      Whether the suspect poses an immediate threat to the safety of officers or others

      c)      Whether the suspect is actively resisting

      d)      Whether the suspect is attempting to evade arrest by flight

**B.    TRAINING**

    **1.    Action vs Reaction**

Officers cannot know what a particular subject is going to do; they can only react to what the subject does and what the law enforcement officer infers to be the subject's intentions. This illustrates the unavoidable necessity that officers must be trained to respond to the threat and not the action.  It is unreasonable and unrealistic to expect officers to allow a situation to develop or escalate until they are certain that they, or others, will be hurt or not hurt (Patrick & Hall, 2010).

One must conclude the U.S. Supreme Court acknowledges that time is a critical factor.  Most deadly confrontations begin and end within three seconds (Patrick & Hall, 2010).  Research has shown that a deadly threat can unfold at a speed of one quarter of a second or less (Force Science Institute Ltd., Gun in Waistband).  The physiological realities of deadly force confrontations include the factors of action-versus-reaction.  Force Science Institute defines reaction time as a measure of the time from the arrival of a suddenly presented and unanticipated signal to the beginning of the response to it.  Action and reaction sequences take quantifiable amounts of time to complete.  There have been many studies completed on action versus reaction.  In a series of experiments with officers from Tempe, Arizona, researchers discovered that the average reaction time for officers to shoot when cued with a light was .31 seconds.  Thus the average reaction of an officer is approximately 1/3 of a second.  The findings of the study show, "Most officers can't fire faster than a suspect with a weapon in hand, even if it is not aimed at the officer."

The officer has to perceive and absorb the threat that a suspect is going to fire, process the information within the current context, decide on an appropriate action, and then signal the muscles to respond.  In the meantime, the suspect has already assessed the situation, decided on a course of action, and must only complete the act of firing.  That is why it is commonly argued that, "Action is always faster than reaction."  (Honig and Lewinsky, 2008, p.141).

4

The realities of action vs reaction weigh heavily on all aspects of defensive tactics training. When reasonable, officers are trained to maintain a reactionary gap between themselves and the suspect specifically due to the action vs reaction principle. However, the dynamics of certain situations require officers to close the reactionary gap in order to gain physical control of a subject. Officers are then on the reaction side of the principle. Training inside the reactionary gap is pivotal for officer safety. Training includes joint manipulations, grounding techniques, striking methods, target areas, intermediate weapons (baton, taser, mace), and lethal force options.

### 2. Training Specific to this Incident

In addition to defensive tactics specific training, every CPD officer receives countless training scenarios. The training scenarios begin during recruit training and continue throughout an officer's career during annual in-service training. Each scenario has a specific objective. The objectives vary from basic patrol-level tasks to complex and specific issues that arise throughout the year. The development of each scenario is rooted in the departmental policy that applies to the scenario. In this case, Division Directive 4.03 is the foundation for scenarios involving out-of-uniform personnel. D.D. 4.03 deals specifically with both personnel operating in a covert capacity and uniformed personnel interacting with out-of-uniform law enforcement officers. For example, D.D. 4.03, Section II – Procedures, sub-section "A. Personnel Challenging Possible Out-of-Uniform Law Enforcement Personnel" states the challenging officer will:

1. Approach cautiously and identify yourself as a police officer.

2. Give clear, concise, and non-conflicting orders.

3. Instruct individuals claiming to be law enforcement personnel, whose identity you are not able to immediately confirm, to disarm in a safe manner and then produce their agency's identification. If the individual refuses to comply, treat the situation as any other encounter with an armed individual.

Furthermore, the directive also details the actions of an out-of-uniform officer when being challenged by a uniformed officer. Namely, the out-of-uniform officer will, "Remain motionless and react professionally. Respond to the commands of the challenging personnel even if it means allowing a suspect to escape" (D.D. 4.03.II.B.). Officer Fihe expected Mr. Burk to behave in this manner if Mr. Burk was indeed a law enforcement officer. However, because Mr. Burk chose not to comply with commands, Officers Fihe and Winchell were obligated to, "treat the situation as any other encounter with an armed individual." This incident was an example of both officers acting as trained and in accordance with policy.

