1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

James A. Burk, Jr., et al.,    :
                               :
          Plaintiffs,          :
                               :    Civil Action No.
     vs.                       :    2:20-cv-6256
                               :
City of Columbus, et al.,      :
                               :
          Defendants.          :

- - -

EXPERT WITNESS DEPOSITION OF PATRICK VEHR

- - -

Location:

77 North Front Street, Fourth Floor

Columbus, Ohio 43215

10:54 a.m., May 23, 2023

- - -

ELIZABETH V. CRADIC
REGISTERED PROFESSIONAL REPORTER

- - -

2

1   APPEARANCES:

2           BARTON R. KEYES, Attorney-at-Law
            Cooper Elliott
3           305 West Nationwide Boulevard
            Columbus, Ohio 43215
4           614-481-6000
            rexe@cooperelliott.com
5
                Appearing in person on behalf of
6               Plaintiffs

7           ALEXANDRA PICKERILL, Attorney-at-Law
            SAMANTHA HOBBS, Attorney-at-Law
8           Columbus City Attorney's Office
            77 North Front Street, 4th Floor
9           Columbus, Ohio 43215
            614-645-0816
10          anpickerill@columbus.gov

11              Appearing jointly and in person on
                behalf of Defendants
12
        ALSO PRESENT:
13
            Daemon Rhein
14          Rachel Veneman
            Tristan Montheith
15
                          - - -
16

17

18

19

20

21

22

23

24

25

3

```
1                    I N D E X

2                      -  -  -
    WITNESS                              PAGE
3
    PATRICK VEHR
4           Examination                  4
            (By Mr. Keyes)
5
                       -  -  -
6

7   EXHIBIT                              PAGE

8   Exhibit No. 1
    (Expert Report of Patrick Vehr)      10
9
    Exhibit No. 2
10  (CPD Directive 2.01, Use of Force)   99

11  Exhibit No. 3
    (CPD Directive 2.04, Chemical Irritants
12  and Intermediate Weapons Regulations)  100

13  Exhibit No. 4
    (Draft Report of Patrick Vehr)       101
14
    Exhibit No. 5
15  (Complaint of James Burk and Summer
    Hilfers)                             101
16
    Exhibit No. 6
17  (Expert Report of Scott DeFoe)       101

18  Exhibit No. 7
    (IAB Investigation Materials for 7/7/20
19  Incident)                            101

20         (Exhibit No. 4 retained by Defendants
                by agreement of parties.)
21
                       -  -  -
22

23

24

25
```

4

1                       P R O C E E D I N G S

2                              - - -

3

4                       PATRICK VEHR,

5     called as a witness, having been first duly sworn by

6       the court reporter, was examined and testified as

7                            follows:

8

9                        EXAMINATION

10    BY MR. KEYES:

11    Q.       All right.  Officer Vehr, my name is Bart

12    Keyes.  We met off the record.  I wanted to

13    reintroduce myself on the record.  I'm counsel for the

14    plaintiffs in this case.  Do you mind telling us your

15    full name for the record, please?

16    A.       Patrick Vehr.

17    Q.       Vehr, okay, I'll try to remember that.

18    A.       That's okay.

19    Q.       And that's V-e-h-r; correct?

20    A.       Correct.

21    Q.       Okay.  And I know you work for the Columbus

22    Division of Police.  What is your, sort of, office

23    address, your base where you work out of?

24    A.       I work out of the police academy, 1000 North

25    Hague.

1    Q.       Got it, all right.  A moment ago the court

2    reporter had you swear an oath to tell the truth.  Do

3    you understand that that oath is just as binding here

4    as it will be in the courtroom?

5    A.       Yes, sir.

6    Q.       I'm going to be asking you a series of

7    questions today.  If at any point you don't understand

8    a question I ask, please let me know so that we can

9    try to clarify it.  Otherwise, if you answer, I'll

10   assume that you understood; is that fair?

11   A.       Okay.  Yes, sir.

12   Q.       If you need to take a break at any time,

13   just let me know.  My only request would be that if

14   there's a question pending, we get an answer before

15   the break, unless you need to consult with your

16   counsel about whether to answer the question or not.

17   Okay?

18   A.       Okay.

19   Q.       I'm going to have -- it's already in front

20   of you.  There's a document that was marked earlier

21   today with another witness, Plaintiff's Exhibit 1 from

22   Lieutenant Bernhardt's deposition.  And first of all,

23   do you recognize that document?

24   A.       I don't think I've seen this before.

25   Q.       Okay, that's okay.  I'll represent to you

6

1  that this is a deposition notice that we've served.

2  The particular rule that governs this is called

3  Federal Rule 30(B)(6).  But it's essentially a list of

4  topics directed at the City of Columbus, and then

5  their job is to provide a designee to testify about

6  those topics.

7  A.        Okay.

8  Q.        And we've been told that you're a designee

9  for some of these topics.  Were you aware of that

10 before today?

11 A.        Yes, sir.

12 Q.        Okay.  Do you -- by looking at Exhibit 1,

13 would you mind letting us know which topics you are

14 the designee that's here to testify for?  And I know

15 there's subparts under those, so if it's some subparts

16 but not all for a particular topic, just point that

17 out to me, please.

18 A.        No. 1.

19 Q.        Okay.

20 A.        No. 2.

21 Q.        Okay.

22 A.        And I believe that is it.

23 Q.        All right.

24 A.        One and two.

25 Q.        Okay.  By the way, is officer -- is that the

7

1   correct title?

2   A.        Yes, sir.

3   Q.        Okay, thank you.  Officer Vehr, I'd like to

4   walk through some information about your background

5   before we get into some substance of your testimony.

6   So what is your current position?

7   A.        I am a defensive tactics instructor at the

8   police academy.

9   Q.        And that's, in particular, the City of

10  Columbus Police Academy?

11  A.        Yes.

12  Q.        How long have you held that position?

13  A.        Seven and a half years.

14  Q.        Is that your full-time role?

15  A.        It is.

16  Q.        All right.  How long have you worked for the

17  Columbus Division of Police?

18  A.        Fifteen years.

19  Q.        What other positions have you held with CPD,

20  if you could just walk me through a time line of your

21  tenure?

22  A.        I was patrol officer on Zone 1, the north

23  side.  I did defensive tactics instructing on a

24  part-time basis starting in 2010.  And then I also

25  held various assignments on patrol as far as

8

1   plain-clothes type assignments, directed patrol.  I

2   was a field training officer.  I was a bike patrol.

3   And then in 2016 I was -- I took the assignment now in

4   defensive tactics.

5   Q.       Okay.  All right.  Let's walk through those

6   items in a little bit more detail.  So you -- is it

7   fair to say your first position was as a patrol

8   officer?

9   A.       Yes.

10  Q.       You said that was Zone 1?

11  A.       Yes.

12  Q.       And it sounded like you were telling me that

13  at some point -- oh, I think you said around 2010 you

14  started doing defensive tactics instruction part time?

15  A.       That's correct.

16  Q.       Were you still a patrol officer at that

17  time?

18  A.       I was.  So when we do in-service training,

19  we augment the training with various patrol officers

20  that are certified to teach.

21  Q.       Got it.  When did you become certified to

22  teach?

23  A.       2010.

24  Q.       Okay.  What training or exams did you have

25  to complete to be certified to teach defensive

9

1  tactics?

2  A.        We have both a state certification and then

3  an internal city certification.  They are both

4  two-week courses, so a total of four weeks.  And then

5  along with our first in-service, we do an

6  apprenticeship mentoring program with a senior

7  instructor during that phase of in-service.

8           And then in addition to that, to be able

9  to -- and that's to teach in-service.  To be able to

10 teach at the recruit level, we would need another

11 two-week instructor skills development through the

12 State of Ohio.

13 Q.        So an additional two-week state course for

14 the -- to be able to train recruits, you said?

15 A.        Yes, sir.

16 Q.        Okay.  Do you have a, sort of, maintenance

17 requirement?  Do you have to take any additional

18 education to maintain that certification?

19 A.        We have to instruct a minimum twenty-four

20 hours every two years, I believe, to be able to renew

21 our certificate every two years.

22 Q.        That's you instructing, or that's you

23 receiving instruction?

24 A.        That's me instructing.

25 Q.        Okay, understood.  Do you receive any

10

1   training in order to maintain your certification?

2   A.      There's various -- the State of Ohio will

3   put out various update courses.  Throughout the last

4   ten years I think I've done two.

5   Q.      Okay.

6   A.      But it's just -- it's usually -- OPOTA will

7   release an update for instructors, and then we have to

8   go -- it's either an eight- or a sixteen-hour course,

9   depending on the update.  And then my taser instructor

10  certificate is an -- every two years I receive

11  training update.

12  Q.      And that's a separate certificate from

13  defensive tactics?

14  A.      Yes, sir.

15  Q.      All right.

16      (Exhibit No. 1 marked for identification.)

17  BY MR. KEYES:

18  Q.      What we've been doing for the depositions is

19  just starting with each witness, starting at one, and

20  then putting their name under it.  So you're actually

21  going to have another Exhibit 1 --

22  A.      Okay.

23  Q.      -- in front of you marked specifically for

24  your deposition.  And this is -- I'll represent to you

25  this is the report that we received from the City's

11

1  counsel in this case, authored by you.  And looking at

2  it, do you recognize this as your report in this case,

3  your opinion report?

4  A.       Yes, sir.

5  Q.       All right, thank you.  I'm going to ask you

6  to turn to the last -- this is double-sided, but it --

7  so it would be the last two papers.  It starts with

8  your name at the top.  It appears to be a resume or a

9  CV?

10  A.       Yes, sir.

11  Q.       Okay, thank you.  Is the resume or CV that's

12  attached as the last three pages to your report, is

13  that a current -- is that up to date as of today?

14  A.       Yes, sir, I believe so.

15  Q.       Okay.  So it appears that the Columbus

16  Division of Police, that's the only municipal police

17  department that you've worked for; is that correct?

18  A.       That's correct.

19  Q.       All right.  And before you started working

20  at the division of police, you were -- you served in

21  the Army National -- the Ohio Army National Guard;

22  correct?

23  A.       Yes, sir.

24  Q.       All right.  Let's focus on your role as an

25  expert -- or being offered as an expert witness by the

12

1  City in this case.  A couple of things I want to cover

2  before we get into the substance of your opinions.  So

3  you are currently employed by the defendant, the City

4  of Columbus; correct?

5  A.        Correct.

6  Q.        Okay.  When did you first hear or learn

7  about potentially serving as an expert witness in this

8  case?

9  A.        I believe it was roughly one year ago.

10 Q.        Okay.

11 A.        Maybe three months prior to the submission

12 of my report, right around that time frame.

13 Q.        And who first contacted you about providing

14 a report or serving as an expert?

15 A.        There was a former attorney, Mr. Sperlazza.

16 Q.        Bill Sperlazza, who's now a judge?

17 A.        Correct.

18 Q.        Okay, got it.  And so my -- your first

19 contact about serving as an expert in this case came

20 from the city attorney's office, not any supervisors

21 or anyone in your chain of command; is that fair?

22 A.        Yes, sir, that's fair.

23 Q.        Is your compensation as an expert, is there

24 anything above and beyond your salary as a police

25 officer that you're being paid for your work in this

13

1  case?

2  A.       No, sir.

3  Q.       Okay.  What is your annual salary?

4  A.       Generally about a hundred thousand dollars

5  currently, with overtime I receive.

6  Q.       That's inclusive of overtime?

7  A.       Yes, sir.

8  Q.       All right.  Has your work in this case

9  involved any overtime so far?

10  A.       No, sir.

11  Q.       No?  Other than discussions with the city

12  attorney's office, have you spoken with anybody else

13  employed by or affiliated with the City in connection

14  with your work as an expert in this case?

15  A.       No, sir.

16  Q.       Other than anybody in the city attorney's

17  office, has anybody reviewed your report?

18  A.       No, sir.

19  Q.       Have you served as an expert witness in any

20  other case?

21  A.       Yes, sir.

22  Q.       What other case or cases?

23  A.       The City's case, it involved Plaintiff

24  Timothy Davis.

25  Q.       Okay.

14

1   A.         And then I was called as an expert to
2   represent the FOP in an arbitration case.
3   Q.         Okay.
4   A.         And that is all.
5   Q.         Have you written reports in either of those
6   cases?
7   A.         Yes, sir.
8   Q.         Both or just --
9   A.         Just the Timothy Davis case.
10  Q.         Just Davis, okay.  Have you given testimony
11  in either of those cases?
12  A.         Yes.
13  Q.         Okay.  Let's start with Davis, have you
14  given testimony in Davis?
15  A.         Yes.
16  Q.         A deposition?
17  A.         Correct.
18  Q.         Trial?
19  A.         Yes.
20  Q.         Any hearings, Daubert hearings, anything
21  like that?
22  A.         No, sir.  Deposition and trial.
23  Q.         Okay, got it.  What about the FOP
24  arbitration matter, have you given testimony in that
25  case?

15

1   A.        Yes, sir.

2   Q.        Deposition?

3   A.        It was an arbitration hearing.

4   Q.        At the hearing, okay.

5   A.        Yes.

6   Q.        There was no prehearing discovery

7   deposition?

8   A.        No.

9   Q.        The Davis case, that's an excessive force

10  case against the City and one or more of its officers,

11  I'm assuming?

12  A.        Correct.

13  Q.        What was the FOP arbitration case about?

14  A.        It was a case in which the City was

15  terminating an FOP member for excessive force.

16  Q.        In -- all right.  Let's break each of these

17  apart a little bit more.  I'm going to focus on the

18  Davis case first.

19  A.        Okay.

20  Q.        What was the nature of the force involved in

21  that case, or the alleged excessive force in the Davis

22  case?

23  A.        It involved various low levels of force as

24  well as some strikes and a taser.  I think that's

25  answering your question correctly.

16

1  Q.       I think so.  Were there multiple officers

2  involved?

3  A.       There was.

4  Q.       That case went to trial, I believe, was it

5  last -- was it in '22?

6         MS. PICKERILL:  '21.

7         MR. KEYES:  '21, okay, thank you.

8  BY MR. KEYES:

9  Q.       So you recall testifying at trial in '21?

10  A.       Yes, sir.

11  Q.       Okay.  Did you -- in the Davis matter did

12  you learn of the -- any of the post trial proceedings?

