```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION


                        - - - - -


James A. Burk, Jr.,         :
et al.,
                            :
        Plaintiffs,
                            :
        vs.                     Case No. 2:20-cv-6256
                            : Judge James L. Graham
City of Columbus,             Magistrate Judge
et al.,                     : Chelsey M. Vascura

        Defendants.         :

                            :


                        - - - - -


    VIDEOTAPED DEPOSITION OF JAMES A. BURK, JR.


                        - - - - -



            Taken at Cooper Elliott
         305 West Nationwide Boulevard
              Columbus, OH 43215
            June 9, 2023, 9:02 a.m.



                        - - - - -


            Spectrum Reporting LLC
         400 South Fifth Street, Ste. 201
              Columbus, Ohio 43215
         614-444-1000 or 800-635-9071
            www.spectrumreporting.com


                        - - - - -
```

2

1                    A P P E A R A N C E S

2

   ON BEHALF OF PLAINTIFFS:
3
          Cooper Elliott
4         305 West Nationwide Blvd.
          Columbus, OH 43215
5         By Jonathan N.  Bond, Esq.

6
   ON BEHALF OF DEFENDANTS:
7
          City of Columbus, Department of Law
8         77 N. Front Street
          Columbus, OH 43215
9         By Alexandra N. Pickerill, Esq.
             Samantha M. Hobbs, Esq.
10

11   ALSO PRESENT:

12        Gregory Castetter - Videographer

13

14

15

16

17

18

19

20

21

22

23

24

```
1                    Friday Morning Session

2                   June 9, 2023, 9:02 a.m.

3                       - - - - -

4              S T I P U L A T I O N S

5                       - - - - -

6         It is stipulated by counsel in attendance that

7    the deposition of James A. Burk, Jr., a Plaintiff

8    herein, called by the Defendants for

9    cross-examination, may be taken at this time by

10   the notary pursuant to notice and subsequent

11   agreement of counsel that said deposition may be

12   reduced to writing in stenotypy by the notary,

13   whose notes may thereafter be transcribed out of

14   the presence of the witness; that proof of the

15   official character and qualification of the notary

16   is waived.

17                       - - - - -

18

19

20

21

22

23

24
```

4

1                    I N D E X

2    Examination By                              Page

3    Ms. Pickerill - Cross                          6

4    Exhibits                                    Page

5    Exhibit 4 - PRB document, 5-5-2016            27

6    Exhibit 5 - Last Chance Agreement             28

7    Exhibit 6 - Notification of Personnel Action  32

8    Exhibit 7 - Letter, 11-2-2021                 50

9    Exhibit 8 - Letter, 7-16-2021                 54

10   Exhibit 9 - Defendants' Fed. R. Civ. P. 31    78
                 Deposition By Written Question To
11               The United States Bureau of
                 Alcohol, Tobacco, Firearms, and
12               Explosives

13   Exhibit 10 - Settlement Agreement             84

14   Exhibit 11 - Position Description             93

15   Exhibit 12 - Burk Interview transcript,      116
                  8-14-2020
16
     Exhibit 13 - 911 audio                       138
17
     Exhibit 14 - Burk identifying documents      148
18
     Exhibit 15 - Fihe's body cam                 164
19
     Exhibit 16 - Administrative Interview        225
20

21
     (Electronic exhibits attached.  Originals returned
22   to Ms. Pickerill.)

23

24

5

1          THE VIDEOGRAPHER:  The following

2    deposition of James A. Burk, Jr., is being taken

3    on June 9th, 2023 at 305 West Nationwide

4    Boulevard, Columbus, Ohio in the case of James A.

5    Burk, Jr., et al., versus City of Columbus,

6    et al., in the United States District Court,

7    Southern District of Ohio, Case No. 2:20-cv-6256.

8          The court reporter is Stacy Upp, and

9    the videographer is Gregory Castetter.  This

10   deposition is being recorded by Spectrum Reporting

11   LLC.

12          We are on the record at 9:02.  Will

13   counsel please announce their presence.

14          MR. BOND:  Jonathan Bond for

15   plaintiffs.

16          MR. PICKERILL:  Alexandra Pickerill for

17   defendants.

18          MS. HOBBS:  Samantha Hobbs for

19   defendants.

20

21

22

23

24

6

```
 1                        - - - - -
 2                   JAMES A. BURK, JR.
 3      being first duly sworn, testifies and says as
 4      follows:
 5                   CROSS-EXAMINATION
 6      BY MS. PICKERILL:
 7      Q.        Good morning, Mr. Burk.
 8      A.        Morning.
 9      Q.        My name is Allie Pickerill.  I
10      represent the City of Columbus and the officers in
11      this lawsuit.  I'm just going to ask you some
12      questions to try to learn more information about
13      the lawsuit that you're bringing and sort of all
14      the facts that kind of go around that.
15                   If you ever have any questions about my
16      questions, if they don't make sense, just let me
17      know.  I will try and think of a better way to ask
18      it or maybe it was a bad question to begin with
19      and we'll -- we'll figure out a better way to go
20      forward.
21      A.        Okay.
22      Q.        So just as long as you let me know.  If
23      you do answer a question, I'm going to assume that
24      you did understand the question that I asked.  The
```

7

```
1    only -- the other big thing is we do have a court

2    reporter here who's typing down everything that we

3    say, so we'll have to try and be careful not to

4    talk over each other.  I know I'm -- I do that

5    sometimes too.  So just we'll both try and do our

6    best.

7    A.          Okay.

8    Q.          All right.  If you need a break at any

9    time, just let me know.  That's not a problem.

10   You can talk to your attorneys, take whatever

11   breaks you need.  All I ask is that if there is a

12   question pending that we get an answer to it

13   before we break, okay?

14   A.          Yes.

15   Q.          Okay.  Could you please go ahead and

16   give us your full name, spelling your first and

17   last?

18   A.          James Alan Burk, Jr.  J-A-M-E-S,

19   A-L-A-N, B-U-R-K, Jr.

20   Q.          Have you ever had your deposition taken

21   before?

22   A.          I believe so, yes.

23   Q.          Okay.  In what context?

24   A.          I believe it was in -- as law
```

8

1   enforcement.

2   Q.          Okay.

3   A.          The context as -- as a city police

4   officer.

5   Q.          Okay.  In relation to, like, a case

6   that you were working?

7   A.          Yeah.  It was something of that nature.

8   Q.          Okay.

9   A.          I mean, this is 20-plus years ago.

10  Q.          Did that -- probably working as a

11  police officer, did that ever require you to

12  testify in court?

13  A.          Absolutely.

14  Q.          Okay.  Did you ever testify in court

15  for any nonpolice matters?

16  A.          No.

17  Q.          Okay.

18  A.          Not that I'm aware of.

19  Q.          Did you ever testify in court related

20  to an ATF matter?

21  A.          Yes.

22  Q.          Okay.  Just sort of, like, throughout

23  the course of your business, is that something you

24  would have to do?

9

```
1    A.        Testimony in support of -- of cases,

2    correct.

3    Q.        Yeah.

4    A.        That were going to trial or in some

5    type of hearing.

6    Q.        Okay.  Have you ever yourself before

7    been part of a lawsuit?

8    A.        No.  Not that I'm aware of.

9    Q.        Okay.  Never -- nobody's ever sued you

10   that you know of?

11   A.        No.

12   Q.        And you've never sued anyone else --

13   A.        No.

14   Q.        -- before this?

15            Did you do anything to prepare for this

16   deposition?

17   A.        I mean, we were -- we live out of

18   state, so, no, not really.  But I mean when we got

19   in here, I met with -- obviously, met with my

20   attorneys and I watched the video of the incident

21   for the first time ever.  And the audio, I

22   listened to the audio.  And then -- yeah, and then

23   there was some -- some documentation that I

24   perused through.
```

1    Q.          Okay.

2    A.          And that was pretty much it.

3    Q.          Okay.  Do you know what documents you

4    looked at to prepare?

5    A.          I believe there was a -- some ATF

6    documents.  I can't remember exactly what they

7    were.

8    Q.          Okay.

9    A.          But they were just had to do with the

10   incident itself and some either statements or

11   possibly what I had -- had explained at some point

12   to ATF personnel and -- and stuff like that

13   regarding the incident.

14   Q.          Okay.  So, like, ATF documents.  Any

15   CPD documents?

16   A.          I don't know if I remember actual CPD

17   documents that were there.  But I -- obviously,

18   the video footage, CPD stuff there, the audio, and

19   -- and there might have been something else on the

20   video screen, something to do with, like, a

21   printout or -- or -- it was inside a police car.

22   Q.          Okay.  I'm just going to ask some

23   questions about you.

24   A.          Uh-huh.

1  Q.       Can you tell me when your birthday is?

2  A.       August 8th, 1969.

3  Q.       Okay.  And where are you living right

4  now?

5  A.       Tennessee.

6  Q.       Okay.  What part of Tennessee?

7  A.       Middle Tennessee.

8  Q.       Middle Tennessee.

9           Okay.  How long have you been living in

10 Tennessee?

11 A.       Approximately going on one year.

12 Q.       Okay.  How are you liking it down

13 there?

14 A.       It's quiet.

15 Q.       Been down there about one year.  Where

16 were you before Tennessee?

17 A.       Loveland, Ohio.

18 Q.       Okay.  And do you live in Tennessee

19 with your wife?

20 A.       Yes, I do.

21 Q.       Okay.

22 A.       And my son.

23 Q.       Does anyone else live there with you?

24 A.       No.

12

```
 1   Q.        Was -- did your wife live in Loveland
 2   as well?
 3   A.        Yes, she did.
 4   Q.        Okay.  When were you all married?
 5   A.        2016.
 6   Q.        '16.
 7             When was your son born?
 8   A.        January 26th, 2021.
 9   Q.        Okay.  How long had you all lived in
10   Loveland?
11   A.        I had lived in -- I had lived in
12   Loveland, oh, 16, going on 17 years, so 18 --
13   probably almost 18 years.
14   Q.        Okay.
15   A.        And she has been with me for seven.
16   Q.        Okay.
17   A.        I resided there before we got married.
18   Q.        Are you currently employed?
19   A.        No.
20   Q.        Okay.  Did -- where did you go to high
21   school?
22   A.        I went to high school at Gavit High
23   School.
24   Q.        Gavit?
```

13

```
1    A.          Yeah.  In northwest Indiana.

2    Q.          Okay.  Did you go to college after

3    that?

4    A.          I had kind of the prolonged college

5    experience.  I went to college after high school,

6    then went in the military, then became a police

7    officer, then finished my college education.

8    Q.          Where did you start college?

9    A.          Indiana University.

10   Q.          What were you studying?

11   A.          Criminal justice.

12   Q.          Okay.  How far into that degree did you

13   get?

14   A.          I have my bachelor's in criminal

15   justice.

16   Q.          Okay.  So how far did you get the first

17   time?

18   A.          Two years, you know, kind of halfway.

19   Q.          Oh.

20   A.          Halfway through.

21   Q.          And you mentioned you went to the

22   military.

23   A.          And then I went -- then I joined the

24   Marine Corps for four years --
```

1  Q.        Okay.

2  A.              -- honorably discharged.  And then when

3  I came out, I started to go back to school, but

4  was able -- eventually went to a job fair and put

5  in my information and in the process took off for

6  the -- for a city police department, and I pursued

7  that.  And then once I was established in that

8  career, then finished up my education because I

9  knew I wanted to eventually get to the federal

10 level, which I -- which of course required a

11 degree.

12 Q.        Uh-huh.

13 A.        So --

14 Q.        What police force were you with?

15 A.        The Hammond.

16 Q.        Hammond.  Is that in Indiana?

17 A.        Indiana, yes.

18 Q.        Okay.  How long were you with the

19 Hammond police force?

20 A.        Just under -- just under 10 years.

21 Q.        Okay.  And what kind of positions did

22 you have with the police force there?

23 A.        I was a -- well, I started out as a

24 patrol officer.  I was a -- I spent also time as a

```
1    S.W.A.T. officer, firearms instructor, defensive
2    tactics instructor.  I fit a lot of bills.  And
3    then I was also an ATF task force officer; I ran
4    their gun recovery program.
5    Q.          Uh-huh.  Is that how you got interested
6    in ATF?
7    A.          As an -- I had a working relationship
8    with the local ATF office as part of my duties for
9    the police department, which segued into getting
10   an ATF task force position.  Yeah, obviously, you
11   know, my relationship and, you know, what I
12   brought to the table, my experience and just --
13   Q.          Uh-huh.
14   A.          They -- at that time, ATF was hiring
15   kind of on a -- it's called Schedule B.  And
16   that's kind of like placed on a referral program
17   from within the agency.  And obviously, you know,
18   I was highly referred, so I was able to get in
19   contact with -- with the initial hiring process
20   and then it was 18 months of everything screening,
21   medical, interviews, testing, all that kind of
22   stuff.  And then, you know, Congressional budget
23   issues, and then eventually got -- got the call.
24   Q.          Okay.  I'd like to talk to you about
```

1   your time with ATF a little bit.  ATF is the

2   United States Bureau of Alcohol, Tobacco, Firearms

3   and Explosives, right?

4   A.        Yes, it is.

5   Q.        What year did you start working there?

6   A.        2004 I was hired.

7   Q.        Okay.

8   A.        July to be exact, summer.

9   Q.        We'll be exact.

10            What were your -- what was your

11  assignment?  What were your roles when you

12  initially started?

13  A.        Initially started as a special agent

14  assigned to the Cincinnati field office.

15  Q.        Is the special agent title a sort of

16  broad one or are there other titles within ATF?

17  A.        Well, you're either on the law

18  enforcement side of the house or you're on the

19  civilian side of the house.  I mean, we have other

20  positions within the agency that are non law

21  enforcement.

22  Q.        Okay.

23  A.        So those are, you know, support

24  positions, you know, intel positions and stuff

1    like that.  But as far as there's an inspector's

2    side of the house that does the regulatory arm,

3    which are not special agents.  So the special

4    agents do the criminal investigative work.

5    Q.        Okay.  Is there any --

6    A.        The actual law enforcement.

7    Q.        Okay.  Is there any hierarchy within

8    the special agents or --

9    A.        Oh, absolutely.  There's a management

10   structure going all the way down -- or, you know,

11   you know, the director or acting director is what

12   we always had for a long time.  And then there's

13   deputy -- or assistant directors and it -- it's a

14   -- it's a normal hierarchy like you'd have in any

15   kind of business setting.

16   Q.        Okay.

17   A.        And then it trickles down, you know,

18   you have divisions and divisions have SACs and

19   then they have two ASACs and then each office has

20   a resident agent in charge, and then he has field

21   agents that work for that office.  So there's --

22   there's a supervisory chain of command and they're

23   all agents.

24   Q.        Okay.

1    A.          By trade, they're all agents.  But now

2    they're not in the field, they're management.

3    Q.          Uh-huh.  Uh-huh.

4                I appreciate you kind of fleshing that

5    out for me.  I hadn't fully understood sort of

6    what the hierarchy was.

7                Do you remember in August of 2015 what

8    your roles and responsibilities with ATF were?

9    A.          I think -- 2015.  I was obviously

10   always a special agent.  And at that time I

11   believe I was the division tactical advisor.

12   Q.          What does that mean?

13   A.          It means I -- all operational-type

14   planning that are conducted by the -- in this case

15   the Columbus field division would be -- would be

16   submitted to me for review to determine tactical

17   soundness --

18   Q.          Uh-huh.

19   A.          -- of the operation before it takes

20   place.  And part of those responsibilities were

21   also the quarterly tactical training for all the

22   agents in the division.  So I led the training and

23   for -- for two quarters of the four of the year, I

24   ran the firearms training, I trained instructors,

1    and I was kind of all things that had to do with

2    tactics instruct, whether it be physical,

3    firearms, was -- was all facilitated and oversaw

4    by me.

5    Q.          Uh-huh.  So were you still stationed at

6    the Cincinnati field office?

7    A.          I worked for the division, but, yeah,

8    that's always where it's kind of been my home

9    office space.  But in that time, I was -- had

10   office space there, but I was working more in a

11   divisional capacity throughout the division, it's

12   just you got to call home somewhere.  So it has

13   always been the Cincinnati field office.

14   Q.       Okay.

15   A.          Which had to do with my proximity where

16   I lived and they -- the space was there.

17   Q.       Uh-huh.

18   A.       So --

19   Q.       So when you say it was more a

20   divisional --

21   A.          Position.

22   Q.          -- position, what area did that

23   include?

24   A.          The southern judicial district of

1    Indiana and the southern judicial district of

2    Ohio.  So figure everything from pretty much

3    Columbus south and everything from including

4    Indianapolis south.

5    Q.        Okay.

6    A.        For two states.

7    Q.        Was your supervisor in Cincinnati?

8    A.        Yes.

9    Q.        Okay.

10   A.        My -- my supervisor as the DTA was not

11   the Cincinnati supervisor at the time.  Or, I

12   mean, was not the -- my supervisor at the time.  I

13   would have answered to the division ASAC.

14   Q.        Okay.  Could you tell me first what DTA

15   means?

16   A.        Division tactical advisor.

17   Q.        Okay.  And ASAC?

18   A.        Assistant special agent in charge.

19   He's the -- he's one of two number twos at the

20   division level.

21   Q.        Okay.

22   A.        Which cover that -- both of those

23   judicial districts.

24   Q.        Okay.  And that's who you would have --

1    A.        That's who I would --

2    Q.        -- reported to?

3    A.        If I had to answer to somebody, it

4    would have been the ASAC.

5    Q.        Okay.

6    A.        Direct -- would have been my next line

7    so to say.

8    Q.        Okay.

9    A.        Because I was working at the division

10   level, not at the field office level --

11   Q.        Okay.

12   A.        -- for management purposes.

13   Q.        Gotcha.

14             So if you ever needed to report to

15   someone, the ASAC is who you --

16   A.        Is who I would confer with.  I mean, I

17   believe the ASAC is who gave me my annual reviews

18   and stuff like that.  It was not a -- you know,

19   they're -- you know, he knew more about what I was

20   doing, you know, so to say than the -- the agent

21   -- the resident agent was managing his field

22   agents in their case work.

23   Q.        Right.

24   A.        I was doing things for the whole

```
 1   division.  So that was -- that was kind of how it
 2   was structured at the time.
 3   Q.          Okay.
 4   A.          Even though I had like a direct
 5   relationship with the supervisor in Cincinnati
 6   because he was my supervisor until I started doing
 7   things for the division.
 8   Q.          Uh-huh.
 9   A.          So I broke away from the case work to
10   do the training aspect.
11   Q.          So the ASAC just kind of has a better
12   thumb on what's going on sort of in your whole
13   area as opposed to just in Cincinnati?
14   A.          Well, the RACs for each field office,
15   they're the boots on the ground supervisor for all
16   their agents, for each agent assigned to that
17   office.  Those RACs, depending on -- will answer
18   to one of two ASACs.
19   Q.          Okay.
20   A.          So the ASACs manage the RACs, the RACs
21   manage the field agents.  The ASACs are managed by
22   the SAC, the main guy for each division --
23   Q.          Okay.
24   A.          -- throughout the country.  There's one
```

```
 1    for each division.

 2    Q.          Oh, one SAC for each division?

 3    A.          For each division.

 4    Q.          Okay.

 5    A.          So there's multiple SACs throughout the

 6    country.  Those SACs then, you know, usually

 7    answer to a deputy assistant director that is

 8    geographically covering parts of a country.

 9    Q.          Sure.

10    A.          Our country.  So it's -- it kind of is

11    structured that way.  And those DADs answer to

12    likely the -- the -- you know, the assistant

13    director and then there is the director, which is

14    kind of like the director of any federal agency,

15    he's the top dog.

16    Q.          Okay.  Okay.  So I'm going to -- I'm

17    going to ask you more questions I think about the

18    organizational structure I think later on.

19                But I'm going to go back to August of

20    2015 for a moment.  Did you have some conduct in

21    August 2015 that was investigated by ATF?

22    A.          Yes.

23                MR. BOND:  I'm just going -- for the

24    record, I want to voice my objection to
```

```
 1    questioning about this past disciplinary conduct
 2    just for the record.
 3    Q.         Okay.
 4    A.         Say the question again.  I'm sorry.
 5    Q.         Yeah.  Did you have any conduct in
 6    August of 2015 that was investigated by ATF?
 7    A.         Yes, I did.
 8    Q.         Can you tell me about that?
 9    A.         I had some -- some personal issues that
10    I was struggling with.  And, you know, with --
11    with stress, anxiety, and some alcohol usage and
12    dependency.  And it -- it affected my -- my
13    personal conduct and, you know, that led to a --
14    you know, a situation where I had to, you know,
15    because of my position, it obviously, you know,
16    had an affect on my position and work at the time,
17    so that's -- that's briefly what happened, yeah.
18    Q.         Okay.  Can you tell me sort of what
19    your involvement in the investigation was?  Did
20    you sit down for interviews, did you have to talk
21    to people, did you have to submit letters?
22    A.         Yes, I did.  I did sit down for an --
23    in an interview with -- with the agency.  Yes, I
24    did.
```

25

```
 1    Q.          Okay.  Did you receive a notice that

 2    they were proposing removal from the agency?

 3    A.          I did.

 4    Q.          Okay.

 5    A.          That was an initial proposal, yes.

 6    Q.          Initially, yes.

 7    A.          Yeah.

 8    Q.          I just want you to authenticate this

 9    document for me.  Okay.  Can you just tell me if

10    that is the notice that you received in relation

11    to that August 2015 incident?

12               THE REPORTER:  Do you want this?

13               MS. PICKERILL:  Yeah, of course.

14    A.          Yeah.  With some retractions, of

15    course.

16    Q.          Okay.

17    A.          But, yeah, I mean, it's a copy of it.

18    Q.          Okay.

19    A.          It appears to be legitimate, yes.

20    Q.          Okay.  What did -- when you got that

21    letter, what did that letter let you know?

22    A.          Well, they were proposing -- you know,

23    it was proposed that -- that I'd be removed from

24    my position.  Again, I had a personal issue that
```

1    led to, you know, conduct that I wasn't proud of.

2    And I had a dependency at the time that I was

3    dealing with, due to the amount of exhaustion,

4    anxiety, stress.  You know, in my personal life I

5    was covering a lot of things in my professional

6    life that were just, you know, being -- becoming a

7    lot to handle.  I made, you know, some bad

8    decisions.  I went and resolved the issue with --

9    with ATF, sought -- got treatment, took a break

10   for about a month and -- and came back and, you

11   know, put it behind me and continued to -- to be

12   successful in my career.

13   Q.        Uh-huh.

14   A.        It's unfortunate that I allowed myself,

15   you know, to get to that position but, you know,

16   it was -- you know, you live and learn.  And I

17   made a mistake and I owned up to it.

18            MS. PICKERILL:  Uh-huh.  As a clerical

19   matter, I'm going to ask my co-counsel if you

20   already marked the exhibits with numbers?  Is it 1

21   through 3?

22            MS. HOBBS:  Yes.

23            MS. PICKERILL:  Okay.  Because I on --

24   I have a good faith basis to believe that exhibits

27

```
 1    1 through 3 will be forthcoming, I'm going to mark

 2    this as Exhibit 4.

 3                        - - - - -

 4             Thereupon, Exhibit 4 is marked for

 5    purposes of identification.

 6                        - - - - -

 7    BY MS. PICKERILL:

 8    Q.         Did you ultimately sign an agreement

 9    with ATF out of this investigation into conduct?

10    A.         Yeah.  I received a 30-day suspension

11    and I signed a -- you know, essentially something

12    that's a -- if I can recall, like, you know, don't

13    get in trouble anymore.  Like, you're --

14    Q.         Uh-huh.

15    A.         You know, just don't have any more

16    issues.

17    Q.         Okay.

18    A.         I can't recall what it was called or

19    what the thing was.  But it was, you know, like,

20    don't let it happen again.  Like, you know, no

21    more -- no more problems.

22    Q.         Yeah.  That's no problem.  I was

23    actually going to hand you the document.

24    A.         Oh, okay.
```

28

1    Q.         To see if I have what you remember to

2    be that agreement.  And I'll purport it's titled

3    Last Chance Agreement.

4                       - - - - -

5          Thereupon, Exhibit 5 is marked for

6    purposes of identification.

7                       - - - - -

8    A.         Okay.  Yeah, this -- yeah, this looks

9    to be it without reading it word for word.  But,

10   yes.

11   Q.         Okay.

12              THE WITNESS:  What am I doing?

13              THE REPORTER:  Yeah.  You can just put

14   that here like that.

15              THE WITNESS:  Oh.

16   BY MS. PICKERILL:

17   Q.         Did this agreement limit your roles

18   with ATF at all?

19   A.         Not that I was aware of, no.

20   Q.         Did it change your responsibilities in

21   any way?

22   A.         No.  It was just based on -- on your

23   conduct.  Like don't get in trouble again and, you

24   know, no -- no more issues.

29

```
1    Q.         It was a two-year agreement?

2    A.         Well --

3    Q.         Is that right?

4    A.         I -- I believe.  I didn't read it.  But

5    I --

6    Q.         Did you read it at the time when you

7    signed it?

8    A.         I did.

9    Q.         Okay.

10   A.         Yeah.  I would have read it then.  I

11   just didn't read it -- take the time to read it

12   completely.

13   Q.         Okay.

14   A.         I just looked at it and it appeared

15   familiar to me, and that's why I said --

16   Q.         Sure.

17   A.         -- I know what it is.

18   Q.         You can look at it.  But did you sign

19   it on August 5th, 2016?

20   A.         Well, yeah.  I did.

21   Q.         Okay.  To -- did you ever get into any

22   issues again --

23   A.         I --

24   Q.         -- with that agreement?
```

30

```
 1    A.          No.

 2    Q.          Okay.

 3    A.          I've never had any problem at all.  And

 4    my -- my reviews and performance reviews even then

 5    were acceptable, but it only excelled.  I mean,

 6    I've had a very, very good career at ATF with the

 7    exception of the one incident that I, you know,

 8    allowed myself to get into.  And got back, you

 9    know, on -- on a good -- in a good place.  But,

10    you know, my -- my reputation and -- and

11    performance is well documented.

12    Q.          Would you mind just handing me back

13    that document?  I don't believe that I marked the

14    number on the sticker.

15    A.          It's got a "5" or something on it.

16    Q.          Oh, it does have a 5.  I did mark it.

17    I apologize for my unnecessary anxiety about that.

18               Moving on to your other parts of your

19    time with ATF.  Were you reassigned to a different

20    position in 2017, do you remember?

21    A.          I was asked to take on the

22    responsibilities of the NICs investigations

23    because of the volume and the nature of the work.

24    And, you know, as it was explained to me, my work
```

31

1    ethic and attention to detail was not always

2    something that was exhibited by other agents.  And

3    they felt because of the pressure received from

4    headquarters to resolve these cases and -- and

5    make the -- you know, the accurate determinations

6    on them, you know, would I be willing to -- to

7    assume this role and to also take on

8    responsibilities for other offices in order to --

9    to help.

