**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| James A. Burk, Jr., *et al.*, | Case No. 2:20-cv-06256 |
| Plaintiffs, | |
| v. | Judge James L. Graham |
| City of Columbus, *et al.*, | Magistrate Judge Chelsey M. Vascura |
| Defendants. | |

**DEFENDANTS' FED. R. CIV. P. 31 DEPOSITION BY WRITTEN QUESTION TO THE UNITED STATES BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES**

Pursuant to Rule 31 of the Federal Rules of Civil Procedure, Defendants Kevin Winchell, Joseph Fihe and the City of Columbus serve this deposition by written questions on the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  ATF is to provide their answers and any objections to these deposition questions to the undersigned within **28 days** after being served.

**DEFINITIONS**

Definition 1.  **"Complaint"** means the complaint that was filed by James Burk in the above-captioned lawsuit on December 4th, 2020.

Definition 2.  **"CPD"** means the Columbus Police Department located in Columbus, Ohio.

Definition 3.  **"Exhibit 1"** means the Notice of Final Decision on Proposed Removal related to James Burk and dated November 3, 2021. A copy of Exhibit 1 is also included herewith.

Definition 4.  **"Exhibit 2"** means the bodyworn camera footage of Officer Joseph Fihe from July 7, 2020 and depicting the Incident. A copy of Exhibit 2 is also included herewith.

Definition 5.  **"Exhibit 3"** means the Last Chance Agreement signed by James Burk on August 5, 2016. A copy of Exhibit is also included herewith.

Definition 6.    **"Exhibit 4"** means the Position Description signed by Kathryn Greene on December 19, 2016 and related to James Burk. A copy of Exhibit 4 is also included herewith.

Definition 7.    **"Exhibit 5"** means the audio file of the 911 call placed by Sarah Al Maliki on July 7, 2020 and from the address 3359 Edgebrook Drive. A copy of Exhibit 5 is also included herewith.

Definition 8.    **"Exhibit 6"** means the sworn affidavit of Sarah Al Maliki written and sworn in relation to this matter. A copy of Exhibit 6 is also included herewith.

Definition 9.    **"Identify"** or any variation thereof, shall have the following meanings:

a.    With respect to a natural person or individual, it shall mean to provide information that would allow the defendants in this case to contact the natural person or individual and to serve a subpoena upon him or her. Such information would include as much of the following as is in your possession, custody, or control after reasonable inquiry: (i) the natural person's or individual's full name; (ii) any aliases or pseudonyms used by the natural person or individual; and (iii) the person's or individual's business and residential addresses, phone numbers and email addresses. If you cannot provide current identifying information for a particular natural person or individual, provide the most recent information in your possession, custody, or control after a reasonable inquiry.

b.    With respect to an entity or collective, it shall mean to provide information that would allow the defendants in this case to contact that entity or collective and to serve a subpoena upon it. Such information would include as much of the following as is in your possession, custody, or control after reasonable inquiry: (i) the entity's or collective's full legal name; (ii) any other names under which the entity or collective does business or conducts its activities; and (iii) the entity's or collective's main business address, main phone number, and main email address. If you cannot provide current identifying information for a particular entity or collective, provide the most recent identifying information in your possession, custody, or control after a reasonable inquiry.

c.    With respect to a document, item of electrically stored information, or a tangible thing, it shall mean to provide: (i) a description of the document, item, or thing that would allow the defendants in this case to know its form, its content, the date upon which it was created, and the identity of its creator; and (ii) the current location of the document, item, or thing that would allow the defendants to inspect it. Any request asking you to identify a document or thing can be answered by producing a copy of that document or thing, so long as you provide a sufficient explanation as to where the document or thing can be located within your overall production (e.g., a Bates number).

Definition 10.    **"Incident"** means the acts, events, conditions, and/or circumstances that are described in the complaint associated with the above-captioned lawsuit. Specifically, the Incident refers to the interactions between James Burk and Sarah Al-Maliki and between James Burk and CPD officers on July 7, 2020. The Incident took place at or near the residential address 3359 Edgebrook Drive in Dublin Ohio 43017.

Definition 11.    **"Policies"** or **"Policies and Practices"** refer to any official or unofficial policies or recognized practices or procedures taught to and followed by ATF employees. Specifically, Policies and Practices refers to those such polices that were in place on July 7, 2020.

Definition 12.    **"Training"** refers to any official or unofficial training given to ATF law enforcement officers on or before July 7, 2020.

