**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| | **:** | |
| **James A. Burk, et al.,** | **:** | |
| | **:** | **Case No. 2:20-cv-6256** |
| **Plaintiffs,** | **:** | |
| **v.** | **:** | **Judge Graham** |
| | **:** | |
| **City of Columbus, et al.,** | **:** | **Magistrate Judge Vascura** |
| | **:** | |
| **Defendants.** | **:** | |

**OPINION & ORDER**

This matter is before the Court upon *Defendants City of Columbus, Joseph Fihe, and Kevin Winchell's Motion for Summary Judgment* (ECF No. 51), filed August 14, 2023. For the reasons that follow, Defendants' Motion is **GRANTED** as to Count 2 of the Plaintiffs' Complaint (ECF No. 1) and **DENIED** as to the remaining Counts contained therein.

**STATEMENT OF THE CASE**

This case arose out of an encounter between law enforcement officers from different law enforcement agencies. When then-Special Agent James Burk reported to a Columbus address for a routine function in his role with the Bureau of Alcohol, Tobacco, and Firearms, the resident of the address called 911, and officers with the Columbus Police Department were dispatched to the scene. Upon the arrival of then-Officer Joseph Fihe, the encounter quickly escalated, and continued to escalate with the arrival of Officer Kevin Winchell shortly thereafter. Officers Fihe and Winchell held Agent Burk at gunpoint, used a TASER when putting him in handcuffs, and detained him in the back of a police cruiser.

On December 4, 2020, Plaintiff Burk initiated the instant case under 42 U.S.C. § 1983, alleging in Count 1 of his Complaint that Defendant-Officers Fihe and Winchell used excessive

1

force in violation of Burk's Constitutional rights.[1] Burk has also alleged "Malicious/Willful/Wanton/Reckless Misconduct" (Count 3) and Intentional Infliction of Emotional Distress (Count 4), and Plaintiff Summer Hilfers alleged Loss of Consortium (Count 5) against the Defendant-Officers. All claims derive from the encounter on July 7, 2020. Defendant-Officers Fihe and Winchell filed the Motion for Summary Judgment now before the Court, arguing that there is no genuine dispute of material fact, that they are entitled to Qualified Immunity and, as such, that Plaintiffs Burk and Hilfers cannot prevail as a matter of law.

**Background**

In the case at bar, two audio recordings (ECF No. 51-3 and ECF No. 65-1) and one video recording (ECF No. 51-4) have been submitted by the parties. Though these recordings are the primary factual source for the parties as well as the Court, they do not resolve all the factual disputes, and the Court's description herein of what the recordings contain—from the posture of viewing inferences in the light most favorable to the Plaintiffs—is necessarily prospective at this stage. A triable issue arises where genuine disputes of material facts are unresolved by the recordings; however, testimony "seeking to contradict an unambiguous video recording" does not create a genuine dispute. *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014).

On July 7, 2020, ATF Special Agent Burk reported to 3359 Edgebrook Drive for the purposes of retrieving a firearm pursuant to a "delayed denial" from the National Instant Criminal Background Check System ("NICS"). Burk Dep. 110:3-18, ECF No. 57-1. A "delayed denial" describes a circumstance where a background check disqualifies an individual from firearm ownership, but only after the individual has already been allowed to take possession of the firearm while the background check is pending. *Id.* at 62-67. In such circumstances, an ATF Agent, such

---

[1] Burk has dropped his *Monell* claim (Count 2) against Defendant City of Columbus. Pls.' Mem. in Opp'n 23, ECF No. 65.

as Plaintiff Burk, will be dispatched to attempt to retrieve the firearm with the individual's consent, a routine ATF function. *Id.*

Agent Burk arrived at 3359 Edgebrook Drive at approximately 13:50:00 on July 7, 2020. Defs.' Mot. Summ. J Ex. 2, Al Maliki Aff. ¶ 7, ECF No. 51-2. A resident of the address, Sarah Al Maliki, responded to Agent Burk's knocking by coming to the door, but would not allow him to come inside because she was home by herself with her children while her husband was at work. *Id.* at ¶¶ 5-13. Agent Burk attempted to explain his presence, including his status as a law enforcement officer, but what specifically he said and what Al Maliki heard remain matters of dispute. *Compare Id.* at ¶¶ 11-17 *and* Burk Dep. 131:18-138:4.

Al Maliki told Burk that she was going to call 911 and did so. Al Maliki Aff. ¶ 17-18. The audio recording of the 911 call indicates that the call was placed at 13:54:25 and lasted approximately 15 minutes. Def. Mot. Ex. 3, ECF No. 51-3. During the call, Al Maliki explained the circumstances to the 911 operator, including Burk's claim that he was a law enforcement officer:

| | |
|---|---|
| Operator: | Did he show you a badge or give you any kind of ID at all? |
| Al Maliki: | Yes, he showed me a badge. |
| Operator: | Okay, what did the badge look like? |
| Al Maliki: | I don't know. |
| Operator: | Okay. Did it have a name on it or a number on it? |
| Al Maliki: | No, no, there's only signal [sic] on it. |

*Id.* at 01:41-02:00. Eventually, Al Maliki communicated to the operator that Burk claimed to be with the ATF (*Id.* at 02:58), specifically, and she also provided his badge number and the name of his supervisor. *Id.* at 03:48-04:00.

During the 911 call, Al Maliki demonstrated some unfamiliarity with some English terminology. For example, at one point, she asks the operator to explain what "ATF" stands for

(*Id.* at 03:00-03:08), and, in the exchange quoted above, she has used "signal," perhaps in place of "symbol." The responding officers were informed by dispatch that the suspect—Agent Burk—had tried to open the door. Defs.' Mot. Ex. 1, ECF No. 51-1. While Al Maliki did say "he tried to open the door" (*Id.* at 00:30), whether she confirmed that she was describing an element of burglary is questionable:

> Operator: When you say he tried to open the door, did he put his hand on the doorknob, or what?
> Al Maliki: Yes, he said open the door because he's a police.

*Id.* at 00:52-00:59. In her affidavit executed March 2, 2023, Al Maliki describes Burk "knock[ing] very loudly and several times," "order[ing]" her to open the door, "threaten[ing]" to stay there all day, and "bang[ing] forcefully" on her door, but stops short of alleging that he ever put his hand on the doorknob or otherwise attempted entry over Al Maliki's refusal to allow him in. Al Maliki Aff. ¶¶ 7-14.

