Regarding:

James A. Burk Jr, *et al* v. City of Columbus *et al*

Prepared for:

Alexandra Pickerill

Assistant City Attorney

City of Columbus

Prepared by:

LaRae Copley, RPh, MD/PhD

Copley Medical Consulting, LLC

LaRae.Copley@copleymedicalconsulting.com

614.425.6142

September 13, 2024

Copley Medical Consulting. LLC                                   Burk, *et al* v City of Columbus, *et al*
September 13, 2024

**Consultation Question**

This evaluation was conducted to assess Mr. James Alan Burk, Jr (DOB 8.8.1969) who is in the process of litigation related to events occurring on July 7, 2020, and the claim of "serious and severe mental, emotional, and psychological injuries."

**Sources of Information**

The following were utilized to collect information about Mr. Burk for the current evaluation:

1. A 4-hour evaluation of Mr. Burk in a private room at Spectrum Reporting, LLC, located at 400 South 5th Street, Columbus, Ohio on 8/30/24.
2. Complaint filed 12/4/20, in the United States District Court for the Southern District of Ohio Eastern Division: James A. Burk Jr and Summer Hilfers vs the City of Columbus, Joseph Fihe and Kevin Winchell.
3. Medical records from Mr. Burk's current psychiatrist Dr. O. Joseph Bienvenu III from 8/17/20 through 8/13/24.
4. Body camera footage provided by the Columbus Police Department spanning approximately 21 minutes from 7/7/20.
5. Responses of interrogatories by Mr. Burk to the City of Columbus, served 5/12/22.
6. ATF personnel documents including Last Chance Agreement dated 8/5/16, Notice of Final Decision on Proposed Removal 11/2/2021, Notice of Proposed Removal dated 7/16/21, Transcription of Burk Interview conducted 8/14/20.
7. Video deposition of Mr. Burk conducted by Ms. Pickerell on 8/29/24.
8. Transcript of deposition of Mr. Burk conducted by Ms. Pickerill on 6/9/23.
9. Medical records from Mr. Burk's prior primary care physician Dr. Jeremy Bruce (Christ Hospital), dated 1/14/20-3/29/22.
10. Medical records from Mr. Burk's current primary care physician Dr. Hunter Stenzel, dated 9/2/2023-6/5/2024.
11. Letters from Bayside Marin dated 6/10/16 and 10/7/15.
12. Letter from Sean Riley, of Safe Call Now dated 6/10/14.
13. Letters from Dr. Bienvenu for disability retirement dated 1/21/21, and 5/16/22.
14. Letter from Psychologist Irene B. Giessi, Ed.D dated 5/25/16.

**Notification of Purpose and Limits of Confidentiality**

Upon meeting with Mr. Burk, I explained to him my title and role in completing the evaluation. I also explained that I had been retained by the City of Columbus to provide an objective evaluation and explained the purpose of the evaluation, the methods that I would employ in the evaluation, and the limits of confidentiality. I explained that the evaluation may result in my preparing a report, deposition and/or testimony and that none of the information provided should be expected to be held in confidence. I explained that his participation was voluntary and that he could pause or stop the evaluation at any time. I confirmed that he wanted to continue with the evaluation and understood this information.

**Background Information and Prior Functioning:**

The following is a summary of salient parts of Mr. Burk's historical information taken from both available records and the evaluation on 8/30/24.

Mr. Burk was born and raised in the Chicago area, near Hammond, Indiana. His parents were both young when they had him and split up when he was approximately 1 years old. He was raised predominantly by his mother who remained a single mother throughout his childhood. He reported seeing his father on occasional weekends. He has a brother nine years his junior. He described growing up with limited resources and having to take care of himself while his mother was working to support the family. He stated, "I didn't grow up in a traditional family setting, so it was a lot of free reign for me; had single mother trying to support me and my brother and her time away working left me to you know make my own decisions."

Mr. Burk stated he went to public school and graduated from Gavit High School. He reported being an "average student" and preferring athletics over academics. He stated he did as well in school as needed to stay eligible for sports. He denied significant academic or behavioral difficulties in school. After completing high school, he studied criminal justice for a year and a half at Indiana University but was "just not into it." Concurrently, he worked part time loading trucks for a freight company.

When he was 21 years old, Mr. Burk enlisted as a Private in the United States Marine Corp after

[3]

deciding he needed a break from college. He spent time in the Philippines, Bosnia and Somalia. Mr. Burk reflected "if I was going to do it, I wanted what I perceived to be the hardest and the most, you know, if I was going to wear a title I wanted (like) a big title above other titles." He described that "it was more about just being able to achieve…you know achieve and get through it, achieve that accomplishment. That's how I've always been, goal driven." Mr. Burk reported that he was in the infantry and part of a team called the "Marine Expeditionary Unit Special Operations Capable," (MEUSOC) and had to be "mission ready." When asked if his life was in danger, he said, "not a whole lot of that, isolated incidents of that," "but not trench warfare," "not cuttin' and slashin' although you're trained to do it." When asked if he had to do things that bothered him as part of the missions, he stated "I don't know that there was a whole lot that actually bothered me because… I mean… I signed up for it," and stated, "I don't think it affected me aversely."

