IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

--|--

Case No. 2:20-cv-6256

--|--

James A. Burk, Jr., et al.,

Plaintiffs,

vs.

City of Columbus, et al.,

Defendants.

--|--

Deposition of:  LARAE COPLEY, M.D.
Date and Time:  Friday, September 27, 2024
                8:51 a.m.

Place:          Columbus City Attorney's Office
                77 North Front Street
                4th Floor
                Columbus, Ohio  43215


Stenographic
Reporter:       Carla D. Manahan, RPR,
                Notary Public - State of Ohio

--|--

info@irg-oh.com - 614.875.5440

Page 2

```
 1   APPEARANCES:
 2
 3   On behalf of Plaintiffs:
 4      ABIGAIL F. CHIN, ESQ.
        abbyc@cooperelliott.com
 5
        Cooper Elliott, LLC
 6      305 West Nationwide Boulevard
        Columbus, Ohio  43215
 7      614.481.6000
 8
        On behalf of Defendants:
 9
        ALEXANDRA N. PICKERILL, ESQ.
10      anpickerill@columbus.gov
11      SHEENA D. ROSENBERG, ESQ.
        sdrosenberg@columbus.gov
12
        SARAH N. FELDKAMP, ESQ.
13      snfeldkamp@columbus.gov
14      For Zach Klein
        Columbus City Attorney
15      77 North Front Street, 4th Floor
        Columbus, Ohio  43215
16      614.645.7385
17
18              --|--
19
20
21
22
23
24
25
```

info@irg-oh.com - 614.875.5440

Page 3

```
 1                I N D E X
 2
 3   LARAE COPLEY, M.D.
 4      Examination by Ms. Chin              4
 5            E X H I B I T S
     No.   Description               Page
 6
     Copley 1   Contract for Services      5
 7
     Copley 2   Deponent's Response to     8
 8              Duces Tecum
     Copley 3   Fee Schedule               9
 9
     Copley 4   Invoice                    10
10
     Copley 5   Invoice                    10
11
     Copley 6   Invoice                    10
12
     Copley 7   Curriculum Vitae           18
13
     Copley 8   Report                     38
14
15
16
17
18
19
20
21
22
23
24
25
```

info@irg-oh.com - 614.875.5440

Page 4

```
 1                Friday Morning Session,
 2                September 27, 2024.
 3                --|--
 4          LARAE COPLEY, M.D.
 5   being by me first duly sworn, deposes and says as
 6   follows:
 7          EXAMINATION
 8   BY MS. CHIN:
 9      Q.  Good morning, Doctor.  Is it Copely?
10      A.  It's Copley.
11      Q.  My name is Abby Chin.  I represent the
12   plaintiffs in this matter.  Could you start by
13   stating your name and spelling it for the record?
14      A.  Sure.  It's LaRae, L-A-R-A-E, Copley,
15   C-O-P-L-E-Y.
16      Q.  And what's your business address?
17      A.  So my business is actually 6193 Rings
18   Road.  I have a PO box there.  I work out of the
19   home.
20      Q.  And you understand that you're under oath
21   today from the oath that the court reporter just
22   gave.
23      A.  I do.
24      Q.  Have you had your deposition taken
25   before?
```

info@irg-oh.com - 614.875.5440

Page 5

```
 1      A.  No.
 2      Q.  All right.  So I'm going to start by
 3   going over a few ground rules.  I'm sure your
 4   attorneys prepped you but just so we're on the
 5   same page moving forward.
 6      A.  Sure.
 7      Q.  The court reporter is taking down
 8   everything that we're saying today.  So I just ask
 9   that you provide verbal answers to my questions
10   rather than head nods or shakes or uh-huh, huh-uh
11   so we have the same record, same page.
12      A.  I will try.
13      Q.  I will do my best not to interrupt you.
14   I ask that you do the same with me just so, you
15   know, I ask my full question.  I'll try to let you
16   answer fully before we move on.  Is that fair?
17      A.  It is.
18      Q.  I may occasionally ask a bad question.
19   If you don't understand the question that I'm
20   asking, please ask me to clarify.  Okay?
21      A.  Okay.
22      Q.  If you answer the question, I'll assume
23   that you understood it.  Fair?
24      A.  Fair.
25      Q.  You were hired by the City of Columbus
```

info@irg-oh.com - 614.875.5440

1 and some of the police officers in this case?
2 A. I was hired by the City of Columbus,
3 yeah.
4 Q. Okay. I'm going to hand you what I've
5 had marked as Copley 1. If you want to take a
6 look at this exhibit --
7 A. Uh-huh.
8 Q. -- and let me know if you've seen it
9 before.
10 A. I have. It's my typical contract for
11 services.
12 Q. Okay. And do you have a signed copy of
13 this?
14 A. I do.
15 Q. Okay. Is there any reason that this copy
16 would be different than the signed copy that you
17 have?
18 A. I don't think so. I think it's strange
19 that my signature is not on this one. I'm happy
20 to provide it if that's -- I could email back
21 because of --
22 MS. PICKERILL: Can we go off record for
23 a second?
24 (Discussion off the record.)
25 MS. PICKERILL: Okay. Thank you.

1 BY MS. CHIN:
2 Q. Are you prepared to offer your opinions
3 today?
4 A. I am.
5 Q. Is there any information that you're
6 still waiting on before providing your opinions
7 today?
8 A. I don't think so, no.
9 Q. Do you recall that my office issued a
10 subpoena to you for documents prior to this
11 deposition?
12 A. I do.
13 Q. Hand you what I marked as Copley 2.
14 A. Thank you.
15 Q. This is titled Deponent's Response to
16 Duces Tecum, and it's signed by one of the
17 attorneys, Sheena Rosenberg. Have you seen this
18 document before?
19 A. I have.
20 Q. Did you review it before it was submitted
21 in this case?
22 A. Yeah. Yes. I'm just double-checking.
23 Yes.
24 Q. To your knowledge are all the answers to
25 these responses truthful and accurate?

1 A. To my knowledge, yes.
2 Q. I do want to ask you about response
3 number two.
4 A. Okay.
5 Q. It's titled, a copy of any testimony, log
6 of LaRae Copley, M.D., and you responded, no
7 responsive documents; is that accurate?
8 A. It is.
9 Q. I know you said you've never testified in
10 a deposition before. Have you ever testified at
11 trial before?
12 A. I have not.
13 Q. Any other times that you've been under
14 oath providing testimony?
15 A. Not under oath.
16 Q. Okay. All right. We can set that one
17 aside.
18 I'll hand you what's been marked as
19 Copley 3. Have you seen this document before?
20 A. I have.
21 Q. And this is your fee schedule?
22 A. It is.
23 Q. Are you still charging the same amounts
24 on this fee schedule today?
25 A. To this client, yes.

1 Q. So looking at this, since we're in the
2 discovery deposition, you charge $700 and if we go
3 over two hours that would be another $350?
4 A. It is, yes.
5 Q. All right. I'll hand you what I've
6 marked as, these will be three exhibits together,
7 it's Copley 4, 5, and 6.
8 Let me know if you have seen these
9 before.
10 A. I have.
11 Q. And these are the invoices that you
12 submitted to the City of Columbus in this matter?
13 A. They are.
14 Q. Are there any invoices that you submitted
15 that are not here?
16 A. I do not think so, no.
17 Q. So you haven't submitted an invoice yet
18 for today?
19 A. I have not.
20 Q. So not including today, rough math, it
21 looks like the City has paid you about $12,500?
22 A. That's not accurate actually, because
23 you'll see that this is a retainer, and the
24 retainer is taken off of Copley 5.
25 Q. Okay.

1    A.  So we've got actually a total of a little
2  over --
3    Q.  Probably about $1,100 or $11,000?
4    A.  Yeah.  Little over ten; something in that
5  range.
6    Q.  Okay.  We can put that one aside.
7       Thank you.  Easier to get some of those
8  documents out of the way first.
9    A.  No problem.
10   Q.  How long have you been doing expert work?
11   A.  I've been doing expert work for about two
12 years since I started a company called Copley
13 Medical Consulting in 2022.
14   Q.  What percentage of your income comes from
15 expert work?
16   A.  It has been variable.  Would you like
17 this year or last year?
18   Q.  Let's start with last year.
19   A.  Last year, a little over ten percent, I
20 think.
21   Q.  And how about this year?
22   A.  This year thus far for all of my
23 business, assuming that everything that is out
24 comes in paid, it is less because I've had a
25 change in salary.

