UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES A. BURK, JR., et al.,        )
                                   )
   PLAINTIFFS,                     )    CASE NO. 2:20-cv-6256
                                   )
          vs.                      )
                                   )
THE CITY OF COLUMBUS, et al.,      )
                                   )
   DEFENDANTS.                     )
_____    )

TRANSCRIPT OF JURY TRIAL PROCEEDINGS - VOLUME 1
EXCLUDING VOIR DIRE
BEFORE THE HONORABLE JAMES L. GRAHAM
MONDAY, NOVEMBER 4, 2024; 8:37 A.M.
COLUMBUS, OHIO

APPEARANCES:

   FOR THE PLAINTIFFS:
       Cooper Elliott, LLC
       By:  Barton R. Keyes, Esq.
            Abigail F. Chin, Esq.
       305 West Nationwide Boulevard
       Columbus, OH  43215

   FOR THE DEFENDANTS:
       Columbus City Attorney's Office
       By:  Alexandra N. Pickerill, Esq.
            Sheena D. Rosenberg, Esq.
            Sarah Feldkamp, Esq.
       77 North Front Street, 4th Floor
       Columbus, OH  43215

- - -

    Proceedings recorded by mechanical stenography, transcript
produced by computer.

MONDAY MORNING SESSION

NOVEMBER 4, 2024

- - -

(The following proceedings were had in open court.)

THE COURT:  Good morning, Counsel.

So before we get down to work, let me ask this:  Has there been any progress in settling this case?

MR. KEYES:  No, Your Honor, not since our last --

THE COURT:  Who would like to tell me?

MS. PICKERILL:  Your Honor, we have not received a renewed demand from plaintiff since we made our last offer of $150,000.

MR. KEYES:  That's correct, Your Honor.  After the last offer of $150,000, Ms. Pickerill and I had a phone call discussing our respective positions in an effort to cut to the chase.  In that discussion, it was apparent that for both sides the -- what would have been the final or very close to final positions were nowhere close enough to make any progress.  So we both agreed that the continued exchange of numbers back and forth was not going to be productive.

THE COURT:  Well, that's a shame.  Someone is going to lose big in this case, and I think you're all taking an unnecessary risk.  However, we're here to try the case.

Now, there's several matters that I need to rule on before we actually begin the trial, but my plan is to begin

1  with the selection of the jury, and then we'll take a recess

2  after we have picked the jury in this case, and while -- and

3  excuse the jury and let them have their lunch and so forth, and

4  we'll get to work on the legal issues that we need to resolve

5  before we actually begin the trial itself.

6      Now, I've got a list of the things that I would expect

7  to deal with, and there is a -- I need to make additional

8  rulings -- or I need to make rulings on the defendants' motion

9  for a determination of the objectively reasonable nature of

10  certain actions taken by the defendants.

11      There is a pending motion in limine to determine the

12  scope of permissible testimony of the plaintiffs' use-of-force

13  expert, Mr. Scott DeFoe.

14      There is the issue of the scope of any testimony we

15  will receive in the first part of the trial regarding injuries

16  and lost income.

17      I am going to revisit the issue of whether I'm going

18  to permit cross-examination of the defendants in the

19  plaintiffs' case.

20      Those are some of the things that I feel we need to

21  address before we actually begin the trial.  Are there any

22  others?

23      Plaintiffs' counsel?

24      MR. KEYES:  Yes, Your Honor.  Thank you.

25      I think most of these would come after jury selection

1    because I don't think they necessarily impact jury selection,

2    but a couple of them might.

3          So the Court had noted that it was intending to issue

4    a jury instruction, I believe, at the start of trial, possibly

5    before evidence, regarding issues like control of the scene and

6    law enforcement.

7          THE COURT:  Yes.  Yes.  That will be part of my

8    preliminary jury instructions in this case.  I think it's

9    particularly important that the jury know what principles

10   govern some of the issues in this case, and part of that comes

11   from the established principles of law enforcement in a

12   situation like this.

13         MR. KEYES:  Thank you, Your Honor.

14         My only request -- I guess my first question would be,

15   will we have an opportunity to see that proposed instruction

16   before it is read to the jury so that we can note any

17   objections for the record on that instruction?

18         THE COURT:  Well, I think it is on the record; is it

19   not?

20         MR. KEYES:  I may have been mistaken, but I think in

21   the --

22         THE COURT:  Willie?

23      (The Court conferring with law clerk off the record.)

24         THE COURT:  All right.  Yes, it's the substance of the

25   order I filed which is entitled "Nationally Accepted Principles

1  of Law Enforcement Regarding Command and Control between

2  Uniformed and Nonuniformed Officers at the Scene of a Suspected

3  Crime."  That was filed last week on November 1st.

4        MR. KEYES:  Yes, Your Honor.  We did see that order.

5  I just was not sure if there was -- if that order was setting

6  out the full scope of the intended instruction or if there was

7  going to be additional language in the instruction that we

8  might see.

9        THE COURT:  Well, let me review it and see if that's

10  the case.

11        MR. KEYES:  Thank you, Your Honor.

12        And so my only request then would be once we know

13  that, that we have an opportunity before that instruction is

14  read to --

15        THE COURT:  Well, I think I did make it clear in that

16  order that part of Mr. DeFoe's report gets into issues that I

17  thought were inappropriate, and that is his application of,

18  basically, the use-of-force standard, what's reasonable under

19  the circumstances, to the issuance of the orders made at the

20  scene by the officers in control of the scene; and that it was

21  the Court's ruling that that would be inappropriate.

22        MR. KEYES:  Yes, Your Honor.

23        THE COURT:  But there are perhaps other issues about

24  his testimony, and I want to hear about that in the hearing on

25  the specific issue of what he will be permitted to testify

1   about and what he won't.

2          MR. KEYES:  Thank you, Your Honor, for that

3   clarification.

4          So my only -- to cut to the chase of bringing this

5   issue up, all I'm trying to figure out is, in terms of making

6   or lodging any objections to the proposed instruction that we

7   might have, I did not know if there was going to be a further

8   written description of the instruction that we would see or if

9   I can lodge our objections just based on the issue that was set

10  out as it was described in the order on Friday because we would

11  have an objection to putting a --

12         THE COURT:  Well, after we have sorted it all out I'm

13  going to give you your opportunity to make your objections, but

14  I want to hear your arguments before I make final rulings, of

15  course.

16         MR. KEYES:  Yes, Your Honor.

17         THE COURT:  I certainly will give you an opportunity

18  before we proceed, after we have settled all of these

19  questions, to make your objections.

20         MR. KEYES:  And I appreciate that.  I just wanted to

21  highlight the issue, because it was a preliminary jury

22  instruction, to make sure that we were going to have that

23  opportunity before.

24         THE COURT:  Absolutely.

25         MR. KEYES:  Thank you, Your Honor.

1          The nature of the bifurcation order, I know that that

2     was an issue that I think we still have to discuss.  And I

3     raise that issue now because depending on what the nature of

4     the bifurcation is going to be, that could be a relevant issue

5     to try to sort out before jury selection so that the potential

6     jurors understand, you know, if they are likely to be here, you

7     know, for a longer or shorter week.

8          So if it's going to be the same jury, if the plaintiff

9     is successful on liability --

10         THE COURT:  It would be my intention to proceed with

11    the same jury.

12         MR. KEYES:  Thank you, Your Honor.

13         This would be one of the items -- do you want just at

14    this point a housekeeping list of things we would need to take

15    care of before we start?

16         THE COURT:  That's just fine.

17         MR. KEYES:  All right.  I would like to discuss at the

18    appropriate point if there's an efficient method of preserving

19    plaintiffs' objections to matters regarding ATF personnel

20    decisions.  They were the subject of the motion in limine.  The

21    Court ruled on the motion in limine, and so we understand that

22    the Court is going to allow that evidence in.

23         THE COURT:  Well, it depends on what evidence is

24    produced.  I can't make a final ruling on that until we

25    actually get into the evidence.  Some of it may come in; some

1  of it may no longer be relevant once we have sorted the issues

2  out.

3        MR. KEYES:  That's fair, Your Honor.  So we will just

4  handle objections to that on a case-by-case basis then.

5        One other item -- and the answer may be we need to see

6  what the selected jurors' schedules are like.  But I think we

7  had discussed in the final pretrial if we wanted to have a plan

8  for tomorrow, with tomorrow being Election Day, if that was

9  something that we needed to plan ahead for.  If we don't --

10        THE COURT:  The first issue I'm going to take up with

11  the prospective jurors is the election.

12        MR. KEYES:  Okay.  Very good.

13        THE COURT:  So we'll sort that out.  My hope is that

14  most of them will have already voted, and then we'll need to --

15  if we have a body of jurors sufficient -- prospective jurors

16  that's sufficient, then we may just excuse the others who

17  haven't and desire the time to vote.

18        If not, then we're going to take half a day off to let

19  people vote.

20        MR. KEYES:  Thank you, Your Honor.  Those are all my

21  questions.

22        THE COURT:  Hoping we'll be able to avoid that.

23        MR. KEYES:  That is all for us.

24        THE COURT:  All right.  Very well.

25        Defense counsel?

1      MS. PICKERILL:  Just briefly, Your Honor.

2      I believe Bart touched on it just briefly, but one of

3  plaintiffs' motions in limine was to exclude from evidence both

4  the documentation from ATF, as well as any mention of

5  Mr. Burk's termination.  And I understand that we're going to

6  see, in terms of the documents and the evidence, kind of how

7  that plays out at trial, whether or not we're allowed to talk

8  about the fact of the termination or not.

9      THE COURT:  Well, that's one of the very basic issues

10  that I expect to address in the hearing on these various

11  matters.

12      And this is what it boils down to:  I'm wondering

13  whether or not the settlement agreement that Mr. Burk made

14  which resolved his denied claim for disability retirement and

15  which resolved his termination proceedings in which he was

16  dismissed from service, and his appeal was never ruled on, and

17  the fact that he entered into a settlement agreement in which

18  he agreed not to have any -- ever work again for the Department

19  of Justice, what effect that has on his claims of lost income.

20      And I have considered seriously ruling that it makes

21  it impossible for him to establish a claim of lost income, at

22  least not in the way in which his expert has been prepared to

23  testify, because it would be sheer speculation for the jury to

24  try to decide what the ultimate result of these various appeals

25  would have been.  It would be absolute speculation on their

1   part.  All we know for sure is that he agreed he would never

2   again work for the Department of Justice.

3          So it may be that the Court would rule that his lost

4   income claims are incapable of proof because of his entering

5   into an agreement which the defendants had no input into.  It's

6   not fair to them.  He's required to prove his lost income

7   claims by a preponderance of the evidence, but it would be

8   sheer speculation to decide what would have happened in these

9   disciplinary proceedings and the appeals.

10         On the other hand, it might be possible for a

11  plaintiff to approach this issue in a way that would not

12  require jury speculation and make some reasonable assumption as

13  to when he would have ended his employment with ATF.

14         And I've thought about various ways, and I was hoping

15  that I might hear some creative thinking on the plaintiffs'

16  part to solve that issue and to grant leave to have Dr. Rosen

17  amend his report.  Well, his amended report turned out to not

18  address these issues at all, so it was just not helpful at all.

19         I would suggest that plaintiffs' counsel might try to

20  engage in some constructive and creative thinking about this.

21  Maybe the jury could be told that they can assume that he would

22  have continued working until retirement age and that his only

23  claim for additional lost income would relate to potential

24  employment after his age of retirement at age 57.

25         Then, of course, the kinds of additional employment

1  that he could reasonably find under those circumstances would

2  include some restrictions because of the discipline that he

3  received while employed.  It would certainly include the

4  discipline that he received for the shoplifting incidents, but

5  perhaps not, the other matters that were brought up after the

6  incident with Officers Fihe and Winchell.

7  So these are just some -- I'm just throwing out the

8  things that have been going through my mind, but this is a

9  major issue, and I think I have just described the range of

10  solutions the Court might entertain.

11  In the final analysis, if there isn't any solution,

12  I'm probably going to rule that his lost income claims are

13  speculative.  I'm certainly going to rule that the defendants

14  are not in any way bound by the administrative rulings that

15  were made as a result of a settlement agreement that they had

16  no role in whatsoever.

17  All right.

18  MS. PICKERILL:  I appreciate that, Your Honor.

19  THE COURT:  Okay.  Anything else?

20  MS. PICKERILL:  Not at this time.  I think anything

21  else can be brought up when we chat again this morning.

22  THE COURT:  All right.  Very well.

23  We're going to recess then, and when we come back

24  we're going to start picking the jury in this case.

25  Thank you, Counsel.

1          (Recess taken from 8:54 a.m. to 8:58 a.m.)

2          (Prospective jurors in at 8:58 a.m.)

3          THE COURTROOM DEPUTY CLERK:  This is Case No.

4     2:20-cv-6256, James A. Burk, Jr., et al. versus the City of

5     Columbus.

6          THE COURT:  Members of the prospective jury, welcome

7     to the United States District Court for the Southern District

8     of Ohio.  You have been summoned here this morning for one of

9     the most important rights that we enjoy under our Constitution,

10    and that is the right to a trial by jury.

11         I know that each of you is here at some degree of

12    inconvenience, and I want to thank you for your public service

13    and your willingness to serve in the important capacity of a

14    juror in a case in federal court.

15         I'm going to tell you a little bit about the case that

16    you'll be called upon to hear, if you're selected as a member

17    of the jury, and explain some of the procedures we're going to

18    follow in the trial.

19         But the first thing I want to ask about has to do with

20    the election.  This case is beginning the day before a very

21    important presidential election, and we want to make sure that

22    your service in this case does not in any way interfere with

23    your right to cast your ballot in that election.

24         So let me ask you, how many of you have already voted?

25    If you have, hold up your hands.

1          Looks like a lot of you have.

2          Now, those of you who have not voted, I'm considering

3   that we might take half of the day off tomorrow in order to

4   facilitate voting.  However, I'm mindful of the fact that our

5   prospective jurors are summonsed from a large area of the

6   state, literally almost the entire southern half of the state

7   of Ohio, and some of you have come quite a distance to be here

8   in Columbus.

9          So let me ask you if that solution -- that is, taking

10  the morning off or the afternoon off -- would be sufficient to

11  permit you to exercise your right to vote.  If there's anyone

12  here who feels that would not work, hold up your hand, please.

13         I don't see any hands.

14         All right.  Very well.

15         Well, that's an important matter that I wanted to

16  resolve.  So what we'll do, then, is we will let you know, if

17  you're picked to be a juror in this case, whether we're going

18  to take the morning off or the afternoon off, and we'll all

19  discuss that and decide what's the best approach to that.

20         All right.  Now, let me begin by introducing myself

21  and members of my staff who will be assisting me in the trial

22  of this case.

23         I'm Judge Graham.  I have had the honor and privilege

24  of serving the citizens of the Southern District of Ohio for

25  38 years.  I'm a lifetime resident of the city of Columbus.  I

1  was a lawyer here for a while.  As I said, I have served as a

2  judge now for 38 years.

3          My staff who assists me in doing this work includes

4  some of the folks in the courtroom this morning, and I'd like

5  to introduce them.  I'm going to start with my courtroom deputy

6  and administrative assistant, Mrs. Shane.

7          Mrs. Shane, would you stand, please.  You're down

8  there somewhere, I know.

9          THE COURTROOM DEPUTY CLERK:  Yes, Your Honor.

10         THE COURT:  All right.  Mrs. Shane, if you're picked

11 to be a juror, she is the person to communicate with if any

12 issues of any kind arise.  She pretty much runs things, so she

13 will be your contact person if you're picked to be a juror in

14 this case.

15         I also have -- I'm assisted in my work by judicial law

16 clerks, and there are three of them here in the courtroom this

17 morning.  I'll start with my senior judicial law clerk, Jason

18 Everetts.

19         Jason, would you stand.

20         And then I'm also assisted in this case by Mr. William

21 Ver Steeg.

22         Willie, thank you.

23         And my other law clerk here in the courtroom this

24 morning is Jimmy Hinton.

25         So these young men are extremely qualified young

lawyers who assist me in all of the legal matters that I'm
called upon to rule upon as a judge.

Now, let me tell you a little bit about this case.
You've been summoned here this morning in a civil case.  It's
not a criminal case.  A civil case involves a claim for money
damages.

This case is brought by an individual by the name of
James Burk and his wife, Summer Hilfers.  The defendants in
this case -- now, the person who brings the case to court is
referred to as the plaintiff.  The defendants are Joseph Fihe
and Kevin Winchell.  The defendants are the individuals that
the claim is brought against.  They're the persons who the
plaintiffs seek to recover money damages from.

Mr. Burk, the plaintiff, is a former special agent for
the Federal Bureau of Alcohol, Tobacco, and Firearms, usually
called by its acronym, the ATF.

Mr. Fihe and Mr. Winchell are Columbus Police
officers.  They are police officers employed by the City of
Columbus, Ohio.

Mr. Burk claims here that the officers, Officers Fihe
and Winchell, violated his rights under the Constitution of the
United States, and he brings this case under a statute referred
to as Chapter 42 of the United States Code Section 1983.  That
statute gives a citizen of the United States the right to bring
an action in federal court for money damages when a state

1   officer violates his federal constitutional rights.

2         Now, the incident which gives rise to this case

3   occurred on July 7th, 2020, at 3359 Edgebrook Drive.  That's an

4   address here in Columbus.

5         On that date Mr. Burk went to that address in the

6   course of his duties as an ATF agent, and he was dressed in

7   plainclothes.  His clothing had no ATF symbols on them.  His

8   mission was to recover a firearm that had been purchased by a

9   resident at that address, a gentleman who lived at that

10   address.

11         Federal law permits the purchaser of a firearm to take

12   possession of the firearm while a background investigation of

13   the purchaser is made.  If for any reason the person is later

14   found unqualified to purchase the firearm, then an ATF agent

15   like Mr. Burk is sent to his home to request him to return it.

16         In this case, when Mr. Burk arrived at the address, a

17   lady answered the door.  She was the wife of the purchaser, and

18   she told Mr. Burk that her husband wasn't home, and Mr. Burk

19   and this lady had a disagreement.  Perhaps as a result of a

20   language barrier or whatever, she felt that he was

21   inappropriately seeking to enter her home and she didn't think

22   he was really a police officer.

23         So she said that she was going to call 911, and she

24   did.  She called the Columbus Police Department, and she told

25   Mr. Burk that's what she was doing, and Mr. Burk stayed there

on her front porch waiting the arrival of law enforcement officers that she had called.

As a result of this lady's call, Officer Fihe was dispatched to the scene to investigate a possible burglary by a person in civilian clothes claiming to be a police officer.

Shortly after Officer Fihe arrived at the scene he called for backup, and Officer Winchell was dispatched to the scene. These three officers, Officers Fihe and Winchell and Burk, had a disagreement which culminated in Officers Fihe and Winchell's use of force against Mr. Burk.

Mr. Burk claims that this was a violation of his constitutional rights and that he sustained physical and emotional injuries and that he is entitled to recover money damages for medical bills and lost income.

His wife is claiming damages for what is called in the law loss of consortium, and that is an interference with the marital relationship. So she claims that his injuries as a result of this incident have damaged their marriage.

Now, Officers Fihe and Winchell deny that they used excessive force against Mr. Burk and assert that the force they used was reasonable and necessary to obtain compliance with lawful orders that they gave in the course of their investigation.

So that is the -- those are the basic facts, and that's the nature of the case that you folks have been called

 1  here today.

 2          Now, I would like to ask the parties and the attorneys

 3  to introduce themselves, and I'm going to call upon counsel for

 4  the plaintiff.

 5          Mr. Keyes, would you introduce yourself and your

 6  associates.

 7          MR. KEYES:  Thank you, Your Honor.

 8          Good morning, everyone.  My name is Bart Keyes.  I'm

 9  an attorney at the law firm Cooper Elliott here in Columbus;

10  and my co-counsel with me seated here is Abby Chin in the

11  center seat, Spencer Meador on the left there.  She will be

12  here with us for jury selection this morning.

13          May I introduce the plaintiffs as well, Your Honor?

14          THE COURT:  Yes, indeed.

15          MR. KEYES:  James Burk is seated right behind us here,

16  and next to him is his wife, Summer Hilfers.

17          Next to them is one of our paralegals, Sommer

18  Donnelly.

19          Thank you.

20          THE COURT:  Very well.  Thank you, Mr. Keyes.

21          Now I would like to ask counsel for the defendants,

22  Officers Fihe and Winchell, to introduce herself and her

23  associates and her clients.

24          MS. PICKERILL:  Thank you, Your Honor.

25          Good morning.  My name is Allie Pickerill.  I work for

the Columbus City Attorney's office.  With me to my direct

right is Sheena Rosenberg.  To her right is Sarah Feldkamp.

They are both attorneys on the case as well.

        To their right is Maria Myers, our paralegal, who will

be here with us the whole time as well.

        Behind us here is Detective Joseph Fihe.  Next to him

is Officer Kevin Winchell.

        THE COURT:  Very well.  Thank you.

