UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES A. BURK, JR., et al.,    )
                               )
   PLAINTIFFS,                 )    CASE NO. 2:20-cv-6256
                               )
         vs.                   )
                               )
THE CITY OF COLUMBUS, et al., )
                               )
   DEFENDANTS.                 )
_____)

        TRANSCRIPT OF JURY TRIAL PROCEEDINGS - VOLUME 2
            BEFORE THE HONORABLE JAMES L. GRAHAM
            TUESDAY, NOVEMBER 5, 2024; 9:09 A.M.
                    COLUMBUS, OHIO

APPEARANCES:

    FOR THE PLAINTIFFS:
        Cooper Elliott, LLC
        By:  Barton R. Keyes, Esq.
             Abigail F. Chin, Esq.
        305 West Nationwide Boulevard
        Columbus, OH  43215

    FOR THE DEFENDANTS:
        Columbus City Attorney's Office
        By:  Alexandra N. Pickerill, Esq.
             Sheena D. Rosenberg, Esq.
             Sarah Feldkamp, Esq.
        77 North Front Street, 4th Floor
        Columbus, OH  43215

                         - - -

    Proceedings recorded by mechanical stenography, transcript
produced by computer.

1      TUESDAY MORNING SESSION

2      NOVEMBER 5, 2024

3                          - - -

4      (Jury in at 9:09 a.m.)

5      (The following proceedings were had in open court.)

6           THE COURT:  Good morning, ladies and gentlemen.

7           Counsel, I believe we had Mr. Burk on the witness

8      stand.

9           Mr. Burk, you may resume your seat there.

10          MS. PICKERILL:  Your Honor, before I re-begin with

11     questioning, I did have one issue that I wanted to get some

12     clarification on from Your Honor.  Would it be possible to have

13     a sidebar?

14          THE COURT:  Yes.

15     (The following proceeding was held at sidebar.)

16          MS. PICKERILL:  Your Honor, before trial yesterday you

17     said that you were reserving your judgment on whether some of

18     those ATF documents talking about Mr. Burk's bad behavior could

19     come into evidence.

20          We believe that during the opening and during

21     Mr. Burk's direct examination, I believe his counsel directly

22     opened that door.  During Mr. Burk's testimony he talked about

23     various awards and accommodations that he had with ATF for

24     following policies.  He also talked about how he properly

25     followed his training when he didn't take out his badge at

1 certain times.

2      Additionally, in the opening, Ms. Chin represented the

3 only discipline Mr. Burk has ever had with ATF was the incident

4 with Kroger.  She also explained to the jury that Mr. Burk was

5 fired, but then said that defense counsel would be misleading

6 if it were to bring that up.

7      At this time we believe that that door is open for us

8 to explain the context of all of these statements that

9 plaintiff has made.

10      Finally, Your Honor, we have -- it's been represented

11 to us that plaintiff intends to call former Agent Herndon as

12 one of their witnesses.  This particular witness was only put

13 on the trial list in order to rebut those ATF documents and to

14 bolster Mr. Burk's credibility and his ability to follow the

15 policies of ATF.  If that evidence is allowed to come in, we

16 certainly think that the door is open for us to discuss those

17 disciplinary records.

18      I wanted to check with you before finishing the

19 cross-examination of Mr. Burk.

20      THE COURT:  Okay.  Counsel for plaintiff, what do you

21 say?

22      MR. KEYES:  Thank you, Your Honor.

23      So our objection to those evidentiary materials is

24 preserved in the rulings on the motions in limine, and in the

25 Court's follow-up orders late last week I believe it was made

1   clear that the Court believed that those -- that the evidence

2   regarding Mr. Burk's termination proceedings would come in for

3   various reasons.

4           So we still stand by our objection.  For the record,

5   our objection has been preserved.

6           Our objection --

7           THE COURT:  Okay.  But one of the counsel's arguments,

8   defense counsel, is saying that you opened the door for this in

9   comments made during the opening statement.

10           MS. PICKERILL:  As well as Mr. Burk's direct

11   examination, yes.

12           THE COURT:  As well -- you're talking there about the

13   awards he received and so forth?

14           MR. KEYES:  We can respond specifically to those

15   points, Your Honor.

16           THE COURT:  So what exactly was said in opening

17   statement that you think opened the door?

18           MS. PICKERILL:  Yes, Your Honor.

19           Ms. Chin said to the jury that they will learn that

20   the only discipline that Mr. Burk ever received while at ATF

21   was for that incident at Kroger.  She also said that -- she

22   told the jury that we, defense counsel, would be presenting

23   evidence that Mr. Burk had been terminated from ATF and then

24   told the jury that this was misleading.

25           THE COURT:  That this was?

1    MS. PICKERILL:  That that would be misleading, to say

2    that he had been terminated.

3         Without any additional context, the jury is left with

4    only that statement and the notion that we, as defense counsel,

5    are misleading them in some way.  We're not allowed to show

6    them that evidence.

7         THE COURT:  So do you agree that's what your

8    co-counsel said in opening statement?

9         MR. KEYES:  I believe that the -- on the first issue

10   in reference to the prior discipline, I don't believe that the

11   statement was that that was the only discipline he ever

12   received.  I believe the context of that statement was before

13   July 7th, 2020, before the date that we're talking about.

14        On the comment about termination, I agree that

15   Ms. Chin said in opening statement that defense counsel would

16   likely present evidence of his termination and that it would be

17   misleading, and those comments were based on the Court's prior

18   rulings that these materials would come in.

19        So we would submit, just again to preserve -- that our

20   objection remains preserved because the comment in opening

21   statement is not evidence, as the Court has already instructed

22   the jury.

23        That said, our -- the objections we would raise now

24   are on the same basis that we had raised before trial in motion

25   in limine briefing.

1          So we understand the Court's ruling on those issues

2     that that evidence was likely to be allowed in.  We would

3     object on the same basis that those rulings that it is a

4     nonfinal determination that was canceled specifically by ATF,

5     the agency --

6          THE COURT:  Yes, I've read all of that.

7          MR. KEYES:  Yes, Your Honor.  I didn't want to --

8          THE COURT:  I'm having some difficulty remembering

9     precisely what Ms. Chin may have said, and we may ask the

10    reporter to read that back for us.  But first I'd like to know

11    just what part of this -- these records you're going -- that

12    you wish to inquire about.

13         MS. PICKERILL:  Specifically the notice of proposed

14    termination and the notice of final decision of termination.

15    If I can --

16         THE LAW CLERK:  In November?

17         MS. PICKERILL:  Correct.  Thank you.

18         If you want to know the specific quotes that I will be

19    referencing --

20         THE COURT:  How are they relevant?

21         MS. PICKERILL:  They are relevant because the officers

22    are going to testify that they doubted Mr. Burk's claim that he

23    was a federal agent.  Part of the reason they doubted it was

24    because he was not following those policies that they

25    understood federal agents to have to comply with.

1    The ATF documents all corroborate that understanding.

2  Thus, proving to the jury that the defendant -- or offering

3  some proof to the jury that the defendant officers' both

4  interpretations and, therefore, actions based upon it were

5  reasonable, which is the exact question the jury is tasked with

6  answering.

7    And, Your Honor, if we want to reserve the issue of

8  the punishment, the termination specifically, I'm happy to

9  leave my questioning only to the policies that he violated and

10  using those documents to show that, and we can talk about the

11  termination or his severance from ATF potentially later at a

12  damages trial.  But those finding I would -- I believe are

13  still relevant to the reasonableness.

14    THE COURT:  All right.  What if we -- I've been

15  struggling with the issue of determining just what Mr. Burk was

16  required to do under the uniform standards for law enforcement,

17  and I've been wondering just what evidence I might hear about

18  the scope of those standards, and I'm -- I believe that the

19  disciplinary records do reflect the standards that the federal

20  government, and specifically the ATF, applied to Mr. Burk; and

21  I have been considering admitting into evidence those parts of

22  the disciplinary proceeding in order to establish that that was

23  part of the standards of law enforcement that he was required

24  to follow during these events.

25    If those records are relevant, I think that would be

1    the best way to get those matters before the jury and it would

2    be much better than trying to develop this during the

3    cross-examination of Mr. Burk.

4            Now, was there anything else in the disciplinary

5    records that you believe would be admissible to the issue of

6    credibility or anything like that?

7            MS. PICKERILL:  Your Honor, I think it all sort of

8    goes to his credibility because he's testified that he followed

9    policy.  And if ATF finds that that is not true, then that goes

10   against his credibility of understanding his policies or

11   interpreting his own actions or his ability to reflect on that

12   day.

13           THE COURT:  Okay.  So now I want to -- I want to see

14   exactly what Ms. Chin said, so I'm going to excuse the jury

15   while our court reporter finds that part of the opening

16   statement.

17           MS. PICKERILL:  Yes, Your Honor.

18           THE COURT:  All right.

19           MR. KEYES:  Your Honor, briefly?

20           THE COURT:  Yes.

21           MR. KEYES:  On the last comment that Ms. Pickerill

22   made --

23           THE COURT:  We're going to excuse the jury.

24           MR. KEYES:  Okay.  I will wait then.

25           THE COURT:  You can say anything you want to after

1    that.

2          MR. KEYES:  Thank you.

3       (The following proceedings were had in open court.)

4          THE COURT:  Ladies and gentlemen, a request for a

5    sidebar conference to discuss legal issues is a normal part of

6    any trial, and usually the Court's able to rule on those

7    matters at the sidebar conference.  However, in this case I

8    need to refer to some additional materials before I make a

9    final ruling on the issue the lawyers have brought up with me.

10         It's an issue of law that concerns the Court, and it's

11   not one of the matters that you folks are concerned with, and

12   I'm going to have to make a ruling on the issue that's been

13   raised.

14         So it's going to take a few minutes to get the

15   additional material that I need, so we're going to excuse you

16   folks to the jury room while we do this.

17         And this is probably not the first time this is going

18   to happen.  It's a usual part of any trial, and we want to make

19   sure that we get everything right so that you have the correct

20   evidence that you need to decide the case.

21         We're going to excuse you for the next 10 minutes or

22   so.

23         THE COURTROOM DEPUTY CLERK:  Please rise.

24       (Jury out at 9:22 a.m.)

25         THE COURT:  All right.  Please be comfortable,

1  Counsel.

2      I'm going to ask our reporter to see if she can find

3  the part of the record.

4      Anything that counsel can do to help you?

5    (Discussion had off the record.)

6      THE COURT:  All right.  It looks like I interrupted

7  opening statement and perhaps prevented plaintiffs' counsel

8  from opening the door.

9      She didn't get far, and I think the potential

10  prejudice of permitting cross-examination on this is -- it is

11  grounds for me to sustain the objection.

12      However, I'm going to reserve ruling on the ultimate

13  admissibility of parts of these disciplinary records relating

14  to termination because those records do contain significant

15  evidence of the standards that the ATF and law enforcement in

16  general placed upon Mr. Burk at the time of this incident.

17      I'm going to sustain the objection.

18      All right.  We can bring the jury back.

19      MR. KEYES:  Thank you, Your Honor.

20    (Jury in at 9:35 a.m.)