### 3. Use of Force Continuum Training

The Columbus Division of Police uses the Action-Response Use of Force Continuum (see below) to guide officers in determining a reasonable response to a specific situation. Annually, every CPD officer is trained of the Use of Force Continuum during the classroom portion of in-service training. The Use of Force Continuum is merely a guide for choosing a reasonable response to a suspect's actions. The Officer-Subject Factors and Special Circumstances are essential in determining a reasonable response. It is important to note that the Officer-Subject Factors and

5

Special Circumstances found on the Use of Force Continuum are identical to those found on CPD Form U.10.128-Use of Force Report. I will use the Use of Force Continuum to analyze the incident on July 7th, 2020.



Officers are trained to respond to actions presented or cues displayed by the suspect. In this case, the involved officers' decisions to use force were based solely on the actions of Mr. Burk. If Mr. Burk had remained motionless, reacted professionally, and responded to the commands from Officer Fihe, as one would expect when challenging an out-of-uniform law enforcement officer, then neither officer would have used force to gain control of Mr. Burk.

Both officers reported Mr. Burk displayed "verbal or physical danger cues" and "not responding to commands." According to the OPOTA Subject Control Instructor Manual (2020), pre-attack indicators are "signals or cues that a person displays that may indicate a pending attack. These indicators can be verbal, non-verbal, conscious, and/or unconscious." (Use of Force, p. 6). The most common of these pre-attack indicators is a non-compliance with orders. When ordered to the ground, Mr. Burk responded with, "I'm not going to do it," (Officer Fihe BWC) and continued to face Officer Fihe. Mr. Burk's posture indicated he had no intention of complying with Officer Fihe's order.

At any point during this encounter, Mr. Burk could have chosen to comply with the verbal commands of the officers and the force being used. Although Mr. Burk did eventually get on the

6

ground, he decided to physically resist the handcuffing techniques being applied by Officers Fihe and Winchell. In my opinion, once on the ground, Mr. Burk exhibited a low-level of active resistance as defined in the OPOTA (2020) Subject Control Manual. Low-level active resistance is, "when a subject exhibits resistive movement to avoid physical control (e.g., pulling away, holding onto chair, steering wheel, etc.)" (Use of Force, page 14). The responding officers were forced to use training and the Use of Force Continuum as a guide for a reasonable response. Attempting joint-manipulation techniques and a taser drive-stun in order to complete handcuffing was a reasonable response to Mr. Burk's actions.

In order to assist officers in determining an objectively reasonable response to a suspect's actions, officer-subject factors and special circumstances are listed on both the Use of Force Continuum and the CPD Form U.10.128. As previously stated, the Use of Force continuum is merely a guide and the totality of the circumstances must be considered. The officer-subject factors, combined with the special circumstances, allow officers to flow up and down the force continuum so that there is no single deciding factor in determining reasonableness.

Several of the officer-subject factors and special circumstances must be considered when determining the reasonableness of the officers' response in this incident. Special Knowledge is significant because of the nature of the dispatched call. Officers were responding to a burglary in-progress with the possibility of a male claiming to be a law enforcement officer. Officers Fihe and Winchell have been trained on D.D. 4.03 and fully expected the male suspect to respond to commands – if he was in fact an out-of-uniform law enforcement officer. Mr. Burk's non-compliance was an indicator that he was not a law enforcement officer and raised suspicion that he was instead a burglary suspect.

Next, three special circumstances criteria are closely related in this incident and should be addressed in conjunction with each other – closeness of a weapon, being on the ground, and distance from the subject. As discussed earlier that due to Mr. Burk's non-compliance, the officers transitioned to a prone handcuffing position that effectively eliminates distance and leads to a hands-on approach. Although officers are trained in prone handcuffing techniques, specifically if an officer anticipates resistance, there are risks associated with being on the ground. Primarily, the suspect has the ability to hide his or her hands underneath the body and/or utilize the ground surface to gain leverage during the resistance. Furthermore, Officer Fihe recognized very quickly Mr. Burk was carrying a holstered firearm on his right hip. This fact was especially concerning because Officer Winchell was attempting to place Mr. Burk's right hand behind his back in very near proximity to the firearm. Undoubtedly, these three special circumstances increased the threat level awareness of both officers.

The final special circumstance that needs addressed is Subject Handcuffed. This is especially important when Mr. Burk was escorted to rear seat of the cruiser. Due to Mr. Burk's behavior, officers were obligated to further investigate Mr. Burk's claims. Although a badge and credentials were retrieved from Mr. Burk, officers decided a quick verification of the credentials was required. Mr. Burk's firearm was recovered and rendered safe, yet not completely secured in a locked cruiser – furthering the need for Mr. Burk to be placed in the back seat. Mr. Burk prolonged the verification of credentials by refusing to fully sit in the cruiser. Officer Fihe reacted by pulling Mr. Burk from the opposite door. Although handcuffed, Mr. Burk was physically moved resulting in a low-level use of force.