13  For example, I know there was a motion for a new trial

14  filed in Davis.  Were you aware of that?

15  A.       I was --

16  Q.       Okay.

17  A.       -- when it occurred.

18  Q.       Okay.  When the motion was filed?

19  A.       I think I heard through the media --

20  Q.       Gotcha.

21  A.       -- as well as -- yeah.

22  Q.       Okay, all right.  In the Davis case -- and

23  I -- so with the caveat that I understand you would

24  have produced a written report and there would be a

25  record of your testimony, so understanding that the,

17

1  you know, full extent of your opinions are going to be

2  captured in those documents, and so I'm not trying

3  to -- you know, I don't want to mischaracterize

4  anything in there.  I just want to ask as a general

5  matter --

6  A.       Okay.

7  Q.       As a general matter, were your opinions in

8  Davis to the effect that every alleged use of force in

9  the encounter was reasonable?

10          MS. PICKERILL:  Objection.  But go ahead and

11 answer.

12 A.       Yes, sir, those were my opinions.

13 BY MR. KEYES:

14 Q.       Okay, all right.  And obviously, like I

15 said, we can consult the report and the transcripts --

16 A.       Sure.

17 Q.       -- for those specific details.  But

18 generally speaking, that's fair to say; correct?

19 A.       Yes, sir.

20 Q.       Are you aware of the outcome of the motion

21 for new trial in the Davis case?

22 A.       I believe so, sir.  I --

23 Q.       What's your understanding of the outcome of

24 the motion for new trial?

25 A.       I --

18

1          MS. PICKERILL:  Objection.  But go ahead.

2  A.          I understand that the -- and I don't know

3  the legal terms -- the judge overruled the jury's

4  findings to create a new trial.

5  BY MR. KEYES:

6  Q.          Okay.

7  A.          And then there was a settlement reached.

8  Q.          Okay, understood.  So there was no second

9  trial?

10  A.          No, sir.

11  Q.          And that case was in federal court; correct?

12  A.          Yes.

13  Q.          That was here in the Southern District of

14  Ohio, I take it?

15  A.          Correct.

16  Q.          Judge Marbley, if I remember?

17  A.          Yes, sir.

18  Q.          Yes?  Okay.  And did you ever read his

19  decision on the new trial motion?

20  A.          I did not.

21  Q.          Okay.  Was it your understanding that the

22  jury had rejected all of the plaintiff's claims of

23  excessive force?

24  A.          Yes, sir.

25  Q.          All right.  And then was it also your

19

1    understanding that the court granted a new trial, in

2    other words, overruled one of those findings as to at

3    least one component of the alleged excessive force?

4               MS. PICKERILL:  Objection.  Go ahead.

5    A.         That was my understanding.

6    BY MR. KEYES:

7    Q.         And so that would have been -- in that case,

8    as you told us earlier, as a general matter your

9    testimony was that every aspect of the alleged

10   excessive force in that case was reasonable; correct?

11   A.         Correct.

12   Q.         Jury agreed with you; correct?

13   A.         Correct.

14   Q.         And then a federal judge vacated that

15   decision as to at least some component of the

16   excessive force; correct?

17              MS. PICKERILL:  Objection.  Go ahead.

18   A.         That's my understanding, but I don't know

19   specifics.

20   BY MR. KEYES:

21   Q.         Sure.  Did the Davis case ever get to a

22   point where you were -- I know -- strike that.  I know

23   you said your understanding is the Davis case resolved

24   after that.  Did it ever get to a point where you were

25   getting ready to testify again at a new trial?

20

1   A.      No, sir.

2   Q.      All right.

3   A.      Not to my knowledge.

4   Q.      Was the city attorney's office also

5   defending the Davis case?

6   A.      Yes, sir.

7   Q.      In the Davis case was it -- well, strike

8   that.  Earlier you told me that in this case you, kind

9   of, first were contacted about this case from the city

10  attorney's office.  Was it the same thing in the Davis

11  case?  Was it the city attorney's office that first

12  reached out to you?

13  A.      Yes, sir.

14  Q.      And then what about the -- well, strike

15  that.  In the Davis case were you paid anything

16  specific for your testimony, or was it like here where

17  you didn't make any extra money other than your

18  salary?

19  A.      Same as here.

20  Q.      All right, thank you.

21  A.      Same set up.

22  Q.      In the -- let's shift focus to the FOP

23  arbitration that you mentioned.  You said that was an

24  arbitration involving the City's attempt to terminate

25  an officer for alleged excessive force?

21

1   A.          Correct.

2   Q.          How did you come to be offered as an expert

3   witness in that case?

4   A.          I was contacted by the FOP.

5   Q.          Are you a member of the FOP?

6   A.          Yes, sir.

7   Q.          Who was it from the FOP that contacted you?

8   A.          It was their attorneys.

9   Q.          Okay.

10  A.          I don't remember specifically which one

11  initially.  But Nikki Wannemacher was assigned to the

12  case so -- but I don't remember exactly which of the

13  attorneys.  This was six -- five, six years ago.

14  Q.          That's okay.  And actually, you're answering

15  what I was ultimately getting to.  Was it the

16  attorneys, or was it a --

17  A.          The attorneys.

18  Q.          Okay.  Not an officer member or somebody of

19  the FOP?

20  A.          Correct.

21  Q.          All right, thank you.  What was the nature

22  of the alleged excessive force in that case?

23  A.          The case involved a high-profile incident

24  that was a result of a gun run that involved our

25  member -- one of the FOP members striking a suspect,

22

1   that the chain of command initially found within

2   policy.  And then up at the highers of the chain of

3   command, deputy chief/chief level found it outside of

4   policy.

5   Q.        All right.  And so the arbitration then

6   was -- was it the --

7   A.        The chief recommended termination, and it

8   was appealed --

9   Q.        Gotcha?

10  A.        -- to arbitration.

11  Q.        Okay.  And you'll have to excuse me.  I'm

12  not super familiar with that process.  So is it the

13  member that initiates the arbitration, or is it the

14  FOP itself?

15  A.        FOP on behalf of the member.

16  Q.        Got it, okay.  And in that arbitration --

17  are you able to disclose the name of the member for

18  that?

19          MS. PICKERILL:  I'll be honest --

20          MR. KEYES:  Let's go off the record for a

21  second.

22              (Discussion held off record.)

23  BY MR. KEYES:

24  Q.        Officer Vehr, we had a brief discussion off

25  the record because I didn't want to run afoul of any

23

1   confidentiality restrictions about that arbitration.

2         MR. KEYES:  And I'll put on the record

3   that -- what we agreed to do, because we all believe

4   that the arbitration's outcome is public now.  And so

5   I'll ask you some questions about that.

6         But if the city attorney's office determines

7   down the road that our belief was incorrect, Allie can

8   get in contact with me, and we can make arrangements

9   to redact this portion of the transcript before it's

10   publicly filed to remove any identifying information.

11   All right.  So we've agreed to that on the record?

12         MS. PICKERILL:  Yes.  Thank you very much.

13         MR. KEYES:  Thank you.

14   BY MR. KEYES:

15   Q.     Officer Vehr, what was the name of the

16   officer involved in that arbitration?

17   A.     Zach Rosen.

18   Q.     What was the nature of the -- I'm sorry, you

19   were starting to tell me the nature of the alleged

20   force.  You said there was a gun run, and the officer

21   struck the suspect; is that correct?

22   A.     Correct.

23   Q.     What is the -- when you use the label gun

24   run, what does that mean?

25   A.     The -- for us our 10 code is 1033, a 33 run.

24

1    It's a person with a gun dispatched, and it

2    involved -- it's a high-priority Priority 2 run.  It

3    involves a lot of officer safety issues initially when

4    responding.

5    Q.        Got it, okay.  And again, understanding that

6    presumably there would be a record of your full

7    testimony at the hearing, so I'm not trying to

8    mischaracterize anything.  But as a general matter,

9    were your opinions in the Rosen matter that all of the

10   alleged use of force was reasonable?

11   A.        Yes, sir.

12   Q.        What was the outcome of that arbitration?

13   A.        The arbitrator ruled in favor of the initial

14   chain of command and that his force was reasonable but

15   upheld the -- not the termination recommended by the

16   chief but additional discipline, or downgraded the

17   discipline.

18   Q.        Okay.  So the arbitrator found the force to

19   be -- would the determination have been within policy?

20   Is that what they would determine in an arbitration?

21   A.        They could.

22   Q.        Okay.

23   A.        And in this case the arbitrator ruled that

24   rather than termination, the proper discipline was a

25   number of hours that --

                                                                    25

1   Q.          Okay.

2   A.          -- Officer Rosen had to forfeit.  I don't

3   remember exactly what the number of hours was.

4   Q.          Okay, all right.  So was the -- I think I

5   need to clarify this a little bit then.  Was the

6   original chain of command determination -- was the

7   original determination that the force was within

8   policy?

9   A.          Yes, sir.

10  Q.          All right.  And so there would have been no

11  recommended discipline for that; correct?

12  A.          Correct.

13  Q.          Okay.  And then at the higher level chain of

14  command they overturned that finding; correct?

15  A.          They made it outside of policy.

16  Q.          Outside of policy, sought to terminate?

17  A.          Correct.

18  Q.          Then the FOP challenged that on behalf of

19  the member through the arbitration; correct?

20  A.          Correct.

21  Q.          The arbitrator found -- I guess, as far as

22  the use of force -- here's where I'm confused, because

23  you said that the arbitrator agreed with the initial

24  chain of command determination but then still --

25  A.          The way I understood --

26

1    Q.         -- still recommended discipline?

2    A.         The way I understood the arbitration's

3    ruling -- and again, this was several years ago.

4    Q.         Sure.

5    A.         Was that it was -- the force itself was a

6    reasonable response, yet the reporting of the force --

7    Q.         Okay.

8    A.         -- is ultimately what he determined -- the

9    arbitrator determined was discipline -- was why the

10   discipline --

11   Q.         Okay.  And again, I'm not -- I understand

12   that there would be a written determination somewhere.

13   A.         Right.

14   Q.         So I'm not trying to hold you to -- if we

15   see that determination and we see something is a

16   little bit different, I'm not trying to hold you to

17   it.

18   A.         Okay.

19   Q.         I'm just trying to get an understanding of

20   these cases that you've served as an expert in.

21   A.         Sure.

22   Q.         That's all.

23   A.         That's how I remember it.

24   Q.         Okay.  Do you recall in that arbitration,

25   the Rosen arbitration, was there a report?  Did you

27

1   write a report, an opinion report?

2   A.        I did not, no, sir.

3   Q.        Okay.  Do you recall if there was another

4   expert on the other side of the case?

5   A.        The other side called multiple chain of

6   command.

7   Q.        Okay.

8   A.        Deputy chiefs, chief, all the way down, I

9   believe, to the commander level.  But I'm not sure if

10  they testified to use of force specifically as a use

11  of force expert or just in a general sense.

12  Q.        Understood.

13  A.        To my knowledge, they did not call a

14  specific use of force expert.

15  Q.        Yeah, so in contrast, for that Rosen

16  arbitration you had no involvement at all in either

17  the underlying encounter or in the -- any possible

18  disciplinary reviews or anything like that?

19  A.        No, sir.

20  Q.        You were called in after the fact to

21  evaluate the case and give your opinions?

22  A.        Correct.

23  Q.        And to the best of your knowledge, there was

24  nobody equivalent doing that on the City side; is that

25  fair?

28

1  A.        Correct.

2  Q.        Okay.  All right.  So in both of the

3  matters, the Davis case and the Rosen arbitration --

4  before I move forward, just to be clear, so those are

5  the only two matters in which you've provided any

6  expert opinion reports or testimony?

7  A.        Yes, sir.

8  Q.        Okay.  Are there any -- I have to use the

9  term "matters" broadly 'cause there could be, you

10 know, asserted claims; there could be litigation; it

11 could be an arbitration matter.  Are there any matters

12 similar to what -- you know, similar to what we've

13 talked about, where you've been consulted to review a

14 use of force even if you didn't ultimately write a

15 report or give testimony?

16 A.        In a general sense, I mean, that happens

17 throughout the year quite often.

18 Q.        Okay.

19 A.        Where there will be various things that

20 happen, whether it be with the City of Columbus or an

21 outside agency.  They may call our office and talk to

22 me or one of our other experts and just say, hey --

23 and we don't rule on policy one way or the other, but

24 we will give them, like, training, how we would train

25 specific incidents.

29

1          So in a sense we're, you know, advising on

2     training-specific topics as they relate to that

3     specific use of force.

4     Q.          I think I understand.  That's really

5     helpful.  So in those other situations you're being

6     contacted not necessarily as a potential expert in a

7     disputed, you know, litigation or arbitration matter,

8     but as somebody who trains in this area, giving input

9     on, hey, here's what you might address; is that fair?

10    A.          Correct.

11    Q.          Okay, all right.  So then in terms of actual

12    engagements as a potential expert witness, it's just

13    the Davis case and the Rosen arbitration?

14    A.          Yes, sir.

15    Q.          All right.  And in both of those matters you

16    were retained and offered opinion on behalf of the

17    party or parties that were taking the position that

18    the force was reasonable; correct?

19    A.          Correct.

20    Q.          Have you ever been retained by a party

21    making an excessive force claim against the police?

22    A.          No, sir.

23    Q.          Would you ever even consider being retained

24    in a matter like that, on behalf of the party making

25    the excessive force claim against the police?

30

1  A.          Being an expert witness is part of my job

2  duties as a defensive tactics instructor.  So I'm

3  called by the city attorney, whether they're a

4  plaintiff or defendant -- I guess they wouldn't be a

5  plaintiff -- so I'm simply responding to the request

6  that's within my job assignment.

7           So I don't do this type of testimony outside

8  of work, so I couldn't say one way or the other

9  because I -- that's not part of my normal assignment.

10  Q.          Understood, okay.  And you make a fair

11  point.  The only time that you would consider serving

12  as an expert witness is when it arises in the scope of

13  your employment by the City of Columbus; true?

14  A.          Correct.

15  Q.          All right.  We've talked about your

16  testimonial history as an expert.  Have you -- outside

17  of being offered as an expert witness, have you given

18  testimony in either a deposition or in court as a fact

19  witness?