10           Because we're -- you know, Ohio being a

11   source -- considered a source state for firearms,

12   there's a high volume of purchases.  And these --

13   these come in waves and waves and waves, and it's

14   a delicate issue because in many instances

15   firearms are transferred and a lot of those people

16   are prohibited, some aren't, and now you have a

17   situation that ATF's left to clean up based on the

18   decision made by FBI on the front end.  So it's --

19   it's -- it can turn real bad for ATF real fast if,

20   you know, the matters aren't dealt with in a

21   timely fashion.

22   Q.        Uh-huh.

23           I have some more questions, and I want

24   to talk to you some more about your work doing

32

```
1    those retrievals.  Before -- and I'll be honest.
2    I have a difficult time interpreting some of these
3    sort of HR documents.  Is this just the notice
4    that you were reassigned to do those NICs
5    retrievals?  I could be wrong, I'll put that out
6    there.
7                      - - - - -
8           Thereupon, Exhibit 6 is marked for
9    purposes of identification.
10                     - - - - -
11   A.         I personally have not seen this.
12   Q.         Okay.
13   A.         That I'm aware of.  But, yeah, I mean,
14   you get these personnel actions, these -- SF --
15   I'm not sure what this one is.  SF50s.  But, yeah,
16   I mean, any time there's a change of location, a
17   change of position, a change of assignment, it
18   doesn't change the fact that you're still not a
19   special agent with a badge with a gun doing
20   investigative work, it just means the nature of
21   what you're doing may have changed.
22   Q.         Absolutely.  And that's sort of just
23   what I was trying to understand with the timeline
24   of when you started doing the NICs retrievals and
```

33

1    sort of just what these meant.

2    A.          It's just -- you know, I also had one

3    of those when I moved from an agent to being a

4    DTA.  Even though I could go out and do the same

5    work I was doing before, my focus was on something

6    different so they generate an SF50 and it kind of

7    just lets them know, hey, his responsibilities are

8    different.  If I would have promoted to a

9    supervisor --

10   Q.          Uh-huh.

11   A.          -- I would have got the same thing that

12   says he's been reassigned to, you know, a

13   different type of focus.

14   Q.          Could you just confirm for me that this

15   is what you said, an SF50 regarding you and that

16   the date is 8-20-17?

17   A.          It's dated 8-29-17.

18   Q.          Okay.

19   A.          And it has my name, initials and every

20   -- my identifiers on it.

21   Q.          Okay.  And I'll agree that we're not

22   entirely sure.

23   A.          Okay.

24   Q.          But --

34

1    A.        Now --

2    Q.        Since we talked about it, I just wanted

3    to put on the record what we do know about it.

4    A.        Am I allowed to ask a question?

5    Q.        Sure.

6    A.        I just noticed that certain things are

7    redacted on other forms, but I notice my, you

8    know, date of birth, yea, no big deal.  But my

9    Social Security on these documents not redacted,

10   so is that pause for concern?

11   Q.        So I will let you know we received

12   these from ATF directly and they did the

13   redacting.  I am so happy to redact out your

14   Social Security number before we file this.

15   A.        I would be comfortable with that.

16             MR. BOND:  Don't worry.  Your --

17   they're not -- no one is allowed to put your

18   social in the record.

19             THE WITNESS:  Okay.

20             MR. BOND:  We'll make sure of it.

21   A.        It was just an observation.

22   Q.        Absolutely, yeah.

23             MR. BOND:  Okay.

24   Q.        Right now, this is just kind of with

1   us.

2   A.        Okay.

3   Q.        And before we file it, we'll make

4   sure --

5   A.        Thank you.

6   Q.        -- that any of those personal

7   identifiers are redacted.

8   A.        No, I believe you.

9   Q.        No, I appreciate you pointing it out.

10          MS.  PICKERILL:  Did I give you one?

11          MR. BOND:  I've got one.

12  BY MS. PICKERILL:

13  Q.        Okay.  So I want to move now to 2020

14  and sort of what was going on with ATF.

15  A.        Uh-huh.

16  Q.        On July 7th, 2020, what was your role

17  with ATF?

18  A.        I was currently investigating the --

19  all NICs retrievals and -- and NICs investigation

20  related matters for the -- the Southern District

21  of Ohio and Indiana, which encompasses every

22  single county in those two districts which is

23  numerous.

24  Q.        Okay.

36

1    A.        So I was essentially doing it for five

2    different field offices.

3    Q.        Okay.  So I've seen sort of throughout

4    the documents, sometimes I'll see NICs retrievals,

5    sometimes I'll see NICs investigation.

6    A.        Uh-huh.

7    Q.        Is there a difference between those

8    two?

9    A.        Amongst the agents, NICs retrievals,

10   NICs -- I've got a NICs, I've got -- you know,

11   I've got to run out and I've got to do a NICs,

12   NICs retrieval.  I mean, the -- the retrieval is

13   obviously going to pertain to that it was a

14   delayed denial, that the gun had then been

15   transferred to a purchaser and they had been

16   denied after the fact, meaning the three-day wait

17   period had exceeded.  By -- by law, the -- the gun

18   dealers or policy, the -- the gun dealers can

19   release a firearm even though a background check

20   has not been finished by FBI.  That is --

21   Q.        Really?

22   A.        Absolutely.

23   Q.        Huh.

24   A.        So FBI -- and just to -- FBI -- the gun

1    dealer calls in -- you know, you go to buy a gun,

2    fill out the 4473, it's all your information, you

3    answer a series of questions.  And then the gun

4    dealer contacts the FBI background NICs center,

5    provides that information, identifiers, they run a

6    background check.  There's one of three things

7    that can happen.  One, they see enough on there to

8    say absolutely not, he's prohibited, he's denied.

9    Gun dealer says, sorry, you've been denied.

10   That's all you can tell him.  Can't tell him why

11   or anything like that.  And then it's up to the

12   person to figure it out or file an appeal or

13   whatever.

14          Second thing that could happen is looks

15   good to go, you're given an immediate proceed, pay

16   your money, get your gun, go out the door.

17          Third thing that happens is you're put

18   on what's called a delay, meaning FBI hasn't quite

19   decided whether you can or whether you're given a

20   proceed or denial, they have to look into it

21   further.  Well, they only got -- they get three

22   days to do that.  And if they cannot come back

23   with an answer to a gun dealer, the gun dealers

24   can say, hey, we haven't heard from FBI, come get

1    your gun.  The gun goes out the door.  FBI on the

2    forth day, fifth, sometimes I've seen it over a

3    month later they finally come back and there's

4    been incidences where the gun dealer has never

5    heard back from FBI.

6    Q.        Uh-huh.

7    A.        So they've only got to wait three days.

8    They're in it to make money.  They sell it, hey,

9    come get your gun.  Now the gun is out there and

10   in a large percentage of the -- of the cases, the

11   person is prohibited.

12   Q.        Uh-huh.

13   A.        Well, as soon as that gun -- as soon as

14   that whole thing takes place, it's not FBI's --

15   this is ATF's problem now.  And it's a priority

16   for them, even though it's not, you know, the

17   glory stuff.

18   Q.        Sure.

19   A.        It's -- it's an important thing because

20   it can look really bad if the gun is used in a

21   crime.

22   Q.        Sure.

23   A.        If it, you know, ends up in a bad way,

24   which is always the concern.  So now -- now --

1    those are the three things that can happen.

2              So a NICs retrieval, back to your

3    question, would be the gun -- you're referencing

4    the fact that a gun has made it out the door

5    before the background check.  Now the possessor,

6    purchaser has it, not always possessing it any

7    more but sometimes, yes.  And then now you have to

8    go work the investigation, locate -- try to locate

9    the gun, make contact with the purchaser and

10   ultimately try to recover the firearm in some

11   fashion, and we have a multitude of options to do

12   that.

13   Q.        Okay.  Thank you.  That really helps

14   explain the entire buying process for me.

15             So you're only dealing with instances

16   of that third category you described where someone

17   gets the delayed denial?

18   A.        No.  I was dealing with all of those.

19   Q.        Okay.

20   A.        So if somebody gets a standard denial,

21   really what happens means they went -- they went

22   to try, then we generate a warning letter to them.

23   So there's a process there.  There's an

24   administrative process there that, you know, I'll

1    -- I'll do up a warning letter.  And it's -- it's

2    kind of a boilerplate, but it's a three-page

3    letter that says this -- it doesn't tell them why

4    they were prohibited, it just says it's a -- you

5    know, nobody likes to get a -- anything in the

6    mail from.

7    Q.        Yeah.

8    A.        So it's -- it's kind of a stern

9    warning.  It's on them to kind of figure it out.

10   But it's a reminder, hey, you've been found to be

11   prohibited.  Cease and desist from trying to

12   purchase firearms.  So there's an administrative

13   process for those that I also took care of.  But

14   the priority part of it was the retrieval part, so

15   that was the other part was the delayed denials.

16   So I have standard denials and you have delayed

17   denials where the gun made it out the door.

18   Q.        Okay.

19   A.        I took care of all of that.

20   Q.        So on standard denials, are you going

21   out to retrieve a firearm?

22   A.        No.  It was never transferred.

23   Q.        Gotcha.  Thank you.

24             So you were responsible in the summer

1   of 2020 for all of those --

2   A.          Everything --

3   Q.          -- NICS cases?

4   A.          NICS.  Everything NICs related.

5   Q.          Was there --

6   A.          The division came to me for everything.

7   Q.          Was there anyone else doing NICs

8   retrievals throughout the area or was it just you?

9   A.          I was doing -- I can't speak for other

10  divisions, how they chose -- this is a -- you

11  know, this was what we did in our division, you

12  know, this was under the, you know, direction of

13  our SAC and -- and ASAC and what would be best use

14  of resources in order to tackle this problem.

15  Because we were inundated with it, and it -- I

16  hate to say it, but you can't just give that

17  responsibility to anybody because a lot of times

18  they just sit and they don't get done.  It's --

19  people -- it's -- it's -- it's tedious work and it

20  requires a lot of travel throughout the day.

21  Q.          Uh-huh.

22  A.          And a lot of agents just don't want to

23  do that.  They want to stay close to the office.

24  They've got to, you know, pick their kids up and

42

1    4:00, and, you know, things like that. And it's

2    -- it's just not something everybody wants to do

3    because of the nature of the work.

4    Q.        Uh-huh.

5    A.        But, you know, I saw a purpose in it

6    and I was more than -- you know, I thought it was

7    a good idea the way they were structuring it

8    because it -- it allows a -- one person to create

9    a -- a -- and have a detailed manner and

10   methodical way to approach these cases in a timely

11   fashion without distractions. And then it allowed

12   for other agents to work on other dedicated

13   projects as well.

14   Q.        Uh-huh.

15   A.        So it really did work good as a model

16   and as -- it did for our division. It worked

17   really well. And we -- rarely did we get a call

18   from headquarters about, hey, what's -- you know,

19   what's going on? Why is there still so many of

20   these unresolved? We just didn't get that.

21   Q.        Uh-huh.

22   A.        For the time that I was doing those

23   cases, which was almost four years. I've always

24   done them, but focused for the last four years of

43

1    my career.

2    Q.         Uh-huh.  So how often were you having

3    to travel around for that -- for that role?

4    A.         Every day.

5    Q.         Every day.

6               Were you traveling to multiple places a

7    day?

8    A.         Sometimes.  Depending on how much time

9    was needed to resolve each one.

10   Q.         Uh-huh.

11   A.         I mean, I tried to accomplish as much

12   as I could in a 10-hour day.  But sometimes you

13   get somewhere and then, you know, it's -- maybe

14   the person is not home or maybe you have --

15   they're at work or here -- here's where they're at

16   or here's where they live, they gave a bad address

17   on the form, they didn't really live there but it

18   was on their license.  But they -- but there's

19   steps.  I mean, you just don't know where your day

20   is going to go because you can't account for where

21   that person is at at any given time.

22   Q.         Uh-huh.

23   A.         But the urgency and the -- I should say

24   the priority of trying to get the firearm is just

44

```
 1    another day ticking.  And it's -- you know, you

 2    just don't want it to be on your watch when a gun

 3    pops up in a crime and it -- it wasn't retrieved

 4    or attempted to be retrieved within a reasonable

 5    time frame, what's set forth by ATF.

 6    Q.         So if you're -- you, you're traveling

 7    all over to try and find these people, like, if

 8    they're not at home when you get there, you don't

 9    necessarily want to drive all the way back.  Do

10    you just have to get lunch and hang out and --

11    A.         It -- it -- it really kind of depends.

12    Like I said, most of the time, you know, I can

13    determine whether the -- you know, through a

14    dialogue with the -- with the resident or whoever

15    the person is that, you know, answers the door.

16    Again they may not live there.  Well, then I'm

17    going back through some documents trying to find,

18    okay, where are some secondary possible places.

19    We have databases that allow us to see where maybe

20    they're --

21    Q.         Uh-huh.

22    A.         -- coming up on a report of something

23    with -- well, there's another possible address.

24    They may live -- so you go there.  So -- or it's,
```

1    hey, my -- you know, my boyfriend will be back,

2    you know, that's him, he'll be back, you know, at

3    5:00.  Well, you know, am I going to drive three

4    hours back to Cincinnati?  No, I'm going to go try

5    to get some administrative -- I've got my lap --

6    I've got all my stuff with me, and I'll kill time

7    and do some other work and work some other stuff.

8    Or I may -- if it's in Dayton and I've got to go

9    to Beavercreek on another one, I'll go over and

10   work on that one and see if I can get that done

11   and then come back to the other one.  So I try to

12   accomplish as much as I can in one day.  And it's

13   really not about a convenience to me, it's more

14   about the fact that the time frame on these cases,

15   the clock is always ticking and they really don't

16   want these exceeding a -- you know, a 30-day

17   window, you know, the sooner the better.  But

18   you're going to start getting nasty-grams when --

19   when things aren't getting resolved.  And so I --

20   and I try to always keep the heat off the division

21   and get these resolved and -- and it -- and we did

22   really good at it, really, really good at it.

23   Q.        You mentioned that you were working

24   10-hour days.  How many days a week were you

1   working?

2   A.          Five days.

3   Q.          Five days?

4   A.          I mean, 10 is your expectation.  But it

5   -- I mean, I've worked plenty of longer days.

6   It's just --

7   Q.          Yeah.

8   A.          -- you're required to put in a 10-hour

9   day.

10  Q.          Okay.

11  A.          That's what you're paid for.

12  Q.          And --

13  A.          Out in the field.  I mean, there's

14  9-to-5 positions and stuff.  But this is a

15  investigative position and you're paid according

16  -- accordingly for that.  So that you're putting

17  in at least 10 hours.

18  Q.          Yeah.  For the job that you were doing,

19  that was the expectation?

20  A.          As a field agent, yes.  As a field

21  agent.

22  Q.          Gotcha.

23  A.          Any field agent.

24  Q.          In the summer of 2020, were you under

1    any sort of suspension or limitation on your work

2    responsibilities?

3    A.        No.

4    Q.        Okay.  Did you ever -- you said you

5    were really -- I'll go back.  Did you ever work

6    with a partner in that role?

7    A.        I didn't have an assigned partner.  If

8    I needed additional resources for any reason, I

9    was free to ask.  I mean, it's subject to

10   availability.  But the -- the per -- the direction

11   and -- and authorization that was given to me was

12   to pursue these cases, and as I needed resources,

13   ask for them.

14            I mean, I was a seasoned officer, very

15   successful and did a lot of things in the agency.

16   And my, you know, discretion was -- was highly

17   regarded, and I did ask when I needed it.  There

18   was times where -- and if it wasn't from within

19   our own agency, then I would -- I would seek

20   assistance elsewhere from another law enforcement

21   agency.

22   Q.        So --

23   A.        As I -- as it was needed.

24   Q.        So were there -- so there were some

1    runs where -- or some assignments where you would

2    take someone else with you if it -- if it was

3    necessary?

4    A.        If the -- if the subject's criminal

5    history warranted a concern that it may -- the

6    presence of more would be better, usually another

7    agent, just a second person.  You know, if they

8    had a propensity for violence, disorderly conduct,

9    et cetera, or if perhaps the -- the location you

10   were going to was in a risky area, then, you know,

11   you've got to have somebody to watch your back.

12   It would be more -- more of a chance that

13   something could -- you know, could happen in a

14   high crime area versus a -- you know, just a

15   suburban neighborhood.

16   Q.        Sure.

17   A.        So -- but the idea was resource

18   management, you know, take what you need.

19   Q.        Uh-huh.  So were you able to get help

20   sort of from the various ATF branches throughout

21   your division?

22   A.        Normally it could come from where I'm

23   located, out of Cincinnati.  I would ask somebody

24   out of Cincinnati just because I can account for

49

1    their availability a little bit better.

2    Q.        Okay.

3    A.        And you have tighter relationships with

4    them.  You know, guys are -- you know, you're less

5    likely to get an excuse, well, you know, I've got

6    -- it's just human nature.  You know, it's just

7    how -- so I would -- if I needed it, I would first

8    and foremost get an agent from Cincinnati.  Have I

9    got agents from other area at times, yeah,

10   probably, but I've done hundreds of these a year.

11   I mean, hundreds of firearms I retrieve per year.

12   And it's -- so, I mean, it's -- you know, it's a

13   lot, but you know, if I needed it, I -- I would

14   get somebody if I needed it.

15   Q.        Okay.

16   A.        If I, you know, felt -- and coming from

17   my background, I can assess a risky situation

18   pretty well.

19   Q.        I am going to talk next a little bit

20   about sort of the end of your time with ATF.

21   A.        Sure.

22   Q.        And because I -- I know what ATF has

23   said about this, but I really want to know sort of

24   what your thoughts are.

50

```
 1    A.        Yeah.

 2    Q.        And what your understanding of the

 3    situation was.

 4    A.        Absolutely.

 5    Q.        So I'm going to hand you a letter, this

 6    was the notice of final decision from

 7    November 22nd, 2021.

 8    A.        Uh-huh.

 9    Q.        Actually, let me put a sticker on it

10    first.

11                      - - - - -

12         Thereupon, Exhibit 7 is marked for

13    purposes of identification.

14                      - - - - -

15         MS. PICKERILL:  There you go.

16    BY MS. PICKERILL:

17    Q.        Yeah.  Can you just describe for us

18    what that is?

19    A.        That's a --

20              MR. BOND:  Wait a second.  Alex, just

21    for the record, I want to object to questioning

22    about the -- the 2021 finding of conduct

23    unbecoming, as it's been since removed from the

24    file.  Just for the record I wanted to say that.
```

1             MS. PICKERILL:  Thank you.

2             MR. BOND:  Are we marking this?  Did we

3    mark this?

4             MS. PICKERILL:  It's Exhibit 7.

5             MR. BOND:  All right.  Thanks.

6    BY MS. PICKERILL:

7    Q.           Mr. Burk, can you just briefly describe

8    for us what this letter is?

9    A.           Yeah.  It's a -- it's a notification

10   from a -- from the bureau deciding official at the

11   time.  It's a rotating position, so it -- it

12   changes.

13   Q.           Is that someone with the professional

14   review board or --

15   A.           No.  That is a figurehead in the

16   agency, and again it's a rotating position.

17   Usually a SAC, sometimes an ASAC that will take on

18   the position as the bureau deciding officials.  So

19   it changes.  It's -- it's just a position to take

20   on a different responsibility for the time.  And

21   all they do is make the final decision.  And it's

22   usually based off of -- of, you know, they take

23   into account what the PRB, which is a board of

24   other agents or supervisors throughout the

1    country, you know, convene to review something and

2    -- and make a decision.  And then they submit that

3    to the bureau deciding official for him to make

4    his decision, which is the only decision.  Like, I

5    mean, it's -- it's not -- the PRB just makes

6    recommendations, they don't make decisions.  The

7    bureau deciding official makes decisions.

8    Q.        Okay.  And then if someone or I suppose

9    when you appealed his decision, who do you appeal

10   it to?

11   A.        That would be -- I'd appeal that -- I'm

12   trying to think how that process is.  I'd appeal

13   it to -- I'd appeal that to -- yeah, I believe --

14   I think it's appealed to -- well, the agency is

15   involved.  And I know -- I'm not 100 percent sure

16   exactly how that's channelled.  But I believe it

17   -- it does go back through, I mean, ATF is

18   involved.  I'm just not 100 percent sure on

19   exactly whether it goes to ATF -- probably ATF and

20   maybe OPM at the same time.  I'm not 100 percent

21   sure that.

22   Q.        Uh-huh.

23   A.        I mean, in this case I don't know what

24   the nuances of which channels it travels through.

1    I just know you have the -- the option.

2    Q.        Okay.  You had mentioned the

3    recommendation of PRB as well.  Did you get a

4    letter with one of those in this instance?

5    A.        No.  You just get -- you only get --

6    that I can recall, I think you're -- any

7    notifications and stuff are just coming from the

8    -- the bureau deciding official.

9    Q.        Okay.

10    A.        I mean, it doesn't matter what the

11    nature of anything is, if there's anything, you

12    know, from minimal to maximal, whatever it is,

13    it's -- you're going to get -- the bureau deciding

14    official is your conduit.

15    Q.        Okay.

16    A.        Based on anything that is -- goes

17    before the PRB, which could be anything.  It's --

18    Q.        Okay.

19    A.        So --

20    Q.        I'm going to show you what I've marked

21    as Exhibit 8.  And this is a letter from the

22    professional review board dated July 16th, 2021?

23    A.        Oh, okay.

24                  - - - - -

1          Thereupon, Exhibit 8 is marked for

2    purposes of identification.

3                    - - - - -

4    Q.          Have you seen that before?

5    A.          Yeah.  Maybe I have.  It's -- like I

6    said, it's been awhile.

7    Q.          That's okay.

8    A.          Okay.  So, you know, I stand -- I guess

9    I stand corrected, if in -- if in fact the review

10   board -- okay.  Then I guess they do notify you.

11   I thought it all came through the BDO, but it's

12   been a long time.  I mean, since this anyways,

13   it's been a couple years.  So I've -- I can't

14   recall every document.  But, yeah, I would say

15   that's correct then, that you get notification

16   from the PRB and then -- then I believe maybe you

17   appeal to the BDO, I -- maybe that's the process.

18   I just can't remember exactly right now.

19   Q.          Okay.  That's totally okay.  I just

20   wanted to make sure --

21   A.          Yeah.

22   Q.          -- that I had the correct documents and

23   I wasn't missing anything or --

24   A.          No, that is.  I just couldn't recall

1    the order in which you got them and who you got

2    them from --

3    Q.        No worries.

4    A.        -- from myself.

5    Q.        In Exhibit 7, which is the later

6    letter.

7    A.        BDO, right.

8    Q.        Uh-huh.  The deciding official

9    sustained three specifications; is that right?

10   A.        One -- I see three specifications noted

11   here, yes.

12   Q.        Okay.  Do you remember what the

13   specifics were?  It's okay if you don't.

14             Do you remember that all three

15   specifications were for conduct unbecoming?

16   A.        That was the general -- the general

17   charge of conduct unbecoming, that's a -- kind of

18   a catch all in the agency.  From A to Z, it's --

19   it's a catch all.  I mean, you can make anything

20   apply to it.  So in this case, that was -- that

21   was the only charge that they were using against

22   me.

23   Q.        The first specification was for the use

24   of profanity and for failing to wear a badge or

1    something to identify yourself as law enforcement.

2    Is that a correct understanding?

3    A.        That's my understanding of what's

4    written here.  But they're -- they're

5    contradicting their own policy in their own order

6    because you're not required -- in the instance of

7    where I was at and what I was doing in that type

8    of administrative investigative, you're not

9    required to wear anything visible.  So -- but

10   again, I mean, I've got to deal with what they --

11   you know, what they put before me.  It's -- you're

12   kind of in a position where you're -- you know,

13   you know, that's -- you just kind of got to deal

14   with it.  But it's -- it's entirely incorrect, so,

15   you know, the -- there was -- obviously, you

16   watched the video.  There was profanity used.  And

17   there's a reason, you know, under those

18   circumstances.  But as far as the identification

19   part, no, and I -- and I do believe there's

20   documentation that's accurate that supports the

21   fact that in that capacity, you're -- you're not

22   required to.

23   Q.        Do you have any of that documentation?

24   A.        I believe I thought there was something

1    that -- I thought -- well, I know that to be the

2    case.  But I thought there was -- I could have

3    swore there was some kind of documentation that

4    said you don't need to wear that.

5    Q.        Okay.  And --

6    A.        I mean, I believe there is.  Do you not

7    have something with that in it?

8    Q.        I do not.

9              MR. BOND:  He's talking about the

10   written response from ATF.

11             MS. PICKERILL:  Oh.

12   A.        I mean --

13             MR. BOND:  The interrogatory written

14   responses, that's what I think is what he's

15   talking about.

16             MS. PICKERILL:  Okay.

17   A.        Yeah, I guess.  I just know that there

18   was -- it -- first of all, it's not in the policy,

19   it's not in -- that you have to do that in -- in

20   the manner of which I was conducting these

21   retrievals, and it's an administrative

22   investigation, it's not an enforcement operation

23   so to say, I wasn't required to.  I mean -- and it

24   wasn't me making that decision, it was my

1    management.  It's -- it's the way that -- they're

2    the ones putting forth the enforcement of the

3    orders and -- and the way things are going to be

4    in the division.  So I was following -- following

5    ATF policy and protocol in this manner.  And

6    wearing markings and all this is not required,

7    you're required to have your credentials and

8    you're required to have your firearm and you're

9    required to be, you know, professional and

10   courteous to the people you're -- you're -- you

11   know, the citizens you're trying to make contact

12   with.  But I've never in -- in every NICs case

13   that I've ever worked, I never -- and focused on

14   those four years, I never wore badges hanging and

15   the garments.  And there's -- there's a reason for

16   that.  So, one, it's not required.  And, two, it's

17   -- it's not really tactically sound and it doesn't

18   usually initiate a warm, fuzzy feeling with a

19   citizen when you get somebody of authority showing

20   up with all kind of stuff at your door.  You're

21   really trying just to create a dialogue and

22   resolve the situation.

23   Q.        Okay.

24   A.        So I -- so I believe that specification

1    has some inaccuracy in it.  But, you know, at the

2    time, I -- I just have to deal with what -- with

3    what their decisions are.  Because this is not a

4    division level, this is coming out of

5    headquarters.

6              And my understanding and what I was

7    informed is this event obviously happened on

8    7-7-20.  I was told don't worry about it.  You

9    didn't do anything wrong.  You didn't violate any

10   policies.  This is all coming from my SAC, my

11   ASACs, nothing happened with this.  It was

12   essentially a forgotten matter until a lawsuit

13   splashed across the headlines.  It was then told

14   to me ATF headquarters, which is a separate

15   element, wasn't happy about that.  And now there's

16   a problem because we have a working relationship

17   with the Columbus Police Department, we always

18   have.  We have their agents or their officers as

19   part of our task force and this is not good for

20   the agency that this agent is -- is now involved

21   in this.