Definition 13.    **"Plaintiff"** shall mean the Plaintiff in the above-captioned matter and former ATF employee, James Burk.

Definition 14.    **"You"** (or any other form of the second-person, singular pronoun) means ATF. It shall further mean, when appropriate and applicable, any person acting at the behest of, at the direction of, under the control of, or upon behalf of ATF.

## <u>WRITTEN DEPOSITION QUESTIONS</u>

Please provide all information that is within your possession or control and that is responsive to the following deposition questions:

RAC OCCHIPINTI          DTA NGBEA

SAC MCPHERSON          RALPH CONTE/MGMT

**Question #1:** Who was the supervisor(s) of James Burk when he was employed with ATF on July 7, 2020?

<u>Response:</u>

Frank Occhipinti, Resident Agent in Charge, Cincinnati Field Office

**Question #2:** Who was the "Bureau Deciding Officer" in the case of James Burk's termination in November 2021 and as referenced in Exhibit 1?

Response:

On or about November 3, 2021, John E. D'Angelo was the Bureau Deciding Official ("BDO") who issued the decision of removal to James Burk.

**Question #3:** Who was the "Bureau Deciding Official" in the case of James Burk's 2016 disciplinary matter and as referenced in Exhibit 3?

Response:

On or about May 5, 2016, the Bureau's Professional Review Board ("PRB") issued to then-Special Agent James Burk a Proposed Removal.  The designated BDO was to be Eugenio A. Marquez.  Prior to the issuance of any decision on the Proposed Removal, the Bureau resolved the action through a Last Chance Agreement ("LCA") that was executed by the Bureau and James Burk on or about August 5, 2016.  The LCA was executed by Mr. Marquez, on behalf of the Bureau.

**Question #4:** Describe the nature and type of supervision that was given to James Burk, as an ATF law enforcement officer, between January 1, 2020 and July 7, 2020.

Response:

First-line supervisor – RAC Frank Occhipinti

**Question #5:** What was James Burk's title with ATF on July 7, 2020?

Response:

Special Agent James Burk

**Question #6:** What were James Burk's primary responsibilities as an ATF officer on July 7, 2020?

Response:

Special Agent Burk's responsibilities primarily consisted of investigating NICS Delayed Denial

4

investigations for the Columbus Field Division.

**Question #7:** James Burk provided Exhibit 4 as a position description for his responsibilities. Is Exhibit 4 an accurate representation of James Burk's position description as it would have been on July 7, 2020?

Response:

Exhibit 4, as attached to the Defendants' Fed. R. Civ. P. 31 Deposition by Written Question to the Bureau (hereinafter "Defendants' Discovery Request"), is an accurate copy of the Bureau's Position Description for the position of GS-1811-13, Criminal Investigator (Special Agent) as of December 19, 2016. Mr. Burk occupied the position of GS-1811-13, Criminal Investigator (Special Agent) during the time relevant to the Complaint.

**Question #8:** If Exhibit 4 is not an accurate representation of James Burk's position within ATF on July 7, 2020, what is a correct position description for James Burk's role on July 7, 2020?

Response:

Not applicable, see response above to Question # 7.

**Question #9:** Was James Burk operating in his official capacity as an ATF law enforcement agent when he made contact with the resident of and / or attempted to retrieve a gun at 3359 Edgebrook Drive on July 7, 2020?

Response:

Yes.

**Question #10:** At the time of the Incident, was James Burk permitted to travel and operate unaccompanied while retrieving firearms as part of his duties with ATF?

Response:

Yes.

**Question #11:** Are all law enforcement officers with ATF permitted to travel as part of their work? If no, which ATF law enforcement officers are permitted to travel as part of their work?

Response:

Yes.

**Question #12:** At the time of the Incident, did ATF have a Policy or Practice regarding which law enforcement officers may operate alone and which may work with a partner? If yes, please identify or explain the Policy or Practice.

Response: There is not a policy prohibiting agents from working independently while conducting administrative duties. Agents in On-The-Job training status, or OJT, work closely with their OJT instructor (or senior agent), to ensure they complete the Critical Tasks minimum requirements which include activities vital to developing investigative skills and the ability to perform independently as an ATF agent.

**Question #13:** At the time of the Incident was James Burk required to give notice and / or receive approval prior to traveling in or out of state for work?

Response: Yes, Special Agent Burk was required to inform me of his whereabouts prior to contacting the subjects of his investigation. Approval to travel within the Columbus Field Division was not required.