For his part, Burk vehemently denies putting his hand on the doorknob. Burk Dep. 142:22-24. At approximately 13:56:10pm, Officer Joseph Fihe was dispatched to respond to Al Maliki's call. Pls.' Mem. in Opp'n Ex. A, ECF No. 65-1. Regardless of whether Al Maliki meant that Agent Burk had his hand on the doorknob, or she understood his (apparently forceful) knocking as consistent with "tr[ying] to open the door," the message relayed to Officer Fihe was of a "possible 10-8," using the code designated for burglary. *Id.* at 00:16-00:21. While Officer Fihe was on his way, details from the conversation between Al Maliki and the 911 Operator continued to be relayed by the dispatcher over the radio and in the form of written dispatch notes viewable to Officer Fihe on his Computer Assisted Dispatch monitor ("CAD"). *Id.* at 00:19-01:05; Defs.' Mot. Ex. 1, ECF No. 51-1. At 13:56:21, the CAD displayed "HE SHOWED HER A BADGE…NO NAME OR #

4

ON IT." However, at 13:57:25, the CAD displayed "HE SAYS HE IS WITH ATF," and then at 13:58:50, "SAYS HIS NAME IS JIM BURK…..BADGE #4672." Defs.' Mot. Ex. 1.

From this point, the recitation of facts is primarily based on the Court's viewing of footage from Officer Fihe's body-worn camera ("BWC"), submitted as Exhibit 4 to Defendants' motion for summary judgment. Officer Fihe arrived at the residence and exited his cruiser at approximately 14:03:30, drawing his firearm as he moved in Burk's direction. *Id.* at Ex. 4 05:06, ECF No. 51-4; Fihe Dep., 58:25-59:7. Agent Burk was standing on the porch of 3359 Edgebrook as Officer Fihe approached from across the street. Defs.' Mot Ex. 4 05:11-05:13. At 14:03:38, Officer Fihe called out, "hey turn around let me see your hands. Turn around let me see your hands." *Id.* at 5:14-16. Agent Burk replied, "I'm a federal fucking agent." *Id.* at 5:17. Officer Fihe then replied, his voice raising to a yell and aiming his firearm at Agent Burk, "Okay, let me see your hands, I need to see some ID, GET ON THE GROUND." *Id.* at 05:18-05:21. By 14:03:44, Officer Fihe had Agent Burk held at gunpoint. *Id.*[2]

Officer Fihe continued to order Agent Burk to get on the ground as Agent Burk stepped off the porch and away from the residence. *Id.* at 05:22-05:25 Burk said, "What's your deal?" *Id.* at 05:26. Officer Fihe repeated the order to get on the ground. Burk then said, "I'm a federal agent." *Id.* at 05:27-05:31. At 14:03:56, Officer Fihe activated his radio to call in a "10-3," the code indicating an officer in trouble. *Id.* at 05:32-05:33. Agent Burk, again, said, "I'm a federal agent." Officer Fihe, again, shouted, "GET ON THE GROUND." *Id.* at 05:34-05:35. Agent Burk said, "I'm not getting on the ground, I'm a federal agent," to which Officer Fihe replied, still holding

---

[2] Officer Fihe would later testify that he saw "a bulge which looked like the silhouette of a gun" under Burk's shirt at some point "very close to the beginning of the encounter," but that he could not remember when, specifically, he became aware of the gun. Fihe Dep., 72:18-73:7.

Agent Burk at gunpoint, "Why wouldn't you show me your ID when I got here?" *Id.* at 05:36-05:42. Agent Burk answered, "You didn't ask for it." *Id.* at 05:43.

Over the 50 seconds that followed, Officer Fihe and Agent Burk continued to argue along the same lines, as Agent Burk repeatedly and explicitly refused to get on the ground. *Id.* at 05:45-06:35. At one point, Agent Burk stated, "I'm not getting on the ground," to which Officer Fihe replied, "Well then stay where you're at." *Id.* at 05:47-05:53. During this time, Agent Burk held up the packet of papers in his hand and said "Dude, why would I have an OHLEG sheet?" *Id.* at 06:32-06:34; *See* Burk Dep. 173:18-174:12 (explaining that an OHLEG sheet should be familiar to law enforcement). At 14:05:00, Officer Winchell arrived at the scene, whereupon he immediately aimed his firearm at Agent Burk and ordered him to get on the ground. Defs.' Mot. Ex. 4, 06:36-06:41. With this order, Agent Burk complied. *Id.* at 06:42-06:49.

As Agent Burk got facedown on the ground at 14:05:15, he said "You got my ID right here, left pocket." *Id.* at 06:48-06:51. The Officers did not check for Agent Burk's ID, but instead moved to put him in handcuffs, grabbing his wrists and stating, "We're going to put your arms behind your back," to which Agent Burk replied, "Wait a second." *Id.* at 06:51-06:54. Officer Fihe then said "Do not resist," to which Agent Burk replied, "I'm not resisting." *Id.* at 06:53-06:55. As the Officers positioned themselves over Agent Burk and brought his wrists together behind his back, Officer Fihe stated, "You're acting like a moron." *Id.* at 06:56. Over the next 50 seconds, the Officers repeatedly ordered Agent Burk to put his hands behind his back, while Agent Burk repeatedly pleaded with the Officers to stop and check his ID, and continued to deny that he was resisting. *Id.* at 06:56-07:46. At 14:06:11, Officer Fihe used his TASER on Agent Burk as Officer Winchell secured the second handcuff. *Id.* at 07:47-07:58.

With Agent Burk then handcuffed and prone on the ground, the Officers removed the firearm from the holster on Agent Burk's right hip and sat him up on the curb. *Id.* at 07:59-08:32. At 14:07:02, Officer Fihe began to check for the ID Agent Burk claimed to have in his left pocket, and by 14:07:24 Officer Fihe had Agent Burk's ID and badge in hand. *Id.* at 08:38-09:03. Officer Fihe asked Agent Burk for his supervisor's name, which Agent Burk provided. *Id.* at 09:04-09:14.

In spite of this apparent confirmation of Agent Burk's identity as an ATF agent, Officer Winchell lifted Agent Burk to his feet while Officer Fihe and ordered him to "Get in the car." *Id.* at 09:23-09:26. With all three men next to the cruiser, Agent Burk said "Guys, please, just talk to me for one second," to which Officer Fihe replied, "Get in the car, we'll talk later. You had your chance." *Id.* at 09:41-09:46.

Officers Fihe and Winchell then opened the cruiser door and sat Agent Burk on the backseat as he continued to implore the officers to stop, citing a medical condition and stating, "I need to breathe." *Id.* at 09:49-10:01. Officer Fihe told Agent Burk, "Get your legs in, we're closing this door." *Id.* at 10:02. Agent Burk again indicated that he needed air and said, "Call an ambulance, I'm asking for an ambulance." *Id.* at 10:07-10:08. However, when Officer Fihe told Agent Burk that they already had a medic coming, Agent Burk then said that he did not need a medic. *Id.* at 10:09-10:13. The Officers then resumed ordering Agent Burk to get (his legs) into the car while Agent Burk continued to protest. *Id.* at 10:15-10:18. Officer Fihe then went to the other side of the cruiser and pulled on Agent Burk while Officer Winchell pushed him in from the other side until the doors could be closed. *Id.* at 10:19-10:43.