It was during his time in the military that Mr. Burk became more aware of his discomfort in smaller spaces, but reported he had some difficulties with small spaces prior. He was unable to tie this fear back to a specific life event. He found he was able to usually maneuver around this in the Marines to avoid becoming overly anxious. Part of maneuvering around this was being able to control his external environment. This claustrophobia continued throughout his life when needing to travel on planes, but he was able to do so with adjusting his travel plans.

Regarding his attitude towards his military experience, he stated "like I've always done just (I) strived to be… albeit a team player, be better than everybody else, and work for my own recognitions, my own promotions, my own awards and accolades and stuff….and I had a really good run for 4 years. All of my promotions were meritorious."

Upon honorable discharge from the Marines with the rank of Corporal, Mr. Burk utilized the GI bill and returned to Indiana University. He reported being "more focused," and "more mature." Soon after, he began seeking a position with the police and was hired by the Hammond Police Department where he worked for 10 years. He stated he "was always on the front line of things being part of the SWAT team," and "always did above and beyond what the average officer/agent would do." He became "part of specialty teams that handle more of the high-risk stuff."

While working for the police, Mr. Burk finished his degree in criminal justice from Indiana University. By that point, Mr. Burk reported he had his sights set on leaving the department and trying to get on with a federal agency because "I really couldn't have fathomed myself staying there," and "it was driven so much by politics." Mr. Burk stated, "the promotions were all politics based, who you sell tickets for, who you're pounding signs for" and "that's just not me; I mean I can get along to get along, I'm not going to go above and extra on my time to do that because one, I don't believe in that. I'm very merit driven. That's my belief, the best person for the job, show me your performance. What did you accomplish, what did you do?"

Mr. Burk reported his experiences in the police department ranged from the mundane to attending homicide scenes. He was a firearms instructor and defensive tactics instructor. About his experiences as a police officer, he stated "honestly, you know you see a lot of pretty bad stuff; you do. You see some bad things." He described that talking with coworkers was helpful and did not think it caused him hardship. He stated that what bothered him the most was not the dangers or risks of the job, rather "it was seeing kids mistreated; that was tough… tough... and sometimes old people being neglected, left to die." Mr. Burk was emotional when he described "to see how kids were neglected, were abused. You weren't really trained for those kind of things", and that it "hit you in the gut a little bit."

In 2004, he transitioned to the ATF where there was less camaraderie but other benefits including higher pay and different politics on the job. He reported this was a high stress job where he wanted to be successful and achieve. He reported doing well at the job overall and receiving good feedback on his work.

In 2015, he transitioned to a job as a special agent that did weapons retrieval soon after having a disciplinary action at work related to alcohol use. He ultimately took 30 days from work to go to a residential rehabilitation treatment program. He found this to be very helpful to shift his focus to have more balance between his personal life and professional life.

Mr. Burk reported being married three times. His first marriage was during his time in the Marines in his 20s and lasted about 7 years. He described that they both had different life agendas stating, "she

[5]

wanted to settle down, have kids." Mr. Burk's second marriage was close to the beginning of his career at the ATF and lasted 4 years. Records review suggested that this marriage was strained by his work at the ATF. He has been married to his third wife Summer for nearly 8 years. Mr. Burk reported that they have a three-year old son named Jace born on January 26, 2021.

Mr. Burk reported that prior to the events of 7/7/20, he and his wife "had a good plan in place." His wife was pregnant, and he described the plan to retire to land in Tennessee as a way to enjoy his retirement and raise his child. He described that he "felt like I was in a really good place in life; really good career going on."

## PAST PSYCHIATRIC HISTORY

Mr. Burk reported that he first saw a psychiatrist in the residential rehabilitation program he went to at Bayside Marin for 30 days in 2015. He did not recall his diagnosis and did not take medication per his recollection. He reported having significant professional and personal stressors at the time he initiated this treatment. He described that he was experiencing difficulties with sleep, stress and anxiety as well as alcohol dependency. Mr. Burk received therapy for Generalized Anxiety Disorder (GAD) after his stay at Bayside Marin according to documentation provided by Dr. Irene Giessl. The complete records from these treatments were not available to me at the time of this report to clarify Mr. Burk's full diagnosis.

Mr. Burk said he had never been psychiatrically hospitalized or made a suicide attempt.

Mr. Burk sought care after the events of 7/7/20, with Dr. O. Joseph Bienvenu. He reported continuing to see Dr. Bienvenu remotely and reported being treated for PTSD[1] and MDD[2] with sertraline[3] and mirtazapine.[4] He denied seeking therapy from a separate provider as part of treatment for PTSD or MDD alongside Dr. Bienvenu.

---

[1] PTSD is Post Traumatic Stress Disorder.
[2] MDD is Major Depressive Disorder.
[3] Sertraline is an antidepressant with FDA indications for major depressive disorder, multiple anxiety disorders and PTSD.
[4] Mirtazapine is an antidepressant with sedative properties that can be used off label to assist with sleep.

## SUBSTANCE HISTORY

With regard to substances, Mr. Burk stated that he has never been a smoker or used illicit substances. He reported trying THC a handful of times in high school.