1       Do math.  One second.
2       So for the year of 2024 --
3  Q.  Uh-huh.  Yes.
4    A.  -- approximately 15 percent, maybe.
5  Approximately.
6    Q.  Approximate is fine.
7    A.  Yeah.
8    Q.  When you've been retained as an expert,
9  what type of work are you performing?
10   A.  Sure.  I've done different types of work
11 in the past.  I've been retained in the past by
12 the State Medical Board to provide an expert
13 opinion for a particular issue that they have or
14 concern they've had, or I've been retained to
15 evaluate charts for standard of care assessments
16 before.  I've been retained to evaluate clients of
17 lawyers for potential harm, emotional harm, and
18 that falls within psychiatry.
19   Q.  When you've been retained to perform work
20 with State Medical Board reviews and whatnot, have
21 you provided any testimony or other sort of oral
22 statements about what you had there?
23   A.  Sure.  I usually will come to speak with
24 the committees on the board.  It's not under oath.
25 It's not officially testimony; just to review a

1  report that I've written after I've reviewed
2  literature.  When I've done work specific to a
3  particular licensee, and I'm reviewing some of the
4  work that they've done because there's -- the
5  board has a concern, I have not come and done
6  testimony at this point, just provided written
7  reports.
8    Q.  In the work that you're doing for maybe
9  potential reviews of standards of care, what --
10 have those led to you being retained as a
11 testifying expert?
12   A.  They have the potential to -- for me to
13 need to come to a hearing for the State Board of
14 Medicine.  That has not happened.
15   Q.  So outside of the work with the State
16 Board of Medicine have you been retained by
17 attorneys for litigation purposes?
18   A.  I have.
19   Q.  And what has been the scope of those
20 engagements?
21   A.  So they have included going in and
22 evaluating patients, or prior patients.  They're
23 not my patients, but patients, for emotional harm,
24 they have -- and then preparing a report of
25 opinions.  I've also been hired to review just

1  chart work for malpractice, which does not include
2  evaluating the person.  It's usually, the question
3  is, is there standard of care breaches in prior
4  treatment.
5    Q.  Okay.  So you just haven't had an
6  instance yet where your report work has turned
7  into needing to testify either at a deposition or
8  at trial?
9    A.  Correct.  Correct.
10   Q.  In the work that you're doing for
11 litigation purposes, what percentage of the time
12 are you being hired by the defendant in the
13 matter?
14   A.  By the defendant in the matter.  Let me
15 think about that.  Both -- I haven't had that many
16 cases so I would have to sit down and think about
17 it.
18      There are times that I am being hired by
19 the plaintiff; times I am being hired by the
20 defendant to review and -- on both sides and it
21 does not result in a report written because the
22 conclusion is not helpful to the lawyer who has
23 asked me to review something.  As far as a
24 percentage of time, I get calls from both.
25   Q.  Is it equal?

Page 14

1      A.  Yeah, I would say so.  I would say so.
2      Q.  And when you're writing -- when you get
3  asked to write a report after a review, how often
4  are you writing up for a plaintiff's counsel
5  versus a defense counsel?
6      A.  Sure.  For litigation the purpose?
7      Q.  Yes.
8      A.  Let me think about that.  I have written
9  this one for defense.  I have written a second one
10  that's current and currently going on for
11  plaintiffs and then I have work as part of my job
12  as a fellowship where I'm actually hired by the
13  courts.  So I have a private practice for
14  forensics and then I have work that I do as a
15  forensic fellow.
16      Q.  Explain that to me.
17      A.  Sure.  Absolutely.
18         So I was a practicing psychiatrist for a
19  long time.  I continue to be a practicing
20  psychiatrist.  I started a small business called
21  Copley Medical Consulting.  That's all private
22  civil work.  State Board of Medicine is through
23  that work.  Cases I've had for litigation have
24  been through that work.  Phone calls I get from
25  lawyers about, would you be willing to review
        info@irg-oh.com - 614.875.5440

Page 15

1  this, is through that work.
2         In doing that work, I decided to go back
3  and become a forensic psychiatry fellow with Ohio
4  State University because I was getting calls for
5  cases that I wanted to take and didn't feel like I
6  should take because I didn't have as much legal
7  experience, and I wanted to get that.  So I'm
8  currently a forensic fellow, and that involves
9  criminal forensics.
10         And it's part of that work I am working
11  -- and that's not private work through my own
12  business, that's through Ohio State University.
13         As part of that work, I am involved in
14  some private -- some civil work, I should say, not
15  private work -- some civil work and but mostly
16  criminal work.  The criminal work is through the
17  courts usually or it's been asked for by the
18  hospital.
19      Q.  Okay.  With the civil work that you've
20  done, civil litigation work, I know it sounds like
21  you haven't been doing it for about -- you've been
22  doing it for about two years?
23      A.  Uh-huh.  Yes.  Yes.  Sorry.
24      Q.  Thank you.
25         About how many reports have you been
        info@irg-oh.com - 614.875.5440

Page 16

1  asked to generate?
2      A.  For civil work?
3      Q.  Correct.
4      A.  I'm going to say five.
5      Q.  Have you ever been retained before by the
6  City of Columbus?
7      A.  I have not been retained by the City of
8  Columbus other than for this.
9      Q.  How do you advertise your expert
10  services?
11      A.  I am part of an organization called Seek
12  and they maintain a list of experts.  But there's
13  no formal -- like I don't have a website or
14  anything like that.  Most of the work that I get
15  is word of mouth.
16      Q.  Do you have to pay to have your profile
17  appear on Seek?
18      A.  I have paid in the past to have it
19  appear.  It's approximately $500 a year.
20      Q.  Any other places that you advertise your
21  expert work?
22      A.  I have business cards that I give
23  colleagues.
24      Q.  When did the City of Columbus first
25  contact you about doing work on this case?
        info@irg-oh.com - 614.875.5440

Page 17

1      A.  It would be just prior to the date of
2  this signature.  We talked very briefly.
3      Q.  The signature of the engagement
4  agreement?
5      A.  Yes.
6      Q.  I don't know that I have a dated copy.
7      A.  I'll happily provide you a dated copy.
8  The date on the first invoice for retainer is in
9  June; so I would say June 2024.
10      Q.  How did the City of Columbus reach out to
11  you?
12      A.  I received a phone call.
13      Q.  Do you know how they found you?
14      A.  I don't.  You would have to ask them.
15      Q.  I will hand you what I've previously
16  marked as Copley 7.
17      A.  Thank you.
18      Q.  And if you want to take a look at this
19  and let me know if this is the most up to date CV
20  of yours.
21      A.  It appears to be, yes.
22      Q.  Okay.
23      A.  Yes.
24      Q.  I'd like to walk through this with you
25  just so I can understand your background a little
        info@irg-oh.com - 614.875.5440

Page 18

1    bit more.
2        A.  Of course.
3        Q.  So starting under the heading that is
4    titled Leadership.
5        A.  Uh-huh.  Yes.
6        Q.  It looks like you were medical director
7    of Providers for Healthy Living for about two
8    years; is that right?
9        A.  I was.  I was.
10       Q.  And you finished that role in June of
11   2024?
12       A.  I did.
13       Q.  Why did you stop that role?
14       A.  Because I made the decision to go into
15   forensic psychiatry fellowship and that was a
16   full-time position.  It wasn't reasonable or
17   appropriate to be a medical director part time for
18   the people who needed me there all the time.
19       Q.  And I think I know the answer to this
20   question, but are you still operating Copley
21   Medical Consulting, LLC?
22       A.  I am.
23       Q.  So Copley Medical Consulting would be
24   February of 2022 through the present?
25       A.  Yes.
             info@irg-oh.com - 614.875.5440

Page 19

1        Q.  In your role as medical director for
2    Providers of Healthy Living, what sorts of roles
3    and responsibilities did you have?
4        A.  Sure.  So it was a full-time position
5    that was approximately half seeing my own patients
6    and then half administrative work.  The
7    administrative work actually included, in my mind,
8    some clinical work because I was supervising the
9    clinical treatment that my mid-levels, in other
10   words, physician assistants, nurse practitioners,
11   were providing to the patient population of the
12   whole agency.
13       I was assuring there was adequate
14   coverage.  I was there for clinical consultation
15   at any point, and then I would work with the
16   leadership of this private practice to make sure
17   that policies they were considering from a
18   business perspective were a good idea clinically
19   for people and for treatment.  I would do teaching
20   as part of that as well.  I really saw myself as a
21   liaison, and then I would see -- not quite sure
22   how I want to say it -- I would see patients
23   where -- I had my own caseload of patients, and I
24   would see patients where someone on my team was
25   struggling with the care of that patient; so I
             info@irg-oh.com - 614.875.5440

Page 20

1    would provide some second opinions.  And then if a
2    patient within the agency receiving care had
3    concerns about their provider, there was some kind
4    of disagreement, I would oftentimes manage those
5    compliance, along with our patient care advocate.
6        Q.  With -- so you said about half of your
7    time was admin work, maybe plus a little bit of
8    that patient care you just discussed --
9        A.  Yes.
10       Q.  -- but then half was your own patient
11   care?
12       A.  Right.  Approximately.  I was seeing
13   patients on my own.  I had my own caseload that
14   then I maintained even after I left this medical
15   directorship.  I still see patients one evening a
16   week.
17       Q.  About how many patients do you treat
18   within your typical caseload?
19       A.  Currently right now?
20       Q.  Let's start currently right now.
21       A.  Currently right now I'm providing between
22   -- I'm sorry, I didn't know -- I'm providing
23   between three and four clinical hours on my own
24   private caseload of providers of services a week
25   of patients that I've seen long term for general
             info@irg-oh.com - 614.875.5440

Page 21

1    psychiatry.
2        Q.  When you were medical director for
3    Providers for Healthy Living about how many hours
4    a week were you providing clinical practice
5    patient care?
6        A.  Where I am the physician taking care of
7    the patient directly?
8        Q.  Yes.  Yes.
9        A.  Approximately 17 to 20, depending on the
10   week.
11       Q.  What caused the drop from 17 to 20 to
12   three to four?
13       A.  Sure.  Absolutely.  When I started doing
14   -- when I basically changed jobs and became a
15   psychiatry forensic fellow, it just wasn't
16   reasonable for me to do the work that I was
17   signing up for as a forensic fellow and maintain
18   even 15 hours a week of patient care.  So it was
19   separate to that.  I have patient care as part of
20   my forensic fellowship, but it just -- it wouldn't
21   be responsible, in my mind, to do that.  So I went
22   through my caseload and arranged for patients to
23   be transferred that I thought were -- maybe needed
24   more than I could offer if I was just in that
25   office a few hours a week.
             info@irg-oh.com - 614.875.5440