        Ladies and gentlemen, this part of the trial, the

process of selecting the jury, has its own name.  It is called

the voir dire examination.  Strange-sounding name.  It comes

from the French language.  It's been part of our jurisprudence

for years, going all the way back to the colonial days and even

before that, all the way back to the country that many of

our -- well, we were originally colonies of, Great Britain.

        And it signifies -- the words are in French, and they

mean -- "voir dire" means to speak the truth.  It became the

name of this part of the trial because jurors have always been

examined, asked questions, under oath to determine their

qualifications to serve as jurors.

        The voir dire procedure is a question-and-answer

process in which the Court asks the jurors questions about

their personal experiences and their background in an effort to

determine whether or not any of the particular jurors -- or

prospective jurors have had experiences or have relationships

1 that might make it difficult or impossible for them to be

2 completely fair and impartial jurors.

3     So you will be called upon to speak the truth

4 regarding your qualifications to serve as jurors, and that's

5 what the voir dire examination is all about.

6     So I'm going to be asking you questions about your

7 background and experiences and relationships, and let me assure

8 you that we will try to make that process as painless as

9 possible.  Indeed if there is anything that should come up

10 that's particularly sensitive, then we will -- we have some

11 procedures to conduct those questions and answers in privacy.

12 But it's a very important part of the process, as I'm sure you

13 can understand.

14     So the first part of it, then, involves administering

15 an oath to all of you as prospective jurors, and I'm going to

16 ask Mrs. Shane to do that.

17     THE COURTROOM DEPUTY CLERK:  Would the prospective

18 jurors please rise and raise your right hand.

19     (Prospective jurors sworn.)

20     (Jury selection was conducted on the record and filed under

21 seal in a separate transcript.)

22     THE COURT:  Members of the jury, I'm going to be

23 giving you some preliminary instructions regarding your

24 participation in this case, and that will also include a

25 summary of the legal issues that apply and rules that apply to

1    a case of this kind.  I need to confer with the attorneys in

2    order to inform them and receive their suggestions in regard to

3    those instructions.

4           So we're going to excuse you folks for lunch now, and

5    the lawyers and I will be taking a brief lunch, and then we

6    will be working on these preliminary instructions, so we're

7    going to excuse you for one hour.

8           And let me give you this instruction which is

9    important, and I'll be repeating this every time we recess:

10   You should not discuss this case with anyone.  You should not

11   permit anyone to discuss it with you.  You should not try to do

12   any research of your own about this case using any of our

13   research sources that we now have so handy, but that would be

14   improper.  You should not do anything like that because your

15   decision in this case must be based solely on what you hear in

16   this courtroom.

17          Perhaps this would be a good time for the Court to

18   give the standard instruction on the use of social devices.  Do

19   we have that handy?

20          Mrs. Shane, I assume the jurors are familiar with the

21   restrictions on their use of cell phones; am I correct?

22          THE COURTROOM DEPUTY CLERK:  Yes.  I'm saying that,

23   questioning myself.

24          THE COURT:  Did the clerk's office explain to you that

25   your cell phones will be in a -- what do they call that device?

1    Some kind of a bag, yeah.

2           THE COURTROOM DEPUTY CLERK:  I don't know if James

3    explained that to them or not.  They haven't been taking

4    jurors' phones.

5           THE COURT:  Oh, they have not?

6           THE COURTROOM DEPUTY CLERK:  No.

7           THE COURT:  They have not implemented that policy?

8           THE COURTROOM DEPUTY CLERK:  No, they don't take them.

9           THE COURT:  Good, good, good.

10          Well, members of the jury, during the trial of this

11   case you must not communicate with or provide information to

12   anyone by any means about this case.  You may not use any

13   electronic devices or media, including any form of social

14   media, to communicate to anyone any information about this case

15   or to conduct any research about this case until after you have

16   returned your verdict in this case.

17          In other words, you cannot talk to, correspond with,

18   or electronically communicate with anyone about this case.  And

19   I would expect you to immediately inform me if you become aware

20   of another juror's violations of those instructions.

21          A violation of these instructions would mean that we

22   would have to start all over again and pick another jury.  And

23   if there should be a violation during the trial, we would have

24   to start the trial all over again.

25          So that would be just a tragic waste of time, and it

would just defeat the interest of justice in this case, so just don't do it.

And as I said, all of this is important because you must decide this case based solely on the evidence presented in the courtroom.  Information on the internet or available through social media might be wrong, incomplete, or inaccurate. You are permitted to discuss this case with your fellow jurors only during your deliberations after you have heard all of the evidence in this case, and, of course, then your discussions will be based upon the evidence that you have heard here in this courtroom.

It is important that you are not influenced by anything or anyone outside this courtroom.  Otherwise, your decision could be based on information known only by you and not your fellow jurors or the parties, and this would unfairly and adversely impact the judicial process.

A juror who violates these instructions jeopardizes the fairness of these proceedings and could result in a mistrial, which would require the entire trial process to start over again.

All right.  We will see you back here after lunch.

Mrs. Shane, you may adjourn court.

THE COURTROOM DEPUTY CLERK:  Please rise.

This court is adjourned.

1    (Recess was taken at 11:49 a.m. to 12:53 p.m.)

2                          - - -

3                                    MONDAY AFTERNOON SESSION

4                                    NOVEMBER 4, 2024

5                          - - -

6         THE COURTROOM DEPUTY CLERK:  All please rise.

7         Court is met pursuant to recess.

8         THE COURT:  Mrs. Shane, do we have our jurors in the

9    jury room?

10        THE COURTROOM DEPUTY CLERK:  Most of them are back,

11   yeah.  We gave them until 1:00, so they have a couple more

12   minutes.

13        THE COURT:  Okay.  So when they're all back, I want to

14   see if there are any that need to be off tomorrow to vote.

15        So, Counsel, we have several things to discuss.  I'm

16   going to deal with this one first since it doesn't require a

17   whole lot of discussion.

18        I have given additional consideration to the issue of

19   whether I will permit the plaintiff to call the defendants for

20   cross-examination in the plaintiffs' case.  And although I have

21   done this in the past -- and I think I noted this in our

22   telephone conference -- and have permitted it, it's not

23   provided for in the federal rules.  It's an Ohio rule that some

24   federal judges sitting in Ohio, including myself, have followed

25   in trials in this court.

1    However, that procedure does interrupt the usual

2  progression of the presentation of a case, and it permits an

3  argumentative, aggressive cross-examination of the defendants

4  out of context and without the usual direct examination of the

5  defendants which would provide a context for the -- their

6  context, at least, for the cross-examination.

7    I've seen cases in which this has substantially

8  changed the dynamics of the trial from what would have occurred

9  if there had been a direct examination.  It deprives the

10  defendants' counsel of the opportunity to provide the

11  defendants' context in direct examination and requires and can

12  create a very negative impact and substantial delay sometimes

13  in the opportunity for the defendants' counsel to provide the

14  context for the defendants' testimony.

15    In this case it could be days, and the lingering

16  negative impressions are pretty hard to countervail after a

17  substantial delay.

18    So I've decided I'm not going to do it anymore.  There

19  would be a limited exception, however, if the defendants are in

20  possession of information that's really not contested but

21  simply isn't of record yet.  Things that might pertain to scope

22  of employment or things like that, that are easily elicited

23  through a brief cross-examination of the defendant would be

24  permissible.  But here I think the stipulations that have

25  already been entered into take care of all of those kinds of

1 issues.

2      So I am going to exercise my discretion to follow the

3 normal rules and not permit cross-examination of the defendants

4 in the plaintiffs' case.

5      Now, we need to discuss the issue of the Court's

6 preliminary instructions to the jury regarding the

7 applicability of the nationally accepted principles of law

8 enforcement regarding command and control between uniformed and

9 nonuniformed officers at the scene of a suspected crime.

10      And I believe my law clerk has given you copies of my

11 proposed instruction; am I correct?

12      It says:  The interaction between Special Agent Burk

13 and Officers Fihe and Winchell are governed by nationally

14 accepted principles of law enforcement regarding command and

15 control between uniformed and nonuniformed officers at the

16 scene of a suspected crime.

17      Under these accepted principles and practices of law

18 enforcement, LEOs (law enforcement officers), the defendants,

19 Fihe and Winchell, were in command and control of the scene

20 upon arrival.  Burk was required to prepare for his encounter

21 with uniformed officers by having his credentials, which

22 included his photograph, in view for inspection by the

23 uniformed officers.  He was required to treat the defendant

24 officers with respect and follow their commands, and the

25 defendant officers were entitled to expect him to do so if he

1   was, in fact, a federal law enforcement agent.

2          His failure to do so could reasonably cause them to

3   doubt his claim that he was a federal agent and influence their

4   decision about the extent of the threat of danger he might

5   represent to their safety.

6          So I'll be pleased to have any comments about that

7   proposed instruction.

8          Mr. Keyes?

9          MR. KEYES:  Thank you, Your Honor.

10          Would you like me to stand at counsel table; is that

11  okay?

12          THE COURT:  That's fine.

13          MR. KEYES:  Thank you.

14          We do have an objection to the instruction, the

15  proposed instruction, that the Court just read.  We have

16  several bases for an objection.

17          The first being that with respect to giving a specific

18  substantive instruction at the start of the evidence or before

19  the evidence, as opposed to -- and separating it from the other

20  substantive instructions that the jury will hear only at the

21  close of the evidence, we believe that that would give an

22  unduly influential position as to any particular instruction as

23  being singled out to the jury and therefore taking on

24  potentially more importance for the case than other

25  instructions that would only come after the evidence.

1      So we have an objection just logistically of when the

2 Court would give the instruction.

3      As to the content of the instruction, we don't believe

4 that the instruction that Burk was required to prepare for his

5 encounter with uniformed officers by having his credentials,

6 which included his photograph, in view for inspection by the

7 uniformed officers, we don't believe that that portion of the

8 instruction is appropriate because it imposes a specific

9 standard that is not found in any of the Fourth Amendment case

10 law, and there will not be clear evidence of a uniform standard

11 that would apply.

12      THE COURT:  Well, I referred to the standards of the

13 Bureau that he works for, and they refer specifically -- ATF,

14 and that would include his training, refers to these standards,

15 and that's one of the requirements.  It's shown by the records

16 of the disciplinary proceedings.

17      Now, those may or may not -- those may not be

18 admissible in evidence, but they're part of the record in this

19 case, and I certainly have no reason to doubt that they are

20 correct.  They are the records of the ATF, and they reflect

21 these standards.  That's where I got them.

22      MR. KEYES:  Respectfully, Your Honor --

23      THE COURT:  Do you disagree that those were the

24 standards of the ATF; that those are the standards of -- the

25 so-called command-and-control standards applicable to all law

1   enforcement?

2   　　　　MR. KEYES:  Your Honor, we disagree that the personnel

3   decision, that the termination, the initial termination --

4   　　　　THE COURT:  Well, we're not getting into that at all

5   in these preliminary instructions.  We're getting into the

6   standards that applied to the officers at the scene, and those

7   are the national standards adopted by both of these law

8   enforcement organizations and all initially adopted by both

9   federal and states.

10  　　　　MR. KEYES:  Your Honor, respectfully, we don't believe

11  that the records that you are referring to reflect an ATF

12  standard.  The evidence -- and I'm having Ms. Chin grab a copy

13  of the deposition from our box here.

14  　　　　But the evidence that will be presented in this case

15  on ATF standards is going to come from the ATF written

16  deposition that was provided under the ATF's regulations in

17  discovery; and those standards that the Court is referring to

18  in this instruction, that Mr. Burk was required to prepare for

19  his encounter by having his credentials in view for inspection

20  by the uniformed officers, are not attested to by ATF's

21  deposition answers given under oath.

22  　　　　So we would dispute the assumption or the presumption

23  that the content of this instruction comes from accepted

24  standards by ATF.

25  　　　　THE COURT:  Is there anything in this deposition that

1  contradicts what the disciplinary records show the standards

2  are?

3      MR. KEYES:  Yes, Your Honor.  One moment.

4      While we're pulling that -- I'm sorry, Your Honor.

5  Let me find the correct question and answer here.

6      Question No. 38 requires that an officer have a

7  visible badge, but not that the officer outwardly wear the

8  visible badge.

9      And the more specific question, Question No. 39:  Does

10  ATF have a policy regarding the attire that law enforcement

11  agents should wear when working in the field (i.e., uniforms,

12  equipment, visibility of a badge, or other ATF insignia)?

13     ATF's answer is:  Under ATF dress-code policy, SA Burk

14  was within ATF policy regarding the clothing he was wearing the

15  day of this incident.  During our meeting with the Columbus

16  police chief the day after this incident, he acknowledged how

17  SA Burk, quote, looked like a cop, unquote, with how he was

18  dressed, 5.11 pants and a polo shirt.  This attire is within

19  policy when conducting field work.  This was not an enforcement

20  operation, one during which agents may possibly wear uniforms

21  to improve their presence or professional appearance, which the

22  resident agent in charge (RAC) or group supervisor (GS) have

23  the discretion as to if/when they must be worn.

24     THE COURT:  All right.  Well, that does not address

25  the issue that the standard requires when the officer knows --

1  when the nonuniformed officer knows that uniformed officers are

2  coming to the scene, that he prepare and display his

3  credentials.  Which is, what I gleaned from the review of the

4  disciplinary records, part of the LEO standards.

5          And that's not contradicting.

6          MR. KEYES:  Your Honor, that was the first question

7  that we were reading into the record.

8          Question No. 41 from the ATF written deposition, the

9  question is:  In the Notice of Final Decision on Proposed

10  Removal regarding James Burk and dated November 3rd, 2021, it

11  states, quote, In sustaining the specification, I find that you

12  did not --

13          THE COURT:  Sustaining what specification?

14          MR. KEYES:  This is quoting from the November 3rd,

15  2021, Notice of Proposed Removal.

16          THE COURT:  Sustaining what specification?  What's he

17  referring to?

18          MR. KEYES:  We can pull that up.  One moment, Your

19  Honor.

20          THE COURT:  Well, that's the specification in one of

21  the charges.

22          MR. KEYES:  Correct.  Yes.

23          I'm referring, then, to the -- thank you, Your Honor.

24          The question was written by the City of Columbus, so I

25  will have to surmise which portion of the November 2021 notice

1   they were referring to.

2          But on page 2 of -- and this is Defense Exhibit T, for

3   the record, and this would be the November 2nd, 2021, Notice of

4   Final Decision on Proposed Removal.

5          So it's Specification 1 -- the charge is conduct

6   unbecoming a special agent.  Specification 1, on or about

7   July 7th, 2020, at or near Dublin, Ohio, when approached by a

8   police officer that you were told was coming to the scene, you

9   failed to have any law enforcement officer (LEO) badge or

10  credentials visible to identify yourself as an LEO.  And when

11  addressed by the police officer, you stated -- Your Honor, do

12  you want me to use the direct "F" word that's quoted -- you

13  stated, I'm a federal fucking agent.

14         Question No. 41 then quotes:  In sustaining this

15  specification, I find that you did not have any LEO badge or

16  credentials visible to identify yourself as an LEO, despite

17  your awareness that the local police were being called to the

18  scene.

19         So I believe that's the specification that the City

20  was quoting when they wrote Question No. 41 to ATF.

21         Then the question is:  What was ATF's policy and/or

22  training as of July 7th, 2020, regarding when and how its law

23  enforcement officers should display their badges?

24         ATF's response:  No formal written policy at that

25  time, but it is common practice to identify oneself.

1       THE COURT:  Well, that's what we're talking about,

2  common practice in the law enforcement community.

3       MR. KEYES:  Your Honor, the jury instruction

4  specifically references a requirement to prepare for his

5  encounter with uniformed officers by having his credentials,

6  which included his photograph --

7       THE COURT:  That's a requirement of the uniformed

8  principles of law enforcement.

9       MR. KEYES:  Your Honor, I'm reading ATF's statement of

10  their requirements, and that statement is nowhere in their

11  requirements that they --

12      THE COURT:  Well, it's part of the uniform principles.

13      MR. KEYES:  Your Honor, I'm not aware of the source of

14  uniform principles that we're speaking about.  If we're talking

15  about ATF --

16      THE COURT:  One of them is in the deposition testimony

17  and part of it is in the disciplinary file, and so that's

18  where -- that's what I'm relying upon.

19      Let's hear from the City.

20      MS. PICKERILL:  Yes, Your Honor.

21      We don't have any objection to the instruction as it

22  has been laid out.  We agree that the evidence in the record in

23  this case supports this instruction and supports this notion of

24  national policing practices.

25      And if I could quote another question from ATF's

1    deposition by written question, they were asked:  Was James

2    Burk required to have a visible badge or other ATF insignia

3    when interacting with civilians and attempting to collect

4    evidence on firearm retrievals?

5          Their response was simply, yes, that he was required

6    to have a badge not only on him, but visible, which would

7    necessarily mean out of his pocket and able to be seen.

8          And we believe that all of the evidence, including

9    this deposition by written questions, corroborates the standard

10   that Your Honor has laid out in this instruction.

11         THE COURT:  All right.  Okay.  Any other objections?

12         MR. KEYES:  Yes, Your Honor.

13         On the same content, Question No. 47 in ATF's written

14   deposition, the City asked:  As an ATF law enforcement officer,

15   was James Burk trained to have his badge out and visible if he

16   was aware that local law enforcement would be arriving at the

17   scene of a retrieval?

18         That is a question that is very specific to the

19   content that is included in this proposed officer authority

20   instruction.

21         ATF's response to the City's Question No. 47 was:

22   There has not been a policy or training addressing attire or

23   actions taken by agents when conducting, quote, administrative,

24   unquote, duties during which local law enforcement has been

25   called, and then SA Burk's incident was, quote, administrative.

1 Only policy addressing attire or actions taken by agents is

2 when conducting planned or unplanned, quote, enforcement

3 operations that went into effect in 2021.

4 So, Your Honor, as to the information that is actually

5 provided by the agency at issue, ATF, we would submit that

6 their deposition responses show that the standard that's quoted

7 in this proposed officer authority instruction is not correct.

8 And as to the City's position as to whether Mr. Burk

9 was required to have a visible badge or other ATF insignia when

10 interacting with civilians and attempting to collect evidence

11 or retrieve firearms, he did have a visible badge because -- we

12 know that because he showed her through the window.  That's

13 what she tells the dispatcher.

14 THE COURT:  All right.

15 MR. KEYES:  Thank you, Your Honor.

16 THE COURT:  Anything else?

17 MR. KEYES:  Your Honor, the next sentence:  He was

18 required to treat the defendant officers with respect and

19 follow their commands, and the defendant officers were entitled

20 to expect him to do so if he was, in fact, a federal law

21 enforcement agent.

22 We would object to that content as well because it

23 does not actually come from any clear written standard.

24 And, in fact, the standard that would apply to the

25 defendant officers' actions, we believe the more relevant

1   standard, appears in Defendants' Exhibit E, which is the

2   Columbus Police Division Directive 4.03, Section (II)(A)(3),

3   instructing personnel challenging possible out-of-uniformed law

4   enforcement personnel.

5       Columbus Police are instructed to instruct individuals

6   claiming to be law enforcement personnel, whose identity you

7   are not able to immediately confirm, to disarm in a safe manner

8   and then produce their agency's identification.

9       We believe that that statement, because that is a

10   Columbus Police Division personnel directive, would be the

11   appropriate content for an instruction along these lines in

12   terms of governing the officers' conduct on the scene.

13       So an instruction to the jury that Mr. Burk was

14   required to follow their commands and the defendant officers

15   were entitled to expect him to do so if he was, in fact, a law

16   enforcement agent, we think that that instruction is not

17   proper, when the directives to Columbus Police personnel

18   instruct them to go about this encounter in a way differently

19   from the way they did.

20       MS. PICKERILL:  Briefly, Your Honor?

21       THE COURT:  Yes.

22       MS. PICKERILL:  Your Honor, the standard that Mr. Burk

23   was required to follow the commands of uniformed local law

24   enforcement officers comes directly from the termination, those

25   internal investigative packets that you had mentioned

1  previously.  Two of the three specifications which were

2  sustained against him had to do with not following the commands

3  of the local law enforcement officers.

4          Additionally, this was another question that was asked

5  to ATF during the deposition by written question.  The question

6  was whether or not ATF officers received training on

7  interacting and cooperating with local law enforcement.

8          ATF responded:  Currently, agents are taught to

9  identify themselves and to follow the commands of responding

10  local law enforcement.

11          That's consistent with the internal investigation.

12  It's consistent with those national practices that we have been

13  talking about.

14          MR. KEYES:  Your Honor, if I may respond?

15          THE COURT:  Yes.

16          MR. KEYES:  ATF Question -- I'm sorry.  What was the

17  number?

18          MS. PICKERILL:  45.

19          MR. KEYES:  Question 45, the answer specifically

20  states "currently," meaning answered as of the time that these

21  responses were signed on March 7th -- I'm sorry.  The questions

22  were served on March 7th, 2023, so the answers would have come

23  at some point in the spring or summer of 2023, three years

24  after the incident.

25          That answer does not address whatever training or --

1    whatever training may have been in place as of July 7th of 2020

2    because the question wasn't worded that way.

3            So we do not believe that -- especially with the

4    answering caveating itself "currently," we don't believe that

5    that appropriately -- is appropriate evidence of an ATF

6    standard of July 7th of 2020.