21      THE COURT:  All right.  Ladies and gentlemen, we have

22  resolved the matter.  Thank you for your patience.  You may be

23  seated.

24      Counsel, you may continue.

25      MS. PICKERILL:  Thank you, Your Honor.

- - -

JAMES A. BURK, JR.

    Called as a witness on behalf of the Plaintiffs, having been

    previously duly sworn, resumed the stand and testified as

    follows:

- - -

CROSS-EXAMINATION (cont'd)

BY MS. PICKERILL:

    Q    Good morning, Mr. Burk.

    A    Good morning.

    Q    When we left off yesterday afternoon we were talking

about what happened when you arrived at Sarah Al Maliki's house.

Do you remember that?

    A    Yes.

    Q    And when you had talked to Mr. Keyes before I got up

here to ask you some questions, he had talked to you about the

credentials you had on you that day.

    A    Yes.

    Q    Okay.  I'm going to put those back up on the screen.

         Can you see that?

         Are those the same credentials you were looking at

yesterday?

              THE COURT:  So can the jury see these?

              MS. PICKERILL:  Not yet, Your Honor.  I'll ask for it

    in just a second.

1        THE COURT:  Very well.  Go ahead.

2        MS. PICKERILL:  We can go ahead and display it for the

3   jury.

4        MR. KEYES:  It's a joint exhibit, Your Honor, so we

5   have no objection to it going out.

6        THE COURT:  Very well.

7        MR. KEYES:  Thank you.

8        THE WITNESS:  The screen has got a little --

9   BY MS. PICKERILL:

10   Q    Oh, is it -- are you able to write on it?

11   A    No, I was just trying to get that off of it.

12        MS. PICKERILL:  It seems to be a little tech box.

13        THE WITNESS:  Thank you.

14   BY MS. PICKERILL:

15   Q    Okay.  So there we go.

16        That first page there, those are your credentials,

17   right?

18   A    That is a portion of it, yes.  Correct.

19   Q    The second page is your badge, right?

20   A    That is correct.

21   Q    Okay.  And when you were at Sarah Al Maliki's house, you

22   showed her what was on this first page, correct?

23   A    I ultimately showed her what was on both pages because I

24   was asked for the badge as well, I believe.

25   Q    Okay.  You would agree with me that this first page is

1  not a badge, correct?

2      A     That's correct.  That's my photo and my authority and

3  the agency and my position.

4      Q     Okay.  That's the first page of this document, right?

5      A     That's the first fold open of the credentials, correct.

6      Q     And it's your testimony that you showed her this as well

7  as what's on the second page?

8      A     I believe so, yes, through the window when the

9  discussion was happening.

10     Q     Okay.  We talked a little bit yesterday about when you

11 sat for a deposition.  Do you remember that?

12     A     Yes, I remember sitting for the deposition.

13     Q     Do you remember being under oath for that deposition?

14     A     Yes, I do.

15     Q     Same oath you're under today?

16     A     Yes.

17         MS. PICKERILL:  Could we please take this down from

18   the jury and just have it for counsel and the witness?

19 BY MS. PICKERILL:

20     Q     I'm going to pull up that same transcript of your

21 deposition and go to page 151.  It starts on line 10.

22         Starting on line 10 there I asked you the question:

23 Okay.  Did you show Sarah anything other than the credentials

24 that we have talked about on the first page?

25         Your answer:  No.

1    I read that correctly, didn't I?

2    A    No, that's not -- no.  It's no, and then I explained I

3   showed her the most important item to validate who I was.  So I

4   showed her my credentials.

5    Q    You didn't show her your badge?

6    A    Well, the badge was shown because I believe it was asked

7   for in order to verify my badge number when she was on the

8   phone.

9         There was no visual between us and the door.  It wasn't

10  until I was able to show those to her through the window.  I

11  wasn't able to show them to her.

12   Q    You would agree with me that when I asked you this

13  question about a year ago and you were under oath, and I asked

14  you whether you showed her anything other than that first page,

15  your answer was no, because that was the most important document

16  to you?

17   A    Correct.  It had my photo.  It had my agency.  It had

18  everything on there, yes, correct.

19   Q    On that day, you weren't wearing a badge on a chain

20  around your neck, were you?

21   A    No.

22   Q    You weren't wearing a badge affixed to your belt, were

23  you?

24   A    No.  We wouldn't necessarily -- no, I had my

25  credentials.

1    Q    Your credentials also weren't outwardly visible, were

2  they?

3    A    They normally never are, no.

4    Q    And they weren't that day?

5    A    No, they were in my pocket.

6    Q    One reason you don't like to have your badge immediately

7  visible on these types of runs is because they don't create a

8  warm, fuzzy feeling with people?

9    A    It's my experience, and the experience of others in this

10  same capacity, is not to overwhelm the situation with an

11  authoritative police presence.  It's to create a dialogue.  It's

12  an administrative activity.  And many times, especially at that

13  time, the presence causes people to be less responsive and not

14  want to engage out of fear of law enforcement for whatever

15  reason that may be.

16    Q    And that's one of the reasons why you don't like to

17  always wear a visible badge when you go on these runs?

18    A    I would wear the exact same thing that we're authorized

19  to wear and carry my --

20    Q    Mr. Burk, I'm asking you specifically about a visible

21  badge.

22    A    No.  I carry the credentials.  I carry everything on me

23  exactly the same way, and I don't carry visible markings, no.

24    Q    And when Sarah told you -- so let me back up a little

25  bit.

1  So you did at one point remove your credentials and your

2  badge from your pocket, right?

3  A   Yes, I did.

4  Q   And just to be clear, I don't know if it's clear from

5  the photograph, those are all sort of in one billfold, right?

6  A   It's contained in one -- yeah, one fold.  One part of it

7  opens up to show your photo, your agency, your authority.  You

8  flip the middle divider over and then it presents your badge

9  with its identification marks.

10  Q   Those are all in one item?

11  A   Contained in one.  They are not two separate items.

12  Q   When Sarah told you that she was calling 911, you put

13  your badge and your credentials back in your pocket; is that

14  right?

15  A   Yes, I did.

16  Q   And that billfold in your pocket was the only identifier

17  that you had on you on July 7, 2020, correct?

18  A   As far as my credentials are concerned, yes.

19  Q   It was the only identifier you had on you period that

20  day, correct?

21  A   On my person, yes.

22  Q   Okay.  When Sarah told you that she was calling the

23  police, you told her, "I am the police."

24  A   I did say that, yes.

25  Q   When Sarah told you that she was calling the police, you

1  understood the police were on their way to her house, right?

2      A      I would believe they would be if she said she was

3  calling the police, yes.

4      Q      That's what you believed on that day?

5      A      Yes.

6      Q      You waited, I think you told us, five to ten minutes

7  before the police got there?

8      A      Approximately, yes.

9      Q      While you waited that five to ten minutes, you stayed on

10 Sarah's porch, right?

11     A      Yes, I did.

12     Q      And you stayed facing her door?

13     A      I kept my eyes on her door, yes.

14     Q      During that five to ten minutes, you didn't take the

15 opportunity to call Columbus Police Department and verify your

16 identity to them while they were on the way, did you?

17     A      No.  I stayed focused on the door.  I was aware of the

18 dialogue and my information being transmitted to the Columbus

19 Police Department, so I stayed.

20     Q      So that's a no?

21     A      That's a no.

22     Q      You also didn't call -- didn't take this opportunity to

23 call the local Columbus branch of ATF to let them know that you

24 were there so that they could verify your identity?

25     A      No, I did not do that.  No.

1  Q    You didn't take the gun off of your hip, did you?

2  A    I would never do that.

3  Q    You didn't take your badge back out of your pocket to

4  have it ready to show the officers and verify your identity when

5  they got there, did you?

6  A    No.

7  Q    Okay.  You didn't hold the badge in your hand so that

8  way when the officers came up they would be able to see it, did

9  you?

10  A    No.

11  Q    Part of the reason you told me that you didn't do this

12  was because you didn't want to hold your badge and your folder

13  at the same time; is that right?

14  A    No.  I kept my hands available in the event that

15  something was going to transpire at the door.  If there was a

16  person that actually answered the door, I would be able to

17  physically manipulate myself to present the items I needed to

18  show, or if it became a situation that I had to protect myself,

19  then I had a hand to do that.  It's just standard practice for

20  standing in a doorway.

21  Q    And when I asked you why you didn't want to hold the

22  badge in the same hand as your folder, one of the things you

23  said was that it would be a big deal if you were to lose your

24  gun or your creds, so you wanted to keep them secure; is that

25  right?

1    A    Well, that is correct.

2    Q    To you, the fact that police were on their way was a

3  relief; is that right?

4    A    Yes.  Under the circumstances, yes, it was.

5    Q    It was a relief to you because you always get

6  cooperation?

7    A    In the same situation I've -- it's always been a very

8  cooperative dialogue and exchange when the local law enforcement

9  arrives.

10   Q    On July 7, 2020, you had an ATF tactical vest in the

11 back of your car, didn't you?

12   A    Yes, I did.

13   Q    A tactical vest is a bulletproof vest; is that right?

14   A    Yes.

15   Q    You didn't just have that vest; you had other ATF

16 tactical gear in your car that day, didn't you?

17   A    I did.  Yes, I did.

18   Q    You didn't retrieve any of that tactical gear while you

19 waited five to ten minutes for the police to arrive, did you?

20   A    No, absolutely not.

21   Q    At this time I want to look at some of the body-worn

22 camera footage with you and ask you some questions about it.

23        I'm going to pull up Joint Exhibit I.

24         MS. PICKERILL:  If we could have it displayed to the

25  jury, please.  I'm going to start playing it at 5 minutes and

1    7 seconds.

2        (Video was played in open court.)

3    BY MS. PICKERILL:

4    Q    I've paused it at 6 minutes and 38 seconds.

5        When Officer Fihe arrived on scene he was driving a

6    marked CPD cruiser; is that right?

7    A    Yes.

8    Q    You waived Officer Fihe over to you when you saw him,

9    right?

10   A    I attempted to, yes.

11   Q    And you waived him over as you were turning around to

12   face him, correct?

13   A    I attempted to waive him over and then turn my direction

14   back to the door.

15   Q    So you had been facing the door, you turned around,

16   waived him over, and then turned back around?

17   A    I noticed his approach, the vehicle arriving.  I waived

18   him over, and then turned my position back towards the door.  I

19   was trying to, as I previously stated, assist him in locating

20   where I was standing.  Briefly, albeit, I did that and then

21   turned my focus back to the door.

22   Q    Do we see that on the video?

23   A    No, because what you see on the video is his body cam

24   facing me, not a visual of the body camera from inside the

25   vehicle as it's approaching.

1   Q    So that's a no?

2   A    It's a no.

3   Q    When you very first saw Officer Fihe arrive on the

4   scene, you wholeheartedly believed that he was going to remove

5   your firearm, make sure that you were on the ground, handcuff

6   you, and put you in a cruiser before he was able to do anything

7   else?