As mentioned above, Columbus Police officers are extensively trained in all areas of defensive tactics. The officers in this incident relied on countless hours of defensive tactics training on the reasonableness of force. Each use of force that was used to control Mr. Burk was a trained technique and adhered to the principles taught in defensive tactics training. Three different levels of force were used in the incident with Mr. Burk; they were levels zero, one, and three. Each level has specific training principles that apply.

### a. Level Zero – Officer's Presence

The officer's presence is commonly referred to as the lowest level of force. An officer will typically begin a confrontation at this level. In my experience, the overwhelming majority of altercations are resolved through level zero techniques. Subjects will generally comply with simple officer presence techniques. However, the level zero techniques attempted by Officer Fihe on Mr. Burk were ineffective and Mr. Burk chose to escalate the encounter. Officer Fihe was clearly in a marked CPD cruiser and was wearing the division-issued uniform. Without question, Officer Fihe was acting in accordance with his sworn duties as a uniformed police officer. His mere presence is intended to de-escalate the situation and most conflicts are resolved through verbal commands. Officer Fihe gave multiple commands to, "Get on the ground!" Given the behavior of Mr. Burk, these commands were reasonable attempts to position Mr. Burk in a safe position until back up officers arrived.

Officers are also trained to maintain *contact-cover* principles. In this case, Officer Winchell arrived second and began proper contact-cover principles. He positioned himself to the side of Officer Fihe to specifically avoid cross-fire issues that might arise. Officer Winchell quickly assessed level zero techniques were ineffective and approached to gain physical control of Mr. Burk. Mr. Burk suddenly complied with the order to "get on the ground" and Officer Winchell holstered his gun while attempting to control Mr. Burk's right arm. Given Mr. Burk's behavior and general non-compliance with orders, Officer Winchell displayed tremendous restraint by initially keeping the confrontation at a level zero on the force continuum.

Finally, officers are also trained to maintain a reactionary gap and give loud verbal commands from a position of cover or concealment. This often involves the officers having lethal force option available (i.e. the handgun is out of the holster and pointed at the suspect) and the suspect complies with the commands of the officers. In training, this technique is commonly referred to as a *felony stop* and is used primarily on violent felons whom the officer believes may be armed. The incident with Mr. Burk initially met the criteria for Officer Fihe to attempt a *felony stop*. Officer Fihe was responding to a burglary in-progress call and the details specified a male was claiming to be a law enforcement officer, indicating reasonable suspicion that a firearm was involved. Officer Fihe remained positioned behind cover while giving the initial verbal commands, suggesting he was relying on *felony stop* specific training. However, in my opinion, due to the actions of Mr. Burk, Officer Fihe was forced to quickly adapt his course of action and order Mr. Burk to the ground. A successful *felony stop* approach hinges upon compliance from the subject. Once non-compliance is observed, the *felony stop* should be adapted to the next best option for the officer – in this case placing Mr. Burk in a prone position. Given the totality of the circumstances, the officer's tactics on the initial approach were reasonable and consistent with the current CPD level zero training curriculum.

### b. Level One - Empty hand control, pressure points, grounding techniques, and joint manipulations

CPD officers are trained in a variety of level one techniques. All these techniques are designed to achieve control of the suspect in order to handcuff. According to OPOTA's Principles of Handcuffing (2020), "Do not try to handcuff resisting subjects until they are in a position of control." (p. 3). Ideally, officers apply handcuffs to subjects while standing and resistive behavior never occurs. But, in this case, Mr. Burk refused to comply with simple verbal orders indicating he would resist handcuffing techniques. As trained, both officers then ordered Mr. Burk in a prone position so that each officer was able to approach from a position of advantage.

As soon as both officers began to control the arms of Mr. Burk, he began to actively resist. Officer Winchell reacted by physically manipulating Mr. Burk's right arm and shoulder in order to place his right wrist behind his back. Mr. Burk continued to use his strength to keep his right arm from being pried behind his back. Officer Fihe was also attempting a similar technique to Mr. Burk's left arm. He too was met with Mr. Burk actively resisting the movement of his left arm to behind the back. Officer Fihe observed Officer Winchell struggling and decided to transition to a taser (see below). The taser was effective and achieved the desired response of bringing both hands behind the back. Officers were then able to apply handcuffs.