20  A.          Yes, sir.

21  Q.          Roughly how many times have you testified as

22  a fact witness, other than an expert witness?

23  A.          And you're counting criminal, civil

24  litigation, or perhaps misdemeanor traffic type?

25  Q.          Just a general ballpark, and then we'll --

31

1   A.          Couple dozen maybe.

2   Q.          And some of those matters, I think you were

3   just starting to touch on, would have been probably

4   back from your time as a patrol officer when you

5   had --

6   A.          Yes, sir.

7   Q.          -- you know, made an arrest, the case goes

8   to trial, something you may need to testify about --

9   A.          Correct.

10  Q.          -- your observations; correct?

11  A.          Correct.

12  Q.          What about civil cases where you've been not

13  retained as an expert or offered as an expert?  Have

14  you testified in any civil cases?

15  A.          I testified in my role as a patrol officer

16  in a civil litigation case against a hospital in which

17  I was the officer that brought a suspect in custody.

18  That is a transfer of custody case.  And that

19  individual ended up suing, I believe, the hospital or

20  retail store.  And then I was brought in to testify in

21  the arbitration as a fact witness.

22  Q.          Okay, understood.  Have any of the cases

23  where you've testified as a fact witness or as a

24  non-expert, have any of those cases involved

25  allegations of excessive force?

32

1   A.        No, sir.

2   Q.        And would that be true about both

3   depositions and trial testimony?

4   A.        Correct.

5   Q.        Aside from the two matters we discussed

6   where you served as an expert, have you given

7   testimony in a case where -- let's take it broader

8   than just alleged excessive force.  Have you ever

9   testified in a case involving allegations of some kind

10  of misconduct against an officer, a police officer?

11  A.        No, sir.

12  Q.        When you mentioned earlier that occasionally

13  you'll receive questions about kind of for, I guess,

14  training purposes, questions about the way something

15  went down, and you might give guidance or

16  recommendations to another agency asking for input; is

17  that fair?

18  A.        That's fair.

19  Q.        Okay.  In any of those matters are you -- do

20  you give, sort of, an assessment of whether in that

21  particular incident excessive force was used?  Is that

22  part of what you're doing in that situation?

23  A.        No, we don't -- I wouldn't make a

24  determination one way or the other on the

25  reasonableness of the force.  It's generally a

33

1  question -- specifically from outside agencies, since

2  you asked this, it's generally because we train

3  outside agencies as part of our police academy.  They

4  go out to the street; they act -- you know, are

5  involved in an incident; they may call us as trainers

6  and say, hey, how was this officer trained to respond

7  in this case.

8  Q.       Gotcha, okay.

9  A.       And then we can give their training

10  principles that we provided, and then they determine

11  whether the force was reasonable or excessive.

12  Q.       Understood.  Okay.  So in those situations,

13  when you're getting those other inquiries, you're not

14  doing anything like what you did for this case?

15  A.       No, sir.

16  Q.       Okay.

17  A.       Very informal.

18  Q.       Have you during your time as an officer ever

19  been alleged to have used excessive force, to your

20  knowledge?

21  A.       No, sir.

22  Q.       When you were first contacted about this

23  matter, without getting into the specifics of

24  conversations, were you -- I mean, were you provided

25  documents right away, or was it just a verbal summary

34

1   at first?  How did you become, sort of, familiar with

2   the case when you were first contacted?

3   A.         Well, I had seen the initial body camera

4   video that was released after the incident, and then

5   sometime later -- and I'm not quite sure of the time

6   frame -- but several months later I was contacted by

7   the city attorneys and was informed of the pending

8   litigation and that they -- and it was kind of a basic

9   summary.  And then I was given the materials --

10  Q.         Materials to review.  So you said you had

11  seen the video released several months -- the video

12  you saw several months before the city attorney's

13  office contacted you?

14  A.         I believe so, because it was released in the

15  media initially, if I remember correctly.  And then

16  several months after that is when I was contacted as

17  the expert.

18  Q.         Gotcha, okay.  When you then began your

19  review -- and I believe that your report includes a

20  list of the materials you considered.

21  A.         Yes, sir.

22  Q.         While we're on that, is there anything -- if

23  you look at Exhibit 1 of your deposition, is there

24  anything that you considered in arriving at your

25  opinions that's not listed?  And it's on pages 12

35

1    and -- oh, yeah, you're there.  Okay.  Yeah, take a

2    look at the materials reviewed section, please, on 12

3    and 13 of your report.

4    A.        Uh-huh.

5    Q.        And my only question is whether that's a

6    complete list of the materials you considered?

7    A.        Yes, sir, I believe that's complete.

8    Q.        The first item listed on your materials

9    reviewed is, Internal Affairs Sergeant Berman's

10   investigative summary.  Do you see that?

11   A.        Yes, sir.

12   Q.        So you were aware before you formed your

13   opinions in this case, you were aware of the outcome

14   of the Internal Affairs investigation; is that fair?

15   A.        This isn't listed in order of review.

16   Q.        Okay.

17   A.        So I would have -- I very well could have

18   formed my opinion before I read the IA investigation.

19   I'm not quite sure of the order, because I had the

20   videos; I had the officer's written report; and then I

21   also had the IA investigative summary.  And I would

22   have read all of that.

23   Q.        Okay.

24   A.        While forming my opinion, I guess, is the

25   best way to put that.

36

1    Q.        All right, understood.  So in terms of the

2    order, you just don't know, as you sit here today,

3    whether you reviewed the investigative summary before

4    you formed your opinions in the case?

5    A.        I believe that I was -- I read the

6    investigative summary as I was forming the opinion.

7    Q.        Okay.  When you started your work on the

8    case, you knew that one or more officers had been

9    accused of excessive force; correct?

10   A.        Correct.

11   Q.        Did you know the outcome of the IAB

12   investigation before you received the materials that

13   you reviewed?

14   A.        I believe the IA investigation was part of

15   the initial materials, so I would have had it.

16   Q.        Okay.

17   A.        Yes, sir.

18   Q.        And I appreciate that.  My question is

19   slightly different.  I'll try to reword it, because I

20   know you told me that before you -- you had some

21   initial conversations before you started receiving and

22   reviewing materials; is that fair?

23   A.        Initial conversations with city attorneys.

24   Q.        Yes.

25   A.        Yes, sir.

1    Q.        Okay.  Do you recall knowing of the outcome

2    of the IA investigation before you received any

3    materials on the case?

4    A.        I don't recall knowing that, no, sir.

5    Q.        Okay.  So generally, what was your process

6    in reviewing this case in order to develop and form

7    your opinions?

8    A.        I generally take all information provided,

9    and then I will weigh that information with our

10   current training protocols and curriculum and then

11   form my opinion based on that.

12   Q.        Okay, all right.  Did you speak to any of

13   the officers involved in the incident?

14   A.        No, sir.

15   Q.        All right.  And in terms of the opinions

16   that you form in this case, in your words what is it

17   that you're opining on?  Is it -- well, just let me

18   ask you generally, in your words what is it that

19   you're opining on in this case?  Not the -- strike

20   that.  Let me clarify my question.

21           Kind of, what questions are you answering

22   when you give your opinions in this case?  I

23   understand what the opinions are, but what did you

24   think your questions were that were posed to you?

25   A.        I understood there was a claim of excessive

38

1    force against the officers and that I was giving my

2    opinion as to whether that force was reasonable or

3    not.

4    Q.        Okay.

5    A.        And that involved both Level 0, Level 1, and

6    Level 3's use of force.

7    Q.        Okay.  And when you say reasonable or not,

8    are you talking -- 'cause if you look at pages 10 to

9    12 of your report -- and we'll get into specifics down

10   the road -- but pages 10 to 12, your concluding

11   opinions, each of those headings talks about the

12   decisions or actions complying with generally accepted

13   police practices and procedures.  Do you see that?

14   A.        That's correct.

15   Q.        Is that the question that you were answering

16   as to each of these issues, is compliance with

17   generally accepted police practices and procedures?

18   A.        That would be one of the questions, yes,

19   sir.

20   Q.        Okay.  We'll come back to some specifics in

21   a few minutes here.  All right.  You're aware at this

22   point that James Burk, one of the plaintiffs in this

23   case, was serving as an agent of the Bureau of

24   Alcohol, Tobacco, and Firearms at the time of the

25   incident at issue; correct?

39

1   A.          Yes, sir.

2   Q.          We'll call that ATF.  Is that okay?

3   A.          Yes, sir.

4   Q.          Have you ever served as an agent or officer

5   for ATF?

6   A.          No.

7   Q.          Do you have any personal knowledge of ATF's

8   policies and procedures?

9   A.          No.

10  Q.          Any personal knowledge of how ATF agents are

11  trained?

12  A.          No.

13  Q.          Any personal knowledge of how ATF agents are

14  supervised?

15  A.          No, sir.

16  Q.          Have you yourself ever trained any ATF

17  agents?

18  A.          Not to my knowledge.

19  Q.          All right.  And it's -- I suppose it's

20  possible that some officer that you trained at some

21  point could have then at some point also have been an

22  ATF agent, so let me ask a different question.  Have

23  you provided any training to any officers or agents

24  specific to ATF operations?

25  A.          No, sir.

40

1  Q.        And you've never been employed by the ATF in

2  any capacity; correct?

3  A.        I was not employed.  In college I did an

4  internship with the ATF --

5  Q.        Okay.

6  A.        -- I should mention.  I was in the Toledo

7  office.

8  Q.        Was that like a summer internship, a

9  school-year internship?

10  A.        School-year internship.

11  Q.        And was that when you were studying for

12  your --

13  A.        Bachelor's.

14  Q.        -- bachelor's in criminal justice?

15  A.        Yes, sir.

16  Q.        All right.  So would that have been -- so

17  you earned your bachelor's in '06, so that would have

18  been sometime in, I'm assuming, the '02 to '06 time

19  frame?

20  A.        Correct.

21  Q.        During your internship in the Toledo office

22  of ATF, did you receive any training or education

23  about any field enforcement protocols or policies for

24  ATF?

25  A.        Not that I recall.

41

1    Q.         Have you heard the phrase knock and talk as

2    it relates to ATF operations before?

3    A.         Specifically ATF, no, but as a general law

4    enforcement term, yes, sir.

5    Q.         As a general law enforcement term what would

6    you understand that to mean?

7    A.         An individual is seeking information with

8    somebody that's inside that residence.  So they knock,

9    announce, identify themselves as a law enforcement

10   officer, and -- as part of an investigation typically.

11   Q.         Okay.  Is that what Mr. Burk was doing in

12   this -- or I'm sorry -- is that what Agent Burk was

13   doing in this case?

14   A.         I believe he claimed he was doing a knock

15   and talk, yes, sir.

16   Q.         Do you have any reason to dispute that?

17            MS. PICKERILL:  Objection.  Go ahead if you

18   know.

19   A.         I have no reason to dispute it, no, sir.

20   BY MR. KEYES:

21   Q.         Have you ever attempted to recover a firearm

22   from a convicted felon?

23   A.         No, sir.

24   Q.         All right.  Let's do this.  Why don't we

25   take a short break because I'm going to put one of the

42

1    videos up.  We can go off the record.

2                    (Recess was taken.)

3    BY MR. KEYES:

4    Q.        Officer Vehr, there is in front of you

5    Exhibit 1 to your deposition, your report.  Here,

6    we'll move that deposition notice out of the way for

7    now.  Okay.  So I wanted to -- we're going to look at

8    a couple of items in a moment here, but I want to look

9    at an item you mentioned in your summary of

10   conclusions, which is on page -- or I'm sorry, it's in

11   the overview of the incident on page 2.

12                    The first paragraph, it talks a little bit

13   about the dispatch information -- by the way, on that

14   point, from your review of the case do you recall

15   whether Officer Fihe was ever told before arriving at

16   the scene that Agent Burk had provided a name and a

17   badge number to the person that was inside the

18   apartment?

19   A.        I don't recall.  To my knowledge, is that he

20   was not provided that on the radio traffic.

21   Q.        Okay, okay.  Would that information, if it

22   was provided, hypothetically, would that be relevant

23   to any of the opinions or assessments that you've

24   given in the case?

25   A.        Not necessarily.  It would have been

43

1   relevant information to identifying him as an ATF

2   agent.

3   Q.        Sure.

4   A.        But specifically how the officers approached

5   the situation, it would have -- I think they would

6   have approached the same way, hypothetically.

7   Q.        Okay.  From your review of the case, are you

8   aware of whether -- I believe we have a document on

9   this.  Strike that.  Oh, here we go.  I'm going to

10  hand you what was previously marked as Exhibit 2 at

11  Officer Fihe's deposition.

12  A.        Okay.

13            MS. PICKERILL:  Thank you.

14            MR. KEYES:  You're welcome.  I do have an

15  extra.  There we go.

16  BY MR. KEYES:

17  Q.        And this is a one-page document with the

18  heading display event at the top.  Do you see that?

19  A.        Yes, sir.

20  Q.        Do you recall this document being among the

21  materials you reviewed in this case?

22  A.        I do.

23  Q.        Okay.  What would you call this document?  I

24  mean, I know it says display event, but is this a --

25  A.        This is a printout from the dispatcher and

44

1    the specific dispatch run details provided through our

2    CAD system.

3    Q.        Okay.  The CAD system being -- what is the

4    CAD system?

5    A.        It's essentially our dispatching system that

6    sits on our computer in the cruiser.

7    Q.        Okay.  So the information on the -- under

8    the remarks section, there's a bunch of time codes and

9    some comments.  Do you see that?

10   A.        I do.

11   Q.        Is that information that would be displayed

12   on the monitor in the cruiser to the responding

13   officer?

14   A.        Potentially, but sometimes it depends on

15   what's up on the screen initially.

16   Q.        Okay.

17   A.        So there could be something in front of this

18   on the computer, like a map or the patrol view itself.

19   So as this updating, it's not going to -- it won't

20   display unless we click on the actual CAD system.

21   Q.        Okay.

22   A.        And then in addition to that, sometimes

23   these remarks are behind the time stamp when it is

24   provided to the computer.  And I don't know if it is

25   specifically in this case, but that happens in my

45

1  experience.

2  Q.        Meaning the time code we see might be

3  earlier than when the remark appears in the CAD?  Is

4  that what you're saying?