22             And my understanding was through

23   informal channels, but it's a small agency, like,

24   the -- the acting director at the time made it a

1   point to -- to get me out of the agency because of

2   it.  It -- I wasn't worth sacrificing any conflict

3   with Columbus is my understanding.  Again, it's

4   not in writing, it's just, you know, it's -- it's

5   the channels, it's gossip, it's talk, it's agency

6   talk.  And so, you know, I really wasn't in a

7   position to try to fight whatever they were trying

8   to do.  I just had to take -- you know, go about

9   it and try to seek a correction to things as to --

10  to really where -- what was accurate and what --

11  what had happened.

12          And -- and so I -- this -- the

13  specification one, it's their rationale there to

14  me was incorrect.  I mean, as far as the -- having

15  -- you know, basing it on part -- not wearing

16  credentials and I had credential.  I have it

17  exactly the way every agent does when they go out

18  and knock on a door for something of that nature,

19  so --

20  Q.        Something of that nature.  You had

21  mentioned that this run was investigative and not

22  enforcement based.  What does that mean?

23  A.        Well, ATF has planned enforcement

24  operations.  These are instances where you're

1    going to generate a search warrant, you have

2    preplanning that is required to take place.  You

3    are going to use a multitude of resources to

4    accomplish this planned operation, search

5    warrants, arrest warrants, undercover operations,

6    buy busts, et cetera, those things go through a

7    whole different -- those are called planned

8    enforcement operations.  There are whole separate

9    requirements for those.

10    Q.          Uh-huh.

11    A.          The planning is -- has to be

12    preplanned.  It has to go through a couple

13    different layers, of which I used to be involved

14    in as the DTA.  I would review the operational

15    plans, make sure they were safe, tactically sound,

16    and then I would give my recommendation to the

17    ASAC.  And say, hey, I'm good on the tactical

18    side; I think it's sound.

19                He would take my advice and then, you

20    know, go -- go review it as well and then usually

21    go -- I was -- you know, the DTA is deemed the

22    tactical expert, the expert on all things tactical

23    for the division.  That's why, you know, you're

24    asked to be that or you're appointed to that

62

1    position.  You're still an agent, still a field

2    agent, but your -- your expertise in that matter

3    is -- is why they want you in that position.

4              So that's a planned operation.  NICs

5    retrievals are not planned.  You don't make it a

6    -- it's not an enforcement operation where you're

7    going there with the intentions of making an

8    arrest in that capacity.  It's to be

9    non-confrontational.  It's really to just

10   facilitate the recovery of the firearm.  And

11   because it's such, there's options.  You have

12   three options.  I have discretion in one of those

13   three options in how I want to go about the

14   recovery of the firearm.

15             So in -- it's a very -- it's meant to

16   be very non-confrontational.  We just want to get

17   the gun back.  We can't fault the person entirely

18   because we're trying to remedy a situation by

19   where they can still get the gun, even though

20   their background check is back, that's not their

21   fault.  And in some cases, you know, maybe they

22   didn't know they were prohibited.  Maybe they were

23   advised otherwise by an attorney.  I don't know.

24   Q.        Uh-huh.

1    A.         But then there's instances where, you

2    know, I thought that was off my record and, you

3    know, so it -- that's really not the point.  The

4    point is either you can have it or you can't.  And

5    if you can't, then we've got to fix the situation.

6    Q.         You mentioned that you have three

7    options to go --

8    A.         Yes.

9    Q.         When you go retrieve a firearm.  What

10   are those three options?

11   A.         I can -- I can -- if the firearm is

12   located or the person is in possession, I can

13   seize it.  I just take it.  That's my authority to

14   do so by law.  They are a prohibited person and

15   they're in possession of a firearm.  So I do not

16   need a warrant in order to do that.  It's -- it's

17   by authority:  Seize it.

18           The second option is I can facilitate

19   the return of the firearm to the FFL where they

20   purchased it.  Okay.

21           I -- and the third option is I can

22   facilitate the transfer to a third party called a

23   third party transfer, and of course that person's

24   vetted by myself to ensure they're not a

64

1    prohibited person.

2            And those two options, the last two,

3    return to the FFL and the third-party transfer are

4    the two essentially preferred options because it's

5    a -- disposal of the firearms by the agency is a

6    very time consuming process.  The firearms will

7    pile up in the local vault, in this case

8    Cincinnati.  And it will take an -- you know,

9    approximately a year for it to go through the

10   legal notification and all the -- the -- the

11   channels that it needs to go with to get

12   ultimately approved for destruction.  And -- and

13   the agency doesn't want to deal with all of those

14   firearms if it's not going to be prosecutable.

15           Now, if in -- if it's indeed a case

16   that warrants a seizure of the firearm, then there

17   may be grounds to further pursue prosecution or a

18   case to be billed if the person is -- you know,

19   their criminal history reflects the fact that,

20   yeah, they knew they weren't supposed to get this

21   gun.  Yeah, they have it, and they have a

22   horrendous criminal history.  It's appealing to

23   the U.S. attorney's office to pursue that case,

24   and we can only recommend it.

1          So those are the three options.  But in

2     most instances, the -- the third-party transfer

3     and the return to the FFL are the preferred

4     options and those are the options with very few

5     exceptions that I facilitated in almost every

6     instance, with the exception of a few that

7     warranted otherwise.  And it -- it was nice to

8     have those options because, you know, contrary to

9     what people may think, you know, we're not as bad

10    or ATF is not as bad as everybody make them out to

11    be.

12          So what -- what a good aspect of that

13    is is it -- you know, everybody thinks they're at

14    your doors, they're going to take your guns.

15    Well, no.  You know, listen, I've just got to fix

16    this problem.  You know you're not supposed to

17    have it.  My job is to advise you why, and I'm

18    going to advise you why and show you why.  But we

19    have some tools in our toolbox.  So if the FFL

20    wants you to give you money back, we don't care.

21    If he wants to give you $50 of 100 back on it,

22    it's better than nothing.  It's better than the

23    first option.  Or if there is someone that doesn't

24    live in the same house as you obviously that we

1    can vet that we feel comfortable as a third-party

2    transfer that understands and will sign that

3    you're prohibited and that the return of that

4    firearm is going to get them in trouble as well

5    and they're willing to do that, then we'll

6    facilitate that return.  And in the four years

7    that I did that job, extensively intensely like

8    that, hundreds, hundreds of contacts with all

9    walks of life, race, creed, color.  It doesn't

10   matter his -- you know, there's not too many times

11   that I didn't leave with a, man, I really

12   appreciate the way you handled this, thank you, I

13   never expected this.  And -- and in my -- you

14   know, my -- what I liked about that so much was

15   that you -- I've done all the heavy enforcement

16   stuff and all of that kind of stuff, you know, eh,

17   you know, no body -- you know, it's -- you're not

18   liked when you are there.  But, you know, seeing

19   that I was able to leave people with a good taste

20   in their mouth even though they're doing something

21   they really didn't want to do, but, still think,

22   you know what, this was way better than I thought

23   it was.  And you know what, you guys aren't that

24   bad; I totally understand.  So having those

1    options and those were the options I usually

2    pursued, unless it warranted otherwise made the

3    job very easy in it's finality of when that gun

4    had to be taken or removed from their possession.

5    Q.          You had also mentioned that right after

6    this event with CPD happened that both your SAC

7    and ASAC told you that you didn't do anything

8    wrong and didn't violate any policies.

9    A.          I was -- I -- when I left the scene or

10   was finally cleared to go, I went to the division

11   office and, you know, went through what had

12   happened.  And they obviously saw exactly the way

13   I was dressed.  They -- you know, they went

14   through what they knew and, you know, we're --

15   they saw no violations, they assured me, listen,

16   you're a victim in this case, this was -- should

17   have never -- they should have never acted that

18   way, you know, they were really kind of in shock

19   as, you know, as I was.  And from what I

20   understand, there was -- that was then and -- and,

21   you know, that was what I was being told at the

22   time.  There was, you know, I was told a number of

23   things in terms of -- of, you know, what -- you

24   know, that I was -- in no way, shape or form at

1    fault.  I was -- I should not have been confronted

2    in the fashion I was.  And apparently the next day

3    there was some follow-up with my SAC at the time

4    with -- with ranking members of the Columbus PD

5    and the matter was discussed and things were said

6    that, you know, we're in agreement with what they

7    told me is my understanding.

8    Q.       So back to that November 2021 letter.

9    The second specification more specifically was for

10   refusing multiple lawful commands to get on the

11   ground.  Is that your understanding?

12   A.       Specification -- that's specification

13   two?

14   Q.       Yes.

15   A.       Yeah.  Yeah.  I see it in there,

16   refused his command, yes.

17   Q.       Okay.  And then the -- the last one

18   which was also conduct unbecoming was more

19   specifically for failing to cooperate with being

20   handcuffed; is that your understanding?

21   A.       That's what they're referencing in

22   there.  That is my understanding.

23   Q.       Okay.  Okay.  And then they kind of

24   talk about how they're going to determine the

1    sanction and weighing some factors.  Do you know

2    about those factors, the --

3    A.         The Douglas.

4    Q.         -- Douglas?

5    A.         They're referenced in there, yes.

6    Q.         Okay.  On page 3, they say that "much

7    of your misconduct was intentional, repeated, and

8    created an unnecessary risk of harm for yourself

9    and the responding officers."  Do you agree with

10   that?

11   A.         I disagree with that.

12   Q.         Okay.  In weighing these factors, they

13   talk about also considering some letters of

14   recommendation that you submitted?

15   A.         Yes.

16   Q.         Okay.  And those were letters sort of

17   on your -- on behalf of you as an agent?

18   A.         Those were -- those were the -- yeah,

19   those were letters generated by my senior

20   management -- my management.

21   Q.         Okay.

22   A.         Division management.

23   Q.         The letter also notes that at least in

24   ATF's talking with you that you failed to

1    recognize throughout the process that you bear

2    some responsibility in how these events unfolded?

3    A.        What form are you referencing?

4    That's --

5    Q.        It's that notice of final decision on

6    page 4.

7    A.        Okay.  Not the -- not the -- not the

8    letters you were referring to previously?

9    Q.        No.  I'm so sorry.

10   A.        Not --

11   Q.        In the letter of the final decision.

12   A.        Okay.

13   Q.        On page 4.  I should have been more

14   clear.

15   A.        Now, can I have the question again, now

16   that I know the document you're talking about?

17   Q.        Yeah.  And if you want to look at -- my

18   question is is that -- is that true, do you feel

19   that you bear any responsibility for how the

20   events unfolded?

21   A.        No, I do not.  Not -- not for the

22   actual event, no.

23   Q.        Okay.  For any other part of it?

24   A.        I mean, the only responsibility I might

1   bear is that I -- I chose to work on that case

2   that day instead of -- of going to a different

3   case where, you know, I -- that would be the only

4   thing that I would think based off of all the

5   information and my assessment and experience in

6   that situation, I -- I do not feel that way, no.

7   I do not feel that I was responsible for the

8   actions of that officer.

9   Q.       And just to be clear, you don't believe

10   that you did anything outside of policy by picking

11   to go do that case that day?

12   A.       Absolutely not.  Absolutely not.

13   Q.       Just making sure.

14   A.       No.  It's just, you know, I -- I've

15   been in that similar situation with less

16   information provided where the person was unsure

17   of who I was at their door, or I was possibly

18   sitting in a vehicle, you know, which is unmarked,

19   waiting, doing some surveillance, just waiting for

20   the person to get home or seeing if that's a real

21   address.  A concerned citizen calls, hey, there's

22   a suspect, someone suspicious, I think they're,

23   you know, maybe wanting to break into a house or

24   -- you know, you just don't know what people call

1    in.  And that has happened several, several times

2    because of the nature of what I'm doing.  And in

3    every single one of those incidences, albeit an

4    officer may approach with some general caution,

5    there is a who are you?  Do you have some

6    credentials?  And there's a dialogue.  There is

7    some type of dialogue to -- to quell any concern

8    by the officer, eliminate any risk to myself or

9    the officer, and obviously my hands are visible, I

10   -- I have credentials in my pocket.  Can I please

11   see them?  And it's -- and that doesn't matter

12   whether that was ever a -- a large city, major --

13   major city police department response or a

14   three-man sheriff's department in the sticks of

15   southern Indiana somewhere.  It's just -- it's

16   just kind of like there's a procedure for -- for a

17   situation like that.  You -- if the person is not

18   an obvious threat, you can see their hands, this

19   is law enforcement 101.  Create a dialogue.  Find

20   out what -- what are they doing?  Do you have some

21   identification?  You know, yeah, I'm with ATF.  Do

22   you have some questions?  Questions that probably

23   only another law enforcement officer know or -- or

24   I have documents, I always have the documents with

1    me.  And I'm always dressed the same fashion.

2    Everything is -- I'm very systematic in what I do

3    with that job.  And it's -- it's never -- there's

4    never been a course of action like there was that

5    day.  So I -- I don't feel at all that I

6    contributed to the actions of the -- of the way --

7    of the way that officer responded.

8    Q.       Ultimately, the bureau deciding

9    official made the decision at that time to remove

10    you from ATF?

11    A.       Yes, he did.

12    Q.       And the letter says it would be

13    effective November 5th, 2021; is that right?

14    A.       Correct.  Over for a year after this

15    incident occurred, yes.  Well over a year.

16    Q.       Okay.  And we talked about sort of the

17    weighing of those factors to determine what

18    sanction they felt was appropriate.  Those are

19    sort of gone through that a little bit more detail

20    in the earlier letter on the proposed removal --

21    A.       Could this be --

22    Q.       -- Exhibit 8.

23    A.       Okay.  Would this be -- since there's

24    not a question, can I pause and use the bathroom?

74

```
1    Q.          Yes.  Absolutely.  I didn't believe I
2    had a question.  I was just letting you know --
3    A.          And I didn't want to interrupt you
4    either so I --
5    Q.          -- what document I was turning to.  I
6    appreciate that very much.
7    A.          -- was trying to find a moment.
8    Q.          I wouldn't hate a bathroom break
9    either.
10   A.          I -- well, yeah.
11               THE VIDEOGRAPHER:  We are off the
12   record.  The time is 10:11.
13               (A short recess is taken.)
14               THE VIDEOGRAPHER:  This is the start of
15   media number two.  We are back on the record.  The
16   time is 10:24.
17   BY MS. PICKERILL:
18   Q.          So we were looking at Exhibit 8, which
19   was the notice of proposed removal -- removal,
20   excuse me, from the PRB.  Sort of right at the
21   beginning on page 2 they note that you were
22   working on July 7th, 2020 and performing your
23   duties of an ATF special agent.  I just want to
24   confirm with you that that's true?
```

1   A.          Yeah.  That's -- I was working as a

2   special agent.

3   Q.          Okay.  On -- I just want to clarify if

4   you know some of this stuff in here.

5               On page 3, they say that you made

6   multiple attempts to contact -- to make contact

7   with the female resident.  How many attempts did

8   you make to get in contact with her?

9   A.          When you say "attempts to contact," are

10  you -- what are you referencing?

11  Q.          I guess maybe that's the clarification

12  I'm looking for, is do you know or --

13  A.          I'm not sure what they're referencing.

14  But there was an initial contact of going to the

15  residence and then knocking on the door and

16  obviously probably knocking a couple more times to

17  gain the attention of the resident so they'd

18  answer the door.

19  Q.          Okay.  So you hadn't sent any letter to

20  the residents before this?

21  A.          No.  That would never be the case.

22  Q.          Okay.  I think you had mentioned

23  earlier that there are some other instances where

24  letters might be sent.  And those were in sort of

1    different kinds of cases; is that right?

2    A.        Those are -- those are in cases where

3    the firearm has not been transferred, so no person

4    possess it, they're just being notified.  Hey, you

5    attempted to try to purchase, your background

6    check was found to be prohibiting, cease -- you

7    know, don't keep trying until you can get that

8    issue resolved.

9    Q.        Okay.

10   A.        So it's a strong warning letter put out

11   by the agency.  But there's no firearm

12   transferred, so that's the difference.

13   Q.        Uh-huh.  You're not having to go

14   retrieve anything?

15   A.        Correct.  It's not in the possession of

16   a prohibited person --

17   Q.        Gotcha.

18   A.        -- or believed to be in the position.

19   Q.        Okay.  So the only time that you had

20   gone to this residence was on this day?

21   A.        It was the very first initial contact

22   to try to determine if the person lived there, you

23   know, it's just initial contact to kind of

24   continue the investigation as to the whereabouts

77

1    of the firearm or in this case if the person was

2    there or not, so, yes.

3    Q.        Uh-huh.  Was it part of your job to

4    interact with local law enforcement?

5    A.        Yes.

6    Q.        Okay.  And it -- they kind of -- they

7    say that directly on page 6 of this document is

8    where I was getting that.

9    A.        Okay.

10   Q.        If that's helpful.

11   A.        I'll get there.

12   Q.        And I think you had mentioned earlier

13   the deposition by written question that we had

14   sent to ATF and then got some answers to.

15   A.        I believe that's what would have been

16   what that document was.  I couldn't recall the

17   document, but I thought there was mention of that

18   somewhere.

19   Q.        Okay.  I think that I found what you

20   were mentioning.  And so I'm going to ask you a

21   couple questions, and I've labeled this as

22   Exhibit 9.  Can you tell me if that is what you

23   were talking about?

24                        - - - - -

1          Thereupon, Exhibit 9 is marked for

2    purposes of identification.

3                    - - - - -

4    A.        I'd have to look and see, yeah.

5    Q.        Okay.

6    A.        That looks like it.  I believe there

7    was some there somewhere.

8    Q.        And --

9    A.        I don't recall what page or anything,

10   but I do recall reading something of that nature

11   in here.

12   Q.        Yeah.  I think question 39 talks about

13   the dress code policy and that your clothing was

14   within that policy on the day in question?

15   A.        Policy regarding the -- yeah.

16   Q.        And they kind of make that distinction

17   between the administrative --

18   A.        That's what I believe I was

19   referencing.

20   Q.        Okay.

21   A.        That I was dressed appropriately and

22   professional and had what I needed to do and --

23   and what was per policy for what I was doing.

24   Q.        Okay.

1    A.          In terms of the -- yes.

2    Q.          Okay.  I want to make sure I got that.

3    And actually if you wouldn't mind holding on to

4    that.

5    A.          Sure.

6    Q.          If you could go to page 13.  I'm going

7    to look at question number 42.  They say that you

8    -- in terms of working and coordinating with local

9    law enforcement as part of your job, that you

10   would have been trained or advised to call them

11   ahead of time.  Do you remember what training or

12   advisory notice you would have gotten about that?

13   A.          And again the question is -- is very

14   general.  It's -- it's based on the need for

15   resource.  We're -- we're law enforcement agents,

16   federal agents.  If we feel we need the

17   assistance, by all means use it.  And sometimes

18   local law enforcement may need or have information

19   that may be of value to the investigation.  It --

20   it's certainly not a requirement.  We're not

21   trained that you have to.

22   Q.          Uh-huh.

23   A.          In many instances, you -- you don't

24   call the local law enforcement.  And outside the

1    scope of this would be the fact that what you

2    don't want to do is create a large presence at a

3    scene and -- and unintentionally escalate the

4    person's stress or -- or draw attention to what

5    you're doing there.  So it's -- it's situation

6    specific.  But, yes, you -- there is -- you know,

7    you are trained in a sense that you have that at

8    your disposal.  You don't have to.  If you need

9    the extra resources, by all means we're all on the

10   same team, use -- use as you need.

11   Q.        Uh-huh.

12   A.        And it's reciprocal.

13   Q.        In the next -- in question 43 ATF says

14   that it's a common and recommended practice.

15   Would you agree with that sort of -- colorization?

16   A.        How to responding if -- if -- yes.  And

17   you're trained to establish a dialogue, identify

18   yourself and present your credentials to validate

19   who you are.  And as I said before, I've never not

20   followed that -- or attempted to follow that

21   protocol and it not be successful until July 7th,

22   2020.

23   Q.        Uh-huh.  If we look again at Exhibit 8.

24   Sorry.  I -- I know I'm going to be jumping

1   around.

2   A.          Hang on.  That's 9.

3   Q.          The July 16th, 2021 letter.

4   A.          Okay.

5   Q.          On page 6, they say that your work was

6   limited to matters such as NICs cases throughout

7   Ohio and Indiana.  Why was your work limited to

8   those matters?

9   A.          Because that is the judicial districts

10  of the Columbus field division.  That's our area

11  of responsibility for the division for -- for that

12  district.  It was -- I mean, we have the northern

13  district of Ohio as well, but for reasonable

14  purposes of not having to draw per diem, lodging,

15  the expectation of going to -- up to Cleveland to

16  work on cases is -- it's -- you know, they had to

17  draw the line somewhere of what -- and I had to

18  agree to what I was willing to do and, you know,

19  it's a purse strings thing.  It's, like -- but

20  that's why I covered -- I agreed I'll take all of

21  this area.  I'll cover it.  Don't worry about it,

22  I got it covered.  But that's -- I believe that's

23  what the reference is, that was my area of

24  responsibility, which is extensive as it is.

1    Q.          Okay.   Thank you.

2               Down on the same page in factor No. 4,

3    it says the "(RAC explains that the standard

4    practice within the office is for you to work in

5    NICs cases by yourself based on your prior

6    disciplinary record involving Kroger)."  What does

7    that discipline with Kroger have to do with your

8    working the NICs cases?

9    A.          My understanding when -- when I was

10   again -- I wasn't ordered to do those NICs cases.

11   I was asked, you know, would you be willing.  I

12   think there was an understanding, too, that a lot

13   of the personal problems that I was going through

14   were stress, anxiety, work demands.  I was, you

15   know, going and -- you know, I was wearing a lot

16   of different hats, and essentially taking myself

17   two times to a point of exhaustion of trying to

18   accomplish so much and wear so much that, you

19   know, upon discussion I was at that point in time

20   having kind of recalibrated and refocused and

21   addressing my personal problem with -- with things

22   and is -- that I -- I was in agreement to do that

23   because it allowed me to -- it really took a lot

24   of stress out of my personal life and it -- and it

1    just had a little bit more structure and a little

2    bit more opportunity to have a little bit more of

3    a normal life versus a more taxing and, you know,

4    it was a good fit and it was a need and it -- and

5    I agreed to do it --

6    Q.          Uh-huh.

7    A.          -- because it benefitted the division,

8    benefited the offices, benefitted everyone

9    involved.  And again it's -- we're a small agency.

10   You know, at times you only have a few office --

11   agents in an office and -- but the

12   responsibilities don't lessen based on the amount

13   of people in the office.  So, you know, I'm a team

14   player.  It's, like, you know, whatever is best

15   for the agency and the division and it keeps us in

16   good standing, you know, I'm willing to do.  And I

17   saw a way to take this program, form it into

18   something that's very effective and -- and I was

19   able to accomplish the results by myself of what

20   agents from five offices couldn't accomplish

21   because I was able to focus solely on that and it

22   worked for me and it worked even better for the

23   agency, so that's how that came to be.

24   Q.          Okay.  Moving more generally to -- to

1    the -- to the interaction with ATF through this

2    process.

3    A.        Oh.

4    Q.        Did you ultimately appeal that final

5    decision?

6    A.        Oh, well, I absolutely would have

7    appealed it.

8    Q.        Yeah.

9    A.        I don't have the -- I don't know if I

10   have a document in front of me.  But, yeah,

11   absolutely.  I was in total disagreement as was --

12   as was my division management.  I mean, it was --

13   it was a -- you know, it was a blind-side to say

14   the least.  But again the explanation as to how

15   that came to be and -- and why it probably

16   happened, you know, unfortunately, you know,

17   that's how sometimes things work and, you know,

18   headquarters, politics, all that kind of stuff,

19   so, yes.

20   Q.        So I've just handed you Exhibit 10,

21   which I believe is a document related to that

22   appeal?

23                     - - - - -

24             Thereupon, Exhibit 10 is marked for

1    purposes of identification.

2                        - - - - -

3    A.        Yes.

4    Q.        Can you tell me what it is?

5    A.        It's the Settlement Agreement for

6    the -- yeah, for the appeal.  It's a correct --

7    it's a correct rationale for my separation from

8    the agency is what it is -that ATF has agreed to.

9    That -- to make the correction of record.

10   Q.        So they agreed to like you said correct

11   your record?

12   A.        Correct.

13   Q.        And specifically to change the notice

14   of removal to change the reason on it?

15   A.        Absolutely.

16   Q.        Okay.

17   A.        To a medical inability to perform,

18   which was the -- as a result of the injuries,

19   permanent injuries that I've sustained because of

20   the incident.

21   Q.        Okay.  That was going to be my next

22   question.

23              This agreement -- this agreement does

24   not say that they were wrong in their findings in

```
 1    those previous letters, does it?
 2    A.         I wouldn't expect that it would.
 3    Q.         Okay.
 4    A.         I mean, it's -- you know, it's -- you
 5    know, they're going to do the right thing, but at
 6    the same time nobody wants to look like they were
 7    wrong.  I mean -- I mean, I get it, and my -- my
 8    rationale behind it is, you know, not only the way
 9    I felt about the situation, but felt of my
10    management who would know me best who know the
11    situation here in the Columbus field division and
12    how that and, you know, others.  You know, if I
13    had felt I had done anything wrong, I would -- I
14    would own the results of things.  And in this case
15    it was -- it was very obvious to me that I had to
16    try to get the record corrected and -- because
17    this should have never happened.  And that's not
18    just my opinion, that's the opinion of my
19    management, except ATF headquarters has their own
20    agenda and it's a different animal.  And
21    unfortunately, you know, it supersedes everybody
22    else when they make a decision on something,
23    regardless of whether it's right or wrong, it's
24    just the way it is, so.
```

1   Q.          When you say that that is the opinion

2   of your management, are you referring once again

3   to the statements that your RAC made to you after

4   this or was there any written --

5   A.          It --

6   Q.          -- communication about it?

7   A.          They obviously submitted their opinions

8   and responses to the actions of the PRB to be

9   submitted to the BDO.  I think it strongly, you

10  know, lends to what I'm saying in terms of their

11  opinions of the matter.  And not only what I was

12  told but what they stepped up to the plate and

13  said this is wrong the way he was --

14  Q.          Uh-huh.

15  A.          So they submitted the --

16  Q.          Do you mean the letters of

17  recommendation?