**Question #14:** If he was, why was James Burk required to give notice and / or receive approval prior to traveling in or out of state for work?

Response: Notice of his whereabouts was a given as common courtesy and as a matter of officer safety.

**Question #15:** Did James Burk give notice / receive approval prior to traveling to Columbus on

July 7, 2020 as part of his job duties?

Response:

Yes.

**Question #16:** If James Burk gave notice of traveling on July 7, 2020, please identify the person(s) who was informed.

Response:

Special Agent Burk notified RAC Frank Occhipinti of his whereabouts.

**Question #17:** At the time of the Incident was James Burk required to give notice and / or receive approval prior to attempting to retrieve a firearm?

Response:

No.

**Question #18:** If he was, why was James Burk required to give notice and / or receive approval prior to attempting to retrieve a firearm?

Response:

N/A

**Question #19:** Did James Burk give notice and / or receive approval prior to attempting to retrieve the firearm located at 3359 Edgebrook Drive?

Response:

Yes.

**Question #20:** If he gave notice prior to and attempting retrieval of a firearm at 3359 Edgebrook Drive and making contact with the resident(s) there, please identify the individual(s) who was informed.

Response:

RAC Frank Occhipinti

**Question #21:** On July 7, 2020, did James Burk have the proper evidence and documentation, pursuant to ATF Policies and Practices, to seize the firearm located at 3359 Edgebrook Drive?

Response: As SAC of the Columbus Field Division at that time, I did not know the exact circumstances surrounding his need to be at the above address.  SA Burk was an experienced agent, who had conducted many NICS investigations.  He would have had the necessary documentation needed to complete the task for which he was present there to complete.

**Question #22:** Was the gun located at 3359 Edgebrook Drive lawfully registered to an occupant at that address?

Response:

N/A.

**Question #23:** At the time of the Incident, was James Burk required to document his travel when it was related to his work?

Response:

Travel requiring lodging, overnight stays, per-diem, or transportation other than a GOV usually requires documentation.

**Question #24:** If he is required to do so, why was James Burk required to document his work-related travel?

Response:

N/A

**Question #25:** If he was required to do so, how was James Burk required to document his work-

related travel?

Response:

N/A

**Question #26:** Did James Burk properly document his travel and his plans to travel that ultimately took place on July 7, 2020?

Response:

N/A

**Question #27:** At the time of the Incident, was James Burk required to document his planned gun retrieval attempts?

Response:

Yes.

**Question #28:** If he was, why was James Burk required to document his planned gun retrieval attempts?

Response:

NICS Retrieval attempts are documented in a Report of Investigation (ROI).

**Question #29:** Are ATF law enforcement officers required to document the evidence which supports retrieval of a firearm?

Response:

Yes

**Question #30:** If ATF officers are required to document evidence which supports retrieval of a firearm, did James Burk properly retrieve, collect, and document evidence which supported retrieval of a firearm at 3359 Edgebrook Drive on July 7, 2020?

Response:

Yes

**Question #31:** Did anyone, other than James Burk, examine the evidence to determine whether or not a retrieval was appropriate from 3359 Edgebrook Drive on July 7, 2020?

Response:

Yes

**Question #32:** What is required of ATF law enforcement agents prior to executing a firearm retrieval (i.e., what steps need to be taken, what evidence needs to be found, is there a chain of command which needs to sign off on the execution, etc.)?

Response:

ATF O 3140.1A - Upon being assigned a delayed denial case, the special agent will conduct the following investigative activity: (a) If during the initial assessment conducted by the RAC/special agent it appears the disability identified by NICS may not be a qualifying conviction or prohibition, the RAC/special agent will review the information with Division Counsel and obtain the necessary court and/or law enforcement records for a more definitive review of the prohibition determination. The special agent will document this in the case management log. Otherwise, within 3 business days of being assigned the case, the special agent will contact the suspected prohibited possessor in person or via telephone to affirmatively advise him/her of the prohibition, confirm his/her acquisition/possession of the firearm(s), and discuss and initiate various firearm disposition scenarios. The special agent will document all investigative activity related to all contact with the suspected prohibited person in an ROI and/or the case management log in N-Force.

**Question #33:** Did James Burk follow all required steps prior to attempting to retrieve the gun located at 3359 Edgebrook Drive and making contact with the resident(s) there on July 7, 2020?