## **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504

U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## DISCUSSION

Plaintiff Burk alleges that the conduct of the Defendant Officers in the July 7, 2020 incident, as described above, constitutes excessive force in violation of his constitutional rights. Defendants argue that qualified immunity bars this suit because the "Defendant Officers' uses of force against Plaintiff Burk were objectively reasonable and no constitutional violation occurred." Defs.' Mot., 11. Though Plaintiffs' Complaint does not specifically identify which actions of the Defendant Officers are alleged to have constituted excessive force, both parties focus their attention on three (3) particular moments of the encounter: (1) Officer Fihe (and later, Officer Winchell) detaining Burk at gunpoint almost immediately upon arriving to the scene; (2) the use of the TASER on Burk while handcuffing him; and (3) the continued detention of Burk after the Officers had checked Burk's credentials.

### I.       Qualified Immunity & Excessive Force.

Under the doctrine of qualified immunity, government actors are shielded from civil liability in the performance of their duties if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

Courts use a two-step inquiry to analyze qualified immunity: (1) whether the government official's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "When more than one officer is involved," as in the instant matter, "the court must consider each officer's entitlement to qualified immunity separately." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 944 (6th Cir. 2017). Furthermore, when multiple parts of the incident are alleged to have constituted excessive force, the court must consider the entitlement to qualified immunity as to each part. *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 865 (6th Cir. 2020).

The Fourth Amendment prohibits law enforcement officers from using force exceeding that which is "objectively reasonable under the totality of the circumstances." *Smith*, 874 F.3d at 943. The "objective-reasonableness standard," directs courts to consider "the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene," rather than with the benefit of hindsight. *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). This analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396-7, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). But at the same time, the inquiry is "without regard to [the officers' actual] underlying intent or motivation." *Graham*, 490 U.S. at 397. Ultimately, the inquiry is whether the use of force was reasonable when balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396.

The Sixth Circuit has consistently considered the "*Graham* factors" in determining the reasonableness of the use of force. *Harris v. City of Circleville*, 583 F.3d 356, 365 (6th Cir. 2009).

In *Graham*, the U.S. Supreme Court stated that the Fourth Amendment analysis "requires careful attention to the facts and circumstances" of each case, and directed attention in particular toward "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to resist arrest by flight." 490 U.S. at 396. "These factors are not exhaustive," and the inquiry remains whether the use of force was reasonable under the totality of the circumstances. *Vanderhoef*, 938 F.3d at 276.

As to the second[3] step in the qualified immunity inquiry, a right is considered "clearly established" when the "contours of that right" are sufficiently defined by precedent to "place[] the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011). "Clearly established law" must not be defined at a "high level of generality." *Id.* at 742. But the Court need not find a case "on all fours" with the instant fact pattern before determining that a right was clearly established. *Vanderhoef*, 938 F.3d at 278 (quoting *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018)). When determining whether the law is clearly established, the Court must look first to the decisions of the Supreme Court, then to published opinions from the Sixth Circuit, and finally to decisions of other circuits. *Vanderhoef*, 938 F.3d at 278 (citing *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019)).

### A.    Use of Force (1): Initial Detention of Agent Burk at Gunpoint.

Defendants argue that Officer Fihe's use of force at the start of the encounter—i.e., aiming his firearm at Agent Burk—was objectively reasonable under the circumstances. Specifically, Defendants argue that Officer Fihe "had reason to believe that the suspect had been or was committing an attempted burglary and may be impersonating a police officer." Defs.' Mot., 11.

---

[3] The Court has discretion in determining the order in which it will proceed on the two-step qualified immunity inquiry. *Pearson*, 555 U.S. at 242 (2009).

Defendants further argue that Agent Burk's initial response when addressed by Officer Fihe amounted to "at least passive resistance" when Burk "refused to obey lawful commands," and "exhibited behavior which can reasonably be perceived as attempting to resist detention or flee." *Id.* at 11.

The Court first considers whether this use of force surpassed that which is objectively reasonable under the Fourth Amendment. If the use of force is determined to be objectively reasonable, then the Defendant Officers are entitled to qualified immunity, and summary judgment is appropriate. However, if the use of force is determined to be unreasonable, or if a genuine dispute of material fact precludes such a determination, the Court next considers whether the right alleged to have been violated was clearly established at the time of the incident. For the reasons that follow, the Court determines that a jury could find from the evidence that pointing a gun at Agent Burk was not objectively reasonable; that the facts plausibly describe a violation of a clearly established right; and that, therefore, the Defendant Officers are not entitled to qualified immunity for this use of force.

1.   ***Did the Defendant Officers Violate Plaintiff Burk's Constitutional Rights?***

The Sixth Circuit has recognized that pointing a firearm at someone, and the "implicit threat" of shooting for noncompliance, can constitute excessive force in violation of the suspect's constitutional rights under the Fourth Amendment. *Vanderhoef*, 938 F.3d at 277. Drawing a gun may constitute excessive force against a person when that person is "not fleeing or posing a safety risk." *Wright*, 962 F.3d at 865; *see also Vanderhoef*, 938 F.3d at 277 (off-duty defendant-officer was unreasonable in pointing gun at plaintiff's head following traffic accident); *Binay v. Bettendorf*, 601 F.3d 640, 648 (6th Cir. 2010) (genuine dispute of material fact precluded determination as to whether defendant-officers were reasonable in detaining the occupant of the

premises at gunpoint); *Davis v. Bergeon*, 187 F.3d 635 (6th Cir. 1999) (pointing firearm is potentially excessive force).

To determine whether the conduct alleged violated a constitutional right, the Court must balance the "nature and quality" of the violation against the government interest at stake. *Vanderhoef*, 938 F.3d at 277. In so doing, the Court considers the totality of the circumstances, guided in particular by the factors set forth in *Graham*: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to resist arrest by flight." 490 U.S. at 396. For the reasons that follow, the Court determines that a jury could find that the Defendant Officers' use of force in aiming their gun at Burk was not objectively reasonable.

i.    *Graham Factor 1: The Severity of the Crime*

As the first *Graham* factor, the Court must consider "the severity of the crime at issue." 490 U.S. at 396. Defendants assert that "Detention by way of holding a suspect at gunpoint is a reasonable response to encountering a suspected burglar at the scene of the alleged crime." Defs.' Mot., 11. Defendants cite *Stevens-Rucker v. City of Columbus, OH*, 739 F. App'x 834 (6th Cir. 2018) in support of the proposition that burglary is sufficiently severe to justify detaining an unarmed suspect at gunpoint. Plaintiffs counter, essentially, that Officers Fihe and Winchell were unreasonable in believing that Agent Burk was a burglary suspect in light of the substantial information indicating that he was in fact an on-duty ATF agent. Pls.' Mem. Opp'n, 17. Because Officer Fihe's knowledge of Agent Burk's identity as law enforcement is central to the "severity of the crime" analysis, this factor is primarily guided by the information available to Officer Fihe while en route to the scene and upon his arrival.