In regard to alcohol, Mr. Burk stated currently doesn't drink regularly. Mr. Burk stated that in 2015, he struggled with some personal issues and described "stress, anxiety, some alcohol use and dependency and it affected my personal conduct." He reported drinking up to 1 bottle of wine nightly and stated, "it calmed me down, it would cool my nerves, maybe help me get some sleep. My mind wasn't racing about this and that and what I got to do tomorrow." He sought treatment through a 30-day residential rehabilitation program at Bayside Marin which he found to be helpful to shift his focus to more work life balance.

## PAST MEDICAL HISTORY

Mr. Burk said he has hypertension and hyperlipidemia and takes medications for both. He had surgery on his shoulder in November 2020. Review of records showed he was recently being evaluated for differing blood pressure between his arms and possible vascular causes.  He reported a remote history of wisdom tooth removal. He reported he does not have a history of seizures or head injury with loss of consciousness.

## MEDICATIONS:

Mr. Burk reported taking 15mg of mirtazapine nightly. He stated that he was newly aware that if used ongoingly, mirtazapine can be an antidepressant. Mr. Burk reported taking sertraline 100mg daily. Per records from Dr. Bienvenu, Mr. Burk was prescribed 150mg or 1.5 tablets daily at one point in his care. However, Mr. Burk did not recall ever cutting a tablet in half for dosing. Also, review of Dr. Bienvenu's records show that the sertraline had been discontinued at the last appointment documentation available at the time of this writing. Mr. Burk also reported taking Losartan[5], amlodipine[6], atorvastatin[7], and "a whole lot of ibuprofen.[8]" Mr. Burk reported experiencing decreased libido as a possible side effect of sertraline.

---

[5] Losartan is a blood pressure medicine
[6] Amlodipine is a blood pressure medicine
[7] Atorvastatin is a medicine used to treat hyperlipidemia, or high cholesterol.
[8] Ibuprofen is an over-the-counter medication used for pain and inflammation.

**REVIEW OF COLLATERAL RECORDS:**

**Psychiatric Treatment Records from Dr. Bienvenu**

***2020:***

Mr. Burk began seeing his treating psychiatrist Dr. Bienvenu on 8/14/20 and was diagnosed with PTSD and possible MDD during his initial evaluation. Dr. Bienvenu recommended considering sertraline for treatment. Dr. Bienvenu noted that Mr. Burk was struggling with his mind returning to the event and video when not otherwise distracted, feeling the need to talk about the incident/express emotions, and also avoiding people at work. On 8/31/20, Mr. Burk was reporting irritability, concentration concerns, and sleep interruption such as "in the middle of the night thinking of things coming up, as well as "play-back" of incident of assault." Dr. Bienvenu noted "he remains very wound-up, has difficulty resisting bringing the topic up, gets angry, etc." Mr. Burk had started sertraline.

In September of 2020, Mr. Burk went back to work and was in the middle of an Internal Affairs (AI) investigation. Dr. Bienvenu noted on 9/14/20 that Mr. Burk "does continue to ruminate and feel self-conscious about the sharing of the video." On 9/30/20, Dr. Bienvenu noted that Mr. Burk "admits perfectionism, not wanting to do things halfway- at work and at home," and this caused friction with his wife. Dr. Bienvenu noted "he is still getting incensed when he thinks about the cause of all of this." On 10/22/20, Mr. Burk was preparing for surgery and had been transferred at work which bothered him. Dr. Bienvenu noted "He continues to get angry, wanting to talk about the incident, whenever he gets a reminder." Additionally, Dr. Bienvenu recommended that his sertraline dose be increased to 50 mg daily. On 11/23/20, Dr. Bienvenu noted that Mr. Burk was getting apprehensive about his upcoming surgery, was not sleeping well partially due to pain and that "his mood is pretty good, especially when he can get distracted from the resentment toward DoL (Department of Labor)" On 12/29/20, Mr. Burk reported that he was "less reactive than usual," and "more reasonable" and he thought the sertraline was helping.

***2021:***

On 1/19/21, Mr. Burk reported learning that someone posted the video on the internet and Dr. Bienvenu noted "this was pretty disheartening. It feels like he is sitting on the toilet, door flung open, whole neighborhood watching - feels vulnerable." Mr. Burk's son, Jace, was born in January 2021

which he shared with Dr. Bienvenu during his 3/17/21 appointment. Mr. Burk also reported "He felt increasing anxiety, distracting his focus. He found himself replaying the event, wondering what issue IA may be after, though his supervisors were completely supportive at the time." During his 3/30/21 appointment, Dr. Bienvenu noted that "his wife still notices he is drifting. It is wasting his time, and it is exhausting." Dr. Bienvenu also noted that "his irritability has also worsened with daytime fatigue (caring for baby, etc.), and he and his wife are hitting a bit of a rough patch." At his 4/19/21 appointment, Mr. Burk reported he was "doing OK," he was working in a supportive intelligence role at the ATF, and that he ruminated about the incident at times especially when he had reminders of it. On 5/4/21, Mr. Burk reported plans to move to Tennessee, his wife was changing job positions, and he was considering retirement. He was taking 100mg of sertraline daily and reported that his mood had been OK but that he would worry, get angry and dwell on the event. On 5/18/21, Mr. Burk reported "He is in a somewhat diminished role compared to his previous role at ATF. He had more reward and variety in his previous role." He described some family conflict and more ability to weather tense situations. On 6/1/21, Mr. Burk reported better sleep and more focus on his son Jace. On 6/22/21, Dr. Bienvenu assessed that Mr. Burk was making improvements and "doing well," as Mr. Burk was reporting his shoulder was not as bothersome for sleep and he no longer needed the over-the-counter sleep aid melatonin. Mr. Burk was also awaiting the outcome of the IA investigation. On 8/9/21, Mr. Burk reported having difficulties determining how to best move forward. Dr. Bienvenu noted that Mr. Burk was considering appealing his termination and "on the other hand, he is soured by ATF - though his chain of command's support means a lot."