Page 22

1    Q.  Let's turn the page here.
2    A.  Sure.
3    Q.  Talk some about your clinical experience.
4    A.  Are we still on the CV?
5    Q.  Yes, on the CV.
6    A.  Sure.
7    Q.  The top experience is the forensic
8  psychiatry fellowship that we've been talking
9  about?
10    A.  Exactly.
11    Q.  And so that would be July of 2024 through
12  the present?
13    A.  Right.  It's a one-year program.
14    Q.  After the one-year program, what do you
15  anticipate doing?
16    A.  That is a fantastic question that I
17  haven't decided yet.
18    Q.  Still early on in the program.
19    A.  It's early on in the program.  I will
20  still -- I'm clear that I will maintain patient
21  care.  It would be very difficult for me to leave
22  patient work.
23    Q.  Why do you say that?
24    A.  Because I am a physician.  I love taking
25  care of my patients.  I don't know what I would do

Page 23

1  if I weren't seeing patients.  I could never be a
2  full administrator.
3    Q.  With this forensic fellowship, let's kind
4  of go back and talk about all of the work that
5  you're doing there.  So you're doing some criminal
6  work and civil work?
7    A.  I am.  The civil work is with one of my
8  colleagues who does civil work.  So a fellowship
9  is an educational experience and so I am -- part
10  of that is to be paired with multiple folks who
11  are practicing forensics.  Some of them do civil
12  work; some of them do criminal work.
13    Q.  Being paired with them, are you shadowing
14  them?
15    A.  So the word we would use in medicine is
16  they are supervisors.  However, it's a little bit
17  tricky of a scenario because as someone who's
18  practiced psychiatry before, and as licensed and
19  board certified my need for supervision in the
20  context of the State Medical Board is not there.
21  It's my decision to work with colleagues who are
22  forensic people so that I can learn more about
23  forensics.
24    Q.  When you're doing work for the State
25  Medical Board, is it the State Medical Board

Page 24

1  that's asking you to do the work?
2    A.  Yes, through Copley Medical Consulting,
3  yes.
4    Q.  And that's not through the fellowship?
5    A.  Correct.  It precedes me deciding to do
6  the fellowship.
7    Q.  I'm trying to kind of piece out what
8  you're doing with Copley and what you're also
9  doing with the forensic fellowship piece.  I know
10  you explained a little bit about this, but can you
11  provide a little bit more detail about what you're
12  doing in the fellowship?
13    A.  Absolutely.  Sure.
14  So the purpose of the fellowship might be
15  more helpful to start with.  So the purpose of the
16  fellowship is that after a year of experiences in
17  forensics that I will take a board exam so I can
18  be board certified in forensics.  So there are
19  certain requirements that have to happen during
20  this year.  That includes experiences like at the
21  state hospital.  It includes experiences in
22  prison.  So I go to the Ohio Women's Reformatory
23  for part of the week.  Copley to TVBH which is now
24  COBH; they just changed names.  And I spend time
25  at the Timothy B. Moritz Forensic Unit which is

Page 25

1  maximum security to both provide care and to do
2  reports.
3  So there's a difference between a
4  treating psychiatrist and a forensic evaluator to
5  mix these two roles.  It's not a good idea.  So
6  I'm assigned in both of those roles for different
7  persons.
8  Think about what else I do.  I go to
9  didactics.  I teach as part of this.  So I'm
10  teaching both residents in medicine and then
11  psychology interns in psychopharmacology.  It's a
12  very academic position.  I hope that makes sense.
13    Q.  Yeah.  Thank you.
14    A.  Yeah.
15    Q.  The care piece of it -- so I'll break it
16  down between the care and the treating piece you
17  mentioned and the forensic evaluation piece.
18    A.  Okay.
19    Q.  The treating piece, that's similar to
20  what you've been doing throughout your practice or
21  since you've been a psychiatrist?
22    A.  So it is -- it's treatment.  However,
23  it's an extremely different patient population.
24  These are patients who are at a maximum security
25  hospital, facilities.  They are either -- they've

Page 26

1      either been found to be incompetent to stand trial
2      because of mental illness or they have -- they're
3      being evaluated for those reasons acutely from
4      jails or prisons, or they might have already been
5      deemed NGRI or not guilty by reason of insanity
6      and they're there for -- they've been remanded by
7      the state to be there for treatment. So that's a
8      very different population of psychiatric needs
9      than the people that I see privately, which is
10     what I would call field psychiatry, general
11     run-of-the-mill psychiatry practice. Different
12     people.
13         Q. The patients that you're treating now, I
14     understand it's a different population.
15         A. Sure.
16         Q. But are you seeing these patients more
17     than once?
18         A. I do sometimes. It depends on what their
19     needs are. So I work with a particular attending
20     who is treating them long term and I will work
21     with him to see patients that he sees with them.
22     So, yes, I see them more than once. I'm not
23     officially the attending on the case. That's my
24     -- I feel like it's splitting hairs.
25         Q. In talking about the forensic evaluation

Page 27

1      piece of this role, are you producing reports with
2      that --
3         A. Yes.
4         Q. -- or what are you doing?
5         A. Of the fellowship role?
6         Q. Yes.
7         A. Yes.
8         Q. What do those reports look like? I
9      guess, what are you asked to do?
10        A. What's the consultation question?
11        Q. Yes.
12        A. Is this evaluees competent to stand
13     trial? Does this evaluee have -- has this evaluee
14     made adequate progress to have a different level
15     of care within the hospital system? What is the
16     violence risk if this person were to be
17     recommended for a conditional release by the
18     court? What is the violence or self-harm risk to
19     this person? These are criminal questions that
20     happen.
21        Q. When conducting these evaluations, do you
22     see the patient once?
23        A. So I would see the evaluee as many times
24     as needed but not in a treatment providing role.
25     So I usually will see them once or twice

Page 28

1      realistically.
2         Q. Thank you. That was helpful.
3         A. Sure.
4         Q. And it looks through this clinical
5      experience that the second one down from the top,
6      are you still a treating psychiatrist through
7      Providers for Healthy Living?
8         A. Right. So this is in reference to the
9      private caseload I keep for a few hours a week.
10        Q. The three to four hours?
11        A. Uh-huh. Yeah. Which is where I started,
12     and then I took a job as medical director which
13     became full time and then I went back to my few
14     hours a week.
15        Q. And then one down from that, senior staff
16     psychiatrist with Ohio State, it looks like you
17     were there for about 11 years?
18        A. I was, and that was a full-time position.
19        Q. Full-time active clinical practice
20     position?
21        A. So for part of that time I was the chief
22     of psychiatry which had an administrative role.
23     However, I was a full-time psychiatrist there. I
24     carried a full caseload there.
25        Q. After 11 years, what prompted you to

Page 29

1      leave that role?
2         A. I was in need of a change, of leadership,
3      of ideas, of types of patients. I had begun
4      working in a private place. So I had begun at
5      Providers for Healthy Living working a few hours a
6      week seeing patients in the community versus
7      patients that were part of Ohio State's services.
8      And it was just -- it was time for a change, time
9      to do something different.
10        Q. So you were with Providers for Healthy
11     Living and Ohio State for two years at the same
12     time?
13        A. Concurrent, yes. So I was full time at
14     CCS at Ohio State and seeing patients for four
15     hours a week. Yeah.
16        Q. Is that general in, I guess the
17     psychiatry field, that psychiatrists may treat
18     patients through two different entities?
19        A. Absolutely. Absolutely.
20        Q. And then teaching experience, which is on
21     the third page, are you currently teaching any
22     classes?
23        A. I am. I'm teaching a psychopharmacology
24     class for psychology interns at Ohio State. It's
25     part of their seminar series. It's not something

Page 30

1  that -- it's part of their seminar series.  I
2  don't want you to think, oh, I taught this
3  semester-long course.  It's five hours of
4  teaching, but it's on the topic of
5  psychopharmacology over the course of a month and
6  a half.
7      Q.  What is psychopharmacology?
8      A.  The use of medications within psychiatry
9  and psychiatric illnesses.
10     Q.  How many years have you been a
11  psychiatrist?
12     A.  I graduated from residency 2010, was
13  board certified since 2011 but have been
14  practicing with my independent license in medicine
15  since 2009.  You have a training license as a
16  resident and at some point during that time you
17  get your full license is how that works.
18     Q.  So about 15 years?
19     A.  About 15 years, yes.
20     Q.  In your professional capacity as a
21  psychiatrist, have you ever been sued by a
22  patient?
23     A.  No.
24     Q.  We can put that aside.
25         I want to focus for a moment on how you
          info@irg-oh.com - 614.875.5440

Page 31

1  interact with patients in your clinical practice.
2  So putting the kind of report generating,
3  litigation piece aside --
4      A.  Sure.
5      Q.  -- when you're asked by attorneys or
6  other entities do that type of work.
7      A.  Okay.
8      Q.  In your clinical practice, do you ever
9  diagnose patients without meeting them?
10     A.  No.
11     Q.  So you would never do it solely off of a
12  records review?
13     A.  I'm -- no.  I would have an opinion about
14  how if the records supported the diagnosis that
15  was given by another clinician; but, no.
16     Q.  In your clinical practice do you ever
17  diagnose patients only meeting them once?
18     A.  Do I ever diagnose a -- I will always
19  provide a provisional diagnosis upon meeting a
20  patient if I -- if the purpose was to assess them
21  for treatment.  It's never with the intention of
22  not meeting them again, but there will always be
23  patients who come and see you once and don't
24  return.  So never intentionally, I should say.
25     Q.  Would you in your clinical practice ever
          info@irg-oh.com - 614.875.5440