7            As to the argument that the personnel determination,

8    again, Defendants' Exhibit T, the November 2nd, 2021, Notice of

9    Final Decision on Proposed Removal, we would submit that

10   legally that notice cannot serve as an establishment of

11   standards because it was canceled.  It was canceled.

12           And I know that the Court has noted that while it

13   was -- along with that cancellation there was a settlement

14   agreement.  But that does not change the fact that this

15   particular notice dated November 2nd of 2021, that that notice

16   was canceled by ATF itself.

17           So to use a canceled administrative decision that was,

18   again, later canceled and overturned to say, well, that

19   establishes the standards that govern ATF agents or other

20   federal law enforcement agents, we don't believe is proper.

21   Because if that's the source of the standards, the fact that it

22   was canceled makes it of no force and effect.  So it cannot, as

23   a matter of law, establish a set of standards for agents to

24   follow.

25           THE COURT:  All right.  Anything else?

1          MR. KEYES:  Not on that instruction.  Thank you, Your

2     Honor.

3          THE COURT:  All right.  Now, I have a preliminary

4     instruction on the use of force.

5          Do you have that, Counsel?  And do I have it?

6          MS. PICKERILL:  We do, Your Honor.

7          MR. KEYES:  Yes, Your Honor.

8          THE COURT:  Mr. Ver Steeg.

9          MR. KEYES:  If I may approach?

10         We have no objection to it, so if he wants use our

11    copy to refer to, that's fine.

12         THE COURT:  Defense counsel?

13         MS. PICKERILL:  We have no objection to that

14    preliminary instruction, Your Honor.

15         MR. KEYES:  Your Honor, I'm sorry.  If I may, for a

16    moment?

17         THE COURT:  Yes.

18         MR. KEYES:  Thank you.

19         We have no objection to the content of that specific

20    instruction; but as with the officer authority instruction, we

21    do object to including an instruction on a single aspect of the

22    case to be presented to the jury before evidence, to the

23    exclusion of other aspects of the case.

24         As the Court ruled last week, there is an aspect of

25    unlawful detention still in the case; and there is a separate

1 proposed jury instruction related to unlawful detention.

2   So our position would be if we're going to be

3 including substantive instructions to the jury about

4 substantive claims, such as excessive force, they should

5 include other aspects of the case as well, such as unlawful

6 detention.

7   And we also believe -- I know this was discussed with

8 the Court late last week.  We also submit that an unlawful

9 arrest instruction is still appropriate in the case.

10   So if we are putting substantive instructions on parts

11 of the claims before the jury, we would request that it not be

12 limited to excessive force, but also to include unlawful

13 detention and unlawful arrest as well.

14   THE COURT:  All right.  Let me consider that.

15   So we're going to bifurcate this case on the issues of

16 liability and damages.

17   So what -- it may be that this is taken care of by the

18 stipulations.  I notice that the stipulations include reference

19 to the nature of the injury Agent Burk -- at least the nature

20 of the physical injury that he sustained.

21   Is there anything else that plaintiffs' counsel

22 believes the jury should have in the way of preliminary

23 instructions regarding issues of injury and damages?

24   MR. KEYES:  As far as preliminary instructions on

25 those issues, no, Your Honor.

1    THE COURT:  All right.  And I would -- I'm going to

2  read the stipulations to the jury, so that will certainly give

3  them the context of the damage claims.

4    Now, the scope of the testimony of the plaintiffs'

5  use-of-force expert, Scott DeFoe, I addressed that in my filing

6  that related to the national standards of uniformed and

7  nonuniformed officers and indicated my view that some of

8  Mr. DeFoe's testimony improperly, in the Court's view, applied

9  the use-of-force standard, what's reasonable under the

10  circumstances, to the orders issued by the defendant officers.

11    And it's the Court's belief that those orders are

12  lawful orders if they are in accordance with the principles,

13  the national law enforcement principles, regarding command and

14  control of the scene.

15    So is there any disagreement about that?

16    MR. KEYES:  Your Honor, the specific issue of

17  Mr. DeFoe's testimony, we will not be asking him to opine on

18  standards that would be based on information that was not

19  perceived or available to the responding officers.

20    On the issue of the commands versus the use of force,

21  I'm having a hard time, at least in the first instance,

22  separating the two because the holding of a subject at gunpoint

23  is specifically deemed in the case law to be a form of a use of

24  force, and some of the commands that were verbally given were

25  contemporaneous with Officer Fihe and later Officer Winchell

1  holding Agent Burk at gunpoint.

2        So in terms of separating the commands from the use of

3  force, I'm not sure that the facts would allow that clean of a

4  separation because they all come at the same time.

5        However, we are fine with limiting and instructing

6  Mr. DeFoe that any testimony he gives about use-of-force

7  standards should not speculate about orders that are separate

8  and not -- separate and distinct from a use of force or not

9  accompanied with a use of force.

10       THE COURT:  All right.  Defense counsel?

11       MS. PICKERILL:  That seems to cover the largest issue

12 that we had with Mr. DeFoe's testimony.  We are concerned with

13 him testifying about the totality of the circumstances, to

14 include things that only Mr. Burk could have known, and to then

15 apply a different standard to Mr. Burk's -- to apply that

16 use-of-force standard to Mr. Burk's response to those commands.

17       We would still reserve the right to object if we feel

18 like his testimony gets into any of those areas.

19       THE COURT:  All right.  Very well.

20       MS. PICKERILL:  Your Honor, one more thing, if I may?

21       THE COURT:  Yes.

22       MS. PICKERILL:  Defendants have requested in their

23 last motion in limine to be permitted to rebut DeFoe's

24 testimony with some of those findings from ATF's internal

25 investigative documents.  Not necessarily mention of the

1　termination punishment, but to mention the analyses that ATF

2　goes through in there and -- as those are reasonable -- those

3　are pertinent to the reasonableness of the defendant officers'

4　actions.

5　　　　THE COURT:  So do you have specific content that you

6　can identify for us right now?

7　　　　MS. PICKERILL:  Yes.  Specifically, Your Honor, the

8　Notice of Final Decision on Termination, which I believe was

9　November 2nd, 2022.

10　　　　THE COURT:  The entire document?

11　　　　MS. PICKERILL:  Let me see if I can pull up the exact

12　pages, but specifically their findings on the specifications,

13　which I believe is about a page and a half of the document.

14　　　　THE COURT:  Well, we're not going to be talking about

15　that in voir dire -- in opening statements.

16　　　　MS. PICKERILL:  Okay.

17　　　　THE COURT:  And I'll rule on that when the time comes

18　in the development of the testimony.

19　　　　MS. PICKERILL:  Understood.  Thank you, Your Honor.

20　　　　THE COURT:  Now, let's see if we can solve this issue

21　regarding unlawful detention.

22　　　　All right.  I agree that the preliminary instructions

23　should address the issue of unlawful detention, and here's what

24　I propose:  Plaintiff Burk claims that while acting under color

25　of law, Defendant Fihe and Defendant Winchell each violated

1  Mr. Burk's constitutional right not to be subjected to an

2  unreasonable detention.

3         When a police officer has reasonable suspicion that a

4  person was involved in criminal activity, they may briefly

5  detain someone.  An investigatory stop must be temporary and

6  last no longer than necessary to effectuate the purpose of the

7  stop, and it must be limited to the least intrusive means

8  reasonably available to verify or dispel the officer's

9  suspicion in a short period of time.

10        And I think that's enough to give the jury a basic

11  instruction on what kind of issues are raised by a detention

12  claim.

13        Any objection?

14        MR. KEYES:  For a preliminary instruction, that's

15  fine, Your Honor.  Thank you.

16        THE COURT:  All right.  Very well.

17        MS. PICKERILL:  No objection from the defense either.

18        THE COURT:  All right.  So are we ready to begin?

19        MR. KEYES:  Your Honor, I hate to go back to the very

20  first thing you mentioned on the bench, but if I may at least

21  be heard and make a record on the inability to cross-examine

22  and call the defendant officers in the plaintiffs' case in

23  chief.

24        THE COURT:  Sure, yes.

25        MR. KEYES:  Thank you, Your Honor.

1    We do believe that such a limitation is improper under

2 the Federal Rules of Evidence relating to witnesses, and we

3 believe that under 601 the defendant officers are competent

4 witnesses.  And we believe that Rule 611, in particular 611(c),

5 specifically contemplates that a party may call an adverse

6 party as a witness because that 611(c) specifically talks about

7 leading questions being allowed when a party calls a hostile

8 witness, an adverse party, or a witness identified with an

9 adverse party.  That is 611(c)(2).

10    So we would submit -- do you want me to pause?

11    THE COURT:  We'll take a look at the rule.

12    MR. KEYES:  Thank you, Your Honor.

13    THE COURT:  Well, the rule says:  The Court should

14 exercise reasonable control over the mode and order of

15 examining witnesses so as to make those procedures effective,

16 avoid wasting time, and protect the witness from harassment or

17 undue embarrassment.

18    It doesn't specifically address the issue of calling a

19 witness -- a defendant for cross-examination in the plaintiffs'

20 case, and it's the Court's feeling that that can result in

21 substantial prejudice to the witness.

22    I've seen that procedure used to cross-examine a

23 witness vigorously and argumentatively without any ability for

24 the jury to hear the witness' context for what he's being

25 examined about, or she, and then creating a lasting negative

1   impression that may not be addressed for days.

2         So I think that, particularly in a case as lengthy as

3   this, that it could indeed lead to unfairness.  So I'm going to

4   exercise my discretion under Rule 611 to not permit it.

5         MR. KEYES:  Your Honor, in that case, we would ask

6   alternatively -- and one of the practical considerations here

7   is that --

8         THE COURT:  Now, if an officer knows something that is

9   necessary for your case that only they know and it's not -- as

10   I said, relating to course of employment or something like that

11   that should be stipulated but isn't, but I don't think

12   that's -- that's not present here.

13         MR. KEYES:  Your Honor, part of the issue is that

14   Mr. DeFoe's testimony, his expert testimony, is largely going

15   to be considering things that would ordinarily be established

16   by not just the video of the incident, but testimony evidence

17   from the officers.

18         So if the Court would not permit us to call the

19   defendant officers in our case in chief, I would alternatively

20   ask that we be allowed to read portions of their deposition

21   transcript into evidence because Mr. DeFoe's opinions are going

22   to, in part, take into account some evidence that would be

23   expected to come from the officers if they were called to

24   testify live.

25         THE COURT:  All right.  Well, that may be entirely

1    appropriate.  We'll have to deal with that at the time it

2    arises.

3         MR. KEYES:  Thank you, Your Honor.

4         That's all for us, Your Honor.  Thank you.

5         THE COURT:  All right.  I think what you're saying is

6    we know what their testimony is on certain things, and it's

7    easily determined by reading their deposition transcript, and

8    you should be permitted to ask a hypothetical question on the

9    basis that they are reasonably expected to give the same

10   testimony here that they did in their deposition.

11        I would be inclined to permit that.

12        MR. KEYES:  Yes, Your Honor.  I mean, not to split --

13   I could phrase it as a hypothetical question.  I believe that

14   the deposition testimony is admissible as substantive evidence,

15   the deposition testimony itself, because the witness is a party

16   opponent; and under the rules of oral depositions, we could --

17   the rules would allow us to read that testimony into the record

18   as substantive evidence.

19        THE COURT:  I may agree with you there.  I guess I

20   would have to see the testimony, was there an objection to it,

21   and so forth, but I think that's probably correct.

22        MR. KEYES:  Thank you, Your Honor.

23        That's not conceding the point that additional

24   testimony elicited live would be helpful to those assumptions,

25   but in the alternative that would be our request.

```
 1              THE COURT:  All right.

 2              MR. KEYES:  Thank you, Your Honor.

 3              THE COURT:  Anything else we need to resolve before me

 4   bring our jury in?

 5              MR. KEYES:  Oh, I'm sorry.  Your Honor, just before

 6   the end of the day, have we decided, are we going to convene in

 7   the morning tomorrow and take the afternoon off?

 8              THE COURT:  We need to find out.

 9              MR. KEYES:  Okay.  Thank you.

10              THE COURT:  All right.  Mrs. Shane?

11              THE COURTROOM DEPUTY CLERK:  Yes, Your Honor.

12              THE COURT:  Would you see if our jurors have

13   returned --

14              THE COURTROOM DEPUTY CLERK:  I'm sure they have.

15              THE COURT:  -- and see what their plans are with

16   regard to voting.

17              THE COURTROOM DEPUTY CLERK:  You want me to find out

18   if there's any that have voted?

19              THE COURT:  And want to vote or are asking to.

20              THE COURTROOM DEPUTY CLERK:  I will do that.

21              MR. KEYES:  Your Honor, while Mrs. Shane is out, would

22   it be okay to start getting our slideshow set up?

23              THE COURT:  Yes, indeed.

24              MR. KEYES:  Thank you.

25           (Pause in proceedings.)
```

1          THE COURT:  Mr. Keyes and defense counsel.

2          Yes, ma'am.

3          THE COURTROOM DEPUTY CLERK:  We have five who need to

4    vote, and they all want to do afternoon.

5          THE COURT:  Okay.  Five of them, and they want to vote

6    in the afternoon tomorrow.

7          Now, I am removing from my instruction on the national

8    standards the sentence that says:  Burk was required to prepare

9    for his encounter by having his credentials, which included his

10   photograph, in view for inspection by the uniformed officers.

11         I think that's correct, but I don't have the ability

12   to verify that belief, so we're not going to tell them that

13   now.  We may end up telling them that in the final

14   instructions, but we're going to take that out of the

15   preliminary instruction.

16         MR. KEYES:  Understood.  Thank you, Your Honor.

17         THE COURT:  All right.  We are ready.

18      (Jury in at 1:45 p.m.)

19         THE COURTROOM DEPUTY CLERK:  This court is met

20   pursuant to recess.

21         THE COURT:  Ladies and gentlemen of the jury, I have

22   some preliminary instructions for you that will give you some

23   information that will guide you as you listen to the arguments

24   of counsel and as you listen to the evidence as it's developed

25   in this case.

1      It will be your duty to find from the evidence what

2   the facts are.  You and you alone will be the judges of the

3   facts of this case, and you will then have to apply to those

4   facts the law as I will give it to you at the end of the case.

5   You must follow that law whether you agree with it or not.

6      Nothing that the Court may say or do during the course

7   of the trial is intended to indicate or should be taken by you

8   as indicating what your verdict should be.  What verdict is to

9   be rendered in this case is your sole responsibility as the

10  jurors.

11     Now, the evidence from which you will find the facts

12  will consist of the testimony of witnesses and any documents or

13  photographs or videos or other things received into the record

14  as exhibits and any facts that the lawyers agree to, or

15  stipulate, or that the Court may instruct you to find as a

16  matter of law.

17     Certain things are not evidence and should not be

18  considered by you, and I will list them for you now.

19     The statements and arguments and questions of the

20  lawyers, their statements and their arguments and their

21  questions, are not evidence.

22     Objections to questions are not evidence.  Lawyers

23  have an obligation to their clients to make objections when

24  they believe evidence being offered is improper under the Rules

25  of Evidence, but you should not be influenced by the objection

1 or by the Court's ruling on it.  You should see whether the

2 witness answers the question.  If the Court permits the witness

3 to answer, then you should be concerned with the answer to the

4 question, not the objection.

5 If the objection is overruled, just treat that answer

6 like the answer to any other question.

7 If you are instructed, however, that some item of

8 evidence is received for a limited purpose only, then you must

9 follow that instruction.

10 Testimony that the Court has excluded or instructed

11 you to disregard is not evidence and must not be considered.

12 Anything that you may have seen or heard outside the

13 courtroom is not evidence and must be disregarded.  You are to

14 decide this case solely on the evidence presented here in the

15 courtroom.

16 Now, there are two kinds of evidence:  Direct evidence

17 and circumstantial evidence.  Direct evidence is the direct

18 proof of a fact such as the testimony of an eyewitness.

19 Circumstantial evidence is proof of facts from which you may

20 infer or conclude that other facts exist.

21 I'll give you some further instructions about this and

22 other matters at the end of the case, but just keep in mind

23 that you may consider both kinds of evidence.

24 It will be up to you to decide which witnesses to

25 believe, which witnesses not to believe, and just how much of

1  any witness' testimony to accept or reject.

2       I'll give you some guidelines at the end of the case

3  that you may wish to use in determining the credibility of

4  witnesses; but in the final analysis, you would use the same

5  reasoning process you would in your ordinary affairs to decide

6  whether someone is telling the truth.

7       Now, the burden of proof, we have talked about this.

8  This is a civil case.  The plaintiff has the burden of proving

9  his or her case by what is called the preponderance of the

10  evidence.  That means the plaintiff has to produce evidence

11  which, when considered in light of all of the facts, leads you

12  to believe that what the plaintiff claims is more likely true

13  than not true.

14       To put it differently, if you were to put the

15  plaintiffs' and the defendants' evidence on the opposite side

16  of the scale, the plaintiff would have to make the scale tip

17  somewhat on his or her side.  If the plaintiff fails to meet

18  this burden, then the verdict must be for the defendant.

19       Those of you who have sat on criminal cases, well, we

20  have discussed that.  The burden of proof of reasonable doubt

21  is not applicable here.

22       Now, I'm going to give you some brief preliminary

23  instructions about the specific issues in this case.

24       As you know, in this case the plaintiffs claim that

25  Mr. Burk's federal constitutional rights were violated by the

1  defendants.  Mr. Burk claims that while acting under color of

2  law the defendants, Fihe and Winchell, violated his

3  constitutional right to be free from the use of excessive or

4  unreasonable force.

5          To succeed on that claim, Mr. Burk must prove that

6  Defendants Fihe and/or Winchell used unreasonable force against

7  the plaintiff.

8          You must decide whether defendants' use of force was

9  unreasonable from the perspective of a reasonable officer

10  facing the same circumstances that Defendant Fihe or Defendant

11  Winchell faced.  You must make this decision based on what each

12  officer knew at the time of the use of force.

13          The reasonableness inquiry is an objective one.  The

14  question is whether the defendant officers' actions were

15  objectively reasonable in light of the facts and circumstances

16  facing them, without regard to their underlying intent or

17  motivation.  If a use of force is objectively reasonable under

18  the circumstances, then it does not violate the Fourth

19  Amendment of the Constitution.

20          The reasonableness of a particular use of force must

21  be judged from the perspective of a reasonable officer on the

22  scene rather than with the benefit of 20/20 hindsight.

23          The nature of reasonableness must allow for the fact

24  that police officers are often forced to make split-second

25  judgments under circumstances that are tense, uncertain, and

1  rapidly evolving about the amount of force that is necessary in

2  a particular situation.

3          Mr. Burk also claims that while acting under color of

4  law, Defendants Fihe and Winchell violated his constitutional

5  right not to be subjected to an unreasonable detention.

6          When a police officer has reasonable suspicion, they

7  may briefly detain someone.  That detention must be temporary

8  and last no longer than necessary to effectuate the purpose of

9  the detention, and it must be limited to the least intrusive

10  means reasonably available to verify or dispel the officer's

11  suspicion in a short period of time.

12          Now, there are certain principles applicable, national

13  principles of law enforcement applicable, to the -- to all of

14  the law enforcement officers involved in this case.  These

15  principles are applicable to Agent Burk, and they are also

16  applicable to Officers Fihe and Winchell.  These are nationally

17  accepted principles of law enforcement regarding command and

18  control between uniformed and nonuniformed officers at the

19  scene of a suspected crime.

20          Under these accepted principles and practices, the

21  defendant officers, Fihe and Winchell, were in command and

22  control of the scene upon their arrival.  Agent Burk was called

23  upon to respect and follow their commands, and they were

24  entitled to expect Mr. Burk to do so if he was, in fact, a

25  federal law enforcement agent.

1        His failure to do so could reasonably cause them to

2   doubt his claims that he was a federal agent and influence

3   their decisions about the extent of the threat or danger that

4   he might represent to their safety.

5        Now, a few words about your conduct as jurors.

6        You as the jurors must decide this case based solely

7   on the evidence presented here in the four walls of this

8   courtroom.  That means that during the trial you must not

9   conduct any independent research about the case and you should

10  not consult any reference matters whatsoever, including such

11  things as the internet.

12       Until you retire to deliberate you should not discuss

13  this case with anyone.  After you retire to deliberate you may

14  begin to discuss the case with your fellow jurors, but you

15  should not discuss this case with anyone else until after you

16  have returned a verdict in this case.

17       I've given you instructions about the use of

18  communication devices, and you are to follow those instructions

19  throughout this trial.

20       You must not talk to anyone at any time about this

21  case or read or listen to anything that may be on the news

22  about this case.  You're not to communicate electronically with

23  anyone about this case.  This, of course, includes your family

24  and friends.  And as I have explained, a juror who violates

25  these instructions jeopardizes the fairness of these

1  proceedings.

2         You should not form any final opinion about this case

3  until all of the evidence is in.  You should keep an open mind

4  throughout this trial, right up until the time you start your

5  deliberations.