8   A    His demeanor led me to believe that that's what his

9   intentions were the whole time, yes.  It's not what I expected;

10  it's what I believed to be the case.

11  Q    So all of the choices that you made were with that in

12  mind, with that initial belief in mind?

13  A    Yes.

14  Q    When Officer Fihe got out of his car and started to

15  approach you, he did not have his gun pointed at you, did he?

16  A    No, he had it removed from his holster in a ready-type

17  position.

18  Q    Down by his side?

19  A    Outside of his holster, yes.

20  Q    Not raised and pointed at the ground?

21  A    It wasn't in the position I see it right now, but I

22  can't -- I know it was out of his holster.  What specific angle

23  he had it, I cannot say.  I just saw him presenting his firearm,

24  and that's what I was responding to.

25  Q    But it wasn't pointed at you?

1    A    Not at that second, no.

2    Q    Before he pointed his gun at you, the very first thing

3    you said to Officer Fihe was, "I'm a federal fucking agent."

4    A    Yes.

5    Q    You didn't tell Officer Fihe that your badge was in your

6    pocket because you needed to identify yourself as an agent

7    first; is that right?

8    A    I identified myself as I did as a federal agent.  That

9    was the first thing when I turned around and saw his pistol out.

10   Q    But the reason you didn't tell him that your badge was

11   in your pocket at that time was because you felt it was

12   important to first tell him that you were a federal fucking

13   agent; is that right?

14   A    That was my first instinct, is to identify myself as a

15   federal agent, expecting the next step to be, "Can I see some

16   credentials?"

17   Q    And you were trying to convey that you're a federal

18   agent, in your words, in an emotional fashion; is that right?

19   A    Can you ask me that question again?

20   Q    Sure.

21        In your words, you were trying to convey to Officer Fihe

22   the fact that you were a federal agent, and you were trying to

23   do that in an emotional fashion?

24   A    Well, it was, yes, in an emotional fashion under the

25   circumstances and what I was looking at, yes.

1   Q    And it's your opinion that it's a normal course of

2   action to identify yourself by using swear words?

3   A    No.  Normally I'm just asked to present my credentials.

4   I'm not asked to -- I'm not in this situation, not confronted

5   with somebody with their firearm already in a heightened sense

6   after I had already provided the information as to who I was.

7        No, that would not normally be the dialogue.  I would be

8   asked for my credentials or there would be a conversation of

9   sort.  At which time, I would be able to verify who I was

10  through either questions and answers, an examination of my

11  credentials, or both.

12  Q    My question was a bit different.

13       You feel that it was within the normal course of action,

14  under these circumstances, to identify yourself by using swear

15  words; is that correct?

16  A    That's what I did in that moment, yes.

17  Q    And you believe that that is within the normal course of

18  action for an ATF agent?

19  A    It's not the normal course of action, no.  In this

20  situation I did, under the circumstances, yes.

21  Q    Officer Fihe gave you a command to get on the ground,

22  correct?

23  A    Yes, he did.

24  Q    He actually gave you that command a number of times,

25  right?

1    A    Yes, he did.

2    Q    You understood that command, right?

3    A    I understood what his intentions were, yes.

4    Q    But you didn't get on the ground because you were

5    worried about your safety; is that right?

6    A    That is correct.

7    Q    You were worried about your safety because of Officer

8    Fihe, right?

9    A    That is one of the elements that I was concerned about,

10   yes.

11   Q    You were also worried about your safety because the

12   woman -- because Sarah, we know her name, could have been lying

13   to you and her husband might be home?

14   A    That's one option, yes, absolutely.

15   Q    Now, her husband, Alla, he didn't make you worried

16   enough to bring a partner to the scene with you, did he?

17   A    No.

18   Q    He didn't make you worried enough to put on your

19   tactical vest when going to his house, did he?

20   A    No.  That's not what we normally would do, no.

21   Q    But he made you worried enough about your safety that

22   you couldn't comply with Officer Fihe's commands?

23   A    Well, there's always a concern, yes.  There's a concern

24   because now my attention is being drawn away from a residence

25   that I'm conducting an investigation at where there is believed

1  to be a firearm possessed illegally.  I cannot account for the

2  mindset or the actions of anybody behind that door, but I have

3  to be vigilant of it, so yes.

4     Q    You felt that instead of getting on the ground, standing

5  up and disregarding Officer Fihe's commands was the most

6  tactical choice you could make?

7     A    In that moment, it -- yes.  In that moment, yes.

8     Q    When Officer Fihe first told you to get on the ground,

9  you walked off of the porch; is that correct?

10    A    Yes.

11    Q    You claimed that you did this because it would give

12 Officer Fihe the very best presentation of yourself?

13    A    Yes.  I'm in his clear view.  I couldn't be any more in

14 his clear view at that moment with my hands up.  So yes,

15 that's --

16    Q    When Officer Fihe told you to get on the ground, you

17 felt that the safest option was to ignore that command and walk

18 into more lighting; is that right?

19    A    Yes, the safest place for me was to just stand still.

20 He has his firearm pointed at me.  Yes, that was my decision at

21 the time, to remain there well visible to him.

22    Q    And you actually told Officer Fihe that you would not be

23 getting on the ground?

24    A    Yes.

25    Q    You were trained at ATF to follow the commands of local

1  law enforcement officers, weren't you?

2     A    Yes.

3     Q    And the reason that you told Officer Fihe that you would

4  not get on the ground is because you felt that your personal

5  safety supersedes everything else?

6     A    Yes, your personal safety does supersede -- yes, it

7  does.  You have to take that into account.

8        MS. PICKERILL:  I'm going to start playing the video,

9   Joint Exhibit I, from where I stopped at 6:38.

10     (Video was played in open court.)

11  BY MS. PICKERILL:

12     Q    When Officer Winchell arrived on the scene you got on

13  the ground on your own; is that right?

14     A    When I noticed the second officer arriving and following

15  suit with the first officer, at that time I decided there was

16  not going to be any dialogue.  So, yes, I got on the ground.

17     Q    They didn't have to place you on the ground; you got on

18  the ground on your own?

19     A    Yes, I did.

20     Q    And you would agree with me that law enforcement

21  officers, they place suspects facedown on the ground all of the

22  time, right?

23     A    Suspects, yes.  Yes.

24     Q    And we heard in the video the officers told you to put

25  your hands behind your back, right?

1    A    Yes.

2    Q    You knew what that meant?

3    A    I knew what that meant.

4    Q    You knew that when they said put your hands behind your

5  back, they meant at the small of your back to be handcuffed,

6  right?

7    A    Yes.

8    Q    But once you were on the ground you were trying to stop

9  the situation from going any further, weren't you?

10   A    Yes, I was.

11   Q    You were trying to get the officers to pause what they

12  were doing?

13   A    Yes, I was.

14   Q    Because you didn't want to be handcuffed, did you?

15   A    Of course not, no.

16   Q    And you didn't put your hands behind your back because

17  it was too difficult for you; is that right?

18   A    It was becoming very difficult for me to do so, yes.

19   Q    But if you had been standing, you would have had no

20  problem?

21   A    If I was standing without anybody physically on top of

22  me it would be much easier to put my hands behind my back, yes.

23        MS. PICKERILL:  I'm going to start the video again

24   where we left off at 6:53.

25      (Video was played in open court.)

1  BY MS. PICKERILL:

2     Q    Okay.  I want to ask you some questions specifically

3  about what happened in that small portion of the video, and we

4  talked about this previously.

5          Did you see your arm kind of start from behind your back

6  and then move up to the ground next to you?

7     A    If you can replay it, I can look at it, yes.  Please.

8     Q    Absolutely.

9          MS. PICKERILL:  I'm starting it at 6 minutes and

10  50 seconds.

11     (Video was played in open court.)

12  BY MS. PICKERILL:

13     Q    Did you see that?

14     A    Briefly, yes.

15     Q    And you have testified that your arm flew up in that

16  fashion because Officer Fihe lost his grip and you moved your

17  arm instinctively?

18     A    I don't believe I said that.

19     Q    Okay.

20     A    My arm flying up -- I'm not sure what the question is.

21     Q    So when you were deposed, I asked you what happened in

22  that moment, why your arm flew up, why your arm moved from the

23  small of your back to the ground next to you.  Do you remember

24  that?

25     A    I don't necessarily remember exactly that, no, I don't.

1  I'm -- right now I'm going by what I'm seeing on the video.

2  So...

3     Q    I'm going to play a portion of your deposition where the

4  question is asked.

5           MS. PICKERILL:  Could we take that down from the jury?

6   Thank you.

7           MR. KEYES:  Thank you.

8           MS. PICKERILL:  Yeah, appreciate that.

9           I'm going to start at 52:32.

10  BY MS. PICKERILL:

11    Q    You remember that your deposition was also video

12  recorded; is that right?

13    A    I believe so, now that you say that.

14           MS. PICKERILL:  Could we get this up for the witness

15   and counsel, please?

16           I think that was my mistake.  Thank you so much.

17  BY MS. PICKERILL:

18    Q    All right.  I'm just going to pull up the deposition

19  transcript since we are having some tech issues.

20           Okay.  So on line 9 I tell you that I have the video

21  paused at 7 minutes and 2 seconds.

22           I asked you:  Did you see where your left arm was at the

23  small of your back and then it moved to kind of be down on the

24  cement next to your chest?

25    A    Yes.

1    Q    You answered:  I saw my arm move, yeah, in the video.

2  Yes.

3         I asked:  Okay.  Do you remember what happened there?

4         You answered:  Looking at the video, it looks as though

5  he was trying to pull my arm one way and lost control of my arm

6  or -- or it slipped, and then my arm obviously came back

7  instinctively.  I probably put it on the ground, so that's what

8  I would have suspected happened.

9         I read that correctly, didn't I?

10   A    You did, and I agree with that.  That helps me have a

11  better understanding of the video.

12   Q    Okay.  And you believe -- you understand that when that

13  happened, when your arm moved from the small of your back to the

14  ground next to you, that the officers were trying to handcuff

15  you at that time, right?

16   A    Yes.

17   Q    You would agree that after you were handcuffed, neither

18  officer used a TASER on you again, correct?

19   A    After I was handcuffed, no, I wasn't tased anymore.

20   Q    And following this, you were seen by medics, correct?

21   A    Ambulance personnel, yes.

22   Q    They came to the scene of Ms. Al Maliki's house and saw

23  you there?

24   A    Yes.

25   Q    Mr. Burk, if you were ever to do another one of these

1  gun retrievals, you wouldn't do anything differently than what

2  you did on July 7, 2020; is that right?

3      A    At the time I wouldn't have thought anything differently

4  because -- and would have thought everything would have been

5  exactly the same.  I had been through a scenario multiple times

6  where law enforcement had been called.  I never had the

7  opportunity to present my credentials to the occupant --

8      Q    Mr. Burk, my question is actually a lot simpler than all

9  of that.

10          If you were to do one of these runs again, you wouldn't

11  do anything differently, would you?

12      A    No.  It's the same fashion -- I did every thing the same

13  way, so my answer would be I would do it -- now, in --

14      Q    That's okay.  That answers my question.  Thank you.

15          In fact, you don't think that there's anything you could

16  have done better during this interaction on July 7th, 2020,

17  correct?