As trained, officers then placed Mr. Burk in an upright seated position in order to avoid positional asphyxiation. Officer Winchell then stood Mr. Burk to his feet and escorted him toward rear of the cruiser. Mr. Burk was told multiple times to sit in the back of the cruiser so that officers could properly investigate the situation. Mr. Burk again refused to comply with orders, even though he was already handcuffed. This led to Officer Winchell pushing Mr. Burk's legs towards the back seated position while Officer Fihe pulled Mr. Burk from the driver side.

### c. Level Three (CEW)

CPD Directive 2.04 states, "Sworn personnel may use an intermediate weapon to protect themselves or another person from harm, to effect the arrest of or gain control of a physically aggressive/resistive subject, or to prevent or stop the commission of a criminal offense." This directive also defines the division approved X26P Taser as an intermediate weapon. Officers Winchell and Fihe attempted to place handcuffs on Mr. Burk and end the confrontation quickly using a low-level of force. However, Mr. Burk actively resisted that attempt by engaging his muscles in a manner that prevented his hands from being placed behind his back. Mr. Burk's actions resulted in Officer Fihe applying a 5-second drive stun to the lower back of Mr. Burk.

The division issued X26P Taser (CEW) operates in two ways; probe mode or drive stun mode. The CEW is equipped with a 25 ft. cartridge that, when energized, deploys two probes at a distance up to 25 feet. If the cartridge is removed, the CEW operates in drive stun mode only. Operating the taser in drive stun mode only, as Officer Fihe did, is significantly less intrusive than probe mode and causes only localized pain. During annual taser re-certification, officers are trained in both modes. This training includes transitional drills with an inert taser cartridge, live cartridge taser deployments and scenarios designed to incorporate the taser.

Whether the taser is deployed in drive-stun or probe mode, each trigger of the taser will generate a 5-second cycle.  That 5-second cycle is known as the "window of opportunity" to control and handcuff a subject.  Officer Fihe decided to employ the taser in drive-stun mode resulting in effective pain compliance to Mr. Burk.  Officers were able to complete handcuffing immediately following the drive-stun application.  In short, both officers were met with active resistance while attempting handcuffing techniques; Officer Fihe relied on his training by transitioning to a 5-second drive-stun taser use; and, both officers were then able to successfully secure Mr. Burk with handcuffs.

## IV.   WITNESS TESTIMONY OF INCIDENT

Two witnesses were interviewed as part of the use of force investigation.  Mrs. Sarah Al Maliki and Mr. Mike Azad were both present at the scene, however they only provided a limited perspective of the event.   Mrs. Al Maliki was the caller of the initial dispatched run, but only observed the beginning portion of the exchange between Mr. Burk and responding officers.  Mrs. Al Maliki stated, "she saw one of the officers point his firearm," (Investigative Summary, IAB 202007-1014, page 2) but she did not see the physical struggle once on the ground. On the other hand, Mr. Azad did not hear the verbal commands being issued to Mr. Burk, but did witness Mr. Burk's resistive behavior on the ground. Mr. Azad stated that Mr. Burk was, "yelling, screaming, and moving around" (page 2).  Both eye-witness accounts of the incident coincide with the officers' reports and body camera video footage.

## V.   CONCLUDING OPINIONS ON USE OF FORCE USED TO CONTROL MR. BURK

### 1.   The Officers' decision to approach with guns drawn complied with generally accepted police practices and procedures.

Officers Fihe and Winchell were dispatched on a burglary in-progress, a priority one call based on Patrol SOP.  Even though officers were notified the suspect was claiming to be a police officer, the call taker also informed officers that he had tried to open the door.  Upon arrival to a burglary in-progress, or any other felony in-progress, CPD officers are trained to approach the scene with weapon drawn.  Ideally, once contact with the suspect is made, officers should attempt a *felony stop* technique in order to properly secure the scene. Officer Fihe's decision to approach Mr. Burk with his weapon drawn was fully consistent with training protocols and policy.  It is also reasonable for Officer Fihe to expect Mr. Burk to comply with all commands if he was truly law enforcement personnel.