5  A.        No, sir, vice versa.

6  Q.        Oh, okay.  Oh, so the --

7  A.        So that the time code that we get here may

8  not specifically correlate to the time that it popped

9  up on the CAD and the cruiser.

10  Q.        Okay.

11  A.        There could be a delay based on signal and

12  various things that happen with laptops.

13  Q.        I understand.  I think we're on the -- so

14  the remark popping up on the CAD could happen later

15  than --

16  A.        Than what it says here.

17  Q.        -- what the time code says?

18  A.        Potentially.

19  Q.        Understood, understood, all right.  And so

20  as you sit here, you don't know whether -- so if we

21  look at the -- and I understand that caveat you just

22  gave me, but the time code 13:58:50 says his name is

23  Jim Burk, Badge No. 4672.

24           As you sit here, you don't know whether that

25  information was displayed to -- whether Officer Fihe

46

1  would have seen that information displayed on the CAD

2  or not; is that fair?

3  A.       That's fair.  I don't know that, sir.

4  Q.       You can set that aside.  Going back to

5  Exhibit 1 of your deposition, your report, under

6  overview of the incident on page 2, the second

7  paragraph of that section, starting Officer Fihe

8  approached the male, you see that?

9  A.       Yes, sir.

10  Q.       It refers to Agent Burk refusing to comply

11  with the verbal commands of Officer Fihe.  Do you see

12  that line that you put in there?

13  A.       Yes, sir.

14  Q.       Would that be a relevant factor in your

15  assessment of the reasonableness of the force that was

16  ultimately used in this case, whether Agent Burk was

17  complying or refusing to comply with Officer Fihe's

18  verbal commands?

19  A.       Yes, sir.

20  Q.       How does that issue, compliance or

21  noncompliance with verbal commands, how does that

22  factor into your analysis of whether any particular

23  use of force was reasonable or not?

24  A.       Well, I would say it factors heavily on the

25  initial approach.  If there's compliance, that would

47

1    indicate that -- and specifically in this case that

2    would indicate that Mr. Burk is complying.  And the

3    run, as we looked at the details, initially came in

4    that there was a person saying they were a police

5    officer or saying they were law enforcement.

6          So we would expect compliance on that

7    initial approach.  And if we don't have compliance,

8    then we would have to treat him as any other potential

9    burglary suspect.

10   Q.     Okay.  So I think I understand.  So as far

11   as initial approach, if the responding officer is

12   giving verbal commands and the subject is not

13   complying, then you're saying, well, you have to treat

14   that as any other felony suspect at that point?

15   A.     Correct.

16   Q.     Did I understand you correctly?

17   A.     Correct.

18   Q.     And if he is complying, how does that affect

19   the situation?

20   A.     Well, if he is complying, then that changes

21   the potential response --

22   Q.     Okay.

23   A.     -- of the officer.  So in this case if he

24   had complied with the initial order of, turn around,

25   show me your hands, that would likely change the

48

1    behavior of Officer Fihe.

2    Q.        Okay.  And let's take that a step further.

3    So if he had complied with the initial order, turn

4    around, show me your hands, how would that -- in your

5    assessment how would that have affected the events

6    that unfolded after that point?

7              MS. PICKERILL:  Objection.  Go ahead.

8    A.        I would -- and this is hypothetical because

9    I don't believe that he did comply with that initial

10   order.  But I would expect the officer would then call

11   him back to his point of cover or potentially wait for

12   a second officer, and that's what we would train him

13   to do in that case.

14   BY MR. KEYES:

15   Q.        Okay.

16   A.        And then secure him and retrieve the

17   identifying information.

18   Q.        Gotcha, okay.  Okay.  All right.  Let's --

19   I'm going to pull up what I'll represent is a portion

20   of Officer Fihe's body cam footage from the incident.

21   This was previously marked as Exhibit -- Plaintiff's

22   Exhibit 4 at Officer Fihe's deposition.  And I know --

23   so Officer Fihe's body-worn camera, that was some of

24   the material that you reviewed in forming your

25   opinions in this case; correct?

49

1    A.        Yes, sir.

2    Q.        The file that we have on this flash drive is

3    about -- let me make sure I'm doing this correctly --

4    roughly twenty-one minutes long, give or take.  Does

5    that -- in terms of your memory of your review, does

6    that sound about right as far as the length of his

7    body cam footage from the incident?

8    A.        Yes, sir.

9    Q.        Okay.  And so we're not going to sit here

10   and watch the whole thing.  I'm going to jump to a few

11   points because I do have some specific questions.  So

12   I'll represent that we have this open at the formative

13   55-second time code.  And what you'll see when I hit

14   play is this is shortly before he -- this is as he's

15   arriving at the apartment complex.

16           And I will -- actually, I need to open this

17   in the other player.  Excuse me one moment.  One

18   moment, excuse me.

19                (Video played off record.)

20   BY MR. KEYES:

21   Q.        All right.  So I've got this stopped right

22   about five minutes here, and we see --

23           MR. KEYES:  This part is on the record.

24   BY MR. KEYES:

25   Q.        We see Officer Fihe still in his car at this

50

1    point; correct?

2    A.        Correct.

3    Q.        Okay.  And I'm going to go ahead and hit

4    play.

5                   (Video played off record.)

6    BY MR. KEYES:

7    Q.        All right.  So now at about the 5:11 -- 5:10

8    or 5:11 time code, he's exited his patrol car;

9    correct?

10   A.        Correct.

11   Q.        But do you --

12             MR. KEYES:  Off the record for a second.

13   BY MR. KEYES:

14   Q.        So -- okay.  So at this point, 5:11 on the

15   time stamp on this machine, Officer Fihe has exited

16   his patrol car; correct?

17   A.        Correct.

18   Q.        And we see the red truck in about the middle

19   of the screen.  That's -- and we know that's between

20   him and Agent Burk; correct?

21   A.        Yes, sir.

22   Q.        Can we see Agent Burk yet in this frame?

23   A.        It appears so, up at the door.

24   Q.        Okay.  And can you tell which way Agent Burk

25   is facing at that point?

51

1    A.        I cannot.

2    Q.        All right.  Let's go ahead and advance.  And

3    I'll represent to you what I'm going to do.  I'm going

4    to let this play for a few seconds, and if there are

5    specific items we need to slow down on -- and I think

6    there are a couple we can kind of do -- look at some

7    individual frames.

8    A.        Okay.

9    Q.        All right.  So I'm going to go ahead and hit

10   play, starting at 5:11 here.

11                  (Video played off record.)

12   BY MR. KEYES:

13   Q.        So between 5:11 and 5:16, you agree with me

14   Officer Fihe tells Agent Burk, turn around, let me see

15   your hands?

16   A.        Yes, sir.

17   Q.        Okay.  At this point we can see Agent Burk;

18   correct?

19   A.        Correct.

20   Q.        And that's him just to the -- if we were

21   describing it as a landmark, if we look at that red

22   truck, just kind of to the right of the front

23   passenger window we can see Agent Burk; correct?

24   A.        Correct.

25   Q.        Okay.  What direction is Agent Burk facing

52

1   at that point?

2   A.          I can't tell.

3   Q.          You can't tell.  Okay.  Let's go ahead and

4   advance the video a little bit, starting from 5:16.

5                (Video played off record.)

6   BY MR. KEYES:

7   Q.          Okay.  So what I'm trying to find out is, as

8   best we can tell from the video-- and I've paused it

9   at 5:20 again -- now, at this point by 5:20 we can see

10  Agent Burk is facing Officer Fihe; correct?

11  A.          Correct.

12  Q.          If we go back to 5:16 -- it's not going to

13  be as precise -- here, we'll start it at 5:14.  I'm

14  going to do a frame-by-frame advance to see if we can

15  try to pinpoint as best as possible which way Agent

16  Burk is facing, starting at the 5:14 mark.

17              All right.  I've advanced a few frames still

18  at 5:14.  Can we see yet which way Agent Burk is

19  facing?

20  A.          I cannot.

21  Q.          I'm sorry to be leaning so close to you.

22  A.          No, that's okay.

23  Q.          I don't think there's a better way to do

24  this.  We're still at 5:14.  Any way to tell yet which

25  way Agent Burk is facing from this camera?

53

1    A.       I cannot.

2    Q.       Now we've entered into the 5:15 time code.

3    Can you see which way he's facing yet?

4    A.       No, sir.

5    Q.       And if we keep advancing here, okay, now

6    we're at the 5:16 time code.  And I'm going to ask you

7    to look carefully at Agent Burk in this frame.

8    A.       Okay.

9    Q.       Do you have a better sense of whether he was

10   facing Officer Fihe at this point or not?

11   A.       It appears he's facing to the side.

12   Q.       To the side, okay.  And Officer Fihe is

13   coming -- I suppose from this angle it would look like

14   Officer Fihe is coming from what would be over Agent

15   Burk's, sort of, left shoulder; is that fair?

16   A.       I'd say that's fair, yes, sir.

17   Q.       And so Agent Burk appears to be still at the

18   door of the apartment; correct?

19   A.       I believe so, yes.

20   Q.       Okay.  Okay.  Now I'm going to go back a few

21   seconds, and we're going to run this sequence again.

22   We'll start at 5:03.

23   A.       Okay.

24                  (Video played off record.)

25

54

1   BY MR. KEYES:

2   Q.        All right.  So by 5:16, where we saw Agent

3   Burk, he still has his back to Officer Fihe; is that

4   correct?

5   A.        Appears so.

6   Q.        Okay.  And then I paused it at 5:16, right

7   after Officer Fihe said, turn around, let me see your

8   hands; correct?

9   A.        Yes, sir.

10  Q.        Okay.  Now, if we advance a few more

11  seconds, we're now at the 5:18 time code.  And would

12  you agree with me -- Oops, I'm sorry, I'll have to go

13  back to that.  We'll just run it from 5:04 again, and

14  we'll try to stop right around that 5:18 time code.

15              (Video played off record.)

16  BY MR. KEYES:

17  Q.        All right.  And so here we are at the 5:18

18  time code.  And would you agree with me that Agent

19  Burk has turned around at that point?

20              MS. PICKERILL:  Objection.  Go ahead.

21  A.        I think that's subjective to if -- when

22  Officer -- when the officer made the command, was he

23  asking Mr. Burk to turn facing him or turning facing

24  away from him?  Because when we say turn around, we

25  typically mean face away from us.  So he turned and

55

1  faced toward him, I would agree with you.

2  BY MR. KEYES:

3  Q.        So when Officer Fihe gives the command to

4  turn around, Agent Burk is facing away from Officer

5  Fihe; correct?

6          MS. PICKERILL:  Objection.  Go ahead.

7  A.        No, sir, I don't believe so.  I believe he's

8  facing toward the side.  And he says the command twice

9  as he's turning, which to me would tell me that the

10 officer intended for him to turn away from him.

11 BY MR. KEYES:

12 Q.        I see, okay.  So in any event, whether you

13 think he's facing to the side of -- I'm sorry, let me

14 walk that back.  So if Agent Burk -- we can agree that

15 when Officer Fihe gives the command to turn around, do

16 we agree that Agent Burk is not facing Officer Fihe

17 yet at the time Officer Fihe first gives that command?

18 A.        Yes, sir.

19 Q.        Okay.  Now, at 5:18 Agent Burk is facing

20 Officer Fihe; correct?

21 A.        It appears so, yes, sir.

22 Q.        And he has his hands out and extended;

23 correct?

24 A.        Correct, with something in his left hand.

25 Q.        Yeah.  And we'll talk about that in a

1    second, but he has his hands out and extended to the

2    sides; correct?

3    A.        Correct.

4    Q.        Not pointing forward?

5    A.        No, sir.

6    Q.        Not behind his back; just out and to the

7    sides.  Correct?

8    A.        Correct.

9    Q.        Okay.  So at this point which of the

10   commands that Officer Fihe gave do you contend Agent

11   Burk had not followed?

12   A.        I believe Officer Fihe was likely commanding

13   Mr. Burk to turn away from him and to turn around.

14   And as he faced and he said, turn around, let me see

15   your hands, he faced toward him, and he didn't turn

16   around.  So that was one of the commands.  I don't

17   feel Mr. Burk complied.

18           And Mr. Burk should also -- like, he should

19   be aware that as officers approach and when we say

20   turn around, common practice is that they turn away

21   from us.

22   Q.        Okay.  We'll get to that in a moment.  But

23   as far as the words that Officer Fihe used, you're

24   saying that Agent Burk did not follow the command to

25   turn around.  That's your position?

57

1    A.         I believe he did not follow the -- he didn't

2    react the way that Officer Fihe expected him to react

3    with that command.

4    Q.         Understood.  But he did turn around, you'd

5    agree with that; correct?

6               MS. PICKERILL:  Objection.  Go ahead.

7    A.         He turned and faced the officer, yes, sir.

8    BY MR. KEYES:

9    Q.         Okay.  Well, I want to make sure we're clear

10   on our words.  When Officer Fihe says, turn around,

11   show me your hands, at that point when he says that

12   command, Officer -- or excuse me -- Agent Burk is not

13   facing him yet; correct?

14   A.         Correct.

15   Q.         And so after Officer Fihe says, turn around,

16   show me your hands, you agree with me, Agent Burk

17   turns around?

18   A.         The first --

19               MS. PICKERILL:  Objection.  Go ahead.

20   A.         The first time or the second time?

21   BY MR. KEYES:

22   Q.         Well, let's listen to how quickly that

23   happens here.

24                    (Video played off record.)

25

58

1    BY MR. KEYES:

2    Q.        So he says it twice within a matter of one

3    second.  Would you agree?

4    A.        Correct.

5    Q.        We can play that again if you need to hear

6    it.

7    A.        Roughly.

8              (Video played off record.)

9    BY MR. KEYES:

10   Q.        All right.  So the repeated line comes

11   within about a second of the first line; is that fair?

12   A.        Correct.

13   Q.        Okay.  And at that point Agent Burk turns

14   around; correct?

15             MS. PICKERILL:  Objection.  Go ahead.

16   A.        I believe he was turning around as he said

17   the first time.  And then he echoed the command

18   because he didn't do the desired response that the

19   officer was expecting.  He said, turn around, turn

20   around.