18  A.          Absolutely.  And I believe --

19  Q.          Okay.

20  A.          -- those were what was submitted to the

21  BDO in my appeal to the BDO --

22  Q.          Yes.

23  A.          -- or my response to the BDO, yes.

24  Q.          I believe that's correct as well.

```
1   A.        And --
2   Q.        I just wasn't sure what --
3   A.        You know --
4   Q.        -- you were referring to.
5   A.        -- and to that degree, you know, the
6   reason we're sitting here today is at the urging
7   of my -- and direction and urging of my management
8   at the time.  I didn't know who Cooper Elliott
9   was.  That information was provided to me by my
10  chain of command and based on their interpretation
11  of the events, and your -- and the violation of my
12  rights that I really need to get counsel.  And it
13  wasn't because I did something wrong, it was
14  because of what happened to me and their opinions
15  of it.  And I was provided with -- with the
16  information.  Because, I mean, I wasn't looking
17  for a fight.  I was looking for, you know, I'm --
18  I'm left in a bad situation.  I'm injured.  You
19  know, I -- the way -- the manner in which I was
20  treated when I was trying to do my job by who I
21  thought was going to be another fellow law
22  enforcement officer coming to help me out and have
23  some dialogue with, like it's always been.  So,
24  yeah, their opinions I held in high regard because
```

```
 1    I was very honest.  Be honest with me.  Tell me.
 2    Listen, you -- what they did was wrong.  And this
 3    is -- this is egregious and, you know, you didn't
 4    violate any policies, any orders you don't have
 5    anything to worry about.  And you know what, this
 6    is -- this is really bad, you need -- you really
 7    -- here's -- here's who you -- you know, here's
 8    what we suggest you do, and -- you know, and I did
 9    that.  And I did it and, you know -- and it ends
10    up of course, you know, nowadays it's splashed in
11    the newspaper and media, and nothing was
12    happening.  Now all the sudden that and, you know,
13    I -- you know, we've got to do something about it
14    is headquarters opinion and, you know, I've got to
15    -- I'm one person trying to fight, you know, ATF
16    headquarters and convince them otherwise and they
17    have an agenda and my agenda was to just go about
18    doing my job, so here we are.
19    Q.       Do you remember who it was that gave
20    you Cooper Elliott's contact information?
21    A.       Roland Herndon, my ASAC.
22    Q.       Rowland Herr?
23    A.       Herndon.
24    Q.       Herndon?
```

1    A.         He's since retired.  That came through

2    him and -- and that was provided -- I met with

3    him.  And he said he'd get me the contact of who

4    -- who I should call as -- as representation.  And

5    that number was I believe given to my -- or my RAC

6    at the time or RAC Occhipinti, it wasn't -- yeah.

7    And then he said, here, this is the number from

8    Roland.  And I went okay.  And I'm like okay.

9    And, you know, I just kind of went with their

10   guidance.  You know, I figured they had my best

11   interest at heart.  And, you know, they were --

12   they had a good assessment of the situation.  They

13   were aware of things I wasn't aware of, you know,

14   before I was even aware of them, you know, for

15   reasons we'll probably talk about.

16   Q.         Turning back to the settlement

17   agreement just briefly.

18   A.         Yeah.

19   Q.         You agreed as part of this agreement

20   that you would withdraw the appeal you had

21   submitted; is that right?

22   A.         What page are we on?  That was the

23   fourth --

24   Q.         I believe it is page 2 at the very

1    bottom, the little b there.

2    A.        Okay.  It just helps me look.

3    Q.        Of course.

4    A.        By...signature...Appellant

5    withdrawals...prejudice...appeal...above-captioned

6    MSPB...and voluntarily waives any and all further

7    rights to appeal.  Okay.  Yeah.  And it includes

8    any -- any appeals MSPB and -- okay.  Appeal.  And

9    as well as any other pending employment-related --

10   right.  It's -- it's a done issue.  They corrected

11   the record.  My separation from ATF is based on

12   the injuries sustained, not because they

13   terminated me for cause or conduct unbecoming.

14   So, yes, that's --

15   Q.        Uh-huh.

16   A.        And I agreed that we're done.  This

17   is -- you know, there's -- there's no more

18   anything after that to be done.  And there was

19   some stipulations as to if I ever used ATF for a

20   reference and stuff, they would have to, you know,

21   provide a reference for my job -- or for a job or

22   employment or something in a fashion that -- you

23   know, who to contact and stuff like that.  And,

24   you know, just general -- general understandings

1    and that.  That was -- that's the way I understand

2    it.

3    Q.        Uh-huh.  The only other specific

4    question I wanted to ask about was on page 3.

5    A.        Okay.

6    Q.        Initial the d and the e.  Do you

7    understand that to mean that you're agreeing not

8    to sue ATF about this appeal or this process?

9    A.        Release...forever discharge both United

10   States and ATF -- yeah, that would be my

11   understanding.  They're -- they're wanting to make

12   sure that there's not legal action against them

13   for anything they've done to me.

14   Q.        Gotcha.  And I'll skip that.

15   A.        That would be my understanding.  I

16   mean, there's a lot of jargon there.  But it's

17   what I'm seeing there, would be forever

18   discharge....United States Department of Justice

19   and ATF...as their employees officials, et cetera,

20   et cetera, capacities and -- you know, it's --

21   yeah.  Basically, no legal action against them.

22   Q.        Okay.  Thank you.  I think we're done

23   with that document for now, as long as you're done

24   with it as well.

93

1    A.        Uh-huh.

2    Q.        I'm going to show you what I'll purport

3    to be a position description for your roles at

4    ATF.

5                        - - - - -

6           Thereupon, Exhibit 11 is marked for

7    purposes of identification.

8                        - - - - -

9    A.        Okay.

10   Q.        And sort of talk about that more

11   generally.  I'm going to mark it Exhibit 11.  That

12   goes to you.

13             MS. PICKERILL:  There you go.

14   A.        Uh-huh.

15   Q.        I think that this is from 2016; is that

16   right?

17   A.        Yeah.  Maybe -- if that -- if the --

18   Q.        Or --

19   A.        If the 16 at the top of the page is

20   referencing the year, I -- like I said, there's a

21   face document here.

22   Q.        So --

23   A.        And then there's additional

24   documentation on the back, so I'm not quite sure.

```
 1    It looks like to be two documents.  This is a

 2    document in and of itself with this added to it is

 3    -- I don't know.  Maybe it's an attachment or an

 4    addendum.  So that has 16 at the top dash 131,

 5    this front one has 7-2008 on it is.

 6    Q.        Okay.

 7    A.        So I'm -- when you say document,

 8    there's two.

 9    Q.        So Exhibit --

10    A.        In my opinion.

11    Q.        -- 11 is --

12    A.        Probably in a document with an

13    attachment.

14    Q.        A document with an attachment.  Both of

15    these being documents about your position at ATF;

16    is that accurate to say?

17    A.        Looks like a general job description of

18    a --

19    Q.        Okay.

20    A.        -- of a criminal investigator 1811

21    series.

22    Q.        Okay.  And is that -- would that have

23    been your position description in 2020 as well?

24    A.        Yes.  And the 13 indicates -- indicates
```

1    your seniority grade.

2    Q.          Okay.

3    A.          Or actually, yeah, you're -- you're --

4    it has to do with your pay grade and then there's

5    steps to that.  But, yeah, that's accurate, 1811,

6    grade 13, and I was a step 7 at the time.

7    Q.          Step 7.  Okay.

8               On page -- I'm going to say 377 because

9    that's what's in the bottom right-hand corner.

10   A.          Okay.

11   Q.          It talks about your Supervisory

12   Controls.  Would that section have been an

13   accurate description of what your supervisor

14   structure looked like in 2020 when you were doing

15   those NICs runs?

16   A.          "Incumbent works under general

17   administrative and technical direction of a

18   group...or branch chief."  Yep.  "Advice and

19   guidance....  Incumbent conducts...generally uses

20   his/her own judgement...reviews case" -- yes.

21   Q.          Okay.  It says that "The supervisor

22   reviews case reports."  Do you do case reports for

23   everything or when do you do case reports?

24   A.          In general or as it pertains to what my

1    duties were at the time?

2    Q.          As pertaining to your duties in 2020.

3    A.          Case reports are generated when -- in

4    this case for the NICs retrievals when there's

5    a -- you know, obviously you're taking -- you're

6    facilitating the retrieval of the firearm, it

7    doesn't matter whether it's -- it goes to the FFL

8    or it's a third-party transfer or you seize it,

9    you have to generate what's called an ROI, it's a

10   report of information.

11          A case report by clarity is not an ROI.

12   An ROI -- a case report in -- in ATF terms is a

13   culmination of ROIs and investigative material

14   that is presented to the U.S. attorney's office

15   for review and for potential prosecution.  So

16   they're kind of using case report I think possibly

17   to represent an ROI on a day-to-day report of

18   activity -- of information, so I just wanted to

19   make that clear.

20   Q.          Okay.

21   A.          But, yes, you submit your ROI.  This is

22   -- this is the event that happened or guidelines

23   to when you have to do an ROI and when you don't

24   have to do them.  But in -- in the purposes of my

1    position, I -- I always -- I did ROIs for every

2    recovery.  And in some instances if it became

3    multiple events that warranted an ROI, there may

4    be additional ROIs as part of that single case.

5    Q.        Uh-huh.

6    A.        But -- and then you submit those, put

7    them in the inbox, he reviews them, checks them

8    off, you know, and, you know, he -- he knows, you

9    know, and then they go into the case file which is

10   assigned a case number.  Every case it -- it

11   doesn't matter what it is.  And then they go in

12   there and that's the hard copy record of that

13   case.

14   Q.        Okay.

15   A.        So it's just one component of what may

16   comprise the case file.  And they're referred to

17   as ROIs in -- in the ATF.

18   Q.        Okay.

19   A.        Case reports are a culmination and it's

20   submitted for prosecution.

21   Q.        Specifically for prosecution?

22   A.        Yeah.

23   Q.        Okay.  So in the course of what your

24   job required in 2020, you weren't necessarily

1   creating case reports, but you would have been

2   creating ROIs?

3   A.          I mean, I certainly wouldn't if I was

4   going to present the case for prosecution.  I

5   would put together a case report, it's what we

6   called it.

7   Q.          Uh-huh.

8   A.          It was a blue cover, it was a

9   wrap-around, and it was filled with all the -- all

10  the components that substantiated the case.  Here

11  is everything.  Sometimes you didn't have

12  everything or maybe you didn't.  Or the prosecutor

13  said, hey, can you get me this, too?  I would like

14  this and then that gets added.  But it was your,

15  hey, this thing is ready to be reviewed, let's,

16  you know, put it before a grand -- you know, do we

17  grand jury it or direct -- you know, support the

18  prosecution.  So --

19  Q.          Uh-huh.

20  A.          -- yes, it's just would I have done

21  that if the situation dictated, absolutely.  It's

22  part of your job as a criminal investigator.  It's

23  no different than what anybody else is doing, it's

24  just a different focus.

99

1    Q.          Uh-huh.  So just not every case will

2    get a case report?

3    A.          No, some cases they just don't go

4    anywhere, they fall apart or they -- you know, I

5    mean, there's a case number when you open -- you

6    start an investigation, it's got a case number.

7    And then depending on where the investigation goes

8    depends on whether it ever develops into a

9    prosecutable-type of case.

10   Q.          Uh-huh.

11   A.          You know, there's the input from the

12   supervision, there's the input from the U.S.

13   attorney's office, you know, there's a lot of

14   people that have to, you know, be in -- on the

15   same page in order to support the prosecution.

16   But that's what has always been known as a case

17   report.  It was the finality of everything

18   together and the presented material was the case

19   report.

20              An ROI is the -- is the report of

21   activity in support of the case report.  The case

22   report is usually made of a -- any number of ROIs,

23   it could be one, two, three, 100.  It just depends

24   on the length and the duration of the case.

1    Q.        Uh-huh.  And so when you send both your

2    ROIs and your case reports to your RAC to look at?

3    A.        That would -- the norm -- yeah, of

4    course it goes to your first front line

5    supervisor.  And he reviews it, signs off on it,

6    and you go -- you go from there.

7    Q.    Okay.

8    A.        And if I'm correct, he has the

9    authority to sign on behalf of the SAC for those

10    type of things, for ROIs and that.  He can sign

11    for that because there is a spot on there I

12    believe has either the ASAC or SAC, but you can --

13    his approval is all you need to continue doing

14    what you're doing.

15    Q.    Okay.

16    A.        And then it becomes a record.  But I

17    believe he has some authority to sign in place I

18    think.

19    Q.    Okay.

20    A.        And I can't remember.  It may have

21    changed, I don't know.  But either way, it's an

22    ROI, a report of information.

23    Q.        And so do you have to wait until you

24    get that approval before you can keep working on

1    that particular case?

2    A.          No.  It's -- it's not -- no.  No.  No.

3    No.  It's -- the reports are essentially reports

4    of what you've done, not what you're asking

5    permission to do.  So in the case of a NICs

6    retrieval, I'm compiling a case file with all the

7    supporting documents that I have.  Now, could that

8    ultimately depending on where this case goes,

9    depending on the person's criminal history,

10   depending on -- I mean, there's any number of

11   variables.  Could that then all that information

12   be developed into a case report and presented for

13   prosecution, absolutely.  Normally in the NICs

14   investigations, that's -- that's usually not the

15   case because even though it's a, you know, an -- a

16   critical thing needs to be resolved, it's --

17   there's so many of them.  There's just so many of

18   them, you -- the U.S. attorney's office just can't

19   accept them.  And so the ROI is -- all that is is

20   a report of what you've done.  You still can go

21   forth and do things in the investigation, that's

22   just a report of what you've just done, that's all

23   that is.  It's not a -- you don't have to be a --

24   granted an approval on an ROI to then continue --

```
 1   Q.          Okay.

 2   A.             -- your investigation.

 3   Q.          Okay.  And so what is -- like, what's

 4   the supervisor reviewing the ROIs for and signing

 5   off on them?

 6   A.          Well, he shouldn't.  But, you know, if

 7   he's paying attention, he's looking for

 8   grammatical errors.  You know, I can't -- every --

 9   you've got a multitude of agents, so you get all

10   different things, some would be better than

11   others.  Conciseness, does it -- is it -- is there

12   anything that springs out to him as obvious or

13   maybe there was a step or something missed or,

14   hey, what about this, what about that.  And

15   honestly, I don't -- I don't recall ever really

16   having to be that case, I'm pretty thorough and

17   detailed and I did everything in a very systematic

18   fashion that other than, you know, who it was and

19   information regarding the firearm and some of

20   those things, you know, I was very exact in what I

21   did.  So rarely did I have that conversation

22   about, hey, can you fix this, do this or where is

23   this, so -- but, yeah, that's -- essentially he's

24   just giving it a once over to make sure there's no
```

1    glaring problems.

2    Q.          Makes sense.

3    A.          Because it is an official document.

4    Q.          Is there any standard or process of how

5    much information you have to acquire or how many

6    ROIs you need to do before you can go retrieve a

7    firearm?

8    A.          The -- in these NICs cases, the -- the

9    ROI is not generated until after the retrieval is

10   made.  That is the -- that is the action that

11   needs to be documented.  It's not an ROI that

12   says, well, I ran a criminal background check

13   today, you know, I made phone calls to the clerk's

14   office.  You have a case management log that kind

15   of just helps you organize your -- the things

16   you've been doing day to day.

17   Q.          Uh-huh.

18   A.          But the ROI is saying, hey, on this

19   date and time, you know, received information, you

20   know, NICs Brady Operation branch regarding, you

21   know, subject A determined to be -- by FBI

22   determined to be a prohibited person based on

23   blah, blah, blah.  On this date and time, you

24   know, conducted an additional background check and

1    you're -- you then document in the ROI, at least I

2    did, of my investigative steps that came to the

3    determination that this person is in fact

4    prohibited per ATF, not FBI, per ATF.  And then it

5    also includes the fact that on, you know, the next

6    paragraph on this date and time, ATF agent --

7    Special Agent Burk made contact with subject A at

8    his residence located at blah, blah, blah, was

9    advised, subject stated they had the firearm,

10   blah, blah, blah.  Agent took possession.  Advised

11   subject, you know, that he'd -- he'd be allowed to

12   return the firearm to the FFL on this date.  ATF

13   agent contacted the FFL, agreed to return the

14   firearm.  So that is then submitted at the -- at

15   the culmination of those activities to document

16   here's how this -- here's how this was handled.

17   Q.        Okay.

18   A.        So there's the record that confirms

19   that that firearm was in fact retrieved and is no

20   longer in that person's possession.

21   Q.        Okay.  So how do you -- how do you

22   learn about these firearms?

23   A.        Meaning?

24   Q.        So if the first time -- I'll go back.

1    So how do you learn that someone might

2    be in possession of a restricted firearm?

3    A.         You get a Brady operation branch NICs

4    referral report.  That comes in from head -- from

5    the NICs -- ATF NICs section who -- who has a

6    liaison that works with FBI.  So they -- here's

7    what we have.  They give it to them.  They look

8    through it.  They then send those reports out to

9    the prospective geographical division that would

10    cover that area of where that person may live.

11    Sometimes it's where the FFL's at or maybe where

12    the subject lives.  Usually where the FFL's at.

13    Then that goes out to the division.

14         The division would then distribute

15    that.  In this case, all those reports came to me.

16    And then I would see the intended purchaser.  I

17    would see what firearm they purchased, the

18    identifiers, the date of purchase, the date they

19    were denied, whether it was a standard denial,

20    whether this firearm was in fact transferred and

21    whatever information that FBI would have initially

22    gleaned to make their decision.  I then start with

23    that as a foundation and then build from that

24    until we have enough information to confirm that

1    either the person, in fact, is not prohibited,

2    which happens a percentage of the time, or in fact

3    they were.  We -- we uphold the FBI's

4    determination and -- and -- and go -- they'll have

5    to facilitate the retrieval of the firearm.  But

6    we do not go and do that until we are absolutely

7    100 percent sure.

8              And our process was for me to do the

9    case workup, do all the investigative things, make

10   a determination, and then I would submit that to

11   our division counsel.  She'd give it another

12   thorough legal look over.  If she had any

13   questions, answers, we kind of worked together.

14   And then she would say I concur with your

15   decision.  Or she may say, well, you know, could

16   you -- could you get this other document or

17   something?  Okay.  Yeah.  Great.  Whatever.  And

18   then, okay, great.  Now I feel good; I agree.  You

19   know, so there was a -- for Columbus field

20   division there was a very thorough process.  I --

21   and at least -- and those were the four years that

22   I was running that program.  That's how it was

23   done and it was done that way in every case.

24   Q.        So you would submit a write-up with

1    sort of the evidence and the backup for why the

2    retrieval is appropriate, but that's different

3    than an ROI?

4    A.        What do you mean submit a write-up?

5    Q.        You said that as you get these cases

6    from the FBI and then you do the research to make

7    sure that the determination is appropriate?

8    A.        Correct.

9    Q.        And then you said you would submit a

10   write-up.

11   A.        No.  I never said submit a write-up.

12   Q.        Okay.  What did you say?

13   A.        I said I'd contact our division

14   counsel.

15   Q.        Okay.

16   A.        And then I would say here's a case for

17   review, a delayed denial.  I'd give her the name,

18   case number, I would attach some documents that

19   were very -- maybe the new documents that weren't

20   contained in the original FBI determination, I'd

21   maybe add those as attachments in the email.  But

22   then she would then be able to go in

23   electronically and also look at the case work and

24   all the things that were attached as part of the

1    case.  So she can access the case, go through

2    everything I have, look for what she may be

3    looking for to make what -- what she is thinking

4    they need to see in order to say I concur.  But

5    she can access the case, it's a -- it's an

6    electronic case management system so she can acc

7    -- you know, depending on your approval status,

8    you know, you can access it.  So there's nothing

9    really submitted.  Like, it's, hey, I took a look

10   at it, I agree, I concur.  He's -- and I would

11   keep that email as part of the record so to show

12   that it wasn't only my decision, but it was also

13   the decision of our division counsel.  So those

14   were the steps.  But she can access every agent's

15   case, too, to look and put legal review on things.

16   Q.        Okay.  So you're gathering evidence and

17   documents.  But the first time that you're putting

18   anything in sort of a formal summary is that ROI

19   after the retrieval?

20   A.        Well, everything is entered -- all of

21   your documents -- everything you're building is

22   entered into Nforce, which is your electronic case

23   management system.  So things are accumulated and

24   organized and compartmentalized and put in folders

1    in there.

2    Q.        Okay.

3    A.        The only thing in your investigative

4    step that you're going to need to -- at least

5    initially is if you go out and you retrieve a

6    firearm, you're going to then memorialize that

7    action in your -- in your first ROI.  And in --

8    generally in these cases if there's no other

9    circumstances that spinoff of this, that also has

10   to be documented, then it's usually that single

11   first report, you know, it's usually about a three

12   -- maybe a three page report or something.  It's

13   all encompassing from the initial information you

14   got, all the way through the retrieval process.

15   You try to sum it up in a single report, because

16   you're moving onto the next one.  As long as you

17   have everything in there that substantiates that

18   that firearm was -- you know, that that person was

19   prohibited and, you know, authority allowed you to

20   go ahead and take that possession from them.  And,

21   you know, obviously you articulate that you have

22   transferred it or returned it or seized it.

23   Q.        Uh-huh.

24   A.        And then there's other forms that kind

1    of go with that stuff, too.  But it's -- the ROI

2    encapsulates all that.

3    Q.        Okay.  So talking specifically about

4    the incident that is involved in your lawsuit.

5    A.        Uh-huh.

6    Q.        Did you go through all of those

7    investigative steps that we just talked about for

8    this --

9    A.        Absolutely.  I do it that way on --

10   Q.        -- investigation?

11   A.        -- every -- every NICs case, I do the

12   same fashion.  Very methodical about it.

13   Q.        Okay.  Who was the firearm -- who

14   possessed the firearm that you were looking for?

15   A.        Well, it was my belief based on the

16   investigation that I did that -- and the

17   pronunciation of his name is -- I don't have that

18   down exactly.  But Suleiman, Mr. Suleiman I guess.

19   Q.        First name Ala?

20   A.        Possibly.  Without looking at the form,

21   I -- yeah.

22   Q.        Okay.

23   A.        Something of that nature.  And he would

24   have been the original -- the purchaser of the

1    firearm in question.  So based on the fact that he

2    purchased it and the information I had, it was

3    believed that he would likely be the first person

4    or the -- or the current possessor of it.  That's

5    not always the case.  But that's what I would have

6    believed, that's what ATF would believe and that's

7    what division counsel would believe.  So that's

8    where we start in terms of the retrieval process

9    is who purchased it.  Who's on paper as the

10   purchaser.  Now, that doesn't mean he has it, it

11   just means he purchased it.

12   Q.        Uh-huh.

13   A.        He possessed it at some point in time.

14   Now -- now we need to find the gun.

15   Q.        Okay.

16   A.        And sometimes there is a series of

17   steps to do that because it has changed hands.

18   Q.        So was your plan that day to retrieve

19   the firearm?

20   A.        My plan that day was just to knock and

21   talk to Mr. Suleiman to explain to him that he is

22   prohibited, he was found prohibited.  Obviously,

23   he's going to confirm that he -- or that he

24   purchased the firearm because it's on paper.  I

1    mean, there's a record of it.  And then discuss

2    with him the whereabouts of the firearm.  In many

3    instances, they're like, well, yeah, I still have

4    it.  It's, you know, here, there.  Or, well, I

5    don't have that anymore.  I -- you know, I --

6    there's something, and then we take the next steps

7    from there.

8              So it's always about initial contact,

9    creating a dialogue, locating the weapon and also

10   informing the person that they are prohibited and

11   showing them -- you know, it's not just my word.

12   Here's -- here's the documentation.  And a lot of

13   times, you know, here you go.  I can't give them

14   copies of the documents, obviously.  But I'll

15   show, here.  Here your -- does this conviction

16   back in 19, you know, 82 for, you know, whatever

17   it may be, does that -- oh, well, yeah.  I forgot

18   about that one.  And, you know, so you're --

19   you're just working with them.  You want them to

20   be educated because you don't want to have to come

21   back to this house because they did it again.

22             So, you know, my intention was to -- to

23   contact him, have a dialogue or have a dialogue

24   with somebody that's at that location.  One, is it

1    his -- does he actually live there?  And then in

2    many instances you end up talking to a spouse or

3    girlfriend, they're not concerned, but they're

4    concerned, they want to know.  It's not a secret.

5    Hey, this is about a firearm.  Can you -- you

6    know, where's he at?  Can you give me an address

7    where he's at?  And you bring them up to speed

8    because you don't want everybody all frazzled

9    because the government came to your house.  So

10   it's like, listen, we have to solve this problem.

11   Here's what it's about.  No one's under arrest,

12   you know, unless something bad breaks.  And let's

13   figure it out.  And it's just never been an issue.

14   It's never been an issue until 7-7-20.  But my

15   intent was just to make contact with them.

16   Q.         Okay.  And you were retrieving this

17   firearm because of an immigration issue; do I have

18   that right?

19   A.         That was his prohibiting -- that was

20   his -- the prohibitor that was cause for his

21   denial, yes.

22   Q.         Okay.

23   A.         And that was confirmed with the -- with

24   an ICE agent who referenced his file and informed

1    what his -- his current immigration status was.

2    And that was part of the information submitted to

3    the division counsel.

4    Q.        Okay.  This -- this wasn't a case where

5    you were recovering a firearm from a convicted

6    felon, was it?

7    A.        No.  He -- he had no criminal record

8    other than an immigration prohibitor, which is one

9    of the nine prohibitors for -- it makes you

10   prohibited.  You have to have a certain

11   immigration status, and he didn't have it.  It was

12   still pending.  His immigration status had not

13   been resolved; therefore, he's prohibited from

14   possessing a firearm in the country.

15   Q.        Okay.

16   A.        So -- but he went and purchased one

17   anyways.

18   Q.        Gotcha.

19             I think we may have talked about this,

20   but you didn't have a warrant to recover this, it

21   wasn't a case where you needed a warrant --

22   A.        Does not.

23   Q.        -- was it?

24   A.        It doesn't require a warrant, no.

1    Q.          Okay.  So in terms of your case reports

2    and submitting them to your supervisor --

3    A.          Uh-huh.

4    Q.          -- what does it mean for one of your

5    cases to be reviewed but still pending?

6    A.          Reviewed but still pending?

7    Q.          If --

8    A.          I'd have to look at kind of what you're

9    reference is.

10   Q.          Yeah.  I realized now that was perhaps

11   not the best way to ask it.

12               You had talked about an interview that

13   you did with some -- with ATF in relation to the

14   investigation into conduct.  Do you remember that?

15   A.          Can you rephrase that question, please.

16   Q.          Yes, I can.

17               Do you remember doing an interview with

18   ATF while they were investigating your conduct in

19   2021?

20   A.          The only interview I had was the

21   initial interview, pro -- post the event.  I don't

22   know a week or --

23   Q.          In August 2020?

24   A.          Yeah.  It was maybe a week or two

1    later, something of that nature.

2    Q.         Yeah.

3    A.         Yes, that was the interview that I had,

4    ATF.

5    Q.         Okay.

6    A.         ATF internal investigators because of

7    the -- there was force involved in the incident,

8    either way.

9    Q.         I'm going to mark this as Exhibit 12.

10                       - - - - -

11          Thereupon, Exhibit 12 is marked for

12   purposes of identification.

13                       - - - - -

14   A.         Okay.

15   Q.         And on page 6 in your answer there,

16   it's maybe 10 lines down.  The sentence starts

17   with, "So, that came to me...."

18   A.         Okay.  Over.  Yeah.  Yes.

19   Q.         Okay.  Do you know what you meant when

20   you said the case was reviewed per normal standard

21   procedure but it was still pending?