<u>Response:</u> If while conducting a NICS investigations a firearm retrieval is warranted, SA Burk would have verified the subjects background information which led to their being prohibited from purchasing/possessing firearm(s), thru court documents, data base inquiries, FFL documentation, etc. To my knowledge, SA Burk's supervisor was aware of the firearm retrieval, although authorization for agents to do so is not required while they are conducting these types of investigations.

**Question #34:** Why was James Burk given a "last chance agreement," as shown in Exhibit 3, on August 5, 2016?

<u>Response:</u>

The Bureau and then-Special Agent Burk resolved the Notice of Proposed Removal dated May 5, 2016 via execution of the LCA. Please refer to the LCA.

**Question #35:** What was the nature of the last chance agreement signed by James Burk and shown in Exhibit 3?

<u>Response:</u>

Bureau objects as the use of the term "nature" is overly broad and vague. Notwithstanding said objection and reserving all rights, the Bureau responds as follows. Please refer to the LCA.

**Question #36:** Was James Burk placed on any type of restriction or limitation of his work duties as a result of the last chance agreement and associated investigation?

<u>Response:</u>

The Bureau retained then-Special Agent Burk in an active-duty status during the time leading up

11

to the thirty-day suspension as imposed pursuant to the LCA. Please refer to the LCA, ¶ 5.c.

**Question #37:** Was James Burk under any kind of limitation or restriction of his work duties on July 7, 2020? If so, please identify the reason for and type of limitation.

Response:

On or about July 7, 2020, then-Special Agent James Burk was performing his official duties, specifically, investigating NICS Delayed Denial investigations for the Columbus Field Division.

**Question #38:** Was James Burk required to have a visible badge or other ATF insignia when interacting with civilians and attempting to collect evidence or retrieve firearms?

Response:

Yes

**Question #39:** Does ATF have a policy regarding the attire that law enforcement agents should wear when working in the field (i.e., uniforms, equipment, visibility of a badge or other ATF insignia)?

Response: Under ATF Dress Code Policy, SA Burk was within ATF policy regarding the clothing he was wearing the day of this incident. During our meeting with the Columbus Police Chief the day after this incident, he acknowledged how SA Burk "looked like a cop" with how he was dressed, 5.11 pants and a polo shirt. This attire is within policy when conducting field work. This was not an enforcement operation, one during which agents may possibly wear uniforms to improve their presence or professional appearance, which the Resident Agent in Charge (RAC) or Group Supervisor (GS), have the discretion as to if/when they must be worn.

**Question #40:** If such a policy exists, please identify it.

Response: ATF O 2130.1C – Conduct and Accountability (Section 9e, ATF Dress Code Policy)

**Question #41:** In the Notice of Final Decision on Proposed Removal regarding James Burk and dated November 3, 2021 (Exhibit 1) it states "[i]n sustaining this specification, I find that you did not have any LEO badge or credentials visible to identify yourself as a LEO, despite your awareness that local police were being called to the scene." What was ATF's Policy and / or Training, as of July 7, 2020, regarding when and how its law enforcement officers should display their badges?

<u>Response</u>: No formal written policy at that time but it is common practice to identify oneself.

**Question #42:** As an ATF law enforcement officer, was James Burk Trained or advised to inform local law enforcement of his presence prior to attempting a firearm retrieval?

<u>Response</u>:

Yes

**Question #43:** If James Burk was Trained or advised to inform local law enforcement prior to attempting a firearm retrieval, why was he advised to do this?

<u>Response</u>:

This a common and recommended practice for all Special Agents.

**Question #44:** As an ATF law enforcement agent, was James Burk given Training on how to respond and act if and when local law enforcement arrives at the scene of a retrieval?

<u>Response</u>:

Unknown what training James Burk had regarding such interaction. Would possibly have to request records from his initial ATF academy and FLETC training, if available and/or documented.

**Question #45:** If ATF officers receive Training on interacting and cooperating with local law enforcement, please describe what they are trained to do if they are aware that local law

enforcement will be responding to the scene of a retrieval.

Response:

Currently agents are taught to identify themselves and to follow the commands of responding local law enforcement.

**Question #46:** If James Burk was Trained or advised on how to interact and / or coordinate with local law enforcement, why did he receive such training?

Response:

Unknown what training James Burk had regarding such interaction. Would possibly have to request records from his initial ATF academy and FLETC training, if available and/or documented. Currently such training is standard at the training academy.

**Question #47:** As an ATF law enforcement officer, was James Burk trained to have his badge out and visible if he was aware that local law enforcement would be arriving at the scene of a retrieval?