13

Before engaging with Agent Burk, Officer Fihe was informed by the dispatcher of a "possible" burglary: "male, white, gray shirt, tan pants, knocking on the door says he's a police officer and she needs to open up, and he's tried to open the door forcefully."[4] Pls.' Mem. Ex. A, 00:19-0:32. The dispatcher followed up to say, "now saying that he showed a badge that had no identification on it at all, just a simple badge, no name or number." *Id.* at 00:49-00:57.[5] Officer Fihe testified at his deposition that it "sound[ed] like it's a badge that maybe somebody got from a gumball machine or something like that." Fihe Dep., 36:3-5. Upon this information, Officer Fihe believed that he was on his way to the scene of a "violent felony in progress." *Id.* at 31:1-2. While the dispatcher did not describe the question of Burk's identity in criminal terms ("says he's a police officer," (Pls.' Mem. Ex. A, 00:25-00:27)), Officer Fihe came to believe that, in addition to the burglary, he was also responding to "somebody allegedly impersonating a police officer." Fihe Dep. 32:4-5. The specific allegation of impersonating a police officer appears to have originated with Officer Fihe himself, as the dispatcher merely raised suspicions about the purported badge. However, minutes later—before Officer Fihe arrived at the scene—the CAD showed that the suspect said he was with ATF and had provided his name and badge number, details which would tend to confirm that Burk was in fact a law enforcement officer.[6] Defs.' Mot., Ex. 1.

---

[4] Al Maliki did not say that Agent Burk "tried to open the door forcefully." The dispatcher's characterization likely comes from Al Maliki's apparent confirmation that Agent Burk put his hand on the doorknob. Def. Mot. Ex. 3, 00:52-00:59. As noted *supra*, 3-4, there are strong indications that the hand-on-doorknob detail was a misunderstanding, but Officer Fihe would have no reason to question the information he received from the dispatcher, and while the Court must draw permissible inferences in favor of Plaintiffs at this stage, the Court must also view the facts "from the perspective of a reasonable officer on the scene." *Vanderhoef*, 938 F.3d at 276. Officer Fihe did not speak with the 911 caller, Al Maliki, at any point prior to the encounter with Agent Burk.
[5] This detail also evolved from Al Maliki's report on the 911 call. When asked what the badge looked like, though she had apparently seen it only moments prior, Al Maliki replied, "I don't know," and, when asked specifically, said it did not have a name or number, "only signal." Def. Mot. Ex. 3, 01:41-02:00. This exchange is rather innocuous in light of Al Maliki's complete unfamiliarity with ATF. *Id.* at 03:00-03:08. But again, the Court's analysis must be limited to information available to Officer Fihe at the time, which does not include these specific details of the 911 call.
[6] At his deposition, then-Detective Fihe was equivocal as to whether he in fact ascertained this information before engaging Burk (Fihe Dep., 45:11-22), but there is no dispute that it was available to him on his CAD, and the BWC footage shows Officer Fihe interacting with the CAD display multiple times during the approximately 7-minute drive

Officer Fihe remained steadfastly committed to investigating the suspected (by him) impersonation of a police officer throughout the encounter with Agent Burk, and it would prove to be a very difficult suspicion to shake. He testified that this suspicion added to his sense that he was responding to a "violent felony" because, "When people impersonate police officers, they usually would have a weapon on them or something like that." Fihe Dep., 32:6-9. The Court observes, as a reasonable jury might, that legitimate law enforcement officers usually would have a weapon on them, too; but from here, the table was set: any piece of information tending to corroborate Agent Burk's identity as law enforcement was, for Officer Fihe, more likely indicative of an increasingly sophisticated impersonation effort:

- Upon receiving additional information regarding Burk's identity en route:

    Fihe:  I don't know if I even remember that it was with ATF or what, but it didn't sound legitimate… I just remember saying, wow, this just doesn't sound legit at all.

    *Id.* at 37:23-38:4.

- Upon engaging Agent Burk, whose first words were "I'm a fucking federal agent":

    Fihe:  Immediately I'm starting to think to myself that's not the way police conduct themselves.

    *Id.* at 63:25-64:7.

- Upon observing the silhouette of a gun on Agent Burk:

    Fihe:  So I knew that he either had a fake gun or something. I can't think of anything else that would be that shape that somebody would have on their body.

    *Id.* at 32:21-24.

- Upon checking Burk's credentials (near the end of the encounter, after using the TASER and handcuffing him):

---

to the scene. Viewing inferences in the light most favorable to the Plaintiffs, the Court finds that a reasonable officer on the scene would be aware of this information.

> Q:      You saw that he had a badge indicating he was with ATF… correct?
> Fihe:   *Indicating*, yes sir.
>         […]
> Q:      [Now] you've seen [Burk's] ATF badge and agency identification, correct?
> Fihe:   I wouldn't say that I confirmed that it was an ATF badge. I saw a badge. It's a very small badge. […] I was not convinced.

*Id.* at 99:18-21; 100:20-101:4 (emphasis supplied).

Defendants cite *Stevens-Rucker* to support the proposition that Officer Fihe's detention of Agent Burk at gunpoint was reasonable in light of the severity of the crime alleged. In *Stevens-Rucker*, representatives on behalf of the estate of Jason White alleged that Columbus police officers used excessive force resulting in White's death. 739 F. App'x 834. As in the instant case, the first responding officer in *Stevens-Rucker* responded to a call of a possible burglary (*Id.* at 836), but the similarities largely end there.

When the officers in *Stevens-Rucker* encountered the suspect, White, he was shirtless, soaking wet, wielding a knife, and noncommunicative in the midst of a mental health crisis. *Id.* at 843. It was approximately 5:00am when the 911 call was placed, after White had already entered (and left) the caller's apartment armed with the knife. *Id.* at 834. The first instance of force scrutinized by the court occurred only after White had banged on the door with the knife to try to enter again and had already encountered and fled from another officer. *Id.* at 841.

Officer Fihe faced much different circumstances when he arrived at 3359 Edgebrook on July 7, 2020. Though he had been informed of a "possible 10-8," he had also been informed that the suspect "says he is a police officer," and, later, he received the suspect's name, law enforcement agency, and badge number, all before reaching the scene. Defs.' Mot., Ex. 1. Defendants note that, once he arrived on scene, "Officer Fihe found Plaintiff Burk in front of [Al Maliki's] front door and matching the description she gave for the alleged burglar." Defs.' Mot., 12. Agent Burk indeed

16

matched the description, but the description included his claim that he was a police officer, and when Officer Fihe arrived, he received substantial information tending to support Burk's claim. Burk—the suspected burglar—was still on the porch and made no attempt to flee. Fihe Dep., 90:23-25. Though he was not in uniform and was not displaying any law enforcement insignia when Officer Fihe approached, there is no allegation that his clothing or appearance was otherwise inconsistent with law enforcement operating in plain clothes. When he first comes into the frame of Officer Fihe's BWC, Burk appears to be stationary, standing on the porch, and holding a manila folder or paper of some kind. Defs.' Mot., Ex. 4, 05:18. Though Defendants point out that Burk was not presenting his credentials, was not in uniform, and did not arrive in a marked law enforcement vehicle, the Court is not persuaded that these details would meaningfully move the needle for a reasonable officer having already received Burk's name, agency, and badge number.