On the 8/9/21, Mr. Burk reported that he had spoken with his primary care doctor who had recommended starting to use as needed mirtazapine to sleep in addition to the sertraline. Dr. Bienvenu agreed it was appropriate. Mr. Burk reported he had been placed on administrative leave and Dr. Bienvenu had a discussion with him about possibly applying for disability. At Mr. Burk's next appointment on 8/26/21, he was still trying to decide how to proceed with the ATF and reported that mirtazapine was helping with sleep. On 9/7/21, Br. Bienvenu noted "talking about the incident brings him right back to that situation, gets him riled up," and that Mr. Burk was preparing to respond to the ATF's decision. At his 9/15/21 appointment, Dr. Bienvenu noted that Mr. Burk had better mood, "his sleep is not great, mostly due to Jace," and "it has been hard to get motivated, though he has been keeping up with the house and the yard." Dr. Bienvenu recommended getting some exercise and

Copley Medical Consulting. LLC                                          Burk, *et al* v City of Columbus, *et al*
September 13, 2024

continuing with a higher dose of sertraline at 150mg daily. On 9/29/21, Mr. Burk was reporting "he is trying to keep his mind occupied and keep himself busy," while waiting for upcoming meetings with the ATF for mediation. He also reported that mirtazapine was increased by his PCP to 15mg nightly which was helping with sleep. During his 11/10/21 appointment, Mr. Burk reported receiving the news upholding termination from the ATF and was unsure if he would appeal or apply for disability. Dr. Bienvenu noted he "is ruminating about all of the things he has done for his job, working too hard (ruined previous marriage), putting himself in danger." In November 2021, Dr. Bienvenu noted that "Mr. Burk continues to have a really hard time," "he finds it hard to function normally and feel normal," and that his wife was reporting concerns that Mr. Burk was losing focus. Mr. Burk's wife reported "she has seen him get panicky and completely derailed by the thoughts in his head." Dr. Bienvenu recommended continuing sertraline 150mg and mirtazapine 15mg nightly. In December 2021, Mr. Burk was no longer working for the ATF, and described how talking to an old friend "brought back all of the feelings from the event, like it happened yesterday." Dr. Bienvenu noted "he is very soured about the whole thing, disillusioned with police work and obviously with ATF. It caused a flare of temper and distractibility."

### *2022:*

In January 2022, Mr. Burk was awaiting mediation with the ATF. He reported to Dr. Bienvenu that he "does get tense around police cars, puts him back in the situation that set all of this off." On 1/19/22, Dr. Bienvenu noted that "as usual when he is doing worse, he has difficulty talking about anything other than what happened." In March 2022, Dr. Bienvenu reported that Mr. Burk was still in the process of mediation with the ATF and that "bringing up the issues brings back the anger, including when talking with lawyers." By 3/30/22, Dr Bienvenu noted that Mr. Burk "was doing ok," and "he has not been taking mirtazapine lately, as he needs to be able to wake up and care for Jace in the middle of the night." Dr. Bienvenu recommended mirtazapine 15mg at night when there was not a concern for his son's needs and continuing sertraline 150mg daily. In June 2022, Mr. Burk was awaiting the outcome of disability and moving his family to Tennessee. In August 2022, Dr. Bienvenu assessed that Mr. Burk was "doing fairly well but having family stress." Dr. Bienvenu noted that Mr. Burk was trying to keep busy and was getting decent sleep, depending on how his son was doing. During his 8/24/22 appointment, Mr. Burk reported concerns about dry mouth and sexual side effects. It was unclear if this was due to his sertraline or his blood pressure medication and Dr. Bienvenu did not

recommend changes to his medication. On 8/29/22, Mr. Burk reported his blood pressure medication was changed. Dr. Bienvenu noted a longer discussion about decreased libido, marital conflicts and parenting strategies for their son. Mr. Burk was still awaiting the outcome of disability with the ATF and Dr. Bienvenu noted that the "whole incident and everything happening afterwards goes through his head every day." Mr. Burk reported that he had stopped taking mirtazapine previously due to concerns about his son's needs and Dr. Bienvenu recommended that he continue with sertraline 150mg daily. By 9/27/22, Dr. Bienvenu noted that Mr. Burk appeared to be doing better "with improving health and social environment," and thought his MDD was in remission.