Page 32

1  prescribe medication after only one meeting with a
2  patient?
3      A.  Yes.
4      Q.  What would happen if then the patient
5  never returned to see you again?
6      A.  So if they never returned to see me
7  again?
8      Q.  Yes.
9      A.  So I'm very conscious of prescribing
10 medication.  So I'm not willing to prescribe a
11 long-term prescription.  We might prescribe a
12 trial amount of medication with the plan that
13 you're coming back to see me so we can see how it
14 went.
15     Q.  What would be the length of maybe a trial
16 period?
17     A.  14 to 30 days depending on the type of
18 medication or the needs of the patient.
19     Q.  And part of that is because then you'd
20 want to make sure that they come back and get
21 evaluated by you again?
22     A.  Absolutely.  I want to make sure they're
23 doing okay.
24     Q.  And that the medication is either
25 working, or if not, adjust it?
          info@irg-oh.com - 614.875.5440

Page 33

1      A.  Absolutely.  And make sure there are no
2  side effects to the medication or no concerns
3  about that course of treatment, no questions.
4      Q.  In your clinical practice how often are
5  you meeting with a patient?
6      A.  So it will always depend on the needs.
7  It could be anywhere from once every week or two
8  to once every three months depending on the
9  patient's stability and clinical needs.  I tend to
10 not go over three months.  It's not an ODMH
11 recommendation.
12     Q.  Are you meeting with patients in person?
13 Do you do anything over Zoom?
14     A.  So currently I'm doing a fair amount of
15 telehealth.  Prior when I was working as medical
16 director, I did both.  I had clinic days in house.
17 I had zoom-based appointments and I would
18 determine if patients needed to -- if they need to
19 be seen in person or not clinically.
20     Q.  When you see a patient how long does that
21 appointment last?
22     A.  It could be anywhere from thirty minutes
23 to an hour depending on what the patient needs.
24     Q.  In your clinical practice, besides
25 prescribing a possible medication, would you come
          info@irg-oh.com - 614.875.5440

Page 34

1   up with a treatment plan after only meeting a
2   patient once?
3       A.  Absolutely.
4       Q.  And what happens if the patient then
5   never comes to see you?
6       A.  So their follow-up plan is part of that
7   treatment plan.  So if they don't, I would -- so,
8   for instance, let's say, the patient would always
9   leave my office with an appointment scheduled.  So
10  then if that appointment were to be canceled or
11  the patient didn't show for that appointment,
12  either I or our office staff will reach out to
13  them to try to reengage them or to see if there's
14  anything that we can help provide.  It's a pretty
15  standard practice.  Recognizing that the patient
16  has the choice to engage in that or not.  Sure.
17      Q.  Based on your clinical experience, is it
18  common for a patient, I guess, maybe if this is
19  the right term or not, and correct me if it's not,
20  but psychiatric status to kind of change over
21  time?
22      A.  Absolutely.
23      Q.  Can it change from day to day?
24      A.  Can a patient's status change from day to
25  day?  It would depend on what I'm treating; but,
        info@irg-oh.com - 614.875.5440

Page 35

1   yes, certainly.
2       Q.  All right.  Let's talk about this
3   specific case now.  You understand that we're here
4   for a lawsuit where an individual who was an ATF
5   agent is suing the City of Columbus and some of
6   its police officers?
7       A.  I do.
8       Q.  What did the City of Columbus ask you to
9   do in this case?
10      A.  So the City of Columbus asked me to look
11  at the treatment that they had from the officer --
12  I should say the ATF agent, Mr. Burk, and to
13  evaluate him for any concerns around PTSD or
14  emotional harm based on data that they had
15  received from his treating providers.
16      Q.  And I think we both know who we're
17  talking about who the -- when you say Mr. Burk,
18  it's James Burk --
19      A.  Yes.  Yes.
20      Q.  -- the plaintiff in this case.
21      A.  Yes.
22      Q.  So the City of Columbus asked you to
23  review the records.  When did they ask you to
24  complete an evaluation of Mr. Burk in person?
25      A.  When did they ask me -- when did I know I
        info@irg-oh.com - 614.875.5440

Page 36

1   would be doing that?
2       Q.  Yes.  Was that part of the initial
3   engagement?
4       A.  Yes.
5       Q.  In your professional work doing kind of
6   generating reports or the, you know, expert work
7   that we've talked about, have you provided
8   opinions when you've been generating reports
9   solely off of records reviews?
10      A.  For the purposes of malpractice; not for
11  the purposes of saying what a patient is or is not
12  suffering with.
13      Q.  So when you're asked to look at the
14  patient's kind of emotional harm or suffering,
15  emotionally, mentally, you are meeting the patient
16  in person and in having that evaluation?
17      A.  Absolutely.  I wouldn't be able to render
18  an opinion without meeting them.
19      Q.  So in this case you did ultimately end up
20  evaluating Mr. Burk?
21      A.  Yes.
22      Q.  When you evaluated Mr. Burk, you at that
23  time knew that the City of Columbus had hired you?
24      A.  Yes.
25      Q.  I'm going to hand you what's been marked
        info@irg-oh.com - 614.875.5440

Page 37

1   as Copley 8.
2       A.  Thank you.
3       Q.  This is your report that was provided to
4   us in this case.  Can you take a look through this
5   and let me know if it's accurate?
6       A.  It appears, yes.  It's dated
7   appropriately and has my signature on it.
8       Q.  Any changes to your report since
9   September 13, 2024?
10      A.  No.
11      Q.  Since September 13, 2024, has the City
12  provided you any additional documents or records?
13      A.  No.
14      Q.  Let's turn to page 2.  You'll see you
15  have sources of information there, the second
16  heading.  Do you see that?
17      A.  Uh-huh.
18      Q.  Who provided you this information?
19      A.  This information was provided either
20  through the City of -- so it was provided through
21  the City of Columbus either from Ms. Pickerill or
22  Ms. Rosenberg.
23      Q.  When did the City provide this
24  information to you?
25      A.  I was not provided all of it at once,
        info@irg-oh.com - 614.875.5440

Page 38

```
 1   just based on as things came in.  I received the
 2   first set of records when I was hired in June.
 3      Q.  When you evaluated Mr. Burk in person,
 4   did you have all of these documents before you
 5   evaluated him?
 6      A.  So I had all of the documents with the
 7   exception of number 14.  And there was a question
 8   about whether or not that -- I didn't -- I had not
 9   seen that document beforehand and so I had asked
10   about further information and got documents.
11      Q.  With documents, the first one is the
12   four-hour evaluation of Mr. Burk.  So I won't
13   include that in the documents.  But with documents
14   2 through 13 you had all of those before you met
15   with Mr. Burk in person?
16      A.  I believe that is true.  So I -- I
17   actually met with doctor -- I met with Mr. Burk on
18   8/30.  The video of him was taken on 8/29.  I
19   don't know that I had that video before I --
20   number seven, I don't know that I had number seven
21   before I met with him.  I believe I received that
22   after the fact.  Okay.
23      Q.  Let's just walk through these one by one
24   then.  So number two is the complaint.  You had
25   that before you met with Mr. Burk?
             info@irg-oh.com - 614.875.5440
```

Page 39

```
 1      A.  Yes.  Yes.
 2      Q.  Did you review that before you met with
 3   Mr. Burk?
 4      A.  Yes.  Yes.
 5      Q.  Number three, did you review that before
 6   you met with Mr. Burk?
 7      A.  Yes.
 8      Q.  Number four, did you review that before
 9   you met with Mr. Burk?
10      A.  Yes.
11      Q.  What about number five?
12      A.  Yes.
13      Q.  Did you review that before with you met
14   with Mr. Burk?
15      A.  Yes.
16      Q.  Number six, did you review that before
17   you met with Mr. Burk?
18      A.  Yes.  Yes.
19      Q.  Number eight, did you review that before
20   you met with Mr. Burk?
21      A.  Yes.
22      Q.  Number nine, did you review that before
23   you met with Mr. Burk?
24      A.  Yes.
25      Q.  Number ten, did you review that before
             info@irg-oh.com - 614.875.5440
```

Page 40

```
 1   you met with Mr. Burk?
 2      A.  I actually am not sure because that says
 3   current PCP, and I believe that those records came
 4   in afterwards.
 5      Q.  Is it possible you had those beforehand?
 6      A.  I don't recall that I had those
 7   beforehand.  I believe it was after.
 8      Q.  Number 11, did you review those letters
 9   before you met with Mr. Burk?
10      A.  Yes.
11      Q.  Number 12, did you review the letter from
12   Sean Riley before you met with Mr. Burk?
13      A.  Yes.
14      Q.  And number 13, did you review the letters
15   from Dr. Bienvenu for disability retirement before
16   you met with Mr. Burk?
17      A.  Yes.
18      Q.  So when you met with Mr. Burk you already
19   had a fair amount of background about him?
20      A.  I did.
21      Q.  And you already had information about the
22   underlying allegations of the case?
23      A.  Yes.
24      Q.  And you already had an understanding of
25   the incident that occurred on July 7th of 2020
             info@irg-oh.com - 614.875.5440
```

Page 41

```
 1   that's the subject of this case?
 2      A.  I had an understanding, but not
 3   necessarily his understanding until I met with
 4   him.
 5      Q.  If I use the term incident, can we agree
 6   that that's the July 7, 2020, incident that
 7   occurred between CPD and Mr. Burk?
 8      A.  Yes.
 9      Q.  In your clinical practice, how often do
10   you receive records about a patient prior to
11   meeting with that patient?
12      A.  Reasonably commonly.
13      Q.  What types of records are you receiving
14   about a patient beforehand?
15      A.  So I will receive at the very least for
16   clinical work the patient's account of why they're
17   coming in to see me, the reason they're seeking
18   psychiatric consultation or psychiatric treatment.
19   I oftentimes have records from other psychiatric
20   providers and other primary care folks depending
21   on if the patient has provided those beforehand,
22   and then if they have not I will ask them to
23   provide them so that I can understand their -- I
24   can get collaborating information about how
25   they've been doing.
             info@irg-oh.com - 614.875.5440
```