6         I am permitting you to take notes in this case, but

7  you're not required to do so.  If you want to take notes, I

8  would caution you that it is difficult to take detailed notes

9  and pay attention to what the witness is saying at the same

10  time.  Your first priority should not be your notes; it should

11  be listening and watching the witness while they are

12  testifying.

13         So make sure your note-taking does not interfere with

14  listening to and considering the evidence and watching and

15  listening to the witness.

16         If you take notes, you should not discuss them with

17  anyone else before you begin your deliberations.  You will not

18  take your notes home with you.  You will have an envelope to

19  put your notes in, and they will be safeguarded in the jury

20  room when you go home for the evening, and make sure that you

21  leave your notes in the jury room.  You will have a special

22  envelope to put your notes in.

23         If you choose not to take notes, that's entirely up to

24  you.  Whether you do or don't take notes, it's your

25  responsibility to listen carefully to the evidence and you

1   should not think that you can give that responsibility to

2   someone who is taking notes.  So your notes are for your own

3   use.

4           In making your decision, your decision must be based

5   upon your independent recollection, your independent

6   recollection, of the evidence.

7           Now, this trial will now begin, and the first

8   procedure is the opening statements of counsel.  This is an

9   opportunity for the attorney for each side to tell you what

10  they believe the evidence in the case is going to show.

11          Their opening statements are not evidence.  They are

12  simply statements of what they believe the evidence will be.

13  You, of course, will be the final determiners of what the

14  evidence is and what it shows.

15          So we start with plaintiffs' counsel because the

16  plaintiff has the burden of proof.  And then defense counsel

17  will have her opportunity to make her opening statements, and

18  this is her opportunity to tell you what she believes the

19  evidence in this case will show.

20          After all of the evidence is in, several days from

21  now, then the lawyers will have the opportunity to present

22  closing arguments; and closing arguments are an opportunity for

23  the lawyers to summarize and interpret the evidence for you.

24  After the arguments of counsel, I will then give you the

25  instructions of law applicable to this case.  You will then

1    retire to deliberate on your verdict.

2            All right.  At this time we will entertain plaintiffs'

3    opening statement.

4            MS. CHIN:  Thank you, Your Honor.

5            Good afternoon.  Thank you all for being here.  We

6    appreciate you guys being patient with us as we took a little

7    bit of a longer lunch break.

8            I'm going to spend the next 30 minutes or so giving

9    you all a preview of what we're going to see over the next

10   several days, as Judge Graham just mentioned.

11           This case is an interesting one because it's simple in

12   some respects, but it's also unique.  It's simple because at

13   the end of this case we're going to ask you one overarching

14   question:  Did Columbus Police officers, did they go too far

15   when they pointed a loaded gun, handcuffed, tased, and threw my

16   client, James Burk, in the back of a police vehicle on July 7th

17   of 2020?

18           But this case is also a unique one because, as you

19   have heard, everyone involved in it is law enforcement.

20           Now, before I get into telling you about what happened

21   on July 7th of 2020, I want to go over a couple of rules for

22   you all to think about throughout the scope of this trial.  As

23   Judge Graham just mentioned to you, these are rules to help

24   guide you but they are also fundamental to our rights as

25   citizens of the United States.

1    The Fourth Amendment to the United States Constitution
2  protects all of us from unreasonable searches and seizures.
3  And we won't get into searches on this case, but we are talking
4  about seizures, and the first piece of that is unlawful
5  detention.
6    As Judge Graham just mentioned, a police officer can
7  detain someone briefly if they have a reasonable suspicion that
8  a crime has occurred or is about to occur.  But that detention
9  must be brief, no greater than necessary, and by the least
10  intrusive means possible.
11    The second piece of this case, which he also told you
12  about, is excessive force.  That means that a police officer,
13  they can use force if it's objectively reasonable given the
14  circumstances.  But what this also means is that a police
15  officer can't use force if they're tired, if they're having a
16  bad day.  They can't use force if a person is being rude to
17  them, and they can't use force as a form of punishment.
18    So it's with these rules in mind that I want to --
19  want you all to focus on the day that we're here for today, and
20  that's July 7th of 2020.  It's July 7th of 2020, and my client,
21  ATF Special Agent James Burk, he's headed out for what he
22  thinks is going to be a routine day.  He puts on a gray Nike
23  polo, tan 5.11 tactical pants, and he heads out the door.  He's
24  headed to Dublin, Ohio, to retrieve an illegal firearm.
25    Now, taking one step back.  As we have heard,

1    Mr. Burk, Agent Burk, was a special agent with the Bureau of

2    Alcohol, Tobacco, Firearms and Explosives.  And what ATF does

3    is they ensure that people who -- if there's illegal guns on

4    the street, what ATF does is they go and retrieve them, they go

5    collect them.  But that process gets a little complicated.

6         As you heard Judge Graham mention during voir dire,

7    sometimes -- everybody gets background checked when they go

8    purchase a firearm, but sometimes that background check isn't

9    complete by the time that the purchase goes through.

10        So what happens is once -- if that purchase goes

11   through and the FBI then flags somebody as a possible illegal

12   purchaser, that's when ATF gets involved.  Then ATF will

13   conduct an investigation, thorough investigation.  And if ATF

14   determines that a gun was purchased illegally, then ATF sends

15   out one of their agents to go collect that illegal firearm.

16        There's a number of people who can't purchase firearms

17   legally.  Criminals can't purchase firearms, people who have

18   been hospitalized with mental health disorders can't purchase

19   firearms, and people whose immigration status is in question

20   can't legally purchase a firearm.

21        In this instance, Agent Burk was headed out to Dublin,

22   Ohio, to collect an illegal firearm that had been purchased by

23   somebody whose immigration status was in question.

24        So turning back to the day.  Agent Burk, he heads out

25   to a townhome in Dublin, Ohio.  It's around 1:50 in the

1    afternoon.  It's sunny outside.  There's very few clouds.  But

2    it is July, so it's pretty hot.  It's over 90 degrees on this

3    particular day in the afternoon.

4          Agent Burk, he walks up to the door and he knocks.

5    He's in plainclothes, but he has his badge and credentials at

6    the ready.  They're in his pocket on his left side.

7          After he knocks, a woman comes to the door.  Agent

8    Burk identifies himself, and he asked to speak with her

9    husband, who is the purchaser of the illegal firearm.

10          Now, when he does get to the door, he does show the

11    woman his badge.  But she's nervous, and she doesn't want to

12    open the door.  She keeps the door closed through this entire

13    encounter.  But because she's nervous, she calls 911.  And 911

14    sends out the defendants in this case, Officer Fihe and Officer

15    Winchell, and they're sent out to respond to a potential

16    burglary where the person is saying that they're law

17    enforcement.

18          Now, Agent Burk has no problem with 911 being called.

19    He's been an ATF agent for over 15 years at this point, and

20    he's retrieved hundreds of illegal firearms.  This isn't the

21    first time that local law enforcement has been called, and this

22    isn't the first time that he's faced a situation like this.

23    This isn't the first time that he walks up to a door and he

24    knocks and the person doesn't want to speak to him.  This isn't

25    the first time that somebody has told him that the purchaser of

1    the firearm isn't home, but really that person is hiding, and

2    so he's got to dig a little deeper to retrieve that illegal

3    firearm.

4           This isn't the first time that local law enforcement

5    has been called to verify his identity.  It's understandable.

6    People get nervous; 911 gets called.

7           But what's happened to Agent Burk in the past is that

8    local law enforcement, they roll up to the scene, he has a

9    conversation with them, they ask him who he is, to see his

10   badge, and they verify his identity.  And then local law

11   enforcement, they help ease the person's comfort who called

12   911, but they also can help Agent Burk retrieve that illegal

13   firearm.

14          So he knows that 911 has been called, and, again, he

15   has no problem with it.

16          After Officer Fihe and Officer Winchell are sent out,

17   Agent Burk and the woman at the door, they wait seven minutes

18   for law enforcement to arrive, but it's not silent.  It's not

19   silent the entire time that Agent Burk and the woman at the

20   door are waiting for Officer Fihe, who is the first to show up

21   at the scene, to arrive.

22          Instead, 911 asks the woman at the door to collect

23   additional information.  911 asks the woman at the door to ask

24   Agent Burk:  What police department are you with?  What's your

25   name?  What's your badge number?

So the woman at the door does just that.  She asked Agent Burk, "What police department are you with?"

He responds, "I'm with ATF."

She asks -- the woman at the door gives that information to 911.

The woman at the door asks him, "What's your name?"

He says, "It's Jim Burk."

And the woman at the door tells 911, "He says his name is Jim Burk."

The woman at the door asks him, "What's your badge number?"

He says, "4672."

And the woman at the door tells 911 his badge number, 4672.

It's all helpful information, right?  All information that would be helpful for Officer Fihe and Officer Winchell to know as they arrive up to the scene.

So how does that information get passed off between 911, after collecting that from the woman at the door, to the police officers?  You see, there's these screens in police officers' cars that display information that 911 can send them. You'll sometimes see this as a display event.  You might also hear it referred to as a CAD report throughout this case.  But all this information gets sent to a computer screen on the dash on the police officer's car.

1    In this case, 911 sends Officer Fihe, who is the first

2  person to arrive at the scene, all of this information.  He

3  gets on the screen in his car that a person showed the woman a

4  badge.  He sees -- or he gets the information that the person

5  at the door is saying that he's with ATF, that he's saying that

6  his name is Jim Burk, and he's saying that his badge number is

7  4672.

8    All this information gets sent to the screen in the

9  car, and all this information gets sent with about five minutes

10 still remaining as Officer Fihe is headed to the scene.

11   All right.  So hopefully I set that up for you.  And

12 now instead of telling you what happens next on July 7th of

13 2020, I would just like to show you.  Because, really, why take

14 my word for it when you can watch it?  We have the body camera

15 footage from Officer Fihe.

16   So this body camera footage is going to start about a

17 minute before Officer Fihe exits his vehicle.

18   At this point, remember, it took seven minutes for him

19 to get there from being sent out by 911, and he's had the

20 information on the screen in his car for about five minutes at

21 that point.

22   So we'll start there.

23   THE COURT:  No, no, no.  This is opening statement.

24 This is not the time to present evidence.  It's the time to

25 tell the jury what the evidence is going to show.

1    MS. CHIN:  Respectfully, Your Honor, this is a joint

2 exhibit that the parties have agreed to the authenticity and

3 admissibility of.

4    THE COURT:  Please, Counsel.  Please.

5    MS. CHIN:  Yes, Your Honor.

6    So as I've told you, Officer Fihe has had the

7 information in his car for about five minutes, and he rolls up

8 to the scene.  He rolls up to the scene, and what happens next

9 is that he gets out of his car and he immediately unholsters

10 his gun.  He's about 30 feet away from where Agent Burk is

11 standing on the porch still by the door.

12    Officer Fihe rolls up, and he starts yelling.  He

13 starts yelling at Agent Burk.  He says, "Hands up.  Turn

14 around.  Show me your hands and turn around."

15    So what does Agent Burk do?  Puts his hands up, and he

16 starts turning around towards where Agent Fihe -- or towards

17 where Officer Fihe has given those commands.

18    As Agent Burk is turning around, he responds to Agent

19 Fihe and he says, "I'm a federal agent."

20    Now, next, Officer Fihe points his gun towards Agent

21 Burk, and he yells three conflicting commands.  He yells, "I

22 need to see your hands.  I need to see some ID.  Get on the

23 ground.  Get on the ground now."

24    He yells all three of those in succession, about two

25 seconds.

1    "Hands up.  I need to see some ID.  Get on the ground

2    now."

3           So Agent Burk and Officer Fihe then begin to have an

4    exchange.  Agent Burk declines to get on the ground, but he

5    tells Officer Fihe that he -- he tells Officer Fihe that he is

6    a law enforcement agent, that he's with -- that he's a federal

7    agent.

8           But Officer Fihe won't listen to him.  Officer Fihe

9    won't listen to Agent Burk telling him that he is a federal

10   agent.

11          And I'll be fair, Officer Fihe does say get on the

12   ground, but Agent Burk says that he can't get on the ground.

13          About a minute later, Officer Winchell rolls up.  At

14   this point Agent Burk and Officer Fihe are still exchanging

15   words.  Officer Fihe is still telling Agent Burk to keep his

16   hands up, and he keeps his hands up the entire time.

17          He keeps his hands up, but he tries to tell Officer

18   Fihe, "I've got my badge.  I've got my creds right here in my

19   left pocket."

20          But Officer Fihe won't look at his credentials.

21   Officer Fihe never asks for Agent Burk's name throughout this

22   entire encounter.  He never asks who Agent Burk is with.  He

23   never asks for Agent Burk's badge number, despite this entire

24   time knowing that he was responding to a situation where there

25   was a person claiming to be law enforcement and he had all that

1    information in his car.  Remember that.

2           So Officer Winchell rolls up to the scene, and at this

3    point Officer Winchell also pulls his loaded gun and points it

4    at Agent Burk, so Agent Burk has two guns -- loaded guns pointed

5    at him.

6           At this point Agent Burk gets on the ground, and he's

7    laid out with his hands nowhere near his hips, and he's pleading

8    with Officer Fihe and Officer Winchell, "Just get my creds.  Get

9    my creds out of my pocket."

10          They never once do.  They still don't ask for his name,

11   they still don't ask for who he is with, and they still don't

12   ask for his badge number.

13          Instead, what Officer Fihe and Officer Winchell do is

14   they knee Agent Burk in the back as he's pleading with them,

15   "I'm hyperventilating.  I can't breathe.  Just please look at my

16   creds."

17           They cuff him behind the back, but while they're

18    cuffing him he's also tased.  He's tased multiple times.  He's

19    tased and cuffed while pleading with them to "Please look at my

20    badge.  Get my badge out of my pocket."  But they never once

21    do.

22          Once Agent Burk is cuffed, Officer Fihe and Officer

23   Winchell have him sit, sit on the sidewalk, kind of one of those

24   stoops that leads into a parking lot.  And he's sitting there on

25   the ground, hands behind his back, cuffed.

1    At this point, finally, Officer Fihe grabs Agent

2  Burk's credentials out of his wallet -- out of the side pocket

3  of his pants.  He pulls them out, and he looks at them.  He

4  sees the ATF.  He sees Agent Burk's picture.  He sees the badge

5  number.

6    They also ask Agent Burk who his supervisor is.  Agent

7  Burk responds the SAC, which is special agent in charge, is

8  McPherson, John McPherson, but he's about to retire, and it's

9  soon going to be Roland, who is Roland Herndon, who you may

10  hear from later in this case.

11    Agent Burk gives all this information to them.  They

12  have also seen his credentials at this point, but I will tell

13  you they still never ask for his name, they still never ask for

14  who he is with, and they still never ask for his badge number.

15    Instead, what Officer Fihe and Officer Winchell do is

16  they keep Agent Burk cuffed behind his back, and they grab him

17  and pull him over to the back of a police cruiser.

18    While they're pulling him over to the back of the

19  police cruiser, what do they say to him?  They say to him, "You

20  had your chance," and then they throw him and yank him in the

21  back of the police cruiser, and they leave him there cuffed and

22  detained, and he remains detained and cuffed for about an hour.

23  After that hour, they finally set him free.

24    So a lot happened during that encounter, a lot happened

25  during that encounter between Officer Fihe and Winchell and

1  Agent Burk, a lot of things that shouldn't have happened.

2  Remember, before, five minutes before, Agent Burk --

3  excuse me.

4  Five minutes before Officer Fihe rolls up to the scene

5  he receives information on the screen in his car.  And that

6  information says that he showed a badge, that he says he's with

7  ATF, that his name is Jim Burk, and that his badge number is

8  4672.

9  Yet never once, never once through the entire encounter,

10  do they ask him:  What's your name?  Who are you with?  What's

11  your badge number?

12  This is despite them knowing that they're responding to

13  a situation where it's a potential burglary, where the person is

14  claiming that they're law enforcement.

15  Even Agent Burk, as they rolled up to the scene, tells

16  them, "I'm federal law enforcement," with his hands in the air,

17  but they still never ask for his name, who he is with, or his

18  badge number.

19  Now, I'll tell you that a lot happens during that, a lot

20  happens during that.  And, you know, I'm not a police officer,

21  I'm not law enforcement, I'm just telling you what I'm thinking

22  right now, but --

23  THE COURT:  Counsel, just tell the jury what the

24  evidence is going to show, not your opinions.  Just tell them

25  what the evidence is going to show.

1    MS. CHIN:  The evidence is going to show that Officer

2    Fihe had multiple pieces of information prior to arriving at

3    the scene.

4         As you saw, he received information about Agent Burk

5    having a badge, what's his name, who he is with, and his badge

6    number.  He had all that information for five minutes.  Yet

7    when he rolls up, when he rolls up, he never once asks to

8    confirm that information to verify the identity.

9         The evidence is also going to show that Officer Fihe

10   should have had some suspicions raised when he got to the

11   scene.  As I've told you, he was dispatched for about seven

12   minutes between the 911 call and Officer Fihe arriving.  He's

13   responding to a burglary where the person is saying they're

14   possible law enforcement.  Yet when Officer Fihe rolls up,

15   Agent Burk is still there.  Agent Burk will actually tell you

16   that he waived him over.  He didn't flee.  He was waiting for

17   them.

18        The evidence is also going to show that Officer Fihe

19   gave Agent Burk conflicting commands.  As I told you, he gave

20   three commands within about two seconds.  "Let me see your

21   hands.  I need to see some ID.  Get on the ground."

22        THE COURT:  Counsel, you're repeating yourself.

23        Is there anything else that you believe the evidence

24   is going to show?

25        MS. CHIN:  The evidence is going to show that Officer

1  Fihe and Officer Winchell should not have detained Agent Burk

2  in the manner that they did.  They cuffed him, they left him in

3  the back of a vehicle for an hour, having all this information

4  about who he was.

5           THE COURT:  Counsel, you're repeating yourself.  This

6  is not a time for argument.  This is a time to tell the jury

7  what you believe the evidence is going to show.

8           MS. CHIN:  I mentioned to you earlier how Officer Fihe

9  and Agent Burk --

10          THE COURT:  If you mentioned it earlier, you don't

11  need to repeat it.

12          MS. CHIN:  The evidence is going to show that Agent

13  Burk did not get on the ground right away, and I want to tell

14  you what the evidence is also going to show about why he didn't

15  do that.

16          Agent Burk didn't get on the ground because he was

17  retrieving an illegal firearm.  The door was closed, and he had

18  no information about what was going on behind that door.  He

19  couldn't get on the ground and put himself in a compromised

20  position.  He was already turned with his back towards the door

21  with his hands up.

22          He also has his firearm on his hip.  He's already

23  exposing himself by turning his back to the door to a situation

24  that he doesn't know what's going on.  He hopes for the best.

25  You pray for the best, but you expect the worst.

1     So the evidence will show that he couldn't get on the

2     ground.  He couldn't expose himself or that firearm on his hip

3     anymore than he already did.  What's he going to do if that

4     door opens?

5          MS. FELDKAMP:  Objection.

6          THE COURT:  All right.  Sustained.

7          MS. CHIN:  The evidence is also going to show Agent

8     Burk's response to this situation.  Over his 15 years of being

9     an ATF agent, he's retrieved hundreds of firearms.  Local law

10    enforcement had been called before.  But the evidence will show

11    that never once, never once, was Agent Burk in a situation

12    where a local law enforcement officer pulled and pointed a

13    loaded gun at his face.

14         He was shocked.  He didn't know what to do when he

15    thought -- and he will tell you that he thought that these

16    officers were on the same side as him.  He'll tell you that he

17    expected them to come help him retrieve the illegal firearm.

18         Throughout the scope of this trial you're also going

19    to hear evidence about two events that are outside of July 7th

20    of 2020.

21         The first is a discipline that Agent Burk had in 2015,

22    but I'll tell you that this happened five years before the

23    incident.  Agent Burk is going to tell you that he owned up to

24    his mistake and he took responsibility for it.

25         And Agent Burk is also going to tell you that over

1　30 years of public service, years in the Marines, serving as a

2　local law enforcement, and then 15 years with the ATF, that

3　this is the only blemish that he has ever had.

4　　　　　　MS. FELDKAMP:  Objection.

5　　　　　　THE COURT:  Overruled.

6　　　　　　MS. CHIN:  Evidence that may also be talked about in

7　this case is something that happened after July 7th of 2020.

8　You're probably going to hear that Agent Burk was terminated

9　because of this day, but I do want to tell you that that's

10　misleading.  Because what the evidence is going to show is that

11　in 2020, at the end of 2020, five months after this incident

12　happened, the evidence will show that --

13　　　　　　THE COURT:  Just one moment.  Step forward, Counsel.

14　　　(The following proceeding was held at sidebar.)

15　　　　　　THE COURT:  Okay.  Where are you going with this?

16　　　　　　MS. CHIN:  I'm just trying to pursue with them what's

17　going to come in.

18　　　　　　THE COURT:  How do you know it's going to come in?

19　I've reserved ruling on that.  I think you're opening the door

20　but --

21　　　　　　MS. CHIN:  I can move on.

22　　　　　　THE COURT:  What were you planning to say?

23　　　　　　MS. CHIN:  If we're going to pursue the termination,

24　if they're intending to talk about it in their opening

25　statements, then we would like to talk about the evidence that

1  goes against the termination.