18      A    There's always things you can do differently.  Yes,

19  there's always things you can do differently.  Under the

20  circumstances, I did exactly what I thought was the best thing

21  for me to do in those circumstances, under those conditions.

22      Q    So is that a no, you don't think there is anything you

23  could have done better?

24      A    I could have -- you know, I mean, again, the use of the

25  profanity was more than emotional response.  I'm speaking within

1   that entity of one brother law enforcement to another, who I

2   would assume would be, you know, easing into the situation to

3   ask me for any credentials.  But I don't know that I would do it

4   any differently under the circumstances, no.  I'm just thinking

5   about how the situation evolved.  I would likely have done the

6   same thing.

7   Q    So you don't believe that there is anything that you

8   could have done better on July 7, 2020?

9   A    Yes, there's always things that could be done.  When you

10  go back and look at a situation, there's always things you could

11  think about.  But I don't know that I would have done it any

12  differently under the circumstances, looking at it -- I mean,

13  could I have not used profanity in the exchange?  Sure, I could

14  have done that.

15       But I don't -- if the situation were to happen to unfold

16  again, I would, under that presentation of what I was faced

17  with, I don't know that -- I wouldn't have done anything

18  differently.  That would have been my reaction to what I was

19  facing.

20  Q    Okay.  But you agree with me today that there are things

21  you could have done better?

22  A    I think everybody could have did things better, yes.

23  Q    You could have done things better, Mr. Burk?

24  A    Yes, I could have done different things.  I mean, yes,

25  there's certainly variables.

1    Q    And you would agree with me that there were points

2    during this interaction that you were not complying with the CPD

3    officers, correct?

4    A    Yes, I wasn't -- yeah, there was -- I mean, it's right

5    there on the video.  I wasn't complying with their commands, no.

6         MS. PICKERILL:  Okay.  Thank you very much, Mr. Burk.

7         I have no further questions at this time, Your Honor.

8         THE COURT:  All right.  And redirect examination?

9         MR. KEYES:  Yes, Your Honor.  Thank you.

10                            - - -

11                    REDIRECT EXAMINATION

12   BY MR. KEYES:

13   Q    Mr. Burk, let's start with the last point first, when

14   you were asked about whether there were things that could have

15   happened better.

16        Were you addressing in your answers the situation as you

17   were in the moment, or are you speaking from hindsight?

18   A    Hindsight.

19   Q    I'd like you to look, if you could, please, at Joint

20   Exhibit VII.

21        Relating to the question of what portions of your

22   credentials you showed Ms. Al Maliki when you arrived or when

23   you were at her home, Joint Exhibit VIII, the in-car display

24   from Officer Fihe's vehicle at 13:56:21, it says:  He showed her

25   a badge.

1        Do you see that?

2    A    Yes.

3    Q    And as best to your recollection, is that statement in

4    Officer Fihe's in-car display, the first part, he showed her a

5    badge, is that portion accurate?

6    A    Yes.

7        MR. KEYES:  We can take that down, please.  Thank you.

8    BY MR. KEYES:

9    Q    On this issue of what degree of worry you had when you

10   were conducting this retrieval, I want to get into that a little

11   bit -- in a little bit more detail and ask you to sort of divide

12   it out by time for us, if you could.

13       So in terms of before you arrived at the house and

14   knocked on the door, what factored into your consideration of

15   how much worry or how many precautions you had to take in

16   conducting this retrieval?

17   A    Well, the criminal history that you ran, the reasons for

18   the prohibiting factor, the time of day, the location of the

19   attempted retrieval, these are all normal considerations that

20   you take into account of how you're going to approach or manner

21   in which you're going to put emphasis on a predetermined threat.

22       In this instance there was very little, other than the

23   immigration prohibiter for the possession of the firearm.  The

24   time of day was certainly middle of the day, sunny, bright.  The

25   area which the retrieval was going to be attempted, or at least

1    contact with the resident, was not an area of concern based on

2    law enforcement experience for that area.

3          So those were things you take into consideration on how

4    you're going to approach the knock-and-talk attempt at the door

5    and whether it warrants anything additional besides what I

6    arrived with that day.

7          THE COURT:  Excuse me, Mr. Keyes.  I don't think this

8    is redirect.  I don't think there was any cross-examination

9    about any of these things.  So maybe move on to something that

10   was covered in the cross-examination.

11         MR. KEYES:  Your Honor, respectfully, I believe it was

12   covered in the cross-examination.  There was a line of

13   questioning about you were not worried enough to take a

14   partner, you were not worried enough to wear an ATF tactical

15   vest, and the questioning that --

16         THE COURT:  All right.  Okay.  Go ahead.  Go ahead.

17         MR. KEYES:  Thank you, Your Honor.

18   BY MR. KEYES:

19   Q    So you told us about considerations from before you

20   arrived.

21         Your degree of worry or your degree of precaution, did

22   that change in any way after you first arrived at the house?

23   A    No.  Everything was -- it was as expected or have been

24   encountered in the past on multiple occasions.

25   Q    Now, specifically about the residence and what was going

1    on inside, what would have caused you -- I think you explained

2    to some degree on cross-examination concerns about safety from

3    behind the door.  What would have caused you to have concerns at

4    that point?

5        A    Well, I could tell that there were other occupants in

6    the house.  I could not make out -- because I could hear that.

7    Through the wall, through the door, I can hear movement.  There

8    wasn't an immediate answer of the door, which is normal in most

9    instances.  You knock on the door, somebody answers to see who

10   it is, and you explain.

11        So it was beginning to create a situation where now I do

12   have a concern because the normal course of this type of

13   administrative investigation is now becoming not the normal

14   course, which makes me become a little bit more concerned about

15   the unknowns behind the door because the activity is becoming

16   concerning as to what the person's thinking or doing or

17   occupants may be doing behind the door.

18        Q    At the beginning of your examination on

19   cross-examination, when defense counsel asked about your

20   employment history, is that anything that these officers had any

21   knowledge about when they encountered you on July 7, 2020,

22   Officers Fihe and Winchell?

23             MS. PICKERILL:  Objection.  Lack of personal

24    knowledge.

25             THE COURT:  All right.  Sustained.

1          MR. KEYES:  I can rephrase, Your Honor.

2     BY MR. KEYES:

3          Q     Had you ever encountered Officers Fihe or Winchell

4     before July 7, 2020?

5          A     No, I had never -- I wasn't aware of them.

6          Q     Thank you.

7                Are they ATF agents?

8          A     No.

9          Q     Had they ever been, to your knowledge?

10         A     No.

11         Q     And you worked at ATF for how long up to that point?

12         A     Sixteen years.

13         Q     In the 16 years you worked at ATF, did you come to have

14    a general understanding of who had access to ATF agents'

15    personnel files and records?

16         A     Yes.

17         Q     Would members of the Columbus Division of Police, patrol

18    officers of the Columbus Division of Police, would they have had

19    any access to your ATF personnel records?

20         A     No.

21              MS. PICKERILL:  Objection.

22              THE COURT:  All right.  Sustained.

23              MR. KEYES:  May I have a moment to confer with my

24     co-counsel?

25              THE COURT:  Yes.

1     (Plaintiffs' counsel conferring off the record.)

2          MR. KEYES:  All right.  No further questions, Your

3     Honor.  Thank you.

4          THE COURT:  Very well.

5          Any further cross-examination?

6          MS. PICKERILL:  No, Your Honor.  Thank you so much.

7          THE COURT:  All right.  Mr. Burk, that concludes your

8     testimony for now.  Thank you, sir.  You may step down.

9          And plaintiff may call their next witness.

10          MR. KEYES:  Your Honor, our next live witness would be

11     by Zoom, and I see we're approaching 10:30.  Would it make

12     sense to take a short recess just to set up the --

13          THE COURT:  That makes a lot of sense.  We're going to

14     break at 10:30 anyhow, and you probably need to set up for the

15     video and so forth.

16          MR. KEYES:  Yes, Your Honor.

17          THE COURT:  So we'll take our morning recess now.

18     We'll be in recess for 15 minutes.

19          THE COURTROOM DEPUTY CLERK:  Please rise.

20          This court will stand in recess.

21     (Jury out at 10:19 a.m.)

22     (Recess taken from 10:19 a.m. to 10:41 a.m.)

23     (Jury in at 10:41 a.m.)

24          THE COURT:  All right.  Counsel, who is the next

25     witness?

1    MR. KEYES:  Your Honor, our next witness will be Scott

2    DeFoe by live video conference.

3    THE COURT:  I don't think we're ready for his

4    testimony.

5    Counsel.

6    (The following proceeding was held at sidebar.)

7    THE COURT:  There are major unresolved issues

8    regarding the scope and extent of his testimony which I haven't

9    ruled on, have I?

10    You've got objections.

11    MS. PICKERILL:  That's correct, Your Honor, yes.

12    THE COURT:  Yeah, which I haven't ruled on.

13    We don't have enough evidence in the record on some of

14    these issues for me to determine whether some of the opinions

15    he's going to give are admissible or not.

16    So you're going to need to call a different witness

17    until we get more evidence in the record.  We don't have the --

18    we don't have enough evidence in this record.

19    One of the things I'm particularly concerned about is

20    this issue that Mr. Burk continues to talk about, his concerns

21    over what might be going on behind the doors and so forth, and

22    I know that DeFoe is going to be testifying about that.  I

23    don't think we're ready to -- I'm not ready to make a ruling

24    yet on that.  I haven't had an opportunity to make a ruling yet

25    on that.

1        I have suggested some of the areas that I think are

2   potentially improper about his testimony.  I put those in an

3   order, but I haven't made a final ruling on it, so I think

4   it's -- we're just not ready to proceed with this witness.

5        Do you have another witness you can call?

6        MR. KEYES:  Your Honor, we can, yes, that's fine.

7        My only note for the record would be -- first of all,

8   my apologies.  I thought that we addressed the issues when we

9   spoke before the trial started yesterday about the areas of

10  Mr. DeFoe's testimony, but I understand from your comments now

11  that there were more issues than what was discussed that are

12  still out there to be resolved.  It was on that basis that we

13  thought we could proceed with him today.

14       THE COURT:  All right.  Well, that's fine.

15       Do we have another witness?

16       MR. KEYES:  Yes, Your Honor.  We could -- I mean, if

17  the Court would permit us to call Officers Fihe and Winchell

18  live, we could do that.  We also had deposition testimony we

19  could read.

20       THE COURT:  No, we're not going to call Fihe and

21  Winchell.  I ruled on that.

22       MR. KEYES:  We have their deposition testimony that we

23  could offer into evidence because that will contain some of the

24  factual items that are relevant to Mr. DeFoe's testimony.

25       We also have the written deposition of ATF which

1  addresses some of the law enforcement standards or credential

2  standards that the Court has indicated concerns about.  That

3  would be testimony that could be read into the record as a

4  written deposition.

5          THE COURT:  All right.  We need to look at those

6  things also.