The officers are trained this way due to the seriousness of the suspected offense.  The realities of the action vs reaction training principle must also constantly be applied to every situation.  Because a felony crime is suspected, officers are trained to approach with caution, utilize cover and/or concealment, and attempt to verbally de-escalate the situation, if possible.  This type of tactical response ensures the safety of themselves and all parties involved.

> **2.    The Officers' decision to order Mr. Burk to the ground and treat Mr. Burk as any other armed suspect complied with generally accepted police practices and procedure.**

Officer Fihe was immediately met with verbal defiance and aggressive posturing when attempting to verbally de-escalate Mr. Burk.  Mr. Burk's unprofessional behavior was not indicative of an out-of-uniform law enforcement officer – raising Officer Fihe's level of suspicion that Mr. Burk may in fact be a burglary suspect.  As a result of the initial exchange, it's reasonable for Officer Fihe to order Mr. Burk to the ground in a prone handcuffing position – especially considering back-up had yet to arrive.  Officer Fihe requesting an "officer in trouble" call is a further indication that he assessed Mr. Burk's behavior as threatening.  Relying on proper contact cover principles, Officer Winchell echoed the command to get on the ground when he arrived.  Mr. Burk eventually complied with the order shortly after Officer Winchell arrived on-scene.

D.D. 4.03 clearly states that if someone claims be an out-of-uniform law enforcement officer, yet refuses to comply then the officer will, "treat the situation as any other encounter with an armed individual."  Officer Fihe was met with non-compliance from Mr. Burk and was required to follow his division directive.  He, and Officer Winchell, were forced to treat the situation as if Mr. Burk was an armed suspect of a burglary in-progress call.

> **3.    Based on the totality of circumstances, the officers' level one force in controlling Mr. Burk complied with generally accepted police practices and procedures.**

Mr. Burk was directed to the prone handcuffing position before both officers began physical control.  Officer Fihe moved in to control Mr. Burk's left arm, while Officer Winchell attempted to control Mr. Burk's right arm.  Officers needed to secure Mr. Burk in handcuffs prior to retrieving his badge and credentials.  CPD officers are not trained to search a felony suspect in a prone position prior to be placed in handcuffs.  Therefore, both officers were acting as trained to handcuff Mr. Burk first and then search his pockets for identifying information.

Mr. Burk reacted to their attempt to handcuff by actively resisting their physical control.  Mr. Burk's resistive movements of his hands and arms were felt by both officers, but difficult to observe on body worn cameras.  Had Mr. Burk not been resisting, or even passively resisting, both officers would have been able to keep control of both wrists and apply the handcuffs.  Officer Fihe was able to apply joint pressure to the left shoulder and pry Mr. Burk's left hand from underneath his body to behind his back.  Similarly, Officer Winchell applied the same basic technique to Mr. Burk's right arm and wrist, but Officer Winchell was unsuccessful in using the trained technique.

> **4.    Officer Fihe's decision to deliver a 5-second taser drive stun complied with generally accepted police practices and procedures.**

At the point Officer Fihe decided to draw his X26P taser, Mr. Burk was clearly actively resisting the handcuffing techniques being applied.  As stated in D.D. 2.04, sworn personnel may use an intermediate weapon, such as a taser, to, "gain control of a physically aggressive/resistive subject." Additionally, Mr. Burk's holstered firearm was clearly visible during the struggle from Officer

11

Fihe's BWC. The presence of the firearm added a threatening variable to the situation that weighed heavily on the reasonableness of Officer Fihe's response.

The drive-stun applied to Mr. Burk was intended to apply pain to the localized area of contact. Officer Fihe directed the 5 second cycle to the lower back of Mr. Burk and achieved the desired result. Mr. Burk reacted to the pain of the drive-stun allowing the prying of the right hand by Officer Winchell to be effective. When Officer Fihe removed the front cartridge of the taser to transition to the drive-stun application also suggests Officer Fihe was purposely choosing the least intrusive means reasonable to control Mr. Burk.

> **5. The officers' decision to place Mr. Burk in the back seat of the cruiser to verify credentials complied with generally accepted police practices and procedures.**

After Mr. Burk was secured in handcuffs, the officers rolled him over to a more comfortable position. We specifically train our officers to move the subject to a seated position to avoid unnecessary pressure on the diaphragm. Then, Officer Fihe retrieved Mr. Burk's badge and credentials. Due to Mr. Burk's behavior up to this point, it is reasonable for officers to be suspicious of Mr. Burk's claims. Officers Winchell and Fihe both decided it was best to verify the ATF badge and credentials ensuring they were not stolen or fabricated. Verifying Mr. Burk's credentials was simply the officers exercising due diligence and fully investigating the dispatched call. Had officers released Mr. Burk from custody prior to verifying the badge and credentials, the officers would be disregarding their instincts and ignoring common practices.