21   BY MR. KEYES:

22   Q.        Oh, so you're saying you believe Officer

23   Fihe was giving two different commands to turn around?

24   A.        No, sir.

25   Q.        Well --

59

1   A.        He said it twice, correct.  But within that

2   second he is reading the body language of Mr. Burk,

3   right, and it's also -- he's observing his behavior.

4   And if he determines that he needs to repeat the

5   command, then he repeated the command, which would

6   indicate to me that Mr. Burk didn't react the way he

7   expected him to on the first time.

8   Q.        When he repeats the command as quickly as he

9   does, isn't it likely that Agent Burk, as he's turning

10  around, was reacting to the first command he heard to

11  turn around?

12  A.        It's possible.

13  Q.        Okay.  And then, I mean, you talk a lot in

14  your -- well, strike that.  I don't need to refer to a

15  specific -- excuse me -- a point in your report, but

16  you're aware generally from your experience and your

17  training, of the concept of perception reaction time;

18  is that fair?

19  A.        Yes, sir.

20  Q.        Excuse me.  Agent Burk's act of turning

21  around, you can't, as you sit here today, say

22  whether -- strike that.  We'll move on.

23           In -- we're frozen on 5:18 again here.  You

24  see that?

25  A.        Yes, sir.

60

1   Q.        Okay.  At this point Officer Burk has shown

2   Officer Fihe his hands; correct?

3   A.        Correct.

4   Q.        And we agree -- well, I mean, we heard it on

5   the video.  We heard exactly what Officer Fihe has

6   said, turn around, show me your hands.  And he repeats

7   it twice very quickly; correct?

8   A.        Correct.

9   Q.        He doesn't say, turn your back to me, does

10  he?

11  A.        No, sir.

12  Q.        He doesn't say, drop your papers, does he?

13  A.        No, sir.

14  Q.        So in terms of just the words that Officer

15  Fihe used, what Agent Burk did was the things that

16  Officer Fihe told him to do up to this point; is that

17  fair?

18          MS. PICKERILL:  Objection.  Go ahead.

19  A.        I'm not sure what Mr. -- how Mr. Burk

20  perceived the commands, but it's not what the officer

21  expected him to do as a result of his commands.  So

22  the officer expected Mr. Burk to act a certain way,

23  namely turn away.  And he didn't do that, so he's

24  perceiving a failure to comply initially.

25

61

1    BY MR. KEYES:

2    Q.        If Agent Burk had his back to Officer Fihe

3    when Officer Fihe approached and Officer Fihe then

4    says, turn around, I mean, wouldn't -- the only way to

5    follow that command to be to do what Agent Burk did,

6    to turn and face him?

7             MS. PICKERILL:  Objection.  You can answer.

8    A.        If he's at his back, but I believe that

9    Mr. Burk was facing toward the side so -- and the

10   officer is approaching from a near side angle.  So

11   when he says turn around, he -- turn around, this way.

12   BY MR. KEYES:

13   Q.        So your opinion -- well, is it an opinion,

14   or are you assuming that Agent Burk -- excuse me --

15   does not have his back to Officer Fihe when Officer

16   Fihe approaches?  Do you want to look at it again?

17   A.        No.

18   Q.        Okay.

19   A.        I'm trying to think the way you phrased that

20   question, how to answer that properly.  Can you

21   restate that for me?

22   Q.        Yeah.  And what I'm getting at is you

23   mentioned Agent Burk facing to the side.

24   A.        Correct.

25   Q.        And that seems to be a significant point

62

1    that you're trying to make, and so I'm trying to

2    understand whether that is a -- if that is an opinion

3    you've formed, if it's a fact that you are saying you

4    know is true, if it's something that you're relying on

5    Officer Fihe's testimony, for example?  You know, I'm

6    just trying to figure out that statement that Agent

7    Burk is facing to the side.  What all informs that

8    statement?

9    A.        That's just my perception of how I'm viewing

10   the video.

11   Q.        I see, okay.

12   A.        Of his body position.

13   Q.        I understand.  Okay, okay.  And by the way,

14   I guess we should clarify, so if we're watching a

15   body-worn camera, that position at this time in 2020

16   would have been roughly where, about, say a second

17   button down on a button-down shirt?

18   A.        Yes, sir, roughly.

19   Q.        Okay.  So maybe about roughly 10 to

20   12 inches below an officer's line of sight; is that

21   fair?

22   A.        I think that's fair.

23   Q.        All right.  I'm going to play the

24   video again from this point, from the 5:18 time code.

25   Let's back up a second or two.  That's more than a

63

1   second or two but -- here, we'll start at 5:14.

2                    (Video played off record.)

3   BY MR. KEYES:

4   Q.        Okay.  So by 5:21 we see Officer Fihe has

5   his service revolver drawn and pointed in Mr. Burk's

6   direction; correct?

7   A.        It's not a revolver.

8   Q.        I'm sorry --

9   A.        Pistol.

10  Q.        Pistol, yep, my mistake.  Officer Fihe has

11  his service pistol drawn and pointed in Mr. Burk's --

12  or in Agent Burk's direction by 5:21 on this video;

13  correct?

14  A.        Yes, sir.

15  Q.        So in that -- starting again at 5:14 -- and

16  my question is going to be, between when we start to

17  play and when Officer Fihe draws his service pistol,

18  points it in Agent Burk's direction, my question is

19  going to be, are there additional commands of Officer

20  Fihe that you believe Agent Burk did not follow.

21  Okay?  So let's go ahead and play it.

22                    (Video played off record.)

23  BY MR. KEYES:

24  Q.        All right.  So -- and we'll get to, get on

25  the ground.  So up until that point where he draws the

64

1    pistol, that's what I'm focused on.  You heard a

2    couple of other commands there; correct?

3    A.        Yes, sir.

4    Q.        We heard another, let me see your hands?

5    A.        Correct.

6    Q.        And we heard, I need to see some ID;

7    correct?

8    A.        Correct.

9    Q.        Okay.  Which of those commands, if any, do

10   you believe Agent Burk did not follow at that point?

11   A.        We train our officers, plain-clothes covert

12   officers, that when a responding officer is en route,

13   or in this case, that the ID would be ready or would

14   be around the neck, such as mine, on the belt, or

15   perhaps even in a hand above the head.

16   Q.        Okay.

17   A.        So when he says, I need to see some ID, I

18   believe that he's perceiving that as noncompliance

19   with Mr. Burk because he's not doing one of those

20   things.  So we would expect when we're responding to

21   this type of run, that if somebody is indeed a police

22   officer -- as the run states, we don't know until we

23   arrive -- that we would have clearly visible a badge

24   or an ID.  So when he says, I need to see some ID,

25   that's what he's referring to.

65

1    Q.       Okay.

2    A.       I believe.

3    Q.       All right.  Did Agent Burk have anything

4    around his neck?  And I'm not sure if we can see it on

5    the video; I'm just curious if you remember from your

6    review of any of the reports or anything like that.

7    A.       I don't believe so.

8    Q.       Okay.

9    A.       But I can't tell from this angle.

10    Q.       Yeah, and maybe -- some of the shots later

11    on are a little bit up closer, so maybe we can see

12    there.  Okay.  So if I understand your answer

13    correctly -- well, first of all, let's do this.

14              (Video played off record.)

15    BY MR. KEYES:

16    Q.       All right.  So we're at 5:18.  I'm going to

17    hit play again.  You see -- I'm sorry, back to 5:18,

18    you see Agent Burk has his hands out; correct?

19    A.       Yes, sir.

20    Q.       Okay.  He keeps his hands out in those

21    intervening seconds between then and when Officer Fihe

22    draws his weapon -- or trains his weapon in that

23    direction; correct?

24    A.       Correct.

25    Q.       Okay.  So is he -- at that point would you

66

1    agree that he's complying with the command to, show me

2    your hands, that Officer Fihe has given?

3    A.        I know you said we would get back to the

4    papers in hand.

5    Q.        Yeah, yeah.

6    A.        But the papers in hand actually is going

7    to -- he's going to perceive that as well.  When we

8    say, show me your hands, we expect nothing in the

9    hands.

10   Q.        Okay.

11   A.        So if it's a file folder or if it's papers,

12   show me your hands, we would expect a reaction to drop

13   whatever you have and show me your hands, with nothing

14   in hand.

15   Q.        I see.

16   A.        So the very fact that he's holding his

17   papers and is not dropping them is also indication

18   that he's not reacting the way we would expect a

19   police officer to react.

20   Q.        I think I understand your testimony, but I

21   want to clear something up.  So you're saying -- and

22   you've mentioned a couple times that he's not reacting

23   in a way we, meaning Columbus Police Department

24   officers, would expect another officer to react; is

25   that fair?

67

1  A.          Another plain-clothes officer, the way this

2  officer was trained.

3  Q.          I understand, okay.  Meaning the way Officer

4  Fihe was trained?

5  A.          Fihe was trained, yes, sir.

6  Q.          Okay.  So then -- so when I ask about

7  whether Agent Burk has complied with a command or not,

8  is it true that your opinions are not just considering

9  the words of the command but the assumptions or

10 expectations that Officer Fihe would have about how

11 those words would be interpreted?

12         MS. PICKERILL:  Objection.  You can answer.

13 A.          Specific to this case, because we are

14 approaching a potential law enforcement officer, I

15 think that's fair to say.  He's expecting that person

16 to react the way a law enforcement in a plain-clothes

17 assignment would react or should react given the

18 circumstances.

19 BY MR. KEYES:

20 Q.          I see.  Okay.  So the words, show me your

21 hands, those are the words Officer Fihe says, but he's

22 expecting that -- even though he hasn't specifically

23 said to you, you're telling us that he would expect

24 Agent Burk not to just put his hands up and out the

25 way he did but also to drop whatever was in his hand,

68

1   in that folder?

2           MS. PICKERILL:  Objection.  Go ahead.

3   A.       I would assess the situation so that

4   training would tell him, show me your hands, means

5   nothing in hand.  And when there is something in

6   hand -- when you give that command, you're expecting

7   that person to drop whatever they're holding.

8   BY MR. KEYES:

9   Q.       Okay, all right.  Have you seen anything on

10  the video that we've watched so far that would suggest

11  that Agent Burk had any kind of weapon in that -- the

12  papers or the file folder that were in his left hand?

13  A.       No, sir.

14  Q.       Okay.  So then I think I understand where

15  we're sort of getting hung up a little bit.  If we

16  just take the words, show me your hands, has Agent

17  Burk done that at this point?

18          MS. PICKERILL:  Objection.  Go ahead and

19  answer.

20  A.       I mean, I would say no, because you can't

21  see the hand on the left.  He's got a folder blocking

22  it.

23  BY MR. KEYES:

24  Q.       Okay.  So if we see in his left hand -- all

25  right.  So we see there's a file folder or papers in

69

1    his left hand in that image there.  That's at 5:19 in

2    the video; correct?

3    A.        Okay, yes, sir.

4    Q.        Did Officer Fihe perceive how -- I mean, was

5    he gripping it from the side -- I mean, his entire

6    hand wasn't clearly concealed behind the paper 'cause

7    it would have fallen out; right?

8    A.        Right, but it's not clearly visible either.

9    Q.        Right.  But so he's holding it with at least

10   part of his hand --

11   A.        Sure.

12   Q.        At least part of his hand would be visible

13   in front of that file, because that's how you have to

14   hold a file when you've got it up like this; fair?

15   A.        Fair.

16   Q.        I need to see some ID, we heard that command

17   in there as well.

18   A.        Right.

19   Q.        If Agent Burk's ID is somewhere where he'd

20   have to reach for it, he couldn't both show Officer

21   Fihe his hands and produce ID at the same time; fair?

22   A.        Fair.

23   Q.        Okay.  And both of those commands come in

24   rapid succession, immediately one after the other;

25   correct?

70

1    A.        Correct.

2    Q.        Okay.  You agree, impossible for him to

3    comply with both of those commands?

4              MS. PICKERILL:  Objection.  Go ahead.

5    A.        Show me your hands.  I need to see some ID.

6    Keep in mind that you have to look at this through the

7    totality of the initial approach too, not just the

8    commands that he perceived were noncompliance prior to

9    that, about the turning around that we got hung up on.

10             So he's viewing that as noncompliance.  And

11   now, when he gives those commands, Agent Burk could

12   have had a -- maybe asked a question, is it okay if I

13   reach for my ID, or something like that.  It's -- but

14   he would -- because Agent Burk didn't have the ID out

15   initially, I would agree that he would have to hide

16   his hand to reach for his ID.

17   BY MR. KEYES:

18   Q.        Okay.  And so if hypothetically Agent Burk's

19   identification was in his pocket or at his hip

20   somewhere where he'd have to reach for it, if

21   hypothetically that were the case, you'd agree with me

22   that, I need to see some ID, and, show me your hands,

23   those two commands in rapid succession would have been

24   impossible for Agent Burk to follow those both at the

25   same time?

71

1   A.        Again, I don't know what the officer's

2   intent -- when he says, I need to see some ID, to me

3   he's expecting that ID to already be produced.  He's

4   already -- as we approach, we're approaching a scene

5   that involves a law enforcement officer who's in plain

6   clothes.  When I say, I need to see some ID, I expect

7   that ID to be present and visible.

8           So I need to see it.  And if I don't see it,

9   then that tells me something else, that this person --

10  it could potentially lead you to believe that this may

11  not be a law enforcement officer if there's no ID

12  present, or badge.  And I'm not sure what the

13  officer's intent -- obviously, you'd have to ask him,

14  when he said, I need to see some ID, was that a

15  question, or was that a statement.

16  Q.        Okay.  So in terms of that statement, I need

17  to see some ID, it sounds like you're not -- based on

18  what you just told me, you're not able to tell us

19  whether that's a command that was meant to produce

20  some kind of reaction or what Officer Fihe was

21  intending when he made that statement?

22  A.        I think he expected to see ID either in hand

23  or around his neck.

24  Q.        Okay.

25  A.        And he reacted and said, I need to see some

72

1  ID.

2  Q.        I see.  And so if Agent Burk didn't have

3  that ID in his hand or around his neck, would you

4  agree that perhaps it would have been unwise for Agent

5  Burk at this point to try to reach toward his hip or

6  into a pocket for some ID?

7  A.        At this specific point I would agree.

8  Q.        Okay.  Going back to the point we were

9  talking about with turning around -- well, let's play

10 this again.  I don't want to take it out of context.