22   A.         I'm looking.  I'm looking where you see

23   that at.  10 lines down.

24   Q.         Oh.  Here.  I can hand --

1   A.        Page -- oh, I'm sorry.  What page?

2   Q.        Six.

3   A.        Sorry.  Wrong page.

4             Okay.  Help me out here.  Six.  Okay.

5   Hang on a second.

6   Q.        Sorry.  I underlined it in orange and

7   pink if that helps.

8   A.        Okay.  I'm sorry.  It's a back page.  I

9   was looking at single faced, so that's why I

10  couldn't find it.  Do you know what I'm saying?

11  Q.        Oh.

12  A.        You've got five, and six is on the back

13  of five instead of being --

14  Q.        Oh.

15  A.        I wasn't prepared for that.

16  Q.        I apologize.

17  A.        I'm looking and I'm like I don't have a

18  page 6.  Anyways.  Okay.  So investigation came to

19  me.  I handle primarily all the NICs

20  investigations....  that came...and I worked with

21  it and I -- so that came to me, I worked with it,

22  you know, per normal SOF provided it

23  was...pending...prohibitor is -- yeah, it hadn't

24  been resolved.  It's -- the -- the case, it's

1    pending, it's -- it's still open.  That's what

2    that meant.

3    Q.        Okay.

4    A.        Yeah.  Meaning the firearm is still out

5    there.

6    Q.        Okay.  Makes sense.

7             Did you have to get approval from

8    anyone before traveling to Columbus to retrieve

9    this -- or to attempt to retrieve this firearm?

10   A.        Yeah.  I keep -- keep my first line

11   supervisor informed of my activities.

12   Q.        Okay.  Did anyone else know that you

13   were coming up to Columbus to recover the firearm,

14   anyone else within ATF?

15   A.        I don't know for sure.  But if I spoke

16   with another agent that day or another co-worker,

17   said, hey, what are you up to today?  Well, I'm

18   helping -- I've got to go to Columbus for a

19   retrieval today.  And so, you know, would somebody

20   else be aware?  I mean, we communicate.  We --

21   when we're on the job, we usually tell each other

22   what we're up to, what's going on.  You know,

23   because then, you know, then it -- it's just --

24   it's just talk, it's just what we do.  But, you

1    know, your supervisor needs to know where you're

2    at.  So he knows, hey, what do you got going?

3    Well, I'm going to head up to Columbus on a NICs

4    today and then I've got to run over Indiana, and

5    then, you know, maybe -- maybe back to Cincinnati

6    if I can do it all in one day.  So he's aware of

7    what I'm doing, yeah, absolutely.

8    Q.          Is that supervisor in Cincinnati?

9    A.          That's my first line supervisor.

10   That's Frank Occhipinti --

11   Q.          Okay.

12   A.          -- at the time.

13   Q.          Were you planning to do any other work

14   while you were in Columbus?

15   A.          I don't -- I believe my intention that

16   day was there's another case, but Columbus in the

17   route of travel was the first one I was going to

18   go to.  I -- I can't say for sure because

19   everything kind of changed after that day.  You

20   know, I -- I usually try to do as much as I can in

21   one day.  And I would likely say there was

22   probably another residence or another person if I

23   had the case at the point where it was ready --

24   you know, the denial was confirmed.  I just don't

1    know if I -- you know, there would have been

2    records and files with me of course they were in

3    my case file -- or my car and all that.  But I --

4    I don't know for sure where I was heading after

5    Columbus.

6    Q.         Okay.

7    A.         Logically I would be, though, likely.

8    Q.         Okay.  When -- what are instances --

9    actually, I think we've covered that.

10             Did you tell the Columbus ATF office

11   that you were going to be sort of in their neck of

12   the woods?

13   A.         No.  There's no reason to.

14   Q.         Okay.  We talked about that.

15             Looking at your Position Description,

16   which is Exhibit 11.

17   A.         Yes.

18   Q.         On page 376, it anticipates as part of

19   your job "In initiating or conducting criminal

20   investigations, incumbent generally utilizes

21   elaborate planning and coordination to resolve and

22   overcome complex jurisdictional problems involving

23   other Federal, State, county or local agencies."

24   A.         Uh-huh.

1    Q.        What are some of those jurisdictional

2    problems that you guys have to work around?

3    A.        The biggest one is whether that person

4    is -- is currently involved in a -- in an

5    investigation maybe for similar circumstances.  So

6    you have two agencies focused on the same subject

7    conducting the same, similar type operation, so of

8    course you don't want to get in a -- in a

9    situation where you're trampling over somebody

10   else's investigation.  I mean, that's -- that's

11   really the paramount thing is -- is -- and there's

12   a term for it.  Deconflicting --

13   Q.        Okay.

14   A.        -- is the term we use.  Deconflicting.

15   So you deconflict with the other agency.  You

16   know, these are -- these are enforcement-type

17   operations and stuff like that.  Usually

18   preplanned stuff that's going to be a little heavy

19   or a little more presence of nature, you're going

20   to have multiple agents maybe in that area, cars,

21   marked up, and it's like, you know, hey, what's

22   going on kind of thing.  But it's usually for de

23   -- you know, de -- so you don't step on each

24   others' investigative toes.  It normally is.

122

1    Q.          Uh-huh.

2    A.          And again it's generally -- is it not

3    always the case, no.  Because sometimes,

4    unfortunately, there's sensitive reasons why you

5    don't want the local law enforcement to know.

6    Maybe they have somebody that you've got

7    information that is providing information or the

8    case is so sensitive that it -- they can know the

9    day it's going to happen and not any time sooner.

10   So there's -- there's reasons for things.  And

11   we've had those kind of things happen.  So there's

12   a lot of variables there is what I'm saying.

13   Q.          Uh-huh.  Was there a reason in this

14   case that you didn't want local law enforcement to

15   know about the operation?

16   A.          It's not that I didn't want them to

17   know.  It's that I wasn't really -- I wasn't

18   required.  It's not policy that I have to notify

19   them.  It's -- it's an -- you know, essentially an

20   administrative contact, you know, it's not a

21   planned operation.  It's knocking on somebody's

22   door to explain to them that there's a problem,

23   show them some paperwork.  If the gun's there,

24   great, we'll fix the problem.  But, no, there -- I

```
1    saw no -- absolutely no reason.  There was no --
2    it wasn't in a high crime area.  The person didn't
3    have an extensive record.  There was -- there was
4    absolutely no need to draw other resources into
5    this situation.
6    Q.         And you were -- you were alone on this
7    run, right?
8    A.         As I was on most of them.
9    Q.         Okay.
10   A.         Almost --
11   Q.         Sometimes -- go ahead.
12   A.         Primarily all of them, except for again
13   in -- in certain situations where there was more
14   of a potential threat to myself, then it made
15   sense tactically speaking, yes.
16   Q.         Okay.  How are you trained to retrieve
17   firearms if they are inside of, like, a personal
18   or a private home?
19   A.         Well, I establish, one, that they have
20   it.  And if they do say they have it, I ask them,
21   you know, well, where do you have it?  And if they
22   say, you know, I've got it under the couch --
23   normally what I would do is if they -- is if I've
24   established the dialogue and they say they have
```

1    it, then I'd say, well, do you mind if I step in,

2    you know, if you are going to retrieve the

3    firearm.  And you talk sense to them.  Oh, yeah,

4    no problem, no -- you know, this, that and the

5    other.  And, you know, and then you -- well, where

6    -- and I would just walk with them to where it's

7    at, and they'd show me.  And I'd say don't pick it

8    up.  I'll take possession so that it's secure,

9    make sure it's unloaded.  Create -- make it safe.

10            And then we'll say, okay, now I have it

11   so, here, let's -- here's a couple options we can

12   -- you know, what -- and, you know, sometimes

13   depending if they're, you know, really nice, we're

14   like, well, which one -- I'll be willing to call

15   the FFL and see if they'll work with you.  They

16   don't have to.  Or if you have a third party.

17            Now, if those options aren't there, and

18   I've had that happen, well, I'm sorry, but, you

19   know, here's how you can appeal the process.

20   These -- and I would give them the steps.  And I

21   would be very clear I'm not giving you legal

22   advice, I'm just saying here's the steps you need

23   to go through.  And a lot of times they don't know

24   what to do.  And I give them that information and

1    they're, like, oh, man, I don't know -- thank you.

2    Thanks for helping me figure out how to solve

3    this.  And I said when you do, then, you know,

4    when you are not prohibited, then it's not an

5    issue.  But until then -- so I'll take possession.

6    So usually a permission-type thing.

7            Now, if they're, like, you know, if

8    you're possessing the firearm, you know, I mean,

9    there's been -- there's -- it's all about

10    dialogue.  It's about making them comfortable and

11    maintaining your safety at the same time.  And

12    most of the time it's, yeah, because they don't

13    want to -- now that they've said I have the gun,

14    they don't want you any more on edge either

15    because obviously it's a situation with a firearm

16    and you are law enforcement.  So normally you

17    would go in and just follow them and, I mean,

18    retrieve the firearm.  Sometimes it's in their car

19    and then you're like, okay, and we walk out to the

20    car.  So, you know, of course taking all the

21    safety, normal safety protocols.  But again, I

22    mean, I've never had an issue.

23    Q.        Uh-huh.

24    A.        So that's normally how it would be

126

```
1    done.

2    Q.          I think we've talked a little bit about

3    sort of what you were dressed in that day.  Would

4    you describe it as office attire?

5    A.          I would describe it as exactly what I'm

6    wearing here today.  A gray polo, tactical-type

7    pants, the exact same footwear, these green --

8    tactical green kind of boots, except in this case

9    I have my wallet in my left pocket instead of my

10   credentials.  I always kept my credentials in my

11   left pocket because my pistol is on my right.  And

12   if you have to produce them, you produce them with

13   your left hand, not your right hand.  Because if

14   you ever need to refer to your firearm, you don't

15   want to have something in your hand to do it.

16   This is exactly what I had on that day.

17   Q.          Okay.

18   A.          Not the same shirt.  Exactly what I had

19   on today is what I'm wearing today.

20   Q.          Okay.

21   A.          I mean just to help illustrate.

22   Q.          Yeah.  Thank you.

23              And just to clarify.  On the day in

24   question, you had a pistol on your --
```

127

1    A.          Pistol on my --

2    Q.          -- right hip.  And you do not have one

3    today?

4    A.          No.  And I don't -- I don't have

5    credentials obviously with me.

6    Q.          Okay.  Thank you.

7                At the time you had an ATF vest in the

8    back of your car; is that right?

9    A.          I had ATF -- yeah.  There was a

10   tactical vest back there, yes.  A tactical vest,

11   there was rifle, there were other tactical attire

12   that would be worn in the event that there was a

13   necessary response to tactical situation, those

14   could be on the fly.  So you -- you just carry

15   that stuff with you, every agent does.

16   Q.          Okay.  Was your badge in your left

17   pocket?

18   A.          In my credential fold in my left

19   pocket, yes.

20   Q.          Okay.

21   A.          It has my photo, it has my authority

22   written in there, and then it also has my badge

23   with my badge number on it.

24   Q.          Okay.  Did you have --

128

1   A.        And my --

2   Q.        -- a badge or credentials around your

3   neck or on your belt?

4   A.        No.

5   Q.        Or anywhere else?

6   A.        I would not normally do that.  No, not

7   in those -- not in this type of situation.

8   Q.        Okay.  What kind of car were you

9   driving?

10  A.        I was driving a 2018 black Kia Sorento.

11  Q.        Was it a marked car?

12  A.        No.  None of our vehicles are marked.

13  Q.        Okay.

14  A.        But it is -- it is outfitted with

15  emergency lights and a radio, yes.

16  Q.        Okay.  Emergency lights, like, a top

17  bar?

18  A.        Not -- no.  It would be a bar like a

19  cross -- inside, it's --

20  Q.        Okay.

21  A.        It's not obvious on the outside, but I

22  have the controls inside.  I can flip it so if I

23  ever had to utilize it to get somewhere in an

24  emergency fashion, you have the blue -- blue and

1    red flinkers, you've got the siren.  It's all

2    that, but it's all packaged in a vehicle like

3    that.

4    Q.        Gotcha.

5              When you got to Edgebrook Drive, where

6    did you park the car?

7    A.        Generally probably just a space or two

8    over from maybe the -- the front of the residence.

9    Q.        Okay.

10   A.        You know, I don't usually park directly

11   in front, but it might have been the available

12   spot at the time.

13   Q.        On the --

14   A.        But I'm not going to park way down the

15   street and walk.  I'm going to park, you know,

16   obviously somewhat close if I have to retrieve a

17   document or an additional thing from the car,

18   but --

19   Q.        Okay.

20   A.        So it would have been somewhere in the

21   general front of the residence.

22   Q.        Okay.  On the same side of the street

23   as the house?

24   A.        Yeah.  Yeah.

1    Q.        Can you tell me what happened when you

2    first knocked on the door?

3    A.        I first knocked on the door, I didn't

4    hear anything, and so I knocked again.  And then I

5    could here some type of movement, rustling around

6    behind the door.  You know, I could tell that

7    somebody -- somebody was there.  And I probably

8    knocked again.  And then I got a response from I

9    believe a female.  And I identified myself, you

10   know, my -- I said who I was, showed my

11   credentials and tried to establish a dialogue.

12   Q.        Okay.  You initially identified

13   yourself without your credentials; is that right?

14   A.        No.  I -- I believe I informed her -- I

15   can't recall.  I'm -- I don't know -- I don't

16   believe -- I maybe would have because she would

17   not have been able to see me through the door.

18   But I advised her of who I was, federal agent, you

19   know, my name, all that kind of stuff.  But I -- I

20   -- I do not recall -- well, she didn't answer the

21   door, so I couldn't have showed them this way.

22   But it's -- I did show her the credentials and at

23   -- at some point I believe through the window when

24   she was able to view them.  And I'm -- I just

1    can't recall if she first viewed through the

2    window and then also looking to see who it was and

3    I held them up.  But I don't know for certain.

4    But I did identify myself.

5    Q.        Okay.

6    A.        I just didn't say nothing.

7    Q.        So you identified yourself, kind of

8    told her who you were?

9    A.        Yep.

10   Q.        Did you give her any other information?

11   A.        I told her that I was there and I am

12   trying -- again, his name Suleiman, Ala Suleiman,

13   that that's who is -- who I was trying to make

14   contact with ultimately.

15   Q.        Uh-huh.  Did she -- what did she say

16   when you told her that?

17   A.        She said he wasn't there.

18   Q.        Okay.  And so what was your plan when

19   -- or I guess did you believe her when she told

20   you he wasn't there?

21   A.        Based on my experience, I -- generally

22   speaking, I had -- I had doubts because it's a

23   very common response at times.  You know, and you

24   have to work through it.  And I usually do that

1    with dialogue, so that they, one, can understand

2    that, you know, that this is an important issue.

3    And also that, you know, there's -- no one is

4    going to jail.  It's not -- you know, and, you

5    know, a lot of times you just have to work through

6    it.  Because, you know, it's easy.  No, he's not

7    here.  Well, okay.  You know, well, oftentimes

8    they are.  And, oh, well, you know, you get an

9    apology.  I'm sorry.  I thought you were going to

10   arrest me.  And, you know, you just don't know.

11   So I really couldn't say.  You know, it seemed odd

12   that you wouldn't answer the door and it was --

13   her activity was a little, like, not common.  So

14   in my mind, yeah, I had reason to believe that he

15   may still be there, of course.

16   Q.        Uh-huh.

17   A.        Yeah.  Based on her -- based on her

18   response, too.

19   Q.        And so what did you say to her when she

20   told you he was at work?

21   A.        I said, well, can you -- I said can you

22   please open the door?  And -- so I can speak with

23   you?  I have -- you know, I can show you the

24   documents.  I -- I adamantly told her nobody is

133

1    under arrest.  There's -- there's -- it's nothing

2    like that.  I just need to at least speak with the

3    resident here about this situation.  And -- and

4    it's just me trying to create the dialogue to

5    determine, you know, I -- I don't know if he --

6    he's not here means he doesn't live here.  He's

7    not here because he's at -- he's not home.  Or

8    he's not here because he's actually here, but I'm

9    telling you he's not.  So there's a lot of

10   different things.  And it -- I just said, you

11   know, can you please open the door?  I just -- you

12   know, let me at least explain to you and show you

13   why I'm here.

14   Q.       Uh-huh.

15   A.       And, you know, she didn't want to open

16   the door or she started calling the police or --

17   you know, is where it then went to.

18   Q.       Okay.  You had mentioned earlier that

19   you took your badge -- you showed her your badge?

20   A.       Absolutely.

21   Q.       Did you put it back in your pocket when

22   you were done?

23   A.       Yeah.  I believe so.  I -- when she was

24   -- said she was calling the police, I said, well,

1    that's fine.  I am the police, but please do.  I

2    -- I saw it as a relief for the situation because

3    I always get cooperation.  I show them who you

4    are.  I mean, I've been down this road several,

5    several times.  And I said by all means.  I'll --

6    but I'm going to, you know -- and here is my name,

7    she asked my name.  She asked my agency.  She

8    asked my badge -- you know, to see my badge.  She

9    asked my badge number.  All of this was provided

10   to her, in turn she was providing it to Columbus

11   dispatch.

12   Q.        Okay.  How long would you say you were

13   on the porch trying to have this dialogue with her

14   before she called the police?

15   A.        A couple minutes maybe.

16   Q.        A couple minutes?

17   A.        Couple minutes, yeah.

18   Q.        Okay.

19   A.        I can't say for sure.  But it wasn't a

20   long time.

21   Q.        Uh-huh.

22   A.        Yeah.  It wasn't a long time.

23   Q.        And -- and so what -- I mean, and so

24   what do you do if -- if the homeowner who's not

1   your suspect won't answer the door?  Do you have

2   options?

3   A.          You know, like I said, her -- her

4   conduct --

5   Q.          Uh-huh.

6   A.          -- and her lack of -- I'm not sure what

7   was going on inside the house because I wasn't in

8   the house.  I couldn't see in the house.  I didn't

9   look through windows or anything.  So I really

10  didn't know.  But normally somebody usually

11  answers the door.  So her -- her conduct is -- you

12  know, and the fact that you wouldn't just open the

13  door and -- you know, again I would just continue

14  to try to create the dialogue and maybe come up

15  with other ways that I could think of besides

16  identifying myself, providing documentation.  And

17  in that instance if she had not maybe called the

18  police, you know, I may have just sat, waited,

19  and, you know, maybe he came home.  You know, I --

20  I can't just wrap it up and say, well, I can't do

21  this one.

22  Q.          Uh-huh.

23  A.          You know, I have to then assess the

24  situation and make some decisions on what I would

1    do.  This was a very unusual circumstance that

2    nobody -- somebody's in there and they're refusing

3    to answer the door.  In the instances before, it's

4    they're calling the police as I'm walking up the

5    steps and then they show up and it's, here, yeah,

6    you know, what's your business?  Who are you?

7    Identify yourself.  Oh, here.  Okay.  All right.

8    Yeah.  What can I do for you?  Can I help you?

9    And it goes that way.

10                 But in this case I would have, you

11    know, just assessed the situation, determined

12    whether I'm going to wait there longer.  I mean, I

13    -- I'm on the clock, so I'm not -- I've got to get

14    these solved, so, you know, I would have gave it

15    some time or, you know, sat and thought and maybe

16    he would have showed up, maybe they came out,

17    maybe they left the residence.  You know, there's

18    any number of things.  I may have went over and

19    maybe talked to a neighbor.  I -- there's just a

20    lot of options.  I've got a lot of investigative

21    options, but it really didn't get to that point

22    based off what occurred.

23    Q.          Uh-huh.  Did -- did you tell -- I think

24    we know her name now as Sarah.  Sarah, the woman

1    inside the house, that you were going to stay on

2    her porch all day unless she opened the door?

3    A.          I said I -- I'm going to have to remain

4    here.  What I said was I'm going to stay here.

5    I'm going to be here because I have to resolve

6    this situation.

7    Q.          Uh-huh.

8    A.          You know, her he's-not-here answer just

9    doesn't make me go away.  I -- we've got to do

10   something here.  We've got to try to resolve this

11   situation.  And if I had to stay in the area and

12   wait to see if Suleiman showed up or -- or I can

13   determine that he didn't live there in some

14   fashion, well, then I do.  But it -- it's going to

15   take some time.  So I wasn't --

16   Q.          Uh-huh.

17   A.          Just because she said he's not here

18   doesn't mean I'm leaving.  I still have an

19   investigation to conduct.

20   Q.          Okay.  Did you call her a liar?

21   A.          Never.  Never.

22   Q.          Okay.

23   A.          I would never -- I wouldn't do that.  I

24   didn't do that.  But I would never do that because

1    that is not how you're going to establish a -- a

2    cooperative dialogue by insulting somebody.  So,

3    no, I didn't -- I've never done that.  It doesn't

4    -- it serves you no purpose.

5    Q.        Have you listened to the 9-1-1 call

6    that she made that day?

7    A.        Yeah.  I -- I listened to that audio

8    yesterday.

9    Q.        Okay.

10   A.        I can't recall it verbatim.  But I did

11   listen to it.

12   Q.        I am going to play a portion of it.

13   I'm not -- we're not going to listen to the whole

14   thing.

15   A.        Uh-huh.

16   Q.        And I'm going to mark that as

17   Exhibit 13.  And I'll start it and stop it and

18   just ask you some questions about what you

19   recognize.

20                      - - - - -

21        Thereupon, Exhibit 13 is marked for

22   purposes of identification.

23                      - - - - -

24   A.        Okay.

1    Q.          And there's nothing to view on the

2    screen, I don't know why I'm pointing it this way.

3    A.          That's okay.

4    Q.          It's just sound.

5    A.          Okay.  Sure.

6               (Audio played.)

7    BY MS. PICKERILL:

8    Q.          3359 Edgebrook Drive, that's the

9    address that you went to?

10   A.          Yeah.  If that's the address of record,

11   then that's the one.  I -- I didn't recall the

12   number at this point in time.

13   Q.          Okay.

14   A.          But, yeah, that sounds right.

15   Edgebrook for sure.  The numbers, yeah.

16              MR. BOND:  Can you say where you're

17   starting and stop so I can write it down.

18              MS. PICKERILL:  Yes.  I have paused it

19   -- I started at the beginning.  And I've paused it

20   now at nine seconds.  And I'm going to play it

21   also at nine seconds.

22              (Audio played.)

23   BY MS. PICKERILL:

24   Q.          Just is that the voice of the woman

1    that you remember inside the house?

2    A.        If that's the audio call, yeah, I -- I

3    guess.  I mean it sounds different because I'm

4    listening to it on a little laptop computer.  But

5    I can say it's very similar, because I was on the

6    porch.  I'm in a open environment.  I'm going

7    through a door and a wall and all this stuff

8    listening to it.  But, yeah, yeah, I would have to

9    agree.  I'm not going to disagree that it's not

10   her.  It's -- it sounds a little different coming

11   from -- from a little speaker, but I wouldn't --

12   Q.        Okay.

13   A.        Yeah.

14   Q.        Do you remember the conversation that

15   she described just the back and forth?

16   A.        There was some back and forth.  I don't

17   necessarily agree with what she's saying.  She on

18   here seems a little confused as to what she's

19   saying.  And I know that some of the things that

20   she's saying on there are absolutely not true.

21   Q.        Okay.  Has she said anything so far in

22   what I've played that is untrue?

23   A.        I think did she not just say something

24   about coming through the door or -- or trying to

1    open the door?

2             MS. PICKERILL:  And I'm so sorry, Jon,

3    I paused that at 31 seconds.

4    BY MS. PICKERILL:

5    Q.        I'm going to back it up so we can hear

6    it again.

7    A.        Yeah.  Please do.

8    Q.        And just -- any time you hear something

9    that you believe -- that is untrue, let me know

10   because I'd like to know.

11   A.        Okay.  I didn't know that.

12   Q.        I -- I hadn't asked for that yet.

13   That's all right.

14   A.        Okay.

15   Q.        I've moved it back to 16 seconds.  I

16   think that should give us what we're looking for.

17   And I'm going to I play it from here.

18             (Audio played.)

19   A.        Okay.

20   Q.        I've paused it -- excuse me -- at 23

21   seconds.

22   A.        Yes.  I said I -- I identified myself

23   -- I had already said I identified who I was and

24   -- and why I was there.  What I believe she said

142

1    to me was when I asked for that name, he's not

2    here.  So I -- she did not indicate a

3    relationship.

4    Q.        Okay.

5    A.        I don't remember her saying any

6    relationship to the person per se.  I don't recall

7    that.  So I'm just --

8    Q.        Okay.  So you might not have been aware

9    at the time that it -- she was his wife?

10   A.        I may not have been aware, no.

11   Q.        Okay.

12   A.        Because I don't recall that.  I do

13   recall identifying myself.  I do recall her saying

14   she's calling the police.

15   Q.        Okay.  I'm going to start playing it

16   again at 23 seconds where it is paused.

17             (Audio played.)

18   A.        Okay.

19   Q.        Is that what you were talking about?

20   A.        That's what I'm talking about.  That's

21   completely false.

22   Q.        Okay.  Did you ever touch the door

23   handle?

24   A.        Never.

143

1    Q.        Okay.

2    A.        I had no purpose to do that.  I'm --

3    I'm just -- just regular door knock.

4    Q.        Knocking?

5    A.        Knocking at the door.

6    Q.        Okay.  In your opinion what would it

7    mean to knock forcefully?

8    A.        I mean, I guess if I was pounding on

9    the door with my fist, I'd say that's pretty

10   forcibly.  But that's not forcibly.  That's a --

11   that to me is that's a knock at the door.

12   Q.        Okay.

13   A.        That's letting somebody know, hey,

14   there's somebody outside that wants to meet with

15   you.  But aggressive, no.

16   Q.        Okay.  Would you say that's about how

17   hard you were knocking on her door?

18   A.        I'm saying that's -- I would consider

19   that -- yeah, I would just say a -- a standard

20   door knock.  How you would knock if you are

21   wanting to get somebody's attention on the inside.

22   Q.        Okay.  I have paused it at 31 seconds

23   after the last clip.  And I'm going to pick it up

24   right from there.

144

1    A.          Okay.

2    Q.          Again, if you hear anything that you

3    don't agree with or believe is true --

4    A.          Okay.

5    Q.          -- let me know.  And I might stop it to

6    ask some questions, too.

7    A.          Okay.

8                (Audio played.)

9    A.          That's incorrect.

10   Q.          Okay.  Did you tell her to open the

11   door because you're law enforcement?

12   A.          No.  She said I -- what I heard on

13   there was he tried to open the door because he's

14   the police.

15   Q.          Okay.  I think she made two comments.

16   It's paused right now at 59 seconds.  I'm going to

17   back it up just a little bit just to see if I can

18   more clearly understand what's being said.

19                I'm going to start it at 42 seconds.

20                (Audio played.)