Response:   There has not been a policy, or training, addressing attire or actions taken by agents when conducting "administrative" duties during which local law enforcement has been called, and then SA Burk's incident was "administrative." Only policy addressing attire or actions taken by agents is when conducting planned/unplanned "enforcement" operations that went into effect in 2021.

**Question #48:** In Exhibit 1, it is stated that James Burk had "limited potential for use as an ATF agent." In what ways was James Burk limited in his ability to perform work with ATF?

Response:   Special Agent Burk was responsible for investigating a majority of the NICS Delayed Denial cases in the Columbus Field Division.

**Question #49:** As of July 7, 2020 how was James Burk Trained to respond to the presence of

CPD, or any other local law enforcement, officers?

Response:

Unknown what training James Burk had regarding such interaction. Would possibly have to request records from his initial ATF academy and FLETC training, if available and/or documented.

**Question #50:** How was James Burk Trained to respond to commands from local law enforcement officers while operating in his capacity as an ATF law enforcement officer?

Response:

Unknown what training James Burk had regarding such interaction. Would possibly have to request records from his initial ATF academy and FLETC training, if available and/or documented.

**Question #51:** Prior to making the final decision on James Burk's removal, did the individual identified in Question #2 review the video footage labeled Exhibit 2 and provided herewith?

Response:

BDO D'Angelo reviewed the materials relied upon by the PRB in the Proposed Removal dated July 16, 2021 (see attached). Included within the materials relied upon were the Internal Affairs Division ("IAD") investigatory report ("ROI") and exhibits thereto, which included the video footage referenced in the instant Question # 51 as Exhibit 2. The video footage labeled Exhibit 2, referenced in Question # 51, was attached to the IAD ROI as Exhibit 7.

**Question #52:** What, if any, violations of ATF Policies can be seen in Exhibit 2?

Response:

As a result of the Incident, the Bureau's PRB proposed the removal of then-Special Agent Burk for the reasons stated in the Proposed Removal (see attached). The Proposed Removal cited to

15

two ATF orders, 2130.1B (Conduct and Accountability) and 2140.1A (Adverse Action and Discipline). In the Proposed Removal, the Agency charged SA Burk with Conduct Unbecoming a Special Agent, consistent with the above policies. BDO D'Angelo sustained the proposed removal in a decision issued on or about November 3, 2021. Please refer to the removal decision.

**Question #53:** For all of the Policies identified in Question #52, please explain why those Policies are in place or were in place on July 7, 2020.

Response:

The policies referenced in the response to Question # 52 are intended to ensure Agency employees comport themselves both on and off duty in a manner that meets Agency standards and expectations, as detailed in the policies.

**Question #54:** For all of the Policies identified in Question #52, what Training did James Burk receive on how to properly adhere to and carry out such Policies?

Response:

All Special Agents receive training related to the above policies from the point of entry as an employee of the Agency, through basic training at FLETC, and in periodic, ongoing training during their tenure as it relates to 2130.1B (Conduct and Accountability). However, I would defer to the documented FLETC and/or National Academy records as it specifically relates to what training is received upon entry and during basic training at FLETC.

**Question #55:** How was James Burk Trained to act, as an ATF law enforcement officer, in response to the scene that unfolds in Exhibit 2?

Response:

Unknown what training James Burk had regarding such interaction. Would possibly have to

16

request records from his initial ATF academy and FLETC training, if available and/or documented.

**Question #56:** Prior to making the final decision on James Burk's removal, did the individual identified in Question #2 review the audio file labeled Exhibit 5 and provided herewith?

Response:

BDO D'Angelo reviewed the materials relied upon by the PRB in the Proposed Removal dated July 16, 2021 (see attached). Included within the materials relied upon were exhibits to the IAD ROI. Exhibits 11 through 13 to the IAD ROI contained all of the 9-1-1 audio calls relevant to the Incident.

**Question #57:** How was James Burk Trained to act, as an ATF law enforcement officer, in response to being told – as can be heard in Exhibit 5 – that local law enforcement officers were on their way to his location?

Response:

Unknown what training James Burk had regarding such interaction. Would have to ask James Burk and/or possibly have to request records from his initial ATF academy and FLETC training if available and/or documented.

**Question #58:** How was James Burk Trained to act, as an ATF law enforcement officer, when the subject of an attempted firearm retrieval is not at his / her residence?