Defendants further argue that the Officers' "initial skepticism" as to whether Burk was a federal agent was reasonable because of Burk's conduct, which Defendants claim was "in conflict with his federal agent training and what the Defendant Officers would expect to see when encountering a federal law enforcement officer." Defs.' Mot., 13. Specifically, Burk's conduct is alleged to have been his "refusing to comply with the orders of local law enforcement." *Id.*

Approximately 13 seconds after Officer Fihe exited his cruiser, he had his gun aimed at Agent Burk. *Id.* at Ex. 4 05:08-05:21. This occurred only six (6) seconds after Officer Fihe first verbally addressed Agent Burk. *Id.* A very small window remains during which Burk could have exhibited conduct that rendered Officer Fihe's use of force objectively reasonable. As described *supra*: At 14:03:38, Officer Fihe called out, "hey turn around let me see your hands. Turn around let me see your hands," to which Agent Burk replied, "I'm a federal fucking agent." *Id*. At 14:03:44, Officer Fihe had Agent Burk detained at gunpoint. *Id.* The only orders that Burk received

prior to the use of force were to "turn around" and to let Officer Fihe see his hands, and the BWC footage does not definitively establish whether Burk was accurately perceived to be noncompliant. *Id.* Plaintiffs argue that Agent Burk did turn around (to face *toward* Officer Fihe), and that Officer Fihe's unspoken intent that Burk turn the other way (to face *away* from Officer Fihe) does not render Burk noncompliant for the purposes of this analysis. Pls.' Mem., 8-9. A jury accepting Plaintiffs' interpretation could reasonably find that Agent Burk complied with Officer Fihe's commands within mere seconds. Thus, even if Burk's noncompliance could justify Officer Fihe's use of force, the Court finds that a genuine question of fact persists as to whether Burk's conduct was reasonably perceived to be noncompliant.

The Court must consider the circumstances from the perspective of a reasonable officer on the scene. *Vanderhoef*, 938 F.3d at 276. In other words, the Court is not bound by Officer Fihe's unyielding suspicions regarding Agent Burk's identity nor his interpretation of whether Burk was compliant when considering whether his use of force was objectively reasonable. Accordingly, the Court finds that the first *Graham* factor—the severity of the crime—weighs in favor of Burk.

ii.     *Graham Factors 2 & 3: The Immediate Threat Posed by the Suspect & the Suspect's Active Resistance to Arrest*

Defendants argue that the second and third *Graham* factors weigh in favor of Officer Fihe. The second factor considers "whether the suspect poses an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. As Defendants acknowledge, this second factor largely turns on the analysis of the first factor: "The second factor… also weighs in favor of the Defendant Officers as they *reasonably believed* Plaintiff Burk to be a non-compliant and *armed burglary suspect*." Defs.' Mot., 14 (emphasis supplied). In other words, the Defendants argue that because the Officers' perception of the severity of the crime was reasonable—even if ultimately incorrect—then the Officers' perception of the threat posed by Burk reasonably follows. The Court

18

generally agrees that the second factor, under these facts, is strongly informed by the analysis of the first, but because the Court finds that the first factor weighs in favor of Burk, the second factor also weighs in favor of Burk. Regardless, Agent Burk was not brandishing a weapon, was not reaching for anything, was not making any aggressive moves toward Officer Fihe, and did not verbalize any threats against him. *See* Fihe Dep., 77:4-10.

As to the third *Graham* factor, regarding whether the suspect "is actively resisting arrest or attempting to resist arrest by flight" (490 U.S. at 396), Defendants argue that Burk demonstrated "at least passive resistance when he refused to obey lawful commands from the Defendant Officers." Defs.' Mot., 14. As noted above, only six (6) seconds passed from when Officer Fihe first issued a command to when he aimed his gun at Agent Burk, and whether Burk's actions in that window of time constituted noncompliance is in dispute. Therefore, the Court finds that all three *Graham* factors weigh in favor of Burk. A reasonable jury could find that the Officer Fihe's use of force in detaining Agent Burk at gunpoint was unreasonable and thus a violation of Burk's constitutional right under the Fourth Amendment to be free from excessive force.

### iii. *Officer Winchell*

When excessive force is alleged against more than one officer, as in the instant matter, "[T]he court must consider each officer's entitlement to qualified immunity separately." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 944 (6th Cir. 2017). However, Defendants' position is that the analysis is the same: "For the same reasons that it was reasonable for Officer Fihe to use this amount of force, it was reasonable for Officer Winchell to draw and point his firearm." Defs.' Mot., 14-15. Defendants' position notwithstanding, the Court notes that the information available to Officer Winchell when he arrived as the second officer on the scene can be meaningfully

distinguished from what was available to Officer Fihe when he arrived as the first. Regardless, the Court ultimately reaches the same result as to each Defendant Officer's conduct.

As to Burk's identity, Officer Winchell had access to the same CAD display information showing Burk's name, agency, and badge number. Winchell Dep., 7:5-8:12. However, Officer Winchell arrived approximately 90 seconds after Officer Fihe, raising the possibility that Winchell had more time to appreciate the significance of this critical information. Stated differently, to the extent that Officer Fihe's testimony suggests that his ignorance of the information on the CAD display was reasonable under the circumstances,[7] Officer Winchell's additional time to view the information could diminish the force of that same argument on his behalf.

On the other hand, Officer Winchell was responding to Officer Fihe's "officer in trouble" call. Thus, in addition to hearing the report of a possible burglary, Officer Winchell had also heard from the first officer on the scene that he was in trouble. This would tend to shift the first *Graham* factor, the severity of the crime, in Officer Winchell's direction, at least as compared to the analysis as to Officer Fihe.

As to the second and third *Graham* factors, Officer Winchell's perception of Burk as an immediate threat and/or actively resisting, and the reasonableness thereof, necessarily depends on Officer Winchell's perception of Burk as a burglary suspect (i.e., the severity of the crime). Thus, in accordance with the analysis as to Officer Fihe, the analysis as to Officer Winchell for the second and third *Graham* factors is strongly informed by the disposition of the first *Graham* factor.

---

[7] Q:   As you pulled up, you could have checked your display for the last most up-to-date information on the run, correct?

A:   Which puts me in danger. Yes, sir.