On 10/11/22, Mr. Burk had found out he did not qualify for disability and was having more symptoms including difficulties with his marital relationship, being more isolative and sleeping more poorly. Dr. Bienvenu noted in his exam that Mr. Burk was "unable to stop talking about what happened, going back to the day of the incident in July of 2020," and described him with "mood down, angry, worried about his and his family's future, worried about his marriage ending in divorce." Dr. Bienvenu recommended that he restart mirtazapine 7.5mg nightly. On 10/18/22, Dr. Bienvenu met with Mr. Burk's wife and gained additional information including, "she has seen the same decline I have since the incident in July of 2020 that brought him to my attention - with gradual improvements then marked setbacks when things have not turned out as anticipated or seemingly fair." Dr. Bienvenu noted "she notes he is not the same person he was before the incident, though he has shown signs of improving at times - more like himself." On 11/8/22, Dr. Bienvenu noted improved sleep, thought that Mr. Burk was "looking a lot better this week," and that his depression was in remission. At the end of November 2022, Mr. Burk reported that his wife had unexpectedly lost her job which was a stressor. On 12/13/22, Mr. Burk reported he was doing well with his medication although he had actually only been taking 100mg of sertraline a day. Dr. Bienvenu also noted that there were stressors related to his son's sleeping, his wife's job loss and financial strain around that. Mr. Burk was continuing to work on settling with the ATF. On 12/27/22, Mr. Burk was reporting irritability with his son and wife, okay appetite, fair energy, and worrying when he had any free time. His sleep was interrupted with his son's needs.

**_2023:_**
By Mr. Burk's appointment on 1/26/23, his wife had a new job, and he was awaiting further

information about disability. Mr. Burk was reporting some frustration around parenting disagreements with his wife but was feeling good overall. Mr. Burk reported he was trying to improve his activity levels and eating. During his appointment on 4/11/23, Mr. Burk reported he had received disability retirement. He told Dr. Bienvenu he was generally getting good sleep, was in a better mood and that things were going better between him and his wife. In May of 2023, Mr. Burk reported he was doing well and was "feeling more optimistic about his case." He discussed some difficulties with getting along with his wife and some family conflict. In his 6/14/23 appointment, Mr. Burk was managing conflict with his wife around parenting and was working with disability for benefits. Dr. Bienvenu assessed that his depression was in remission. In July 2023, Dr. Bienvenu thought that Mr. Burk had partial remission of depression.

### *2024:*

Mr. Burk was not seen by Dr. Bienvenu again until 4/23/24. At that time, Mr. Burk was reporting marital concerns around disagreement with parenting. He was reporting that whenever lawyers reach out to him about his case, it causes him turmoil. Dr. Bienvenu noted "it affects his inner life, family life, and peace of mind. He goes through the whole incident over and over." Mr. Burk also self-decreased his sertraline because of reduced libido and started taking it as needed. He reported sleeping five to six hours four days a week and Dr. Bienvenu recommended trying mirtazapine again. During his 5/8/24 appointment, Mr. Burk reported mirtazapine had been helpful for sleep and he was taking 15 mg nightly. On 5/29/24, Dr. Bienvenu noted that Mr. Burk's "mood has been okay, better when he and Summer get along."  Mr. Burk also reported that "he notices that his PTSD symptoms worsen when he has to revisit the issue (the events go to the forefront of his mind)." Dr. Bienvenu assessed that Mr. Burk's PTSD was "doing better." At his 7/3/24 appointment, Mr. Burk was dreading coming back to Columbus and Dr. Bienvenu noted "It feels like the incident happened 6 months ago, not 4 years ago. And he thinks again about the fact that it did not have to happen as it did, still cannot see the event from the Columbus policeman perspective." Mr. Burk was not taking his mirtazapine nightly, but only when he anticipated sleep difficulties. Dr. Bienvenu recommended that he begin taking it nightly again and assessed that Mr. Burk was "doing fairly well overall, with increased PTSD symptoms in context of reminders of the event."  During his 7/31/24 appointment, Dr. Bienvenu noted that "He continues to have aversion to interactions with uniformed officers, triggered in everyday life. But the court case consistently triggers his memories and emotional upset."

**Letters from Bayside Marin:**

Leslie Arno, PsyD confirmed that Mr. Burk was receiving treatment from 9/8/15 to 10/8/15, completing Bayside Marin's program for chemical dependency. Dr. Arno did not disclose formal diagnoses in this letter but stated "Many "type A" personalities are drawn towards this line of work as they are inherently leaders and able to make quick decisions, however they are also very uncomfortable being vulnerable and expressing their feelings. Over time, this can lead to depression, anxiety and addiction." Dr. Arno further noted that "Mr. Burk was able to let his guard down enough to work on these deeper issues allowing him to learn new coping tools and communicate in a more effective manner regarding stress and emotions."

**Letter from Psychologist Irene Giessl, Ed.D**

Dr. Giessl reported seeing Mr. Burk beginning 11/9/15 through the date of the letter, 5/25/16. Dr. Giessl reported treating Mr. Burk for Generalized Anxiety Disorder (GAD) with psychotherapy. This therapy occurred in follow up to Mr. Burk's completed residential treatment at Bayside Marin in 2015. Dr. Giessl wrote that she seldom encounters people "as driven and committed to service as Mr. Burk," and that "his past traumatic experience he attributed to being under the influence of alcohol and unlike the person he had been the majority of his life." She also noted "he works hard in therapy to understand his disease and tendency toward anxiety when overly stressed. If anything, I find his leanings toward perfectionism and workaholic behavior to be driving forces." Dr. Giessl noted that Mr. Burk had maintained sobriety at the time of this letter.