1    Q.  So you for some patients may have prior
2  medical records before you meet with them?
3    A.  Absolutely.
4    Q.  And you'll review those before you meet
5  with them the first time?
6    A.  Yes.
7    Q.  And you may -- and you also get the
8  patient's account for why they are seeking
9  psychiatric treatment?
10    A.  Yes.
11    Q.  The patient's account, how is that
12  generated?
13    A.  I do a clinical interview of the patient.
14  Is that how you mean?
15    Q.  I guess you said you get the patient's
16  account for why they're seeking treatment before
17  you even meet with them.
18    A.  Oh, yes.  I'm sorry.  I didn't understand
19  your question.
20      So patients when they're seeking care
21  they usually are given packets of questions to
22  fill out about all sorts of things, including why
23  they are looking for psychiatric care.  And so we
24  ask them to provide some general information about
25  why they're seeking care.  What symptoms they have

1  been struggling with and what they are
2  specifically concerned about seeking care for.
3    Q.  So it's kind of a like, I guess, new
4  patient packet that you may fill out when you go
5  to the doctor's office?
6    A.  Absolutely.  That's a great way to say
7  it.  Most people have done that if they ever
8  sought medical care at all.  Something like that.
9    Q.  Have you within your clinical practice
10  received other types of documents besides that
11  initial patient, new patient packet or prior
12  medical records about a patient before you've met
13  with that patient?
14    A.  I usually would receive predominantly
15  clinical information.  There have been times that
16  I am being referred a patient by another provider,
17  such as a psychotherapist or some -- I've received
18  a consultation, someone has asked me to see their
19  patient for a reason, in which case I might
20  receive their records or I might receive -- we
21  might have a phone call, for instance, about
22  particular concerns.  But it's clinical
23  information typically.
24    Q.  In your clinical practice have you ever
25  received video footage before meeting with a

1  patient about that patient?
2    A.  Have I ever received -- not in clinical
3  practice.
4    Q.  In your clinical practice have you
5  received employment records about that patient
6  before you met with the patient?
7    A.  I have received letters that perhaps a
8  patient has given me related to employment
9  difficulties; but I've never received a full HR
10  pack.
11    Q.  Okay.  So you've never received like a
12  disciplinary file about a patient before meeting
13  with that patient?
14    A.  I have not.  Not for clinical work.
15    Q.  Have you ever received in your clinical
16  work, any testimony that the patient's provided
17  before you've met with them?
18    A.  Not that the patient's provided, no.
19    Q.  You say not that the patient has
20  provided, so, I guess, has there been an instance
21  in your active clinical work where you've received
22  that testimony from another source?
23    A.  Not deposition testimony or transcripts.
24  I might be aware, due to the clinical thing that's
25  bringing the patient to me, that they have legal

1  proceedings around something and they're giving me
2  that information.  They're telling me that they've
3  put that in their packet.  But I've never received
4  testimony as part of that.
5    Q.  Okay.  Let's move to page 3 of your
6  report.
7    A.  Sure.
8    Q.  From my understanding, this looks like
9  pages 3 through maybe the first third of the page
10  of page 6, this is background information and
11  prior functioning of Mr. Burk.
12    A.  With the exception of the confidentiality
13  disclosures, yes.
14    Q.  And you generated this summary?
15    A.  I generated this summary, yes.
16    Q.  And under the heading, Background
17  Information and Prior Functioning on page 3, you
18  mention:  "The following is the summary of salient
19  parts of Mr. Burk's historical information taken
20  from both available records and the evaluation on
21  August 30, 2024."
22      When you generated this summary, how do
23  you decide what is a, I guess, salient part of
24  Mr. Burk's historical information?
25    A.  Sure.  So I try to always take an

Page 46

```
 1    educational history just as part of my practice,
 2    an educational history, a vocational history,
 3    because these oftentimes speak to functioning. I
 4    try to take a relationship history. They speak to
 5    functioning. And so and I will take a trauma
 6    history. I want to understand where this person
 7    grew up, what their culture background is, what
 8    types of experiences they had as a child, an
 9    adolescent and as a young adult. I try to
10    assimilate that into something that is readable
11    and understandable for me and for the Court.
12        Q. And so moving through his other history,
13    on page 6, you have past psychiatric history. Is
14    that still a summary that you generated?
15        A. It is.
16        Q. Is this, I guess, heading included in
17    background information, prior functioning or is it
18    a separate kind of piece for you?
19        A. I think of it as a separate piece.
20        Q. Okay. And what did you base the past
21    psychiatric history on?
22        A. So I based the past psychiatric history
23    on the records I received from his treating
24    psychiatrist, Dr. Bienvenu -- I really hope I'm
25    saying that right -- Dr. Bienvenu as well as the
```

Page 47

```
 1    work that -- or his discussion of it. I asked him
 2    questions about it, about his past psychiatric
 3    history during the exam. And then I had
 4    information from Bayside Marin. That is in there
 5    as well, as well as what he told me about that
 6    experience too.
 7        Q. This summary from past psychiatric
 8    history is coming from your review of the records
 9    and also what Mr. Burk told you?
10        A. Yes.
11        Q. Any other place that that's coming from?
12        A. No.
13        Q. Okay. The substance abuse history, you
14    know same questions, this is still a summary
15    generated by you?
16        A. Yes.
17        Q. And is this summary also, again, coming
18    from what Mr. Burk told you in your records
19    review?
20        A. Yes.
21        Q. Any other places, any other sources that
22    this summary comes from?
23        A. No.
24        Q. His past medical history, this is a
25    summary, again, generated by you?
```

Page 48

```
 1        A. Correct.
 2        Q. In this summary, you base this off of
 3    what Mr. Burk told you and his medical records?
 4        A. Correct.
 5        Q. Any other records or sources that you
 6    considered with his past medical history?
 7        A. No. Just his medical records provided to
 8    me and what he told me.
 9        Q. For his medications on page 7, this is
10    another summary generated by you?
11        A. It is.
12        Q. And that comes from what Mr. Burk told
13    you and the medical records that you reviewed?
14        A. It does.
15        Q. Any other sources?
16        A. My knowledge of psychopharmacology is
17    where the footnotes come from.
18        Q. The prescriptions that you referenced on
19    the bottom of page 7 -- oh, boy. I'm going to try
20    to say these, but --
21        A. It's okay.
22        Q. Losartan.
23        A. Losartan.
24        Q. Is that -- that's a blood pressure
25    medication?
```

Page 49

```
 1        A. True.
 2        Q. Is there any use for losartan in a --
 3        A. Psychiatric way?
 4        Q. -- psychiatric way?
 5        A. No.
 6        Q. How about number six, there?
 7        A. Amlodipine is also a blood pressure
 8    medicine. It was being prescribed by his primary
 9    care folks. So, no, it's not a psychiatric
10    medicine.
11        Q. How about the footnote number seven?
12        A. Atorvastatin is also for his cholesterol.
13    It's not for a psychiatric reason.
14        Q. And ibuprofen is over-the-counter pain
15    medication?
16        A. Yes. Yes.
17        Q. So pages 9 through 13 you provide a long
18    summary of the collateral sources that you
19    reviewed; is that correct?
20        A. This is a review of records from his
21    treating psychiatrist, Dr. Bienvenu, and I broke
22    this down by year because he has been seeing him
23    for several years.
24        Q. When you were generating these summaries
25    of his treatment with Dr. Bienvenu, I guess, what
```

Page 50

```
 1   is your process for generating these summaries?
 2      A.  Sure.  So I will have those records
 3   pulled up, preferably on a computer, not in a big
 4   box.  These were on computer.  And I'm reading
 5   them looking for symptoms that he's reporting over
 6   time that -- excuse me, that Mr. Burk is reporting
 7   over time.  I'm looking for what treatments he
 8   received and I'm looking for the assessments that
 9   Dr. Bienvenu or the treating physician or provider
10   made based on what he was reporting.  So I'm
11   trying to look at the whole -- I'm trying to look
12   at the big picture of what's happening for the
13   patient at the time.
14      Q.  You include, you know, a lot of specific
15   dates in your summaries here.  And from your
16   review, are these dates that Mr. Burk had an
17   appointment with Dr. Bienvenu?
18      A.  Yes.
19      Q.  And do you include all the appointments
20   in this summary?
21      A.  So I include the overwhelming majority of
22   them because usually something is happening in
23   those appointments.  So he was seen multiple
24   times.  And I've listed the dates here so that you
25   could go back and read that note if you wanted
```

Page 51

```
 1   more information.
 2      Q.  Let's turn to page 15.  I want to look at
 3   the bottom of 15.  There's a piece that's titled,
 4   Insight and Judgment.
 5      A.  Uh-huh.
 6      Q.  See that?
 7      A.  Uh-huh.
 8      Q.  And I guess I should mention that this is
 9   under the heading of Mr. Burk's current mental
10   status?
11      A.  Yes, ma'am.
12      Q.  This current mental status or -- is this
13   still a summary?
14      A.  So mental status is what I saw.  That
15   would be the equivalent of when your primary care
16   doctor does a physical exam.  They document what
17   they see that day.
18      Q.  So these -- Mr. Burk's current mental
19   status what you've written here are your
20   perceptions of Mr. Burk after meeting with him?
21      A.  Correct.  From that exam, yes.
22      Q.  From the exam.
23      A.  Yes.  Yes.
24      Q.  In any part of this current mental status
25   are you considering any medical records or
```