2  THE COURT:  Are you going to be talking about these

3  administrative rulings, this settlement, and so forth?

4  MS. CHIN:  No, I won't talk about that, Your Honor.

5  THE COURT:  Okay.  Go ahead.

6  (The following proceedings were had in open court.)

7  MS. CHIN:  Ladies and gentlemen, July 7th of 2020 also

8  led to some injuries for Mr. Burk.  He had a permanent shoulder

9  injury that resulted in a surgery.

10  MS. FELDKAMP:  Objection.

11  MS. CHIN:  This is part of the stipulation.

12  THE COURT:  There's a stipulation.  I should have read

13  the stipulation.

14  Go ahead.  Is that what you're going to tell us about?

15  MS. CHIN:  Yes, just briefly.

16  THE COURT:  All right.  You may.

17  MS. CHIN:  From July 7th, 2020, Agent Burk suffered a

18  permanent shoulder injury that required surgery, something

19  that's not disputed in this case.  He also suffers currently

20  from PTSD.

21  Ladies and gentlemen of the jury, at the beginning of

22  this case I told you that it was unique but it was simple.

23  It's unique because we're dealing in a situation where it's all

24  law enforcement, but it's simple because at the end of the day

25  all we're going to ask you is did Officer Fihe and Officer

1  Winchell go too far when they pointed a loaded gun at, cuffed,

2  tased, and threw my client, James Burk, in the back of a police

3  cruiser keeping him detained for over an hour, despite knowing

4  that they were responding to a situation where they knew

5  somebody was claiming to be law enforcement, where they knew he

6  had a badge, his name, that he was with ATF, and his badge

7  number.

8      I think at the conclusion of this case you are going

9  to conclude that, yes, yes, those officers went too far.

10      Thank you.

11      THE COURT:  Very well.  Thank you, Ms. Chin.

12      MS. CHIN:  Thank you, Your Honor.

13      THE COURT:  All right.  Defense counsel.

14      Ms. Feldkamp, you may proceed.

15      MS. FELDKAMP:  Could we get the PowerPoint up for the

16  jury, please?

17      THE COURT:  Now, let me caution you that this is not

18  argument.  This is an opportunity to tell the jury what you

19  believe the evidence is going to show.

20      MS. FELDKAMP:  Yes, sir.  If I may proceed?

21      THE COURT:  You may proceed.

22      MS. FELDKAMP:  James Burk's bad choices and bad

23  behavior created and prolonged this entire situation.

24      Officers Fihe and Winchell were dispatched to the

25  scene of two priority one felonies in progress:  Burglary and

1    impersonation of a police officer.  Priority one felonies are

2    the most dangerous kinds of calls that police officers can be

3    dispatched to.

4          When Officer Fihe arrived at the scene, he got out of

5    his cruiser, pulled his gun out of his holster --

6          THE COURT:  This is not the time to present evidence;

7    it's time to tell the jury what the evidence is going to show.

8          MS. FELDKAMP:  This is what Officer Fihe will be

9    testifying to.

10         THE COURT:  Well, that's fine.  Tell the jury what the

11    testimony is going to show.

12         MS. FELDKAMP:  Officer Fihe will testify that he got

13    out of the cruiser.

14         THE COURT:  Let's take the image down from the screen.

15         MS. FELDKAMP:  Yes.  Okay.

16         THE COURTROOM DEPUTY CLERK:  The jurors can't see it,

17    Judge.

18         THE COURT:  Okay.

19         MS. FELDKAMP:  Do you mind if we put up a different

20    presentation, please?  I'm sorry.

21         This one will just have words on it.

22         Officer Fihe is going to tell you that he arrived at

23    the scene first, got out of his cruiser, pulled his gun out of

24    his holster, but he kept his gun down by his hip.  This is how

25    Columbus Police are trained to enter the scene of priority one

1   calls because priority one felony calls are the most dangerous

2   kinds of calls that an officer can be dispatched to.

3       Upon arriving to the scene, Officer Fihe is going to

4   tell you that he saw a felony suspect, Mr. Burk. Mr. Burk was

5   wearing a plain store-bought polo, some khaki cargo pants. And

6   Officer Fihe is going to tell you that he saw a gun on

7   Mr. Burk's hip.

8       So at this point in time Officer Fihe is at the scene

9   that he is at, a priority one felony call, and the felony

10   suspect has a gun on his hip.

11       Mr. Burk also is not wearing a visible ATF badge. He

12   was not wearing a bulletproof vest, which would have said "ATF"

13   across the top or some sort of law enforcement identifier.

14   Mr. Burk did not arrive to the scene with a partner, and he did

15   not inform Columbus Police that he would be taking enforcement

16   action that day at all, let alone at Sarah Al Maliki's home.

17       To top it all off, when Mr. Burk saw Officer Fihe,

18   Mr. Burk said, "I'm a federal fucking agent."

19       It would be really wonderful, really fabulous, if our

20   officers could just believe and trust felony suspects, but they

21   don't have that luxury, especially when the felony suspect has

22   a gun on his hip.

23       Our officers have a responsibility to the person who

24   called 911, to their partner, to themselves, to their families,

25   that they secure the scene and that they get home safe.

1    So Officer Fihe knew he needed to make the scene safe.

2  He knew that he needed to remove the felony suspect's gun.  And

3  so Officer Fihe ordered Mr. Burk to put his hands in the air,

4  to turn around, and get down on the ground.

5    You have probably heard orders like these before on

6  shows like Cops or SWAT or Blue Bloods, and that's because

7  these are standard, nationally accepted law enforcement orders.

8    These orders allow for law enforcement to safely

9  approach suspects, remove suspects' weapons, and secure

10  suspects so that the officers can keep the scene safe while

11  they investigate.

12    Rather than complying with Officer Fihe's orders,

13  you're going to watch in a video that James Burk walked towards

14  Officer Fihe.  He repeated, "I'm a federal agent."  And when

15  Officer Fihe ordered Mr. Burk to get down on the ground,

16  Mr. Burk replied, "It ain't happening."

17    So Mr. Burk continued arguing.  Officer Fihe called

18  for backup.  Luckily, Officer Winchell was already on the way,

19  so he was quickly on the scene.  When Officer Winchell arrived,

20  Mr. Burk finally found the ability to get down on the ground.

21    According to the nationally accepted principles of law

22  enforcement, once the felony suspect is on the ground the

23  officer's next step is to secure the suspect and remove the

24  suspect's weapons.  In this specific situation, Officer Fihe is

25  going to tell you that the scene could be secured through

1    handcuffing.

2           So the Columbus Police officers acted pursuant to

3    their training, and they tried to handcuff Mr. Burk, but

4    Mr. Burk was resisting, and he was pulling his hands away, and

5    the officers -- oh, at this point the Columbus Police officers

6    recognized they were dealing with an armed, actively resistant

7    felony suspect.

8           The officers told Mr. Burk that if he continued to

9    resist, he was going to be tased.  Mr. Burk continued to resist

10   and pull his hands away, and he was tased, which finally

11   allowed the officers to get the handcuffs on.  And with the

12   handcuffs on, officers were able to secure the scene, get

13   Mr. Burk to a safe place, and finally begin working to verify

14   whether James Burk was, in fact, who he said he was.

15          Once the officers learned that Mr. Burk was Mr. Burk,

16   Mr. Burk was free to leave.

17          You may be wondering what events led to Officers Fihe

18   and Winchell being dispatched to a call of two potential

19   priority one felonies in progress.  During this trial you are

20   going to hear from a woman named Sarah Al Maliki.  She's going

21   to tell you that she called 911 because Mr. Burk was beating on

22   the door to her home and was demanding that she open up her

23   door.

24          Mr. Burk demanded to know where Sarah's husband was,

25   and Sarah told him the truth.  "My husband's not home."

1    Mr. Burk responded by calling Sarah a liar.  Mr. Burk

2  told Sarah, "I'll stay at your door all night if I have to

3  until you open up."

4    Sarah's husband wasn't a felon.  Sarah's not a felon.

5  Sarah and her husband didn't receive any letter in the mail or

6  a call saying that Sarah's husband wasn't supposed to have this

7  gun that he bought at the store.

8    When we talk to Sarah during this trial she is going

9  to tell you that she didn't know if Mr. Burk was a criminal or

10  a crazy person, and that's why she called 911.

11    During this trial you're also going to hear from some

12  law enforcement experts about nationally accepted principles

13  that all law enforcement is expected to follow.  Earlier today

14  Judge Graham told you that Mr. Burk should have known about

15  these policing principles.  He told you that Officers Fihe and

16  Winchell validly expected Mr. Burk to follow these principles

17  if he was, in fact, a federal law enforcement agent.

18    This is knowledge that Mr. Burk should have had while

19  he worked at ATF, but it's also knowledge he should have had

20  during his time as a police officer and during his time on

21  SWAT.

22    Our law enforcement experts are going to testify that

23  nonuniformed agents are trained that they need to listen to and

24  obey all commands.  If that means they need to be handcuffed,

25  they need to put their hands in the air.  They need to get down

1   on the ground.

2        Federal agents are trained that the federal agent

3   needs to remember that local law enforcement doesn't know who

4   the federal agents are.

5        Federal agents are trained that they need to

6   communicate with the local uniformed officers.  They need to

7   inform the officers that they're a federal agent, tell the

8   uniformed officers what agency they are with, and offer to show

9   the uniformed officers a badge and credentials when the officer

10   is ready.

11        Also, for officer safety, federal agents are supposed

12   to tell -- federal nonuniformed agents are supposed to tell the

13   uniformed officers if they have a weapon.

14        Federal agents are also trained that they should be

15   respectful at all times.  They're trained that they shouldn't

16   raise their voice or swear and that they should de-escalate

17   whenever they can.  That means that they should avoid creating

18   tension or extra danger whenever it's not necessary.

19        Federal agents are also trained that if they're pulled

20   over, stopped by a uniformed officer, that the federal agents

21   need to remember that the local officers are only doing their

22   job.

23        All law enforcement officers are trained that federal

24   agents, local police, state police, they're all equal; they

25   just have different jobs and roles and responsibilities.  No

1   one is better than another.

2           Federal agents, nonuniformed officers, are also

3   trained that they need to take action so they can be safe.

4   That means that they should have a partner or they should be in

5   a group for safety.  Sometimes that means two to five people,

6   depending on the circumstances.

7           They're trained that they should swear a bulletproof

8   vest and that they should have a badge or some other agency

9   marking, and they're trained that it's best practice to contact

10  local law enforcement if they're planning on taking enforcement

11  action.

12          In the law enforcement world there's a saying that if

13  you follow all of these steps, everything will be sorted out.

14          The evidence is going to show Mr. Burk did none of

15  these things.  You're going to hear from our law enforcement

16  experts that James Burk's behaviors and choices in the

17  situation is not what any law enforcement officers would expect

18  from an ATF Agent.

19          Our officers are going to tell you that Mr. Burk's

20  failure to follow the nationally accepted law enforcement

21  principles caused them to doubt Mr. Burk's claim that he was a

22  federal agent and that that failure to follow the nationally

23  accepted law enforcement principles influenced Officers Fihe

24  and Winchell's decision -- excuse me, perceptions of what the

25  extent of the danger was that Mr. Burk was presenting to those

1  officer's safety.

2      Mr. Burk knew that the responding officers were in

3  control of the scene and that he should have cooperated with

4  them.

5      Mr. Burk did not comply when Officer Fihe commanded

6  Mr. Burk to get on the ground more than five times, and

7  Mr. Burk refused Officer Fihe's lawful commands when Mr. Burk

8  told Officer Fihe, "I am not getting on the ground" and "It

9  ain't happening."  This is noncompliance and refusal.

10      Mr. Burk exhibited uncooperative behavior when police

11  officers attempted to put him in handcuffs, and this behavior

12  led Officer Fihe to using a TASER.

13      Mr. Burk didn't contact or inform local law

14  enforcement that he would be taking any enforcement action that

15  day, let alone at Sarah Al Maliki's residence.  He didn't

16  inform Officer Fihe of the gun that was on his holster.

17      THE COURT:  Counsel, I think you're repeating

18  yourself.

19      MS. FELDKAMP:  Okay.  Okay.

20      THE COURT:  Continue.

21      MS. FELDKAMP:  And his profanity was also improper.

22      Mr. Burk is going to tell you that he doesn't think

23  that he played any role in escalating this situation, and he's

24  going to refuse to acknowledge that he did anything wrong.

25      Also, he wasn't wearing a bulletproof vest, didn't

1  have a badge visible.  We already talked about him not

2  contacting local law enforcement.

3       Yet everything was sorted out.  Once the officers

4  verified that James Burk was who he said he was, he was free to

5  leave.

6       If Mr. Burk had acted according to the nationally

7  accepted standards for law enforcement interactions, there

8  would have been no need for Columbus Police to use handcuffs or

9  a TASER.

10       In sum, Sarah Al Maliki is going to tell you that

11  James Burk's bad behavior is the reason that she called 911.

12  The officers are going to tell you that Mr. Burk's failure to

13  follow the nationally accepted law enforcement principles

14  affected their perception of danger.  Several law enforcement

15  experts are going to tell you that James Burk's bad behavior

16  was dangerous and that it didn't align with how law enforcement

17  officers are trained.

18       This incident could have been avoided if Mr. Burk had

19  done any one of the many things that he was supposed to do that

20  day.  Instead, he behaved the way that you're going to see on

21  the body-worn camera video.

22       Throughout this trial Mr. Burk is going to try to

23  convince you that Officers Fihe and Winchell were angry --

24       THE COURT:  All right.  Counsel, this is getting into

25  argument now.  Just tell the jury what you think the evidence

1  is going to show.

2          MS. FELDKAMP:  Okay.  Okay.  I'm sorry about that.

3          THE COURT:  Arguments come at the end of the case.

4          MS. FELDKAMP:  Got it.

5          The evidence will show that the only person who was

6  angry and out of control was Mr. Burk, and your job as the jury

7  in this case is going to be to determine if the Columbus Police

8  officers acted reasonably based on the threat that they

9  perceived and under the totality of the circumstances.  The

10  evidence is going to show that this incident was caused by

11  James Burk's bad choices and bad behavior.

12          Thank you.

13          THE COURT:  Thank you, Counsel.

14          All right.  We're ready for the first witness.

15          MR. KEYES:  Your Honor --

16          THE COURT:  I think this would be a good time to

17  explain to the jury how we're going to proceed in this case.

18          Ladies and gentlemen of the jury, we're going to take

19  this case and divide it into two sections.  We're going to be

20  hearing first all of the evidence relating to what happened at

21  the scene and all of the evidence relating to the determination

22  of whether or not Mr. Burk's constitutional rights were

23  violated.

24          After you have reached a conclusion regarding all of

25  his claims of constitutional violations, if you find in his

1  favor as to any of those claims, then we will proceed with

2  evidence relating to what injury or damages were caused by the

3  particular violation that you find occurred, if you should so

4  find that any occurred.

5          So the trial will be proceeding in two stages.

6          All right.

7          MR. KEYES:  Thank you, Your Honor.

8          Before we proceed, should we read the stipulation to

9  the jury?

10         THE COURT:  I'll be happy to do that.

11         MR. KEYES:  Thank you, Your Honor.

12         THE COURT:  Let's see.  Do I have a copy of them

13  somewhere here?  Yes.

14         Members of the jury, a stipulation is another legal

15  term that the lawyers are familiar with, but we wouldn't expect

16  you particularly to understand them.  A stipulation is an

17  agreement between the parties that certain facts exist.  So

18  when the parties enter into a stipulation, that means those

19  facts have been determined for you.

20         So the parties have entered into some stipulations in

21  this case, and those stipulations include the stipulation that

22  Mr. Burk experienced a right labral tear and biceps tendon tear

23  as a result of his encounter with the officers -- the Columbus

24  Police officers on July 7th, 2020; that he underwent surgery

25  for that injury; that he has certain limitations in mobility in

1   his shoulder as a result of that injury.

2         There is a stipulation that he does suffer from PTSD.

3         There's no stipulation as to what the cause of these

4   various injuries were. Although, the stipulation regarding his

5   shoulder injury does say that it was sustained on November --

6   I'm sorry, that his shoulder injuries were experienced on

7   July 7th, 2020.

8         Now, were there any other stipulations, Mr. Keyes,

9   that you wanted the jury to know about before we begin the

10   evidence?

11         There are some stipulations regarding the defendants

12   acting in the course and scope of their employment.

13         There's a stipulation, or agreement, that on July 7th,

14   2020, at about 2:00 p.m., Officers Joseph Fihe and Kevin

15   Winchell responded to a 911 call in Dublin, Ohio; that on

16   July 7th, 2020, Officer Joseph Fihe was acting under color of

17   law at the time of the incident as a state officer, and a

18   stipulation that on July 7th, 2020, Officer Kevin Winchell was

19   acting under color of law at the time of this incident in his

20   capacity as a Columbus Police officer.

21         There's a stipulation that Mr. Burk was employed as a

22   special agent with the ATF and that he was on duty in that

23   capacity at the time of the incident on July 7th, 2020.

24         Does that cover it?

25         MR. KEYES: Thank you, Your Honor.

1          The last one, it's paragraph 9 on the -- it's on

2     page 2.  It's about the weather that day.

3          THE COURT:  Paragraph 9?

4          MR. KEYES:  Paragraph 9 on July 7th.

5          THE COURT:  I'm sorry.

6          On July 7th, 2020, the weather temperature was a high

7     of 97 degrees and a low of 71 degrees Fahrenheit.

8          MR. KEYES:  Thank you, Your Honor.  That covers it.

9          THE COURT:  All right.  Now, you may call your first

10    witness.

11         MR. KEYES:  Your Honor, thank you.

12         Before having a witness take the stand, I was going to

13    propose, because it's stipulated that it will be admitted into

14    evidence, that we start the evidence by playing Officer Fihe's

15    body-worn camera footage so that the jury can see the footage

16    at this point now that the evidentiary record is open before we

17    call any witnesses to testify.

18         THE COURT:  All right.  That's fine.

19         MR. KEYES:  Thank you.  It will take us just a moment

20    to set that up.

21         THE COURT:  All right.  Fine.

22         So the first item of evidence that you're going to

23    receive is going to be the body-camera footage of this

24    incident.

25         THE COURTROOM DEPUTY CLERK:  What exhibit is this?

1          MR. KEYES:  Joint Exhibit I.

2          Do you want us to move it up to the podium, or can it

3   connect from ours?

4          THE COURT:  Whatever is most convenient.

5          MR. KEYES:  If you can do it from ours, we have it

6   ready.

7          THE COURTROOM DEPUTY CLERK:  I've done what I need to

8   do.

9          MR. KEYES:  Oh, it's not casting.  I'll try to move it

10  over.

11         We'll plug it into the lectern since that appeared to

12  work earlier.

13         THE COURT:  Members of the jury, can you see the video

14  on your cameras?

15         Good.

16         MR. KEYES:  Before we start playing.

17     (Plaintiffs' counsel conferring with defense counsel off

18  the record.)

19         MR. KEYES:  Your Honor, if I may -- I was conferring

20  with Ms. Pickerill -- explain to the jury before we play, and

21  neither side has any objection, about just the silence of the

22  first minute?

23         THE COURT:  All right.

24         MR. KEYES:  All right.  Thank you.

25         Ladies and gentlemen of the jury, we're going to play

1  a video for you.  It's Joint Exhibit I.  It's Officer Fihe's

2  body-worn camera footage.  We're just going to press play and

3  let it go until the end, but you may notice there's about a

4  minute of silence.  That's not a technical glitch.  It's a

5  function of how the body-worn cameras start to record and

6  preserve audio.

7          So when you don't hear anything for the first minute,

8  that's perfectly fine.

9          Thank you, Your Honor.

10     (Pause in proceedings.)

11         MR. KEYES:  The sound should be on now.  Is there a

12  setting over there?

13         THE COURTROOM DEPUTY CLERK:  No, there isn't.  Do you

14  have it plugged in?

15         MR. KEYES:  Yes.

16         Pause this for a moment.  I'm not sure why it's not

17  projecting over the courtroom audio.

18         THE COURTROOM DEPUTY CLERK:  We tested it and it

19  worked fine.

20         MR. KEYES:  It worked just fine.

21         Well, Your Honor, there could be two options.  One is

22  we could proceed with Mr. Burk's testimony and then later on

23  during a break try to fix it, or take a short break now to see

24  if we can get the audio --

25         THE COURT:  Let's take a short break and see if you

1    can sort it out.

2              MR. KEYES:  Thank you, Your Honor.

3              THE COURT:  We're going to take a 10-minute recess.

4              THE COURTROOM DEPUTY CLERK:  Please rise.

5              This court will stand in recess.

6         (Jury out at 3:03 p.m.)

7         (Recess taken from 3:03 p.m. to 3:24 p.m.)

8         (Jury in at 3:24 p.m.)

9              THE COURTROOM DEPUTY CLERK:  This court is met

10   pursuant to recess.

11             THE COURT:  Thank you for your patience.  I think we

12   are ready.