7          Do we have a witness we can call?

8          MR. KEYES:  Not another live witness today, Your

9  Honor.

10          THE COURT:  What about Ms. Hilfers?

11          MR. KEYES:  Well, Ms. Hilfers' testimony would only be

12  relevant to the damages of the case, Your Honor, and that was

13  subject to your bifurcation.

14          THE COURT:  All right.  That's true.

15          All right.  So you're not going to call any further

16  witnesses other than Mr. DeFoe?

17          MR. KEYES:  That would be correct at this point.  We

18  had -- with Mr. Herndon, he was -- Mr. Herndon we don't believe

19  we need to call in our case in chief based on the limitations

20  the Court placed on Mr. Burk's cross-examination, so we would

21  not need to call Mr. Herndon as we originally planned, and so

22  our only remaining live witness would be Mr. DeFoe.

23          THE COURT:  Okay.  All the more important, then, that

24  we address those issues.

25          Okay.  I think we ought to send the jury to go vote.

1    MR. KEYES:  I think that makes sense, Your Honor.

2    THE COURT:  We can stay here and work.

3    MR. KEYES:  Thank you.

4    THE COURT:  All right.  Very well.

5    (The following proceedings were had in open court.)

6    THE COURT:  Members of the jury, we're going to send

7    you to vote early, so we're going to recess until tomorrow

8    morning at 9:00.

9    Please remember my usual instructions.  Don't discuss

10   this case with anyone.  Don't permit anyone to discuss it with

11   you.  Don't do any research or investigation of any kind using

12   any resources whatsoever.  Just leave the case here in the

13   courthouse, and we'll see you back here tomorrow morning at

14   9:00.

15   (Jury out at 10:49 a.m.)

16   THE COURT:  All right.  Counsel, you may be

17   comfortable.

18   MR. KEYES:  Your Honor, I'm sorry.  Before we start,

19   do you mind if I dismiss Mr. DeFoe?  He's still on the Zoom

20   right now.

21   THE COURT:  Oh, no, go ahead.  Tell him we'll be

22   seeing him later.

23   MR. KEYES:  Yes, Your Honor.  Thank you.

24   Scott, we have some proceedings we have to take care

25   of.  You're dismissed for the day, and I'll talk to you --

1  we'll talk to you this -- might be your morning, but later this

2  afternoon.

3          MR. DeFOE:  Yes, sir.  Thank you.

4          MR. KEYES:  Thank you.

5          THE COURT:  All right.  Let's deal first with these

6  deposition excerpts that you want to make part of the record

7  now.

8          MR. KEYES:  Yes, Your Honor.

9          Our initial preference, as we stated, would be to call

10 Officers Fihe and Winchell as on cross-examination as adverse

11 witnesses in our case in chief.  Respecting the Court's ruling

12 that we will not be permitted to do that, in the alternative we

13 would be requesting the opportunity to offer select portions of

14 their deposition testimony as affirmative evidence.  Because of

15 the fact they are party opponents, we believe that is

16 admissible.

17         So as far as procedure goes, we, this morning, were --

18 before we came to court we were trying to work on identifying

19 portions of the deposition testimony that we believe would be

20 material to Mr. DeFoe's testimony so as to have that into the

21 record before he testifies.

22         We would be glad to share those proposed designations

23 with defense counsel so that if there are any objections or

24 counter-designations that they would desire to make, that they

25 have that opportunity.

1          Since we have the afternoon off --

2          THE COURT:  All right.  I'm going to let you stay here

3  and work on that.

4          MR. KEYES:  Okay.  Thank you, Your Honor.

5          Then the other deposition testimony -- it technically

6  is a deposition.  It's a deposition by written questions that

7  the defendants had served on ATF as a federal agency, and so

8  there are written answers to written deposition questions, and

9  so there may be some questions and answers in the ATF written

10  deposition that also would be relevant to inform Mr. DeFoe's

11  testimony and some of those issues that the Court has raised.

12          So that would be the other testimony that we would

13  want to work on.

14          THE COURT:  Have you identified that testimony?

15          MR. KEYES:  We are in the process of doing that.

16  Again, we can work with defense counsel during the afternoon to

17  allow for any objections and so forth.

18          THE COURT:  All right.  So what else?

19          MR. KEYES:  That would be the only additional

20  testimony that we think could be useful to have in the record

21  before Mr. DeFoe's testimony, Your Honor.

22          THE COURT:  All right.  We'll let counsel work on

23  these issues, and I'm going to take care of some other matters,

24  and I'll be back in about two hours.

25          MS. PICKERILL:  Your Honor, if I could briefly just

1  ask one question?

2          THE COURT:  Yes.

3          MS. PICKERILL:  As we are preparing these documents to

4  give this additional context to Mr. DeFoe's testimony, it's the

5  defense's contention that some of those additional ATF

6  documents would also go to serve that same purpose.

7          Would we be permitted to pull portions of those to

8  also give to the jury in order to cross-examine --

9          THE COURT:  Yes.

10          MS. PICKERILL:  Thank you.

11          THE COURT:  Yes.  And, in fact, I can give you a copy

12  of items that I think might be admissible.

13          MR. KEYES:  That would be helpful, Your Honor.

14          MS. PICKERILL:  Thank you, Your Honor.  That would be

15  excellent.

16          THE COURT:  Yes.

17          Willie, can you do that?

18          THE LAW CLERK:  Yes.

19          MR. KEYES:  Your Honor, while Willie is getting that,

20  assuming -- and we'll see from the list.  But assuming that we

21  have some idea already of the documents that you're talking

22  about from our prior discussions, we do think that Evidence

23  Rule 106 would also -- once we see what those are and what the

24  defense intends to proffer or to show with Mr. DeFoe, we would

25  like the opportunity to identify any documents that under

1  Rule 106 we believe should come in for completeness of the

2  record.

3        THE COURT:  Do you have some examples?

4        MR. KEYES:  Yes, Your Honor.

5        So just speaking at a general level, if -- for

6  example, if the documents regarding Mr. Burk's proposed

7  determination come in, so if the November 2021 letter of the

8  termination action, if that were to be usable or admissible

9  with Mr. DeFoe, then under Rule 106 the adverse party is

10 allowed to tender additional evidence that -- in order to

11 present the question fairly to the jury.

12       So because that single letter as an ATF personnel

13 action was canceled, in ATF's own words, as part of the appeal

14 proceedings, we believe that it does not take the effect of an

15 agency action.

16       So the entire ATF --

17       THE COURT:  Well, insofar as it refers to agency rules

18 and regulations and standards, I would think it would be

19 admissible.

20       MR. KEYES:  Your Honor, so the admissibility issue,

21 it's the same objections that we have raised.

22       What I'm saying is under 106, if that document is

23 admitted, we also have the right to tender additional

24 documents.  And I think other documents from the personnel

25 review are relevant because that November 2021 determination is

1  a nonfinal canceled determination, so it would not stand for

2  the agency's understanding or establishment of its standards

3  anymore than letters from --

4      THE COURT:  Do you have something from ATF that would

5  contradict any of those standards?

6      MR. KEYES:  Your Honor, we have the ATF written

7  deposition.  We have letters -- yes.  We have letters from

8  Agent Burk's supervisors that are part of the ATF records.

9      THE COURT:  Are they going to testify?

10      MR. KEYES:  I'm sorry?

11      THE COURT:  Are they going to testify?

12      MR. KEYES:  Well, Mr. Herndon would have been the only

13  supervisor being called in to testify.  However, the documents

14  themselves are admissible under --

15      THE COURT:  No, I don't think so.  There would be no

16  right of cross-examination.  That wouldn't be admissible.  It

17  would be hearsay.

18      MR. KEYES:  The same is true of the November 2021

19  letter because it's not an agency action.

20      THE COURT:  It's an agency document.

21      MR. KEYES:  Well, so are the letters from the

22  supervisors.

23      THE COURT:  Okay.  I'm not going to argue about it.

24      MR. KEYES:  Thank you, Your Honor.

25      THE COURT:  I think it's likely -- I'll give it more

1 thought, but I think it's likely admissible as evidence of

2 agency policy.

3          All right.  We're going to let you work on getting

4 ready, and I'll be back in two hours.

5          Thank you.

6          MS. PICKERILL:  Thank you, Your Honor.

7          THE COURT:  The clerk may adjourn court.

8          THE COURTROOM DEPUTY CLERK:  Please rise.

9          This court will stand in recess.

10     (Recess was taken at 10:56 a.m. to 1:10 p.m.)

11                            - - -

12                                TUESDAY AFTERNOON SESSION

13                                NOVEMBER 5, 2024

14                            - - -

15          THE COURT:  Good afternoon, Counsel.  Are we ready to

16 proceed?

17          MR. KEYES:  Yes, Your Honor.

18          MS. PICKERILL:  Yes.

19          THE COURT:  All right.  Well, let's start with defense

20 counsel's motion entitled Defendants' Second Supplemental

21 Motion in Limine to Exclude or Limit the Testimony of

22 Plaintiffs' Expert Scott DeFoe.

23          And who will be arguing on behalf of the defendants?

24          MS. ROSENBERG:  Sheena Rosenberg, Your Honor.

25          THE COURT:  Very well, Ms. Rosenberg.  Please direct

1  me to the parts of Mr. DeFoe's testimony that you are objecting

2  to.

3          MS. ROSENBERG:  Yes, Your Honor.

4          Do you happen to have the deposition transcript?

5          THE COURT:  I do.

6          MS. ROSENBERG:  Okay.  If you can go to page 10.

7          THE COURT:  Okay.

8          MS. ROSENBERG:  Starting on line 11, and I will read:

9  They approached, ordered him to the ground.  I thought --

10          THE COURT:  Hold on a second.

11          MS. ROSENBERG:  I'm sorry.

12          THE COURT:  Page 10.  All right.

13          MS. ROSENBERG:  Line 11 it says:  They approached,

14  ordered him to the ground.  I thought his decision --

15          THE COURT:  Not on the page 10 that I have.  Page 10

16  is part of his qualifications.  I have a Ph.D. in clinical

17  investigation --

18          MS. ROSENBERG:  I'm looking at his deposition

19  testimony, Your Honor.

20          THE COURT:  I think I am too.

21          MS. ROSENBERG:  Document 53-1?

22          THE COURT:  We had two depositions?  Sorry, that was a

23  different expert.

24          All right.  Okay.  Page 10, line what?

25          MS. ROSENBERG:  11.

1       THE COURT:  Line 11.

2       MS. ROSENBERG:  Yes.

3       THE COURT:  They approached, ordered him to the

4   ground.  I thought his decision not to comply passively

5   resisting was reasonable based on the totality of the

6   circumstances because he was concerned that his back would have

7   been facing an environment that potentially a subject who may

8   have been home, may have been armed, so I could understand the

9   reluctance.  And the fact I thought it was unique that he was

10  being proned out based on everything that I have just

11  previously described.  When he was proned out, they were able

12  to handcuff his left hand.

13      Okay.  So I don't think there's any evidence that

14  these officers knew any of this; that they could have ever had

15  any opportunity to guess that Mr. Burk's actions in resisting

16  were based on anything like this.