Given that a weapon was recovered and still present, and that other civilians were approaching the scene (as seen on Officer Fihe's BWC), the officers were reasonable in deciding Mr. Burk should be detained in the rear seat of the cruiser. Mr. Burk is still obligated to comply with the officer's orders and follow their direction. Mr. Burk likely understood that his credentials needed verification to confirm his claim, yet he still refused to sit fully in the back seat. Officer Fihe needed to physically pull Mr. Burk, while Officer Winchell controlled his legs, to fully secure him in the back seat. I believe both officers' low level of force (level one) was a reasonable response to Mr. Burk's actions at the rear of the cruiser.

## VI. CONCLUSION

I have concluded, based on the materials reviewed, along with my knowledge, skill, experience, training, and education, during the incident on July 7th, 2020, that Officers Fihe and Winchell complied with generally accepted police practices and procedures. My opinions in this case are held to a reasonable degree of certainty in the field of law enforcement.

## VII. MATERIALS REVIEWED

1) IA Sergeant Berman Investigative Summary, IAB Database #202007-1014

2) Compliant, James A. Burk v City of Columbus, 2020-cv-06256

3) Dispatch Audio

4)   Fihe – CPD Body Camera

5)   Winchell – CPD Body Camera

6)   911 Audio Recording, 2020-07-07_14.09.25_Ch84

7)   911 Audio Recording, 2020-07-07_13.54.25_Ch112

8)   Audio Administrative Interview of Officer Winchell

9)   Audio Administrative Interview of Officer Fihe

10)  Audio Administrative Interview of James Burk

11)  Cruiser Video System, Kevin_Winchell_Rearseat_CVS.mp4

12)  *Graham v. Connor*, 490 U.S. 386, (1989)

13)  OPOTA Subject Control Instructor Manual Topic 6-1 (2020) Rev. 04-07-2020

14)  CPD Division Directive 2.01

15)  CPD Division Directive 2.04

16)  CPD Division Directive 4.03

17)  CPD Patrol SOP

18)  Taser Version 22 End User PowerPoint (X26 User Course 22)

19)  National Consensus Policy on Use of Force, January 2017

20)  Patrick, U. W. Hall, J.C. (2010) *In defense of self and others: Issues, facts & fallacies, the realities of law enforcement's use of deadly force*. Durham, NC: Carolina Academic Press.

21)  Honig, A. and Lewinsky, W. (2008). A survey of the research on human factors related to lethal force encounters: Implications for law enforcement training, tactics, and testimony. *Law Enforcement Executive Forum*, 8, 129-152.

22)  Force Science Institute Ltd., 2016 (Gun in waistband, combat tuck average time)

23)  Lewinsky, W. and Hudson, B. (2003a). Time to start shooting? Time to stop shooting? The Tempe study. *The Police Marksmen*, (September/October), 26-29.

## VIII.   QUALIFICATIONS

For a statement of my qualifications, see the attached resume.

## IX.   Other EXPERT TESTIMONY

13

During the previous 4 years I have testified as an expert at trial or by deposition in the case *Davis v. Columbus*, S.D. Ohio Case No. 2:17-cv-823.

## X.  COMPENSATION

I am an employee of Defendant City of Columbus, and I have not been specifically retained by any party in this case. To the extent I have provided or will provide expert analysis, consultation, or testimony on behalf of any party to this case, I have done so or will do so as part of the regular duties of my City employment. I will not be paid any compensation above my normal salary for any expert analysis, consultation, or testimony I have provided or will provide in this matter.