11             (Video played off record.)

12 BY MR. KEYES:

13 Q.        We're coming up on 5:15.

14             (Video played off record.)

15 BY MR. KEYES:

16 Q.        All right.  I want to stop right there at

17 5:41.  We just heard Officer Fihe say, why wouldn't

18 you show me your ID when I got here; correct?

19 A.        Correct.

20 Q.        Okay.  What is -- if Agent Burk had ID on

21 him that was not already visible for -- you know,

22 whether it's in his pocket or it's at his hip or

23 something like that, wherever it is, would you agree

24 with me that from what we've seen on the video up to

25 this point -- this kind of relates to the question I

73

1   asked a moment ago but now a little bit further on --

2   up to this point where Officer Fihe says, why wouldn't

3   you show me your ID when I got here, would you agree

4   with me that if that ID was not already outwardly

5   visible, it would have been unwise for Agent Burk to

6   try to produce it?

7          For example, if it was in his pocket or at

8   his hip, that for this encounter that we've seen to

9   this point, it would have been unwise for Agent Burk

10  to try to produce that ID; is that fair?

11  A.      With his current posture and his current

12  demeanor, I would say, yeah, that's unwise.

13  Q.      And we're talking -- by the way, I want to

14  add to the circumstances here.  Officer Fihe has his

15  service pistol drawn on Agent Burk.

16  A.      Correct.

17  Q.      At that point, once that service pistol is

18  drawn, it would be unwise for anybody to reach for

19  their pocket or their hip to try to produce an ID that

20  wasn't already visible; is that fair?

21          MS. PICKERILL:  Objection.  Go ahead.

22  BY MR. KEYES:

23  Q.      Let me clarify that.  Without the officer's

24  express permission first.

25  A.      I would agree with that.

74

1    Q.        Okay.  And you would agree with me that at

2    no point does Officer Fihe tell Agent Burk to get --

3    up to this point that we've seen in the video, which

4    is at 5:41, at no point up to here has Officer Fihe

5    told Agent Burk to produce identification from his

6    pocket or wherever it might be that it's not currently

7    visible; is that fair?

8    A.        I believe Officer Fihe expected that to be

9    visible so --

10   Q.        Yeah, my question was a little bit

11   different.  Just about what we see in the video.

12   A.        Up to this point, he has not -- what was the

13   question?

14   Q.        Yeah, I'll re-ask the question.  Up to what

15   we've seen in the video so far, up to point -- about

16   five minutes and forty-one seconds, would you agree

17   that Officer Fihe has not instructed Agent Burk to

18   produce identification from a pocket or somewhere else

19   where it wasn't already visible?

20   A.        I agree.

21   Q.        All right.  We might be at a good time for a

22   break.  And at this point Officer Fihe has not

23   repeated his command to turn around since the initial

24   back-to-back we saw at the very beginning of the

25   engagement; is that correct?

75

1    A.        That's correct.

2    Q.        Even though Officer Burk -- or excuse me --

3    even though Agent Burk since that time has been facing

4    him; correct?

5    A.        And walking towards him, yes, sir.

6    Q.        Okay.  You agree with me since that time,

7    since the time Officer Fihe first told Agent Burk to

8    turn around -- and we saw -- you know, we saw the

9    video.  You were telling me you think Agent Burk is

10   kind of to the side at that point.  From that point

11   where Officer Fihe first tells him, twice in rapid

12   succession, to turn around, from that point forward,

13   Agent Burk is facing Officer Fihe.  Do you agree with

14   me?

15   A.        Correct.

16   Q.        And during that time, up until this point at

17   5:41, during that entire time that Agent Burk is

18   facing Officer Fihe, Officer Fihe does not tell him to

19   turn around again, does he?

20   A.        I don't believe so, no, sir.

21   Q.        All right.  Let's take a break there.

22                    (Recessed for lunch.)

23   BY MR. KEYES:

24   Q.        All right.  Officer Vehr, before the break

25   we were looking at a portion of the -- Officer Fihe's

76

1   body cam video.  I'm going to focus now on the time --

2   continuing on after he had drawn his service pistol

3   and trained it on Agent Burk.

4           And what I'd like to do -- I'm just going to

5   play the video, let it run for a little bit here, and

6   there are certain points where I may pause and ask you

7   to confirm certain things that you see.  But hopefully

8   not too many of these.  Okay?

9   A.      Okay.

10          MS. HOBBS:  What's the time stamp for this?

11          MR. KEYES:  Yeah, I'm going to reset it.

12  BY MR. KEYES:

13  Q.      All right.  We're picking up at 5:17 on my

14  player here.

15              (Video played off record.)

16  BY MR. KEYES:

17  Q.      All right.  I'm going to pause at 5:38.  And

18  Officer Vehr, one of the things I wanted to confirm, I

19  believe when we saw the papers in Agent Burk's hands

20  earlier -- and I can -- we can certainly back up if

21  you need a refresher.

22          But I believe we had seen them initially in

23  what would have been his left hand, and then near the

24  end of that clip where we just paused, by that point

25  they're also -- they're in his right hand.  Do you

77

1   agree with that?

2   A.        Yes, sir.

3   Q.        Okay.  So would you agree with me that by

4   this point in the video, at the latest at 5:38, at

5   this point Officer Fihe has seen both of Agent Burk's

6   hands; correct?

7   A.        Yes, sir.

8   Q.        And would you agree with me that at this

9   point it's plain enough to tell that that folder of

10  documents, papers, whatever it was, plain enough to

11  tell that that's what it is, is a bunch of papers, not

12  some kind of weapon or device or anything like that;

13  is that fair?

14  A.        Yes, sir.

15            MS. PICKERILL:  Objection.  Yeah, go ahead

16  and answer.

17  A.        I agree, yes.

18  BY MR. KEYES:

19  Q.        Now, I'm going to go ahead and play the

20  video again, and we're going to let it keep going.

21  And we're going to listen to a little bit of the

22  exchange in addition to seeing what the video shows.

23  Sorry, this is starting at 5:38.

24                  (Video played off record.)

25

78

1    BY MR. KEYES:

2    Q.        Okay.  My question about that exchange we

3    just saw, Agent Burk objects to getting on the ground;

4    correct?

5    A.        Correct.

6    Q.        And Officer Fihe says, stay where you're at;

7    correct?

8    A.        Correct.

9    Q.        Agent Burk says, yes.  And Officer Fihe

10   says, fine; correct?

11   A.        Correct.

12   Q.        Is that -- in terms of what you observe in

13   that video, based on your assessment of the exchange,

14   at that point is -- do you think that Officer Fihe's

15   approach that we saw in that exchange, essentially,

16   okay, if you're not getting on the ground, stay where

17   you are, fine, is that reasonable in your assessment?

18   A.        I'd say it is, yes, sir.

19   Q.        All right.  Now, we'll go ahead and play it

20   again.  And we're picking up at 5:55.

21                    (Video played off record.)

22   BY MR. KEYES:

23   Q.        Okay.  I'm going to pause at that point, and

24   we are at 6:26 in the time stamp.  So we saw -- at the

25   last break where I paused, we saw the exchange where

79

1     Agent Burk objected to getting on the ground.  Officer

2     Fihe said, okay, stay where you are.  Agent Burk said,

3     I will.  Officer Fihe said, fine.

4               Now in the ensuing exchange that we just

5     watched, we saw Officer Fihe going back to telling

6     Agent Burk to get on the ground.  And my question is,

7     is there something that you observed in that

8     intervening time period that you think would have

9     caused Officer Fihe -- I'm sorry, I'm pronouncing it

10    wrong; I think it's Fihe -- that would have cause

11    Officer Fihe to, kind of, walk back to telling Agent

12    Burk to get on the ground instead of being fine

13    staying where he is?  Do you follow my question?

14    A.        Yes, sir.  I would say it's the dialogue

15    that's in between there.  You've got an individual,

16    Mr. Burk, claiming that he's a federal agent and so --

17    and the officer initially tells him to get on the

18    ground.  Then he faces noncompliance, so he adapts his

19    response, which is a deescalation tactic.  Right?

20              He's adapting that, and he's exchanging some

21    dialogue.  And we then again have the claim that, I'm

22    an agent, or something to that effect.  So then he

23    goes back to his original command of, get on the

24    ground.  And in a way that's gauging what Mr. Burk is

25    saying.  It's a compliance gauge.  So if he is who

80

1  he's claiming to be in that short dialogue, then he'll

2  follow this command of getting on the ground.

3  Q.       And have we heard at this point a discussion

4  about where his credentials or identification might

5  be, as far as you know?

6  A.       I don't recall.  I'd have to play it back

7  again.

8  Q.       Yeah, we can do that.

9            (Video played off record.)

10 BY MR. KEYES:

11 Q.       We're backing up just a little bit further.

12 We're just going to go from 5:28 again.

13           (Video played off record.)

14 BY MR. KEYES:

15 Q.       All right.  And I'm curious, I just want to

16 see if you heard the same thing that I did there.  It

17 seemed like there was -- in that back and forth that

18 we just paused at, which we stopped at six minutes

19 even, there's discussion about seeing Agent Burk's ID.

20 Could you hear that in there at all?

21 A.       I heard Agent Burk say something, if you

22 want to see my ID, then ask for it.

23 Q.       Okay.  Would you agree that if -- verifying

24 his identification, is that something that for an

25 encounter like this, where the person is claiming to

81

1    be a law enforcement official, verifying

2    identification is something that the officer

3    encountering this person on the scene, at some point

4    should try to do?

5    A.        Yes, sir.

6    Q.        Okay.  And at this point we've seen that

7    Agent Burk doesn't have a weapon in either hand;

8    correct?

9    A.        Correct.

10   Q.        And he's had up 'til -- up until this point

11   at six minutes so far he's had his hands out to his

12   sides for I don't know exactly how many seconds, but

13   from what we've seen, he's had them out to his sides

14   going back to the point when he was still at the door

15   and he had turned around; is that fair?

16             MS. PICKERILL:  Objection.  Go ahead.

17   A.        That's fair, among other things.

18   BY MR. KEYES:

19   Q.        Okay, sure.  And I guess, is Agent Burk

20   presenting any kind of visible threat at that point,

21   in your opinion, to either the resident in the house

22   or the officer on the scene or anyone else that might

23   be around?

24   A.        I would say, yes, he's -- because of the

25   noncompliance, our officers are going to be trained to

82

1   treat them as any other armed suspect, right, as

2   policy states.  So because the officer is observing

3   and perceiving noncompliance, he's treating him as a

4   burglary suspect right up to that point, or he should

5   be.

6           And also the posture, the back and forth,

7   the arguing, the cursing, that's not -- that doesn't

8   indicate that he's a law enforcement officer.  It does

9   the opposite.  So that would indicate to Officer Fihe

10  that he is a potential threat, yes.

11  Q.       Okay.  But in terms of -- at this point I'm

12  asking about the visual presentation; right?  So my

13  question was about whether he's a visible threat.  So

14  we've seen he turns to face Officer Fihe.  You know,

15  earlier in the video, when he's still by the door, he

16  turns to face Officer Fihe, has his hands out and to

17  the sides.  And by this point in the video, at the

18  six-minute mark, we've seen both hands at one point or

19  another empty, and the only thing that he's had in

20  either hand at any point is that stack of documents;

21  correct?

22  A.       Correct.

23  Q.       And so just visibly does he present --

24  visibly present a threat at that point?

25  A.       I guess the question is what you're defining

83

1    a visible threat.  Because I believe he is being

2    threatening, yes, and I think the officer is

3    perceiving him as a threat.  All right?  Are you

4    saying a weapon?

5    Q.       Well, we can start there.  We know there's

6    no weapon out at this point; is that fair?

7    A.       That's fair.

8             MS. PICKERILL:  Objection.

9    BY MR. KEYES:

10   Q.       Has he -- I mean, we've seen where his hands

11   are; we've seen the encounter up to this point.  Has

12   he made any, sort of, physically assertive gestures,

13   in your opinion, directed at the officer or anybody

14   else that was around him on the scene?

15   A.       I would say his posture as he approached and

16   he was facing the officer and he was walking toward

17   him, that that could be perceived as a threat, in

18   conjunction with the noncompliance, because we're

19   expecting a compliant individual.  So when they're not

20   only noncompliant but also walking toward the officer

21   or shortening that distance, that's threatening in

22   nature, yes.

23   Q.       Okay.  And then we -- now we also saw in

24   that exchange that there's a point where Officer Fihe

25   tells him, stay where you are.

84

1    A.        Correct.

2    Q.        And Agent Burk agrees to do that; correct?

3    A.        Correct.

4    Q.        And we can try to find the spot where he is,

5    but do you have, just looking at what we've seen in

6    the video, a ballpark of how far away they are?  I

7    know it's tough to see from the angle, but we can at

8    least see that red truck that we saw at the very

9    beginning.  That's -- it's still at least the distance

10   of that truck, plus it looks like some more, between

11   Agent Burk and Officer Fihe.  Would you agree?

12   A.        Correct, yes.

13   Q.        All right.  One moment.  All right.  I'm

14   going to move forward.  And just so the record is

15   clear -- because I know we've been kind of watching

16   this in clips and specific pieces that I have

17   questions about.  You have viewed this entire video;

18   correct?

19   A.        Yes, sir.

20   Q.        Okay, all right.  There is a point -- and

21   I'll try to skip forward to it.  All right.  We're

22   starting at 9:26 here on my counter.

23   A.        Okay.

24   Q.        And after several seconds you'll see -- I'll

25   play it for you, but just so you know what we're

85

1    looking for, there's a point where one of the officers

2    mentions Agent Burk having a chance to talk and to

3    show his credentials.  But I'll go ahead and play it,

4    but that's what I'm going to ask about once we get

5    there.

6    A.        Okay.

7              (Video played off record.)

8    BY MR. KEYES:

9    Q.        Okay.  The statement, you had your chance --

10   which I believe came from Officer Fihe; is that

11   correct?

12   A.        I believe so.

13   Q.        'Cause we saw the other -- that would be

14   Officer Winchell that had his hands on Agent Burk,

15   leading him to the car; correct?

16   A.        Correct.

17   Q.        So when Agent Fihe says that Agent Burk had

18   his chance, do you have a sense of what he was -- he

19   had his chance to do what?  What was Officer Fihe

20   talking about at that point?