21   A.          Okay.  I heard that.

22   Q.          Okay.  I -- I can see the confusion.

23   So you certainly -- you're saying you did not try

24   to open the door or touch the --

145

```
1   A.          I did not try to open --

2   Q.          -- doorknob?

3   A.          -- the door.  I would have said, ma'am,

4   please open the door.  I'm a police officer, you

5   know, let me explain the situation to you.  You

6   know, I was just trying to further confirm and

7   reiterate to her that there's no -- no reason for

8   concern, that I am a police officer.

9   Q.          Okay.

10  A.          So -- and I did say can you please open

11  the door?  Can you -- and I would have used the

12  word "please."

13  Q.          Okay.  The word "please" or the word

14  "police"?

15  A.          Please.  Like, ma'am, please open the

16  door.  I'm a police officer.  No one's going to

17  jail.  I just want to explain why I'm here.  You

18  know, please open the door.  It's -- you know, I'm

19  a federal agent, you know, I'm just -- just trying

20  to reconfirm.  I'm not running away, so --

21  Q.          Okay.  I'm going to start playing again

22  at 59 seconds where it was last paused.

23  A.          Uh-huh.

24              (Audio played.)
```

1    BY MS. PICKERILL:

2    Q.          Okay.  Did we hear anything that was

3    untrue in -- in that clip that you noticed?

4    A.          No.  She described accurately to her

5    best that I was.  Other than I -- my

6    interpretation is she didn't see a police car.

7    Not that she didn't see a vehicle I had driven.

8    Q.          Okay.  And that I think --

9    A.          She says I don't see a police --

10   Q.          For what it's worth, I think that is

11   what she meant, too.

12   A.          She didn't see a marked unit out there.

13   Q.          And you mentioned your car was

14   unmarked?

15   A.          Yeah.  Correct.

16   Q.          And you said that the lights were

17   inside of the vehicle, such that you --

18   A.          It's not visible.

19   Q.          Okay.

20   A.          They're visible once you turn them on.

21   It's -- it's for being -- you know, obviously

22   discretion.

23   Q.          Okay.

24   A.          Hence the reason we dress the way we

1   do.

2   Q.        Oh, excuse me.

3   A.        Can I -- can I take a pause for a

4   bathroom break?

5   Q.        Absolutely we can.

6   A.        Thank you.

7   Q.        That's a good place to break.

8             THE VIDEOGRAPHER:  We -- we are off the

9   record.  The time is 11:40.

10            (A short recess is taken.)

11            THE VIDEOGRAPHER:  This is the start of

12   media number three.  We are back on the record.

13   The time is 11:51.

14   BY MS. PICKERILL:

15   Q.        Okay.  So before we took a break we

16   were talking about the 9-1-1 call.  And just at

17   some point while she was on the phone with 9-1-1,

18   did Sarah tell you that the police were going to

19   be on their way?

20   A.        I don't recall if she said they're -- I

21   -- I made the assumption that after she was on the

22   phone and she was again asking me for my

23   identifiers through the window and showing my

24   creds again or showing my creds and talking to

148

1    her, I assumed they were on their way, which is --

2    was fine with me.  I don't recall if she said

3    they're en route.  I do recall her saying I'm

4    calling the police.  And then we had a dialogue of

5    her relaying that information to the dispatch.

6    Q.        Okay.  But it was your understanding

7    that the police were en route to the house?

8    A.        Yes.

9    Q.        Okay.  I think in the clip that we had

10   last listened to -- and I don't know if I put this

11   on the record last time -- but I had it paused at

12   1:49 seconds.

13            Sorry.  Sarah mentioned that you had

14   showed her your credentials, and you've said that

15   a couple of times.

16   A.        Uh-huh.

17   Q.        I have some pictures of your

18   credentials, and there's just a couple of

19   different ones.  And so I wanted to see which ones

20   you had on you that day.  I'm going to mark this

21   as Exhibit 14.  And there are five pages of

22   pictures attached.

23                      - - - - -

24            Thereupon, Exhibit 14 is marked for

Realtime - Videoconferencing - Trial Presentation - Video
Spectrum Reporting LLC | 614-444-1000

1    purposes of identification.

2                    - - - - -

3    A.          Sure.

4    Q.          Yeah.  Just take a look through it.

5    And are all of those some form of your ATF

6    credentials or badge?

7    A.          Okay.  Some pictures are of my official

8    credentials.  Another picture is what is a PIV

9    card, it's a controlled item that is issued to

10   each agent and/or government employee at this

11   point that allows you to access designated areas,

12   come and go from federal buildings without search

13   and to also operate your government issued laptop.

14   Q.          Okay.

15   A.          That is the ID that is on the lanyard.

16   Q.          Okay.  And all of these belonged to you

17   as a special agent with the ATF?

18   A.          Yes.

19   Q.          Okay.  So let's start with that first

20   page.  Can you tell me what this badge is?

21   A.          Well, the first page is not a badge.

22   It's -- it's -- it states my agency, the

23   Department of Justice, my specific agency, my

24   position, my name, and then it also states in the

1    next fold, next compartment of that opened up

2    credential, it shows my photographs, it shows SA

3    standing for special agent, my designation, it has

4    my badge number, and then to the right of that is

5    written -- is my authority.

6    Q.        Okay.

7    A.        And I'm signed, and then it's signed by

8    the current director at that time.

9    Q.        Gotcha.

10            Is -- are these credentials something

11   that you had with you on July 7th, 2020?

12   A.        Yes.

13   Q.        Is this what you showed Sarah?

14   A.        Yes.

15   Q.        Okay.  Moving onto the second page, is

16   that your badge?

17   A.        Yes.  That is the badge that is

18   contained within that credential fold.

19   Q.        Okay.  So all -- what we just looked at

20   on the first page and this badge on the second

21   page are all in the same little billfold, for lack

22   of a better word?

23   A.        Correct.  Which is -- yeah, that is --

24   all that is together in there.

1    Q.        Okay.  The third page is what we saw on

2    the first page?

3    A.        Repeat of the first page.

4    Q.        Okay.  Fourth page, is that that access

5    page?

6    A.        That's the PIV card, correct.

7    Q.        Okay.  And is that the same as what we

8    see in the fifth picture, just with a lanyard?

9    A.        Correct.

10    Q.        Okay.  Did you show Sarah anything

11    other than the credentials that we've talked about

12    on the first page?

13    A.        No.  That's -- I showed her the most

14    important item to validate who I was.

15    Q.        Okay.  Makes sense.

16           Okay.  And so after you had a belief

17    that police were on the way, what did you do while

18    waiting for them to arrive?

19    A.        I stood and -- stood and waited for

20    them to arrive.  Just stood at the porch, probably

21    maybe off center from the door a little bit, you

22    know, still with my -- still facing the door in

23    the event that she did answer and I could talk to

24    her.

1    Q.          Okay.

2    A.          But I just stood there and waited.

3    Q.          Okay.  Did you call local law

4    enforcement or the local ATF branch to let them

5    know what was up, what you were doing out there?

6    A.          Well, obviously my supervisor knew that

7    I was out conducting a NICs investigations and I

8    was heading to Columbus.  And so my whereabouts

9    were known at the time, as to what I was doing.

10   Q.          Okay.

11   A.          Did I make a call while standing there,

12   no.

13   Q.          Okay.  Did you tell anyone at the

14   Columbus branch of ATF that you were there?

15   A.          No.  We had that question earlier.

16   And, no, there was no reason to.  They have their

17   own things that they're doing.  It's -- I wouldn't

18   call other divisions and say that I'm going to be

19   out there doing a NICs investigation.  It's not

20   required.  It's not necessary.

21   Q.          Okay.  So why did you decide to stay on

22   the porch and not go wait by your car?

23   A.          Well, it was -- one, I felt that

24   leaving the area may -- if -- if this resident was

1    concerned as to who I was, leaving, walking, you

2    know, may be interpreted as fleeing.  I -- I just

3    wanted to stand there.  In the event that she did

4    open the door, I could re -- you know, quell her

5    suspicions or concerns, you know, and that was it.

6    I had -- I had -- I was doing nothing wrong but

7    doing my job.  I did everything I was supposed to

8    do in order to identify myself.  So I was just

9    going to wait.  When the police arrived, wave them

10   over, present my credentials, explain what the --

11   the situation, what my purpose was.  And if they

12   wanted to offer assistance, say just explain to

13   her who I am, which is the way it's always been in

14   those similar incidents with less information

15   provided.  So that's -- there was no reason to --

16   to leave the porch.

17   Q.        Okay.

18   A.        It was -- it was where I started out

19   and it's where I think would be the best

20   indication that I had no reason to -- I wasn't

21   doing anything suspect to -- to warrant moving

22   away.

23   Q.        Okay.  Is that the same reason why you

24   wouldn't have taken your gun and, like, put it on

154

1    the hood of your car with your badge or anything?

2    A.          No agent is going to do that.  You're

3    not going to relinquish your firearm or remove it

4    from your person or your credentials.  Those are

5    -- you know, those are very secure, protected

6    items, they'll stay with you.  That is -- that is

7    in no way, shape or form anything any law

8    enforcement is going to do.

9    Q.          Okay.  Why did you make the decision to

10   leave your badge in your pocket?

11   A.          Well, it's a secure place to keep it.

12   Q.          Okay.

13   A.          That's where it -- that's where I pull

14   it out from.  I display it.  I show it to the

15   person.  I validate or everything -- and then I

16   put it back away.  I have a folder in my hand.  I

17   wouldn't consume my hands with multiple things,

18   it's not tactically sound.  I do have a firearm,

19   anything could happen.  I still haven't talked to

20   this person or established what or if anything is

21   going on inside the house.  So I show it as

22   needed.  You asked to see my credentials, here.

23   Is that good?  Okay.  Put it back in my pocket.

24   I've got the folder.  And now I still keep a free

```
1    hand in order to facilitate whatever I may need to
2    do next.
3    Q.        Okay.
4    A.        So --
5    Q.        Why not take your badge out and kind of
6    hold it with your folder, so that it was visible
7    to police when they got there?
8    A.        I've never had to do anything like that
9    before.
10   Q.        Okay.
11   A.        I -- I wouldn't think to do that
12   because it's not something that's ever been
13   necessary.  And again it's -- I had the folder in
14   my hand.  I secured the credentials out of habit
15   of securing them.  It's -- it's a big deal if you
16   lose your creds.  It's a big deal if you lose your
17   gun.  It's -- you know, that's -- it's not a good
18   thing, so your habit is to secure it.  You know,
19   so I, you know, likely would have put it in my
20   pocket because it's a habit to keep that item
21   secure.
22   Q.        Okay.  And then do you zip the pocket
23   up once it's in there?
24   A.        It's a flap.  Yeah.
```

156

1   Q.          Okay.

2   A.          Well, it doesn't have a zipper.  It's

3   just got a Velcro flap that comes over.

4   Q.          Okay.  Cool.

5               Is this a good time to break for lunch?

6               MR. BOND:  I don't know if it's here

7   quite yet.

8               MS. PICKERILL:  Okay.

9               MR. BOND:  But if you -- if you want to

10  break, we can.

11              MS. PICKERILL:  My next move was going

12  to be to start looking at the video.

13              MR. BOND:  So we might as well.

14              MS. PICKERILL:  I'm happy to stop in

15  the middle of that, but it might be more

16  cohesive --

17              MR. BOND:  Yeah.

18              MS. PICKERILL:  -- if we just break

19  now.

20              MR. BOND:  Let's take five.  And I'll

21  ask what the status is.

22              MS. PICKERILL:  Good.  Thank you.  I

23  appreciate it.

24              THE VIDEOGRAPHER:  We are off the

1    record.  The time is 12:01.

2              (A short recess is taken.)

3              THE VIDEOGRAPHER:  This is the start of

4    media number four.  We are back on the record.

5    The time is 1:00.

6    BY MS. PICKERILL:

7    Q.         Thank you.  Excuse me.

8              I'm going to next play part of the body

9    cam video.  I think you mentioned earlier that you

10   had watched it before this deposition?

11   A.         That's correct.

12   Q.         Okay.  Was that the first time you'd

13   watched it?

14   A.         It was the first time.

15   Q.         Okay.

16   A.         Yeah.  I mean, it was apparently a

17   necessity.  Not that I wanted to, but that was the

18   first time I had ever viewed any of the video

19   footage of anything that had to do with this.

20   Q.         Okay.  I'm not going to play the entire

21   thing, but there are parts that I want to ask

22   questions of you about and kind of understand your

23   perspective.  But if there's a moment where you

24   need to take a break or anything like that, just

1     let me know.

2     A.          Okay.  Thank you.

3     Q.          Just to sort of set the scene, do you

4     remember if it was Officer Fihe, do you remember

5     that he was the first one to arrive?

6     A.          I know that to be the case.

7     Q.          Okay.  And it was just one officer at

8     first?

9     A.          As far as I knew.

10    Q.          Okay.

11    A.          That's what I would believe.

12    Q.          If you look quickly at your transcript,

13    it's -- sorry, Exhibit 12.  And I'm looking at

14    page 12, which is another backside of a page.  In

15    the third box down the last sentence in there you

16    said, "So, I saw the car pull up.  I started

17    waving my hand over to me as I turned and started

18    walking towards the middle of the front yard."

19    A.          Okay.

20    Q.          Is that an accurate statement of how

21    you remember the incident starting?

22    A.          Okay.  Third block, is that what you're

23    saying?  Where --

24    Q.          Yes.

159

```
 1    A.          Okay.  Third block.  I would say it's

 2    all, except I don't -- I -- why I recollected

 3    walking to the front of the yard, I mean, you

 4    know, I'm trying to remember exactly how it is.

 5    It's all there -- but upon review of the video, I

 6    actually was standing on the porch --

 7    Q.          Okay.

 8    A.          -- at the time.  So I didn't come off

 9    the porch, and -- and as -- as it would say here.

10    I think I was still on the porch according to the

11    video.

12    Q.          Okay.

13    A.          But everything else seems to be

14    accurate.

15    Q.          Okay.  And when you were doing this

16    interview with ATF, is that what you remembered,

17    that you had started walking towards the front

18    yard?

19    A.          That's what I thought would have been

20    the case.

21    Q.          Okay.

22    A.          I guess where I was at the time that I

23    -- that there was interaction with the officer I

24    guess I wasn't really the primary focus in what I
```

1    was thinking about there.

2    Q.          Okay.

3    A.          It was more or less what I was doing in

4    terms of my actions, not my position or location.

5    Q.          Uh-huh.

6    A.          Just that I was in front of the

7    residence, which in this case I was actually

8    standing on the porch and not in the front yard.

9    Q.          Okay.  And so can you tell me sort of

10   as we sit here today what you remember happening

11   when Officer Fihe arrived?

12   A.          Well, I did see -- notice the car

13   approaching, the squad car approaching.  I done --

14   I did what I've done in numerous times before to

15   aid the officer because -- so that he knows

16   exactly where to focus his attention.  So I'm --

17   I'm waving.  I wave over like this to -- here,

18   where -- hey, I'm at the address.  But it does aid

19   to get the officer's attention when you're

20   arriving, so you can focus on -- instead of trying

21   to look for where the problem is at or what the

22   complaint is, you can focus on it.  So I did that.

23   And so I figured I had his attention and then was

24   standing where I was standing to prepare to have a

1    dialogue and present my credentials and state the

2    purpose that I was at the residence.

3    Q.          Uh-huh.

4              If -- on the same page of Exhibit 12,

5    if you go down four blocks to your response there,

6    can you tell me if that is an accurate depiction

7    of how you remember this event starting?

8    A.          Fourth from the bottom?

9    Q.          Yes.

10   A.          At the time, I -- I believed that's

11   probably how I was remembering it.  Having

12   reviewed the video for the very first time, you

13   know, there's -- there's a few subtle differences

14   than what I made in that statement.  But I also

15   had no video to refer to at that time.

16   Q.          Uh-huh.

17   A.          So the video would be more of an

18   accurate depiction --

19   Q.          Okay.

20   A.          -- versus this statement, per se.  Only

21   for the fact that I was just trying to do this in

22   some kind of memory after the -- after the event.

23   I mean, it was a lot of trauma.  So I was just

24   trying to do my best to -- you know, on a phone

162

1    interview.  This wasn't even in person, this was

2    over the phone.

3    Q.          Okay.  Ope.  Sorry.

4               Is it your memory today that Officer

5    Fihe got out of his car with a pistol trained on

6    you?

7    A.          He had his pistol out.  Absolutely.

8    Q.          Okay.

9    A.          He had his pistol out.  He had not

10   raised it to a pointed position, but he had it out

11   at the ready.

12   Q.          Okay.  Is it your memory that you

13   immediately told Officer Fihe that your

14   credentials were in your pocket?

15   A.          Okay.  Where are we referencing?  Are

16   we referencing something on the paper here?

17   Q.          I don't think -- no.  I'm just asking

18   about your memory.  I'm sorry.

19   A.          I -- I -- yeah, I do recall advising

20   him that I do have credentials in my pocket.

21   Q.          Oh.  Sorry.  And if you'd turn over to

22   page 13.  Now I understand what my note was about.

23   A.          Is there a question?

24   Q.          Okay.  Yes.  Is it your memory that you

163

```
1    immediately told Officer Fihe that your

2    credentials were in your pocket?

3    A.          I don't believe that was the first

4    action I took.  I think I was given some commands

5    that I attempted to try to follow.  I did advise

6    him that my -- that I was an agent.  And I advised

7    him that I had -- you know, my credentials are in

8    my pocket.  I was saying that.  I'm not sure

9    exactly what order that was said, but it was said

10   very much in the beginning of the interaction at

11   some point.

12   Q.          Okay.

13   A.          Yeah.

14   Q.          Yeah.  I'm just trying to understand

15   what your memory of the event --

16   A.          Yeah.

17   Q.          -- of the event is.

18               So I'm going to start playing Officer

19   Fihe's body-worn camera at 5:05.  And I'm going to

20   mark it as Deposition Exhibit 15.  Sorry.  I

21   know --

22               MR. BOND:  No, it's okay.

23               MS. PICKERILL:  -- it's a small screen.

24                         - - - - -
```

164

```
 1              Thereupon, Exhibit 15 is marked for
 2    purposes of identification.
 3                     - - - - -
 4              (Video played.)
 5              THE WITNESS:  Yep.
 6    BY MS. PICKERILL:
 7    Q.        I've paused it at 5:14.
 8    A.        Uh-huh.
 9    Q.        And just I'm going to pause this at
10    certain times to ask questions.  But if there's
11    ever a time that you want to pause it for any
12    reason, just let me know and we can talk about
13    that, too.
14    A.        Okay.  Does that also -- if there's
15    play back that needs to happen?
16    Q.        Yeah.  Absolutely.
17    A.        Like a -- can you rewind that for a
18    second?
19    Q.        Absolutely.
20    A.        Okay.  I want to make sure it's not
21    just pause and I can't do a rewind.
22    Q.        Yes.
23    A.        Okay.
24    Q.        Yes.  If there's something you want to
```

1    say while the video is playing and I haven't

2    paused it, just let me know.  That's not a

3    problem.  And we can go back and watch stuff

4    again.

5    A.         Okay.

6    Q.         I'm going to scoot next to you if

7    that's okay.

8               I'm going to start it at where it was

9    paused.

10              (Video played.)

11   BY MS. PICKERILL:

12   Q.         Okay.  Do you see yourself on this

13   video?

14   A.         Yeah.  I'm standing on the -- on the

15   stoop, porch.

16   Q.         Okay.  And your left hand, is that the

17   folder that you talked about earlier?

18   A.         Yeah.  It's the file folder --

19   Q.         Okay.

20   A.         -- with the documents for the

21   retrieval.

22   Q.         Okay.  Do you remember Officer Fihe

23   telling you to turn around and show your hands?

24   A.         I believe -- yeah, I think that's what

1    he did.

2    Q.        Okay.

3    A.          And that's what I did.

4    Q.          What were -- what's going through your

5    mind at that point?  Now the officer's -- he's

6    arrived, he's giving commands.  What are you

7    thinking at that point?

8    A.          Once I followed his initial commands, I

9    turned around and saw the pistol drawn, fear is

10   the first thing that came to mind.  A little bit

11   of panic.  A little bit of I'm in a quandary here

12   because the officer has his pistol out, which I

13   could not for the life of me understand why he

14   would have it out under these circumstances.  And,

15   two, I still have an unresolved issue behind me,

16   so now I'm kind of put in a position where I'm

17   kind of volnerable on -- from the front and the

18   back, so that's what's going through my mind.  I

19   could not for the life of me understand his

20   approach to this situation.

21   Q.          Okay.  At this point, Officer Fihe does

22   not have his firearm pointed at you; is that

23   right?

24   A.          He his has firearm drawn at his side

1    and he has it out and it's displayed.  I mean,

2    yes, he does.  And he can see that in the video.

3    Q.          You're saying that in the video right

4    here he has his firearm pointed at you?

5    A.          No.  I'm saying you can see in the

6    video as he exits the vehicle he starts -- he

7    draws his firearm out.  And you're --

8    Q.          Oh, okay.  Pardon me.

9    A.          When you see him drawing the firearm --

10   you can't see it in the video here because if he

11   had it -- when he goes to pointing it at me, it

12   comes in the camera, the body cam.  But it he has

13   it in his hand; it's in his right hand right now.

14   Q.          So perhaps you misunderstood my

15   question.

16   A.          Okay.

17   Q.          My question was at this point he's not

18   pointing his firearm at you?

19   A.          At this point, he is not.  He has it

20   out.

21   Q.          Okay.

22   A.          He has it on display.

23   Q.          Thank you.

24              And your response was I'm a federal

168

```
 1    fucking agent; is that right?
 2    A.        Yes.
 3    Q.        That's the first thing that you said to
 4    the officer?
 5    A.        Yes.
 6    Q.        Okay.
 7    A.        That was after -- after following the
 8    initial commands, turning around, showing my
 9    hands, seeing the firearm in his hand, that was my
10    initial statement.
11    Q.        Okay.  Why didn't you tell him that
12    your badge was in your pocket at this point?
13    A.        Because I am trying to first identify
14    that I am a federal agent.  The normal course of
15    action would be to say I'm a federal agent.  Do
16    you have credentials?  Yes, I do.  They're in my
17    pocket.  Can I see them?  Yes, you can.  That's
18    the normal protocol.  And that's the normal --
19    that's the experience that these types of
20    interactions have -- have always went.
21              The -- at what point I turned around
22    and saw his firearm out of its holster in these
23    circumstances became very threatening and alarming
24    to me.  And -- and I've had -- like I said, I
```

169

1    still have an unresolved situation.  This is in my
2    mind one cop talking to another cop who's doing
3    something entirely unnecessary and inappropriate
4    for this type of interaction.  And I'm trying to
5    convey to him in an emotional fashion because of
6    the circumstances that I'm a federal fucking
7    agent, like, listen to I'm saying.  And then
8    obviously I -- in making references to -- to
9    trying to produce my credentials to corroborate
10   what I'm saying.
11   Q.        Have we heard you talk about your
12   credentials so far in the video?
13   A.        No.  He just got out of the car and I
14   started following the commands.  And then I tried
15   to identify myself as an agent.
16   Q.        Okay.  You talked about the normal
17   course of action being to identify yourself as an
18   agent.
19   A.        Uh-huh.
20   Q.        Do you feel that it was outside of that
21   normal course of action to say I'm a federal
22   fucking agent?
23   A.        Under those circumstances, no.  One
24   police officer talking to another police officer,

```
 1    when one police officer is perceived by another
 2    police officer to be acting threatening or --
 3    towards that officer or unnecessary actions, I
 4    don't -- I don't think that's unnecessary.  I
 5    think it's a very -- probably a very common
 6    response by anybody in that situation that has one
 7    -- one police officer has a pistol out at the
 8    ready against the other officer.
 9             Now, he hadn't raised it at that point.
10    He will do that.  But to present yourself at that
11    fashion when -- any trained officer, you know, and
12    having been in that situation, I was not
13    presenting any threat.  I started following his
14    commands.  My hands are up.  You can see my hands.
15    I can't -- I'm not making any furtive movements.
16    I have a case file.  I'm dressed the way I am.
17    His actions really put me in kind of a state of
18    panic and -- and I'm trying to calm the situation
19    or -- or deescalate it by just trying to get him
20    to follow normal protocol and ask for my
21    credentials, maintain his own personal safety, I
22    get that.  But not in this fashion.
23    Q.        Uh-huh.
24    A.        This was -- this was not the way you do
```

1    it.

2    Q.          So, yeah, like, when -- when one of the

3    sides of the police officers is acting threatening

4    or out of normal, then that kind of changes what

5    -- how you might react to it?

6    A.          Well, in this case, it's a pistol out.

7    It's -- it's -- I mean, the pistol is my concern,

8    an accidental discharge, a -- an officer that is,

9    you know, extreme -- becoming extremely aggressive

10   or is -- or is presenting that image in a --

11   toward a person, you know, in this case another

12   law enforcement agent, which you believed, I

13   believed I should say that everything that I could

14   have done up to that point to identify myself was

15   provided to the agency.  That to be greeted in

16   that fashion after providing that -- all my

17   identifiers and them having reasonable means to

18   confirm who I was would not have justified an

19   approach that was made by the officer in that

20   fashion.  And that's what I was perceiving at the

21   time when I see a firearm out from another

22   officer.

23          I'm -- I'm saying who I am in a very

24   fearful and startled and shocking way.  And if --

1    if the profanity obviously came out with it, it

2    wasn't meant with disrespect.  It was said as a --

3    as a part of the emphasis of let me -- I am who I

4    am.  I'm a federal fucking agent is what I said

5    because I was, you know, in that state of mind

6    based on what I'm perceiving in front of me.

7    Q.        Uh-huh.

8              We had talked a couple of times about

9    the -- the file folder that's in your hand.

10   A.        Uh-huh.

11   Q.        Would that have been your entire case

12   file for this particular run?

13   A.        That would have been all the

14   documentation that was not in an electronic form

15   that would have been necessary to confirm to the

16   recipient or that I would need for investigative

17   purposes for reference when conducting an

18   interview to prove that they are in fact

19   prohibited.

20   Q.        Uh-huh.

21   A.        It's not to say there's not another

22   piece of paper or something that might have been

23   on my desk or something.  But it was -- it may be

24   related, but it was not pertinent to what I was

1    there for.

2    Q.        Uh-huh.

3    A.        Those documents would have been in that

4    folder.

5    Q.        I think you talked about later on in

6    the video an OHLEG printout that's in the folder?

7    A.        Yes.

8    Q.        Do you remember if there was anything

9    else in the folder?

10   A.        Yes.

11   Q.        If you don't --

12   A.        There would have been other items in

13   the folder.

14   Q.        Okay.

15   A.        Absolutely.  Because I would have been

16   presenting those documents to or if asked used

17   them to explain my purpose to the resident.

18   Q.        Okay.  Do you remember what documents

19   were in the folder?

20   A.        There might have been -- there was

21   probably the initial Brady referral report of the

22   FBI finding.  There may -- there was the OHLEG

23   documents.  There -- there wasn't a lot on his

24   criminal history.