Response:

Refer to ATF O 3140.1A

**Question #59:** While operating as an ATF law enforcement officer, how was James Burk trained to interact with civilians who are not the subject of any ATF investigation?

Response:

Unknown what training James Burk had regarding such interaction. Would possibly have to request records from his initial ATF academy and FLETC training if available and/or documented.

**Question #60:** Exhibit 6 is an affidavit of Sarah Al Maliki. In her affidavit, Ms. Al Maliki states that during the Incident and before CPD responded, she informed James Burk that the subject of his investigation was not home. In response, James Burk threatened to stay on her porch indefinitely unless she opened the door. Is this tactic, of remaining at a civilian's home, a tactic that is Trained or acceptable of ATF law enforcement officers?

Response:

Stating to an occupant the intent to remain on scene in support of a lawful order is acceptable depending on the specific circumstances.

**Question #61:** Exhibit 6 states that James Burk yelled at Sarah Al Maliki and called her a "liar" when her husband was not home. Is this behavior within ATF's standards and Policies?

Response:

N/A

**Question #62:** Would it be within ATF Policies and Training for an officer to present an OHLEG or a LEADS printout instead of a badge when asked for evidence of the officer's status as a law enforcement officer?

Response:

I am unaware of specific items like OHLEG or LEADS being identified in any ATF policy. However, communicating articulatable subject matter specific to law enforcement in addition to proper identification is common training practice.

**Question #63:** Was James Burk Trained or advised that the presence of local law enforcement

officers would be unreasonable during any of his firearm retrieval attempts because he, as a member of ATF, "is the police?"

Response:

 Unknown.

**Question #64:** Was James Burk Trained or advised to ignore commands from local law enforcement if it was in order to retrieve his ATF badge?

Response:

Unknown what training James Burk received regarding such interaction. Would possibly have to request records from his initial ATF academy and FLETC training if available and/or documented.

**Question #65:** Was James Burk Trained or advised that it was ever acceptable, as an ATF law enforcement officer, to ignore the commands of local law enforcement officers during the course of his work?

Response:

Unknown what training James Burk had regarding such interaction. Would possibly have to request records from his initial ATF academy and FLETC training if available and/or documented.

**Question #66:** Why was James Burk's employment with ATF terminated?

Response:

Please refer to Exhibit 1 as attached to Defendants' Discovery Requests. Subsequent to the issuance of the decision of removal, Mr. Burk appealed the removal to the United States Merit Systems Protection Board ("MSPB"). The MSPB appeal was resolved via a settlement

agreement (see attached).[1]

---

[1] The Bureau provides the referenced settlement agreement in redacted form to protect sensitive, Privacy Act-related information or other sensitive information.  An unredacted version may be produced upon execution of a stipulated protective agreement.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| James A. Burk, Jr., *et al.*, | Case No. 2:20-cv-06256 |
| Plaintiff, | |
| v. | Judge James L. Graham |
| City of Columbus, *et al.*, | Magistrate Judge Chelsey M. Vascura |
| Defendants. | |

**<u>VERIFICATION OF ATF'S RESPONSES TO DEFENDANTS' DEPOSITION BY</u>**
**<u>WRITTEN QUESTIONS</u>**

I, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives, being first duly cautioned and sworn, do hereby swear that the factual statements made in the foregoing responses, answers, and objections are true to the best of my knowledge, information, and belief.

_____

United States Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me and subscribed in my presence this ____ day of _____, 2023.

_____

Notary Public

My commission expires: _____

21

Respectfully Submitted,

/s/ *Alexandra N. Pickerill*

Alexandra N. Pickerill (0096758)
Samantha M. Hobbs (0098726)
Assistant City Attorneys
CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY
77 North Front Street
Columbus, Ohio 43215
(614) 645-0761
ANPickerill@columbus.gov
SMHobbs@columbus.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that, on March 7, 2023, I served electronic copies of the foregoing upon the following individual(s) in both Word and PDF forms via electronic mail:

Jonathan N. Bond
Cooper & Elliott, LLC
305 West Nationwide Boulevard
Columbus, OH  43215
(614) 481-6000
jonb@cooperelliott.com
*Attorney for Plaintiffs*

Stephanie M. Rawlings
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio  43215
Stephanie.Rawlings@usdoj.gov
(614) 255-1606
*Attorney for ATF*

/s/ Alexandra N. Pickerill
Alexandra N. Pickerill (0096758)
Senior Assistant City Attorney
*Attorney for Defendants*