Fihe Dep., 45:7-10. To be clear, Defendants do not expressly claim that either Officer was unaware of the information in the CAD display, but neither do they concede that the Officers did in fact know this information, stating that the Defendant Officers "reasonably believed" that Burk was "merely claiming to be a law enforcement officer" at the time of detention. Defs.' Mot., 13-14.

However, when Officer Winchell arrived on the scene, Burk was already detained at gunpoint. Officer Winchell testified that, upon arriving, he saw no imminent threat, no attempt to flee, and no aggressive movement from Burk. Winchell Dep., 9:10-10:1. Though Burk was thus apparently subdued, Officer Winchell immediately aimed his gun at him. Under these circumstances, the second and third *Graham* factors weigh in Burk's favor, as he was not posing an immediate threat nor actively resisting. A reasonable jury could find that Officer Winchell's use of force in aiming his gun at a subdued Agent Burk was unreasonable and thus a violation of Burk's constitutional right under the Fourth Amendment to be free from excessive force.

## 2. *Was the Right Clearly Established at the Time of the Incident?*

The second prong of the qualified immunity inquiry asks whether the right alleged to have been violated was clearly established at the time of the alleged violation. A right can be "clearly established" under this prong with caselaw presenting "a fact pattern similar enough to have given fair and clear warning to officers about what the law requires." *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018); *cf. Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012) ("It is one thing to overturn a conviction based on judicial interpretations of a constitutional guarantee reached after officers make an arrest; it is quite another to expose officers to the time, expense and risk of money-damages actions based on interpretations not yet clearly established.").

In *Wright v. City of Euclid*, the Sixth Circuit held that "It was clearly established as of November 4, 2016, [the date of the incident in question,] that drawing a weapon on a suspect who was not fleeing or posing a safety risk… constituted excessive force." 962 F.3d 852, 870 (6th Cir. 2020). The use of force at issue in *Wright* was whether the defendant-officers were justified in approaching the plaintiff's car with their firearms drawn. *Id.* at 866. Shortly before stopping him, the defendant-officers observed the plaintiff drive into and park briefly in the driveway of a

residence which the defendant-officers believed to be a source of drug activity. *Id.* Though previous caselaw provided that "an officer is entitled to rely on [his] experience and training in concluding that weapons are frequently used in drug transactions" (*United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001)), the defendant-officers "had very little, if any, reason to think that the [plaintiff] was involved in drug activity." *Wright*, 962 F.3d at 866. Rather, the defendant-officers had, "at most… a suspicion that [plaintiff] had briefly visited with a suspected drug dealer," which the Sixth Circuit found insufficient against the weight of caselaw which "clearly established… that brandishing a firearm without a justifiable fear that [the suspect] was fleeing or dangerous was unreasonable and constituted excessive force." *Id.* at 866, 870.

In *Vanderhoef*, decided in 2019, the Sixth Circuit found qualified immunity did not apply to a defendant-officer under the following circumstances:

> In summary, defendant approached a car reasonably suspecting that the driver had driven recklessly. He saw three unarmed and nonthreatening teens exit the damaged vehicle. He ordered them all to the ground at gunpoint without any of the three teens actively— or even passively—resisting his authority and commands. Moreover, he held them at gunpoint for roughly two minutes. In other words, plaintiff had no [known] criminal record, cooperated throughout the ordeal, posed no immediate threat to [defendant], and did not resist arrest or attempt to flee, all of which are factors that tend to weigh against [d]efendant[ ].

938 F.3d 271, 278 (6th Cir. 2019) (internal quotations omitted). The defendant-officer's conduct in *Vanderhoef* was "objectively *unreasonable*," and violated the Fourth Amendment rights of the plaintiff, "a nonfleeing teenager whom he did not *reasonably suspect* of any prior crime beyond speeding and reckless driving." *Id.* at 278, 281 (emphasis supplied).

Though the Court need not find a case "on all fours" with the instant fact pattern before determining that a right was clearly established (*Id.* at 278), both *Wright* and *Vanderhoef* involve officers brandishing firearms based on unreasonable suspicions of greater crimes than indicated

by the circumstances. The officers in *Wright* had "very little, if any reason to think that the detainee was involved in drug activity." *Wright*, 962 F.3d at 866. The off-duty officer in *Vanderhoef* claimed that he believed the vehicle driven by the plaintiff might have been stolen, but the Sixth Circuit observed that "[T]his purported belief was not based on any facts in the record." 938 F.3d at 277.

Similarly, the Defendant Officers in the instant case perceived a far more dangerous environment than the information available to them would reasonably indicate. Based on the Sixth Circuit caselaw set forth above, the Court finds that it was clearly established at the time of the incident, July 7, 2020, that an officer acts unreasonably and in violation of rights under the Fourth Amendment when pointing a gun at an individual "without a justifiable fear that [the individual] was fleeing or dangerous." *Wright*, 962 F.3d at 870. A jury could reasonably find from the evidence that Burk was not fleeing, was not dangerous, and to the extent that the Officers feared otherwise, they did so unjustifiably.[8] Because the facts taken in the light most favorable to Burk plausibly allege that the Defendant Officers violated this clearly established right, the Defendant Officers are not entitled to qualified immunity with regard to this use of force.

**B.      Use of Force (2): Use of the TASER when Detaining Agent Burk in Handcuffs.**

Defendants argue that Officers Fihe and Winchell are entitled to qualified immunity for their use of a TASER while securing Burk in handcuffs because their use of force was objectively reasonable. Defs.' Mot., 15. Specifically, Defendants focus their argument on the third *Graham* factor, alleging that "Mr. Burk… displayed further resistance by pulling his arms from behind his back and using his muscles to avoid being handcuffed." *Id.* For the reasons that follow, the Court

---

[8]As noted *supra*, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702. To that end, the Court does not question the sincerity of the Defendant Officers' suspicion that Burk was impersonating a police officer and attempting burglary; rather, the Court reaches the conclusion here on the basis that their suspicion would not be shared by a reasonable officer on the scene.

determines that a jury could find that the use of the TASER while securing Burk in handcuffs was not objectively reasonable; that the facts plausibly describe a violation of a clearly established right; and that, therefore, the Defendant Officers are not entitled to qualified immunity for this use of force.

### 1.  *Did the Defendant Officers Violate Plaintiff Burk's Constitutional Rights?*

The Court generally agrees with the Defendants' proposition that "The first and second *Graham* factors remain the same during this latter portion of Plaintiff's encounter with the Defendant Officers," but, again, the Court finds that those factors continue to favor Burk. Defs.' Mot., 15. Stated differently, nothing in this latter portion of the encounter displaces the Court's determination, *supra*, that the substantial information confirming Burk's identity as a law enforcement officer along with his lack of threatening or criminal conduct swings the first two *Graham* factors—severity of the crime and immediate threat posed by the suspect—in his favor. *Cf. Wright*, 962 F.3d at 867 ("The first *Graham* factor… cuts against a finding of justified use of force because there was no probable cause that he had committed any crime at all before the tasering occurred.") Defendants' argument centers on the third *Graham* factor, "whether [the suspect] is actively resisting arrest or attempting to resist arrest by flight." 490 U.S. at 396.