**Mr. Burk's Perceptions of the Events of July 7, 2020:**

The detailed report of context and events of 7/7/20 were described by Mr. Burk during his interview for the ATF investigation on 8/14/20 and during deposition on 6/9/23. In short, Mr. Burk was on a firearms retrieval for a community member and the police were called. An altercation ensued and police arrested Mr. Burk, utilizing handcuffs and Taser. He was confined to the back of a police car. Mr. Burk reported during this evaluation the following recollections and emotion states:

"I was upset…I was so trapped in a helpless position as a Federal Agent who was there in control of his investigation, (and) was now relegated and forced into a position where I had no control. I had to let go of the responsibilities of what I was there for and then I was subjected to just far (more)

excessive force that was even remotely deemed necessary because I and anybody else can list a thousand scenarios of things that could have been done to verify who I was and keep the wheel movin.'"  At one point during the event, Mr. Burk asked for medical attention. When this examiner asked about that, Mr. Burk stated that he, "has high blood pressure and "didn't want to stroke out." Mr. Burk described feeling fear and that the officers overreacted. He reported feeling that the environment as a whole was potentially dangerous and stated, "what I don't need to do is be put on the ground in front of everyone while I'm doin' my job and turn my back to what I haven't even determined is safe to do so."

Mr. Burk claimed that within 24 hours the video of the event was spread amongst the Columbus Police which was upsetting to him. He recalled speaking with his wife about this and stated "Do you remember how scared you were? How vulnerable you felt? When we went through the 1st pregnancy, and you were in our bathroom having a miscarriage? Do you remember how horrible you felt? How trapped and how scared and vulnerable you felt as that process was going on? Now picture someone videoing that and just pushing it out to everybody. That's what it felt like." He also expressed "I had no control of it and I was in disbelief that …. And as far as I'm concerned, there…. how do you have such a lack of control of people's access to stuff like that such that within 24 hours?"

**Mr. Burk's Current Mental Status**

Appearance: Mr. Burk ambulated independently and did not appear to evidence any problems with his gait or coordination. His physical appearance was unremarkable. His hygiene and grooming were appropriate.  He appeared to be forthright in his responses.  He made fair eye contact.

Behavior: Mr. Burk was initially hesitant to engage in the examination when he arrived at the venue and found that the agency would be conducting an audio recording. Mr. Burk arrived planning to record the examination himself with a personal handheld recording device. He paused the process and called his lawyer, stating that "this is not how it was supposed to happen; surprises aren't good right now." He appeared anxious and frustrated by the room set up expressing concern about the technical staff's involvement. After clarification from his lawyer, the Columbus City lawyer and the staff at the agency, the evaluation proceeded. He expressed understanding of my explanation of the purpose of the evaluation, lack of confidentiality, and voluntary nature of the exam. Moving forward, he remained cooperative during the interview.

[14]

Speech:  Mr. Burk's speech was normal in amount, volume and rhythm for most of the exam. He exhibited elevated volume and increased speed when discussing his experience of the events of 7/7/20 and his assessment of the behavior of the Columbus Officers involved.  His vocabulary was adequate and consistent with his educational level.

Mood/Affect:  Mr. Burk reported current mood issues, describing his mood as depressed. His affect was nervous, tearful when discussing having seen neglect and abuse with children while a police officer. He was irritable when asked specific questions about the events of 7/7/20. His affect became angry when considering that he had not received an apology for the way he was treated by officers on 7/7/20.

Thought Process/Content:  His thoughts were clear and his train of thought logical.  He denied hearing voices or seeing things. I did not observe him to be responding to internal stimuli.  He reported no suicidal ideations, intent or plans.

Orientation: He was alert and oriented correctly to person, person, place, time and situation.

Memory:  Recent and remote recall was intact based on his ability to recall historical facts.

Intelligence:  His intelligence was estimated to be in the average range based on his history, vocabulary, and presentation.

Insight/Judgment:  His insight was fair to good regarding his described symptoms and their impact. His insight into his mental health condition was fair to good. He did agree that his sessions with Dr. Bienvenu were helpful stating that having someone to talk to about the matter was helpful. His current judgment was good as he cooperated with the interview and identified his need to speak with his attorney to clarify questions about the evaluation.

**Administration of the Structured Interview of Reported Symptoms (SIRS-2):**
Mr. Burk was given the SIRS-2 during his evaluation on August 31, 2024. The SIRS-2 is a 172-item

structured format psychological assessment validated in adults over 18 years of age. It is primarily designed to assess for feigning within the domain of mental disorders and psychopathology. Additionally, this instrument provides useful data about response styles, openness to evaluators, and response consistency. The total time to administer this instrument to the defendant was 62 minutes which is within the anticipated time frame. Mr. Burk indicated to this examiner that he was experiencing mental health symptoms including depression and low concentration during the exam. His behavior during the exam appeared cooperative and he was reminded that not all questions may apply to him and that questions could be answered with typically short answers. Overall, he scored in the "genuine responding," category.

**CURRENT FUNCTIONING:**
Mr. Burk stated he is currently living in Tennessee on a 22-acre piece of land. He reported spending his time raising his son, being a husband and upkeeping the land. He denied current employment and reported that he is retired on disability from the ATF. He described seeking ongoing weekly to biweekly appointments with his psychiatrist Dr. Bienvenu and finds that it is helpful to have someone to talk with about his problems. He stated it was "helpful to talk to someone I feel like I am not burdening."