Page 52

```
 1   underlying documents that you reviewed?
 2      A.  I'm not sure I understand the question.
 3   I'm sorry.  Could you say it again?
 4      Q.  Yeah.  When you're describing your
 5   perception of Mr. Burk's current mental status as
 6   you did in this section, when you are describing
 7   that, are you considering his medical records with
 8   Dr. Bienvenu?
 9      A.  I am not because I'm doing my own exam of
10   the person; but I have information from those
11   records which he's reviewing with me as part of
12   this whole experience.  But I'm not walking in
13   with a preconceived notion about what I'm going to
14   see, which is what I think you might be asking me.
15      Q.  So I guess what I'm wondering, is because
16   you had reviewed all of his medical records and
17   the other documents, not all of them, but a
18   majority of the documents that the City of
19   Columbus had provided you beforehand, that's --
20   you have that background knowledge at the time
21   that you are also writing these current
22   perceptions of Mr. Burk?
23      A.  I do; because I know what he was
24   complaining of in the exam when I spoke to him,
25   and he made reference to those.  So we talked
```

Page 53

```
 1   extensively about his experience with the ATF,
 2   with the incident on the day when in treatment.
 3      Q.  We have been going for over an hour.  Do
 4   you need a break?  Are you doing okay?
 5      A.  I'm fine.  Thank you.
 6      Q.  Okay.  So turning back to page 15.  I
 7   want to look at Insight and Judgment at the bottom
 8   there.  You write, "His insight was fair to good
 9   regarding his described symptoms and their
10   impact."
11      A.  Uh-huh.
12      Q.  What does fair to good mean?
13      A.  So it means fair to good.  It means not
14   fabulous, not completely without insight.
15      Q.  When you are describing something as fair
16   to good as a psychiatrist, is this on a scale?
17      A.  So I think of it on a scale but I don't
18   usually say, oh, it was 5.3 out of because I did
19   this measurement.
20         So, for instance, Mr. Burk had insight
21   into the fact that he had some symptoms and he was
22   having some struggle.  So I'm always interested in
23   that.  He had insight into how some of his life
24   stressors could be impacting that.  He had insight
25   into how he had received help in treatment.
```

Page 54

1     He struggled a little more when I asked
2  him to consider is there an alternate way to
3  understand his symptoms or when I asked him about
4  alternate ideas.
5     Maybe an example would be more helpful.
6  Q.  Yes.  Sure.
7  A.  I apologize.  So, for instance, in his
8  military history, if you go back, he said that --
9  he said to me that he had seen difficult things in
10  his military history.  He was in danger during his
11  military history at times, but -- and he had some
12  emotional response when talking to me about
13  that -- but then he very quickly said, I signed up
14  for that.  It doesn't bother me.  And I pushed a
15  little on that and he just -- he had some
16  emotional appearance to me at the same time.  It
17  was like that's what I signed up for.  It's in the
18  past, bury that.  And I don't know that that's
19  fabulous insight, ten-out-of-ten insight.
20  Q.  With his prior military history, you
21  mention he maybe felt emotional when he spoke to
22  you about it.
23  A.  Uh-huh.
24  Q.  Did he provide you any specific examples
25  of a traumatic experience that he went through in

Page 55

1  his military history?
2  A.  Yeah.  So I asked him if his life was
3  ever in danger.  And he said to me, well, we
4  didn't have warfare every day.  But in that
5  implication was, you know, we were prepared to be
6  soldiers.  And his quote in here is slashing and
7  -- I apologize.  I'm going to find the quote
8  because it struck me is why I put it in the
9  sentence and I don't want to misquote him.
10     So he talked about being part of Meusoc,
11  M-E-U-S-O-C, and always had to be mission ready.
12  When I made this reference before they are always
13  prepared to go when they say they are mission
14  ready.  And he said, you know, we had isolated
15  incidents when my life was in danger, but it
16  wasn't in the trench, not cutting and slashing
17  although you're trained to do it.  He said, you
18  know, I don't know that a lot of that bothered me.
19  I don't think it affected me adversely.  But I saw
20  this emotion when he talked about that and then I
21  saw this again in his -- when he talked about his
22  experiences as a police officer and seeing
23  children.  He was -- you know, I watched this man
24  hold back tears when we talked about it.
25  Q.  When you quoted Mr. Burk throughout, you

Page 56

1  know, this is the summary that you have here, for
2  example, the passage you just read, are these
3  quotes that you're writing down as you're talking
4  to him?
5  A.  So I'm making a note of them but then I
6  have an audio because it was a recorded
7  examination.
8  Q.  So you went back and listened to the
9  recording as you were generating this report?
10  A.  Yes.  Yes.
11  Q.  I still kind of want to get a better
12  understanding of your scale when you're talking
13  fair to good.
14  A.  Sure.
15  Q.  What I guess would be the adjective that
16  you're using at the lowest level?
17  A.  Fair.  Or the lowest level of the scale?
18  A.  Yeah.
19  A.  None.
20  Q.  What is above none?
21  A.  Some.
22  Q.  And then what comes after some?
23  A.  Fair.
24  Q.  And then good?
25  A.  Uh-huh.

Page 57

1  Q.  And --
2  A.  Full.  I would usually say full.
3  Q.  Instead of good or above good?
4  A.  I would usually say good to full.
5  Q.  So we go none, some, fair, good to full,
6  what --
7  A.  And I'm done.  And then I'm done.
8  Q.  And then you're done.
9  A.  Yeah.  I don't think anyone has perfect
10  insight.  We all have our biases.
11  Q.  Is this scale something that you use as a
12  psychiatrist or is it something that is used in
13  the practice of psychiatry?
14  A.  It is used in the practice of psychiatry.
15  Psychiatrists have words they use to communicate
16  with other psychiatrists.  Yes.  You're not going
17  to find this in a piece of literature, research
18  study.  It would be the same as if I said that he
19  was well groomed as opposed to not well groomed.
20  Q.  Because some of that is coming off of
21  your perception --
22  A.  Absolutely.
23  Q.  -- of what it is?
24  A.  Absolutely.  It's part of the clinical
25  exam.

Page 58

1    Q.  All right.  At the bottom of 15, and
2  really moving towards 16, since there's only one
3  line there.
4    A.  Uh-huh.
5    Q.  You had administration of the structured
6  interview of reported symptoms, SRS-2.
7    A.  Correct.
8    Q.  What is the SRS-2?
9    A.  The SRS-2 is a 172-item psychological
10  test that looks at different symptoms that people
11  report, and it combines those with symptoms that
12  are less likely, more seldomly reported.  It has
13  the purpose of trying to understand the style of
14  reporting symptoms that a patient has; so how
15  engaged they are.  And it has some repeated
16  questions on it that allow the examiner to look
17  for any signs feigning symptoms.
18    Q.  Do you administer the SRS-2 in your
19  active clinical practice?
20    A.  In my active forensic practice, yes.
21  This is a forensic type exam.  In my clinical
22  practice, I'm not forensically evaluating
23  patients.  I'm providing treatment.
24    Q.  With the SRS-2, you said it's 172
25  questions, right?

info@irg-oh.com - 614.875.5440

Page 59

1    A.  Uh-huh.  Uh-huh.
2    Q.  Is this on a sheet of paper when you're
3  administering the test?
4    A.  Sure.  So the test is, as are most
5  neuropsych tests, you have a packet of questions,
6  and that's for that patient.  And that is -- you
7  pay per test to administer it.
8      So I don't just have a set of questions
9  that I use all the time for, like, here's my
10  printout of the SRS-2.  I have a packet for that
11  patient.
12    Q.  Okay.  In the packet of the patient, you
13  ask question one, patient answers, right?
14    A.  Uh-huh.
15    Q.  And how do you document the answer to
16  that question?
17    A.  So the packet that I have on it a --
18  the SRS is based on, yes, definitely, no, maybe,
19  is what it's based on for many of the questions.
20  And then I would -- I would rate that based on
21  what the patient tells me.  I don't say to the
22  patient nor would the standard administration say
23  that I should say to them, yes, please answer yes,
24  no or maybe.  I say we're going to do some short
25  answer type questions.  I'm looking for general

info@irg-oh.com - 614.875.5440

Page 60

1  answers.  And then I will -- if the patient were
2  to say something extra, I would note that.
3    Q.  For Mr. Burk, there's a packet for his
4  SRS-2?
5    A.  There is.
6    Q.  And you still have a copy of that?
7    A.  I do.
8    Q.  I don't believe that was provided to us
9  as part of your expert file.
10    A.  It's proprietary and it breaks the test
11  security, and so I didn't.  I provided an audio
12  recording of me giving the SRS-2 so you can hear
13  it.  And then I have the results in here.
14      This is -- you have to have certain
15  qualifications to purchase this test to show that
16  you're qualified to give it.  If it ends up on the
17  internet, then people know how to break a feigning
18  test.
19    Q.  You said for his results that he was in
20  the genuine responding category?
21    A.  True.
22    Q.  What are the different categories that an
23  evaluee can land in?
24    A.  So genuine responding: so consistent,
25  which basically means they're consistently

info@irg-oh.com - 614.875.5440

Page 61

1  reporting symptoms and experiences.  You can land
2  in what's called non -- it's like a nonengaged.
3  Like if a person said no to every single question,
4  no, no, no, no.  It's like they are not engaged
5  with the test.  And then you can fall into
6  probabilities for feigning, if you will.  So
7  likely feigning or likely over reporting or
8  overexaggerating to a more definite.  It has to do
9  with how high the score is.  I hope I'm explaining
10  that so that -- do you know a what I mean?  Does
11  that answer your question?
12    Q.  Yes.  Thank you.
13      You mentioned that this is a neuropsych
14  test?
15    A.  It's a psychological instrument, yes.
16    Q.  In your work in the forensic psychiatry
17  field, have you reviewed SRS-2 packets for
18  evaluees that other psychiatrists have filled out?
19    A.  I have not reviewed one that another
20  psychiatrist has filled out, no.
21    Q.  When you were evaluating Mr. Burk, did
22  you feel rushed on time?
23    A.  Not at all.
24    Q.  When you were evaluating Mr. Burk, did
25  you have any reason to believe he was not being

info@irg-oh.com - 614.875.5440

Page 62

1  truthful in his answers?
2      A.  Not when I was sitting with him, no.
3      MS. CHIN:  Let's go off the record for a
4  second.
5      (Brief break.)
6  BY MS. CHIN:
7      Q.  All right.  We're back on the record.
8      Dr. Copley, I want to turn now to your
9  opinion portion of the report, which starts on
10  page 18.
11      A.  Thank you.
12      Q.  So based on your education, training, and
13  experience you agree that Mr. Burk has PTSD?
14      A.  I do.
15      Q.  I want to look, there's just a few pieces
16  I want to understand a little bit better here.  On
17  letter F, which is on page 20.
18      A.  Okay.  Yes.
19      Q.  And you use this word in a few places.
20  You use the word "disturbance."  What is
21  disturbance?
22      A.  So this is directly from the DSM
23  criteria.  It's a word they use.  So what is
24  really meant is the duration of symptoms that are
25  causing functional impairment.