13             All right.  Counsel, you may proceed.

14             MR. KEYES:  Thank you, Your Honor.

15        (Video was played in open court.)

16             MR. KEYES:  Your Honor, at this point that's the

17   portion of the video that we would want to show before

18   Mr. Burk's testimony.

19             THE COURT:  Very well.

20             MR. KEYES:  Thank you.

21             Could we take the jury display down for a moment,

22   please?

23             Thank you.

24             May I proceed with Mr. Burk, Your Honor?

25             THE COURT:  You may.

1    MR. KEYES:  The plaintiffs call Jim Burk, or James A.

2  Burk, Jr., legal name.

3    THE COURTROOM DEPUTY CLERK:  Stop here, sir.  Raise

4  your right hand.

5    (Witness is sworn.)

6    THE COURTROOM DEPUTY CLERK:  Okay.  You're going to

7  have a seat over here, and pull that microphone close to your

8  mouth so we can all hear you.

9    Thank you.

10    - - -

11    JAMES A. BURK, JR.

12  Called as a witness on behalf of the Plaintiffs, being first

13  duly sworn, testified as follows:

14    DIRECT EXAMINATION

15  BY MR. KEYES:

16  Q    Good afternoon.  Could you please tell the jury your

17  full name.

18  A    James A. Burk, Jr.

19  Q    And what do people call you?

20  A    Jim.

21    THE COURT:  Mr. Burk, speak into the microphone and

22  keep your voice up, please, sir.

23  BY MR. KEYES:

24  Q    If you need to adjust it, it might get a little closer.

25    Mr. Burk, let's start by asking you to tell the jury a

 1  little bit about yourself, please.  Let's begin with, where did
 2  you grow up?
 3      A    The Chicagoland area in Northwest Indiana.
 4      Q    Where do you live now?
 5      A    Middle Tennessee.
 6      Q    Do you have a family?
 7      A    Yes, I do.
 8      Q    What are they?
 9      A    My wife, Summer, and I have a 3-year-old son.
10      Q    What's your son's name?
11      A    Jace.
12      Q    We may talk about them a little more later.
13           Did you go to college, Mr. Burk?
14      A    Yes, I did.
15      Q    Where?
16      A    Indiana University.
17      Q    And do you have a degree?
18      A    Yes, I do.
19      Q    What kind of degree?
20      A    Bachelor's degree in criminal justice.
21      Q    When did you earn that?  What was the timing?
22      A    I finished my degree in approximately 2002.
23      Q    Did you go straight through?  Did you go straight
24  through college?
25      A    No, I didn't.  I attended Indiana University after

1  graduating high school, and then I took a break, went into the

2  Marine Corps enlistment for four years.  And then when I was

3  discharged from the Marine Corps, then I obtained a position

4  with the city police department and continued my education and

5  finished my degree while I was working as a police officer.

6      Q    Let's break down that career path a little bit too for

7  the jury, please.

8          You mentioned the U.S. Marine Corps.  How long were you

9  in the Marines?

10     A    Four years.

11     Q    What kind of unit or assignments did you have?

12     A    I had a two-year security forces assignment, overseas

13  deployment, and two-year assignment with the Fleet Marine Force,

14  1st Battalion, 8th Marines.

15     Q    What kind of discharge?

16     A    Honorable discharge.

17     Q    What was your rank at your discharge?

18     A    I was an E4 Corporal when I was discharged.

19     Q    Now, you mentioned some time with the city police?

20     A    Yeah.

21     Q    Where was that?

22     A    City of Hammond, Indiana.

23     Q    And to work for the City of Hammond Police, did you have

24  any education besides your college?

25     A    Just working on my college degree at the time while I

1  was an active police officer.

2      Q    Did you have to go through any other education or

3  training to become a police officer?

4      A    Yes, I did.  I had to attend Indiana Law Enforcement

5  Academy in Plainfield, Indiana.

6      Q    And how long were you with the Hammond Police, sir?

7      A    Nine-and-a-half years.

8      Q    After that, what did you do professionally?

9      A    I went directly to ATF in, would have been, July of 2004

10 when I got hired.

11     Q    With ATF did you have to go through any more training or

12 education to take that job?

13     A    Yes, I did.  I had to have my college degree; and then

14 once hired, I attend the basic criminal investigators training

15 program in -- at FLETC, Federal Law Enforcement Training Center,

16 in Glynco, Georgia.  Then upon graduating that, I attended ATF's

17 national academy at that same location.

18     Q    How did you do at the ATF academy?

19     A    I graduated number one in my class.

20     Q    I didn't ask you.  What about the police academy, how

21 did you do there?

22     A    Same, number one in my class, top of the class

23 academically.

24     Q    So back to your time with ATF.  Was there any -- besides

25 your initial training or time at the academy, did you have any

1  certifications or did you do any of your own training while you

2  were there?

3  A    I went through a lot of extra training within ATF.  I

4  was a firearms instructor, use of force, defensive tactics

5  instructor, was a TASER instructor, and I was also a member for

6  a period of time with their Special Response Team.

7        I also served as a division tactical advisor for the

8  Columbus field division for a period of time.

9  Q    Mr. Burk, I'm going to ask you to look at your screen.

10       MR. KEYES:  I'm sorry.  If we publish on his, does it

11  automatically publish to the jury, or can we limit it for the

12  witness?

13       THE COURTROOM DEPUTY CLERK:  I can do witness preview.

14       MR. KEYES:  Can we do witness only, please, for now?

15  BY MR. KEYES:

16  Q    Mr. Burk, actually, would you want a paper copy?  Is

17  that hard to see?

18  A    I think I can make it out.

19  Q    Okay.  I can zoom in a little bit for you.

20       I'm showing you on your screen a document that we have

21  premarked as Plaintiff's Exhibit 12.  Do you recognize what that

22  is?

23  A    Yes.  That is my curriculum vitae, or CV we refer to it

24  as.  Your resume, so to say.

25  Q    Is that a true copy of your resume, at least up through

1   the time that you were still working with ATF?

2      A    Yes, it is.

3           MR. KEYES:  Your Honor, I would ask for permission to

4   publish Plaintiff's Exhibit 12 to the jury.

5           THE COURT:  Any objection?

6           MS. PICKERILL:  No objection, Your Honor.

7           THE COURT:  All right.  You may.

8   BY MR. KEYES:

9      Q    Mr. Burk, I am in Plaintiff's Exhibit 12, and the jury

10  will have this in deliberation if it's admitted into evidence,

11  so I won't ask to go through every single page, but I'm at the

12  certification page -- or the certification section.

13          Do you see your certifications listed there?

14     A    Yes, I do.

15     Q    And then was that an accurate list at the time of this

16  CV?

17     A    Appears to be, yes.  Yes.

18     Q    I'm scrolling down now to your professional training

19  section.  Do you see that?

20     A    Yes.

21     Q    Let me blow this up a little bit here.

22          And does that capture -- spanning onto the following

23  page there, does that capture your training from 1995 through

24  2015 fairly?

25     A    Yes, it does.  That's through my time as a police

1  officer and then, you know, going into my time as an ATF agent.

2     Q    There's a section, instructor experience.  Does that

3  cover your work as an instructor with ATF?

4     A    Yes, it does.

5     Q    I've scrolled to the end of your CV here, Plaintiff's

6  Exhibit 12.  There's a section called individual awards and

7  commendations, correct?

8     A    Yes.  Yes.

9     Q    Just generally, I don't need you to read off every

10  single one, but any particular awards or commendations that you

11  recall receiving during your time with ATF?

12    A    The Todd McKeehan Award was for finishing top of my

13  class at the ATF Academy, and then the Leadership Award was for

14  SRT basic school.  Then I received a Medal of Valor, and then

15  also a Hostile Action Medal that was awarded to our team.

16    Q    And was -- you mentioned SRT next to the Leadership

17  Award there.  What's SRT?

18    A    That stands for Special Response Team.  It's essentially

19  ATF's SWAT team.

20         MR. KEYES:  I'm going to move to another exhibit.

21   Could we pull that down from the jury, please?

22         Thank you.

23  BY MR. KEYES:

24    Q    Mr. Burk, on your screen I'm going to ask you to look at

25  what we have premarked as Plaintiff's Exhibit 13.  Do you see

1 the first page of 13 up on your screen?

2    A    Yes.

3    Q    Scrolling through these pages briefly for you.

4         What's in Exhibit 13, if you could, please?

5    A    That's a police officer of the month --

6    Q    I'm sorry. I should have been more clear. Just

7 generally what does Plaintiff's Exhibit 13 contain?

8    A    An award certification, award --

9    Q    Multiple pages in Exhibit 13, are those all --

10    A    The entire page, yes. I'm sorry. I was looking at the

11 individual page.

12         Yes, it's the actual copies and photographs of the

13 actual awards themselves.

14    Q    All right. Thank you.

15         We won't take time to publish that to the jury, but we

16 will reserve our right to move it into evidence at the

17 conclusion here.

18         I'd like to ask you, Mr. Burk, and kind of fast forward

19 to July 7, 2020, the date of the incident that we're all here to

20 talk about.

21         At that time what kind of work were you doing with ATF?

22    A    I was conducting what we refer to as NICS

23 investigations, NICS retrieval investigations.

24    Q    And what are those?

25    A    It's those investigations that are conducted when there

1 are firearm -- a firearm is purchased by an individual from a

2 federal firearms licensee, and there's instances where those

3 background checks get delayed. Due to federal law, there's only

4 a three business day waiting period. And if that background

5 check isn't completed by FBI, who does the initial check, within

6 that time frame, the federal firearms licensee can go and

7 release that firearm and sell it to the potential purchaser.

8 Q   Okay.  You said at the beginning, I think you called it

9 a NICS investigation.  Is that an acronym?

10 A   National instant background check.  It's just kind of an

11 abbreviated version for that.  It just has to do with their

12 background check, and in these cases there's a reason why they

13 ended up getting denied by FBI initially.

14      That investigation then is sent to us for us to then

15 reinvestigate, validate, make a determination, and retrieve the

16 firearm if it's warranted and if it's not warranted and if we

17 find the investigation to tell us that the person, in fact, is

18 not prohibited or has been errantly denied by FBI, we make that

19 correction and ensure that that data is entered into the

20 background -- national background check so that that person

21 doesn't continue to be denied in the future.

22      If, in fact, we do find that they are, in fact,

23 prohibited, we then have to and are responsible for the

24 retrieval of the firearm from the individual.

25 Q   So if there's a case where you have determined that the

1  purchaser is prohibited and you have to recover the firearm,

2  what's your approach to that, or what was your approach to that

3  in 2020?

4     A     Well, the approach to it, and per ATF policy, it's an

5  administrative-type investigation or administrative action.

6  It's not a pre-planned enforcement operation of sorts.

7           Once we determine that the person is, in fact,

8  prohibited and the firearm has, in fact, been transferred by

9  verifying that with the federal firearms licensee, we make sure

10  that that investigation is reviewed and confirmed by our legal

11  counsel.

12          And then the next step is to locate the purchaser, per

13  the document, make contact with the individual.  And at that

14  point, if we do, and that person is actually, in fact, in

15  possession of the firearm, then we have three different options

16  that we can exercise in that situation.

17    Q     Let's just briefly -- because they're not all at issue

18  here, but briefly what are those three options?

19    A     We can facilitate the return of the firearm to a federal

20  firearms licensee, which is always a viable option.

21    Q     I'm sorry.  Let me pause you there.

22          When you say licensee, is that the gun dealer?

23    A     For layman's term, the gun store.

24    Q     Okay.  Go ahead.  Sorry to interrupt.

25    A     We can facilitate the return of the firearm to the

1   federal firearm licensee.  It goes back into inventory.  In many

2   instances, the purchaser can receive all, some of their purchase

3   money back to them.

4       A second option is what we call third-party transfer,

5   where we find a suitable person that the individual suggests, as

6   long as they're not, obviously, residing in the same residence,

7   an immediate family member.

8       We can then run a background check on that individual,

9   make contact with them, facilitate, if they agree, a transfer of

10  the firearm to their possession.  They are now the owner of said

11  firearm.  There's paperwork that's signed that they understand

12  the other individual is a prohibited person and to provide the

13  firearm back to them is in violation of law, and there's

14  agreements signed.

15      Then the third option, if none of those are viable

16  options, then we ultimately take possession of the firearm and

17  enter it into our inventory, and eventually it usually gets

18  disposed of.

19  Q    Now, I would like to ask you about your approach when

20  you go to contact a person who was found to be a prohibited

21  purchaser.

22      Do you have a specific uniform that you need to wear?

23  A    Professional casual.  In my instance, it's the same

24  attire every day that I work and do these type of

25  investigations, which is a tactical-type cargo pants, a collared

1  shirt, normally a polo-type shirt pullover.  In some instances a

2  button-up, but always a collared shirt.  Suitable footwear.

3  Never gym shoes or anything like that.

4       I have my credentials in my left pocket, my wallet in my

5  right.  My pistol is on my right side.

6       And then I always usually have a lanyard that has what

7  we refer to as a PIV card and that's usually hanging around my

8  neck between my t-shirt and my shirt, and that's our -- that's a

9  Department of Justice controlled item.  It's for accessing

10  federal buildings, and it's also for accessing secured doorways

11  and your laptop, in order to get into your laptop computer.  It

12  has your picture on it and some identifiers on it.

13  Q     Is that lanyard that you just mentioned, is that the

14  same as a credential?

15  A     Not for purposes of identifying yourself necessarily as

16  an ATF agent.  It doesn't have your authority on it.  It doesn't

17  have your badge number.  It's not a representation of your

18  badge.  It does work to identify you to get into a federal

19  building.

20  Q     Understood.

21       The clothing that you just described, was that something

22  that would contain an outwardly visible ATF identification?

23  A     No.  Agent dress in the field for these type of

24  investigations are plainclothes, professional, but we don't wear

25  markings.

1    It's not enforcement operation.  We're not trying to

2  draw attention to ourselves or alarm the community or alarm the

3  residents.  This is a knock-and-talk type of investigation.

4  Many instances we're starting at the most likely place the

5  firearm may be, but often it's not ultimately where the firearm

6  had ended up, so it's part of the investigative process.

7    Q    We heard some discussion in the defense opening

8  statements about a bulletproof vest, or the lack of a

9  bulletproof vest.  Would you -- was a bulletproof vest something

10 that would have been standard for this type of operation or

11 investigation?

12   A    Not at all.  The ATF agent wouldn't wear a visible

13 bulletproof vest on any kind of investigation like this.

14   Q    What about a marked car, an ATF-logoed car?

15   A    We were not issued, nor do we have the disposal of,

16 marked units for our offices.  They're standard-looking sedan or

17 truck-type vehicles that are equipped like a police car with

18 internal lights, emergency lights, radios, and other equipment,

19 but they are not visibly marked "Police" or anything obvious on

20 the outside.

21   Q    So we have talked generally about your job and about

22 these retrievals, and now I would like to focus specifically

23 about the one on July 7th for a little bit.

24        First of all, what was the status of the investigation

25 for this retrieval?

1     A     The subject was confirmed to be prohibited, a

2     noncitizen.  He had an immigration status prohibition that met

3     the criteria to be prohibited.

4     Q     And how did you get to or how did you go to the

5     location?

6     A     I drove in my issued ATF vehicle.

7     Q     Did you have anything with you about the investigation

8     as you went?

9     A     As I always would have, I had a bag with multiple case

10     files in it, and I had the specific case file and field file for

11     the subject resident that I was going to in question, which

12     would have contained several documents that would have supported

13     the case, which also aids me in representing the issue to the

14     subject of the investigation.

15     So it's -- you know, it's not just me showing up saying

16     you're prohibited, but here's the reasons why, let me show you

17     some documents.  And then we usually, through dialogue, figure

18     out one of those three options.  And, you know, it's a work with

19     me and I'll work with you, and let's find the best solution

20     here.

21     Q     As far as the documents, did you have a standard way of

22     carrying those documents with you?

23     A     I always kept the documents in a manila folder, and then

24     those were contained within, like, a carry-along work bag that

25     in this instance was in my vehicle.

1    So I would remove the folder in question that pertained

2 to the subject I was there to see and take that with me to the

3 door.

4    Q    Okay.  I'll show you -- I don't have any written content

5 on these papers, but I have got here in my hand a manila folder

6 with some pieces of paper in it and a pen clipped to it.  How

7 does that compare to the type of packet that you would bring

8 with you?

9    A    It's exactly the same type of folder I use, standard

10 office manila folder.

11    Q    Do you recall roughly when you arrived at the Edgebrook

12 Drive location?

13    A    I'm sorry.  Ask me that question again.

14    Q    Do you remember about when you arrived at the

15 Edgebrook -- at the house, at the Edgebrook Drive.

16    A    Oh, yeah.  It was midday, somewhere 1:30 -- between 1:30

17 and 2:00 roughly.  I don't know the time at the moment.

18    Q    Please tell the jury what happens when you first arrive.

19    A    First arrive, I park my vehicle, exit my vehicle, make

20 an approach to the residence in the same fashion I normally

21 would, you know, being cautious and taking an off-center

22 position at the door.

23        And then I knock at the door, as I would any residence,

24 to try to get the attention of an occupant of the residence.

25    Q    I'm not going to ask you to get up, but do you mind just

1  showing us maybe on the witness stand there, that panel next to

2  you, how forcefully, how hard did you knock on the door?

3      A    (Witness indicating.)

4      Q    Now, what happens after you knock?

5      A    Initially I could hear movement, somebody, people,

6  something going on inside the house, so I knocked again.

7      Q    And then what happened?

8      A    Then a female voice was on the other side of the door

9  within the residence asking me who I was, what I wanted, you

10 know, what I was doing there.

11     Q    And what did you say or do?

12     A    I said I was the police, I was law enforcement, and if

13 she could please answer the door so I could talk to her.

14          And then she asked who I was there to see.  I gave the

15 subject's name that I can't quite remember exactly what his name

16 was at this moment.  Maliki might have been his last name at the

17 time.  I just don't recall it.  She said he wasn't there.  I

18 said okay.  And I just asked her again, "Can you please come to

19 the door so I can speak with you about this matter?"

20     Q    Did she ever open the door?

21     A    No, she did not.

22     Q    Did you ever try to open the door?

23     A    No, I only knocked at the door.  I never attempted to

24 open the door.

25     Q    Did you ever call her a liar?

1    A    No, I never had any dialogue like that with her.

2    Q    Now, when an exchange like the one you just described

3 for us, when that happens, so if the resident says somebody's

4 not home, what's your practice?

5    Do you just leave at that point, or what was your

6 typical practice at that time?

7    A    To continue, in this case, a dialogue, if there is a

8 dialogue with the other person.  I just continue to try to

9 create a dialogue with them so they can understand that, one,

10 this is -- we're not there to arrest anybody.  This isn't an

11 incident where somebody is going to jail.  It's just a matter of

12 me trying to establish whether that person is there or not.

13    And also, in many instances, I'm able to provide whoever

14 is there with the information and show them why I'm there so

15 that they can, in turn, pass that information along if, in fact,

16 the person is actually not there.

17    Q    She told you that her husband wasn't there.  Why didn't

18 you just leave at that point?

19    A    I've been told that many times before, only for the

20 fact -- only, through the dialogue, for the person to then tell

21 me that the person is, in fact, there, and to go get the person,

22 explain to them that they're not going to jail, you need to talk

23 to this person, it's important.  You know, those types of

24 situations have happened on several occasions.

25    Q    Okay.  So you're still there at the front door.  You

1 have had this exchange.  What happens next?

2  A I told her who I was and told her I was law enforcement,

3 police.  I believe I showed her the credentials.  She said she

4 was -- I know she said she was calling the police.  I said,

5 "Well, I am the police, but that's okay.  Please go ahead and

6 call them.  I'm not going to leave.  I'm going to go ahead and

7 stay here.  I'm not going anywhere."

8   So she then, in turn, called the police, and then there

9 was -- then we had some dialogue through the window where I was

10 showing -- again, providing my name; providing, you know, a

11 visual display of my credentials, including my badge, my badge

12 number, the agency I work with was all provided to her again

13 while she was on the phone with who I believed to be the police

14 department.

15  Q When you provided that information to her -- and you

16 said, was it through the window?

17  A It was through the window.  The conversation had moved

18 to where I could actually also visually show her my credentials

19 at the same time.

20  Q So when you provided that information to her that you

21 just mentioned --

22  A Yes.

23  Q -- what, if anything, did you hear in response to that?

24  A I was hearing her give that information to the person

25 she was on the phone with, repeating what I said to that person.

1          THE COURTROOM DEPUTY CLERK:  Do you want this shown to

2     the jurors?

3          MR. KEYES:  Yes.  I was getting ready.

4     BY MR. KEYES:

5       Q     Mr. Burk, would you mind looking at your screen at Joint

6     Roman Numeral X, please?

7       A     Yes, sir.

8          THE COURT:  Counsel, I'm not clear about something.

9     I'm just going to ask Mr. Burk.

10         So did she open the door finally?

11         THE WITNESS:  No, she never opened the door at any

12    point.

13         THE COURT:  How did you show her your credentials?

14         THE WITNESS:  Through the window.

15         THE COURT:  Oh, okay.  So she came and talked to you

16    through the window?