17      MS. ROSENBERG:  No, Your Honor.  Based on the

18  deposition testimony from both officers, there's no testimony

19  that they knew anything about Mr. Burk's investigation, why he

20  was there that day, because he didn't contact law enforcement

21  before that.

22      THE COURT:  All right.

23      MS. ROSENBERG:  And during their time with him he

24  never mentioned the reasons.

25      THE COURT:  I understand your objection.

1        What does plaintiffs' counsel have to say?

2        MR. KEYES:  A couple things on that point, Your Honor.

3        First of all, the use-of-force analysis looks at what

4   an objectively -- excuse me, what an objectively reasonable

5   officer would do under the totality of the circumstances.  One

6   piece of the circumstances that these officers had when they

7   were responding to the scene, the evidence will show, is

8   information that this was a person who was an agent for the

9   Bureau of Alcohol, Tobacco, and Firearms, who was at a

10  residence telling the resident --

11       THE COURT:  They didn't know that.

12       MR. KEYES:  It was in the CAD display, Your Honor,

13  Joint Exhibit VIII.

14       THE COURT:  They knew that the person had identified

15  himself as that, but they didn't know that that's who this

16  person was that they encountered.

17       MR. KEYES:  Your Honor, they don't have to have actual

18  knowledge of the fact that he is an officer.  What I'm saying

19  is that when they have information suggesting that he is a law

20  enforcement official, under the totality-of-the-circumstances

21  analysis, that information --

22       THE COURT:  They didn't know he was a law enforcement

23  official or even have information to that effect.

24       MR. KEYES:  Yes, they did, Your Honor.  They had

25  information on their CAD display that he was -- produced a

1  badge, said he was an agent with ATF, gave his name, gave his

2  badge number.

3  THE COURT:  But they didn't know that's who this

4  person was that they encountered until and unless they got his

5  credentials with his photograph on it and they could identify

6  him.

7  MR. KEYES:  Well, except for the fact that, Your

8  Honor, the description that they had in the CAD -- white male,

9  gray shirt, tan pants -- is also the same description of the

10  person that they see at that front door.

11  THE COURT:  That doesn't mean it's Mr. Burk.  They

12  never met Mr. Burk.  They don't know what Mr. Burk looks like.

13  MR. KEYES:  Your Honor, they have a description of the

14  person at the door, and they see a person matching that

15  description as they pull up.

16  THE COURT:  Okay.  That's a small point that we're

17  arguing about, but -- well, that's really not a small point.

18  But I think there are even more problems here to take into

19  consideration that Mr. Burk might -- that Mr. Burk might have

20  some concern about, like he says, what was going on behind the

21  door.  They certainly wouldn't have known anything about that.

22  MR. KEYES:  Your Honor, they would have not known

23  specifically what was happening behind the door, I agree, but

24  they do have the following information -- the information I

25  just stated.  They also know that the resident who was the

1    subject of Mr. Burk's encounter has not opened the door at his

2    request.

3         THE COURT:  She doesn't have to open the door.  That's

4    not a crime or any indicia of a crime.

5         MR. KEYES:  Your Honor, it may not be a crime, but it

6    is another fact, it is another piece of information that they

7    have, that they have to consider in the totality --

8         THE COURT:  All right.  Well, when you add it all up,

9    there wasn't enough there to have any reasonable suspicion that

10   there was anything going on.

11        MR. KEYES:  Your Honor, if I may?  There's an

12   additional point of potential relevance.  This is -- this

13   prong --

14        THE COURT:  In fact, this person that they encountered

15   never told them, hey, I'm concerned about this situation here

16   that I have got.  He never said anything about that, and

17   there's no -- they didn't know anything about why he was there.

18   In fact, we now know he was there for an administrative

19   function, not for some kind of a law enforcement function.

20        So I'm going to sustain this objection.

21        MR. KEYES:  Your Honor, if I may?  The second prong I

22   was referring to -- well, I do have to take issue with the

23   distinction between administrative function and law enforcement

24   function.

25        Administrative functions can still be law enforcement

1  functions.  The distinction --

2       THE COURT:  If some facts develop that would lead to

3  that conclusion, but there aren't any.  Certainly none that

4  were known by these Columbus Police officers.

5       MR. KEYES:  I understand, Your Honor.  The

6  distinction --

7       THE COURT:  So I'm going to grant this objection.

8       MR. KEYES:  Your Honor, there is a conditional

9  relevance argument that I have to propose as well.

10       Setting aside that issue that the Court just went

11  through, this evidence becomes relevant if the defendants

12  present evidence, which they intend to do, that Mr. Burk --

13       THE COURT:  Well, we'll wait and see if they do.

14       MR. KEYES:  All right.  But, Your Honor, on that

15  point, if they intend to --

16       THE COURT:  They're going to present evidence of what?

17       MR. KEYES:  If they intend to present evidence of what

18  the expectations would be of a federal law enforcement

19  official, then the -- what is going on in the mind of that

20  federal law enforcement official does become relevant, even

21  separate from the *Graham v. Connor* analysis.

22       So in other words, if they are saying it was

23  unreasonable for Mr. Burk to do X, Y, or Z, that itself would

24  call for an explanation of why he did X, Y, or Z.

25       So that is another issue that they have raised that --

1  now, if they don't approach Mr. DeFoe with that line of

2  cross-examination, then this conditional relevance issue does

3  not arise.  But we heard them already question already Mr. Burk

4  about whether he was complying with federal law enforcement

5  standards.

6       If they are going to question Mr. Burk's actions from

7  the point of view of a federal law enforcement official, then

8  that does bring into relevance what he was experiencing in his

9  mind at the time of the -- of this encounter, and so there is a

10  conditional relevance aside from that initial one.

11       THE COURT:  Okay.  Well, we'll see.

12       All right.  What's the next part of Mr. DeFoe's

13  testimony that's objected to?

14       MS. ROSENBERG:  Well, Your Honor, most of the

15  testimony that we are objecting to is just along those lines,

16  the different questions he's asked about -- I'm sorry.

17       THE COURT:  We need to know what it is, what page.

18       MS. ROSENBERG:  Okay.  Let's go to page --

19       THE COURT:  So I'm not going to permit him to testify

20  to the things beginning at line -- your objection starts on

21  line 11, right?

22       MS. ROSENBERG:  Right.

23       THE COURT:  And where does it end?

24       MS. ROSENBERG:  Line 11 through 18.

25       THE COURT:  Well, what about the rest of it?

1      MS. ROSENBERG:  Well, I think we read to line 22 into

2  the record.

3      So the question goes all the way through -- page 11,

4  line 23 is the end of it, that particular part of it.

5      THE COURT:  Well, it's -- so is Winchell laying on his

6  right side, which prevented him from complying?

7      MS. ROSENBERG:  That is what Mr. Burk testified to.

8      THE COURT:  And Officer Fihe did tase him to effect

9  the handcuffing technique.

10      So I think there is a legitimate issue here about the

11  amount of force that was used to enforce compliance with the

12  order issued, and the jury is going to have to decide whether

13  he resisted or not.

14      MS. ROSENBERG:  Mr. DeFoe --

15      THE COURT:  Whether he was able to comply.

16      MS. ROSENBERG:  Mr. DeFoe later testified about the

17  fact that officers are not expected to understand the reasons

18  why someone is resisting at the time; it's just how they

19  perceive it.

20      So they're not expected to figure out the whys at the

21  time.  I can point that testimony out for you.

22      THE COURT:  Well, this raises this question:  So can

23  the expert testify what he thinks happened?

24      The jury has got to decide what happened.  They have

25  got to decide it based upon the evidence they hear, and some

1    expert shouldn't be telling them what the facts are.

2          It says:  He was laying on his right side, which

3    prevented him from even complying.

4          Well, Mr. DeFoe doesn't -- he wasn't there.  Even if

5    he was, it would only be his opinion as to whether -- so.

6          MS. ROSENBERG:  I would agree with that, Your Honor.

7    I don't think Mr. DeFoe --

8          THE COURT:  That would have to be a hypothetical

9    opinion, something like, Mr. DeFoe, assuming the jury should

10   find from the evidence that Officer Winchell was lying on

11   Mr. Burk's right side and that that prevented him from

12   complying.  But he's not going to be able to give his opinion

13   as to what happened.

14         So I'm going to sustain that part of the objection.

15         MR. KEYES:  Your Honor --

16         THE COURT:  I think, likewise, that he would have to

17   say, with regard to the use of the TASER, that he would have to

18   assume that the jury should find, after hearing all the

19   evidence, that Mr. Burk didn't resist and that there was no --

20   that the use of the TASER was unreasonable because he was

21   complying or attempting to comply, but he's not going to --

22   that, again, would have to be a hypothetical question --

23         MR. KEYES:  Your Honor, plaintiffs --

24         THE COURT:  -- not just him giving his opinion.

25         So I would be sustaining objections if he -- to all of

1  this.  Though I see in the deposition -- if that's how he

2  proceeded at trial, I would require that all of this be phrased

3  in the way of hypothetical findings by the jury.

4        So that's going to be my order in regard to -- and my

5  expectation, then, in regard to how Mr. DeFoe should be

6  prepared to testify in this case.

7        MR. KEYES:  Yes, Your Honor, plaintiffs agree.  I

8  mean, that's true of any expert testimony; that if the subject

9  of the testimony would depend on the outcome of disputed facts,

10 those are posed as a hypothetical that the jury ultimately may

11 or may not agree with.  We have no issue with that because

12 that's the standard for any expert that comes in here.

13       THE COURT:  All right.  Now, I have not heard any

14 evidence which would support a reasonable officer, in the

15 position of Mr. Burk, having perceived that there was a threat

16 inside the premises that he arrived at and spoke to the

17 individual inside about and that -- certainly the defendant

18 officers wouldn't have known about any of those things, and

19 there's no evidence that they did.

20       So unless something changes and there's some evidence

21 produced that the defendants knew about it or that he had some

22 additional information he hasn't told us about that caused him

23 to be concerned about some threat, I don't think it was

24 objectively reasonable for him to have entertained that as a

25 reason -- entertained that thinking as a reason to refuse to

1   comply with the lawful orders issued by Officers Fihe and

2   Winchell.

3        And I -- as I have indicated in my order, it's my

4   belief that they were in command and control of this scene.

5   And they were entitled to issue orders, and Mr. Burk was

6   required to comply with them.

7        All right.  What's the next area that you object to?

8        MR. KEYES:  Your Honor, I'm sorry.  Before they move

9   on.  The comments that Your Honor concluded with, is that still

10   relating to lines -- page 10, lines 11 through 18?

11        THE COURT:  That would include any reference to this

12   proposition that Mr. Burk reasonably had some objectively

13   reasonable fear that there was a threat inside the residence

14   that he had visited.

15        MR. KEYES:  Your Honor, if I may?

16        THE COURT:  There's no evidence to support that.

17        MR. KEYES:  Respectfully, Your Honor, for our record,

18   Mr. Burk testified that he was conducting an investigation and

19   retrieval attempt on an unlawfully possessed firearm.