Respectfully submitted,

Patrick J. Vehr
Police Officer
Columbus Division of Police

# Patrick J. Vehr
<u>1000 N. Hague Ave, Columbus, OH 43204 Office: (614) 645-2233 Cell: (614) 374-6150         </u>

## *Professional Experience*

**Columbus Division of Police, Police Officer, 2007-Preseent**
*Defensive Tactics Instructor, Columbus Police Academy, December 2015 – Present*
- Train Defensive Tactics to recruits and in-service officers
- Train and evaluate recruits in all areas of defensive tactics including ground defense, boxing, and subject control
- Write and revise training supplements and lesson plans
- Responsible for the Taser program (accountability, training and certification)
- Provide Expert Witness Testimony in the Division's Grand Jury and civil court proceedings
- Serve on the Subject Matter Expert (SME) Committee for OPOTA Subject Control curriculum

*Patrol Officer, June 2007-December 2015*
- Responsible for all aspects of a patrol assignment
- Duties included responding to calls for service, self-initiated activity, and interaction with community members
- Additional responsibilities:
  - Field Training Officer
  - Patrol Rifle Operator
  - Bicycle Officer
  - Directed Patrol Initiatives
- Awards: Medal of Merit, Safe Driving, and Physical Fitness

*OPOTA Subject Control Instructor, October 2010 – Present*
- Instructor for multiple in-service training phases
  - Trained thousands of current CPD officers in all areas of defensive tactics
- Completed 2014 OPOTA Subject Control Update course and Impact Weapons Instructor Course (Topic 6-2)
- Primary instructor for multiple Advanced Ground Defense Courses and Advanced Weapon Retention/Takeaway Courses.

**U.S. Army, Ohio Army National Guard, Captain, 2006-2014**
*Intelligence Officer (S-2), 437th MP BN, Columbus, OH, 2006-2008, 2011-2014*
- Anti-terrorism Officer
- Responsible for physical security/force protection for a 1,000 soldier Military Police BN.
- Military Intelligence Captain's Career Course, Ft. Huachuca, AZ (2010)

- Top Secret-SCI Security Clearance

*Intelligence Officer, Ohio Homeland Response Force (HRF), 2010-2011*
- Created the Standard Operating Procedure (SOP) for the HRF intelligence section; the first of its kind nationally

*Executive Officer (XO), 323rd MP CO, Toledo, OH, 2009-2010*
- Responsible for training a combat ready 150 soldier Military Police Company
- Accountable for over $200,000 worth of military equipment and supplies
- 323rd MP CO was assigned as the Ohio National Guard's Quick Reaction Force (QRF)

*Platoon Leader, 1st PLT/323rd MP CO, Toledo, OH, 2008-2009*
- Lead over 50 Military Police soldiers in domestic operations and combat readiness

## *Education*

**Master of Business Administration (MBA), 2012**
Ohio Dominican University
Columbus, Ohio
*Magna Cum Laude*

**Bachelor of Science in Criminal Justice, 2006**
Minor in Military Science
University of Toledo
Toledo, Ohio
*Magna Cum Laude*

## *Certifications/Qualifications*

**Master Taser Instructor, 2021-Present**
Columbus Police Academy

**Grace Survival Tactics (GST) Level I Instructor, 2018-Present**
Ohio Peace Officer's Training Academy, London, OH

**OPOTA Fitness Specialist Instructor, 2017-Present**
Columbus Police Academy

**OPOTC Basic Instructor, 2016-Present**
Columbus Police Academy

**OPOTA Impact Weapons Instructor Course (Topic 6-2), 2014-Present**
Columbus Police Academy

**Group Crisis Intervention, 2013**
International Critical Incident Stress Foundation (ICISF)
Columbus Police Academy

**Law Enforcement Active Shooter Emergency Response (LASER), 2013**
National Center for Biomedical Research and Training (NCBRT), FEMA
Columbus Police Academy

**City of Columbus Police Defensive Tactics Instructor, 2010-Present**
Columbus Police Academy

**Taser Instructor (X26, X26P, X2), 2010-Present**
Columbus Police Academy

**OPOTA Subject Control Instructor (Topic 6-1), 2010-Present**
Columbus Police Academy

**U.S. Army Combatives Level I Instructor, 2006**
Ft. Sill, Oklahoma

## *Additional Training and Expertise*

**Brazilian Jiu-Jitsu, 2006-Present**
1st Degree Black Belt for Grappling Fight Team (GFT)
Grove City Brazilian Jiu-Jitsu (GCBJJ) Academy

**Wrestling, 1997-Present**
University of Toledo Wrestling Club

**Muay Thai Kickboxing, 2008-Present**
Columbus Muay Thai Academy (GCBJJ)

**Boxing, 2008 – Present**
Grove City Brazilian Jiu-Jitsu (GCBJJ) Academy
Columbus Police Academy