21             MS. PICKERILL:  Objection.  If you know, you

22   can answer.

23   BY MR. KEYES:

24   Q.        Yeah, if you know.  That's all.

25   A.        I believe it was a response to Agent Burk's

1  comments about having a badge or credentials.

2  Q.         Okay, okay.  And having seen the video, was

3  there a -- in your assessment was there a chance

4  during the encounter -- from what you've seen of the

5  video, was there a chance during the encounter for

6  Agent Burk to produce his credentials to Officer Fihe?

7  A.         Again, I think that goes back to the initial

8  approach --

9  Q.         Okay.

10  A.         -- that we talked about earlier.  I believe

11  that chance was when he's pulling up and the cruiser

12  is visible, or at least maybe Agent Burk can hear the

13  audible siren.  And at that point he should realize

14  police response, and then have his badge and

15  credentials clearly visible.

16  Q.         Okay.  Any other chance after that point?

17  A.         After the initial contact?

18  Q.         Correct.

19  A.         I can't say if there would be a chance or

20  not.  I believe that the officers were reacting to his

21  behavior at that point.

22  Q.         And we know from -- oh, sorry, go ahead.  I

23  didn't want to --

24  A.         No, I'm thinking.

25  Q.         Sure.

87

1  A.        I'm thinking if there would have been a

2  chance for him.  I don't -- probably not at that

3  point.

4  Q.        And in part because Officer Fihe has his

5  service pistol trained on Agent Burk from virtually

6  the very beginning of the encounter; right?  Is that

7  fair?

8  A.        Right.

9            MS. PICKERILL:  Objection.  Go ahead.

10  A.        I would say the chance is by him complying.

11  BY MR. KEYES:

12  Q.        Okay.

13  A.        That's his chance.

14  Q.        Okay.

15  A.        He complies to the commands of Officer Fihe,

16  and then that would, hypothetically, lead to Officer

17  Fihe allowing him to get his ID, his badge.

18  Q.        I see.

19  A.        Or the officers themselves retrieving it.

20  Q.        Okay.  So those initial commands, turn

21  around, show me your hands --

22  A.        Get on the ground.

23  Q.        -- doing those things would have been a way

24  to facilitate --

25  A.        If he had complied with the initial order,

88

1  yes, I believe.

2  Q.        Okay.

3  A.        I don't believe any force would have been

4  used whatsoever.

5  Q.        Okay.  All right.  We're going to put the

6  video away for now.  By the way, in your review of the

7  case did you become familiar with the amount of time

8  or approximate amount of time that Agent Burk would

9  have been at the apartment before Officer Fihe

10  arrived?

11  A.        I think the only time frame was this, sir,

12  Exhibit 2 --

13  Q.        Okay.

14  A.        -- where I saw the initial call come in and

15  then the arrival time of the officer.

16  Q.        Okay.  And feel free to look at Exhibit 2.

17  So roughly how many minutes are we talking about?

18  A.        Are we missing a page?

19  Q.        That's all I have for the -- that's all we

20  had for the display event document.

21  A.        Okay.

22  Q.        That's okay.  I'm not --

23  A.        I think typically there's a bottom section

24  of this.

25  Q.        I see.

89

1     A.       That's maybe on the second page that has

2     arrival time of the initial officer.

3     Q.       Understood, okay. In any event, fair to say

4     that it had been several minutes, at least, between

5     when the call comes in initially and Officer Fihe

6     arrives?

7     A.       Yes, sir, that's fair.

8     Q.       Okay. And given the nature of the call,

9     which was relayed to the responding officer as, what,

10    I believe an attempted burglary?

11    A.       Yes.

12    Q.       With the information that the suspect was

13    claiming to be a law enforcement official --

14    A.       Correct.

15    Q.       -- correct? If the person -- if the subject

16    was not a law enforcement official, would you see

17    anything unusual about the idea that they would have

18    just stood there waiting outside in the middle of the

19    day for the cops to show up?

20    A.       Not necessarily. You're asking if he was

21    not a law enforcement official?

22    Q.       Yeah, and what I'm trying to get a feel for

23    is kind of the overall picture of the situation. I

24    mean, if -- you know, I'm trying to think through --

25    as far as the information that was presented goes, you

1  know, it strikes me as if this person were really, you

2  know, not there to do what he was saying, what Agent

3  Burk was saying he was there to do but was really

4  just, you know, somebody trying to burglarize or enter

5  someone's house unlawfully during the day, it would

6  strike me -- if that were what was going on, it would

7  strike me as kind of unusual for him to just wait

8  there for the cops to come and get him.  Do you agree?

9  A.        No, I don't think that's unusual.  I think

10  it's entirely possible that we catch criminals in the

11  act of the crime they're committing based on a

12  dispatch run.  And although it appears five to six,

13  seven minutes to us, sitting here seems like a long

14  time, but in reality that's very quick throughout the

15  course of an incident.

16          Even responding, it's likely that the

17  officer responding did not realize it had been five to

18  six or seven minutes because that time can go very

19  fast when adrenaline --

20  Q.        I see, okay.  So it's possible -- your sense

21  is that -- what you're telling me right there is it

22  may have been five to seven minutes, but that's not

23  necessarily something that's going through Officer

24  Fihe's mind as he's responding?

25  A.        Specifically the length of how long that

91

1  suspect has been at that door --

2  Q.       Yeah?

3  A.       -- I would -- not that short duration, five

4  to seven minutes.

5  Q.       Okay.

6  A.       If you're -- I think what you're getting

7  at -- maybe twenty, thirty minutes I would understand

8  what you're saying is that --

9  Q.       Yeah.

10  A.       -- now that we have to kind of consider that

11  time frame when we're approaching, that the person

12  who's still here for twenty or thirty minutes hasn't

13  made entry.

14  Q.       And hasn't tried to run away after the

15  police were called.

16  A.       And hasn't tried to run away at that point.

17  But five to seven minutes, I would disagree.  I think

18  that's --

19  Q.       All right.

20  A.       -- entirely possible.

21  Q.       All right.  I'm going to hand you -- we'll

22  save that for last.  All right.  I'm going to hand you

23  a document that was previously marked as Exhibit 3 at

24  Officer Fihe's deposition.

25  A.       Okay.

1  Q.        And there's two pages.  It's front and back.

2  This is Division Directive No. 4.03.  Do you see that?

3  A.        Yes, sir.

4  Q.        And the title of this directive is,

5  surveillance stakeouts, encountering out-of-uniform

6  personnel; correct?

7  A.        Correct.

8  Q.        Is -- now, I believe I saw reference to this

9  directive in your report.  Some of the things you've

10  been saying in your testimony today, my having read

11  this in the past, it kind of, you know, reminded me of

12  some of the items mentioned in here.  So is this

13  directive something that you've relied on in forming

14  your opinions for this case?

15  A.        Yes, sir.

16  Q.        Okay.  And in particular -- well, why don't

17  you tell us -- I'll just leave it open-ended to you.

18  Kind of talk to us about what in this directive was

19  relevant to your opinions, please.

20  A.        Primarily under procedures, 2A.

21  Q.        Okay.

22  A.        So this would be personnel challenging

23  out-of-uniform law enforcement personnel.  These are

24  the policy that guides our officers on the response

25  when faced with out-of-uniform law enforcement.

93

1   Q.      Got it.

2   A.      And then also Section B.

3   Q.      Okay.

4   A.      The responsibilities of the out-of-uniform

5   personnel themselves being challenged.

6   Q.      Got it.  So this -- and when -- the

7   personnel that is being -- when this directive uses

8   the word personnel, it's talking about Columbus

9   Division of Police personnel; correct?

10  A.      I believe so, yes.

11  Q.      Okay.  And so 2B, out-of-uniform personnel

12  being challenged, that's the directive that

13  out-of-uniform Columbus police personnel are being

14  instructed to follow if they're -- in other words, if

15  I'm a Columbus police officer and I'm out of uniform

16  and I'm being challenged, these four steps are what

17  I'm told to follow; correct?

18  A.      Correct.

19  Q.      Okay.  What was the -- I mean, are you

20  familiar with where these procedures, particularly in

21  2B, where they came from?

22  A.      No, sir.

23  Q.      Okay.

24  A.      The actual origin of the --

25  Q.      Yeah, whether they were developed internally

94

1    or from some resource somewhere or something like

2    that?

3    A.          I'm not aware of that, no, sir.

4    Q.          All right.  And so I think we covered

5    earlier in the deposition, but just to ask

6    specifically on this issue, you're not aware of what

7    procedures or directives or instructions might exist

8    for ATF officials -- or for ATF agents on, you know,

9    when they're out of uniform or in plain clothes and

10   being challenged by another law enforcement official?

11   You're not aware of what directives may exist in that

12   context for ATF, are you?

13   A.          No, sir, I do not know those policies.

14   Q.          Okay.  Would Officers Fihe and Winchell have

15   been trained on this directive?

16   A.          Yes, sir.

17   Q.          Do -- strike that.  At the time did Columbus

18   police officers go through any kind of training or get

19   any kind of instruction about other agencies, such as

20   ATF, about how -- let's use ATF as a specific

21   example -- of how ATF agents in the field might

22   conduct, you know, knock and talk operations,

23   retrieval of firearms operations.

24            I mean, as a general matter, would Columbus

25   police have been trained about those, kind of, other

95

1   agencies' procedures?

2   A.        Generally speaking, I would say not, no,

3   with the caveat that we do have individual officers

4   with the department that work with the ATF.

5   Q.        Okay.

6   A.        Specific task force assignment.

7   Q.        Sure.

8   A.        And they would have been trained in those.

9   Q.        Yep.

10  A.        But not internally, no.

11  Q.        And that was -- thank you for that, 'cause

12  that was going to be my next question.  On a more

13  narrow level, if you're part of a joint task force, in

14  that situation you might get some of that exposure to

15  the other agency's training; is that fair?

16  A.        Yes, sir.

17  Q.        Officers Winchell and Officer Fihe were not

18  part of any ATF task force that you're aware of, were

19  they?

20  A.        In their career -- at any point in their

21  career, or at this specific time?

22  Q.        At this specific time.

23  A.        Not that I'm aware of.

24  Q.        Okay.  Are you aware if they had been at any

25  point before this time?

96

1   A.        No, sir.

2   Q.        Looking at procedures now under 2A,

3   personnel challenging possible out-of-uniform law

4   enforcement personnel, the first part of this

5   directive says, approach cautiously and identify

6   yourself as a police officer.  Did Officer Fihe do

7   that?

8   A.        He did through his --

9   Q.        Through his outward appearance?

10  A.        Right.

11  Q.        Yeah, okay.  If he'd shown up in a marked

12  cruiser or had his uniform on, he may not have said,

13  I'm a police officer, but visibly you could tell; is

14  that correct?

15  A.        Correct.

16  Q.        Give clear, concise, and nonconflicting

17  orders.  That's point 2A2.  Do you see that?

18  A.        Yes, sir.

19  Q.        Do you believe that Officer Fihe complied

20  with that directive during the encounter with Agent

21  Burk?

22  A.        Yes, sir, I do.

23  Q.        Okay.  And 2A3, instruct individuals

24  claiming to be law enforcement personnel whose

25  identity you are not able to immediately confirm, to

1  disarm in a safe manner, and then produce their

2  agency's identification.  If the individual refuses to

3  comply, treat the situation as any other encounter

4  with an armed individual.  You see that?

5  A.        Yes, sir.

6  Q.        So I think some of the stuff you've been

7  testifying to earlier, as we see this directive, kind

8  of sounds to me like you were talking about that

9  second sentence in 2A3, if the individual refuses to

10 comply -- excuse me -- treat the situation as any

11 other encounter with an armed individual; is that

12 right?

13 A.        Yes, sir.

14 Q.        Okay.  Let's talk about that first part,

15 instruct individuals complaining -- claiming, excuse

16 me -- instruct individuals claiming to be law

17 enforcement personnel whose identity you are not able

18 to immediately confirm, to disarm in a safe manner,

19 and then produce their agency's identification.  Did

20 Officer Fihe do that in this case with Agent Burk?

21 A.        He attempted, sir, and was faced with

22 noncompliance.

23 Q.        That was when --

24 A.        The initial approach, when he -- that's his

25 attempt to disarm in a safe manner, his attempt to

98

1   control the situation in a safe manner.  And then when

2   he's met with noncompliance, then we go to sentence

3   No. 2.

4   Q.       I see, okay.  And again, what you're

5   referring to is that initial -- the beginning of the

6   encounter, when he says, turn around, show me your

7   hands?

8   A.       Turn around, show me your hands, get on the

9   ground --

10  Q.       Well, so get on the ground comes a little

11  bit later; right?

12  A.       Right.

13  Q.       So I'm talking about the very initial

14  encounter, turn around, show me your hands.  It's your

15  position that he saw non -- he got noncompliance from

16  the very beginning?

17  A.       He got noncompliance, and also, the body

18  language and the verbal defiance that Agent Burk was

19  exhibiting would suggest a threatening nature that

20  also is not just -- 'cause he did comply, and we've,

21  you know, agreed that he has complied with some

22  orders, like stay where you are.  He complied with

23  that order.

24          But in a general sense, he's not complying

25  with the initial approach of the officer, and he's

99

1  argumentative.  And so that's viewed by Officer Fihe

2  as threatening and not immediately being able to

3  disarm that in a safe manner due to his actions,

4  Mr. Burk's actions.  So then that falls into the

5  second sentence.

6  Q.       Okay, all right.  All right.  You can set

7  Exhibit 3 aside.

8  A.       Okay.

9        (Exhibit No. 2 marked for identification.)

10 BY MR. KEYES:

11 Q.       All right.  Officer Vehr, I'm going to hand

12 you what we've marked as Exhibit 2 specifically to

13 your deposition.

14 A.       Okay.

15 Q.       And this is CPD Directive 2.01, the use of

16 force directive; is that correct?

17 A.       Yes, sir.

18 Q.       I'm not really going to spend a whole lot of

19 time on this document, just -- I do note that I

20 believe it was in your reference materials, and you

21 mentioned it in your report.  Is this one of the

22 directives that you evaluated the CPD officers'

23 actions in the incident for -- strike that.  It's a

24 terrible question.