1    Q.        Uh-huh.

2    A.        And the documentation for ICE's

3    confirmation and his immigration number and that

4    would have been in the electronic file.  So was

5    there a substantial -- there was no -- there

6    wasn't an abundance of documents, but there was

7    necessary documents that only an ATF agent would

8    have law enforcement at a minimum.  But the Brady

9    operation branch report, that would -- that's ATF

10   exclusive material.  The OHLEG, any Ohio law

11   enforcement agency is going to have OHLEG

12   material.

13   Q.        Uh-huh.

14   A.        So there was documents.  I can't say

15   everything that was in there.  But those two items

16   I know would have been in there.

17   Q.        Yeah.  And just to be clear, at any

18   point if there's stuff you're not allowed to talk

19   about, I don't want you to get into that.

20   A.        Yeah.  No.  It's just --

21   Q.        Just to the extent that you can.

22             All right.  I'm going to start the

23   video where it was paused last, which is five

24   minutes and 20 seconds.

```
 1                  (Video played.)

 2      BY MS. PICKERILL:

 3      Q.           Okay.  Do you recall the commands that

 4      Officer Fihe gave you to get on the ground?

 5      A.           I recall first and foremost that he

 6      asked for my ID, which is I thought the start of

 7      the logical sequence; although, I didn't see the

 8      purpose for the firearm which alarmed me at first

 9      and -- and created a -- you know, my initial fear

10      which I didn't think would have happened because I

11      didn't think the situation was going to -- I was

12      going to be confronted like that.

13                   But initially he asked for the ID, as

14      he's pointing the firearm at me.  So it -- the

15      whole thing is starting to move away from what the

16      logical sequence would have been.  Let me see some

17      ID.  Okay.  It's in my left pocket.  Can I get it

18      out?  Yes, get your -- let me see your ID.  Boom,

19      boom, boom.  Here it is.  And then, you know,

20      whatever he would -- however means he wanted to

21      retrieve it, bring it to me, lay it on the porch,

22      step away, I don't know how he would want to do

23      it.  But he never stayed on that course.  He went

24      a totally different direction, which now put me in
```

```
 1    a -- you know, an additional position of
 2    vulnerability.
 3    Q.          What -- did you understand what Officer
 4    Fihe meant when he gave the command to get on the
 5    ground?
 6    A.          Yeah.  I know what he meant.
 7    Q.          Okay.  Why didn't you get on the ground
 8    when he started giving those commands?
 9    A.          Well, too, the logical safe place for
10    me when I have another law enforcement or a person
11    with that level of aggression pointing a loaded
12    firearm at me is to keep my hands visible and --
13    and not make any moves.  So I'm -- so I'm
14    perceiving it as -- for my personal safety.  And I
15    still have my -- I'm still there in an official
16    capacity.  I still have an unknown situation now
17    put behind me instead of in front of me.  So I am
18    -- so I'm trying to manage my personal safety,
19    obviously any safety of the public, and I
20    certainly don't want to create a situation that is
21    going to cause him to discharge that firearm,
22    whether it be intentionally or unintentionally.
23    And I know that can be the case, I've seen it
24    happen many times in training.
```

```
1            So there's a lot going through my head
2    at that time and standing there still or not
3    getting on the ground to me is the safest place to
4    be in that moment and the most tactically sound.
5    Q.         Okay.  So at this point you have walked
6    down off the porch?
7    A.         I came off the porch, yes.
8    Q.         Did you think that when Officer Fihe
9    told you to get on the ground that the safest
10   option was to walk closer to him?
11   A.         No.  I didn't walk closer to him.  I'm
12   not seeing that.  I'm seeing I'm standing in the
13   clearest place I can be with the most light and
14   visibility on myself and keeping my hands visible.
15   Q.         Okay.
16   A.         And any law enforcement officer knows
17   the hands are the threat.  That's -- that's the
18   threat.  It's not the feet.  It's not anything
19   else.  The hands are -- are what the threat is
20   whether what it's -- what's in the hands or what
21   the hands can do, draw from -- you know, a weapon
22   or something.  So I was giving him in my
23   experience the best presentation of myself, at the
24   same time trying to preserve myself from being
```

178

1    shot and still not trying to put myself in a more

2    vulnerable position such that whatever is going on

3    behind that door, if it was to turn bad, I'm even

4    more vulnerable or even Officer Fihe more

5    vulnerable to it.  So I -- so I'm making a lot of,

6    like, quick assessment here.

7              Because again this is a split second

8    situation when I'm confronted with an armed

9    officer pointing a pistol at me shouting

10   aggressively, essentially treating me as some type

11   of suspect or as if I was in the middle of

12   committing a crime, which I had no reason to

13   believe that he would think that based on the fact

14   that I had provided all my identifiers not only to

15   the resident, and I know that that was relayed to

16   the police department.  So I'm trying to make a

17   lot of calculated decisions and that and I -- I

18   did the best to try to, you know, first and

19   foremost not get shot.  And that was the safest

20   place to be is standing up with my hands visible.

21   Q.        So when Officer Fihe told you to get on

22   the ground, you felt that the safest option was to

23   walk forward and stay standing with your arms out?

24   A.        My safest option was to put myself not

1    any closer to him, but actually put myself in a

2    more visible fashion.  I go from a shadowed porch

3    out to broad daylight right in the middle where I

4    am not only visible to him, but I may be visible

5    to other people that are surrounded in the area

6    that may be observing.  In the event that I'm

7    unintentionally shot or intentionally shot, I want

8    it to be very clear that I am not a threat to that

9    officer and that is where I tried to position

10   myself.  In no way, shape or form did I make any

11   advancements to him.

12   Q.        Just to be clear, my question was that

13   you walked forward, would you agree?  You walked

14   forward off the porch?

15   A.        I came off the porch.

16   Q.        Okay.

17   A.        I wasn't walking towards him.

18   Q.        Okay.

19   A.        I wasn't aggressing him.

20   Q.        Sorry.  I tried to change that

21   language, but I understand where it was confusing.

22   A.        Okay.  Thank you.

23   Q.        Why -- you said a couple times that the

24   hands are the threat.  Why didn't you drop the

1    folder when he asked to see your hands?

2    A.        Well, he had visi -- visibility of my

3    hands when I was turned this way and then when I

4    turned with him.  It's very clear that I'm not

5    holding a weapon.  I have the folder.  I wasn't

6    dropping anything.  I wasn't grabbing anything.  I

7    wasn't trying to reach for anything.  I was just

8    trying to keep exactly the way I was, but not on

9    the porch, but out in more visible and, you know,

10   I'm waiting for let me see your credentials, let

11   me see your credentials.  Because that's the next

12   logical step in this -- in this situation.

13   Q.        Sorry.  I'm not sure if I mentioned it

14   before.  I'm just going to say it now.

15   A.        Uh-huh.

16   Q.        I have it paused at five minutes and 29

17   seconds.

18            At this point, have we heard you say

19   where your badge or credentials are?

20   A.        I don't know that we've said that right

21   at -- I don't think we've reached that point.

22   Q.        Okay.  I'm going to ask you a question

23   about Exhibit No. 9, which is that ATF questions

24   that they answered.  It's that one.

181

1    A.          Uh-huh.

2    Q.          And I'm looking at question number 45.

3    It goes from page 13 to 14.

4    A.          Okay.

5    Q.          All right.  And so ATF says on page 14,

6    "Currently agents are taught to identify

7    themselves and to follow the commands of

8    responding local law enforcement."

9    A.          Uh-huh.

10   Q.          Were you -- were you trained to follow

11   the commands of responding local law enforcement

12   while you were working as a special agent?

13   A.          Yes.  It's a general -- general

14   response and it has a general application;

15   however, the -- the situation -- it's situation

16   specific.  And if you're -- if you feel that your

17   safety is at risk, then you're not obligated to

18   follow that command.

19          And again I believe this -- this is a

20   general contact, but not under these specific

21   circumstances.  So if you're -- if you have a

22   threat to your life or a perceived threat or fear

23   of being, you know, injured or -- or killed,

24   you're not obligated to follow commands that are

182

1    going to jeopardize -- possibly jeopardize your

2    safety further.

3            In general, of course you want to

4    cooperate and that.  And by all means I was

5    attempting to cooperate by identifying myself.

6    That wasn't obviously good enough in this

7    situation for this officer when all the

8    opportunity was there.  So -- and generally

9    speaking, of course, and I'm sure they're taught

10   to cooperate with federal law enforcement.  But

11   this is -- this is a -- generally, yes.  It's a

12   general statement, but there's exceptions.  And

13   when your personal safety is at risk, you -- you

14   take the -- the decision to preserve that over

15   following a command, if you feel like it's a

16   better way to remain safe.  And in this case,

17   that's what -- that's what I was perceiving.

18   Q.        Okay.  I am going to start playing the

19   video from where it was last paused at five

20   minutes and 29 seconds.

21            (Video played.)

22   BY MS. PICKERILL:

23   Q.        Okay.  I've paused it at five minutes

24   and 48 seconds.

1    A.        Uh-huh.

2    Q.        A couple of times in there did you tell

3    Officer Fihe that you wouldn't be getting on the

4    ground?

5    A.        I -- can you replay it?

6    Q.        Yeah.  Absolutely.

7    A.        I was focused on something else.

8    Q.        That's okay.

9              It goes back in 10 second intervals.

10   A.        Okay.  Yeah.  That's fine.

11   Q.        I'm going to start playing it at 5:28.

12   A.        Thank you.

13             (Video played.)

14   A.        Okay.

15   Q.        I've paused it at 5:38.

16   A.        Yeah.  Now, what was the question?

17   Q.        Do you remember telling Officer Fihe

18   that you wouldn't get on the ground?

19   A.        I remember -- by review of the video, I

20   -- I heard myself say that once, I'm not getting

21   on the ground.

22   Q.        Okay.  Why would you have told

23   Officer Fihe that you weren't going to comply with

24   the commands he was giving?

184

1    A.          Because that was not in my -- in my

2    perception of the situation an -- the -- his

3    presentation of the weapon having pointing --

4    pointing a live firearm at me, moving to the

5    ground and making any type of movements other than

6    standing in place was -- was going to jeopardize

7    my safety.  He wasn't calm, cool and collected,

8    and I know where that leads when -- when an

9    officer is -- is -- his emotions are getting the

10   best of him and he's got the firearm in the hand.

11   Because I've trained officers, I've trained

12   agents, I see how accidents happen with a firearm

13   where there's an unintentional discharges.  And

14   frankly my personal safety was paramount there.

15   And there wasn't -- there wasn't a necessity for

16   me to jeopardize that when I could have simply

17   presented the credentials in -- in a calm fashion

18   to him, and had him review those in any way he

19   chose to, and it -- by just presenting them.  So

20   -- and tactically, it wasn't -- it was -- it would

21   have been a terrible decision for me tactically

22   because I still have the unknowns behind me.  And

23   with that, I -- I was thinking that, okay, he --

24   he's calling for assistance.  The next officer

1    that arrived might be the officer that actually

2    sees and -- and understands the steps to take here

3    in order to deescalate the situation.  I was no

4    threat.  And I assumed that that officer would

5    likely if there was a second officer responding

6    would say just put -- put your pistol down for a

7    -- do you have credentials?  Yes, I do.  They're

8    in my pocket.  I was -- I'm trying to get to that

9    point; he's not letting me.  Can I please see the

10   credentials?  Yes.  Can you carefully remove them?

11   Yes.  That's what I was hoping at this point would

12   logically take place.  But in the meantime, the

13   safest place and the most tactically sound place

14   for me is to stand there with my hands up, and

15   that's the choice I made.

16   Q.        Okay.

17   A.        Because of those reasons.

18   Q.        So was it -- was part of your decision

19   to not get on the ground because you wanted to

20   wait for that second officer to get there to see

21   what would happen?

22   A.        Well, first and foremost, it was not

23   safe for me.  I did not want to make any movements

24   with a trained firearm on me.  I just didn't want

1    to.  I -- you know, I've got a wife, I've got a

2    baby, all of these things going in your head.

3    Because a situation that I'm being confronted with

4    is not a situation that I've ever personally been

5    in.  I've never had another experience that I

6    expect to be offering me assistance to treat me in

7    that fashion and point a loaded firearm at me.  So

8    there's a lot to digest in that moment, and my

9    personal safety superseded everything.  And that's

10   why I chose to stay stand.  These other rationale

11   and reasonings are in my head, too.  They're all

12   going on.  I'm trying to make the best decisions I

13   can and not end up dead.  And I was hoping in

14   addition to just remaining there if he pulled the

15   trigger, there's going to be witnesses, he shot an

16   unarmed person.  If the other -- if another

17   officer opens up or another officer arrives, he'll

18   do the right thing, he'll take the logical

19   sequence, he'll ask for my credentials.  Those are

20   the -- and -- and I'm remaining at least in a

21   tactical position where if I had to respond to

22   aggression behind me for some reason, I can -- I

23   can also protect myself in that fashion.  Standing

24   was by far the safest place for everybody under

1   these circumstances.

2   Q.        You did have on this day a pistol on

3   your right hip, correct?

4   A.        Yeah.  I -- yeah, with my shirt, yeah,

5   like --

6   Q.        Okay.

7   A.        -- I would do on standard apparel,

8   attire, equipment, I would carry on this, yes,

9   absolutely.

10  Q.        Just wanted to be clear.

11            I am going to start playing this from

12  where it was last paused, which is at 5:38.

13  A.        Uh-huh.

14            (Video played.)

15  BY MS. PICKERILL:

16  Q.        In that bit, Officer Fihe told you to

17  -- to stay where you are.  Do you remember that

18  happening?

19  A.        Well, he's saying it, yeah, I -- I mean

20  if it's on the video, it happened.  I can't say

21  that I recall every utterance.  But, yeah, I see

22  it, so he would have said that, yeah.

23  Q.        Okay.  And you told him that you would?

24  A.        Okay.  Yeah.  I --

1    Q.        Is that --

2    A.        I'm hearing it on the video and seeing

3    it, yes.

4    Q.        Okay.  I have paused it at 5:56, and

5    I'm going to start playing it from the same place.

6              (Video played.)

7    BY MS. PICKERILL:

8    Q.        Do you now know that the officers were

9    dispatched -- oh, I'm so sorry.  I have this

10   paused at six minutes and 15 seconds.

11             Mr. Burk, do you know now -- I'm

12   certainly not asking about what you knew at the

13   time.  Do you know now that the officers were

14   dispatched to what was labeled a burglary in

15   progress?

16   A.        I believe -- I believe that now that

17   was their -- the initial dispatch -- excuse me,

18   dispatch that they got --

19   Q.        Okay.

20   A.        -- initially.

21   Q.        And did you kind of hear in the video

22   where Officer Fihe explained or -- or said to you

23   we got a call that someone was impersonating a

24   police officer?

1    A.         I heard that.  And I heard that didn't

2    have any credentials.  So there was a mention in

3    there that I was impersonating an officer and

4    didn't have any credentials.

5    Q.         Okay.  So at the time -- at this point,

6    did you have sort of an understanding of why the

7    police officers were there?

8    A.         Well, I -- I knew the police officer --

9    a police officer would be responding.  I knew that

10   she was calling the police.  I knew that she was

11   not sure if I was a federal agent or not.  I've

12   been there several times before in that same type

13   of scenarios.  So I knew he was -- there was going

14   to be a police response, and I -- I welcomed it

15   because I assumed I'd show my credentials and, you

16   know, create a dialogue and we would state my

17   purposes.  And if he wanted to assist, great.  If

18   not, I didn't need it.  That's fine, too.

19              And so I knew that there was a

20   response.  Now, up until now, I didn't know what

21   exactly was said on the phone to the dispatch and

22   what they had put out.  I learned that after the

23   fact.

24   Q.         Uh-huh.  Okay.  I am going to start

1    playing the video again starting at six minutes

2    and 15 seconds.

3                    (Video played.)

4    BY MS. PICKERILL:

5    Q.          I've paused it at six minutes and 31

6    seconds.

7    A.          Uh-huh.

8    Q.          Were you at this point pointing to your

9    pocket to show where your credentials are?

10   A.          I was just trying to make reference

11   that they're in my left pocket.

12   Q.          Okay.

13   A.          Just with -- at the same time keeping

14   my hands where you can see them, but at least

15   trying to zone him in on where to look for these

16   credentials.

17   Q.          Okay.  And that was your left pocket,

18   right?

19   A.          Always.

20   Q.          Okay.  And to be clear, your gun was on

21   your right hip?

22   A.          Always.

23   Q.          Okay.  Right now that folder, it's in

24   your right hand.  You -- I don't know if you -- do

1    you remember watching in the video you just

2    switched the folder from your left hand to your

3    right had?

4    A.        I likely did under the circumstances.

5    Yeah, I'm now dealing with law enforcement.

6    Q.        Okay.  That would explain how it got

7    into your right hand.

8    A.        Right.  Yeah.  I mean, there's a lot

9    going on in -- in that moment there, you know, I'm

10   -- the folder.

11   Q.        Uh-huh.

12   A.        You know, I'm trying to convince him

13   that who I am and allow this procedure for me to

14   identify myself appropriately.  And, you know, so,

15   yeah, I obviously shifted the folder over to that

16   hand because my credentials are in my left pocket.

17   I really want him to know where to look for these.

18   And, you know, reaching across, probably not a

19   good idea, so I switch hands and I'm, like, right

20   here.

21   Q.        Yeah.  It kind of looks like --

22   A.        So it's just to aid me in referencing

23   him I -- where he can find things if he would just

24   stop and look.

192

```
 1    Q.        That makes sense.

 2              I'm going to start playing it where it

 3    is paused at 6:31.

 4    A.        Uh-huh.

 5              (Video played.)

 6    A.        See.  I switched it back to my left

 7    hand.

 8    Q.        Okay.  I've paused it at six minutes

 9    and 38 seconds.

10              Did you kind of hear the other officer

11    yelling?

12    A.        I -- yeah, he just got there and

13    he's --

14    Q.        Okay.

15    A.        -- going down the same path that Fihe

16    was in terms of his actions, yes.

17    Q.        Okay.  That was my only question.

18              I'm going to start playing it at 6:38

19    where it's paused.

20    A.        Uh-huh.

21              (Video played.)

22    BY MS. PICKERILL:

23    Q.        Did you hear Officer Winchell say face

24    down?
```

```
 1   A.         Yeah.  I'm hearing face down, get down.
 2   I mean, I'm --
 3   Q.         Okay.
 4   A.         I'm processing under duress and stress
 5   while still keeping in mind I'm there doing my
 6   job.  Multiple commands at that time, yes.
 7   Q.         Okay.
 8   A.         And I do hear it on the video.
 9   Q.         So Officer Winchell comes in and he
10   starts giving you the same commands to do the same
11   stuff that Officer Fihe was doing?
12   A.         With his -- with his firearm out as
13   well.
14   Q.         Okay.  I am going -- it is paused -- I
15   paused it at six minutes 42 seconds.  I'm going to
16   start playing from the same place.
17              (Video played.)
18   BY MS. PICKERILL:
19   Q.         I've paused it at six minutes and 52
20   seconds.
21   A.         Uh-huh.
22   Q.         A couple of things happen.  You
23   mentioned to the officers in that clip that your
24   credentials are in your left pocket.
```

194

1    A.          Uh-huh.

2    Q.          Is that a yes?  I'm so sorry, just for

3    the court reporter.

4    A.          Oh, yes.  Yeah.  I was probably trying

5    to guide them to that same pocket that I was

6    trying to indicate when I was standing.

7    Q.          Okay.  Sorry.  The -- it's just harder

8    to type out --

9    A.          Totally understand.  Yeah.

10   Q.          -- sounds.

11              And did you see that Officer Fihe

12   lowered his firearm so it's not pointed anymore?

13   A.          Can you replay it?  Because --

14   Q.          Yeah.  Absolutely.  I'm going to go

15   back 10 seconds to six minutes and 42 seconds.

16              (Video played.)

17   BY MS. PICKERILL:

18   Q.          Okay.  So at this point, you're on the

19   ground?

20   A.          Yes.

21   Q.          Okay.  Officer Winchell is using both

22   of his hands to try and grab your arm; is that

23   right?

24   A.          Appears so in the video, yes.

1    Q.        Okay.  So his gun is not in either of

2    his hands?

3    A.        Not that I could see on this video.  I

4    don't -- I don't see it there.

5    Q.        Okay.

6    A.        He -- he must have holstered it, I'm

7    guessing.

8    Q.        Okay.  Did you hear Officer Fihe say

9    we're going to put your arm behind your back?

10   A.        Just now?

11   Q.        Yeah.

12   A.        I -- replay it again then.  I'm --

13   Q.        Yeah.  Absolutely.

14   A.        I'm probably focusing on something else

15   in the video and not hearing it.

16   Q.        No problem.

17   A.        So let me try to slow my process down

18   here a little bit.

19   Q.        I'm going to start it at 6:44.

20             (Video played.)

21   A.        Okay.  I heard it.

22   Q.        Okay.  You heard him say --

23   A.        Yeah.  We're going put your arm behind

24   your back.

（

196

1    Q.        And then did you hear yourself say wait

2    a second?

3    A.        Yes.

4    Q.        I have it paused at six minutes and 54

5    seconds.  What were you trying to communicate when

6    you told them to wait a second?

7    A.            I was continuing to try to deescalate

8    the situation.  What they were doing in my mind

9    was completely unnecessary, to the point that

10   they're now having me on the ground and trying to

11   forcibly cuff me.  Wait a second is, like, pause,

12   guys.  Pause here for a minute.  Let's -- you

13   know, I'm trying to calm the situation.  But and

14   -- and be the voice of reason here.  I'm like all

15   that had to happen there, if it even needed -- if

16   -- since it got to this point is I'm -- I'm in a

17   -- I'm in a submitted position on the ground.  You

18   have a gun.  Hold your gun.  If you want to point

19   it at me, if that's what you're going to do, then

20   have one person retrieve my credentials.  Oh, here

21   they are.  Oh, you know, great, you know, and then

22   redirect the dialogue to let's try to fix this

23   situation, not continue the aggression.  I have

24   two officers now trying to -- to climb on top of

1    me and one pull this one, one do this and I'm like

2    wait a minute.  Wait a second.  Wait a second,

3    guys.  This is -- this is not necessary.

4            So I'm trying to deescalate the

5    situation.  And it's -- it's, you know, I'm

6    scared, I'm -- you know, I -- I know where this is

7    leading with their actions.  They're going to --

8    you know, they're really just going down the path

9    of treating me really aggressively as if I'm a

10   suspect or I -- I was in the middle -- in the

11   middle of committing a crime in front of them or

12   something, and I'm trying to put pause on the

13   situation.  I'm trying to put pause to it is what

14   wait a second means.

15   Q.       You said that you were in I think you

16   said was a submissive position, is that --

17   A.       I'm face down on the ground.

18   Q.       With your arms out sort of on --

19   A.       I'm belly down, face on the ground, my

20   hands are visible.  That's pretty much a -- a

21   submitted position.  I mean, law enforcement has

22   people in that all the time when they're in any

23   type of custody.  A lot of times, they just have

24   them sit down.  Keep your hands on your head, sit

198

1    on the curb.  There's -- there's a multitude of

2    ways to control somebody, keep your own personal

3    safety, conduct an investigation without cuffing

4    somebody or having to forcibly cuff them, drag

5    them around, force them, stuff them in a squad

6    car.

7            You have two officers there now.  One

8    person can create a dialogue, the other person can

9    just watch me, make sure I don't do anything.

10   Stay still.  Let us get your credentials out.

11   Okay.  They're in my left pocket.  But that's not

12   what they wanted to do.  And I continued to try to

13   be the voice of reason.  Please look at my

14   credentials.  I'm a federal agent.  And -- and

15   that is what we're seeing here in this video.

16   Q.       So are you trying to sort of keep the

17   situation from going to a handcuffing route to

18   sort of stay at this submitted position point?

19   A.       I'm trying to not let this situation

20   escalate any more.  My logical thought, if I --

21   you know, in that moment is that, yeah, they're --

22   they're hell bent on putting cuffs on me.

23           Again, I'm already in a tactically

24   unsound position.  They have no regard for even

1    why I'm there, what the potential threat is.  So

2    being in handcuffs just further puts me in a

3    tactical disadvantage.  A dialogue would have

4    brought them into the loop as to why I was there.

5    Help them understand a little bit about what's

6    going on in the house so that maybe they could

7    have had a dialogue at the same time, kept an eye

8    on the house because there is a firearm believed

9    to be pro -- by a prohibited person that hasn't

10   been resolved yet.

11            So I'm trying to -- trying to maintain

12   some sensibility about a very, very un -- unsafe

13   situation, especially for myself.  But, you know,

14   also for everybody that's there.  I mean, there's

15   just all these things are driving through your

16   head at the same time you're trying to not end up

17   in handcuffs in the back of a car for no reason

18   that you -- it just didn't need to be that way.

19   So, you know, that's -- you know, that's the way

20   I'm perceiving this in this moment is I don't

21   understand why they're doing what they're doing.

22   It's -- I still don't understand why they went

23   this route.

24   Q.        So once you're on the ground and you

1    kind of realize that, you know, they're doing what

2    they're doing and they're wanting to go the

3    handcuffing route, did you put your hands behind

4    your back?

5    A.          I was certainly not resisting their

6    efforts.  I've got two officers trying or

7    attempting to do what is -- as far as our training

8    and experience is done by one officer when you

9    have two officers present.  One officer is the

10   cover present.  He's the officer that makes sure

11   if -- if deadly force is needed, he is the

12   position -- in the position to deploy that or

13   protect around your surroundings in case there's a

14   threat that's coming from an external area.  I've

15   got two officers grabbing and pulling at me at the

16   same time and -- and this video at times working

17   in opposition of each other.

18          And as it proceeds, you'll see, they

19   climb on top of me.  You know, I'm -- I'm not a,

20   you know, overly flexible person, so I'm doing the

21   best I can in that moment to navigate really poor

22   tactics by these officers that is -- is really not

23   the way you would go about this if -- if officer

24   safety was truly what you were concerned about,

```
 1   because it only takes one -- one person to
 2   handcuff somebody.  And if you're calm and you
 3   just explain, hey, this -- bring your hand back.
 4   This -- but it's -- it's high order with these
 5   guys, and that doesn't make it easy for -- for
 6   anything that I'm -- I'm doing when I'm on the
 7   ground to -- to -- to work with that.
 8   Q.          My question was a lot simpler than
 9   that.  My question was just did you put your hands
10   behind your back?
11   A.          I did the best I could do.  I -- I
12   mean, did I -- was I able to get them all the way
13   back?  No.  I was attempting to cooperate the best
14   I could.  But I've got forces going on there that
15   are not allowing me to easily do that.  They're
16   fighting to gain my -- to institute compliance
17   when it really wasn't necessary.  So I -- it's not
18   one person.  You've got one person trying to bend
19   one arm and you've got the other person trying to
20   bend another arm.
21   Q.          Uh-huh.
22   A.          It's not an easy situation to be on the
23   recipient of.  So I could -- I could have put my
24   hands behind my back while I was standing or
```

1    kneeling by just verbal commands, if that's what

2    you wanted to do.  But in this case, it's the --

3    it's the pile on approach.  And it didn't need to

4    be that way.  So I, you know, could not

5    necessarily get my hands behind my back in an easy

6    fashion with that approach.