Defendants cite *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015) in support of the propositions that Burk's actions constituted active resistance and that the Defendant Officers' use of the TASER was an objectively reasonable response that did not violate Burk's Fourth Amendment right to be free from excessive force. In *Rudlaff*, the suspect actively resisted arrest following a traffic stop. *Id.* at 640. One defendant officer initially attempted to handcuff the suspect in a standing position, which the suspect resisted by swinging his arms and "ball[ing] up." *Id.* A second defendant officer then used his TASER, which caused the suspect to fall to the ground,

from which point he was arrested without further incident. *Id.* The Sixth Circuit held that the defendant officers' use of force was objectively reasonable under the circumstances, because, "When an arrestee actively resists arrest like [the suspect] did, the police can constitutionally use a taser or a knee strike to subdue him." *Id.* at 639. Notably, the suspect in *Rudlaff* expressly admitted that he was resisting the defendant officer's attempts to handcuff him. *Id.* at 642.

The instant facts are distinguishable or, in some respects, disputed. Officer Fihe did not attempt to handcuff Agent Burk from a standing position, instead holding him at gunpoint until backup arrived. Upon Officer Winchell's arrival, Agent Burk brought himself to the ground voluntarily.[9] From there, Defendants state that Burk "physically struggled with them and pulled his arms away from his back while the Defendant Officers were attempting to handcuff him." Defs.' Mot., 16. Burk testified that he was "certainly not resisting their efforts," but that he was not able to get his arms back due to the positioning of the Defendant Officers. Burk Dep., 200:5-6; 201:11-20.

The video from Officer Fihe's BWC does not provide much clarity. The video shows that Agent Burk got on the ground before both officers struggled to position his hands behind his back. Agent Burk referenced his ID in his left pocket and pleaded that the officers "wait a minute" once they grabbed his arms. The Court, drawing all reasonable inferences in favor of the Plaintiffs, finds a genuine dispute of material fact exists as to whether Agent Burk's resistance, if any, was sufficient to render the use of force objectively reasonable.[10]

---

[9] To be clear, Burk was expressly and indisputably noncompliant when Officer Fihe first ordered him to get on the ground. However, once he lowered himself to the ground, whether he continued to comply cannot be conclusively determined.

[10] The Court finds no bases (and Defendants do not offer any) to differentiate this use-of-force analysis as to Officer Fihe and Officer Winchell, respectively. Both officers were similarly positioned on top of Agent Burk; Officer Winchell said, "use the TASER," and Officer Fihe did so. *Compare Smith v. City of Troy, Ohio*, 874 F.3d 938, 946 (6th Cir. 2017) (differing analysis for second officer who used TASER upon arriving to scene and reasonably perceived suspect to be resisting handcuffs from first officer).

### 2.    *Was the Right Clearly Established at the Time of the Incident?*

The Sixth Circuit has held that "a police officer violates a suspect's right to be free from excessive force by repeatedly tasing the suspect without giving him a chance to comply with orders." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 946 (6th Cir. 2017). In *Smith*, officers used a TASER to subdue a suspect who "appeared to be resisting being handcuffed," but was in fact in experiencing an epileptic seizure. *Id.* The Sixth Circuit held that the right in question was "clearly established" on February 11, 2014, the date on which the incident in *Smith* occurred. *Id.* The Sixth Circuit recognized in 2008 that "gratuitous or excessive use of a taser" violates a clearly established right. *Goodwin v. City of Painesville*, 781 F.3d 314, 327 (6th Cir. 2015) (citing *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008).

A suspect's right "to be free of physical force when he is not resisting police efforts to apprehend him" has been considered "clearly established" as early as June 2009. *Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015) (citing *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013)). While the "clearly established right" cannot be defined at a high level of generality, the Sixth Circuit has observed, "Drawing the line at a suspect's active resistance defines the right at a level of particularity appropriate for a claim pursued under § 1983." *Coffey v. Carroll*, 933 F.3d 577 (6th Cir. 2019). At that level of particularity, the right of people who pose no safety risk to the police to be free from gratuitous violence was clearly established in 1991. *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006) (citing *Adams v. Metiva*, 31 F.3d 375, 389 (6th Cir.1994).

The Court finds that Burk's right to be free of gratuitous use of a TASER when he was not actively resisting the attempt to secure him was clearly established as of July 7, 2020, the date of

the incident in this matter. Because the facts taken in the light most favorable to Burk plausibly allege that the Defendant Officers violated this clearly established right, the Defendant Officers are not entitled to qualified immunity with regard to this use of force.

**C.     Use of Force (3): Prolonged Detention of Burk.**

Defendants argue that "The less than 20-minute detention of Plaintiff Burk was reasonable to investigate the suspected crimes of attempted burglary and impersonating a police officer." Defs.' Mot., 16. Plaintiffs assert that the detention was unreasonable considering Officer Fihe checked Burk's credentials shortly after he was placed in handcuffs, which should have operated to end the detention. Pls.' Mem. Opp'n, 20.

The qualified immunity analysis for this use of force is simplified by the conclusions the Court reaches above. The second and third *Graham* factors continue to favor Burk; if Burk was not a threat to safety or meaningfully resisting before he was handcuffed and disarmed (and then placed in the cruiser approximately two (2) minutes later), he was certainly not afterward, either.[11] Moreover, the first *Graham* factor favors Burk to an even greater degree, because, by checking Burk's credentials, the Defendant Officers all but eliminated any reasonable basis to believe that Burk was committing any crime, however severe.

Even beyond the extent to which Burk's credentials speak for themselves, for a reasonable officer on the scene, Burk's credentials could recontextualize the officer's observations to that point—e.g., the fact that Burk "matched the description" provided by the 911 caller becomes a detail corroborating Burk's identity, as do Burk's repeated attempts to identify himself as a federal agent; at the same time, this new context would strongly indicate that there was no attempted burglary, which was only tentatively reported in the first place ("possible 10-8"), and even then,

---

[11] That Burk was in fact detained is not disputed. *See* Defs.' Mot., 16 ("The Defendant Officers' decision to detain Plaintiff Burk… was also reasonable.")

with the additional detail that the person "says he's a police officer." *See* Pls.' Mem. Opp'n Ex. A. Thus, consistent with the conclusions reached above, the Court determines that a reasonable jury could find that Burk was detained unreasonably and for longer than necessary, in violation of his rights under the Fourth Amendment.

The Court further determines that Burk's right under the Fourth Amendment to be free of unreasonable detention was clearly established at the time of the incident. In 1983, the Supreme Court held, "[T]his much is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Fla. v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229 (1983). In 2014, the Sixth Circuit cited *Royer* when concluding that "[the defendant-officer] should have been on notice that he could not extend the duration of the stop beyond 'checking out the suspicious circumstances' that justified the original stop." *Lacey v. City of Warren*, 571 F. App'x 400, 401 (6th Cir. 2014).