In reference to the events of 7/7/20 he stated, "It's changed our life, not for the better on our plans on what we were going to do and what can afford, we've taken hits in so many different areas."

Mr. Burk reported that he isolates himself from others since of the events of 7/7/20 to avoid symptoms returning. He explained having difficulty talking to family because he feels like a burden and difficulty talking to friends because he does not want them to know about his struggles. He stated, "I've been…. felt like a gutted fish through this whole thing, from the first moments of this happening to everything I've had to dump out about myself, and it's days like I don't know if it's even worth it."

He reported his ongoing distress with triggers such as having to revisit the events for the purposes of his lawsuit and attempts to avoid them, stating, "It's like I've never been one to be so exposed…to complete strangers." He indicated the chronicity of his distress, stating "it's there every day,

[16]

something I have to read, provide, be somewhere. Now on a disability retirement, I've lost substantially. I can't think of anything good to think about." He also reported ongoing apprehension when he is near law enforcement in the community stating "I mean I'm driving and every time I see a parked police car, it makes me think about the situation. It's just there. There's nothing else to think about."

Mr. Burk reported difficulties with not sleeping well stating if he got 5 hrs of sleep nightly that was a good night. He reported feeling, "bitter, angry, depressed, (I) feel like a shell walking around feeling like crap."

He also expressed negative beliefs about himself that do not appear to have preceded 7/7/20, stating "I feel like my value is far less than it used to be." He also reported, "I love my wife to death, I love my son to death. I'm not at my best so I don't feel like I'm being my best as a husband or a father. I have all of these things going on inside me…all of these distractions and hostility and… and like senses of failure and and… and just feeling gutted and exposed and it's hard to push that stuff down. So, I kinda…I carry that on the surface and it stinks, it keeps me from being as good as I could be for them because I'm not good. I'm not in a good place."

When asked about his progress, he had a difficult time recognizing any progress with symptoms he had made in the past stating, "nothin's changed. My life is only worse than it was. And now I'm dealin' with this and I'm…No it hasn't gotten better at all." He described that avoiding triggers is the main change for him, stating "the only thing that is better is we relocated out of the area and now I live a far more secluded life…. A far more secluded life where I don't have to be around any of the outside stimulus as much…unless I have to… the things that really start to trigger me… the things I see or the things I hear or somebody arbitrarily who I barely know say 'oh I saw this video…"

He demonstrated difficulty with irritability when asked what would "make it more ok," or help him. He stated initially, "I don't know," but then became visibly angry/irritated during the exam when describing how he would like an apology and how others don't care about his plight with symptoms. This was consistent with the irritability documented with triggers from Dr. Bienvenu.

[17]

*OPINIONS*:

The opinions that follow are based on knowledge derived from my education, training, and experience. They are based on my review of records cited earlier in this report as well as my own evaluation of Mr. Burk and offered with a reasonable degree of medical certainty.

In my opinion to a reasonable degree of medical certainty, Mr. Burk meets the DSM-5-TR criteria needed to diagnose PTSD as outlined below:

A. *Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways: Directly experiencing the traumatic event(s).* Mr. Burk experienced trauma on 7/7/20. He described fear that he would be shot or would have a stroke due to hypertension during the events of 7/7/20 and he reported sustaining a physical injury. He described feelings of vulnerability and feeling trapped.  Mr. Burk described experiencing other potentially traumatic events prior to 7/7/20 while he was serving as a Marine and as a Hammond Police Officer where there was the threat of serious injury or death.

B. *Presence of* *one* *(or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:*
*1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s).* Mr. Burk described during his evaluation having recurrent intrusive memories of the events of 7/7/20, particularly around the distress of having others be able to see video of a time that he felt out of control. Mr. Burk's report of this intrusion symptom was also noted by his treating psychiatrist.
*2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s).*
*3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring.*

C. *Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:*
*1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).* He described the need to stay busy and try to be

distracted from his internal thoughts. He described that his physical pain serves as a trigger of intrusive thoughts. Mr. Burk also described that the exposures of the ATF internal affairs process and the lawsuit have been stressors for him resulting in symptoms.

2. _Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s)._  Mr. Burk reported during the evaluation that he spends much of his time isolated on his land in Tennessee as a means of avoiding reminders of the events of 7/20/20. He reported avoiding meeting new people because he does not know if they have seen the video or will mention arbitrarily the events to him.

**D. Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by _two_ (or more) of the following**:

1. _Inability to remember important aspects of the trauma (not due to head injury),_

2. _Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world._ Mr. Burk expressed the belief that he cannot be his best self or a good father or spouse due to the presence of symptoms. He discussed this during the evaluation in a global way stating that the events of 7/7/20 have 'impacted my whole life."

3. _Persistent, distorted cognitions about the cause or consequences of the traumatic event that lead to blaming himself or others._ Mr. Burk has continued to struggle with his negatively changed perspective on law enforcement and feels that the events of 7/7/20 were solely due to the actions of others. He expressed limited ability to consider viewpoints of others involved in the event and subsequent investigations. His treating psychiatrist noted his focus on the injustice he perceived from the events and resultant consequences including the inability to see the viewpoint of the other officers involved in the events.