info@irg-oh.com - 614.875.5440

Page 63

1      Q.  On letter H, you opine that there's no
2  evidence that Mr. Burk's symptoms are attributable
3  to a medical condition or substance.  Do you still
4  agree with that opinion?
5      A.  I do.
6      Q.  The paragraph down from that, the second
7  sentence, you write, "While he does not identify a
8  clear prior event of trauma in his history, he's
9  described multiple potentially traumatic
10  experiences in his history during his time
11  deployed as a soldier and as a police officer."
12      We've talked about this a little bit
13  before, but in your evaluation of Mr. Burk, did he
14  provide you any specific examples of traumatic
15  experiences that he had been through?
16      A.  So he provided more general experiences
17  of times when his life was in danger and would
18  talk about.  So I'll go back to the example he
19  gave in general about seeing children that were
20  neglected or were -- had been abused.  He said,
21  you know, you weren't -- I'm going to
22  paraphrase -- he basically said you're not trained
23  for that.  It just gets you in your gut.  And he
24  compared that to the distress that you might have
25  if your life was directly in danger.

info@irg-oh.com - 614.875.5440

Page 64

1      He talked about if you're going into a
2  dark building, you don't know who's in there.  You
3  don't know if you're in danger.  It's like the
4  being on edge and the hypervigilance of that is
5  stressful but that he felt more prepared for that
6  than the emotional impact of seeing, I believe he
7  said abused children and sometimes old people left
8  to die.  He gave the example of, you know, those
9  kids don't have a dog in the fight and how
10  upsetting that was to him; but he didn't talk
11  about a specific on July, whatever, blah, blah,
12  blah, this thing happened.
13      Q.  And so you write here that he described
14  multiple potentially traumatic experiences.  Why
15  did you use the word potentially?
16      A.  Because he didn't say to me on
17  December 1, 2003, I witnessed the blah, blah,
18  blah, blah, blah.  He didn't -- and so I wanted to
19  -- I wanted to point out that we talked very
20  generally about his experiences as a law
21  enforcement officer and as a soldier.
22      Q.  You would agree that experiences can
23  affect people in different manners?
24      A.  Okay.
25      Q.  Correct?

info@irg-oh.com - 614.875.5440

Page 65

1      A.  Absolutely.
2      Q.  So something that one person feels is a
3  traumatic experience may not be a traumatic
4  experience for another person?
5      A.  Yes, and -- yes, yes.
6      Q.  So I guess stated differently, what you
7  or I may think as traumatic may not be something
8  that Mr. Burk feels traumatic?
9      MS. PICKERILL:  Objection.  But go ahead.
10      THE WITNESS:  That is possible and yes.
11  Yes, that's possible.  I'm trying to understand
12  your question.
13  BY MS. CHIN:
14      Q.  It can depend -- a person's response to a
15  traumatic experience depends on that individual
16  person and how they respond to it.
17      A.  Yes.  Yes.  Thank you.  You said it
18  better than I was going to answer it.  Thank you.
19      Q.  And you agree -- so we've established
20  that you agree that Mr. Burk suffers from PTSD?
21      A.  Yes.
22      Q.  And you agree that that PTSD comes from
23  the July 7, 2020, incident?
24      A.  I agree that that is part of it, yes.
25      Q.  When you say in part, what do you mean?

info@irg-oh.com - 614.875.5440

Page 66

1    A.  So Mr. Burk has risk factors in his prior
2  history to develop a PTSD response to a traumatic
3  event.  And so it would be impossible for me to
4  say that Mr. Burk had absolutely nothing happened
5  to him and then on a particular day as an event
6  and now every single thing from that point forward
7  is due to that particular event; because he had
8  other things prior.
9    Q.  In these experiences that he had prior
10  may -- you're saying may be kind of piece of the
11  puzzle of his PTSD?
12    A.  Yes.
13    Q.  And somebody who's experienced traumatic
14  events, are they more susceptible to, you know, a
15  PTSD response in the future to a traumatic event?
16    A.  They are.  In particular, if I may, he
17  discussed with me having claustrophobia.  I'm
18  going to use that word in a lay way.  That is not
19  a DSM diagnosis.  He described lots of difficulty
20  with small spaces.  He wasn't able to link that to
21  a particular traumatic event, but it's been
22  consistent throughout his history.  I think that
23  having that potentially made his experience of the
24  incident scarier to him, more distressing in that
25  moment; but I cannot attest to what caused that

info@irg-oh.com - 614.875.5440

Page 67

1  claustrophobia prior.  That would be an example.
2    Q.  So putting it in a different way, based
3  off of your evaluation of Mr. Burk, he had some
4  underlying conditions prior to July of 2020?
5    A.  Risk.
6    Q.  Risks.
7    A.  Yes.
8    Q.  That could contribute to his PTSD
9  response from July of 2020?
10    A.  Yes.
11    Q.  Do you agree that Mr. Burk experiences
12  symptoms from his PTSD?
13    A.  I do.
14    Q.  Would you agree that a person suffering
15  from PTSD may find it difficult to engage in life
16  activities?
17    A.  A person, any person?
18    Q.  Any person.
19    A.  Yes.  They would have functional
20  impairment by definition of the diagnosis.
21    Q.  Would you agree that a person with PTSD
22  may feel fear in certain situations?
23    A.  Yes.  Yes.
24    Q.  And they may feel fear particularly in
25  situations that cause them to relate back to a

info@irg-oh.com - 614.875.5440

Page 68

1  traumatic experience?
2    A.  Yes.
3    Q.  Would you agree that a person with PTSD
4  may feel anger?
5    A.  Yes.
6    Q.  Would you agree that a person with PTSD
7  may become irritable?
8    A.  Yes.
9    Q.  Would you agree that a person with PTSD
10  may find that it's difficult to sleep?
11    A.  Yes.
12    Q.  Would you agree that a person with PTSD
13  may feel detached from other people?
14    A.  Yes.
15    Q.  Would you agree that a person with PTSD
16  may feel estranged from other people?
17    A.  Yes.
18    Q.  So given some of these symptoms, would
19  you agree that PTSD can affect how a person reacts
20  in certain situations?
21    A.  Yes.
22    Q.  It can affect how a person acts day to
23  day?
24    A.  Yes.
25    Q.  It can affect even how they may handle

info@irg-oh.com - 614.875.5440

Page 69

1  day-to-day tasks?
2    A.  It may, yes.
3    Q.  It can affect -- PTSD can affect how a
4  person communicates with other people?
5    A.  It may.
6    Q.  And PTSD can affect their relationship
7  with other people?
8    A.  It may.
9    Q.  PTSD may even affect a marriage?
10    A.  It may.
11    Q.  Can a person fully recover from PTSD?
12    A.  Yes.
13    Q.  How do they do that?
14    A.  Great question.  So from the -- in a
15  purely record type situation they just don't meet
16  these criteria anymore.  However, in treatment,
17  many times people will seek psychotherapy as well
18  as medication management to assist them with the
19  physiological symptoms that happen when they are
20  triggered, for instance, by memories that they
21  can't control.  Usually exposure to this over and
22  over again will help abate that.  People have
23  significant improvement once they're able to do
24  that.
25    So I have seen many folks who no longer

info@irg-oh.com - 614.875.5440

Page 70

1  will meet these criteria for PTSD after a
2  traumatic event because they've undergone therapy
3  and sometimes medication management for PTSD
4  specifically.
5      Q.  Do you only diagnose people with PTSD if
6  they meet this, what is it --
7      A.  These criteria.
8      Q.  -- these criteria?
9      A.  So I would -- so, for instance, if I met
10  somebody who had a traumatic experience who is no
11  longer meeting criteria, I would note that in my
12  medical record.  The question is, are the symptoms
13  still functionally impairing.  So it would be like
14  PTSD by history.  You can remit from PTSD.  You
15  can no longer have functional impairment after
16  you've experienced a period of PTSD symptoms.
17      Q.  And your criteria that you're using are
18  the DSM-5-TR?
19      A.  Correct.
20      Q.  When you say someone is in -- I guess
21  you're using remission as a term for PTSD?
22      A.  So that is not a DSM-5-TR word.  But they
23  no longer meet the criteria.  Remission is a very
24  specific word in the DSM used applied to other
25  diagnoses.  They do not apply it to PTSD.  So I
          info@irg-oh.com - 614.875.5440