17         THE WITNESS:  As she was on the phone, she was

18    engaging me through the window, and I was -- she asked for the

19    items, you know, let me see this, show me your badge, or show

20    me your credentials, then she said the badge.  But as I was

21    doing those, it was a step-by-step process.  It was through the

22    window, so she could visibly see them.

23         Then she was saying, "I see his badge."

24         "What's his badge number?"

25         "It's 4672."

1          So she was able to see it.  I provided it to her, and
2     she then was giving that information through the phone.
3          THE COURT:  Thank you.
4          MR. KEYES:  Thank you for that clarifying question,
5     Your Honor.
6     BY MR. KEYES:
7     Q    To follow up on that point, I have put up Joint
8     Exhibit Roman Numeral X on your screen there.
9          MR. KEYES:  Let me ask, Your Honor, if they're joint
10    exhibits, are we okay just to publish them without pausing to
11    ask for --
12         THE COURT:  If they are joint exhibits and they were
13    marked in the final pretrial order, you don't have to go
14    through that.
15         MS. PICKERILL:  Thanks, Your Honor.
16         MR. KEYES:  Thank you, Your Honor.
17    BY MR. KEYES:
18    Q    All right.  Mr. Burk, I'm showing you Joint Exhibit --
19    the first page of Joint Exhibit Roman Numeral X on your screen.
20    Do you see that?
21    A    Yes, I do.
22    Q    And what is that that we're looking at there?
23    A    That is a picture of my -- a portion of my credentials.
24    Q    And I have scrolled down now to the second page of Joint
25    Exhibit Roman Numeral X.  Can you tell us what that is, please?

1    A    That's the second part of my credentials.  You open up

2  the first part, and then you can flip that over, and then your

3  badge is presented.

4    Q    So what was it that you showed her through the window?

5    A    I showed her this portion of my credentials and then

6  also the badge.  I also repeated the number on the badge, my

7  badge number, to her.

8    Q    Thank you for mentioning that.  I was going to clarify.

9         So in addition to showing her the credentials that you

10  just described, did you give her the information verbally?

11    A    Yes.

12    Q    What information was that again?

13    A    My name, the agency I work with, and my badge number.

14    Q    I'm going to show you for a moment a portion of Joint

15  Exhibit Roman Numeral VIII.

16         And, Mr. Burk, I know that this was not a document of

17  yours, but it's a joint exhibit, so I'm going to ask you some

18  questions.  Not as much about the document, but about the

19  information in there.

20    A    Yes.

21    Q    But I'll ask you to assume hypothetically that this

22  document, Joint Exhibit VIII, is a printed format of the in-car

23  display information that Columbus Police officers like Officer

24  Fihe would have responding to this run, and I'm going to direct

25  your attention to a couple of line items in this display.

1          And the first one is at 13:56:21 where it says, "He

2    showed her a badge.  No name or number on it."

3          Do you see that?

4     A    Yes.

5     Q    Was there any other badge that you had shown her besides

6    the one that we just looked at?

7     A    I only have that one badge.  That's all I carry.  Those

8    are my credentials.

9     Q    In the line item 13:57:25 it says, "He says he is with

10   ATF."

11         Do you see that?

12    A    Yes.

13    Q    Is that information that you gave to the resident

14   through the window?

15    A    Yes.

16    Q    And then the line item right under that at 13:58:50, so

17   1:58 p.m. and 50 seconds, it says, "Says his name is Jim Burk,

18   Badge No. 4672."

19         Is that also information that you had given to the

20   resident through the window?

21    A    Yes.

22    Q    Is that what you heard her repeat to the dispatcher on

23   the phone?

24    A    Yes.  As I was giving her each part, yes.

25         MR. KEYES:  We can take that down for now, please.

1  Thank you.

2  BY MR. KEYES:

3  Q    All right.  So after you give the resident this

4  information and you hear her repeating it to the person on the

5  phone, what did you do?

6  A    I took the same kind of cautionary position that I would

7  normally do if I'm waiting at someone's door for them to answer,

8  and I just stood there and waited for a unit to show up and just

9  remained in place.

10  Q    Now, about how long from when the resident says she's

11  calling the police to before -- to when the first Columbus

12  Police officer pulls up?

13  A    Might have been five to ten minutes.

14  Q    I mean, what did you do when you first saw the first

15  police car start to pull up?

16  A    Same thing I always would do.  If I saw the police car

17  rolling up, I began trying to get his attention and waive to

18  where I was at to kind of aid in identifying the situation or at

19  least my location.

20  Q    And why did you do that?

21  A    To make it easier for the officer arriving on scene to

22  see -- you know, I know my information had been provided to the

23  dispatcher, so I was just really trying to gain his attention

24  and, you know, await his assistance, was my thought.

25  Q    Now, Mr. Burk, before this retrieval, about how many

1  firearm retrievals had you done as an ATF agent, just ballpark?

2     A    Several hundred, 300-plus in my career.

3     Q    Of those 300-plus, about how many other times before

4  this one had a subject called police because of concerns about

5  your identity?

6     A    It happens.  Twenty or so, probably, times is a good

7  number, fair representation.

8     Q    In your past experience if a subject had called the

9  police, what would typically happen?

10     A    I would await the arrival.  Again, still trying to

11  create a dialogue with the subject, but say, "Okay.  I'll wait

12  here."

13        It's very same similar instance.  They didn't open the

14  door.  They chose to call the police.  Never in those 20 prior

15  instances had I ever -- was able to provide that much

16  information to the residents while they were calling the police.

17  I merely just waited at the doorstep for the police arrival.

18     Q    All right.  Now, we had already -- before you took the

19  stand we played a little over the full 10 minutes of Officer

20  Fihe's body-worn camera footage.  I have some questions about

21  specific portions.

22        So I'm not going to replay the entire thing since the

23  jury just saw, but I'm going to ask you some questions.  If at

24  any point you need to see a particular part of the video to

25  answer the question or refresh your memory, please just let me

1  know and we can pull that up.  Okay?

2    A    Yes.

3    Q    Okay.  Thank you.

4         MR. KEYES:  Could we go ahead and publish?

5  BY MR. KEYES:

6    Q    This one I do just want to show you the clip and ask you

7  a question about it.  Again, this is Joint Exhibit I.

8         I'm at approximately 14:03:32 time of day.  I'm at 5:08

9  on the timestamp, Mr. Burk.  We're just going to play this for a

10 few seconds.

11     (Video played in open court.)

12 BY MR. KEYES:

13   Q    In that few seconds, we saw Officer Fihe say turn around

14 and let me see your hands twice.  When he started telling you to

15 turn around, let me see your hands, were you facing him already

16 at that point?

17   A    No.  Not initially, no.

18   Q    So what do you do when he says turn around, let me see

19 your hands?

20   A    I turn around and put my hands up.

21   Q    Did you ever reach for your waist, hip, or pocket at

22 that point?

23   A    No.  I saw he had his pistol drawn, and I just kept my

24 hands in place.

25   Q    What was going through your mind when you saw him

1   approach you?

2      A      Shock, disbelief.  I have not been encountered that way

3   by another law enforcement officer under those same

4   circumstances.

5          I was concerned about what may be going on in the

6   residence behind me.  At the same time, I'm not sure why this

7   officer is acting at the escalated presence that he was giving

8   me.

9          I knew I had provided all the information that was

10  necessary for me to be verified who I was, at least prior to the

11  arrival, so I was kind of in shock and scared because he had his

12  pistol drawn.  And I was just awaiting for me to just be able to

13  produce my credentials, have a dialogue about what the nature of

14  the investigation was.

15         If he assists me, great.  If not, assure the lady --

16  make assurances with the lady that, in fact, he is who he is, is

17  what I anticipated.  But I was met with something entirely

18  different, and it was just shock and disbelief that this is how

19  this was happening.

20     Q   We can't see on the camera angle here.  So when you're

21  talking about the way he's approaching, what are you referring

22  to?

23     A      He has his pistol out.  He has his gun out.  He's

24  talking to me in a very direct, authoritative manner.  I'm not

25  sure why he's giving me rapid -- he's very aggressive.  He's

1   saying things very fast, multiple commands at the same time.

2        I was just wanting the opportunity, or waiting for the

3   opportunity, to be able to just show him my credentials.  But I

4   also have a concern behind me, and I'm in a very uncomfortable

5   position at that point.

6   Q    Mr. Burk, we heard your words back to him, and I have

7   already said the "F" word more often than I am comfortable in

8   court records and the proceedings in this case, so I'm going to

9   substitute it for now, but the video obviously has your full

10  words.

11       When you're saying to him, "I'm a federal F'ing agent,"

12  why do you use that language?

13  A    I was shocked.  I was -- this was another brother law

14  enforcement officer who -- I mean, it's not uncommon to be crass

15  and use profanity with each other in our own environment, which

16  is -- in this situation, I felt like he was going to be there to

17  help me, is what my thought was going to be when an officer

18  arrived.

19       But then with the presentation of the firearm, I started

20  to feel unsafe.  And I thought what he was doing was certainly

21  over escalation, and that's -- my comfortability with being

22  amongst my own, it's not uncommon for language like that to go

23  back and forth.

24       And it was, you know, coupled with the shock and

25  disbelief as to how escalated he was right from the very get-go

1  when I was -- initially attempted to just waive him over and to

2  do what I always do in that same situation, and be able to at

3  least present credentials and identify myself and explain why I

4  was there.

5      Q    I am going to play the next few seconds of the video, so

6  I'm going to back this up just for a couple seconds to make sure

7  we get all the audio, and then we'll play it for a little bit

8  longer on here right now.

9      (Video was played in open court.)

10 BY MR. KEYES:

11     Q    Agent Burk, did you hear the things that Officer Fihe

12 said out loud?

13     A    Yeah.  I was hearing what he was saying at that point,

14 yes.

15     Q    So I think we heard, "Let me see your hands.  I need to

16 see some ID.  Get on the ground.  Get on the ground now."  Is

17 that what you heard?

18     A    Yes.

19     Q    He's -- well, first of all, in those other past

20 experiences when you mentioned that local law enforcement maybe

21 have been called and they come to a scene to discuss with you,

22 has anybody ever responded that way to you?

23     A    Never once has there ever been a response in that

24 fashion.

25     Q    Would it have been possible for you to let him see your

1  hands, produce some ID, and get on the ground all at the same

2  time?

3      A    No.  He had his pistol drawn.  If I would have reached

4  for my ID, he would have probably shot me.

5              MS. PICKERILL:  Objection.

6              THE COURT:  Well, sustained.

7              MS. PICKERILL:  Move to strike.

8              THE COURT:  Disregard the answer.

9  BY MR. KEYES:

10     Q    Yeah, let's keep it just to what you observed as to what

11 you may have --

12     A    All right.  I'm sorry.

13     Q    -- subjectively suspected.

14         Frame it this way:  In terms of your training and

15 experience as a law enforcement agent, would it have been wise

16 for to you try to produce your ID at that point?

17     A    Absolutely not.

18     Q    And without saying what you believed Officer Fihe may or

19 may not have done, what would your training tell you about

20 producing your ID at that point?

21     A    Not to reach into my pockets with a firearm trained on

22 me.

23     Q    Why not just get on the ground at this point?

24     A    I was -- because I still had an ongoing investigation

25 going on behind me with a person that is believed to have a

1  firearm illegally in their possession, and I have not resolved

2  that situation behind me.

3       So I really don't know what the status of any threat is

4  behind me, so I have to keep that into account because I am

5  there under my authority as an ATF agent to conduct this

6  investigation.

7       So I'm poised with two opposing situations here that --

8  for me to have to make decisions on.

9  Q    We're going to play this for a few more seconds here.

10 You can look at your screen.

11    (Video played in open court.)

12 BY MR. KEYES:

13 Q    We heard Officer Fihe ask you, "Why didn't you show me

14 your ID when I got here?"  And, Mr. Burk, did you have a chance

15 to show him your ID?

16 A    No, I had no opportunity presented to me.

17 Q    And, again, where was your ID?

18 A    It was in my left cargo pocket.

19 Q    Where would you typically keep your ID on these types of

20 retrievals?

21 A    In my left cargo pocket every day that I worked, every

22 day that I am in the field.

23 Q    Did you at some point during this encounter tell Officer

24 Fihe where your ID was?

25 A    Yes, I tried to.

1    Q    I'm going to play again for a few moments here.

2        (Video was played in open court.)

3  BY MR. KEYES:

4    Q    Couple of questions about that sequence.

5        You had gestured to your pocket, it looked like, in that

6  video?

7    A    Yes.

8    Q    Is that the pocket your ID was in?

9    A    That would be my left pocket, yes.

10   Q    Now, you also made a comment, "Why would I have an OHLEG

11 sheet?"  Did you hear that?

12   A    Yes.

13   Q    What is an OHLEG sheet?

14   A    It stands for Ohio Law Enforcement Gateway.  It's a law

15 enforcement specific secured database for running driver's

16 license information, BMV photos, vehicle registrations, criminal

17 histories within the state of Ohio, and such other items that

18 you would query.

19   Q    Now, I would like to ask you about what we see in your

20 left hand now, that folder.

21        MR. KEYES:  Your Honor, may I approach the witness?

22        THE COURT:  Yes, you may.

23 BY MR. KEYES:

24   Q    Mr. Burk, I'm going to hand you that same manila folder

25 that I held up at the lectern a minute ago.  Just hold onto that

1  for a moment.

2      About how far away were you from Officer Fihe at this

3  point in the video?

4    A   I'd say approximately 25 feet.

5    Q   Approximately -- I have a tape measure if we need to get

6  specific, but can we all agree that the distance between where

7  you are and the jury box right now is about 25 feet?

8      MR. KEYES:  I'm glad to measure.  That's not a

9   problem.

10      MS. PICKERILL:  I'll be honest, I don't have great

11   spacial awareness, so I hesitate to say I agree, but I don't

12   doubt you.

13      THE COURT:  Close enough for me.

14      MR. KEYES:  All right.  Thank you.

15  BY MR. KEYES:

16    Q   So, Mr. Burk, let's assume that the front of the jury

17  box is about 25 feet from where you are there.

18      Can you, holding that folder in your left hand, kind of

19  show us about where you have it in relation to your body in this

20  part of the video.

21    A   (Witness complies.)

22    Q   Okay.  And had you had it in your other hand as well?

23    A   I did.

24      MR. KEYES:  Your Honor, may I approach just to move

25   his monitor out of the way?

1          THE COURT:  Yes.

2    BY MR. KEYES:

3      Q    Carefully you can place it in your right hand as well,

4    and can you hold that about at the angle that you had it during

5    the video.

6      A    (Witness complies.)

7      Q    I can take that back.  Thank you.

8           Could you have held any kind of weapon in that folder?

9      A    Not that I could put in a manila folder, no.

10     Q    Now, back to the OHLEG sheet that you mentioned.  I

11   think you told us what it was, but why did you mention that

12   specific piece of information to the officer?

13     A    Because I was trying to convey to him that I, in fact,

14   was a law enforcement officer.  And I thought by mentioning that

15   specific document, of all the documents I did have, he would

16   know that not just anybody can possess that type of

17   documentation, specifically the OHLEG.  And being an Ohio law

18   enforcement police officer, I knew that he would know what that

19   sheet is, and he would know that it's a protected document and

20   that you have to have authorized access to possess that type of

21   document.

22     Q    I'm going to ask you some more questions about the

23   encounter.  I think for these, because we saw it so recently, we

24   may not need to play the video, but let me know if you want me

25   to jump to a point, and I'm glad to do that.

1        But what I'm going to ask you about is the portion right

2   here where Officer Winchell is arriving, and we saw that you get

3   on the ground as he approaches.  We saw when we watched earlier,

4   correct?

5        A    Yes.

6        Q    Why did you get on the ground at that point when Officer

7   Winchell arrives?

8        A    Well, prior to another officer's arrival, it was going

9   through my mind and hope that the arrival of any additional

10  officers would immediately result in some deescalation, as I was

11  not presenting any type of threat; and that with the information

12  especially that I had already provided to their dispatch, that

13  it would have been verified or I would have been at least asked

14  to remain in my position but then allowed to present a

15  credential now that there was a second officer there, if the

16  first officer felt that it was a threat for me to do so.

17       But when the second officer arrived, that's not what

18  happened.  His actions were the same as the first officer.  And

19  at that point, I had to make a decision on what to do.  So I

20  relinquished my responsibility behind me and got on the ground.

21       Q    When you say the responsibility behind you, what were

22  you talking about?

23       A    To the occupant of the residence or the possessor of the

24  firearm in my investigative duties at that residence.

25       Q    Around this point on the video -- I can play it if you

1 need to -- but do you recall when we were watching the video a

2 moment ago hearing instructions from the officers to put your

3 right hand behind your back?

4     A    Yes, I heard that.

5     Q    When they were instructing you to do that, was it

6 possible for you to move your right hand and put it behind your

7 back?

8     A    Not at the time they were saying that, no.

9     Q    Why not?

10     A    Because the second officer was on my arm.  It was not

11 allowing me to move my arm.

12     Q    Now, we did see that -- you recall seeing the portion of

13 the video where the -- where they used the TASER on you?

14     A    Yes.

15     Q    And at that point we saw your arm go -- your right arm

16 go behind your back and was then handcuffed.  Do you recall

17 that?

18     A    Yes, I do.

19     Q    What changed at that point in the sequence?  What

20 changed that your right hand was now behind your back?

21     A    The second officer moved his body and moved his position

22 off my arm.

23     Q    I'm going to start a portion as they seat you up on the

24 sidewalk here, and we are going to watch that for a few seconds.

25     (Video was played in open court.)

BY MR. KEYES:

1   Q    I've paused it, as we see.  And, again, this is Officer

2   Fihe's body camera, so we see Officer Fihe holding a billfold

3   there.  Is that the same -- well, let me ask you this way:  What

4   did he pull out of your pocket?

5   A    Out of my left pocket he pulled out my credentials, my

6   ATF credentials.

7   Q    Was that the same set of credentials you had showed the

8   resident before?

9   A    The same ones, yes.

10  Q    I'm going to show you a bit of the sequence when you're

11  going into the back of the police car.

12       (Video was played in open court.)

13  BY MR. KEYES:

14  Q    Now, in that sequence that we just saw, the portion of

15  you going into the back of the police car, once you were seated

16  on the bench with your legs still outside the door, could you

17  have freely gotten into the back of the car all the way in on

18  your own?

19  A    No.

20  Q    Why not?

21  A    Because of the seat belt configuration all behind me.

22  It was -- it wouldn't allow my body to go in there, or my head.

23  Q    Do you remember roughly how long you were in the back of

24  the police car?

1    A    Ten, fifteen minutes, maybe, before the ambulance came.

2    Q    And what about when the ambulance came, then what

3    happened?

4    A    Then I was taken out of the police car in handcuffs and

5    placed inside the ambulance in handcuffs.

6    Q    About how long were you in the ambulance?

7    A    An hour, approximately an hour.

8    Q    Did the handcuffs come off when you were in the

9    ambulance?

10    A    No, they didn't.

11    Q    When did the handcuffs come off?

12    A    When I was ultimately let go from the scene after I was

13    able to get my belongings and make a brief phone call to my

14    supervisor.

15    Q    Did you ever get to complete your job that day that you

16    were there to do?

17    A    No, I did not.

18    Q    Did you ever make contact with the homeowner?

19    A    Just visually.  He was sitting on the porch.  The

20    subject that I went there to see was sitting on the porch when I

21    left the scene.

22    Q    Why didn't you engage at that point?

23    A    I was told by my supervisor, "Just go to the division

24    office.  We're not worried about the investigation right now.

25    We're worried about you."

1    Q    During the entire time that you were at the scene in the

2    handcuffs that you have told us about so far, did anybody ever

3    tell you you were under arrest?

4    A    No.

5    Q    Were you ever charged with a crime from this incident?

6    A    No, I was not.

7    Q    Were you ever given a ticket or a summons to appear in

8    court about this incident?

9    A    No, I was not.

10         MR. KEYES:  Your Honor, may I have a brief moment to

11   confer with my co-counsel, please?

12         THE COURT:  Yes.

13      (Plaintiffs' counsel conferring off the record.)

14         MR. KEYES:  One moment.

15         Mr. Burk, at this point those are all the questions I

16   have for you, subject to recalling at later proceedings.

17         THE COURT:  Very well.  Thank you.

18         All right.  You may cross-examine.

19         MS. PICKERILL:  Thank you, Your Honor.

20                              - - -

21                       CROSS-EXAMINATION

22   BY MS. PICKERILL:

23   Q    Good afternoon, Mr. Burk.

24   A    Good afternoon.

25   Q    All right.  A little bit ago Ms. Chin in her opening

1  statement, she mentioned some discipline that you had while at

2  ATF back in 2015.  Do you remember that?

3     A     Yes, I do.

4     Q     Okay.  I want to talk to you a little bit about that.

5           ATF investigated some conduct that you had involving the

6  Kroger grocery store; is that right?

7     A     That is correct.

8     Q     The conduct that they were investigating involved you

9  swapping price tags on bottles of wine; is that right?

10    A     Yes.

11    Q     You would take the price tag off of a cheap bottle of

12 wine that you had at home?