20        THE COURT:  It wasn't unlawful.  I haven't heard any

21   evidence he had authority even to seize the weapon.  He was

22   there to ask them to return it and/or to bargain with them

23   about returning it and getting a refund or finding some other

24   member of the family that might be able to complete the

25   purchase and so forth.

1       As he described it himself, it's a knock and talk.

2  It's not -- so.

3       MR. KEYES:  Your Honor.

4       THE COURT:  Anyhow, that's my ruling on that.

5       MR. KEYES:  I understand, Your Honor.  At some point I

6  would like to make a proffer for the record.  It doesn't have

7  to be right now.

8       THE COURT:  Well, sure, you can.

9       MR. KEYES:  Okay.

10       THE COURT:  Absolutely.

11       MR. KEYES:  Thank you, Your Honor.

12       I think the evidence that would support a reasonable

13  concern --

14       THE COURT:  Well, when you make your proffer, you

15  can --

16       MR. KEYES:  Oh, I'm sorry.  I thought you meant right

17  now.  I apologize.

18       Thank you, Your Honor.

19       THE COURT:  Okay.  What's the next part of Mr. DeFoe's

20  testimony that defense counsel objects to?

21       MS. ROSENBERG:  Your Honor, I just found different

22  excerpts that are based on the same guidelines that you just

23  proposed, different times where he said that it was reasonable

24  for Mr. Burk to not consider -- to not comply because of his

25  subjective concerns.

1    So there's no additional objections that we have that

2 are outside of what you just talked about.

3    THE COURT:  I have already given the jury instructions

4 that Officers Fihe and Winchell were in charge of the scene and

5 that they were the -- they had the authority to issue orders to

6 Mr. Burk and that he was required to follow them.

7    The issue is whether he -- whether they used

8 reasonable force in bringing about compliance with those

9 orders.  And in the case of the use of force to handcuff him,

10 there is a legitimate issue of fact as to whether or not he

11 resisted.

12    If he didn't resist, then there would not be any

13 justification for the use of force, any force, and Mr. Burk

14 wins if that's the case, the jury finds that he didn't resist

15 or couldn't resist because of the circumstances created by the

16 officers.

17    But if he did resist, then it depends upon an

18 assessment of the nature and extent of the resistance as to

19 whether or not the force was reasonable under the

20 circumstances.

21    And the same analysis would apply to the detention of

22 Mr. Burk during the various stages.

23    So that's the kind of testimony that I would expect

24 and consider appropriate from the plaintiffs' use-of-force

25 expert.  In fact, it was some of his own testimony that

1   supported the Court's finding that the uniform standards of law

2   enforcement placed Officers Fihe and Winchell in control of

3   this scene and that they had the command authority to issue

4   orders, and I am -- it's obvious from his testimony that he is

5   relying on these universal standards governing law enforcement

6   officers, federal and state, when they are involved in a

7   situation where a plainclothes officer, that his authority as

8   an officer is being challenged by uniformed officers.

9           The only thing I am not satisfied about quite yet is

10  whether he -- whether those principles also required him to

11  prepare for the arrival of these uniformed officers.  He knew

12  they were coming, that's for sure, and he had plenty of time to

13  prepare.  It may well be that instead of waiving around a

14  manila file, he should have been waiving around his credentials

15  so that these officers could see his photograph and his

16  credentials and see that this is, in fact, the guy he claims to

17  be.

18          All right.  So that's how the Court expects

19  Mr. DeFoe's testimony to be structured.  If there are

20  departures from that framework, then the objections are going

21  to be sustained as his testimony develops.

22          Now, is there anything else more specific that we need

23  to address?

24          MS. PICKERILL:  About DeFoe's testimony specifically,

25  Your Honor, or in general?

1          THE COURT:  Yes, about DeFoe's testimony.

2          MS. PICKERILL:  Did you want to address the excerpts

3   that both counsel had taken out as part of this discussion, or

4   save that for afterwards?

5          THE COURT:  That would be the next matter that I would

6   want to look at.

7          MS. PICKERILL:  Okay.  Then nothing until then, Your

8   Honor.

9          THE COURT:  All right.  Now, Mr. Keyes, you have

10  identified certain documents, including deposition testimony

11  of -- well, the first one is Officer Fihe that I have.

12          So, defense counsel, have you looked at these

13  deposition excerpts that plaintiffs' counsel wants to -- he

14  wants to have Mr. DeFoe consider in expressing his opinions in

15  this case?

16          MS. PICKERILL:  I have had a chance to review them,

17  yes, Your Honor.

18          THE COURT:  All right.  Any problems here?

19          MS. PICKERILL:  I suppose perhaps a bit of

20  clarification.  I was reading them with the understanding that

21  plaintiff was desiring to read these excerpts to the jury.

22          THE COURT:  Oh, I don't think so.

23          MS. PICKERILL:  Okay.  No, Your Honor, then we do not

24  have any --

25          THE COURT:  Let me make sure.

1    MR. KEYES:  Your Honor, frankly, the proposal is a

2 little bit fluid because, since we have an expert coming on

3 before we have had the opportunity to question either defendant

4 officers live, one way to do that would be to read the

5 deposition testimony to the jury so that the facts are in

6 evidence before the expert testifies.

7    Alternatively, if everybody is in agreement and the

8 Court is okay with it, I can provide these excerpts to

9 Mr. DeFoe ahead of his testimony and he can take that -- take

10 those excerpts for what they are worth, with the understanding

11 that at some point, whether it's in our case in chief or in

12 defendants' case in chief, this testimony in one form or

13 another is going to come in.  I'm fine doing it that way

14 instead of taking the jury's time by reading it to them before

15 Mr. DeFoe testifies.

16    THE COURT:  Well, that's fine.  That's how I would --

17 I think that's the best way to proceed.

18    MS. PICKERILL:  Your Honor, Mr. DeFoe has already,

19 prior to making his conclusions in this case, reviewed the

20 deposition transcripts in their entirety for both officers, so

21 we certainly wouldn't have an issue with him considering these

22 excerpts along with the entirety of the deposition, but we

23 would have an objection to having them read to the jury at this

24 time.

25    THE COURT:  Okay.  That objection has been resolved.

1         MS. PICKERILL:  Perfect.

2         THE COURT:  All right.  So there's -- all right.  That

3 resolves that part.

4         MR. KEYES:  I'm sorry, Your Honor.

5         THE COURT:  What about the deposition of Officer

6 Winchell?

7         MS. PICKERILL:  The same, Your Honor.  We would have

8 the same stance on that one.  We have no issue with Mr. DeFoe

9 taking into account the deposition transcript, which he has

10 reviewed in its entirety, of Officer Winchell; but to read

11 portions of it without context into the record at this time

12 would be inappropriate.

13         THE COURT:  You disagree?

14         MR. KEYES:  We disagree that it's inappropriate.

15 However, under the context of the Court's rulings, we are fine

16 proceeding with that way.

17         The whole point, Your Honor, is I can't offer expert

18 testimony without certain foundational material being in the

19 record, and so far it's not in the record.

20         THE COURT:  Well, either that or you vouch for it.

21         MR. KEYES:  Right.  Right.

22         THE COURT:  It's in the record, and so that's good.

23         MR. KEYES:  And that's fine.  I'm just -- when we're

24 at the close of our case, if this testimony has not been

25 admitted, we will have to reserve resting subject to

1   questioning those officers in defense's case.  So we may have a

2   little bit of unusual procedure at the close of our witnesses,

3   is all I'm saying.

4         Certain things happen at the close of the plaintiffs'

5   case that, without this testimony coming into the record, we

6   would have to change the order in which things usually go.  So

7   I'm just -- I'm highlighting that issue for defense counsel and

8   the Court because this information will be in the record, but

9   if we're not presenting it now, then at the close of our case

10   in chief we sort of have -- you know, it's an incomplete record

11   at that point.

12         But logistically, with the order of witnesses that the

13   Court has instructed us, that's the situation that we're --

14   that's our reality for this trial.

15         THE COURT:  They would then, of course, be part of the

16   record the Court would have to consider in ruling on any

17   motions that are made at the end of the plaintiffs' case.

18         MR. KEYES:  Yes, Your Honor.  Thank you.

19         THE COURT:  That's the important part for you and also

20   for the -- preparing your expert to testify.

21         Now, next is a written deposition of a representative

22   of the ATF.  And who was this person?

23         MS. PICKERILL:  There are actually four individuals,

24   Your Honor, who answered questions.

25         THE COURT:  Four individuals?

1    MS. PICKERILL:  They are listed at the very beginning

2  after the definitions.  ATF gives -- they're color-coded.

3    THE COURT:  All right.  I have a list of page numbers,

4  and apparently I have all of those pages.

5    So are there any objections to any of these deposition

6  excerpts?

7    MS. PICKERILL:  Your Honor, we would object to six of

8  the excerpts that plaintiffs proposed, and we would also --

9    THE COURT:  Object to what, please?

10    MS. PICKERILL:  I'm sorry.  To six.

11    THE COURT:  To six.

12    MS. PICKERILL:  Plaintiffs proposed a list of the

13  questions that they present -- wish presented to the jury.  I

14  believe it was sent in an e-mail before we got back.

15    So, yes, we would argue that only some of these are

16  relevant to the case.

17    It's 44, 49, 50, 55, 57, and 64.

18    THE COURT:  Hold on a second.  44, 49, 50.

19    MS. PICKERILL:  55.

20    THE COURT:  55.

21    MS. PICKERILL:  57.

22    THE COURT:  57.

23    MS. PICKERILL:  And 64.

24    THE COURT:  64.  All right.

25    MS. PICKERILL:  Specifically from the list that

1 | plaintiffs provided.

2 | And we would argue that there are a number of
3 | additional questions that, in fairness, should be included with
4 | the list that plaintiffs gave.

5 | THE COURT: Okay. So do you have your own list?

6 | MS. PICKERILL: Yes.

7 | THE COURT: Okay. Well, let's deal with this -- with
8 | plaintiffs' counsel's list first, and let's look at your
9 | objection to No. 44.

10 | MS. PICKERILL: Perfect.

11 | And I might be able to save some time. My objection
12 | to all of those is going to be the same. Those are all
13 | questions that ATF answered. They did not -- it says: Unknown
14 | what training James Burk had regarding such interaction. Would
15 | possibly have to request records from his initial ATF academy
16 | and FLETCE training if available and/or documented.

17 | We would argue that questions with that particular
18 | answer are not relevant or helpful to the jury since they don't
19 | answer the question one way or the other because whoever was
20 | answering the question didn't know the answer.

21 | MR. KEYES: Your Honor, it does go to an issue that
22 | the defense has injected into the case and that the Court has
23 | repeated multiple times that it's concerned about, which is the
24 | existence of uniform national law enforcement standards and
25 | what they would require in this particular case.

1       And these questions -- now, this was not directed at a

2  specific individual.  This written deposition by the City was

3  directed to ATF as an agency, and the answer provided -- so,

4  for example, Question 44 reads:  As an ATF law enforcement

5  agent, was James Burk given training on how to respond and act

6  if and when local law enforcement arrives at the scene of a

7  retrieval?