25            Did you evaluate the CPD officers' actions

100

1    in this incident using Directive 2.01 as part of your

2    assessment?

3    A.        Yes, sir.

4    Q.        So you're, in part anyway, evaluating for

5    compliance with 2.01; is that fair?

6    A.        Correct.

7    Q.        And then I'm going to hand you what we've

8    marked as Exhibit 3 specific to your deposition.

9          (Exhibit No. 3 marked for identification.)

10          MS. PICKERILL:  Thank you.

11   BY MR. KEYES:

12   Q.        Exhibit 3 is Directive 2.04, chemical

13   irritants and intermediate weapons regulations;

14   correct?

15   A.        Correct.

16   Q.        And I note, again, this was part of your

17   reference materials.  Was that because of the use of

18   the taser?

19   A.        Yes, sir.

20   Q.        All right.  And so part of what you were

21   doing in your analysis was evaluating the CPD

22   officers' actions in connection with this Directive

23   2.04; is that fair?

24   A.        Yes, sir.

25   Q.        All right.  We can set those aside.

101

1   A.        Okay.

2   Q.        We only have one copy of this.  This is the

3   stack of documents that you brought with you today.

4   Actually, what I'm going to do --

5            MS. PICKERILL:  If you want to take a break,

6   I can make a copy of it.

7            MR. KEYES:  That -- I'm just going to ask --

8   let's go off the record for a second.

9                (Discussion held off record.)

10           (Exhibit Nos. 4, 5, 6, and 7 marked

11                   for identification.)

12  BY MR. KEYES:

13  Q.        Officer Vehr, I've handed you, now being

14  marked as exhibits, the stack of documents that you've

15  brought into the deposition room with you today.  And

16  I've marked those Exhibits 4, 5, 6, and 7 of your

17  deposition.  Do those documents make up the materials

18  that you brought into the room with you today?

19  A.        Yes, sir.

20  Q.        Okay.  And is that the extent of your file,

21  or do you have other -- are there other file documents

22  that you did not bring with you?

23  A.        This is -- other than what's in my

24  material --

25  Q.        In your reference?

102

1   A.        -- references materials reviewed.

2   Q.        Okay.

3   A.        Some of those are digital.

4   Q.        Sure.

5   A.        Sure.

6   Q.        Got it.  So if I can look with you on these

7   for a second, Exhibit 4 we have -- it's a copy of your

8   report; correct?

9   A.        Yes, sir.

10  Q.        Okay.  Exhibit 5 is the James Burk and

11  Summer Hilfers' complaint in this case; correct?

12  A.        Correct.

13  Q.        All right.  Exhibit 6 -- just making sure

14  there's only one -- yep.  Exhibit 6 is the report of

15  the plaintiff's expert, use of force expert, Scott

16  DeFoe in this case; is that correct?

17  A.        Correct.

18  Q.        And Exhibit 7 is a -- well, it's a -- is

19  Exhibit 7, is that the IAB investigation materials for

20  the incident?

21  A.        Yes, sir.

22  Q.        Okay, all right.  And this was all given to

23  you as one document, correct, in Exhibit 7?

24  A.        Correct.

25  Q.        Okay.  I just wanted to make sure that this

103

1   wasn't compiled specifically by you.

2             MS. PICKERILL:  Just to clarify real fast --

3             MR. KEYES:  Sure.

4             MS. PICKERILL:  -- Exhibit 4, which is the

5   report, is that a final version of the report?

6             MR. KEYES:  Good question.

7             MS. PICKERILL:  I just wanted to make sure

8   it's not a draft.

9             MR. KEYES:  Nope, it's actually his original

10  wet signature.

11            MS. PICKERILL:  Oh, phenomenal.

12            MR. KEYES:  Yep, great.

13  BY MR. KEYES:

14  Q.        Okay.

15  A.        May I review No. 4?

16  Q.        Yes, one moment here.

17  A.        Okay.  Because I want to make sure that's

18  not a draft as well.

19  Q.        Yeah, I mean, it has your signature, and I

20  was just checking really quickly on my -- you can

21  compare it to Exhibit -- so yeah, you've got Exhibit 1

22  of your deposition next to you.  That's the version

23  that was provided to us.  So feel free to look at

24  those.

25  A.        Okay, thank you.

104

1    Q.        Sure.

2    A.        I do believe this is a draft copy, to some

3    extent, because I do have a markup that printed as a

4    potential typo.

5    Q.        In Exhibit 4?

6    A.        In Exhibit 4, yes, sir.

7              MS. PICKERILL:  Yeah, there is a difference.

8              THE WITNESS:  Yeah, right here.

9    BY MR. KEYES:

10   Q.        Okay.

11   A.        The substance of the report, I'm sure, is --

12             MS. PICKERILL:  Oh, yeah, and it also

13   doesn't have the last couple of pages, yeah.

14             MR. KEYES:  I know it didn't attach his CV,

15   yeah.

16             MS. PICKERILL:  CV.

17   A.        Yeah, it may just be possible this page 14

18   is a duplicate with my signature, 'cause this one is

19   not signed.

20   BY MR. KEYES:

21   Q.        I see, okay.  So -- all right.  So it's

22   possible you may have put and attached your original

23   signature to -- in terms of the materials you brought

24   into the room today?

25   A.        Correct.

1  Q.       It's possible you may have grabbed your

2  original signature on the last page and stuck that in

3  with potentially an earlier draft of your report?

4  A.       Correct.

5  Q.       Okay.  All right.  Let's do this.  All

6  right.  I don't see any handwritten notes or

7  annotations on the version in Exhibit 4.  Is that

8  right?

9  A.       No, sir, other than the one --

10 Q.       You said there was a track changes typo?

11 A.       Yeah, track markup, but that would be it.

12          MR. KEYES:  Okay.  So let's do this then.

13 There's plenty of discussion about what Exhibit 4, for

14 Officer Vehr's deposition, is on the record.  If

15 that's actually a draft, you guys are entitled to that

16 back.

17          MS. PICKERILL:  Yeah, thank you.

18          MR. KEYES:  Take a look at that, and if it's

19 something -- I'm assuming that his signature page just

20 got erroneously attached, that it's not that there

21 were two final versions.

22          MS. PICKERILL:  Yeah, because there is a

23 blank signature page.

24          MR. KEYES:  Okay, all right.

25          MS. PICKERILL:  But there -- yeah, there's

106

1   no notes or anything on it.

2              MR. KEYES:  Right, okay.  And that would

3   have been the only thing I would have questions about

4   on it, if it was in fact a draft.  But it had some

5   other material on there; that's a different story.

6              MS. PICKERILL:  Yeah, of course.

7              MR. KEYES:  So with that being the case,

8   let's just leave the references to Exhibit 4 in the

9   record, but the record can show that we've handed it

10  back to the city attorney's office 'cause it does

11  appear to be a draft report.

12             MS. PICKERILL:  Thank you.

13             THE COURT REPORTER:  And just to clarify,

14  you don't want it attached to the transcript?

15             MR. KEYES:  Correct, we do not.

16             MS. PICKERILL:  No.  Thank you.

17  BY MR. KEYES:

18  Q.        And actually, I'm going to ask a little bit

19  more about Exhibit 5, because as I look at it, we

20  identified it as the complaint; but it looks like

21  there's some additional materials attached to it as we

22  get toward the back, which I don't believe were part

23  of the filed complaint.  That's okay.  You don't

24  necessarily need to separate it.

25  A.        Okay.

1  Q.        I'm just clarifying for the record that what

2  we've marked as Exhibit 5 of your deposition was all

3  clipped together when you brought it in.  But we

4  agree, as you look at it now, that it includes

5  documents besides just the civil complaint that was

6  filed?

7  A.        That's correct.  These documents go to

8  Exhibit --

9  Q.        -- 7?

10  A.        -- 7.

11  Q.        Okay.  All right.  And we'll get to 7 in a

12  second.  But if I can look back at Exhibit 5, just to

13  indicate for the record, so Exhibit 5 I'm looking

14  at -- there's no page number on it, but it's the --

15  it's the first page of a division of police internal

16  memorandum, it appears.  Looks like part of the IAB

17  investigation; correct?

18  A.        Correct.

19  Q.        Is the highlighting on that page your own?

20  A.        It is.

21  Q.        Okay.  And then if I could have the exhibit

22  back, on the back of the very last page there's some

23  handwritten notes.  Are those your own handwritten

24  notes?

25  A.        They are.

108

1    Q.       Sorry, they are?

2    A.       They -- yes, sir.

3    Q.       Okay.  What -- I can guess what the notes at

4    the bottom right -- because it looks like it was about

5    the scheduling of your deposition, so I can figure out

6    what those are for.  But the other sections of the

7    notes on that page, what were those notes for?

8    A.       These are notes I made to prepare myself for

9    today's meeting.

10   Q.       Okay, understood.  One of the notes says,

11   emails from Sperlazza?

12   A.       Correct.

13   Q.       Did you review any emails from who's now

14   Judge Sperlazza before coming to your deposition

15   today?

16   A.       No, I forwarded some emails from the

17   original notification to the city attorneys.

18   Q.       Understood.  Did any of those emails contain

19   any hypotheticals or fact scenarios that you were

20   asked to assume and rely on in forming your opinions?

21   A.       I don't believe so.

22   Q.       Did any of the emails that you forwarded

23   contain any information that you relied on in forming

24   your opinions at all?

25   A.       No, sir.

1  Q.       All right, okay.  So let's look at

2  Exhibit --

3           MS. PICKERILL:  Could we go off the record

4  just real fast?

5           MR. KEYES:  Yes.

6           (Discussion held off record.)

7  BY MR. KEYES:

8  Q.       All right.  Exhibit 6 does not have any

9  handwritten notes, so I don't have any questions about

10  that.

11  A.       Okay.

12  Q.       Exhibit 7, which is at least some of the --

13  appears to be at least some of the IAB file, there's

14  highlighting on various pages.  Is all the

15  highlighting in Exhibit 7 yours?

16  A.       Yes, sir.

17  Q.       And then on the back of the last page of

18  Exhibit 7 there are some handwritten notes.  Are those

19  all your notes?

20  A.       Yes, sir.

21  Q.       Okay.  And what was the purpose of the notes

22  you were taking there?

23  A.       This was notes on how I would format my

24  report itself.

25  Q.       Okay, understood.

110

1   A.      So just kind of a brief outline of what was

2   in my mind of how to write it.

3   Q.      Sure, okay, all right.  When you wrote your

4   report for the Davis litigation, was it a similar

5   format to the report you developed in this litigation?

6   A.      I believe so.

7   Q.      That's all right.  I'm sure we can locate

8   that if we need it.  All right.  I'm going to --

9   strike that.  Before I move on, have -- since you

10   prepared -- excuse me -- since you prepared your

11   expert report and provided that, have there been any

12   additional materials you've reviewed since then

13   relating to the case that you hadn't already looked at

14   before you prepared your report?

15   A.      The report of --

16   Q.      Of Mr. DeFoe?

17   A.      -- Mr. DeFoe I've reviewed since.

18   Q.      Okay.  Outside of reviewing his report in

19   this case, are you otherwise familiar with Mr. DeFoe?

20   A.      No, sir.

21   Q.      I'm just going to take a second to get these

22   in order a little bit here.  All right.  I'm going to

23   hand you what we marked earlier today as Exhibit 1 to

24   Lieutenant Bernhardt's deposition.  I think we looked

25   at that at the very start of your time with us today.

111

1   That's that deposition notice with the topics.

2   A.          Yes, sir.

3   Q.          Okay.  I'd like to ask about the -- let's

4   talk about Topic No. 1, the rules, regulations, and

5   procedures --

6               MS. PICKERILL:  Are we going to switch to

7   the 30(B)(6) deposition?

8               MR. KEYES:  Yeah, do you want to take a

9   short break in between?

10              MS. PICKERILL:  Yeah, if we could.

11              MR. KEYES:  Let's do that.

12              MS. PICKERILL:  And since he's answering

13  just as a different entity --

14              MR. KEYES:  Yeah.

15              MS. PICKERILL:  -- if we wouldn't mind just

16  starting a new deposition for the 30(B)(6)?

17              MR. KEYES:  That's fine.  We can transcribe

18  them separately.  I have no issue with that.  Okay.

19  Yeah, let's take five, ten minutes.

20                    (Signature not waived.)

21                          - - -

22              And, thereupon, the deposition was concluded

23  at approximately 2:26 p.m.

24                          - - -

25

112

```
 1                          AFFIDAVIT

 2    State of Ohio              )
                                 ) SS:
 3    County of _____ )

 4         I, PATRICK VEHR, do hereby certify that I
      have read the foregoing transcript of my testimony
 5    given on Tuesday, May 23, 2023; that together with
      the correction page attached hereto noting changes
 6    in form or substance, if any, it is true and
      correct.

 7

 8                      _____
                              PATRICK VEHR
 9

10         I do hereby certify that the foregoing
      transcript of the deposition of PATRICK VEHR was
11    submitted to the witness for reading and signing;
      that after he had stated to the undersigned Notary
12    Public that he had read and examined his testimony,
      he signed the same in my presence on the _____
13    day of _____, 2023.

14

15                      _____
                              Notary Public
16

17    My commission expires _____, _____.

18                          --|--

19

20

21

22

23

24

25
```

113

1                          CERTIFICATE

2    State of Ohio      :
                             SS:
3    County of Delaware :

4            I, Elizabeth V. Cradic, RPR, notary public

5    in and for the State of Ohio, duly commissioned and

6    qualified, certify that the within named witness was

7    by me duly sworn to testify to the whole truth in the

8    cause aforesaid; that the testimony was taken down by

9    me stenographically and afterwards transcribed upon a

10   computer; and that the foregoing is a true and correct

11   transcript of the testimony given by said witness, to

12   the best of my ability, taken at the time and place in

13   the foregoing caption specified.

14           I certify that I am not a relative,

15   employee, or attorney of any of the parties hereto, or

16   of any attorney or counsel employed by the parties, or

17   financially interested in the action.

18           IN WITNESS WHEREOF, I have set my hand on

19   this 6th day of June, 2023.

20

21

22   _____
     Elizabeth V. Cradic, RPR
23   Notary Public, State of Ohio
     My Commission Expires June 20, 2024

24

25