7    Q.        I believe you've said before that while

8    the officers were trying to handcuff you, you were

9    telling them not to; is that an accurate

10   statement?

11   A.        I was -- I was trying to get them to

12   pause their actions and -- and still attempting to

13   establish a -- a logical dialogue here from one

14   cop to another cop that their actions are -- are

15   not warranted and -- and to try to get them to

16   divert to something more reasonable like just

17   retrieve my credentials.  Just look at them.  Ask

18   me what office I'm at.  Ask me who my

19   supervisor -- ask me my phone number.  Like,

20   investigate.  Be an officer on-scene

21   investigation.  Not, you know, on-scene bouncers.

22   I -- I just -- that's what I'm trying to do.  And

23   I'm trying to cooperate at the same time.  I'm

24   trying to not let this become more of a situation

1    where I'm now cuffed, confined, I'm trying to get

2    them to pause their actions, but I'm not actively

3    resisting by any means.

4    Q.        I am going to start playing this again

5    from where it's paused at six minutes and 54

6    seconds.

7            (Video played.)

8    BY MS. PICKERILL:

9    Q.        I have it paused at seven minutes and

10   two seconds.

11   A.        Uh-huh.

12   Q.        Did you see where your left arm was at

13   the small of your back and then it moved to kind

14   of be down on the cement next to your chest?

15   A.        I saw my arm move, yeah, in the video,

16   yes.

17   Q.        Okay.  Do you remember what happened

18   there?

19   A.        Looking at the video, it looks as

20   though he was trying to pull my arm one way and

21   lost control of my arm or -- or it slipped and

22   then my arm obviously came back instinctually.  I

23   probably put it on the ground, so that's what I

24   would have suspected happened.  It wasn't as

```
1    though I was fighting them.  It's -- I believe he
2    lost his grip.  Again I've got two aggressors, you
3    know, acting -- you know, trying to do the same --
4    same task in opposite directions.  So it looked as
5    though his hand slipped, my arm -- obviously, if
6    he had -- you know, was pulling it back, it
7    slipped, it probably went to the ground just to,
8    you know, instinctually, you know, just where else
9    is it going to go?
10   Q.          Uh-huh.
11   A.          So I probably just placed it back on
12   the ground.  And then again I'm continuing to try
13   to get these guys to slow their role and -- and
14   talk to me and just pause the whole cuffing thing
15   because it wasn't warranted.  I'm -- I'm trying to
16   do my job is what I'm trying to convey.  I'm in
17   the middle of -- this isn't a bar where there was
18   a disturbance and I'm just Joe Citizen.  I'm --
19   I'm at a -- on an active investigation in the
20   middle of it and here's where I'm at right now and
21   I'm not being allowed to properly identify myself.
22   And this is where it's going.  And of course I'm
23   trying to -- to get this thing to take a pause at
24   any chance I could try to reason with these guys,
```

1    and it's just not happening.

2    Q.          I'm going to start playing the video

3    again starting at seven minutes and two seconds

4    where it was last paused.

5               (Video played.)

6               THE WITNESS:  Can I take a break for a

7    just minutes --

8               MS. PICKERILL:  Of course.

9               THE WITNESS:  -- if you don't mind?  I

10   just want to use the restroom.

11              MS. PICKERILL:  Yep.

12              THE VIDEOGRAPHER:  We are off the

13   record.  The time is 1:55.

14              MS. PICKERILL:  And for the record, I

15   have stopped the video at seven minutes and 29

16   seconds.

17              (A short recess is taken.)

18              THE VIDEOGRAPHER:  This is the start of

19   media number five.  We are back on the record.

20   The time is 2:01.

21   BY MS. PICKERILL:

22   Q.          Thank you.

23              Okay.  Mr. Burk, I'm sorry about --

24   about this.  I had paused the video at seven

1    minutes and 29 seconds.  And I want to watch just

2    about another 15 seconds of the video.  So I'm

3    going to start playing it from that point.

4              (Video played.)

5    BY MS. PICKERILL:

6    Q.        Okay.  I've paused it at seven minutes

7    and 35 seconds.  Did you hear in the video

8    Officer Fihe saying he's going to get his Taser

9    out?

10   A.        Yes.

11   Q.        Okay.  Do you remember hearing that on

12   the day, do you remember being aware that his plan

13   was to use a Taser next?

14   A.        I -- I -- I don't know if I remembered

15   it that day or in that moment or that was going

16   through my mind.  I -- I would like to think that

17   I probably did, only for the fact that I was

18   trying my best to stay, like, calm the best I

19   could so that I could still try to deescalate the

20   situation.  So I -- so I may have heard it that

21   day.  I can't say now whether I did it that day or

22   not.

23   Q.        Okay.

24   A.        But he obviously said it because it's

1   on the video.

2   Q.        Okay.  Yeah.  And that's helpful.  What

3   I'm really -- I'm asking for is if you have an

4   independent memory of it?  And so that answers my

5   question.

6   A.        Well, I know he did because I -- you

7   know, I mean, there was, you know, injuries and

8   marks left because of it.  So after the fact, I

9   know that he did.  But in that exact moment, I

10  mean, I'm getting -- there's a lot going on there,

11  so I don't know if I'm hearing it clearly.

12  Q.        Uh-huh.

13  A.        I don't know exactly --

14  Q.        Sure.

15  A.        -- to what extent I heard him saying

16  it.

17  Q.        Okay.  It's paused at 7:35.  I'm going

18  to start from there.

19            (Video played.)

20  BY MS. PICKERILL:

21  Q.        Okay.  I've paused it at seven minutes

22  and 55 seconds.  After the Taser is deployed, do

23  they put handcuffs on both of your wrists?

24  A.        I'm eventually, yeah, cuffed after the

208

1    tasing part.

2    Q.          Okay.

3    A.          That's the sequence of it, yeah.

4    Q.          Okay.  Here, I'll -- it's paused at

5    7:55.  I'll play it just for a more seconds.

6                (Video played.)

7    BY MS. PICKERILL:

8    Q.          I've paused it at seven minutes and 59

9    seconds.  At this point in the video, are you

10   handcuffed?

11   A.          It looks like they -- the cuffs are --

12   Q.          Okay.

13   A.          -- both -- on both wrists at this

14   point, yes.

15   Q.          And at this point, do they use the

16   Taser anymore?

17   A.          Not after I'm cuffed, they -- they

18   don't.

19   Q.          Okay.

20   A.          It was -- there was during -- during it

21   and I don't know if it shows -- if you could

22   determine it from the video, but the photos of the

23   signature marks, it was deployed -- and I think

24   their record indicated that it was deployed a

1    single time.  But it was deployed at a minimum

2    based on the signature marks that -- of -- of

3    three times, so he -- so he engaged that -- that

4    trigger three times on the Taser on me.

5    Q.          Okay.  Did a doctor tell you that?

6    A.          Did a doctor tell me that?  The

7    photos -- I'm a Taser instructor.  I know what the

8    signature marks look like.  And when the photos of

9    my injuries were taken, you can see the distinct

10   signature marks.  It's two prong marks in multiple

11   locations.  And you can hear the multiple

12   deployments.  Every time he pulls that trigger, it

13   activates a charge and he did that in sequence

14   multiple spots on my back.  It wasn't a single

15   deployment.  It wasn't a single trigger pull that

16   he did once and it was done.  He kept doing it to

17   me.

18   Q.          But you agree that the Taser report for

19   that device showed only one use?

20   A.          That's what it shows, but that's not

21   what happened.

22   Q.          Okay.

23   A.          And the photographs of the injuries are

24   -- I mean, any trained Taser instructor is going

1   to say, yeah, those are multiple signature marks.

2   Q.          That was all of the video that I was

3   intending to play.

4   A.          Okay.

5   Q.          Unless there's any part of it that you

6   wanted played again or anything that you wanted to

7   talk about that you think is important.

8   A.          No.

9   Q.          Okay.

10  A.          I -- I think that's enough of the video

11  for me.

12  Q.          Okay.  I'll move it over here.

13  A.          I --

14  Q.          I want to ask you about something that

15  the PRB said --

16  A.          Uh-huh.

17  Q.          -- in Exhibit 8.

18              On page 5 at the very top, they talk

19  about why Officer Fihe used his Taser.

20  A.          Uh-huh.

21  Q.          And they said, "Due to your 'turbulent

22  behavior,' which included your refusal to comply

23  with commands, Ofc. Fihe was forced to deploy his

24  Taser so you could be secured in handcuffs."  Do

1    you agree with that assessment?

2    A.          No.  I adamantly disagree with that.

3    Q.          Do you -- in your opinion did you

4    comply with the officers' commands?

5    A.          At which point?  They're -- there were

6    points that I wasn't complying, and there was --

7    there were points where I was absolutely

8    complying.  So I don't know which -- which part

9    you're referencing.

10   Q.          Fair.

11               I was referencing specifically the

12   commands during the handcuffing, so just the

13   portions after you are on the ground.

14   A.          Yeah.  I was attempting to comply.  I

15   was in no way, shape or form actively resisting.

16   Again, I'm in a position with, you know, likely

17   400 pounds of weight on top of me.  I'm not a

18   little pliable flexible guy.  I'm trying to do my

19   best, and at the same time trying to put pause on

20   the situation verbally so they'll at least realize

21   that it doesn't have to go to this length.  Do I

22   want to be handcuffed?  No.  I didn't want to be

23   handcuffed.  I didn't -- I didn't want any of this

24   to happen.  I did my best for it not to happen.

212

1    But I was doing my best to comply.  It's just I'm

2    getting kind of haphazard approach to handcuffing

3    being done, and it wasn't necessary and it

4    actually made the whole process much more

5    difficult for me and for them.

6    Q.          Okay.  In Exhibit 12, which is the

7    transcript of the interview you had with ATF right

8    after this event?

9    A.          Exhibit 12.  Okay.

10   Q.          I'm looking at pages 28 to 29.

11   A.          Okay.

12   Q.          Okay.  At the top of 28, they ask you

13   sort of boils down to why didn't you submit to

14   being handcuffed until they could calm you down

15   and -- and check your credentials?

16   A.          And the question is?  I'm sorry.

17   Q.          Okay.  I was just making sure we were

18   at the right place first.

19               Then on page 29?

20   A.          Wait.  I'm -- was there a question?  I

21   wanted to answer it if there was a question --

22   what was the question?

23   Q.          Okay.  Sure.  Do you -- so my question

24   is going to be they asked you this question about

```
 1    why you didn't submit to handcuff -- handcuffing,

 2    and you give sort of a couple of answers about it

 3    over the next couple pages.

 4    A.         Okay.  I see what you're saying.

 5    Q.         And I had a question about a portion of

 6    it.

 7    A.         Okay.  Great.

 8    Q.         But if you want to just answer that

 9    question for me and then I can dive into this, but

10    -- so why -- why didn't you make the decision to

11    submit to handcuffing at that time --

12    A.         Well, I --

13    Q.         -- to being handcuffed?

14               MR. BOND:  Objection.

15    A.         Well, one, again, it was -- I'm

16    thinking about the fact that I'm in -- I'm in the

17    course of doing my job.  This is an on-the-job, I

18    am well under my authority doing what I'm doing,

19    and of course I don't want to be handcuffed.  I'm

20    trying to cooperate.  It's not -- it wasn't going

21    to be necessarily because I was no threat

22    advantageous for me to be in that situation.  I

23    was scared, for one.  Two, you know, I'm starting

24    to experience the onset of -- of physical issues
```

1    that are concerning to me and I'm trying to

2    express that to them.  You know, there's all these

3    things coming at me and it's hard to just, you

4    know, like -- I'm -- I'm trying not to resist, at

5    the same time I'm trying to still really

6    communicate with these guys to calm down that --

7    that this is a mistake.  What they're doing is a

8    big mistake; it's not necessary.  And, you know, I

9    guess I was, you know -- I certainly wasn't

10   actively resisting.  I wasn't threatening.  I

11   wasn't making threats.  I was trying to slow the

12   momentum of the situation down so that a dialogue

13   could be established.  I -- if need be, I could

14   have just laid there.  I -- I did not want to be

15   handcuffed because now I'm at a further

16   disadvantage and I feel like I'm going down this

17   rabbit hole that I'm not going to be able to get

18   out of in that situation and being confined was --

19   was not a situation that I wanted to be in and

20   still be able to function as a federal agent on

21   the scene of an investigation I was lawfully there

22   to do.

23   Q.         Okay.  On page 29, sort of in the

24   middle of your answer there, you say, "This is

```
 1    what I'm here doing...so, I'm trying to avoid the
 2    whole escalation to everything to the point where
 3    now I'm a federal agent handcuffed down on the
 4    ground and then -- if they then decide I am who I
 5    am, I have to get up, dust myself off, and go back
 6    to these people's door."  Is that part of what was
 7    going through your head during the handcuffing?
 8    A.          Yeah.  That was -- that was not the
 9    primary thing going through my head.  But, yes,
10    that was at the time of the interview a -- another
11    thought that was -- that had went through my head.
12    And it was -- it was post being handcuffed, but I
13    also knew that having -- as I was finally released
14    from this incident, that was also a -- that was
15    also a thought and a concern that I had that I was
16    treated in this fashion, and now I have to get up
17    and, like, go talk to these people and finish my
18    job as if nothing even happened.  And -- and the
19    more they tried to escalate this, the worse it was
20    going to be for me to continue to do my job, which
21    I was there to -- I never even got to finish
22    because of this.  So, you know, that was a
23    concern.  It was what I brought up at the time of
24    the interview.  That wasn't what was going through
```

1    my head at the time I was on the ground, it was --

2    it was in there, but it was just one of the many

3    things that was -- was why this was so

4    unnecessary.  And me being in handcuffs wasn't

5    necessary, and -- and every other thing that

6    happened after the handcuffing wasn't necessary.

7    Q.        Would you say that you were trying to

8    think of any possible way to calm this situation

9    down?

10   A.        To the best of my ability under what I

11   was being presented with, I -- I was trying.  I

12   was trying really, really hard.  I -- you know, I

13   -- again, I was -- I'm not dealing with just an

14   officer walking up and just asking me something,

15   and I'm -- I'm just being a -- you know, a smart

16   aleck and -- and uncooperative.  The first thing I

17   was greeted with was a firearm -- was an officer

18   approaching me with a firearm out.  That starts

19   changing the whole dynamics of things, and it

20   becomes where now I'm being the target -- target

21   of the aggression, and I'm trying to then explain.

22   And the reasons I explained before as to why I

23   didn't want to get on the ground, those have been

24   explained.  But I lost my thought.  I'm sorry.

1    What was the question?

2    Q.         So I -- so I had asked you if you would

3    say that you were trying to think of any possible

4    way to calm the situation down?

5    A.         Yes.  Yes, I was.  I was doing the best

6    I could under the circumstances --

7    Q.         Uh-huh.

8    A.         -- as their actions were rapidly

9    escalating.

10   Q.         Okay.

11   A.         So I'm in a very, very reactive type of

12   situation.

13   Q.         Okay.  In Exhibit 8, which is the

14   notice -- notice of proposed removal, on page 5,

15   they say that -- in the fifth paragraph, "your

16   misconduct was particularly concerning because you

17   refused Ofc. Fihe's commands to get on the ground

18   numerous times, though complying with his commands

19   would have ended in obvious misunderstanding by

20   the responding police officer."  Do you think that

21   if you had obeyed the initial commands that that

22   could have calmed the situation down more quickly?

23   A.         No.  No.  I --

24   Q.         Okay.

1    A.          I wholeheartedly believed at the minute

2    he got out of that vehicle that his intentions

3    were going to be to remove his firearm, approach a

4    nonthreatening, you know, person who's claiming to

5    be an agent.  And he was going to want to make

6    sure I was on the ground, handcuffed and put in a

7    car before he did anything.  And that was

8    certainly not the reasonable course of action by

9    any officer in this same situation, having the

10   facts and information that were available and made

11   available.  So, yes, he -- it wouldn't have

12   changed a thing.

13   Q.          Is there anything that you think you

14   could have done better during this interaction?

15   A.          I don't think so.  I think I did

16   everything that I could possibly do to try to

17   preserve myself from either, you know, any serious

18   injury.  You know, I had a lot of -- you know, a

19   lot of responsibilities going on in that moment,

20   and I -- I don't know that I could have did

21   anything differently to change the course of the

22   events in terms of trying to preserve my position

23   and do my job, and at the same time attempt to

24   identify myself.  Because this is -- this is a

219

1    scenario I have never ever been faced with, ever.

2    And I have been in these scenarios, but I've never

3    been faced with an officer's aggression in this

4    very similar situation by any other agency, large

5    or small, federal or state.  It's just -- it's

6    just so unorthodox to approach a situation where

7    you have all the obvious in front of you, and yet

8    you feel that that level of force is necessary to

9    simply identify -- identify myself and -- or

10   identify the person you're speaking with or trying

11   -- or are concerned about.  So to answer that

12   question, no.

13   Q.        Okay.  I want to -- you were asked a

14   question when you did an interview with ATF that

15   I --

16   A.        Same document?

17   Q.        -- want to ask you here.  Yeah.  It's

18   in Exhibit 12, that one right there.  On page 25.

19            MS. PICKERILL:  I'm sorry.

20            THE REPORTER:  You're fine.

21   BY MS. PICKERILL:

22   Q.        They asked you if you were ever to do

23   NICs retrievals and investigations again, is there

24   anything that you would do differently?  So is

1    there anything that you would do differently if
2    you were ever to do that again?
3    A.        I don't think so.  I -- I really don't.
4    I mean, if I'm -- if everything is the -- is the
5    same, I'm thorough, I'm there for the purpose that
6    I'm there, I'm -- I dress appropriately, I look
7    professional, I treat people with -- you know, I'm
8    trying to communicate in a very informative,
9    nonthreatening fashion.  And honestly, I -- I
10   would -- I would be expecting that no other
11   officers that responded under a situation where
12   someone was concerned about my identity would act
13   and have that level of aggression.  So I didn't do
14   anything wrong.  I followed all the protocols and
15   all the policies.  I wasn't out of line on
16   anything.  Was I scared?  Was I confronted with --
17   with, you know, hostility and stuff?  Yes.  Was I
18   surprised by it?  Yes.  Did I use some profanity
19   in the response in that surprised fashion?  Yeah,
20   I did.  But I'm -- I could not believe that I'm --
21   I'm looking down the barrel of another officer's
22   gun while I'm doing my job and, you know, there --
23   there was no secrets to anything.  I wasn't
24   undercover.  I was just standing there with my

1    hands in the air offering to try to identify

2    myself.

3            So, no, I -- that's -- I personally had

4    developed that manner of doing these cases and it

5    was highly effective.  My chain of command knew

6    exactly how I did things.  They knew how thorough

7    I was.  They knew that there's never been a

8    complaint from any agency or any officer or any

9    citizen has never complained once about how they

10   were treated and questioned my professionalism at

11   all.  So, no, I would -- I would do everything the

12   same way and just hope that the responding

13   officers were better trained.

14   Q.         Would you recommend that -- would you

15   recommend calling law enforcement ahead of time?

16   A.         If you felt like you needed to, of

17   course.  That's our discretion to do that.  I -- I

18   wouldn't say that it's necessary to call local law

19   enforcement every time you go out to do some -- a

20   routine door knock investigation.  Absolutely not,

21   no.  It's -- it's no different than -- than what

22   ATF teaches and stresses, and you have that tool

23   in your tool belt, you don't have to use all your

24   tools all the time.  They're there for you to use

1   and you're given the discretion as a federal agent

2   to use those tools as needed to facilitate

3   accomplishing your job.  Calling local law

4   enforcement every time you're going to go knock on

5   somebody's door is -- is absurd.  It's just not a

6   reality.  It makes no sense.  You're tying up

7   resources from one agency to handle what you can

8   simply handle yourself.  And if there is a concern

9   or response, if they respond and they respond

10  appropriately, they're going to assess, okay,

11  here's -- here's what appears to be an agent.

12  Hey, who are you?  Identify yourself.  I'm a

13  federal agent.  Whoa, you know, okay.  Do you have

14  some credentials?  Yes.  They're in my pocket.

15  Okay.  Do you want me to get them out?  Yes.  Go

16  ahead, retrieve them.  There's a dia -- I mean I

17  wouldn't expect anything else from -- from a

18  certified law enforcement officer than to create

19  that dialogue after he has assesses obviously this

20  is not a burglary in process.  Obviously there's

21  not somebody climbing through to a window.  The

22  subject's still standing there.  He hasn't took

23  off running.  He's trying to talk to me.  He's

24  trying to say he's a federal agent.  He's making

223

```
1    reference to his credentials.  He starts
2    referencing state documents that nobody can get.
3    So, no, I -- it would -- it would be the same.  It
4    was -- I wouldn't suggest doing anything
5    different.  I would suggest that people do these
6    cases as thoroughly as I used to do them and use
7    the tools necessary.  And if it requires calling
8    law enforcement, if you feel like it's necessary,
9    great.  It's not required.  It's not policy.  It's
10   merely there for your discretionary use.  This did
11   not meet that threshold whatsoever.
12   Q.         Did you eventually make a complaint to
13   the Columbus Police Department about this
14   incident?
15   A.         A complaint?  I -- I don't know and --
16   I don't know that I had any contact with the
17   Columbus Police Department after this incident.  I
18   spoke with my chain of command and -- and
19   essentially followed their instructions.  If there
20   was a complaint of some sort that was generated by
21   my attorney's office, I can't speak to that.  But
22   I personally had no communications with the
23   Columbus Police Department after this event.
24   Q.         Okay.
```

224

1    A.          Other than a phone call that came to

2    me.  And I just -- I said I can't -- I just

3    deferred it to my attorney.

4    Q.          Okay.  So do you recall that phone call

5    being for the internal affairs bureau?

6    A.          It may have been that.  I can't recall.

7    It was sometime ago.

8    Q.          Okay.

9    A.          It was somebody that didn't -- said

10   they're from it.  And I said, well, I -- I would

11   just have to defer to my attorney.  Okay.  Thank

12   you.  Click.

13   Q.          Okay.

14   A.          That was it.  I don't know who the

15   person -- I don't know if it was -- who it could

16   have been.  It could have been -- but they

17   purported themselves to be from the Columbus

18   Police Department.  I can't say whether -- who it

19   was.

20   Q.          Okay.  Did you all have an internal

21   affairs bureau at ATF that would, like, look into

22   conduct and things like that?

23   A.          Correct.  That's -- that's the --

24   Q.          Okay.  So just you're familiar with

1   that --

2   A.          Yes.

3   Q.          -- term and what they do?

4   A.          Yes.  Yeah.

5   Q.          Okay.  I'm going -- oh, sorry.

6   A.          Yeah.

7   Q.          I'm going the play that phone

8   recording.  It's not very long.  I'm going to mark

9   it as Exhibit 16 to the deposition.

10                       - - - - -

11          Thereupon, Exhibit 16 is marked for

12   purposes of identification.

13                       - - - - -

14          (Recording played.)

15   BY MS. PICKERILL:

16   Q.          I paused it at 40 seconds.

17   A.          Uh-huh.

18   Q.          Is that you on the phone?

19   A.          Yeah, that's me.

20   Q.          Okay.

21   A.          Yeah.  That's -- that's -- that would

22   be the phone call I think I was referencing.

23   Q.          Okay.  I'm just going to play it until

24   the end real fast.

226

1               (Recording played.)

2    BY MS. PICKERILL:

3    Q.          That's officially the end of that

4    recording.

5    A.          Uh-huh.

6    Q.          Same as you remember it?  There wasn't

7    anything new in there?

8    A.          Yeah, it was.  There was probably a

9    couple other little ho, hums or whatever in there.

10   But, yeah, it was somebody that purported

11   themselves to be from the police department, asked

12   me if I -- and, you know -- and I did what I

13   thought was best and what my -- when I then called

14   my chain of command after the fact and said --

15   they said, yeah, absolutely not.  Don't -- you

16   know, it's on a -- you did the right thing.  And I

17   said, okay, just making sure.

18   Q.          Yeah.  So my only question was going to

19   be if you ever did follow-up.  And it sounds like

20   the answer is no; is that right?

21   A.          I only followed up in the fashion that

22   I followed up in, not directing -- not having any

23   contact or additional statements with the Columbus

24   PD.

1    MS. PICKERILL:  Okay.  Would you mind

2    if we took a quick break for a chat real fast?

3    THE VIDEOGRAPHER:  We are off the

4    record.  The time is 2:28.

5    (A short recess is taken.)

6    THE VIDEOGRAPHER:  We are back on the

7    record.  The time is 2:36.

8    MS. PICKERILL:  Okay.  Thank you very

9    much, Mr. Burk.  We have no more questions for you

10    today.

11    THE WITNESS:  Okay.

12    MS. PICKERILL:  We might meet with you

13    again over Zoom in a couple months to talk more

14    specifically about damages.  But we really

15    appreciate you coming up to answer our questions

16    and to talk with us about your lawsuit.  So --

17    THE WITNESS:  Thank you.

18    MS. PICKERILL:  Thank you very much.

19    THE WITNESS:  I appreciate it.

20    THE VIDEOGRAPHER:  This -- this

21    concludes the deposition of James A. Burk, Junior.

22    We are off the record at 2:36.

23    (Signature not waived.)

24    - - - - -

228

1          Thereupon, the foregoing proceedings

2          concluded at 2:36 p.m.

3                    - - - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

229

1   State of Ohio    :      C E R T I F I C A T E
    County of Franklin: SS

2

       I, Stacy M. Upp, a Notary Public in and for
3   the State of Ohio, certify that James A. Burk, Jr.
    was by me duly sworn to testify to the whole truth
4   in the cause aforesaid; testimony then given was
    reduced to stenotype in the presence of said
5   witness, afterwards transcribed by me; the
    foregoing is a true record of the testimony so
6   given; and this deposition was taken at the time
    and place specified on the title page.

7

       Pursuant to Rule 30(e) of the Federal Rules of
8   Civil Procedure, the witness and/or the parties
    have not waived review of the deposition
9   transcript.

10      I certify I am not a relative, employee,
    attorney or counsel of any of the parties hereto,
11  and further I am not a relative or employee of any
    attorney or counsel employed by the parties
12  hereto, or financially interested in the action.

13      IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office at Columbus,
14  Ohio, on June 26, 2023.

15

16

17

18

19

20  _____
    Stacy M. Upp, Notary Public - State of Ohio
21  My commission expires August 6, 2026.

22

23

24

230

```
               Witness Errata and Signature Sheet
                 Correction or Change Reason Code
           1-Misspelling  2-Word Omitted  3-Wrong Word
             4-Clarification  5-Other (Please explain)

Page/Line          Correction or Change          Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____


I, James A. Burk, Jr., have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

                              Ref: SU308315JB
```