In *Lacey*, the plaintiff, a bail bondsman, arrested a bailee in the usual and legitimate course of his duties. *Id.* However, a witness to the arrest called the police, and the responding officers then encountered the plaintiff with a woman handcuffed in the back of his car. *Id.* The plaintiff was detained while the officers investigated the reported abduction, "but within two or three minutes," one of the officers "confirmed that there was a 'capias' for [the bailee's] arrest," and shared the same with the other officers. *Id.* Furthermore, the plaintiff repeatedly told the officers that he was a bail bondsman; his badge was visible on his belt; the bailee made no accusation of being abducted; and he did not "physically resist the officers or behave aggressively at any time." *Id.* "The officers nonetheless kept [plaintiff] handcuffed for an additional period of time in which every indication was that [plaintiff] was a bail bondsman on the scene performing his duties." *Id.* The Sixth Circuit concluded that the prolonged detention violated clearly established law requiring

28

stops to be "sufficiently limited in time." *Id.* (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 825 (6th Cir.2005)).

In the instant case, the Defendant Officers' investigation was also directly connected to Burk's identity. Defendants argue that the detention was reasonable in duration to investigate the suspected criminal activity, because "While [Burk] was detained, the Defendant Officers spoke to the victim who called 911… and took steps to confirm whether or not Plaintiff Burk was, in fact, a law enforcement officer." Defs.' Mot., 16. Defendants claim that ultimately "the Defendant Officers had no way to verify Plaintiff Burk's badge number," and that "Foregoing a call to ATF [to verify Burk's identity] is not a Constitutional violation and certainly is not a use of force." Defs.' Reply, 1. However, Defendants never identify what steps were taken to confirm Burk's identity, or what information would be necessary for a reasonable officer to believe that Burk is in fact law enforcement.

The Court finds that Burk's right to be free from detention that lasts "longer than is necessary to effectuate the purpose of the stop," was clearly established on July 7, 2020. *Royer*, 460 U.S. at 500. The Supreme Court declared over 30 years ago that the Fourth Amendment "has always been interpreted" in accordance with this principal. *Id.* More recently, this same principal was applied in *Lacey*, which presents, relative to the instant case, "a fact pattern similar enough to have given fair and clear warning to officers about what the law requires." *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018). Because the facts taken in the light most favorable to Burk plausibly allege that the Defendant Officers violated this clearly established right, the Defendant Officers are not entitled to qualified immunity with regard to Burk's unreasonably prolonged detention.

## II. Plaintiffs' Remaining Claims.

Having concluded above that the Defendant Officers are not entitled to qualified immunity for the purposes of Burk's § 1983 claim (Count 1), the Court must nevertheless address Defendants' arguments for summary judgment on Plaintiffs' remaining claims. Specifically, Defendants argue that summary judgment is warranted for Burk's state law claim pleaded as "Malicious/Willful/Wanton/Reckless Misconduct" (Count 3), as well has his claim for Intentional Infliction of Emotional Distress (Count 4), and Plaintiff Summer Hilfers' claim for Loss of Consortium (Count 5). As noted *supra*, Burk has indicated that he will no longer pursue his *Monell* claim (Count 2) against the City of Columbus.

Defendants first argue that the Defendant Officers are entitled to statutory immunity under Ohio Revised Code § 2744.03(A)(6), "for the same reasons that qualified immunity shields them from the 1983 claim." Defs.' Mot., 18. Indeed, the Sixth Circuit has held that when qualified immunity and Ohio statutory immunity rest on the same questions of material fact, the Court "may review the state-law immunity defense through the lens of federal qualified immunity analysis." *Hopper*, 887 F.3d at 759 (quotations omitted). Thus, Defendants state-law immunity defense "stands or falls with their federal qualified immunity defense." *Id.* at 760. Because the Court concluded that the Defendant Officers are not entitled to federal qualified immunity, the Court reaches the same result as to their state-law immunity defense, and finds that summary judgment is not warranted as to Count 3.

In the absence of immunity for the Defendant Officers, Defendants alternatively argue that they are entitled to summary judgment on Burk's claim for Intentional Infliction of Emotional Distress because Burk cannot show sufficiently extreme and outrageous conduct to satisfy the elements of this cause of action. Defs.' Mot., 22. Under Ohio law, Intentional Infliction of

30

Emotional Distress is established only where "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Reamsnyder v. Jaskolski*, 10 Ohio St. 3d 150, 153, 462 N.E.2d 392, 394 (1984); *Cf. Stakich v. Russo*, 2021-Ohio-1098, ¶ 27 ("Whether conduct is "extreme and outrageous" is initially a question of law for the court.").

Defendants cite *Georgin v. Georgin* for the proposition that the Defendant Officers cannot be held liable under this cause of action for acts they were legally entitled to perform. 2022-Ohio-4328, ¶ 37, 204 N.E.3d 1, 10. But *Georgin* involved substantially different circumstances, wherein the allegedly "extreme and outrageous" conduct at issue was a teenager reporting his stepfather's ex-spouse for violation of a protection order. *Id.* at ¶¶ 4-8. Furthermore, as with the immunity question, Defendants' argument is premised on conclusions that the Court has already rejected in its own analysis, e.g., "The Officers… used only the force necessary to secure the scene and safely confirm the suspect's claims." Defs.' Mot., 22.

Again, the same conduct forms the basis for all of the claims raised in the Complaint, and the Court has already identified "sufficient disagreement to require submission to a jury" and preclude summary judgment on Count 1 and Count 3. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Because Defendants' argument as to Count 4 is premised on the same factual bases which the Court has determined to be genuinely disputed, summary judgment is not warranted.

Finally, the parties agree that Count 5, alleging Loss of Consortium, is entirely derivative of Burk's state law claims, such that they "rise and fall together." Pls.' Mem., 22; Defs.' Mot., 22. Accordingly, given the Court's conclusions herein, Defendants are not entitled to summary judgment as to Count 5.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court finds that a reasonable jury could conclude that the force used by the Defendant Officers was excessive and in violation of state law and Burk's rights under the Fourth Amendment. If a jury so found, then the Defendant Officers violated Burk's clearly established constitutional rights, and their conduct is not protected by qualified immunity from suit.

Accordingly, Defendants City of Columbus, Joseph Fihe, and Kevin Winchell's Motion for Summary Judgment (ECF No. 51) is hereby **GRANTED IN PART**, as to Count 2, and **DENIED IN PART** as to Count 1, Count 3, Count 4, and Count 5. Defendant City of Columbus is hereby **DISMISSED WITH PREJUDICE**.


      **IT IS SO ORDERED**.


s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: February 23, 2024