4. _Presence of persistent negative emotional states._ Mr. Burk reported ongoing difficulties with his mood throughout the process of the investigation by the ATF, applying for disability and pursuing litigation. His treating psychiatrist noted difficulties with his mood throughout treatment related to stressors. Mr. Burk reported difficulties with anger, bitterness, depression, and anxiety occurring frequently after the events of 7/7/20. Mr. Burk described during the evaluation having worries about

his son's health problems which was also noted by his treating psychiatrist. His treating psychiatrist noted more marital conflicts between Mr. Burk and his wife surrounding parenting strategies additionally as a potential source of negative emotional states.

*5. Markedly diminished interest or participation in significant activities.*

*6. Feelings of detachment or estrangement from others*

*7. Persistent inability to experience positive emotions.* Mr. Burk reported ongoing difficulties with experiencing happiness indicating that he has not been happy since the birth of his son in January 2021.

**E. Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two or more symptoms:**

*1. Irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects.* Mr. Burk reported difficulties with irritability that impacted his relationship with his wife. Mr. Burk's treating psychiatrist noted irritability as a concern occurring with stressors.

*2. Reckless or self-destructive behavior.*

*3. Hypervigilance*

*4. Exaggerated startle response.*

*5. Problems with concentration.* Mr. Burk reported difficulties with staying present in the moment due to intrusive thoughts and perseveration on the events of 7/7/20 and the subsequent events with the investigation.  This symptom was also noted by his treating psychiatrist.

*6. Sleep disturbance.* Mr. Burk reported chronic difficulties with getting enough sleep. He described difficulties with anxiety and intrusive thoughts as impacting sleep. He has had difficulties with sleep related to job stress prior to the events of 7/7/20 and also more recently has the stressor of his son's sleep disorder potentially impacting his sleep.

**F. The duration of the disturbance has been greater than 1 month.** Mr. Burk reports symptoms have persisted since the events of 7/7/20.

**G. The disturbance causes clinically significant distress or impairment in social, occupational,**

*or other important areas of functioning.* Mr. Burk described limited social contacts outside of his family and the active avoidance of meeting new people. He described not wanting to be involved in prior vocational teaching and not being willing to offer assistance in the community as before to law enforcement. He described not feeling present with his family to the point that he believed this impacted his marriage and role as a father.

H. **The disturbance is not attributable to the physiological effects of substances or another medical condition.** There is no evidence based on the information I have that Mr. Burk's symptoms are attributable to a medical condition or substance.

Mr. Burk reported risk factors for the development of PTSD symptoms after the events of 7/7/20 including prior trauma, a history of GAD and alcohol dependency, and identity as a Veteran. While he does not identify a clear prior event of trauma in his history, he has described multiple potentially traumatic experiences in his history during his time deployed as a soldier and as a police officer. He described exposure to abused or neglected children in a particularly emotional tone in this setting. In my opinion, Mr. Burk's reported history of claustrophobia, ie experiencing increased physical and cognitive anxiety when enclosed in small spaces, likely also increased his level of fear and anxiety during the events of 7/7/20, thus increasing his risk of developing PTSD symptoms.

PTSD can result in chronic symptoms that individuals may attempt to decrease by avoiding triggers or reminders of the trauma. Typically, with appropriate care, a person will have improvement in trauma symptoms. Mr. Burk has received care from his psychiatrist in the form of medication recommendations and supportive psychotherapy. Given Mr. Burk's reported symptoms, he is likely a good candidate for evidence-based therapies such as prolonged exposure (PE), cognitive processing therapy (CPT) or Eye Movement Desensitization Reprocessing (EMDR). He is also a candidate for ongoing medication management as he appears to have done best when he was consistently taking scheduled medication.

In my opinion, Mr. Burk's progress with treatment thus far has been about removing himself from triggering environments, rather than working through tolerating triggering environments and managing negative cognitions about himself and others involved. Mr. Burk described setbacks in symptoms with

Copley Medical Consulting, LLC
September 13, 2024

Burk, *et al* v City of Columbus, *et al*

ongoing reminders of the incident and sequelae which were supported in records from his psychiatrist Dr. Bienvenu. Symptoms of depression, anxiety, and sleep difficulties reappeared throughout his course with both trauma related triggers and other life stressors such as marital conflict and managing his son's health needs.

In my opinion, Mr. Burk's temperament surrounding perfectionism, and strong identity as a high achiever in his career likely have contributed to his emotional distress with the nature of the events occurring on 7.7.20. I would anticipate improvement in his symptoms with hopefully fewer setbacks with additional evidence-based therapy treatments.

In my opinion, Mr. Burk's reports of symptoms in his treatment are not exclusively secondary to trauma. Notably from his treatment with Dr. Bienvenu, he reported having additional life stressors including caring for his son's sleep difficulties, having marital conflicts around parenting styles, and having conflicts with extended family and financial strain in the home from his wife's loss of a job. Symptoms of depression, anxiety, sleep difficulties reappeared throughout his course with both trauma related triggers and these additional life stressors.

I offer these opinions at this time to a reasonable degree of medical certainty based on Mr. Burk's history, examination, and information provided to me, as well as my education, training and experience. Should more information become available in the future, I would welcome the opportunity to revise these opinions if appropriate.

**LaRae Copley, RPh MD/PhD**
Copley Medical Consulting, LLC