Page 71

1  would write, "this patient reports a history of
2  PTSD."  That's how I would write it in my chart.
3  Because I know that I want a full history of any
4  patient I treat but that might not be the subject
5  of clinical concern currently.
6      Just like you might have a history of
7  hypertension and then you lost a hundred pounds
8  and now you don't have it anymore.
9      Q.  With somebody, I guess, when you're using
10  the term history of PTSD, does that mean that that
11  person will never experience PTSD symptoms again?
12      A.  It means that when I write history of
13  PTSD of someone I'm seeing right now, means they
14  don't have them now.
15      I'm lousy at predicting the future.  My
16  crystal ball is not good.
17      But they have risk.
18      It could come back.
19      A.  Sure.  They have risk.  The hallmark of
20  PTSD is getting triggered and it being -- it kind
21  of all coming back up again and eliciting some
22  distress.  That is a hallmark core symptom of
23  PTSD.  I don't try to trigger my patients to see
24  if that happens.
25      Q.  Can a person be cured of PTSD?
          info@irg-oh.com - 614.875.5440

Page 72

1      A.  Define cure.
2      Q.  Have you ever in your active clinical
3  practice had a patient that -- strike that.
4      Can a person be cured of PTSD to the
5  effects that you know that they'll never
6  experience PTSD again?
7      A.  That they'll never experience it again?
8  Never is a big word.
9      What I would like to say to you is I have
10  patients that I have seen who had very severe
11  symptoms, received good treatment and have not had
12  documented PTSD symptoms for years afterwards.
13      Q.  So there's a way with treatment that can
14  help you manage the PTSD?
15      A.  Most definitely.
16      Q.  But that doesn't necessarily mean that
17  you're never going to experience PTSD again?
18      A.  Correct.  Correct.
19      Q.  Give me one moment, please.
20      You've, as we discussed, been retained in
21  this case as a testifying expert?
22      A.  Yes.
23      Q.  And you probably understand that we may
24  be going to trial in this case in a little bit
25  over a month?
          info@irg-oh.com - 614.875.5440

Page 73

1      A.  I didn't know it was over a month; but,
2  yes, I understand trial could happen.
3      Q.  Have we discussed all of the opinions you
4  intend to offer at trial today?
5      A.  All of the opinions I intend to offer in
6  this.  I'm not sure that we have discussed all of
7  them.
8      So we did not discuss the -- it's on
9  page 22.  We did not discuss either Mr. Burk's
10  temperament and how this may have -- may lead to
11  distress.  And we did not discuss that some of the
12  symptoms that he was reporting to Dr. Bienvenu
13  were, in my opinion, not exclusively secondary to
14  trauma.
15      Q.  Let me put it this way.  Are there any
16  opinions not reflected in your report that you
17  intend to offer at trial in this matter?
18      A.  No.  No.
19      Q.  Are there any opinions reflected in your
20  -- are there any bases of your opinions reflected
21  in your report that are not reflected in your
22  report?  That was a bad question.
23      A.  I don't know what you mean.  I'm so
24  sorry.
25      Q.  Your report fully reflects the bases of
          info@irg-oh.com - 614.875.5440



Page 74

```
1    your opinions?
2        A.  Every opinion offered, there's a basis
3    for based on what I was given.
4        Q.  Have you been asked to do any other work
5    in this case?
6        A.  No.  I'm not sure I know what you mean.
7        Q.  Have you been asked to supplement your
8    report?
9        A.  Not to supplement my report, no.
10       Q.  Have you been asked to do any additional
11   evaluation of Mr. Burk?
12       A.  No.
13       Q.  Is there any other work to this date that
14   you intend to do on this case?
15       A.  Should records become available from his
16   prior experience at Bayside Marin, I would be very
17   interested in evaluating those.
18           MS. CHIN:  I don't have any further
19   questions.
20           MS. PICKERILL:  I don't have any
21   additional questions.
22           You have the right to read the transcript
23   before you sign it just to make sure that there
24   are no typographical errors.  You can't change any
25   of your answers or anything like that.  You can
                info@irg-oh.com - 614.875.5440
```

Page 75

```
1    also waive that right.  It's up to you.  But we
2    recommend generally that people read the
3    transcript.
4            THE WITNESS:  I'm happy to read it.
5            MS. PICKERILL:  We'll read it if you
6    don't mind.
7                        --|--
8            Thereupon, at 10:36 a.m., the deposition
9    of LARAE COPLEY, M.D. concluded.
10                       --|--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                info@irg-oh.com - 614.875.5440
```

Page 76

```
1                  AFFIDAVIT
2    State of Ohio        )
                          ) SS:
3    County of _____ )
4        I, LARAE COPLEY, MD, do hereby certify that I
5    have read the foregoing transcript of my testimony
     given on Friday, September 27, 2024; that together
6    with the correction page attached hereto noting
     changes in form or substance, if any, it is true and
7    correct.
8        _____
             LARAE COPLEY, MD
9
10       I do hereby certify that the foregoing
11   transcript of the deposition of LARAE COPLEY, MD was
     submitted to the witness for reading and signing;
     that after she had stated to the undersigned Notary
12   Public that she had read and examined her testimony,
     she signed the same in my presence on the _____
13   day of _____, 2024.
14
15       _____
             Notary Public
16
17   My commission expires _____, _____.
18                       --|--
19
20
21
22
23
24
25
```

Page 77

```
1                  CERTIFICATE
2    State of Ohio        )
                          ) SS:
3    County of Franklin   )
4
5        I, Carla D. Manahan, RPR, the
     undersigned, a duly qualified and commissioned
6    Notary Public within and for the State of Ohio, do
     certify that LARAE COPLEY, MD was by me first duly
7    sworn to testify to the truth, the whole truth,
     and nothing but the truth; that the foregoing is
8    the deposition given at said time and place by
     LARAE COPLEY, MD; that I am neither a relative of
9    nor employee of any of the parties of their
     counsel and have no interest whatever in the
10   result of the action.
         IN WITNESS WHEREOF, I hereunto set my hand
11   and official seal of office on this 1st day of
     October, 2024.
12
13
14
15
16       _____
17           Carla D. Manahan, RPR
             Notary Public, State of Ohio
18           My Commission Expires:
             January 24, 2025
19
20
21
22
23
24
25
          info@irg-oh.com - 614.875.5440
```

# ERRATA SHEET

## Deposition of LaRae Copley, MD taken September 27, 2024

Please list any changes to your deposition below. Be sure to list the page, line, description of change and the reason for your change. Please sign and date when complete. While the changes are not physically made to the transcript, the errata sheet is forwarded to the ordering attorney and will be added as an addendum to your transcript.

| PAGE | LINE | DESCRIPTION OF CHANGE | REASON FOR CHANGE |
|------|------|----------------------|-------------------|
| 16 | 11 | organization called SEAK | misspelling / clarification |
| 14 | 17 | " | " |
| 20 | 5 | Compliance should be "COMPLAINTS" | word substitution |
| 58 | 6 | SIRS-2 in PLACE of SIRS2 | Misspelling |
| 58 | 8 | " | " |
| 58 | 9 | " | " |
| 58 | 18 | " | " |
| 58 | 24 | " | " |
| 59 | 12 | " | " |
| 59 | 18 | " | " |
| 60 | 4 | " | " |
| 60 | 12 | " | " |
| 61 | 17 | " | " |
| | | | |
| | | | |
| | | | |

Signature _____

Date ____10/17/24____

Page 76

1                          AFFIDAVIT

2     State of Ohio            )
                               ) SS:
3     County of _Franklin____  )

4          I, LARAE COPLEY, MD, do hereby certify that I
      have read the foregoing transcript of my testimony
5     given on Friday, September 27, 2024; that together
      with the correction page attached hereto noting
6     changes in form or substance, if any, it is true and
      correct.

7

8                          _____
                           LARAE COPLEY, MD
9

10         I do hereby certify that the foregoing
      transcript of the deposition of LARAE COPLEY, MD was
11    submitted to the witness for reading and signing;
      that after she had stated to the undersigned Notary
12    Public that she had read and examined her testimony,
      she signed the same in my presence on the __14th__
13    day of __October_____, 2024.

14

15                         _____
                           Notary Public

16

17    My commission expires _August 16_, _2028_.

18                       --|--

19           JENNIFER L SHANKMAN
20           Notary Public, State of Ohio
             My Commission Expires
21              August 16, 2028

22

23

24

25



# Integrity Reporting Group, Inc.

614.875.5440
IntegrityReportingGroup.com

To: Ms. Abigail F. Chin, abbyc@cooperelliott.com
Ms. Alexandra N. Pickerill, anpickerill@columbus.gov

Date: October 17, 2024

Subject: James A. Burk, Jr., et al. v. City of Columbus, et al.
No.: 2:20-cv-6256
Deposition of: LaRae Copley, MD
Date Taken: September 25, 2024
------------------------------------------------------------------------------------------------------------

### REPORTER'S SIGNATURE CERTIFICATION

The deposition of the above-referenced witness has been previously transcribed and delivered to counsel who ordered. The witness did not waive signature to the deposition at the time it was taken. Be advised that the witness had been notified that they had a period of thirty (30) days under Ohio Rule 30(E) or thirty (30) days under Federal Rules of Civil Procedure Rule 30(e) to read the deposition and make necessary corrections/changes to the deposition.

_____The witness failed to return an errata sheet and affidavit page within the specified time period which expired on _____. The deposition is now complete as previously transcribed.

__X___The witness has read the deposition and signed the declaration. A copy the notarized errata page is enclosed for counsel.

_____The witness has returned only the signed errata sheet after the 30 days elapsed.

_____The witness has read the deposition and signed the affidavit before a Notary Public. The witness did not return or complete an errata page(s) by 5:00pm _____. A copy of the affidavit is enclosed for counsel.

_____ The witness has read the deposition and signed the affidavit before a Notary Public. Through their attorney's office, the witness confirmed there were no changes and, therefore, did not return or complete an errata page. A copy of the affidavit is enclosed for counsel.

Please append this letter to the deposition so that your record is complete.

6541 Cheshire Road | Galena, Ohio 43021-9409
*Excellence is Never an Accident – Insist on a Stenographic Court Reporter*