13    A     Not necessarily -- I don't really recall, but something

14 of that nature, yes.

15    Q     Okay.  You would take the price tag for a cheap bottle

16 of wine with you into Kroger?

17    A     Yes.

18    Q     Okay.

19    A     No.  Can you rephrase the question again real quick?

20    Q     Sure.

21          You would take the price tag for a cheap bottle of

22 wine --

23    A     Yes.

24    Q     -- with you into Kroger?

25    A     Yes.

1    Q    Okay.  Then once you were in Kroger, you would place

2  that cheaper price tag onto a more expensive bottle of wine,

3  right?

4    A    Yes.

5    Q    You would then take that expensive bottle of wine to the

6  cash register and check out?

7    A    Yes.

8    Q    But you would pay the less expensive price that you had

9  placed on there; is that correct?

10   A    Yes.

11   Q    You would agree that you weren't paying full price for

12 that wine?

13   A    Yes.

14   Q    You did that twice on Saturday August 15th, 2015; is

15 that correct?

16   A    Say the date again, please.

17   Q    It was Saturday, August 15th, 2015.

18   A    Yes.

19   Q    Okay.  You did it two more times on August 25th, 2015;

20 is that correct?

21   A    Yes.  Yeah, I don't recall that long ago, so I can't

22 confirm the date.  But, you know, I did have that problem, and I

23 did do that, yes.

24   Q    And you did it on multiple occasions?

25   A    That I can recall it happened, yes.

1    Q    Okay.  You would agree with me that the way you

2  purchased these bottles of wine was dishonest, right?

3    A    Yes, it was.

4    Q    And for some of these times you drove your

5  government-owned vehicle to Kroger when you took that wine?

6    A    That I don't necessarily agree with, no.

7    Q    Okay.  Do you remember being interviewed as part of that

8  investigation?

9    A    Yes, I do.

10    Q    Do you remember being under oath for that interview?

11    A    Yes, I do.

12        MR. KEYES:  Objection, Your Honor.

13        THE COURT:  Overruled.

14        MS. PICKERILL:  Maria, could we pull up just for the

15   witness and counsel, I believe it's AA, the transcript, and it

16   goes from page 7 to page 8.

17            I guess just stop on page 7, if you don't mind.

18            There's two page 7's.  I apologize.  It starts and

19   stops again.

20            Okay.  Down a little bit more.

21            Okay.

22  BY MS. PICKERILL:

23    Q    Have you seen this transcript of your interview with

24  ATF?

25    A    At some point in time, yes, back then I would have saw

1   it.  I haven't seen it recently, no.

2      Q     Okay.

3      A     But, yes, it's a fair representation.

4      Q     So the second-to-last question asks you:  So that Friday

5   afternoon at 3:22 p.m., how did you travel to the Kroger store?

6         And you responded:  I would -- at that time of day I was

7   probably in -- in my government vehicle.

8      A     Okay.  I see that there, yes.

9         MS. PICKERILL:  You can take that down, Maria.  Thank

10   you so much.

11  BY MS. PICKERILL:

12     Q     For some of these instances where you would go to Kroger

13  and swap the wine labels, you were on duty with ATF; is that

14  correct?

15     A     I don't believe so, no.

16        MS. PICKERILL:  Could you pull it back up, please,

17   Maria, and go to page -- the second page 9.

18  BY MS. PICKERILL:

19     Q     Okay.  The second-to-last question there at the end

20  says:  Would you say that you were on duty when you made that

21  purchase?

22        You clarified:  Which one?

23        The Friday one.  They said the Friday afternoon.

24        MS. PICKERILL:  Maria, if you could scroll to the next

25   page to get the answer.

BY MS. PICKERILL:

Q   Your response to that question about whether you were on duty was:  I would say probably likely so at that time.  3:00, uhm, I don't think I would have gotten up at 4:00 in the morning or something, but, yeah, I was -- I was, I guess -- technically, yeah, I was on duty, yeah, and I was likely driving my government vehicle.

Did I read that correctly?

A   You did.

Q   Thank you.

Did you experience any discipline from ATF as a result of that investigation?

A   Yes, I did.

MR. KEYES:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes, I did.

BY MS. PICKERILL:

Q   Like you told us a little bit ago when you were talking to Mr. Keyes, when you became an ATF agent you got training to be an ATF agent, right?

A   Yes, I did.

Q   Before ATF, like you told us, you also served four years with the Marines; is that right?

A   I did.

Q   As well as nearly 10 years as a police officer?

1    A    Yes.

2    Q    You also received training before you were allowed to

3    become a police officer, correct?

4    A    Yes.

5    Q    And while you were with the police department, you also

6    spent some time as a SWAT officer specifically; is that right?

7    A    Yes.

8    Q    And while you were a police officer you had

9    opportunities to work side by side with ATF members; is that

10   right?

11   A    At a point in time, yeah.  Yes.

12   Q    Turning to the summer of 2020, you kind of explained

13   that your role with ATF was to do these NICS retrievals and you

14   kind of told us what those are about.

15   A    Correct.

16   Q    The firearms that you're retrieving, they weren't

17   necessarily acquired illegally all the time; is that right?

18   A    If the person's prohibited from possessing the firearm,

19   they would be acquired illegally.  In instances where the person

20   knows they're prohibited but doesn't disclose that on the form

21   and it's found out to be they are -- so I guess to answer your

22   question, they would have been acquired illegally.

23        Sometimes they're acquired where the individual believes

24   that they don't have a criminal history that's prohibiting or

25   they were told otherwise or they didn't know that what was on

1 their record was prohibiting, so they, in turn, answered the

2 form -- the questions on the form different than what their

3 criminal history would reflect.

4          So --

5     Q     You would agree with me that there are some instances

6 where folks will go to purchase a firearm; that they will give

7 money and be sold that firearm; and then at some later time a

8 background check comes back to say, oh, actually they can't have

9 that firearm?

10    A     That's the initial determination by FBI, correct.

11    Q     At the time in the summer of 2020, you were assigned to

12 the Cincinnati branch of ATF; is that right?

13    A     Yes.

14    Q     Okay.  You're aware that they also have a Columbus

15 branch, correct?

16    A     The field office, yes.

17    Q     A field office.  Thank you.

18          When you go to do these NICS retrievals, you could ask

19 another ATF officer to go with you, couldn't you?

20    A     There are instances where I have, yes.

21    Q     Exactly.  There are instances where you yourself have

22 asked another ATF officer to go with you on these retrievals?

23    A     If the situation warranted it, per our instructions, by

24 all means, ask for help.  If it warrants it, yes.

25    Q     So you personally would ask for another agent to go with

1  you on any retrievals where you felt like your safety might be

2  at risk?

3      A    Well, your safety is always at risk on every situation,

4  but if the -- if the lead-up in the investigation would indicate

5  that there's a higher chance of a risk, the person's criminal

6  history shows a propensity for violence or violent felonies, the

7  area which you're responding to is a high-crime area, if by

8  chance you had to retrieve the firearm in low-light conditions

9  or in the evening hour, then those would definitely be

10  situations where you would have the assistance of another law

11  enforcement officer.

12          But not purely by just the fact that you're there to

13  retrieve a firearm, that doesn't -- there's always an element of

14  a risk, no more than an officer walking up to a car to issue a

15  ticket or pull over on a traffic stop.

16          So there's -- you're always anticipating and be

17  prepared, but you -- the indications that day would not have

18  been what would fall under a high-risk situation, or believed to

19  be a high risk.

20      Q    It's not just officers within ATF.  You have actually

21  asked officers from other law enforcement agencies to go with

22  you on retrievals before --

23      A    On occasion, yes.

24      Q    On July 7, 2020, you were investigating a firearm owned

25  by a man named Alla; is that right?

1       That was his first name.

2    A    Yes.

3    Q    If I just call him Alla, you will know who I'm talking

4  about?

5    A    Now I will, yes.

6    Q    Okay.

7    A    I did not recall his name.

8    Q    And if I say Sarah Al Maliki, you understand that that's

9  his wife?

10   A    I will now, yes.

11   Q    Alla was one of those folks who had purchased a firearm

12 and then a background check came in after he had the gun; is

13 that right?

14   A    That is correct.

15   Q    And July 7, 2020, was the very first time that you

16 attempted to make contact with Alla; is that correct?

17   A    Yes, it was.

18   Q    You had never sent him a letter letting him know what

19 was going on or that he couldn't have the gun?

20   A    In delayed denials when you have the firearm that's

21 already been transferred, it is not ATF's policy to send

22 notification.

23       The only time there is notification sent on -- is on

24 what they call a standard denial.  That means they went in,

25 attempted to purchase a firearm.  Their background check was

1   immediately denied by FBI.  We get those as well.  Those

2   generate a letter to say, hey, you attempted to buy a firearm.

3   You have been found to be prohibited.  Essentially, don't do

4   that again because of your prohibition.

5           Those letters get generated, but not on delayed denials.

6   Q       So to answer my question, you had not sent a letter to

7   Alla to let him know that he couldn't have --

8   A       That would not have been a matter of policy or practice,

9   no.

10  Q       That's a no, you didn't do it?

11  A       I did not, no.

12  Q       You would agree with me that when you're going to

13  retrieve firearms, your goal is to create a dialogue with the

14  folks you're talking to?

15  A       With the resident, any occupant of the house, yes.

16  Q       So your plan for that day was to talk to Alla or whoever

17  was in that home, correct?

18  A       And to establish the whereabouts of the firearm, yes,

19  correct.

20  Q       When you went to the home on July 7th, 2020, you didn't

21  know if Alla still had possession of that firearm, did you?

22  A       In these type of investigations you never know if the

23  person still has possession.  That's the first place you go, is

24  the address of record to make contact.  And then the

25  investigation continues based on the dialogue and what's

1  determined.

2         In many instances they have the firearm.  In many

3  instances that firearm has now changed hands again.  So it's a

4  step in the process of investigation.

5     Q    And going to Alla's house was the very first step in

6  your investigation into that firearm?

7     A    Was the first step in the field part of the

8  investigation.  Once he was determined to be prohibited, then

9  that was the first step in the field, was to go to his residence

10 and try to make contact.

11    Q    I think you mentioned this, but the reason you needed to

12 retrieve the firearm, or the reason that Alla was prohibited,

13 was because of an immigration-status issue; is that right?

14    A    That is correct.

15    Q    He was not a convicted felon?

16    A    No.  Not that I was aware of, no, not per criminal

17 background check.  It was for the immigration status that was

18 prohibiting.

19    Q    That was the only prohibitor?

20    A    That was what -- at that time, yes, yes, that was the

21 only --

22    Q    Do you know of an additional prohibiter now?

23    A    Not that I was aware of because I don't work there any

24 longer, so I don't know that.  But at the time, it only needs to

25 be based on one prohibiter, and that's what it was based on.

1   That's what we found.

2       Q    But you ran a background check, and you did not find

3   that he had an extensive criminal history either?

4       A    Did not.

5       Q    His home was not in a high-crime area, was it?

6       A    It was not.

7       Q    You were working in your capacity as an ATF agent on

8   July 7, 2020, correct?

9       A    Yes.

10      Q    You were an 1811 criminal investigator; is that right?

11      A    Yes, I was.

12      Q    And part of your job as a special agent was to interact

13  with local law enforcement, right?

14      A    Yes.  At times, yes.

15      Q    Before you went to 3359 Edgebrook Drive, you didn't call

16  CPD or let them know that you would be in their jurisdiction?

17      A    It's not a matter of practice for us to do that unless

18  it's an enforcement operation or we're seeking their assistance.

19      Q    You would agree with me that giving local law

20  enforcement a heads-up when you will be in their area is a

21  common and recommended practice for all special agents within

22  ATF, right?

23      A    For pre-planned enforcement operations we do that all

24  the time, yes, we do.  For knock and talks and casual field

25  investigations, such as NICS investigations, it's not a matter

1  of practice or policy.  It's rarely done, unless you need

2  assistance or you're asking for an officer to meet you at the

3  residence for some reason.

4  Q    So is your testimony that it's not a common and

5  recommended practice for all special agents with ATF?

6  A    To do what?

7  Q    To call local law enforcement before you're in their

8  area and let them know what you're going to be up to?

9  A    For a NICS type of investigation or for an enforcement

10  operation?

11  Q    Any of it.

12  A    Not for a NICS investigation, no.

13        MS. PICKERILL:  Okay.  Maria, could you pull up the

14  deposition at page 79 to 80, please.

15        If we could show it just to the counsel and to the

16  witness.

17        THE COURT:  Ladies and gentlemen, a deposition is a

18  transcript of testimony taken outside of court before the case

19  comes to court, and often the lawyers take the testimony of

20  people who are expected to testify and to -- in order to

21  discover what their testimony may be in the case.

22        And so they are under oath, and a lawyer is present

23  for each side, and they're taken under the same formality as

24  though they were here in the courtroom, and a transcript is

25  made of this deposition.

1   BY MS. PICKERILL:

2      Q      Okay.   On page 79 I asked you the question -- we were

3   looking at document, and I said -- I asked if you would have

4   been trained or advised to call local law enforcement ahead of

5   time, and I asked if you remembered what type of training or

6   advisory notice you would have gotten about that.

7            MS. PICKERILL:  Maria, if you could go down to

8    page 80, that gives us some context for what this next question

9    is.

10  BY MS. PICKERILL:

11     Q      So line 13 on page 80 I asked you:  In question 43 it

12  says that it is a common and recommended practice to call local

13  law enforcement ahead of time, and I asked if you would agree

14  with that sort of colorization.

15           You answered:  How to responding if -- if -- yes.  And

16  you're trained to establish a dialogue, identify yourself, and

17  present your credentials to validate who you are.

18           Did I read that correctly?

19     A      You read it -- yes, you read it just like it is on the

20  screen.

21           MS. PICKERILL:  Maria, you can take it down.  Thank

22   you.

23  BY MS. PICKERILL:

24     Q      We talked about calling the Columbus Police Department.

25  You also did not call the Columbus branch of ATF to let them

1  know that you would be up in their neck of the woods?

2      A      We're all the same division.  I'm under the directives

3  of my resident field agent -- resident agent in charge, the

4  ASAC, and the SAC.  They know my assignment.  They know it's --

5  that my assignment encompasses not only the entire Southern

6  Judicial --

7              THE COURT:  Mr. Burk, you can just answer the question

8   yes or no.  Did you or didn't you?

9              THE WITNESS:  I'm sorry.  Say that again.

10 BY MS. PICKERILL:

11     Q      You didn't call the Columbus branch of ATF --

12     A      No, I did not.  No.  No, I didn't.

13     Q      -- to let them know you would be in the area?

14     A      No.

15     Q      You're not sure if anyone from ATF, other than your

16 direct supervisor, knew that you would be in Columbus on July 7,

17 2020?

18     A      I wouldn't expect anybody to know that except my

19 supervisor who knows my assignment that day, who knows -- that's

20 who I report to as to what I'm doing.

21     Q      Okay.  I think you already told us, but you drove a car

22 to 3359 Edgebrook Drive, correct?

23     A      Yes, I did.

24     Q      I mean, you talked about how that car wasn't marked, so

25 it didn't look like a police car from the outside?

1 A Not unless you looked inside, no.

2 Q You mentioned that it is outfitted with some lights and

3 sirens, but you would agree with me that those lights aren't

4 visible if you're standing outside of the car?

5 A Not from a distance, no.

6 Q When you got to 3359 Edgebrook Drive you knocked on the

7 door and a woman answered; is that right?

8 A No.  I knocked on the door.  The first time I didn't

9 hear -- I could only hear people inside or movement inside.  I

10 knocked again, and then I got a verbal response, but nobody

11 answered the door.

12 Q A woman came to the door and answered your knocking

13 verbally, correct?

14 A She responded to me from within the house, yes.

15 Q She didn't open the door, but she came to the door to

16 talk with you?

17 A Behind the door, inside the residence.  I couldn't tell

18 if she was directly behind the door or just yelling to me from

19 within the house in that area.  I couldn't place her where she

20 was at, just that I could hear her and she could hear me.

21 Q Okay.  This woman was not the man that you were looking

22 for, was she?

23 A It was a female's voice, best I could tell.

24 Q But you were there looking for a gentleman, correct?

25 A Yes, I was.

1    Q    You didn't have a warrant to enter the home that day,

2  did you?

3    A    No, no.

4    Q    You would agree with me that when you're making contact

5  with folks at their home, you want to do your best to make them

6  feel comfortable?

7    A    Yes.

8    Q    Sarah told you that her husband was not home, correct?

9    A    Yes, she did.

10   Q    You doubted her?

11   A    I had reservations, yes.

12   Q    When you're doing these retrievals and someone isn't at

13 home, you don't have to stay there and wait all day.  You have

14 some options, don't you?

15   A    Yeah.  There's always options, yes.

16   Q    You could wait nearby and get some administrative work

17 done until the person comes home, right?

18   A    Yes.

19   Q    You could do some work on your laptop while you wait for

20 the person to come home; isn't that correct?

21   A    Yes.

22   Q    You could drive to another location and do an

23 investigation there before going back to the first location,

24 right?

25   A    In this case, not necessarily because these -- there's

1 distance issues where you're not going to drive to another

2 location and then come back in a short period of time.  These

3 are spread out over two states.

4        So to that, no, not necessarily that.

5 Q    But that's an option that you have in some of these

6 instances?

7 A    Yes.

8 Q    But in this particular instance, if Sarah hadn't called

9 the police, you might have waited on her porch outside of her

10 front door until her husband came home; is that correct?

11 A    Not necessarily there, no.  I may have waited in the

12 vehicle.  I may -- I'm not sure.  I would have had to determine

13 that once I had a little better dialogue with her, to the fact

14 that her husband wasn't, in fact, inside the residence or

15 perhaps directing her to say that he is not there.

16        I mean, these are all scenarios that I have dealt with

17 on several occasions.  So, again, it's part of the investigative

18 process for me to make the determination, and that's best done

19 trying to actually have an actual conversation with somebody,

20 and that what's attempted.

21 Q    Okay.  You told Sarah that you would wait on her porch

22 all night until this situation got resolved; is that right?

23 A    I said I would wait for the police officer.  She said

24 she was calling the police.

25        I said, "I'll wait here."

1      I said, "Go ahead and call.  I am the police, but by all

2  means, call.  I'm going to wait here.  I'm not going anywhere."

3          MS. PICKERILL:  Maria, could you pull up the

4   deposition again for me, please?  Page 136 to 137.

5          Starts at line 23.

6          Thank you.

7  BY MS. PICKERILL:

8      Q    Do you see that on your screen, Mr. Burk?

9      A    Line 23?

10     Q    I just want to make sure it popped up on your screen.

11     A    Yes.

12     Q    The question that starts on line 23 reads:  Uh-huh.

13  Did -- did you tell -- I think we now know her name is Sarah,

14  Sarah, the woman inside the house, that you were going to stay

15  on her porch all day unless she opened the door?

16          Your answer:  I said I -- I'm going to have to remain

17  here.  What I said was I'm going to stay here.  I'm going to be

18  here because I have to resolve this situation.

19          I read that correctly, didn't I?

20     A    Yes.  I did say I have to resolve this situation, and I

21  have to stay here, and I'm not going anywhere.

22          That's what I said.  I didn't make a reference to being

23  there through the night, no.

24     Q    Okay.  And you told her you were going to stay there?

25     A    Yes, I said, "I have to stay here and resolve the

1  situation."

2      I was expressing the importance of why I was there, yes.

3      MS. PICKERILL:  You can take it down, Maria.  Thank

4  you.

5      And, Your Honor, just briefly, I'll represent that I

6  still have quite a number of questions here, but it is just

7  about 5:00.  I didn't know if this would be an appropriate time

8  to take a break.  I'm happy to keep going.

9      THE COURT:  No, you're right.  It's 5:00, and this is

10  probably a good time to stop.

11      Ladies and gentlemen, we're going to release you for

12  the evening, and I want to remind you of my instructions not to

13  discuss this case with anyone.  Don't permit anyone to discuss

14  it with you.  Don't try to do any research or investigation of

15  your own.  Just leave the case here in the courthouse tonight

16  and have a nice evening.  We'll see you back here tomorrow

17  morning at 9:00.

18      THE COURTROOM DEPUTY CLERK:  Leave your notebooks on

19  the chair.

20      THE COURT:  Yes.  You can leave your notebooks on the

21  chair, and we will put them in the jury room where they will be

22  safe.

23      Everybody have a nice evening.

24      Mrs. Shane, you may adjourn court.

25      THE COURTROOM DEPUTY CLERK:  Please rise.

1          This court is adjourned.

2     (Jury out at 5:01 p.m.)

3     (Proceedings concluded at 5:01 p.m.)

4                        - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- - -

WITNESS INDEX

- - -

WITNESSES                DIRECT CROSS REDIRECT RECROSS

PLAINTIFFS':

James A. Burk, Jr. 92     129

<u>C E R T I F I C A T E</u>

I, Crystal Hatchett, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the HONORABLE JAMES L. GRAHAM, Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


                        s/Crystal Hatchett
                        Crystal Hatchett
                        Official Federal Court Reporter
                        January 2, 2025