8       The fact that the agency itself did not have any

9  information whether James Burk received training on that

10  interaction is evidence that a uniform standard requiring

11  specific actions of Mr. Burk in that situation does not exist.

12      So the fact that they're directing these questions to

13  the agency that employed him and the agency is saying we don't

14  have information about that training, you might have to go to

15  some other source, is evidence that, at least within ATF, the

16  existence of specific factual standards or specific -- I'm

17  sorry, specific actions -- standards for specific actions that

18  Mr. Burk would have to take, we would submit that those

19  questions and ATF's answers are evidence that the jury can

20  consider that no such specific standards or training existed.

21      THE COURT:  Well, we saw that right now.  That's not

22  for the jury to decide.  That's something I'm going to decide,

23  and I feel that there is sufficient evidence in the record to

24  support the existence of those standards, and I, in fact, have

25  so instructed the jury.

1      So those are -- this may be -- I think that it's

2  certainly well to include this in the record so that you will

3  be able to make those arguments to the court above.

4      So it's not something that we're going to be giving to

5  the jury because it's not relevant to any issue they're going

6  to have to decide.

7      MR. KEYES:  And then to that point, Your Honor --

8      THE COURT:  But I think they belong in the record.

9      MR. KEYES:  We appreciate that, Your Honor, and I'll

10  state for the record that as to -- we would have the same

11  argument as to the other -- so, for the record, all six of

12  those objected questions and answers, 44, 49, 50, 55, 57, and

13  60, we would make the same argument as to each of those; the

14  Court would have the same ruling.

15      Then our only request, Your Honor, would be -- so if

16  you recall at the beginning of the case when you gave the

17  preliminary instruction about national law enforcement

18  standards, there was some discussion about including a specific

19  statement in there about whether he had to have his --

20      THE COURT:  And I took that out.

21      MR. KEYES:  Yes, you did.  And our understanding, Your

22  Honor, was that --

23      THE COURT:  I'm still up in the air on that one.

24      MR. KEYES:  Exactly.  So we do think -- Your Honor

25  mentioned maybe these are more relevant for a higher court.

1          THE COURT:  I'm still waiting to hear some testimony

2     about it.

3          MR. KEYES:  And we appreciate that, and I think that

4     these answers would be relevant for your consideration, even if

5     they're not read to the jury, when it comes time to do final

6     jury instructions on those issues.

7          THE COURT:  So these standards must be written down

8     somewhere.  Where are they?

9          MS. PICKERILL:  Your Honor, specifically in the

10    excerpts that we provided shortly before this meeting that

11    we're having, from the Notice of Proposed Removal, ECF No.

12    57-6, ATF lists out the specific four orders.

13         THE COURT:  Well, here's what I'm -- I can tell from

14    the testimony of the experts and from the contents of the ATF's

15    disciplinary file that there is a body of uniform accepted

16    rules that apply to this kind of situation, and I'm waiting

17    for -- it would be very helpful if someone could find where

18    these rules are written down, but everybody seems to agree that

19    they're -- those are the rules of engagement and the rules of

20    command and control when a nonuniformed officer's authority is

21    challenged by uniformed officers at a scene.

22         So am I going to hear about that from any witness?

23         MS. PICKERILL:  I believe so, Your Honor.

24         THE COURT:  Who?

25         MS. PICKERILL:  Keith Leighton will testify to the

1  standards of federal law enforcement agents and how those are

2  consistent with what Your Honor has instructed the jury and

3  consistent with what local law enforcement standards are.

4       Additionally, ATF in their documentation specifically

5  cited four ATF policies that were violated by Mr. Burk, and

6  they gave the text of those policies.

7       THE COURT:  Well, those were very nebulous policies,

8  but they do refer to standards of the LEO profession, but they

9  don't quote them or they don't say where they're found, but

10 everybody seems to agree that they exist.

11      Is it simply -- well, I don't know.  Anyhow.

12      All right.  What other issues do we have?

13      MS. PICKERILL:  I suppose before I answer that, are we

14 anticipating that any of the excerpts provided by either

15 parties are going to be read to the jury during plaintiffs'

16 case in chief?

17      THE COURT:  Say that again.

18      MS. PICKERILL:  Is the plan for any of these excerpts

19 that we have provided from --

20      THE COURT:  Excerpts?

21      MS. PICKERILL:  The quoted pieces from Fihe's

22 deposition, Winchell's deposition, ATF's deposition, and the

23 ATF documents.

24      THE COURT:  I haven't heard that any of them are.

25      MR. KEYES:  Your Honor, the defendant officers'

1    depositions, we have addressed that issue a moment ago.   So

2    we're fine with leaving those as part of the record for

3    whatever purpose it may come up at the close of our case.

4          As for the ATF written deposition questions that we

5    have tendered designations for, those I would think we should

6    be entitled to read to the jury for them to take into

7    consideration because ATF as an agency is not subject to

8    subpoena of a corporate or agency representative to testify in

9    court.  The Rule 31 written deposition is their form of

10   testimony.

11         THE COURT:  Yes.

12         MR. KEYES:  And so that --

13         THE COURT:  Didn't I just say I'm going to make that

14   decision and not the jury, as to whether there were uniform

15   standards and what they were?

16         MR. KEYES:  So, yes, you did about the uniform

17   standards, but I'll give you an example of where I'm a little

18   bit concerned, Your Honor.

19         If the defense is going to argue -- and we had some

20   questioning of Mr. Burk on cross-examination along these

21   lines -- that, well, you didn't have your credentials out and

22   at the ready when Officer Fihe pulled up, they're suggesting to

23   the jury in that question that that was an improper action by

24   Mr. Burk.

25         But if in the ATF deposition there's an acknowledgment

1  that there's no formal policy or requirement that he have his

2  credentials out when he knows law enforcement is approaching,

3  that is something we should be able to explain to the jury.

4          THE COURT:  Well, I think it's something that the

5  officers can consider in their assessment of whether or not

6  this individual is, in fact, what he claims to be.  And we have

7  heard him testify about his experience, and I think we're

8  probably going to hear these officers testify about theirs as

9  well.

10         So I have been able to determine the existence of

11  certain principles, I think without any doubt, because all the

12  experts agree on them, and that's the issues of command and

13  control.

14         So these written deposition responses from ATF are not

15  something that add anything to my analysis, and we're not going

16  to have the jury making a finding as to whether or not some

17  principles exist.  So they're not going to get read to the

18  jury, but they will be in the record.

19         MS. PICKERILL:  Yes, Your Honor.

20         MR. KEYES:  Thank you, Your Honor.

21         MS. PICKERILL:  And is that -- this might be a silly

22  question.  When we say that they're part of the record, is that

23  something that's going to be back with the jury -- that's not

24  something that's going to go back with the jury to deliberate?

25         THE COURT:  No, no, no.  It won't go back to the jury.

1    MS. PICKERILL:  Perfect.

2    THE COURT:  Anything else?

3    MS. PICKERILL:  Your Honor, this might be a bit

4  premature.  So if I'm asking it too soon, we can come back to

5  it later.

6    We had talked about Mr. DeFoe being able to rely on

7  portions of the defendants' depositions.  When Agent Leighton

8  testifies, will he similarly be allowed to rely on excerpts

9  from the ATF documents?

10    THE COURT:  From the ATF documents?

11    MS. PICKERILL:  From the Notice of Proposed Removal

12  and the decision on termination where they discuss the policies

13  and the unbecoming conduct.

14    MR. KEYES:  We would have an objection to that, Your

15  Honor.

16    THE COURT:  I have given the jury instructions as to

17  what those rules are.

18    MS. PICKERILL:  Yes, Your Honor.  I understand.

19    Thank you.

20    THE COURT:  So there's no reason to get into the

21  disciplinary record to address any of those issues.  I've told

22  the jury what the standards are.

23    MS. PICKERILL:  Understood.

24    THE COURT:  So, no, I'm not going to let you dig into

25  the disciplinary file.

1        MS. PICKERILL:  Yes, Your Honor.

2        THE COURT:  Plaintiffs' counsel, anything else we need

3   to resolve before we continue with our trial?

4        MR. KEYES:  No, Your Honor, that's it for us.

5        Thank you.

6        THE COURT:  All right.  I think now you will be able

7   to properly prepare Mr. DeFoe for his testimony.

8        MR. KEYES:  Yes, Your Honor.

9        THE COURT:  He's going to be the next witness, right?

10       MR. KEYES:  He will be our next witness.  Since he's

11   now testifying tomorrow instead of this morning, he's actually

12   going to be here in person.

13       THE COURT:  All right.  That's even better.

14       All right.  Anything else we can do today to advance

15   things?

16       MS. PICKERILL:  I don't think we have anything from

17   the defense, Your Honor.

18       THE COURT:  Why don't you all settle this case?

19   Pretty much know what the jury is going to have.

20       MR. KEYES:  We'll keep talking, Your Honor.

21       I did have, just logistically in terms of -- would you

22   like me to make my proffer for the court reporter now on the

23   matters that we talked about, or wait until Mr. DeFoe's

24   testimony has completed?

25       THE COURT:  Go ahead and make it.

1    MR. KEYES: Okay. Thank you.

2    Proffer for Mr. DeFoe's testimony, which we understand

3 to be excluded by the Court's order.

4    We do think that it would be proper for Mr. DeFoe to

5 offer testimony about the reasonableness of Agent Burk's

6 concerns of what was happening behind the door at the condo;

7 and we do think that there was evidence in Mr. Burk's testimony

8 that could support an objectively reasonable concern of

9 activity, including the fact that the resident had not opened

10 the door, the residence was believed to contain a firearm

11 purchased by a prohibited individual, which we would call an

12 unlawfully purchased firearm, and that Mr. Burk testified he

13 could hear multiple people moving around in the house and yet

14 only one person talked to him and only did so through a closed

15 door and through a window.

16    We would submit that that information would be proper.

17 We still have our conditional relevance argument as well,

18 depending on whether defense offers evidence through

19 Mr. Leighton or otherwise about Mr. Burk's perceptions or

20 concerns.

21    Thank you, Your Honor.

22    THE COURT: Very well.

23    All right. We're going to recess and -- or adjourn

24 for the day, and we'll see you all tomorrow morning at 9:00.

25    Everybody have a nice evening.

1          THE COURTROOM DEPUTY CLERK:  Please rise.

2          This court is adjourned.

3      (Proceedings concluded at 2:02 p.m.)

4                          - - -

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

PLAINTIFFS':

James A. Burk, Jr.          163      185

1                    C E R T I F I C A T E

2

3        I, Crystal Hatchett, do hereby certify that the

4   foregoing is a true and correct transcript of the proceedings

5   before the HONORABLE JAMES L. GRAHAM, Judge, in the United

6   States District Court, Southern District of Ohio, Eastern

7   Division, on the date indicated, reported by me in shorthand

8   and transcribed by me or under my supervision.

9

10

11                        s/Crystal Hatchett_____
                          Crystal Hatchett
12                        Official Federal Court Reporter
                          January 2, 2025
13

14

15

16

17

18

19

20

21

22

23

24

25