UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES A. BURK, JR., et al.,      )
                                 )
     PLAINTIFFS,                 )      CASE NO. 2:20-cv-6256
                                 )
          vs.                    )
                                 )
THE CITY OF COLUMBUS, et al.,    )
                                 )
     DEFENDANTS.                 )
_____)

          TRANSCRIPT OF JURY TRIAL PROCEEDINGS - VOLUME 3
              BEFORE THE HONORABLE JAMES L. GRAHAM
               WEDNESDAY, NOVEMBER 6, 2024; 9:09 A.M.
                         COLUMBUS, OHIO

APPEARANCES:

     FOR THE PLAINTIFFS:
          Cooper Elliott, LLC
          By:  Barton R. Keyes, Esq.
               Abigail F. Chin, Esq.
          305 West Nationwide Boulevard
          Columbus, OH  43215

     FOR THE DEFENDANTS:
          Columbus City Attorney's Office
          By:  Alexandra N. Pickerill, Esq.
               Sheena D. Rosenberg, Esq.
               Sarah Feldkamp, Esq.
          77 North Front Street, 4th Floor
          Columbus, OH  43215

                         - - -


     Proceedings recorded by mechanical stenography, transcript
produced by computer.

WEDNESDAY MORNING SESSION

NOVEMBER 6, 2024

- - -

(Jury in at 9:03 a.m.)

(The following proceedings were had in open court.)

THE COURT:  Good morning, ladies and gentlemen.

Good morning, Counsel.

All right.  We're ready for the plaintiffs' next witness.

MR. KEYES:  Yes, Your Honor.  The plaintiffs are prepared to call Scott DeFoe.

But before we bring him in, may we address an issue briefly at sidebar?

THE COURT:  Yes.

MR. KEYES:  Thank you.

(The following proceeding was held at sidebar.)

MR. KEYES:  So before we brought Mr. DeFoe in and the jury was in, the Court provided a copy of the officer authority instruction with the message to us that we are to instruct Mr. DeFoe not to testify inconsistently with anything in the instruction.

THE COURT:  Yes.

MR. KEYES:  And I wanted to note for the record our -- just some objections on a little bit of the language in the instruction.

1      The statement that --

2          THE COURT:  It's already been given.

3          MR. KEYES:  I understand, Your Honor --

4          THE COURT:  Okay.

5          MR. KEYES:  -- as a preliminary instruction.  But as

6   far as limiting the scope of Mr. DeFoe's testimony, the idea

7   that the requirement that Mr. Burk was required to treat the

8   defendant officers with respect and follow their commands, and

9   the defendant officers were entitled to expect him to do so if

10  he was, in fact, a federal law enforcement agent, I think we

11  have two issues with limiting Mr. DeFoe's testimony to not be

12  inconsistent with that.

13          One is that the concept of speaking to the officers

14  with respect is -- I would agree could be a factor, perhaps, in

15  determining whether their perception of a threat or perception

16  of reasonable suspicion, that could be a factor to be taken

17  into consideration; but stated as an absolute, we disagree that

18  that is a standard that is a mandatory standard.

19          And then, secondly, the unqualified statement that he

20  was required to follow their commands does not account for

21  whether a reasonable opportunity for compliance is given

22  between multiple commands.

23          THE COURT:  Okay.  I wouldn't consider that a

24  violation for him to discuss that.

25          MR. KEYES:  Okay.  I appreciate that.

1          THE COURT:  Yes.

2          MR. KEYES:  Okay.  That would be our -- that's our

3     caveat.  That's all I wanted to discuss.

4          THE COURT:  All right.  Thank you.

5          MR. KEYES:  Thank you, Your Honor.

6       (The following proceedings were had in open court.)

7          MR. KEYES:  Your Honor, the plaintiffs would call

8     Scott DeFoe.  May I step out to get him, please?

9          THE COURT:  Yes, indeed.

10         MR. KEYES:  Thank you.

11      (Pause in proceedings.)

12         THE COURT:  Good morning, sir.  Please step right up

13    here, and the clerk will swear you in.

14         THE COURTROOM DEPUTY CLERK:  Raise your hand, please.

15      (Witness is sworn.)

16         THE COURTROOM DEPUTY CLERK:  Thank you.

17         You're going to have a seat over there, and pull the

18    microphone close to you so we can all hear you.

19         THE WITNESS:  Your Honor, may I have my water over

20    there?

21         THE COURT:  Yes, you may.

22         THE WITNESS:  Thank you.

23

24

25

- - -

SCOTT A. DEFOE

Called as a witness on behalf of the Plaintiffs, being first

duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KEYES:

Q     Good morning, sir.

Before we start with any substance, do you mind telling

the jury your name, please.

A     My name is Scott DeFoe.

Q     And, Mr. DeFoe, we have asked you to come help the jury

by giving your expert opinions about the incident in this case.

So, first, before we ask you about any opinions, I would

like you to help the jury understand who you are, in terms of

your background and qualifications.

So if we could start with your background, just start

after high school.

A     After high school, to obviously pay for college, I

joined the United States Army Reserves where I served in

infantry for six years.  I attended Northeastern University in

Boston.  Upon graduation from Northeastern I received my

bachelor's degree.

I was hired as a special agent with United States

Customs Service.  I attended the Federal Law Enforcement

Training Center in Glynn County, Georgia.

1    Upon completion of the four-month academy, I was

2 assigned to Drug Enforcement Administration's Organized Crime

3 Drug Task Force in San Francisco focusing on -- in a

4 plainclothes assignment, focusing on drug smuggling and money

5 laundering investigations.  I worked a matter that emanated in

6 San Francisco and ended up in Los Angeles.  I had the

7 opportunity to work with major narcotics.

8    I decided to join the Los Angeles Police Department in

9 1989, where I spent a total of 26 years.  I had to attend their

10 police academy at LAPD, which is six months in duration.

11    From there I was assigned to South Central Los Angeles,

12 where I worked patrol.

13    Upon completion of my year in training I was assigned

14 over to Northeast Division, which is over by Dodger Stadium in

15 LA, which is the east part of Los Angeles.  There I worked

16 patrol, I worked gangs, I worked the special problems unit, and

17 I worked the Mexican Mafia Task Force.

18    From there I was promoted to Police Officer 3.  You may

19 see, like, a corporal, two-stripe corporal, where I worked vice,

20 which is a plainclothes undercover assignment that focused on

21 prostitution, bookmaking, and gambling.

22    I was injured while working vice.  When I came back to

23 work I worked as a field training officer training new recruits

24 in the academy.

25    I was promoted to detective.  I worked robbery,

1  homicide, gangs, and narcotics.

2       Promoted to Sergeant, went to East LA, which is called

3  Hollenbeck Division in LA, worked as a watch commander,

4  assistant watch commander.  I supervised a 16-officer gang

5  detail in East LA.

6       During that time, I completed my master's degree in

7  public administration at California University in Long Beach.

8       From there I worked internal affairs with LAPD.  I

9  worked -- I was assigned as the vice officer in charge, which is

10  a 20-officer unit in South Central Los Angeles, focusing once

11  again on prostitution, bookmaking, and gambling.

12       I was then promoted to Metropolitan Division K-9

13  Platoon, which is police K-9, that focuses on all 465 square

14  miles of the city of Los Angeles.

15       In my last full-time position I was a sergeant at our

16  SWAT Unit, Special Weapons and Tactics.  It's a full-time,

17  70-officer SWAT team, once again covering all 465 square miles

18  of the city.

19  Q    Thank you, Mr. DeFoe.

20       A couple of follow-up points to what you just explained

21  to us.

22       You mentioned your bachelor's degree.  When did you earn

23  your bachelor's degree?

24  A    I earned my bachelor's degree in 1988.

25  Q    During your time serving as a law enforcement officer

1  have you received any awards or commendations?

2     A     I received over a hundred commendations.  I received the

3  Medal of Valor, which is the highest award for bravery, for an

4  officer-involved shooting.  I received the Police Star, which is

5  the third highest award for bravery, for an officer-involved

6  shooting.  And I received the Purple Heart.  I was shot in the

7  line of duty while working in an undercover assignment.

8     Q     During your career have you ever taught or trained other

9  police officers?

10     A     For approximately 20 of my 26 years I taught tactics,

11  use of force.  During my time assigned to LAPD SWAT as a

12  supervisor I was the officer in charge of our crisis negotiation

13  team, which that was 24 full-time hostage negotiators that dealt

14  with de-escalation, using words and actions to influence

15  behavior, related to barricaded subjects who may be suicidal

16  and/or homicidal.

17     Q     You mentioned in your description of your career path

18  some time in internal affairs, correct?

19     A     Yes.

20     Q     What does internal affairs involve?

21     A     They investigate misconduct on the police department.

22  Typically at internal affairs -- which unfortunately is the

23  biggest division in LAPD.  There's approximately 300 sergeants

24  that are assigned to internal affairs.  It's typically

25  investigating major crime or corruption that's beyond the scope

1  of what a field sergeant can investigate.

2      Q    During your time as a law enforcement official have you

3  ever helped write or revise any policies, procedures, or

4  training documents, training modules for police agencies?

5      A    I was a co-contributor with the LAPD manual in 2000.  I

6  wrote the LAPD K-9 manual.  And I was assigned to the Rampart

7  Corruption Board of Inquiry, which focused on corruption in

8  Rampart Division.  There was a small group of officers that were

9  involved in crimes.  I was a co-contributor and a writer of that

10  document that went to the Attorney General's Office.

11      Q    Now, Mr. DeFoe, we're going to be asking you questions

12  about your opinions regarding police practices, specifically

13  about detention of a person and use of force in this case.  And

14  the jury might wonder why they should listen to you and consider

15  your opinions.

16          So I know you just gave us a lot about your professional

17  background.  Is there anything specific that you haven't already

18  told the jury that you feel qualifies you to talk about those

19  items?

20      A    In addition, I also have a master's of legal studies

21  from Pepperdine's School of Law.  I've been retained on

22  approximately 850 cases throughout the United States and Canada.

23  This would be my 71st trial.  I've been deposed 274 times.

24          I've been retained by both the plaintiff, like in this

25  matter, and then defense in defending officers, both by the U.S.

1  Attorney's Office, the Attorney General's Office.

2      I've been retained on approximately 450 unarmed police

3  shootings on behalf of the plaintiff throughout the United

4  States and Canada in many high-profile cases that you would have

5  heard on TV involving positional asphyxiation, or neck restraint

6  cases.

7  Q    Now, when we say "police practices," what does that mean

8  to you?

9  A    It's everything from hiring, training, the assignment

10 that that specific officer or officers may be assigned to,

11 everything from tactics to de-escalation to the use of

12 less-than-lethal force to the use of lethal force, report

13 writing, conducting an assessment of what transpired and then

14 make determinations if the actions were reasonable.  It's called

15 the use-of-force investigation, which I have completed over a

16 hundred in my career as a supervisor with the LAPD.

17     Everything looking at post-incidence, post-incidence

18 debriefs, critiques, to ensure that law enforcement is

19 constantly evolving and getting better.

20 Q    Thank you.

21     Now, you're a hired expert, meaning you're being paid

22 for your time on this case.  Can you give us an idea of how much

23 your -- or what rates you're being paid for your time?

24 A    Billable hours is $475 per hour for trial and

25 deposition.  I have accrued approximately, over the year and a

1 half I have worked on this case, approximately $16,125.

2 Q And is your compensation in any way tied to the outcome

3 of the case? In other words, whether the plaintiff wins or

4 loses.

5 A No. It's simply for my time accrued in reviewing

6 material, writing a report, conducting a site visit if

7 necessary, deposition preparation, and then obviously trial

8 preparation.

9 Q And the time you have spent and the rates that you have

10 charged, are those in line with your normal rates when you serve

11 as an expert in a case?

12 A They're aligned with the national standards for police

13 practices experts in the United States.

14 Q Did you know any of the people involved in the case,

15 whether the parties on either side or any of the attorneys,

16 before being retained?

17 A No, sir.

18 Q Has my law firm, Cooper Elliott, ever retained you as an

19 expert in any case before?

20 A No, sir.

21 Q So I'm going to ask you some questions today in the

22 areas -- police practice areas of detention and use of force,

23 like I said a moment ago.

24 When you offer any opinions in your testimony, I'm going

25 to ask if you will agree to offer an opinion only if you hold it

1   to a reasonable degree of certainty in your field based on your

2   education, training, and experience. Can you promise to do

3   that?

4      A   Yes, sir.

5      Q   When we talk about reasonable degree of certainty, do

6   you understand that to mean more likely true than not true?

7      A   Yes.

8      Q   From your education, training, and experience, are you

9   generally familiar with -- and I understand that the jury will

10   be given instructions at the close of the evidence. But are

11   you, from your experience, training, and education, generally

12   familiar with the standards that govern the use of force and

13   whether it's reasonable or excessive?

14      A   Yes.

15      Q   Do you mind just explaining for the jury your general

16   understanding?

17      Again, subject to the idea that the Court will instruct

18   the jury at the end and those are the instructions. But can you

19   please tell us what your general understanding of those factors

20   are?

21      A   The objective reasonable standard is basically what a

22   reasonable officer would do in a similar circumstance based on

23   the totality of the circumstances.

24      It's typically going to be predicated on a subject's

25   level of resistance. Like, is the person resisting? If so, how

1  are they resisting?  Then what would -- was the force option

2  used appropriate based on the level of resistance?  Did the

3  person commit a crime and the severity of that particular crime.

4  Lastly, is the person trying to resist and/or flee as a result

5  of the crime that they're alleged to have committed?

6      Q     Thank you.

7           Mr. DeFoe, what materials have you reviewed in this case

8  to help you form your opinions?

9      A     May I refer to my report?

10     Q     Without looking at it, are you able to testify off of

11  memory, or would you need that to refresh your memory?

12     A     Yes.  I reviewed body camera.  I reviewed deposition

13  transcripts.  I reviewed defense experts' reports.  I've

14  reviewed policies and procedures for Columbus Police Department.

15  I've reviewed administrative information regarding Mr. Burk,

16  both personnel records.  Reviewed training material for the

17  officers involved in this case.  Reviewed the use-of-force

18  report in this case that was conducted as a result of the

19  officers' actions in this case.

20     Q     And I appreciate that general description.  Would it

21  refresh your memory to look at your report to see a

22  comprehensive list of what you reviewed?

23     A     Sure.

24     Q     Do you have your report there with you on the witness

25  stand?

1    A    I do.

2    Q    Okay.  If you -- if it will refresh your memory, please

3    feel free to take a look at your report and at the list of

4    materials you reviewed.

5         We're not going to display this for the jury.

6    A    There were a total of 57 different items that I reviewed

7    regarding, as I mentioned, training from the involved officers,

8    specifically for Columbus Police Department -- or Columbus

9    Division of Police, better said; Mr. Burk's training records;

10   obviously the TASER download that was used, the

11   electronic-control device, or TASER, that was used in this case;

12   photographs that were taken; numerous directives, which are

13   training bulletins, training policies; internal affairs report

14   for both Officer Fihe and Officer Winchell; peace officer basic

15   training, which is basically your academy training on specific

16   areas such as de-escalation and use of force; as I mentioned,

17   multiple body-worn camera videos; transcribed interviews of the

18   involved officers and Mr. Burk in this matter.

19   Q    Thank you, Mr. DeFoe.

20        You can set that aside.  If at any point you might need

21   to refer to that to refresh your memory, just let us know before

22   you pick it up, please.  But we can talk through that.  Okay?

23   A    Yes, sir.

24   Q    Thank you.

25        From your review of materials provided to you in this

1  case, have you formed any opinions?

2     A    Yes.

3     Q    And I'd like to start by asking you just at a general

4  level, and then we will get into specifics for each one.

5         But at a general level, and with the understanding that

6  these opinions are only going to be valid if the jury finds

7  certain facts to be true, with that understanding, could you

8  tell us generally what your opinions are in this case?

9         And then, like I said, we'll go through specifics as to

10 each one.

11    A    You want me to just give you a list of opinions?

12    Q    If you could, please, and then we'll touch on each one

13 individually after that.

14    A    Sure.

15         I believe there is a failure by the involved officers to

16 conduct a tactical --

17            THE COURT:  Just one moment.

18            MR. KEYES:  Yes, Your Honor.

19            THE COURT:  I think going down this path could lead to

20 some confusion, and I am concerned with -- step forward.

21       (The following proceeding was held at sidebar.)

22            THE COURT:  So this open-ended question is likely to

23 produce some opinions that reflect his feelings as to what the

24 facts are in this case, and in particular his opinion based on

25 what he sees or has seen in video as to what actually happened,

1  when that is going to be the jury's job, and he has no better

2  opinion than any one else about what actually occurred in this

3  case.

4      So he cannot give his opinion about whether or not

5  Mr. Burk resisted or the degree of his resistance, and I'm

6  afraid just letting him say what his general opinions are is

7  going to invite him to tell the jury what he thinks really

8  happened, when that is the jury's function in this case.

9      So I want you to go -- I want his opinions to be

10  elicited separately and individually as to each opinion based

11  on the facts related to the issue that he is giving an opinion

12  on.

13      MR. KEYES:  And, Your Honor, we have no problem.

14  That's what I was going to do.  I was just asking to give a

15  road map, which I can skip.  No problem skipping over that.

16      THE COURT:  That's a problem.

17      MR. KEYES:  Okay.  I can have him skip over that.

18      THE COURT:  All right.

19      MR. KEYES:  And while we're up here --

20      THE COURT:  I don't want you to ask those kinds of

21  opinions and require him to say what he thinks really happened.

22      MR. KEYES:  No, Your Honor.  And the way that he is

23  going to testify is that when he describes what his opinion is,

24  and there will be times where I can ask him, you know, a

25  specific hypothetical, how it's relevant.

1          THE COURT:  I've outlined my concerns.

2          MR. KEYES:  Yes, Your Honor.

3          THE COURT:  You may proceed.

4          MR. KEYES:  Thank you.

5      (The following proceedings were had in open court.)

6  BY MR. KEYES:

7      Q    All right.  Mr. DeFoe, in the interest of efficiency,

8  instead of having you list all of your opinions in the outset,

9  we will just jump right in to going one by one.

10         What I would like to do for this portion of your

11  examination is to talk about not only what your opinions are as

12  a general matter, but also what they depend on in terms of

13  hypothetical facts.

14         So to be clear, you're not here to instruct the jury

15  what the facts are.  Is that fair?

16     A    Yes, sir.

17     Q    So when we're talking about your opinions, could you

18  please make sure to be clear that any facts you're mentioning or

19  that you're relying on to support your opinions, those are

20  hypothetical facts that are subject to the jury's ultimate

21  determination.  Is that fair?

22     A    Yes, sir.

23     Q    Okay.

24         THE COURT:  Let me make a comment to that.

25         MR. KEYES:  Thank you, Your Honor.

1    THE COURT:  Ladies and gentlemen, you are the ultimate

2  finders of the facts in this case.  Mr. DeFoe, although he

3  is -- has a lot of experience in police work, he doesn't know

4  what happened in this case other than what he sees on the video

5  cam and other than what he hears from the witnesses.

6    And he is not permitted to express an opinion about

7  what really happened in this case.  That's your job.  You are

8  the ones that are going to decide what the facts are in this

9  case.

10    So I want to make it clear that that is your role and

11  that -- and only yours.  Any opinion that Mr. DeFoe may have as

12  to what really happened is his own personal opinion, and he's

13  here to tell you about the principles applied in law

14  enforcement that are involved in this case, but not what really

15  happened.

16    So Mr. Keyes' questions may ask him to assume certain

17  facts occurred; but in the final analysis, you folks are going

18  to be the judge of what really occurred.

19    All right.  You may proceed.

20    MR. KEYES:  Your Honor, along those lines, would it be

21  okay if I gave Mr. DeFoe a couple of examples illustrating that

22  point you just made?

23    THE COURT:  Certainly.

24    MR. KEYES:  Thank you, Your Honor.

25

1  BY MR. KEYES:

2      Q    So, Mr. DeFoe, echoing the Judge's comments, and we'll

3  look at some evidence in a moment, but you reviewed Officer

4  Fihe's body-cam footage as part of your review of this case,

5  correct?

6      A    I did.

7      Q    One of the areas that we'll get into when we get into

8  your substantive testimony is going to address standards

9  relating to compliance with an officer's orders.  Okay?

10     A    Okay.

11     Q    When we look at the video, there will be an exchange --

12 and I'm not describing anything the jury hasn't already seen.

13 There will be an exchange when Officer Fihe approaches and says

14 to Mr. Burk, "Turn around and let me see your hands."

15          Do you remember that portion of the video?

16     A    I do.

17     Q    Okay.  Now, whether Mr. Burk turned around and showed

18 his hands in response to his comment, do you understand that

19 that is a question that the jury will have to answer and not

20 you?

21     A    Yes, sir.

22     Q    Okay.  Another example we'll talk about, and we'll see

23 some video of, is the use of the TASER on Mr. Burk while he's

24 prone on the ground.

25          Do you remember that portion of the body-cam video?

1    A    I do.

2    Q    I will be asking you about standards that would apply to

3    police practices in that area.  One of the questions that the

4    jury will have to decide is whether Mr. Burk was actively

5    resisting putting his hand behind his back.

6         You understand that that is a question for the jury to

7    answer, not you, correct?

8    A    I do.

9    Q    All right.

10        THE COURT:  Thank you, Mr. Keyes.  That was very

11   helpful.

12        MR. KEYES:  Thank you, Your Honor.

13   BY MR. KEYES:

14   Q    All right.  Now, what I would like to do, Mr. DeFoe, as

15   we're talking about your opinions, if it would be helpful, I can

16   pull the body-cam video up from Officer Fihe's body-cam footage

17   and we can talk about segments of the encounter.  Would that be

18   okay?

19   A    Sure.

20   Q    All right.

21        MR. KEYES:  May I have one moment, Your Honor,

22   briefly?

23        THE COURT:  Yes.

24        MR. KEYES:  Thank you.

25        I just wanted to make sure we had tested the sound

1    before I played anything.  Thank you.

2              This is Joint Exhibit I, so we can display it, please.

3              Thank you.

4    BY MR. KEYES:

5    Q    All right.  Mr. DeFoe, I have the body-worn camera video

6    cued up to just about the point that Officer Fihe exits the

7    vehicle at the townhome and encounters Mr. Burk.  Because it

8    would take too long, I'm not going to play the entire five

9    minutes or so of the video leading up to that point.

10             But one hypothetical question I would like you to answer

11   for the jury is, if hypothetically on the way to the townhome,

12   if hypothetically Officer Fihe saw information on his in-car

13   display that Mr. Burk had told the resident his name, his

14   federal agency, and his badge number, if the jury found those

15   facts to be true, do those facts factor into some of the

16   analysis you're going to give about this encounter today?

17   A    Yes.

18   Q    And how would those facts, if true, factor into that

19   analysis?

20   A    Because if true, Agent Burk did what was appropriate.

21   He identified himself.  He gave his agency.  He gave his badge

22   number.  He didn't flee the location.  He remained there for the

23   seven-minute duration until the arrival of Officer Fihe.

24   Q    Now, I'm going to play the first roughly -- this will

25   only be a few seconds, but what we're going to look at is the

1  initial interaction between Officer Fihe --

2      THE COURT:  Mr. Keyes, I want to interrupt you.

3      MR. KEYES:  Thank you, Your Honor.

4      THE COURT:  One fact that you didn't address in this

5  question is whether or not these police officers knew Mr. Burk

6  and knew whether he was the person identified in this badge

7  number and name giving.

8      MR. KEYES:  Thank you, Your Honor.  We can address

9  that.

10 BY MR. KEYES:

11     Q    Mr. DeFoe, I would also like you to assume

12 hypothetically, if the jury finds to be true, that -- I'm going

13 to show you Joint Exhibit VIII for a moment here.

14     Do you have --

15     THE COURT:  The missing factor is whether these

16 officers had any ability to know whether Mr. Burk was, in fact,

17 the person referred to in these credentials.

18     MR. KEYES:  Your Honor, I understand the Court's

19 point.

20     THE COURT:  All right.

21     MR. KEYES:  I believe the factors that can come into

22 play are going to take into account the totality of the

23 circumstances, including --

24     THE COURT:  You're leaving out a very important

25 factor, and it's they didn't know Mr. Burk and they had no way

1  of knowing when they encountered him whether he was the person

2  that properly had that badge.

3          MR. KEYES:  Your Honor, Mr. DeFoe will establish the

4  way that those hypothetical facts do or do not influence his

5  opinions.  So he does consider those, and we will elicit that.

6          THE COURT:  Go ahead.

7          MR. KEYES:  We haven't left it out; we just haven't

8  gotten to it yet.

9          Thank you, Your Honor.

10 BY MR. KEYES:

11   Q    Looking at Joint Exhibit VIII on your screen, there is

12 an entry at 13:55:40 that says:  MW, gray shirt, tan pants.

13          Do you see that?

14   A    Yes, sir.

15   Q    I'm going to ask you to assume hypothetically that "MW"

16 stands for male white or white male.

17          I'm also going to ask you to assume hypothetically that

18 the defendant officers had never encountered Mr. Burk before;

19 that they don't know each other.

20          I'm also going to ask you hypothetically to assume that

21 when Officer Fihe arrives on the scene, Mr. Burk is standing at

22 the stoop of the residence wearing a gray shirt, tan pants, and

23 that he was a white male.

24          Does that set of facts, if proven true, does that affect

25 or relate to the opinions that you would provide in this case?

1    A    Yes.

2    Q    How so?

3    A    Well, hypothetically speaking, if proven true, it's

4    information the officers knew at the time.  On their in-car

5    computer or mobile digital computer, they had received

6    information which was a description of the individual and the

7    attire he was wearing at the time.

8         Upon arrival, there was no one else outside at that

9    point.  Looked and could see, obviously, there was a gentleman

10   who matched the description of a male white wearing cargo pants

11   and a golf shirt standing at the very location where the call

12   was emanated from.

13   Q    Now, looking at Officer Fihe's body-cam video -- and for

14   the record, this is starting at 5 minutes, 6 seconds in the

15   timestamp; time of day, 14:03:30.  And we're going to play this

16   for the first portion of the interaction between Officer Fihe

17   and Mr. Burk.

18       (Video was played in open court.)

19   BY MR. KEYES:

20   Q    All right.  Mr. DeFoe, based on that portion of the

21   body-cam video that you just saw, that initial interaction,

22   first of all, I want to -- I think we all heard the words, but I

23   want you to assume the words Mr. Burk said in response to

24   Officer Fihe's initial contact is, "I'm a federal F'ing agent."

25   Okay?

1    A    (Witness nods.)

2    Q    I'm sorry.  You do have to answer verbally for the

3   record.

4    A    Yes.

5    Q    Thank you.

6         And then assuming that the timing and content of the

7   video we just saw, assuming that that is accurate, based on that

8   portion of this incident up through the point where Officer Fihe

9   draws his gun and points it at Mr. Burk, where we see there in

10  the video where we're frozen, do you have any opinions of the

11  principles that would apply to this encounter, this portion of

12  the encounter, between Officer Fihe and Mr. Burk?

13   A    Principles as it relates to the exhibiting of the

14  firearm or the -- I'm unclear with your question.

15   Q    Well, we'll start with the exhibiting of the firearm.

16   A    Yes.  Hypothetically speaking, the only time you should

17  remove your firearm from your duty holster is if you reasonably

18  believe there is immediate or imminent threat of great bodily

19  injury or death and the subject's actions or level of resistance

20  rise --

21         MS. ROSENBERG:  Objection.

22         THE COURT:  I'm sorry?

23         MS. ROSENBERG:  I said objection, Your Honor.

24         THE COURT:  Overruled.

25         THE WITNESS:  -- the subject's levels of resistance

1    rise to the point where it would be life-threatening for the

2    officer or someone else.

3   BY MR. KEYES:

4    Q    Did you hear Officer Fihe's initial instructions to

5   Mr. Burk, turn around, let me see some ID -- I'm sorry, I'm

6   sorry, turn around, let me see your hands, repeated twice?

7    A    Yes.

8    Q    In terms of that exchange and what appear to be

9   Mr. Burk's actions on the video -- again, the jury will decide

10   what those actions ultimately are.

11        But based on what you would hypothetically see in the

12   video, do you have opinions as to the appropriateness of the

13   timing of commands or timing for response given by Officer Fihe?

14    A    Well, hypothetically speaking, if you can see his hands,

15   as you can in the video, you may not need to ask him to see his

16   hands because you can see the hands.

17        And officers should be concerned with a subject's hands

18   because, as they say, hands will kill.  So it's important that

19   an officer determines where the subject's hands are and if

20   they're free of any weapons or something that may be of concern

21   to the officer.

22        The issue with the way in which we issue commands,

23   hypothetically speaking, should be to de-escalate the situation,

24   which means to use words and actions to influence someone's

25   behavior.

1        And de-escalating, once again, is a control and

2   opportunity for a law enforcement officer, once again, to say

3   and do things to bring the situation to a calm as quickly as

4   possible.

5        Q    Now, I'm going to ask you another hypothetical, to

6   assume a hypothetical set of facts, that if the jury were to

7   find true that when Officer Fihe first approaches Mr. Burk and

8   says turn around, let me see your hands, if the jury finds that

9   Agent Burk was not facing Officer Fihe when he first gave that

10  command, when Officer Fihe first gave that command, would that

11  affect your opinions on the reasonableness of Officer Fihe's

12  reaction in this first few seconds of the video that we saw?

13       A    Yes, it would.

14            MS. ROSENBERG:  Objection.

15            THE COURT:  I'm sorry?

16            MS. ROSENBERG:  I said objection.

17            THE COURT:  Step forward.

18       (The following proceeding was held at sidebar.)

19            THE COURT:  What are the grounds for your objection?

20            MS. ROSENBERG:  He's asking him to determine the

21  reasonableness of the commands that he's giving.  I don't think

22  that's appropriate for him to determine whether or not they're

23  reasonable.  He can say whether policies and principles --

24            THE COURT:  Was that the question?

25            MS. ROSENBERG:  That's what I heard, Your Honor.

1    MR. KEYES:  Are you able to read the question back?

2    (The last question was read by the court reporter.)

3    THE COURT:  That's the -- and the reaction being the

4  pointing of the gun?

5    MR. KEYES:  Yes, Your Honor, correct.

6    THE COURT:  All right.  Overruled.

7    MR. KEYES:  Thank you.

8    (The following proceedings were had in open court.)

9    THE COURT:  You may answer the question.

10    MR. KEYES:  Thank you, Your Honor.

11  BY MR. KEYES:

12    Q    Mr. DeFoe, the Court's given you permission to answer

13  the question.

14    MR. KEYES:  I would add -- I can just add a clarifying

15  point for the record, Your Honor.

16  BY MR. KEYES:

17    Q    When I asked about Officer Fihe's reaction, what I'm

18  specifically talking about is his pointing his gun at Agent

19  Burk.

20    So with that clarification, do you recall the question

21  or do you need me to re-ask it?

22    A    Could you re-ask the question, please?

23    Q    Yes.

24    So assuming hypothetically that when Officer Fihe first

25  verbally instructs Mr. Burk to turn around, let me see your

1  hands, assuming hypothetically that Agent Burk -- Mr. Burk was

2  not facing Officer Fihe at the time Officer Fihe started to give

3  that command, would that hypothetical fact affect your opinions

4  about whether Officer Fihe's reaction in pointing his gun at

5  Mr. Burk was reasonable under the circumstances?

6      A    Yes, it would.

7      Q    And how so?

8      A    Hypothetically speaking, that his actions -- for one, he

9  turned around.  You can see his hands, and his actions never

10  rose to life-threatening where there would be an imminent threat

11  of great bodily injury or death that would necessitate

12  withdrawing his firearm, first, and then pointing his firearm at

13  Mr. Burk at that time.

14      Q    And in your experience, Officer DeFoe, is it standard

15  police practices to train officers that pointing a gun at a

16  person is a type of a use of force?

17      A    Different departments, yes, Counsel, view it as a use of

18  force, a nonuse of force, depending on the agency.

19      Q    And did you see any indications in the Columbus Division

20  of Police materials you received that displaying or pointing a

21  firearm falls on a use-of-force continuum?

22      A    It does.

23          MS. ROSENBERG:  Objection, Your Honor.

24          THE COURT:  Overruled.

25          MR. KEYES:  Thank you, Your Honor.

1  BY MR. KEYES:

2      Q    You talked about your opinions, Mr. DeFoe, in these

3  first few seconds of the encounter between Officer Fihe and

4  Mr. Burk, and you talked about -- we talked about some

5  hypothetical facts and what those opinions would be based on

6  those facts.

7          I would like you to explain to the jury briefly what are

8  the grounds, either the standards or practices, that you would

9  take into consideration that would support those opinions?

10     A    Hypothetically speaking, it's going to be based on the

11 totality of the circumstances.  What type of call for service is

12 it?  Did a crime occur?  Or did a woman, in this particular

13 case, hypothetically speaking, did she call the police because

14 she was concerned that Mr. Burk, who was at her door to conduct

15 a --

16             MR. KEYES:  I can rephrase the question, Your Honor.

17             THE COURT:  Yes, that would be helpful.

18             MR. KEYES:  Thank you.

19 BY MR. KEYES:

20     Q    Mr. DeFoe, my apologies.  What I was trying to ask was

21 not so much about the facts that the jury may decide in the

22 case, but about underlying principles or standards, so whether

23 that's a -- whether that's through standard police training,

24 whether that's through, you know, written materials that police

25 agencies use, those kinds of things.

1      So I'm asking about the foundational basis, not the

2   factual basis at this point.

3   A      Yes, sir, I understand.

4   Q      Okay.  Thank you.

5      So with that clarification, what, if any, bases or

6   grounds did you take into consideration in forming those

7   opinions?

8          THE COURT:  I'm not sure what the question is.

9          MR. KEYES:  I'm asking --

10         THE COURT:  I think he's answered the question when he

11   referred to the Columbus Police Department instructions

12   regarding the use of weapons.

13         MR. KEYES:  Yes, Your Honor, he did refer to it.  I

14   was merely asking if there were any other considerations, as

15   well, beyond that one particular.

16         THE COURT:  That's enough.

17         MR. KEYES:  All right.  Thank you, Your Honor.

18   BY MR. KEYES:

19   Q      As to whether it was reasonable under the circumstances

20   for Officer Fihe to point his gun at Mr. Burk at this time, are

21   there other facts, hypothetical facts, that if the jury agrees

22   are true, are there other facts that would support that

23   opinion -- those opinions in this case?

24   A      Other facts, Counsel, other than -- hypothetically

25   speaking, everything is going to be based on what the officer

1  knows at the time:  What information the officer has at a call,

2  what the individual is doing when he or she arrives, what the

3  subject's level of resistance.  Are they being compliant or

4  noncompliant?  Is it a call or call for service that creates a

5  situation where someone may be armed or presumed to be armed?

6  Is the call for service involving a firearm that may have

7  occurred prior to the officer's arrival?

8        It's going to be predicated on everything the officer

9  knows based on the information he or she has at the time when

10 they arrive at that call for service.

11   Q    Mr. DeFoe, I'd like to give you a couple of specific

12 hypothetical facts and ask how those may or may not affect your

13 opinions as to this portion of the encounter, drawing the gun

14 and pointing it at Mr. Burk.

15       If hypothetically Officer Fihe did not have any

16 information before arriving suggesting that Mr. Burk had

17 displayed any weapon to the resident, if hypothetically Officer

18 Fihe did not have any information to indicate that, is that --

19 is that a fact that would factor into those opinions?

20   A    Hypothetically speaking, it's very important because

21 it's the facts the officer knows at the time.  Was a weapon

22 involved or presumed to be involved based on the initial call

23 for service?

24   Q    And if hypothetically there were evidence from Officer

25 Fihe or otherwise that Mr. Burk -- strike that.  I'll rephrase

1  that question.  Excuse me.

2          If hypothetically there were testimony or acknowledgment

3  from Officer Fihe that he did not believe or have information

4  that Mr. Burk had made any verbal threats of violence to the

5  resident, would that hypothetical fact be relevant in your

6  opinions?

7      A    Yes, sir.

8      Q    How so?

9      A    Hypothetically speaking, once again, it's facts known,

10  that there wasn't any verbal threats, information about having a

11  firearm.  There wasn't a weapon involved.  Those are all

12  important, called clues in law enforcement, which will determine

13  how you approach a scene, how you interact with the involved

14  parties, what level of force options that you may consider, both

15  less-than-lethal and lethal force options.

16      Q    If hypothetically the jury finds to be true that when

17  Officer Fihe arrives and approaches Mr. Burk he can see that

18  Mr. Burk has a folder or papers in his hand, if Officer Fihe

19  acknowledges that hypothetical fact and the jury finds it to be

20  true, would that affect the opinions as to whether pointing the

21  gun at Agent Burk -- or at Mr. Burk is reasonable?

22      A    It would, yes.

23      Q    How so?

24      A    Once again, it's really, hypothetically speaking, if you

25  receive a call that there's a federal agent at a door and the

1 federal agent identifies themselves, and you arrive and,

2 hypothetically speaking, the individual who is described appears

3 to be very similar to the individual for the call for service,

4 and the person has a folder in their hand which would be a

5 document that would be consistent with investigators or

6 detectives conducting followups or investigations, and you can

7 see within that folder because you can -- if you can see that

8 there's not a weapon, a handgun, a knife, or something that

9 would be a concern, all you can see is a folder, that, in

10 itself, would not rise to the level where that folder in itself

11 would make a reasonable officer believe there was an imminent

12 threat of great bodily injury or death and/or somehow that

13 person was armed with a weapon, at least in his hands.

14     Q     Thank you.

15           Another hypothetical fact.  If hypothetically Officer

16 Fihe were to acknowledge that Mr. Burk did not make any

17 aggressive physical moves or reach for anything before Officer

18 Fihe pulled out his gun or pointed his gun at Mr. Burk, if

19 hypothetically Officer Fihe acknowledges that fact and the jury

20 finds it to be true, would that fact affect your opinions?

21     A     It would, yes.

22     Q     And how so?

23     A     Hypothetically speaking, as I testified to earlier,

24 officers are trained to watch hands.  They're also trained on

25 what's called a furtive gesture.  That could be putting my hand

1  abruptly in my waistband, secreting my hands in my pockets,

2  doing something that would raise a reasonable officer's

3  situational awareness that now there may be a problem and

4  heighten that officer's situational awareness where they think

5  there may be a necessity to consider using an either

6  less-than-lethal or lethal force option.

7  Q    Now, as to Officer Winchell, who we don't see in the

8  footage yet, but from reviewing the footage you understand that

9  it may show Officer Winchell arriving on scene a little after

10  Officer Fihe?

11  A    Yes, sir.

12  Q    If Officer Winchell were to acknowledge that upon his

13  arrival -- hypothetically, if Officer Winchell acknowledged that

14  he did not see an imminent threat or a weapon on Mr. Burk, and

15  if the jury finds that fact to be true, believes that fact to be

16  true, would that affect your opinions as to Officer Winchell's

17  actions?

18  A    Yes.

19  Q    How so?

20  A    It's what that specific officer would know based on the

21  totality of the circumstances, what he or she can see when they

22  arrive.

23        If he or she sees an individual holding an item, such as

24  a folder, that does not present any immediate threat or imminent

25  threat of great bodily injury or death, there would not be a

1   necessity, hypothetically speaking, for that officer to take his

2   handgun or her handgun out of the holster and point it at or in

3   the direction of that individual.

4     Q    What about the hypothetical fact that Mr. Burk does not

5   have any outwardly displayed credentials or badge when either

6   Officer Fihe or Officer Winchell arrives, assuming that fact to

7   be true, how does that factor into your analysis?

8     A    That does not factor at all into my analysis, other than

9   agents, as I was a former agent, hypothetically speaking, you're

10   going to keep your credentials in your pocket.

11       And credentials are not a badge, it's a badge and an ID,

12   because you can buy a badge online.  So it's both.

13       Agents are trained, or should be trained, that I don't

14   want anything dark, like a wallet or metal, something like a

15   badge, in my hand if I'm concerned with responding law

16   enforcement.

17       So I would have kept my credentials, hypothetically

18   speaking, where they were and then be guided by the officer to

19   ask me -- which is consistent with officer's training -- let me

20   see your credentials, and then have that person retrieve their

21   credentials and show their credentials.

22     Q    I'm going to ask you to look at your screen, Mr. DeFoe,

23   at Joint Exhibit X, which I'll pull up in a moment here.

24       In joint Exhibit X, I'm showing you the first two pages.

25   The parties have agreed these were Agent Burk's credentials and

1    badge that he had on him on July 7, 2020.

2         Do you see that?

3    A    I do.

4    Q    Based on what you see there, if hypothetically that is

5    an accurate depiction -- accurate picture of Mr. Burk's

6    credentials and badge, does that affect your opinions as to

7    whether him having that out in his hand upon Officer Fihe's

8    arrival factors into the use-of-force analysis as far as

9    pointing the gun at Mr. Burk?

10   A    It does not.

11   Q    Why is that?

12   A    Because I would not want the -- once again, I think it

13   would be a poor decision to have a black object or an object

14   with metal, such as a badge, in your hand upon arrival of

15   responding law enforcement.

16        That, once again, that particular credentials is

17   consistent with what law enforcement could expect to see.

18   Especially, hypothetically speaking, you would match the badge

19   number to the badge number of the person who called.  You would

20   then match the name on the credentials to the person who called,

21   which is on your -- in your in-camera or, better said,

22   in-computer data that you received on the way to the call.

23        So now that would verify, hypothetically speaking, that

24   the person who provided his or her name and their badge number

25   is identical to the badge number and the name that you have at

1  scene.

2     Q    I'm going to play a few more seconds of the video here,

3  and I'm going to just back up a few frames so that we make sure

4  the sound kicks on when we hit play.

5         We have Joint Exhibit I up on your screen again.

6     (Video was played in open court.)

7  BY MR. KEYES:

8     Q    Mr. DeFoe, that additional portion of the -- of Officer

9  Fihe's body-worn camera video that we have just seen, assuming

10  hypothetically that the jury sees and hears the exchange --

11  well, let me ask it this way:  Anything that you saw in that

12  video or heard in that portion of the video that, if the jury

13  hypothetically would agree to be true, affects your opinions

14  about the reasonableness of Officer Fihe's actions at this

15  point?

16     A    Yes.

17     Q    And what would those facts be?

18     A    Hypothetically speaking, when I ask -- when a law

19  enforcement officer asks you to do something, they have to

20  specifically ask you to do it -- Ma'am, I need to see your ID --

21  and then give you a reasonable opportunity to comply to get your

22  ID.  But that is specific.  Let me see what you want me to do,

23  and then give you a reasonable opportunity to do that.

24         Once again, that comes -- goes back to de-escalation

25  that uses words and actions to influence behavior.  What does an

1  officer want a subject to do?

2          Sir, I need to see your hands.

3          Great.  I need to see your ID.  Where is your ID?

4          It's in my left front pants pocket.

5          Great.  Keep the folder in your right hand, retrieve

6  your ID, and hold it up and show it to me.

7          Great.  Now we verified that.

8          Now at least we know there's an ID associated with that

9  person.

10          Because especially important is, people that are

11  committing crimes, hypothetically speaking, from my almost

12  30 years of experience, don't typically wait around for the

13  police to show up.

14          So, once again, that is an important factor in this case

15  or, specifically, hypothetically speaking, in a case.  Is the

16  person that allegedly is doing something wrong, are they there?

17  Yes.

18          They waited -- especially if they waited around seven

19  minutes for law enforcement to arrive to be able to show who

20  they are, that individual, hypothetically speaking, should be

21  afforded the opportunity to show the ID.  Ask them to see the

22  ID, and then let him or her get the ID out of their pocket and

23  show it.

24      Q   And for this brief exchange I'd like you to listen to

25  the words that Officer Fihe uses here.  And we're at the

1  5 minute, 18 second mark, 14:03:41 time of day, in Joint

2  Exhibit I.

3      (Video was played in open court.)

4  BY MR. KEYES:

5      Q    Okay.  Let me see your hands.  I need to see some ID.

6  Get on the ground.  Get on the ground now.

7          If the jury finds that Officer Fihe said those words and

8  said them all within a matter of three to four seconds, if those

9  facts are found to be true, how does that affect your opinions

10 that you just explained to us about giving a reasonable time to

11 comply with commands and making clear commands?

12     A    For one, a reasonable officer would look.  If I can see

13 your hands, I don't need to keep asking you to see your hands.

14 I can see your hands.  If I want you to turn around or I want

15 you to get on the ground, I need to give you one specific

16 command at a time.

17         But to give three compound commands of let me see your

18 ID, turn around, get on the ground, all in one breath or in one

19 command, a reasonable person wouldn't know what to do.  Do you

20 want me to get my ID, do you want to see my hands, or do you

21 want me to get on the ground, and in which order?

22         So officers are trained, or should be trained, that it's

23 a single command.  Let me see your hands, let me see your ID, or

24 get on the ground.  Whichever that is, it should be a specific

25 command.  But more importantly, a reasonable opportunity to

1  comply with that command.

2      Q     If hypothetically Officer Fihe or another witness for

3  the defendant were to suggest that when Officer Fihe said first

4  to Mr. Burk turn around and let me see your hands, if Officer

5  Fihe were hypothetically to suggest that what he intended was

6  for Mr. Burk to turn his back to him, based on what you have

7  seen in the video, do you see any clear command that would make

8  that obvious?

9             MS. ROSENBERG:  Objection.

10            THE COURT:  Sustained.

11  BY MR. KEYES:

12      Q     In terms of standards and practices about clarity of

13  commands, if an officer intends for a person to turn around with

14  their back to the officer, in terms of standards and police

15  practices, what would be a reasonable command to give in order

16  to get that type of action back?

17      A     Turn around and face away from me.  You want the person

18  to face away from you.

19            If you tell me to turn around, I may want -- as a

20  reasonable officer, want you to completely turn around.  Because

21  I not only want to see your waistband, which is important for

22  officers, but I want to see your rear waistband.  Because, once

23  again, that would be a concern for officers.

24            So if I want you to turn around and face away from me,

25  I'm going to say, sir, turn around and face away from me.  That

1  way he understands he's turning away from him.  That would be

2  his back towards him at that point.

3        It may be to turn around so I can see your front and

4  rear waistband, to continue to turn around, depending on what it

5  is.

6        But you just specifically need to slow your emotions and

7  give a single command of what you want to do.  And officers are

8  taught, or should be taught, to not unnecessarily de-escalate

9  the situation by allowing your emotions to drive the entire

10  event.

11     Q    I'm sorry.  I think you may have said "unnecessarily

12  de-escalate."  What did you mean?

13     A    Unnecessarily escalate the situation.  Pardon me.

14     Q    If in the initial exchange, if Officer Fihe were to say

15  hypothetically that his intent was to have Mr. Burk drop or put

16  down the folder that was in his left hand at the start of the

17  encounter, based on standards and practices, is there a

18  reasonable command that an officer should give in a situation

19  like this to have that type of reaction?

20     A    Yes.

21     Q    And what would that be?

22     A    It would be, sir, do me a favor, and that folder that's

23  in your left hand, please place that on the ground.

24     Q    If hypothetically throughout this portion of the video,

25  if hypothetically the jury were to believe that Officer Fihe

1  does not specify to Mr. Burk to put the folder or to put the

2  papers down, if the jury believed that to be true, how would

3  that affect your opinions, if at all?

4     A    It would affect my opinions.

5     Q    How so?

6     A    Because I wouldn't want -- if I'm -- as an individual,

7  or can expect an individual, if a law enforcement officer

8  attired in plainclothes, as I have been on thousands of

9  occasions, I'm not going to do anything, if I'm interacting with

10  uniformed law enforcement, hypothetically speaking, unless they

11  tell me what they want me to do specifically.

12     I'm not going to drop anything.  I'm not going to reach

13  into my pocket.  I'm not going to reach into my waistband or

14  make any other type of furtive gesture that may create a concern

15  for that officer.

16     So it's up to the officer -- and I have, as a uniformed

17  officer, responded and interacted with plainclothes or

18  undercover agents on a number of situations.  I'm going to tell

19  them what I want them to do, with clear and convincing words

20  what I want them to do, not compounded commands, but single

21  commands, and just get them in agreement with what I want them

22  to do by properly de-escalating.

23     Q    Now, Mr. DeFoe, I think you told us at the beginning of

24  your testimony that some of the materials you reviewed included

25  Columbus Division of Police policies or directives; is that

1  correct?

2  A    Yes.

3        MR. KEYES:  Could we take the jury screen down for a

4  moment, please?

5        Still leave it up for the witness.  Thank you.

6  BY MR. KEYES:

7  Q    Mr. DeFoe, I'm showing you on your screen -- the jury

8  cannot see it yet -- a copy of what defendants have premarked as

9  Defendant's Exhibit E, and it's two pages.

10       Do you see that on your screen?

11  A    I do.

12  Q    Is this one of the materials that you reviewed for your

13  work in forming your opinions in this case?

14  A    Reviewed and referenced in my Rule 26 report.

15  Q    Okay.  Thank you.

16       This is -- just tell us for the record -- we'll get into

17  the content in a moment.  But just at the top of the first page

18  there, what is this document that we're looking at?

19  A    It basically outlines --

20  Q    I'm sorry, Mr. DeFoe.  Just for the record, just kind of

21  the title and the description of the document, and then we'll

22  get into the substance of what it does.

23  A    Yes, sir.

24       It's a Surveillance/Stake-Outs/Encountering

25  Out-of-Uniform Personnel.

1    Q    Is that Columbus Division of Police Directive 4.03?

2    A    It is.

3       MR. KEYES:  This is not a joint exhibit, but it is a

4 defense exhibit.  I would request permission to publish it to

5 the jury, please.

6       THE COURT:  Is there a particular part of it?

7       MR. KEYES:  Yes, Your Honor.

8       THE COURT:  It looks like it goes on for pages and

9 pages.

10      MR. KEYES:  This particular one is two pages, but I am

11 going to direct Mr. DeFoe's attention to Section (II)(A) on

12 page 2.

13      THE COURT:  Yes.

14      MR. KEYES:  May we publish that to the jury, please?

15      THE COURT:  Yes.

16      MR. KEYES:  Thank you, Your Honor.

17      Is it up on their screen?

18      THE COURTROOM DEPUTY CLERK:  Yes.

19      MR. KEYES:  Okay.  Thank you.

20 BY MR. KEYES:

21    Q    Mr. DeFoe, do you see Section (II)(A) of Columbus

22 Division of Police Directive 4.03 in front of you?

23    A    I do.

24    Q    And again understanding that the jury will be the trier

25 of fact and determine which facts are true or not true, how did

1  this division directive, if at all, how did it factor into the

2  opinions you formed in this case?

3  A    Hypothetically speaking, I reviewed this document. I

4  incorporated it into my Rule 26 report. Specifically as it

5  relates to (II)(A)(1), (2), and (3) in this case as to the

6  interaction. That being a sworn uniformed officer, like in this

7  case, their interactions with an individual who may be attired

8  in plainclothes with their agency or another agency, what the

9  protocols are and should be when confronting an individual who

10 may be, obviously, out of uniform and who may be a law

11 enforcement officer.

12 Q    Specifically, portion (II)(A)(2), the instruction for

13 the uniformed officer to give clear, concise, and nonconflicting

14 orders. Again, if the jury were to find to be true that Officer

15 Fihe, within six seconds of first verbally addressing Mr. Burk,

16 and when pointing his gun at him at that point, said show me

17 your hands, I need to get on the ground -- excuse me.

18     Said show me your hands, I need to see some ID, get on

19 the ground, all within three to four seconds of each other, if

20 hypothetically the jury were to find that sequence of events to

21 be true, do you have an opinion as to whether procedure

22 (II)(A)(2), give clear, concise, and nonconflicting orders,

23 whether that was followed there?

24 A    Yes.

25 Q    What is that opinion?

1    A    Hypothetically speaking, it would be inconsistent with

2    the directive, which is a policy for the Columbus Police

3    Department, as the actions depicted were not consistent with the

4    directive or the training that would have occurred.

5    Q    And on the next paragraph, Section (II)(A)(3), which

6    says:  Instruct individuals claiming to be law enforcement

7    personnel, whose identity you are not able to immediately

8    confirm, to disarm in a safe manner and then produce their

9    agency's identification.

10         Stopping at that point.

11         If hypothetically, from the evidence, the jury did not

12   believe that Officer Fihe or Officer Winchell instructed

13   Mr. Burk to disarm in a safe manner and then produce his

14   agency's identification, would you have an opinion as to whether

15   their actions complied with this portion of Directive 4.03?

16   A    I do.

17   Q    What is that?

18   A    Hypothetically speaking, it would be inconsistent with

19   the training and inconsistent with the directive.

20   Q    Now, in that same paragraph, immediately after that

21   statement about instructing the nonuniformed officer claiming to

22   be law enforcement personnel -- I'm sorry.  Strike that.

23         Immediately after that portion of the statement

24   instructing individuals claiming to be law enforcement personnel

25   to disarm in a safe manner and then produce their agency's

1   identification, it goes on to say:  If the individual refuses to

2   comply, treat the situation as any other encounter with an armed

3   individual.

4        Now, again, if the jury were to conclude that Officer

5   Fihe or Officer Winchell did not instruct Mr. Burk to disarm in

6   a safe manner and then produce his agency's identification, how

7   would them holding him at gunpoint and ordering him to the

8   ground fit within or not fit within Directive 4.03 in Section

9   (II)(A)(3) there?

10   A    Hypothetically speaking, it would be inconsistent with

11   the directive.  And what's really important is not just a

12   refusal to comply, but a reasonable opportunity to comply.

13        So if the person does not fail to comply but is also not

14   afforded the opportunity to comply, it's incumbent upon the

15   officer, as I testified to earlier, to afford that individual a

16   reasonable opportunity to produce -- for one, ask for the

17   credentials, and then afford them the opportunity to produce the

18   credentials.

19        MR. KEYES:  All right.  Can we take that down from the

20   jury's view, please?

21        Thank you.

22   BY MR. KEYES:

23   Q    Mr. DeFoe, before we publish it to the jury, I'm going

24   to ask you to take a look at what's on your screen.  It's

25   Plaintiff's Exhibit 17, Columbus Police Division Directive 2.01

1 on the use of force.

2        That particular directive, was that one of the

3 directives you reviewed as part of forming your opinions in this

4 case?

5    A   Yes.

6    Q   Were there any particular portions of the use of force

7 directive that are relevant to your opinions today?

8    A   The Level 0 through Level 3 of this specific directive.

9    Q   Before we show it to the jury, how is that portion of

10 the directive, how does that fit in or how is that relevant to

11 your opinions?

12    A   Hypothetically speaking, officers are trained with

13 command presence, verbal commands.  99 percent of all

14 calls-for-service situations are resolved by using proper verbal

15 commands, by properly de-escalating, by asking someone what you

16 want them to do, and give them a reasonable opportunity to

17 comply.

18        As it relates to the escalation of force by an officer,

19 once again it's going to be predicated on a subject's level of

20 resistance.  Do I need to use another force option because this

21 person isn't complying with what I want them to do?

22        If they're not either -- if you have not either given

23 them the opportunity to comply or they're not telling you

24 they're refusing to comply, there won't be a reason to escalate

25 the force.

1          MR. KEYES:  And I would ask for permission to publish

2     the Section (I)(B) of Plaintiff's Exhibit 17, the use-of-force

3     directive, to the jury.

4          THE COURT:  You may.

5          MR. KEYES:  Thank you.

6          Can we put that up?

7          Thank you.

8     BY MR. KEYES:

9     Q    Mr. DeFoe, looking at Section -- I can make this

10    larger -- Section (I)(B), Use of Force Levels of Control.  Is

11    that what you were referring to a moment ago?

12    A    Yes, sir.

13    Q    Okay.  All right.  And so now that we see this specific

14    directive up on the screen, what portions of this directive were

15    relevant to your opinions?

16    A    Level 0, Level 1, and Level 3.

17    Q    I'm at Section II now, Roman Numeral II, of Plaintiffs'

18    Exhibit 17, (II)(A), General.  Are there portions of this

19    section of the use-of-force directive that were relevant in

20    forming your opinions?

21    A    Yes.

22    Q    What was relevant in this portion?

23    A    Sections 1, 2, and 3 of this directive.

24    Q    How so?

25         And keep in mind as you're explaining, if you're

1　assuming facts, please clarify that those are hypotheticals for

2　the jury to ultimately decide.

3　　A　　Hypothetically speaking, even looking at the directive

4　itself, is that Columbus Police Department, Division of Police,

5　even in bold, stated you should try to de-escalate a situation

6　by using trained techniques, communication skills, which is

7　important in all interactions in law enforcement.

8　　　　In addition, it talks about there are times an officer

9　needs to use force, and it's going to be based on, obviously, a

10　subject's level of resistance, and that force has to be

11　reasonable based on the totality of the circumstances.

12　　　　As outlined in this directive, which is consistent with

13　national standards and my experience in law enforcement, is:

14　Does the subject pose an immediate threat of the safety of

15　officers or others?  Was the subject actively resisting arrest

16　at the time?  Was the person attempting to evade arrest by

17　flight?  Or better said, run away from the officers.

18　　Q　　I was going to ask, is there a more layperson's

19　understanding or layperson's idea of what evading arrest by

20　flight means?

21　　　　Is that what you just told us, running away?

22　　A　　Yes.

23　　Q　　If hypothetically the jury concluded that Agent Burk

24　remained at the apartment for the seven minutes -- or

25　approximately seven minutes that it took Officer Fihe to arrive,

1  if the jury finds that fact to be true, how would that factor

2  into whether Mr. Burk was attempting to evade arrest by flight?

3     A    Well, hypothetically speaking, he didn't try to flee

4  prior to the officer's arrival, nor did he try to run away when

5  Officer Fihe responded in this situation.

6         So, hypothetically speaking, officers are trained that

7  if you arrive, typically if someone has committed a crime, my

8  experience has been that people typically don't wait around,

9  specifically for seven minutes.

10        If they are going to wait around and maybe the police

11  come, my experience has been at times that people will flee.

12  They will run away when they see the black-and-white police car,

13  obviously attired in police uniform.  Neither of those things

14  occurred in this case.

15     Q   I'm going to direct your attention back to Joint

16  Exhibit I, the body-cam video, and I'm going to ask as to --

17  we're going to play it up through the point of -- and probably a

18  few seconds past when Officer Fihe appears to use a TASER on

19  Mr. Burk.  Okay?

20    (Video was played in open court.)

21  BY MR. KEYES:

22     Q   Mr. DeFoe, about that clip that we just saw, including

23  through when the TASER is used on Mr. Burk, one of the questions

24  that the jury will have to resolve on the facts is during that

25  exchange, the degree of resistance, if any, Mr. Burk was

1  demonstrating.

2        So I would like you to assume hypothetically, with the

3  understanding that the jury will have to determine what actually

4  happened, but assuming hypothetically that Mr. Burk explained

5  that during this sequence he was unable to get his right hand

6  behind this back because of the weight of the officers on top of

7  him, if the jury finds that fact to be true, how would that

8  factor into the reasonableness of the use of the TASER?

9        MS. ROSENBERG:  Objection, Your Honor.

10       THE COURT:  Sustained.

11  BY MR. KEYES:

12   Q    Does the use of the TASER and its reasonableness depend

13  on any facts that the jury may have to decide based on that

14  portion of the video we just saw?

15   A    Yes.

16   Q    What facts would be relevant in determining whether the

17  use of the TASER was reasonable at that point?

18   A    A subject's level of resistance.  Did it rise to the

19  level of active resistance or pre-assaultive or assaultive

20  behavior, which is a typical standard for most departments, as

21  well as for Axon, who is the manufacturer of TASER.

22       Equally -- actually, more important, is the person --

23  does the person have the opportunity to comply with what you

24  want them to do?  If they are in a position such that they can

25  not give up their right arm to effect a handcuffing technique,

1   you can't expect them to do something they are unable to do

2   based on your positioning.

3        It doesn't rise to the level where now you can now

4   incorporate or introduce another use-of-force option that may

5   not be reasonable simply because you're asking someone to do

6   something that they can't do based on your actions.

7   Q    Now, you recall from -- and we can view portions of it

8   if needed.  But rather than playing the whole thing, I'll just

9   ask, do you recall from your review of the materials in this

10  case that there's a point where the officers escort Mr. Burk to

11  the back of one of the patrol cars?

12  A    Yes.

13  Q    And did you form opinions relating to the reasonableness

14  of those actions as part of your review of the case?

15  A    Yes.

16  Q    And let's just explain to the jury -- and we can talk

17  about specific hypothetical facts if they are needed.  But let's

18  explain to the jury what principles at that point would affect

19  whether the acts of placing Mr. Burk -- excuse me, escorting

20  Mr. Burk to the back of the police car and the method that they

21  used to put him in, what principles would apply to whether those

22  acts were reasonable?

23  A    Yes.  I mean, if -- once again, there's no rush.  The

24  person, hypothetically speaking, has already been handcuffed.

25       When you transport someone, you have to ensure that, A,

1  the back area of your patrol car, the seatbelt has been

2  unattached so it allows people to sit in like we would in our

3  own cars; that you have personal items that you may have in the

4  back seat of a car, you want to make sure that's clear and not

5  in close proximity to the person.  But you want to clear out the

6  environment to allow that person to sit down so you can safely

7  apply or put a seatbelt on that subject.

8      Q    If the jury were to conclude that before transporting

9  Mr. Burk to the back of the police car, that Officer Fihe took

10  Mr. Burk's ATF credentials from his left cargo pocket and

11  reviewed them, if the jury were to conclude that, would that

12  affect your opinions about the reasonableness of the actions

13  about taking him to and putting him in the police car?

14      A    Yes.

15      Q    How so?

16      A    We don't have probable cause to arrest.  Once again, you

17  only can detain someone if there's been criminal activity and

18  you're connecting that person to that activity, and you would

19  need probable cause to arrest that person for a crime that they

20  have committed.

21          If there is no crime, then you cannot detain, including

22  handcuffing.  If there is no crime, you clearly can't put

23  someone in the back of a police car if you are going to arrest

24  them if they have not committed a crime.

25              MR. KEYES:  May I have a moment to confer with my

1  co-counsel, Your Honor?

2         THE COURT:  Yes.

3      (Plaintiffs' counsel conferring off the record.)

4         MR. KEYES:  Your Honor, I think that I'm likely done

5  with my direct examination, but I do notice that it's just

6  about 10:30.  Do we want to take our midmorning break?

7         THE COURT:  Why don't you go ahead and finish, and

8  then we'll break.

9         MR. KEYES:  All right.  Thank you, Your Honor.

10 BY MR. KEYES:

11    Q    Mr. DeFoe, looking over my notes briefly here.

12        During your testimony this morning where you have

13 testified as to opinions, I know you told us at the beginning

14 you agreed only to offer opinions if you held them to a

15 reasonable degree of certainty in your field of police practices

16 and procedures.  And have you done that?

17        Have you only expressed those opinions that you hold to

18 a reasonable degree of certainty?

19    A    I have.

20        MR. KEYES:  Thank you, Your Honor.  No further

21 questions.

22        THE COURT:  Very well.

23        Ladies and gentlemen, we're going to take our

24 midmorning recess.  We'll be in recess for 15 minutes.

25        THE COURTROOM DEPUTY CLERK:  Please rise.

1      This court will stand in recess.

2   (Jury out at 10:28 a.m.)

3   (Recess taken from 10:28 a.m. to 10:49 a.m.)

4   (Jury in at 10:49 a.m.)

5      THE COURT:  All right.  Defense counsel, who will

6   cross-examine?

7      MS. ROSENBERG:  I am, Your Honor.

8      THE COURT:  Very well.  You may proceed.

9      MS. ROSENBERG:  Thank you.

10                  - - -

11              CROSS-EXAMINATION

12  BY MS. ROSENBERG:

13   Q   Good morning, Mr. DeFoe.

14   A   Good morning.

15   Q   I don't think we have ever talked before in this case.

16  My name is Sheena Rosenberg.

17      You did not personally witness this incident on July 7,

18  2020, right?

19   A   Correct.

20   Q   You never talked to Mr. Burk, correct?

21   A   I spoke to him this morning.  Other than that, prior to

22  today, no.

23   Q   Okay.  You never talked to Officer Winchell or Officer

24  Fihe, correct?

25   A   I have not.

1    Q    Okay.  So you relied on review of the body-worn camera

2    of Officer Fihe and Officer Winchell, correct?

3    A    Amongst other documents as well.

4    Q    Yes.

5         And you would agree with me that you can't see

6    everything when you're viewing videos, right?

7    A    Correct.  Correct.  That's correct.

8    Q    You're limited to what's captured on the body-worn

9    camera, right?

10   A    Correct.  The body-worn camera are two-dimensional.

11   Q    Right.

12        So if something is blocking the view of the body-worn

13   camera, you're not going to be able to see what's happening?

14   A    Correct.

15   Q    Okay.  And you listened to the radio dispatch in this

16   case?

17   A    I did.

18   Q    And you also reviewed the CAD, as it's called?

19   A    Yes.  The transcript of the call, yes, ma'am.

20   Q    Okay.  And you also had the opportunity to look at the

21   10 Codes that Columbus Police use, correct?

22   A    I have.

23   Q    And you know this run is a 10-8, right?

24   A    Yes.

25   Q    And you know that means a possible burglary in progress,

1  right?

2      A    I do.

3      Q    And then burglary is a felony of the second degree?

4      A    It is.

5      Q    And a burglary in progress means that it's active and

6  typically could evolve into a home invasion, correct?

7      A    It could, yes.

8      Q    And officers also had information that the person could

9  possibly be in law enforcement, correct?

10      A    Correct.

11      Q    And you would think it would be appropriate for them to

12  still investigate, even though there was some information that

13  it could be someone in law enforcement, right?

14      A    Yes, ma'am.

15      Q    Okay.  You wouldn't expect the officers to discount that

16  the situation could possibly be a burglary in progress?

17      A    No.  I think it's prudent for them to investigate,

18  ma'am.

19      Q    All right.  And if there's information in this case that

20  when the officers arrived they noticed -- well, I'll stop.

21      You had the opportunity to review Officer Fihe's

22  deposition transcript?

23      A    I have.

24      Q    And for purposes of my question I want you to assume

25  that he testified truthfully.  Okay?

1    A    Ma'am, I don't make credibility determinations.

2    Q    But for purposes of my question, I want you to assume

3 that he testified accurately about what happened.

4    A    Yes, ma'am.

5    Q    And according to Officer Fihe's testimony, he indicated

6 he noticed a weapon as soon as he arrived on the scene, correct?

7    A    Yes, that's what he testified to.

8    Q    And you would agree with me that a gun is a deadly

9 weapon, correct?

10    A    Can be, yes.

11    Q    Let's talk a little bit about training.

12    You would expect -- I'm sorry.  I'm on the wrong page

13 here.

14    Federal law enforcement officers are trained to comply

15 with the orders of local law enforcement, correct?

16    A    Yes, ma'am.

17    Q    And the control and presence on the scene would be the

18 uniformed police officers, correct?

19    A    Correct.

20    Q    And the best course of action for someone who is in

21 plainclothes or out of uniform would be to not have anything in

22 their hands, right?

23    A    Preferably.

24    Q    And to be guided by what the responding officers want

25 them to do at the time, right?

1    A    Correct.

2    Q    And if they have a weapon, they should be letting those

3 responding officers know that they have a weapon?

4    A    Correct.

5    Q    Okay.  Now, you watched a little bit of the beginning of

6 the body-worn camera.  And if there's information in this case

7 that Mr. Burk's first interaction or first words he spoke to

8 officers were, "I'm a federal fucking agent," you wouldn't

9 expect an agent to be trained to respond in that manner,

10 correct?

11    A    Hypothetically speaking, no, I don't think the use of

12 profanity was appropriate in this case.

13    Q    And that wouldn't do anything to de-escalate the

14 situation, would it?

15    A    That would not de-escalate, correct.

16    Q    And you would expect a federal law enforcement officer

17 to understand that their words aren't proof of who they are,

18 right?

19    A    I agree with that, ma'am, yes.

20    Q    Okay.

21    A    Sorry to cut you off.

22    Q    You're fine.

23    In fact, agents are taught that their words don't mean

24 anything; that their identification are their credentials,

25 right?

1    A    Yes.  If interacting with law enforcement, correct.

2    Q    Okay.  And you already testified that the uniformed

3 officer is the controlling presence, right?

4    A    I agree with that, yes.

5    Q    And that the nonuniformed or the plainclothes officer

6 should be guided by what the uniformed officer wants them to do?

7    A    Correct, as long as it's reasonable.

8    Q    Now, you put a "reasonable" caveat on it.  But,

9 actually, they should be guided by what the uniformed officer

10 asked them to do in the situation when they're responding to a

11 call, correct?

12    A    Correct.

13    Q    Now, when you reviewed just that very beginning portion

14 of the body-worn camera, there was a lot more commands given

15 after those first three that you talked about during direct,

16 right?

17    A    Yes, ma'am.

18    Q    And there were, I think it was counted, nine commands

19 given to get on the ground during this interaction?

20    A    I don't recall counting them, but it sounds about right.

21    Q    Okay.  And if there's information that the person, in

22 response to a command, says, "I'm not getting on the ground," it

23 would be safe to assume that they had time to comply with that

24 command?

25    A    I don't understand your question.

1    Q    So if an officer says, "Get on the ground," and the

2    person's response is, "I'm not getting on the ground," they had

3    time to comply with that command, right?

4    A    I agree with that hypothetical.

5    Q    Okay.  Now, if an officer believes that a possible

6    suspect has a weapon, it would be reasonable for the officer to

7    secure and detain the person and search them, correct?

8    A    Can you -- I don't understand your question.

9    Q    So if the officer is responding to a scene, right, and

10   they suspect that the person has a weapon on them, it would be

11   proper for the officer to secure the scene and secure the weapon

12   and search the person if necessary?

13   A    If there's connection to criminal activity and they

14   can -- and there's reasonable suspicion to detain, correct.

15   Q    Okay.  So in a situation where someone is responding to

16   a possible burglary in progress, which we already established is

17   a felony of the second degree, and the person has a weapon, in

18   that situation it would be proper to secure that weapon and

19   secure that person before you investigate, right?

20   A    Sorry to cut you off again, ma'am.

21        A reasonable officer, based on the totality of the

22   circumstances, if he or she observed a burglary in process and

23   reasonably believed that the burglar was armed with a firearm,

24   yes, I think it would be reasonable to detain that person for

25   burglary and then subsequently search that person if you

1  reasonably believe that they are armed with a firearm.

2  Q    Okay.  So if you respond to a run for a burglary in

3  progress and they give a description of the person, and when you

4  respond to the scene the person matches that description of the

5  possible burglar, it would be reasonable to -- and that person

6  has a weapon, it would be reasonable to detain that person and

7  secure that weapon, right?

8  A    If there's reasonable suspicion to detain that person,

9  not specific to the facts in this case, but based on the --

10  based on your hypothetical, correct.

11  Q    Well, there's facts in this case that there's a 10-8

12  burglary in progress, right?

13  A    Correct.  But as I testified to earlier, Counsel, is

14  that my experience of almost three decades of working in law

15  enforcement, I have never once come across a burglar who waited

16  for law enforcement to respond.

17        It's been my experience -- then there are other factors,

18  such as the person has identified themself, hypothetically

19  speaking, as a law enforcement officer, provided a badge number,

20  provided -- and the description of that individual at scene is

21  identical to what the CAD or the computer printout for the

22  dispatch is, yes.

23        But based on, hypothetically speaking, unrelated to this

24  case, if there is a burglar at scene and you reasonably believe

25  that person is a burglar, I think there would be reasonable

1  suspicion to detain.  And if they were armed, obviously to

2  secure whatever weapon they may have on their person.

3    Q    Now, we talked earlier, and you said that words alone

4  would not identify someone as a law enforcement officer, right?

5    A    Correct.  That's why it's incumbent upon officers to

6  say, "Just let me see your credentials," and then afford that

7  individual the opportunity to produce those credentials.

8  Especially if they're readily available, such as possibly in the

9  left pocket of their pants.

10   Q    I understand that, but I -- my question was, words alone

11 aren't going to establish that.  And in the run, we only have

12 words alone that it could possibly be someone with ATF, right?

13   A    Correct.  That's why we have a conversation, which

14 happens with every call for service, is we de-escalate as

15 according to -- specific to Columbus policies, the first thing

16 we should do is use words and actions to influence behavior.

17 That would be de-escalate.

18       You would simply ask that person:  Are you a law

19 enforcement officer?  Yes.  Please show me your credentials.

20 Where are they at?  Yes.  And have that person produce the

21 credentials.

22       If the person did something contrary to that, then I

23 would treat that person in the manner in which they responded

24 differently to.  If their level of resistance was increased,

25 then I would respond accordingly.

1    Q    But we can't discount the fact that there's also

2    possibly a burglary in progress, until you can confirm whether

3    or not the person is actually in law enforcement, right?

4    A    Once again, ma'am, it's -- there are many calls for

5    service that law enforcement respond to that are not real, that

6    are bogus, that generate the call for service that aren't, in

7    fact, true.

8         So you're looking at the totality of the circumstances

9    when you arrive.  The fact that it was generated as a burglary

10   in progress, when you get there and the person who is described

11   by the person reporting is still there and they have identified

12   themselves as a law enforcement officer and they look like a law

13   enforcement officer, which is based on the totality of the

14   circumstances, and they are dressed like a law enforcement

15   officer, those are called "clues" in law enforcement.

16        So we would go ahead and then respond to those clues

17   based on what you observe at the time and then based on what

18   that subject's level of resistance is.

19   Q    I want to talk a little bit about you saying someone is

20   dressed like a law enforcement officer.

21        Now, in this case if we have information that the person

22   is wearing a black Nike polo with no law enforcement insignia on

23   that, that's not someone who is dressed like someone in law

24   enforcement, right?

25   A    Simply a black Nike polo, correct, that would not be.

1     Q     If we have information that a person is wearing cargo

2  pants, that is not specific to anyone in law enforcement.  You

3  don't have to have cargo pants that you're automatically in law

4  enforcement, every single person, right?

5     A     Correct.  People in -- non-law enforcement people wear

6  cargo pants.

7     Q     So when you're responding to a scene of a possible

8  burglary in progress and you respond and the person is wearing a

9  black Nike polo and cargo pants, you haven't gotten any

10  information, other than words, that a person could possibly be

11  in law enforcement, right?

12     A     Well, if we're talking specifically about this case.

13  But, hypothetically speaking, if the person is holding an

14  investigative folder; if they're wearing boots such as in this

15  case, maybe, Danner they're called, D-a-n-n-e-r, which is a

16  typical law enforcement boot that many of us have worn; and

17  they're wearing a lanyard around their neck, those are all, once

18  again, called clues.

19          Typically burglars aren't wearing lanyards around their

20  neck, has been my experience.  They're typically not carrying

21  investigative folders, has been my experience.  They're

22  typically not attired in law enforcement attire that someone

23  would typically see in an agent or someone working in a

24  plainclothes capacity.

25     Q     Now, we already talked about what the person is wearing,

1  right?

2          Anybody can wear a black Nike polo, right?

3      A    Correct, anybody can.

4      Q    And you said people don't have a lanyard around their

5   neck if they're a burglar.  There's nothing special about having

6   a lanyard around your neck, right?

7          College students, anybody -- I have a lanyard.  Anybody

8   can wear a lanyard around their neck, right?

9      A    Correct.

10         So if I came to a call for service and you were dressed

11  the way you were with a lanyard around your neck, more likely

12  than not I would not perceive you to be a burglar.  But then I

13  would ask questions to you, ask for an ID, have you produce your

14  credentials if you belong in that specific area.  If you didn't,

15  then I would elevate my response.

16     Q    So in your experience people look like burglars?  They

17  have to look a certain way to look like a burglar?

18     A    No.  Burglars come in all shapes, sizes, colors, ages,

19  yes.

20     Q    Okay.  And information in this case -- if there is

21  information in this case that the lanyard is actually underneath

22  the shirt, that's not going to be helpful to officers responding

23  on the scene.  They can't see what's underneath someone's shirt,

24  right?

25     A    Typically, my experience, working both as an agent and

1    as a law enforcement officer, is that if you're wearing a

2    lanyard and it's secreted, you can, once again, simply provoke a

3    question as to what is that -- are those your credentials around

4    your neck?  No, that's my parking pass to get in and out my

5    government building.  My credentials are actually in my left

6    front pants pocket.  Would you like to see them?  Then I would

7    have that person produce those.

8        Q    But my question was, when you respond to a scene and you

9    see someone that has a -- well, you don't see the lanyard

10   because it's underneath their shirt, you're not going to have

11   any information that's going to identify them as law enforcement

12   based off of that, right?

13       A    Well, if you don't see the lanyard, then obviously you

14   wouldn't make that assessment.

15       Q    Right.  So it's going to require additional

16   investigation before you can get information about who the

17   person actually is, right?

18       A    Just dialogue.

19       Q    Right.

20       A    Correct.

21       Q    Okay.  You were asked earlier about the Columbus

22   Division of Police use-of-force policy in effect at the time of

23   this incident, right?

24       A    Correct.

25       Q    And you reviewed it, yes?

1    A    I have.

2    Q    The policy doesn't actually have anything in it about
3  when you can and cannot point a weapon, right?

4    A    No, typically tactics are left to the discretion of the
5  officer.

6    Q    Right.  But you testified earlier that it was on the
7  use-of-force continuum where you can -- whether or not you can
8  or cannot point a weapon at someone.  That's not true, correct?

9    A    In their prior use-of-force policy, preceding the one
10  that was current, my understanding was that pointing of a
11  firearm was a Level 0.

12        Typically the training -- once again, tactics are
13  different than policy.  The training associated with the use of
14  a firearm is that you shouldn't withdraw, point your firearm
15  unless, A, there's an imminent threat of great bodily injury or
16  death because it limits what your other actions are.

17        It unnecessarily potentially escalates the situation.
18  And if I need to use a less-than-lethal force option, like if I
19  need to transition to a TASER, a baton, pepper spray, if I have
20  my gun out, I can't do any of that.

21    Q    I don't mean to cut you off, Mr. DeFoe, but that really
22  wasn't really my question.

23        I asked you if the policy in place at the time of this
24  incident, it does not have anything in it that says when you can
25  and cannot point a gun, correct?

1    A    Correct.  That's the discretion of the officer based on

2  the totality of the circumstances.

3    Q    Thank you.

4        There's certainly not anything in the use-of-force

5  policy that says you can only point a weapon at someone if there

6  is a substantial risk of deadly threat?

7    A    Their policy does not articulate that, correct.

8    Q    Okay.  Now, in reviewing Officer Fihe's body-worn

9  camera, there's information in this case that Officer Fihe

10  explained the reason why he was there, then you would expect

11  Mr. Burk to understand that they were investigating a possible

12  burglary in progress, right?

13    A    If he articulated that to Mr. Burk, then Mr. Burk

14  should -- I think a reasonable officer, hypothetically speaking,

15  would understand that that's the reason for the response,

16  correct.

17    Q    And if there's information in this case that Officer

18  Fihe explains that he wants Mr. Burk to get on the ground so he

19  can verify his identity, then as the controlling presence, you

20  would expect the nonuniformed officer to comply with the order

21  to get on the ground, correct?

22    A    Yes, I would.

23    Q    Now, prior to any handcuffing in this -- from your

24  review of the body-worn camera, the officers don't have their

25  guns when they're going hands-on with Mr. Burk, correct?

1     A    Officer Winchell had the weapon trained, or pointed, at

2 Mr. Burk until he initiated the handcuffing process.  Then he

3 handcuffed his weapon -- then he holstered his weapon.  Pardon

4 me.

5     Q    My question was, when they went hands-on, they didn't

6 actually have their weapons out anymore, right?

7     A    Oh, correct.  That's correct.

8     Q    All right.  You talked a little bit about resistance and

9 how you -- an officer is trained to respond to resistance

10 earlier, right?

11     A    I did.

12     Q    And an officer is not expected to understand the reasons

13 why someone is resisting arrest, right?

14     A    Unless they articulate as to the reason why, like, "I

15 can't move my arm" or "I can't free up my arm so you can effect

16 the handcuffing," if they articulate that to you, or "I can't

17 breathe" or "I'm having a medical condition," then you

18 understand what that level of resistance may be if they let you

19 know.

20     Q    Someone's motivation or reasons behind it is not

21 something that an officer needs to figure out at the time,

22 right?

23     A    Motivations, correct, the officer can figure that out

24 afterwards.

25     Q    Okay.  And an officer needs to use the force that's

1    reasonable under the totality of the circumstances to effect the

2    arrest or prevent the escape or overcome the resistance, right?

3        A    Objectively reasonable, correct.

4        Q    Okay.  Without any consideration for the person's

5    underlying motives for what they're doing?

6        A    Correct.

7        Q    Okay.  From your review of the use-of-force policy, a

8    TASER can be used -- is a way to secure someone in handcuffs if

9    they're resisting.  It's a possible tool that you can use.

10        A    It can be used both in drive-stun and probe mode,

11   correct, to effect a handcuffing technique.

12        Q    And in this case you had the opportunity to review the

13   TASER records?

14        A    The download from TASER International, Axon, yes.

15        Q    You know that one TASER deployment was successful in

16   this case?

17        A    When you say successful, that only really applies to

18   probe mode if you're looking to achieve neuromuscular

19   incapacitation.  This particular device was used in drive-stun

20   mode.  So it's an application overriding the sensory motor

21   nervous system by pressing the TASER, in this case, to the back

22   of Mr. Burk.

23        Q    I guess when I say "successful," I mean that it was

24   successful in assisting in the handcuffing process.

25        A    I didn't review it that way, ma'am.  I have a different

1  depiction.

2      It became successful when Officer Winchell no longer had

3  pressure on the arm, in the area of the arm, which freed his arm

4  up to be able to be handcuffed.

5      Q    I guess I'll put it this way:  After one use of TASER,

6  Mr. Burk was successfully handcuffed in this case, correct?

7      A    After the deployment of the TASER, he was handcuffed,

8  correct.

9      Q    Okay.  And you talked a little bit about the seatbelt in

10  the cruiser in this case.

11      A    I did.  I was asked questions about that, ma'am.

12      Q    And you didn't go out and look at any Columbus Police

13  cruisers and see how the seatbelt works or anything like that?

14      A    I have been in hundreds of police cars.  They work

15  pretty identical.  I could rest assured, based on the body-worn

16  camera, the position of where the seatbelt was is pretty

17  consistent with most police cars that I have driven over an

18  almost 30-year career.

19      Q    My question was, you didn't go out and look at any

20  Columbus Police cruisers to see how the seatbelt works?

21      A    I didn't think that was necessary, ma'am.  I would have

22  asked counsel if I could do that.

23      Q    So the answer is no?

24      A    That's correct.

25      Q    Okay.  Thank you.

1    MS. ROSENBERG:  If I could have just a moment, Your

2  Honor?

3    THE COURT:  Yes, indeed.

4  (Defense counsel conferring off the record.)

5  BY MS. ROSENBERG:

6    Q    Okay.  You talked a little bit about active resistance

7  earlier on direct.  And you would agree with me that if a person

8  intentionally pulls their arm away during handcuffing, that

9  would be considered resisting?

10    A    Hypothetically speaking, if someone pulls their arm away

11  during handcuffing, correct, that would be active resistance.

12    Q    Okay.  I don't have anything further for you.  Thank you

13  very much.

14    A    Thank you.

15    THE COURT:  Thank you, Ms. Rosenberg.

16    Just a few minutes ago, Mr. DeFoe, you were talking

17  about TASERs, and this might be a good time to learn something

18  about TASERs.

19    I noticed in one of the documents that there was

20  something called sparking a TASER.  And then, Mr. DeFoe, I just

21  heard you say something about the use of a TASER in dry mode.

22    THE WITNESS:  It's drive-stun mode, Your Honor.

23    THE COURT:  So are there different levels of the

24  tasing activity?

25    THE WITNESS:  There are.  Can I explain?

1          THE COURT:  Yes, please.

2          THE WITNESS:  A sparking of a TASER is just basically

3     if I'm trying to get your compliance, maybe you're not

4     listening to me, and I will warn you, "I'm going to tase you,"

5     and you may spark the TASER.  It's kind of like in K-9, we

6     would have a dog bark.

7          THE COURT:  You can hear it.

8          THE WITNESS:  You can hear it.  It's kind of a

9     behavioral --

10         THE COURT:  Not feeling.

11         THE WITNESS:  Not feeling it.  You're just hearing it,

12    and you're like, okay.  Maybe that would be a behavioral

13    modification tool.

14         THE COURT:  That would be the least intrusive.

15         THE WITNESS:  Right.  There's no deployment.  That's

16    not a use of force.

17         In this case it was a TASER X26, and that particular

18    TASER is cartridges, a single cartridge.  You can take the

19    cartridge out.

20         Like, for instance, if I want to fire a TASER at

21    counsel because he's committed a crime and he's running away,

22    optimal range of the TASER is 7 to 15 feet.  There's two probes

23    that are coming out at about 270 feet per second.  As long as

24    we have about a 4-inch spread, you will achieve neuromuscular

25    incapacitation.  That means you will see where the body will

1    lock up, the person will fall to the ground, and then you can

2    handcuff that person.  That's one mode.

3           In this particular case, because of distance, the use

4    of a TASER in probe mode would definitely not have been

5    reasonable.  And I'm not purporting that the use of the TASER

6    was reasonable, so --

7           THE COURT:  My question just is there are apparently

8    different levels of the use of it.  And which one was used

9    here?

10          THE WITNESS:  Drive stun, Your Honor.  That's when

11   they took the cartridge out.

12          THE COURT:  What does it do?

13          THE WITNESS:  You've taken the cartridge out.  Just

14   basically pain compliance, where I'm pressing the TASER on the

15   body part that I want you to think about.  For instance, if I

16   can't handcuff you, I may tase you on your leg.  You'll think

17   about the pain associated with the TASER in your leg, and it

18   may --

19          THE COURT:  You can feel something?

20          THE WITNESS:  Pardon me?

21          THE COURT:  You can feel something?

22          THE WITNESS:  You can definitely feel something, but

23   it's local to that --

24          THE COURT:  So it's not like -- it's not going to

25   incapacitate you?

1          THE WITNESS:  Not like it will --

2          THE COURT:  Like your knees or something like that?

3          THE WITNESS:  Correct.

4          The probe mode would be the only manner which would

5   incapacitate a subject.

6          THE COURT:  That wasn't done here?

7          THE WITNESS:  It was not.

8          THE COURT:  All right.  That's helpful.  Thank you.

9          THE WITNESS:  You're welcome.

10          THE COURT:  Now, redirect examination?

11          MR. KEYES:  Thank you, Your Honor.

12                                - - -

13                      REDIRECT EXAMINATION

14   BY MR. KEYES:

15   Q    Mr. DeFoe, I'm going to start with the example of you

16   tasing me because I'm running away, which I can say I've never

17   had happen -- be used as an example that way in my career.

18          When you were talking about that action in response to

19   the Judge's questions there, that was, you said, the probe mode,

20   I think?

21   A    It's probe or dart mode.  They're synonymous.

22   Q    Okay.  So that's -- if we can clarify, that's not what

23   was happening here, correct?

24   A    No.  The cartridge was taken out, and it was just used

25   basically as a pain-compliance tool.

1    Q    And in your training and experience, are there certain

2    parts of the body where use of a TASER in drive-stun mode as a

3    pain-compliance tool, are there best practices for where an

4    officer might use a TASER in that mode to obtain compliance with

5    a certain action?

6    A    As long as it's not used genitals, face, neck, typically

7    spine is of an issue at times as well; but typically genitals,

8    face, neck, anywhere above the neck.

9    Q    Okay.  Now, you were asked a couple of things on

10   cross-examination that I would like to explore for a few minutes

11   here.

12        When you were questioned about the use of profanity and

13   whether you believed it was appropriate or not.  How, if at all,

14   would that factor into an analysis in your mind of the standards

15   or practices regarding the use of force or detention?

16   A    Unfortunately, there's profanity directed at law

17   enforcement a lot of times during the course of a career.

18        Once again, the force, reason to detain, reason to

19   arrest, has to be based on what the subject is doing at the

20   time.  Mere profanity in itself does not necessitate the use of

21   force, unless there's threatening words associated with that

22   profanity.

23   Q    Now, when you had ongoing experience as a law

24   enforcement officer yourself, did you ever experience times

25   where law enforcement officers might have used profanity to each

1  other?

2      A     Yes.

3      Q     Anything inherently -- anything inherent about the fact

4  that a law enforcement officer might use profanity at another

5  law enforcement officer, anything inherent about that fact that

6  would have changed any of your opinions that you offered on

7  direct examination?

8      A     Just that it's more of an -- unfortunately, more of kind

9  of a fraternal type thing where law enforcement officers at

10 times will talk to each other and may interlace profanity in the

11 course of the conversation, either kiddingly, or even at times

12 if you're upset.

13         So it might be more of a -- I wouldn't say a, you know,

14 words of affirmation or anything, but more so just -- it's not

15 uncommon for law enforcement officers, either kiddingly or at

16 times even if they're angry, to cuss at one another.

17     Q     As far as considering the totality of the circumstances,

18 if hypothetically a subject, whether a law enforcement officer

19 or not, uses profanity at another law enforcement officer or at

20 the law enforcement officer controlling the scene, is that fact

21 alone, does that -- is that the end all be all of the totality

22 of the circumstances determination?

23     A     Not the end all be all, correct.

24     Q     You were asked about whether uniformed officers should

25 guide -- or the commands of uniformed officers should guide the

1 actions of a subject who they're responding to, and there were

2 some questions about the caveat of reasonable commands versus

3 commands more generally.

4 　　　　And I wanted to ask, when you were talking about

5 reasonableness at that point on cross-examination, what exactly

6 were you referring to?  I'm not sure we got a full answer.

7 A    It's basically just what they're asking, what a

8 reasonable officer would ask that person to do.

9 　　　　Like, for instance, if I was -- which I have -- carrying

10 a firearm, either in a plainclothes or undercover capacity, and

11 the person now wants me to do something with that firearm, take

12 that firearm out, I'm going to do none of that.  I'm going to be

13 guided by what the officer --

14 　　　　MS. ROSENBERG:  Objection.

15 　　　　THE COURT:  All right.  I think we're getting off

16 track.  We'll stop right there.

17 　　　　MR. KEYES:  Thank you, Your Honor.

18 BY MR. KEYES:

19 Q    In terms of the related but different question, does

20 the -- when you were referring to the reasonableness of

21 commands, does that incorporate the reasonable time to comply --

22 　　　　THE COURT:  Mr. Keyes, we're not going to get into the

23 issue of reasonableness of commands.

24 　　　　MR. KEYES:  Your Honor, I'm sorry.

25 　　　　THE COURT:  So let's stop right there.

1      MR. KEYES:  Yes, Your Honor.  And I was trying to ask

2  about a -- I'll rephrase the question, Your Honor, because my

3  question is not about the command itself and whether it's

4  reasonable or not to give a command.

5      THE COURT:  These officers had command authority.

6  I've told the jury that.

7      MR. KEYES:  Yes, Your Honor.

8      THE COURT:  And Mr. Burk was supposed to follow their

9  commands if the circumstances permitted him to do so.  If he

10  couldn't because of some obstruction or something like that,

11  then that's obviously a factor to be taken into consideration.

12      MR. KEYES:  Yes, Your Honor.

13      THE COURT:  But the reasonableness of the command is

14  not.

15      MR. KEYES:  Your Honor, that was exactly where my

16  follow-up question was going.

17      THE COURT:  All right.

18      MR. KEYES:  Thank you, Your Honor.

19  BY MR. KEYES:

20  Q    What I was going to ask, Mr. DeFoe, was about in terms

21  of ability to comply with commands, is the factor you talked

22  about on direct examination, giving time to comply, is that a

23  factor in the overall reasonableness under the totality of the

24  circumstances?

25  A    Time and ability to comply.

1      Q      Thank you.

2             You were asked some questions about the Columbus

3   Division of Police use-of-force directive as to the content or

4   whether it defined pointing a firearm as a use of force or not,

5   or whether it allowed or gave specific direction about the

6   pointing of a firearm.

7             When it comes to considering the totality of the

8   circumstances in the reasonableness of a use of force, is a

9   particular department policy controlling by itself?

10     A      I don't understand your question.

11     Q      Sure.  I'll rephrase it.

12            When we're talking about an analysis of reasonableness

13  of force under the totality of the circumstances, can a

14  department policy or directive, can that take precedence over,

15  for example, doctrines from the courts or something that a court

16  might instruct a jury on?

17            MS. ROSENBERG:  Objection, Your Honor.

18            THE COURT:  Sustained.

19  BY MR. KEYES:

20     Q      What role does a police department's policy have in

21  assessing the totality of the circumstances when it comes to the

22  reasonableness of a use of force?  What role does a policy have?

23     A      Ultimately the type of force used and was it reasonable

24  based on the totality of the circumstances.

25     Q      My question is, does the policy itself, is that

1   controlling, is that the be all end all, when it comes to

2   assessing the reasonableness of force?

3       A    No.  It's based on the totality of the circumstances,

4   the subject's level of resistance, and the information that the

5   officer knows at the time.

6       Q    So hypothetically if there were an instruction that

7   drawing a gun may constitute excessive force against a person

8   when that person is not fleeing or posing a safety risk, if that

9   language does not appear in the Columbus Division of Police

10  use-of-force directive but that language appears in case law,

11  for example --

12              MS. ROSENBERG:  Objection.

13              THE COURT:  All right.  Sustained.

14              I think if you rephrase the question, that would be

15   better.

16              MR. KEYES:  Yes, Your Honor.  I can do that, Your

17   Honor.

18              Thank you.

19  BY MR. KEYES:

20      Q    You have --

21              THE COURT:  I think Mr. DeFoe has answered the

22   question.

23              MR. KEYES:  I was thinking about how to rephrase it,

24   and then I realized you're probably right, Judge.  I think the

25   point has been established.

1          THE COURT:  All right.

2  BY MR. KEYES:

3    Q    Mr. DeFoe, you were asked about the 10-8 that was

4  communicated --

5          THE COURT:  In fact, his answer is the same

6   instruction I will be giving the jury as to what is

7   reasonable -- the amount of force used must be reasonable under

8   the circumstances.

9          MR. KEYES:  Yes, Your Honor, and I appreciate that.

10 BY MR. KEYES:

11   Q    I think what I was -- what we were trying to confirm was

12  the fact that language appears or doesn't appear in the division

13  policy.  And I think you told us this already, but that's not

14  the be all end all of the determination, correct?

15   A    Correct.

16   Q    You were asked on the -- on cross-examination about the

17  10-8 that was communicated -- or the possible 10-8 that was

18  communicated to the officers responding to the house.

19          And I think you have clarified this, but just to

20  reiterate what --

21          THE COURT:  Now, you used the term "10-8."

22          MR. KEYES:  Yes.

23          THE COURT:  And I don't think the jury knows what that

24   means, but they have heard about it.  And it means burglary in

25   process, doesn't it?

1  BY MR. KEYES:

2      Q      Is that your understanding, Mr. DeFoe?

3      A      Yes, sir.

4      Q      And so if it's communicated over the radio to Officer

5  Fihe and Officer Winchell, if the jury hears evidence and

6  determines that what was communicated over the radio to them is

7  possible 10-8, that would be possible burglary in progress,

8  correct?

9      A      Correct.

10      Q      Now, aside from having that information, when

11  considering the totality of the circumstances, as a principle,

12  setting aside facts of this case, but as a principle, does the

13  officer have to account for additional information or changed

14  information that they learn over the course of responding to a

15  situation?

16      A      Should consider all of it.

17      Q      Thank you.

18          When the City Attorney's Office asked you about

19  Mr. Burk's clothing on the day in question, do you remember

20  that?

21          Near the beginning of your cross-examination, you were

22  asked some questions about clothing and whether it was --

23  whether -- I think the question was whether it looked like law

24  enforcement clothing; is that correct?

25      A      Correct.

1    Q    What was your understanding or your general -- assuming,

2    again, that what the jury concludes is that Mr. Burk was wearing

3    a gray collared polo shirt and tan tactical cargo pants, or what

4    we have called 5.11 pants, with work-appropriate boots, that

5    description of clothing, if that's what the jury believes to be

6    true that Mr. Burk was wearing, would you have an opinion as to

7    whether that looks like something a law enforcement officer

8    would wear?

9    A    Yes.

10    Q    What is that opinion?

11    A    It looks like something a law enforcement officer would

12    wear.

13         MR. KEYES:  May I display for the witness but not the

14    jury yet, please?

15    BY MR. KEYES:

16    Q    Mr. DeFoe?

17         THE COURT:  We don't have anything on our --

18         MR. KEYES:  All right.  Did that work?

19         THE COURTROOM DEPUTY CLERK:  Yes.

20         MR. KEYES:  I think I had to jostle the cord.

21         MS. ROSENBERG:  I'm going to object.

22         THE COURT:  Just one moment.

23         Ms. Rosenberg, did you have an objection?

24         MS. ROSENBERG:  I was going to object to the use of

25    this exhibit.

1          THE COURT:  I'm sorry?

2          MS. ROSENBERG:  I was going to object to the use of

3   this exhibit here.

4          THE COURT:  All right.

5          MR. KEYES:  May we approach, Your Honor?  Can we

6   discuss at sidebar, please?

7          THE COURT:  Okay.  Step forward.

8       (The following proceeding was held at sidebar.)

9          THE COURT:  I didn't hear your comment.

10         MS. ROSENBERG:  I said I was going to object to the

11  use of the exhibit.  It's the deposition by written questions

12  to ATF.

13         THE COURT:  Oh, okay.  What is it?

14         MR. KEYES:  Your Honor, it's Defendant's Exhibit X,

15  the deposition by written questions of ATF.

16         THE COURT:  Okay.  What part are you going to refer

17  to?

18         MR. KEYES:  I'm going to refer to Question No. 39,

19  Your Honor, because defense counsel on cross-examination raised

20  an insinuation that Mr. Burk was not dressed like a law

21  enforcement official, and so the question and answer at

22  Question 39 --

23         THE COURT:  Well, this just didn't come up at any time

24  during either of the cross-examination, and I think he has said

25  what it was that he was wearing that might have been

1    interpreted as things normally worn by an undercover police

2    officer.

3              MR. KEYES:  Your Honor, if I may.  The questioning on

4    cross-examination was directly on point because there was

5    questioning directed to whether a polo shirt would be law

6    enforcement official attire, whether cargo pants would be law

7    enforcement officer attire.  And the questions and the answers

8    were that, yes, taken alone, those may not be because anybody

9    could wear a polo shirt, anybody could wear cargo pants.

10             And, Your Honor --

11             THE COURT:  Okay.  This document, this is an answer

12   to --

13             MR. KEYES:  It's Defendant's Exhibit X.  They are

14   offering it, Your Honor, and it's the --

15             THE COURT:  I'm sorry.  Just one moment.  It looks to

16   me like it's pure hearsay.

17             MR. KEYES:  Well, Your Honor, it's not hearsay because

18   it's a written deposition, which under the rules --

19             THE COURT:  It's not the deposition of either of these

20   officers.

21             MR. KEYES:  Your Honor, it's the deposition of --

22             THE COURT:  No, I'm going to sustain the objection.

23             MR. KEYES:  Just for my record, Your Honor, the

24   deposition that is referred to is evidence that Mr. DeFoe also

25   considered in his opinions, and so we think it's appropriate

1   for that, but we understand your ruling.

2            Thank you.

3            THE COURT:  Very well.

4       (The following proceedings were had in open court.)

5   BY MR. KEYES:

6   Q    Mr. DeFoe, if hypothetically the jury concluded that

7   Mr. Burk was wearing a gray polo shirt, tan tactical 5.11 cargo

8   pants, and boots, would you agree that if that were the

9   hypothetical outfit that the jury believed Mr. Burk was wearing,

10  that he looked like a cop?

11  A    Yes.

12           MR. KEYES:  No further questions, Your Honor.

13           THE COURT:  All right.  Ms. Rosenberg, any further

14  cross-examination?

15           MS. ROSENBERG:  Very short, Your Honor.

16           THE COURT:  Very well.

17                           - - -

18                   RECROSS-EXAMINATION

19  BY MS. ROSENBERG:

20  Q    Mr. DeFoe, in your review of the CPD policies at issue

21  in this case, you didn't take any issue with how they were

22  formulated or how they were disseminated to officers, right?

23  A    Correct.

24           MS. ROSENBERG:  Okay.

25           THE COURT:  Does that conclude your recross?

1      MS. ROSENBERG:  Yes, Your Honor.

2      THE COURT:  Very well.  Thank you very much.

3      And, Mr. DeFoe, that concludes your testimony, sir.

4  Thank you very much.

5      THE WITNESS:  Thank you, Your Honor.  Appreciate that.

6  Thank you.

7      THE COURT:  You may step down.

8      All right.  You may call your next witness, Mr. Keyes.

9      MR. KEYES:  Thank you, Your Honor.

10      Mr. DeFoe is our last planned witness, and so there's

11  some proceedings that we need to do that might be best to do

12  outside the presence of the jury.

13      THE COURT:  Yes.

14      MR. KEYES:  Thank you.

15      THE COURT:  So, ladies and gentlemen of the jury,

16  Mr. Keyes has just indicated that the plaintiffs have rested

17  their case.  At the end of the plaintiffs' case, then the Court

18  is called upon to make some legal rulings.

19      So we're going to send you folks to lunch early while

20  we work on that, and we will ask that -- we would ask you to

21  come back at 1:00, and we will be ready to proceed then, but

22  for now we're going to excuse you.

23    (Jury out at 11:40 a.m.)

24      THE COURT:  Counsel, please be comfortable.

25      Defense counsel, do you have any motions for the

1 Court?

2         MS. PICKERILL:  Yes, Your Honor.

3         MR. KEYES:  I'm sorry, Your Honor.  Before the motion,

4 I think we need to formally move exhibits into evidence.

5         THE COURT:  Oh, yes.

6         MR. KEYES:  Thank you, Your Honor.

7         I'm sorry.  No intention to interrupt, but I think we

8 needed to complete that before we proceed.

9         THE COURT:  I think you're right.

10         MR. KEYES:  Thank you.

11         Your Honor, we would move into evidence Joint

12 Exhibit I.  That's Officer Fihe's body camera.

13         THE COURT:  Any objection?

14         MS. PICKERILL:  No objection to that, Your Honor.

15         MR. KEYES:  Joint Exhibit VIII, the CAD display event

16 printout.

17         MS. PICKERILL:  No objection to that.

18         MR. KEYES:  Joint Exhibit X -- these are all Roman

19 numerals, of course.

20         Joint Exhibit X, the photos of Mr. Burk's ATF badge

21 and credentials.

22         MS. PICKERILL:  No objection.

23         THE COURT:  All of those are admitted.

24         MR. KEYES:  Plaintiff's Exhibit 12, Mr. Burk's CV.

25         MS. PICKERILL:  Your Honor, we would object to that.

1        THE COURT:  I think it's sufficient that they heard

2   his testimony about that, so we're not going to make that an

3   exhibit.

4        Well, we'll admit it, but we're not going to send that

5   to the jury.

6        MR. KEYES:  That's fine, Your Honor, if it's in the

7   record.

8        While we're on -- well, we'll get through this first.

9        I expect the answer will be the same, but Joint

10  Exhibit 13.  These were the photographs of Mr. Burk's awards.

11  We would move those into evidence.

12       MS. PICKERILL:  That was not a joint exhibit, Your

13  Honor.

14       MR. KEYES:  I'm sorry.  I'm sorry.  You're right,

15  plaintiffs' exhibit.

16       MS. PICKERILL:  And we would object.

17       MR. KEYES:  Plaintiff's Exhibit 13, the photographs of

18  Mr. Burk's -- or the photocopies of Mr. Burk's awards.

19       THE COURT:  All right.  Those are admitted.  There's

20  no objection, is there?

21       MS. PICKERILL:  I object to that, Your Honor.

22       THE COURT:  I'm sorry?

23       MS. PICKERILL:  I would object to his awards and

24  commendations being admitted, yes.  They were not -- they were

25  not published to the jury, nor do they weigh on any of the

1  relevance of what the --

2       THE COURT:  All right.  Well, we're not going to send

3  them, then, to the jury.

4       MS. PICKERILL:  Yes, Your Honor.

5       THE COURT:  They are part of the record.

6       MR. KEYES:  Accept them in the record but not go back

7  to the jury --

8       MS. PICKERILL:  Understood, Your Honor.

9       MR. KEYES:  -- same with Plaintiffs' 12.

10      Plaintiff's Exhibit 17, that was used today with

11  Mr. DeFoe.  That's Division Directive 2.01, the use-of-force

12  directive.

13      MS. PICKERILL:  We have no objection to that.

14      THE COURT:  It's admitted.

15      MR. KEYES:  Thank you.

16      Defendants' Exhibit E, Division Directive 4.03

17  relating to, among other things, encountering out-of-uniform

18  and challenging people who claim to be out-of-uniform officers.

19      MS. PICKERILL:  Certainly no objection to that one.

20      THE COURT:  It's admitted.

21      MR. KEYES:  And this is more in the nature of a

22  proffer, Your Honor, on the issue that we just addressed at

23  sidebar.

24      We would move Defendants' Exhibit X into evidence,

25  specifically --

1      THE COURT:  Was this the one we just discussed at

2  sidebar?

3      MR. KEYES:  It's the one we just discussed, Your

4  Honor.  I think I need to put the content into the record.

5      THE COURT:  It's admitted into the record.  It will

6  not go to the jury.

7      MR. KEYES:  All right.  Thank you.

8      MS. PICKERILL:  In its entirety, Your Honor, or --

9      THE COURT:  Oh, just the part that we discussed at

10  sidebar is the relevant part.

11      MR. KEYES:  Well, so there's two issues on that, Your

12  Honor.

13      So in the parties' -- so we discussed yesterday --

14      THE COURT:  The whole document.

15      MR. KEYES:  Okay.  Thank you.  Thank you, Your Honor.

16      THE COURT:  It will be part of the record.  It won't

17  go to the jury.

18      MS. PICKERILL:  Understood.

19      MR. KEYES:  Thank you, Your Honor.

20      Specifically, for the record, the Question 39 and the

21  answer to Question 39 is what we would have used with

22  Mr. DeFoe.

23      And to proffer his testimony, he would have explained

24  that this deposition was part of the materials that he

25  considered in forming his opinions, and we would have had him

1    specifically quote the answer to Question No. 39:  During our

2    meeting -- this is ATF:  During our meeting with the Columbus

3    Police chief the day after this incident, he acknowledged how

4    SA Burk, quote, looked like a cop with how he was dressed, 5.11

5    pants and a polo shirt.

6          So that's our proffer on that, Your Honor.  Thank you.

7          THE COURT:  Very well.

8          MR. KEYES:  We would also -- that's it for exhibits.

9          THE COURT:  All right.

10         MR. KEYES:  The other issue, as far as the scope of

11   the record, I know we had -- just to resolve any ambiguity.  As

12   we have not been allowed to take live testimony from Officers

13   Fihe or Winchell during our case in chief, we would go ahead

14   and ask the Court to accept their entire deposition transcripts

15   into the record for these purposes.  I know we had submitted

16   some designations yesterday, both sides had.

17         THE COURT:  We will make them part of the record, yes,

18   indeed.

19         MR. KEYES:  Thank you, Your Honor.  Thank you.

20         So subject to the objections we have noted about the

21   inability to call them as live witnesses so that the jury can

22   assess their credibility and so forth, the plaintiff rests.

23         THE COURT:  Very well.

24         All right.  Now, defense counsel.

25         MS. PICKERILL:  Yes, Your Honor.

1    THE COURT:  Do you have any motions?

2    MS. PICKERILL:  Yes.  We would at this time make a

3  Rule 50 motion for judgment on the pleadings on both the

4  excessive force and the unlawful detention claim, as well as

5  the comparative -- or the companion state law battery claim to

6  that excessive force claim.

7    In terms of the unlawful detention, the only evidence

8  that plaintiffs have put on that the detention may have been

9  unlawful was one question that Mr. DeFoe answered, and

10 Mr. DeFoe answered that the standard for when a suspect can be

11 detained is if the officers are able to connect some crime to

12 that suspect.

13   That's not the standard for when detention is

14 allowable.  However, under that incorrect standard or under the

15 correct standard of reasonable suspicion, there's been no

16 evidence that the officers were unreasonable in their detention

17 of Mr. Burk.

18   Both witnesses who have testified today have testified

19 that Mr. Burk matched the description of the burglar who they

20 received the information from the dispatch call about.  That

21 creates reasonable suspicion on its own that Mr. Burk may have

22 been committing that burglary.

23   In addition to that, his immediate behavior upon

24 arrival to the scene, even disregarding whether or not he

25 complied with those initial commands, his initial reaction was

1    to use aggressive language and to walk out further towards the

2    officer.

3           At that point the officer saw that he had a gun, which

4    goes towards their reasonable suspicion that he was or may have

5    been committing that burglary, making the detention that they

6    enforced at that point reasonable.

7           In terms of the excessive force and battery claims,

8    Mr. Burk admitted to not complying with the officers' orders.

9    He also admitted to moving his arms on the ground while the

10   officers were trying to handcuff him.  He was unclear about

11   whether he moved his arms purposefully -- his left arm

12   specifically purposefully to set it on the ground or if he

13   moved it instinctively because Officer Fihe lost his grip.

14          Either way, Mr. DeFoe told us that it's not incumbent

15   upon the officers to consider the subjective intent or motive

16   of the suspect.  All they need to consider is whether they

17   perceive active resistance, and that active resistance is using

18   your muscles to avoid being handcuffed or otherwise detained.

19          And Mr. Burk admitted, either intentionally or

20   instinctively, that he used his muscles to pull his arm away

21   from Officer Fihe when he was handcuffing him.  He has never

22   testified that his left arm had pressure on it or that he was

23   unable to get that arm behind his back.  He has never testified

24   to any other reason as to why that arm moved away from Officer

25   Fihe, other than the fact that he either set it on the ground

1   or that it moved instinctively.

2         Based on the evidence that has been presented in

3   plaintiffs' case in chief, they have not presented evidence

4   that the officers acted unreasonably.  In fact, to the

5   contrary, their own expert witness testified that it would be

6   reasonable to use a TASER on an actively resisting subject.  He

7   agreed that the motion of pulling your arms away from being

8   handcuffed is active resistance.

9         He further testified that it would be reasonable for

10   officers to detain a suspect when they believe that they have

11   suspicion of a crime and can link that to an individual.  He

12   agreed that Mr. Burk matched the description of the alleged

13   criminal in this matter.

14         As such, we would ask for a judgment on the pleadings

15   for all of plaintiffs' claims at this time.

16         Thank you.

17         THE COURT:  Very well.

18         Mr. Keyes?

19         MR. KEYES:  Thank you.

20         I believe we're talking about, under Rule 50, a

21   directed verdict.  The judgment on the pleadings standard is

22   just whether we have stated a claim for relief.  So I think the

23   standard that we're talking about --

24         THE COURT:  As a matter of law.

25         MR. KEYES:  Correct, Your Honor, judgment as a matter

1    of law, not directed verdict.

2         I believe the standard that we're talking about is, is

3    there some evidence that the jury could conclude would

4    establish the elements of the plaintiffs' claims, would

5    establish those elements.  And the record contains more than

6    enough evidence to get this issue to the jury.

7         First -- I'll take the issues in the order that

8    defense counsel raised them -- the unlawful detention aspect of

9    the case.  They only address reasonable suspicion, and that's

10   only one part of it.

11        Reasonable suspicion is a factor, but so is the length

12   and nature of the detention.  The detention, in order to be

13   reasonable, must be only short enough to accomplish the purpose

14   that allowed the detention in the first place and must use the

15   least intrusive means in order to accomplish that purpose.

16        The evidence here is that Mr. Burk was handcuffed and

17   then even after the defendant officers pulled and reviewed his

18   ATF credentials from his left cargo pocket, he remained

19   handcuffed for approximately an hour.  That creates an issue of

20   fact for the jury to determine whether the length of detention

21   and the intrusiveness of detention, keeping him in handcuffs

22   that entire time, were reasonable.

23        This is not a claim that requires an expert -- any

24   piece of expert testimony to establish.  In fact, the case law

25   is clear that the ultimate determination cannot be stated by an

1  expert's testimony.  What an expert can do in these cases, Your

2  Honor, is can inform the jury about standards, policies,

3  procedures, best practices, that may apply.  But the ultimate

4  issue of whether a detention is unlawful has to be decided by

5  the jury.

6          So not only were we not required to have Mr. DeFoe

7  offer that specific conclusion, if he did offer that specific

8  conclusion, it would be objectionable and I would have had no

9  good argument as to why he should be allowed to tell the jury

10  ultimately the detention was unreasonable.

11          So we believe that the evidence in the record does

12  support the unlawful detention aspect of the case going to the

13  jury when the Court considers the testimony of Officers Fihe

14  and Winchell that are in the record through their deposition.

15          Some of the statements in there would include Officer

16  Winchell's testimony that once the officers had pulled and

17  reviewed Mr. Burk's credentials, it did seem to appear that

18  more likely than not he was probably a law enforcement officer.

19  That's some of the evidence that the jury will hear once

20  Officer Winchell testifies.

21          The jury will also hear, and it's part of the

22  deposition testimony, from Officer Fihe that there was no

23  probable cause at any point to --

24          THE COURT:  So, Mr. Keyes, can you direct me to

25  specific deposition testimony --

1        MR. KEYES:  Yes, Your Honor.

2        THE COURT:  -- that demonstrates your point here?

3        MR. KEYES:  In Officer Winchell's deposition, this is

4   on page 14, starting at line 3:

5        Question:  At this point when we add it up, dispatcher

6   saying there was a man at the front door claiming to be law

7   enforcement and now we have got a handcuffed individual with

8   credentials that say ATF, government ID, did it seem more

9   likely than not that the information was pointing to the

10  conclusion that he was, in fact, law enforcement?

11       Answer:  It seemed that he probably was, yes.

12       Question:  He wasn't released at that point, though,

13  correct?

14       Answer --

15       THE COURT:  Now, this is at what time in this whole

16  sequence of events?  After they got his credentials?

17       MR. KEYES:  After they have got his credentials and

18  he's handcuffed.

19       THE COURT:  All right.  What about the initial

20  restraint?

21       MR. KEYES:  The initial restraint with pointing the

22  gun at him, you mean?

23       THE COURT:  Well, yes, when this whole thing began.

24       MR. KEYES:  Yes, Your Honor.

25       So on that point, the evidence allows the claim to go

1   to the jury because when it comes to the excessive force

2   analysis, again, the jury is the decider of the totality of the

3   circumstances and whether the force is reasonable.

4           Nothing has -- no new information from the point of --

5           THE COURT:  Here we have two officers -- well, we have

6   Officer Fihe, who is proceeding to investigate a 10-8, a

7   burglary committed, possible burglary, by someone who is

8   impersonating a law enforcement officer.  He gets to the scene

9   and he starts issuing commands pursuant to his authority as the

10  uniformed officer in command and control of the scene.

11          The first thing he hears is the supposed officer using

12  profanity and then refusing to obey his commands, and then he

13  aims his weapon.  I believe that's what the evidence shows.

14          So is that restraint reasonable?

15          MR. KEYES:  Your Honor, first of all, I would disagree

16  with the characterization of the evidence because you have to

17  look at what happened before Officer Fihe pointed his gun at

18  Agent Burk because that use of force begins as soon as he has

19  the gun trained on him, and the only evidence --

20          THE COURT:  He didn't have his gun trained on him

21  initially, did he?

22          MR. KEYES:  No, he did not, and that's my point, Your

23  Honor.

24          So when he trains his gun on Mr. Burk, when Officer

25  Fihe does that, the body-cam video shows a six-second duration

1    of when Officer Fihe first tells Mr. Burk turn around and let

2    me see your hands, turn around and let me see your hands.  He

3    repeats it twice in rapid succession.  The video camera -- and

4    I believe the Court agreed in its summary judgment

5    determination, Your Honor, that the body-worn camera footage

6    would not allow a decision, as a matter of law, to take away

7    from the fact-finder as to whether Agent Burk complied with

8    that initial command or not, and that leaves the question for

9    the jury.

10           Because when Officer Fihe draws his gun -- not only

11   draws it, but then has it pointed at Mr. Burk within those six

12   seconds, it's a question for the jury as to whether that use of

13   force, the pointing of the gun, is reasonable.

14           And the jury can consider whether in that six-second

15   window, between when Officer Fihe first tells Mr. Burk turn

16   around and let me see your hands, and when he has his gun

17   pointed at him six seconds later, it's for the jury to

18   determine, based on all the evidence, whether or not Mr. Burk

19   complied with that initial command because --

20           THE COURT:  Stop right there.

21           MR. KEYES:  Yes, Your Honor.

22           THE COURT:  Ms. Pickerill, respond to that.

23           MS. PICKERILL:  Yes, Your Honor.

24           Officer Fihe's testimony in his deposition, and I

25   anticipate at trial, will be that when he arrived at the scene,

1  consistent with what we see on the video, he began giving

2  orders to Mr. Burk to show his hands and to turn around.

3  Mr. Burk did not turn around.  He put his hands out, not empty.

4  Therefore, Officer Fihe gave the same command again;

5  that if perhaps Mr. Burk didn't understand what he meant by

6  turn around, certainly when he said it again he would

7  understand that he wasn't doing it the first time and he would

8  turn around.

9  At that point Officer Fihe realized that he was not

10  complying with those commands, and at that time he realized

11  that Mr. Burk had a weapon.  He already knew from the moment he

12  got out of the car that Mr. Burk matched the description of the

13  suspected burglar.

14  That alone is enough to detain him at gunpoint and to

15  raise the firearm, but Officer Fihe waited until Mr. Burk

16  didn't comply with commands and combined that with his

17  knowledge that he matched the description of the burglar and

18  that he had a firearm on his hip and that he did not have any

19  law enforcement insignia and that he wasn't acting like a law

20  enforcement agent --

21  THE COURT:  Which command was he supposed to follow --

22  MS. PICKERILL:  Turn around --

23  THE COURT:  -- of all the three that were uttered in a

24  few seconds?

25  MS. PICKERILL:  We would argue, Your Honor, that he

1  had plenty of time to turn his body around.

2         THE COURT:  All right.

3         MR. KEYES:  Your Honor, on that point, the Court spoke

4  on this issue on summary judgment, and this is on Page ID

5  1579 -- starting on 1579 of ECF 74.

6         THE COURT:  Now we have heard the evidence.

7         All right.  I'm going to think about that a little

8  while.

9         MS. PICKERILL:  Could I adjust one thing very briefly,

10 Your Honor?

11        THE COURT:  Of course -- go ahead, ask your question.

12        MS. PICKERILL:  I just want to put on the record, Your

13 Honor, our argument that everything we have argued in this

14 Rule 50 motion also entitles the officers to qualified immunity

15 in this case.

16        That's it, Your Honor.  Thank you.

17        THE COURT:  Qualified immunity on what grounds?

18        MS. PICKERILL:  On the grounds that their actions were

19 reasonable and not contrary to any currently established rule

20 of policing at that time.

21        MR. KEYES:  Your Honor, may I respond?

22        THE COURT:  Yes.

23        MR. KEYES:  Thank you, Your Honor.

24        Defense counsel's argument is the clearest example of

25 why the jury needs to resolve this issue because the defense

1    have made arguments in this Rule 50 motion about Officer Fihe's

2    testimony.

3         Officer Fihe has not testified in court.  The jury has

4    not been able to observe him, has not been able to judge his

5    credibility, to see his mannerisms, to see how he responds to

6    questions as opposed to just the words on a page.

7         All of those things that cause courts throughout the

8    country to say we defer to the finder of fact's determination

9    of credibility because they can observe those matters.  No

10   observation of those matters has happened in this case to date.

11        And so when Officer Fihe testifies, "I perceived

12   Mr. Burk to not be complying with my commands to turn around

13   and let me see his hands," and this is the Court's words:  A

14   jury accepting plaintiffs' interpretation could reasonably find

15   that Agent Burk complied with Officer Fihe's commands within

16   mere seconds.  Thus, even if Burk's noncompliance could justify

17   Officer Fihe's use of force, the Court finds that a genuine

18   question of fact persists as to whether Burke's conduct was

19   reasonably perceived to be noncompliant.

20        And a key piece of evidence that was before the Court

21   on summary judgment was the body-cam video.  The jury has seen

22   the body-cam video.  That body-cam video presents an issue of

23   fact.  Directed verdict is not proper, especially when it would

24   be based on the proposed trial testimony of an officer whom the

25   jury has not had the ability to see testify and judge his or

1   her credibility.

2       THE COURT:  All right.  So I'm going to give all of

3   this some thought while we take our recess.

4       Any additional argument from the other side?

5       MS. PICKERILL:  Your Honor, I do believe that prior to

6   beginning defense's case in chief we are going to have to

7   address the motion that plaintiffs' counsel filed last evening.

8       MR. KEYES:  Yes, we did file a motion, Your Honor.

9       THE COURT:  Yes.  Remind me what that was about.

10      MR. KEYES:  It's to exclude the testimony of the

11  resident Sarah Al Maliki.  We can discuss that with Your Honor,

12  but I did have some additional points on the Rule 50 motion

13  before we moved on.

14      THE COURT:  Oh, yes.  Go ahead, give me your

15  additional comments on the Rule 50 motion.

16      MR. KEYES:  Thank you, Your Honor.

17      We kind of got deep into the use-of-force issues,

18  which are important.  You had asked earlier if I had specific

19  citations to deposition testimony that I thought were material

20  to some of the issues raised by the motion, and I understand

21  that the Court has said that a specific instruction for

22  unlawful arrest or a distinct cause of action for unlawful

23  arrest is not going to be presented to the jury as a

24  stand-alone claim.

25      However, when it comes to assessing the reasonableness

1  of a detention, of an investigatory stop, one of the factors is

2  going to be the length of that detention.  And if a detention

3  is so long that it would cross the line into an arrest, then

4  that detention is unlawful if it's not supported by probable

5  cause.

6        And Officer Fihe will testify, and this is at -- I

7  should have had this ready, but I was focused on the questions

8  the Court was asking.

9        He will testify that at no point during the encounter,

10  either before or after pointing his gun at Agent Burk, before

11  or after Mr. Burk was handcuffed, that at no point was there

12  probable cause to arrest him.

13        And we think that that testimony, given the length of

14  the detention, would be relevant evidence that would allow the

15  claim to go to the jury because, again, if he's detained to a

16  point where it becomes an arrest, then that detention is

17  unlawful if there's no probable cause.

18        So we think that that evidence in the record is

19  relevant to get the unlawful detention claim to the jury.

20        THE COURT:  All right.

21        MS. PICKERILL:  Just briefly, Your Honor.

22        THE COURT:  Yes.

23        MS. PICKERILL:  I apologize.

24        As we have already discussed, plaintiffs do not have

25  an unlawful arrest claim in this matter.  Furthermore, the

1  evidence on the record from Mr. Burk himself was that he was

2  detained in handcuffs in the cruiser for, at most, 14 minutes.

3  After that, he testified that he went to see the medics.  At

4  that time it was incumbent upon the medics to decide whether or

5  not to leave him handcuffed, and it has -- it was not these

6  officers' decisions.  He was no longer in their detention.

7        The evidence on the record is that these officers

8  detained him for about 14 minutes.

9        MR. KEYES:  We would disagree with that

10  characterization of the evidence, Your Honor.  It was Officer

11  Fihe who handcuffed Agent Burk and who determined that he had

12  to stay at the scene.

13        The fact that he's transported from the back of a

14  police cruiser to a different vehicle at the same scene when

15  that detention or arrest was initiated by Officers Fihe and

16  Winchell does not change the fact that they are the source of

17  the detention; and that because they had the information that

18  they did that confirmed his identity as a law enforcement

19  official, it was incumbent upon them to release him once they

20  had reasonable information.

21        So that claim does go to the jury, Your Honor.

22        THE COURT:  So do we have any evidence about who

23  decided to leave the handcuffs on while he was in the custody

24  of the medics?

25        MR. KEYES:  Your Honor, no, but there doesn't have to

1 be -- the arrest is performed by the officers who are

2 defendants here.

3     MS. PICKERILL:  There was no arrest, Your Honor.

4     MR. KEYES:  Your Honor, he was moved from the sidewalk

5 to the back of a police car.

6     THE COURT:  He was detained.

7     MS. PICKERILL:  Yes.

8     MR. KEYES:  We would submit there is an issue of fact

9 as to whether that detention became an arrest and had to be

10 supported by probable cause.

11     THE COURT:  Well, we don't have -- I don't think I

12 have enough evidence to determine whether there's any merit to

13 your argument that detention became an arrest and/or, if it

14 did, who was responsible for that.  Was it these officers or

15 the medics?

16     Anyhow.  Okay.  Any other arguments that counsel wish

17 to make on these issues?

18     MR. KEYES:  May I consult with Abby?

19     THE COURT:  Yes.

20   (Plaintiffs' counsel conferring off the record.)

21     MR. KEYES:  Not from the plaintiffs, Your Honor.

22     MS. PICKERILL:  Nor from the defense, Your Honor.

23     THE COURT:  All right.  Very well.

24     We're going to take a recess for lunch, and we're

25 going to come back and have some further discussion about this

1  in an hour, and I will then decide how we proceed with the

2  jury.

3          The testimony of Ms. Al Maliki.  So the jury has

4  already heard a lot of that in the plaintiffs' case.

5          MR. KEYES:  Your Honor, what the jury has heard is the

6  information that was communicated to the defendant officers,

7  not that -- because neither defendant officer ever spoke with

8  Ms. Al Maliki before they arrived at the scene or before they

9  detained Mr. Burk, so there has been no --

10          THE COURT:  Mr. Burk testified at great length about

11  his interactions with Ms. Al Maliki, and it seems to me that at

12  the very least her version of those events have some bearing on

13  Mr. Burk's credibility.

14          MS. PICKERILL:  We agree, Your Honor.

15          MR. KEYES:  Your Honor, the Court instructed that only

16  what was known to the officers or perceived by the officers was

17  relevant to whether their actions were reasonable or not, and

18  that --

19          THE COURT:  That's what I just said.  It may be --

20  this evidence may be relevant to Mr. Burk's credibility, his

21  believability as a witness.

22          MS. PICKERILL:  That's part of our argument, Your

23  Honor.

24          THE COURT:  Anyhow.

25          MR. KEYES:  Your Honor, I apologize.  Before we close

1    the record, I overlooked one note on the Rule 50 motion.

2           On the use of force when on the ground and

3    handcuffing, defense counsel addressed the handcuffing of the

4    left hand, did not address the tasering that occurred before

5    the handcuffing of the right hand.  And that's another use of

6    force where I think the Court acknowledged already, well, it's

7    up to the jury to decide whether Mr. Burk was prevented from

8    putting his arm back because he was resisting or because

9    Officer Winchell was putting weight on top of him.

10          Both the video and Mr. Burk's testimony would allow

11   the jury to decide that issue.  If Officer Winchell's testimony

12   is relevant, the jury has to assess its credibility.

13          So we would submit that on that aspect of the case,

14   there's sufficient evidence for the jury as well.

15          THE COURT:  All right.

16          MR. KEYES:  Thank you, Your Honor.

17          THE COURT:  Thank you, Counsel.

18          THE COURTROOM DEPUTY CLERK:  Please rise.

19          This court will stand in recess.

20      (Recess was taken at 12:09 p.m. to 1:01 p.m.)

21                          - - -

22

23

24

25

1                          WEDNESDAY AFTERNOON SESSION

2                             NOVEMBER 6, 2024

3                             - - -

4      THE COURT:  Counsel, I've given consideration to the

5 motion for judgment as a matter of law, the Rule 50 motion, and

6 I will deny that motion, and I'm going to permit -- Ms. Maliki,

7 is it?

8      MS. PICKERILL:  Al Maliki, Your Honor.  It's two

9 words.

10      THE COURT:  I'm going to permit her to testify.  We've

11 already heard all of Mr. Burk's testimony about that incident,

12 and he claims that it affected his response to the defendants'

13 orders.  And I think it's in fairness that we should hear her

14 version.  It may even be relevant to his credibility also.  So

15 it doesn't inject any new issues into the case.  So I'm going

16 to permit her to testify.

17      If there's any particular part of her testimony that's

18 believed to be inadmissible, I'm sure that Mr. Keyes will

19 object and I'll make a ruling on it.

20      MR. KEYES:  Yes, Your Honor.  Ms. Al Maliki was

21 prerecorded and there were some objections from both sides

22 during examination.

23      THE COURT:  She's going to testify by deposition?

24      MS. PICKERILL:  She testified previously on a video

25 recorded trial deposition, yes.

1    THE COURT:  Do I need to make rulings in advance?

2    MS. PICKERILL:  Both parties received a copy of the

3 objection log, and that accompanied her deposition.  Our

4 understanding was that if those objections were to be

5 preserved, they should have been presented prior to the start

6 of testimony in this case.

7    THE COURT:  Do I need to rule on those objections now?

8    MR. KEYES:  Yes, Your Honor.  There were objections

9 preserved by both sides during the deposition.  I don't think

10 there's any requirement that the parties present those before

11 evidence starts.  The timing would be when the Court is about

12 to allow the testimony.  So depending on when that testimony is

13 going to be presented, we could submit specific objections for

14 the Court's consideration at that time.

15    MS. PICKERILL:  If I may, that just makes it a little

16 bit difficult with that it being a prerecorded deposition.  In

17 past cases the practice has been to pre-submit the objections

18 with which the parties intend to maintain so that the video can

19 be redacted and none of those issues go in front of the jury.

20 We don't have time to redact that video now at this late

21 juncture.

22    THE COURT:  Let's proceed with other witnesses, then,

23 so that we can properly prepare her testimony.

24    MS. PICKERILL:  How would you like us to go about

25 that, Your Honor, with the objections?

1          THE COURT:  Well, this evening, Counsel, you can

2     decide which objections you're going to preserve and that I

3     need to rule upon, and we'll do it first thing tomorrow

4     morning.

5          MR. KEYES:  Sounds good, Your Honor.

6          MS. PICKERILL:  Okay, Your Honor.

7          THE COURT:  All right.  We're ready to call the jury

8     back.

9          MS. PICKERILL:  One other thing that I just thought

10    of.  Prior to the beginning of plaintiffs' presentation of

11    evidence, we played the body-worn camera footage of the

12    incident.  Prior to our presentation of evidence, may we be

13    permitted to play the 911 call?  That is a joint exhibit in

14    this case.

15         THE COURT:  Any objection to that?

16         MR. KEYES:  Your Honor, even separate from the issue

17    about Ms. Al Maliki's testimony in general, we do think that

18    the 911 call itself -- defense counsel is correct.  As we

19    stated in our brief yesterday, we had initially agreed that it

20    was a joint exhibit.  However, based on the Court's ruling

21    yesterday that information that was not perceived by the

22    officers is not relevant, as opposed to Ms. Al Maliki's factual

23    testimony about what she observed, which is what the Court just

24    ruled on, I think the separate recording of the 911 call,

25    because that was not communicated to the officers, it would not

1  have any bearing on credibility the same way that her testimony

2  would.

3           THE COURT:  What's in the 911 call that the

4  defendant -- that the defendants knew about?

5           MS. PICKERILL:  The 911 call provides the basis for

6  the information that ends up in the dispatch audio and in the

7  run report.  Furthermore, Your Honor --

8           THE COURT:  That's the information that's relevant.

9           MS. PICKERILL:  Your Honor, plaintiffs entered into a

10  stipulation prior to this trial proceeding that they stipulated

11  to both the authenticity and the admissibility of that 911

12  call.  To revoke it now after they have had an opportunity to

13  have their client testify about it would be prejudicial to the

14  defendants.

15           THE COURT:  Their client testified about the 911 call?

16           MS. PICKERILL:  He testified about what he heard when

17  the 911 call was being made, what he was doing while it was

18  being made, the information that he gave to Sarah while she was

19  on that 911, and additional information about what was

20  occurring at the time of that call.

21           MR. KEYES:  All of which, Your Honor, the relevant

22  information was reported to the defendant officers through

23  either the radio --

24           THE COURT:  I had forgotten, but you're right.  He did

25  testify about what he heard Ms. Al Maliki was telling the

1    dispatcher.

2            MR. KEYES:  And, Your Honor, our concern about the 911

3    call, specifically in light of the Court's ruling yesterday

4    limiting Mr. DeFoe's testimony about Mr. Burk's subjective

5    perceptions, the 911 call suffers from a similar defect.  And

6    the relevant information from the 911 call everybody agrees is

7    what was reported to the officers through the radio dispatch or

8    through the CAD.  To have them play the 911 call is actually

9    going to be prejudicial because what it will do is create a

10   perception of fear and concern, none of which is relevant to

11   the information the officers had as they were responding to the

12   run.

13           THE COURT:  But Mr. Burk has already testified about

14   it.  He listened to it.

15           MR. KEYES:  His testimony --

16           THE COURT:  The lady was talking and the dispatcher

17   was broadcasting what she was telling.  I'm going to let it in.

18           MR. KEYES:  Thank you, Your Honor.

19           MS. PICKERILL:  Your Honor, may we be permitted to

20   play -- and not the entire thing but the beginning of that call

21   prior to calling our first witness?

22           THE COURT:  Yes.

23           MS. PICKERILL:  Thank you, Your Honor.

24           THE COURT:  Yes.

25           MR. KEYES:  Okay.  All right.

1        THE COURT:  All right.  Are we ready to proceed?  It

2  sounds like we are.  Bring the jury in.

3    (Jury in at 1:08 p.m.)

4        THE COURT:  Ladies and gentlemen of the jury, as you

5  know, the plaintiffs have now rested their case and now it's

6  the defense's opportunity to present their case.

7        And, Ms. Pickerill, you may call your first witness.

8        MS. PICKERILL:  Yes, Your Honor.  Prior to calling our

9  first witness, we're going to ask to play a portion of Joint

10  Exhibit VII which is the 911 call, for the record.

11        THE COURT:  Very well, you may.

12        MS. PICKERILL:  Thank you.

13    (Audio played in open court.)

14        MS. PICKERILL:  Thank you, Your Honor.  At this time

15  the defense would call Officer Joe Fihe to the stand.

16        THE COURT:  Very well.  Officer, please step forward

17  and be sworn.

18    (Witness sworn.)

19        THE COURT:  You may proceed.

20        MS. PICKERILL:  Thank you, Your Honor.

21

22

23

24

25

- - -

JOSEPH FIHE

Called as a witness on behalf of the Defendants, being first
duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. PICKERILL:

Q.    Could you please introduce yourself?

A.    Sure.  My name is Joseph Fihe.  I work for the Columbus
Division of Police.  I'm a detective.  I work in the accident
investigation unit now.

Q.    What do you do with the accident investigation unit?

A.    We investigate fatal accidents and any serious injury
felony accidents.

Q.    How long have you been a detective with the Columbus
Police Department?

A.    Almost four years.

Q.    Did you do anything with the Columbus Police Department
before you became a detective?

A.    I did.  I was on the city of Pataskala -- before I
worked Pataskala, I worked patrol in the city of Columbus.  I'm
sorry.

Q.    That's okay.  So let's talk about your time with the
Columbus Police Department first.

A.    Yes, ma'am.

Q.    What different roles have you held with CPD?

1    A.    Mainly just patrol.  I've been with the City of Columbus

2    for 24-and-a-half years now.  I worked patrol before I went

3    inside to be a detective.

4    Q.    So about 20-and-a-half years on patrol?

5    A.    Yes, ma'am.

6    Q.    You mentioned something about Pataskala.  Have you been

7    a part of other police departments?

8    A.    Yes.  Before I was hired on with Columbus, I was in

9    Pataskala.  That's east of Columbus.  I was there for six years.

10   Q.    Did you receive training before starting with either of

11   those police departments?

12   A.    Yes, ma'am.  I went through two police academies.  The

13   first one was, of course, for the City of Pataskala.  The second

14   one was the Columbus Police Academy.

15   Q.    How long did you -- or how long is the Columbus Police

16   Academy?

17   A.    Both academies were about six months.  They were really

18   rigorous training, a lot of everything.  It teaches you a lot.

19   Q.    Did they train you specifically on when and how to use

20   force?

21   A.    Yes, ma'am.  They did.

22   Q.    Are there any factors that you're trained to consider

23   when determining how much force is appropriate in a situation?

24   A.    Absolutely.  Our force is a response to the resistance.

25   Q.    Are there any factors other than resistance that you

1  consider when determining the force to use?

2     A.   Are you talking about *Graham v. Connor*?  Connor

3  versus --

4     Q.   Yes.

5     A.   Yes, ma'am.  That's part of our directives.  It's a

6  decision case with the U.S. Supreme Court where it gives the

7  officers quite a bit of latitude on when you're making the

8  arrest.  It has to do with when somebody is resisting arrest,

9  whether they're resisting or not -- excuse me.  Get a drink of

10  water real fast.

11     Q.   Absolutely.

12     A.   I don't know.  Maybe I said too much.  I'll let you --

13     Q.   That's okay.  Do you know the -- those other factors --

14  I guess strike that.

15          What is *Graham v. Connor*?  When you say that, what is

16  that?

17     A.   It's a U.S. Supreme Court case.

18     Q.   And do you see those *Graham v. Connor* standards anywhere

19  in the directives that you follow as a CPD officer?

20     A.   Yes, ma'am.

21     Q.   Where is that?

22     A.   It's in our directives in our use of force area.

23     Q.   Do those factors include the severity of the crime at

24  issue?

25     A.   Absolutely.

1    Q.    We've heard a little bit about whether or not a suspect

2  is fleeing.  Do those factors also consider that?

3    A.    It would be something to consider, sure.

4    Q.    Do all of the factors have to be present in order for

5  you or another CPD officer to use force?

6    A.    No, ma'am.

7    Q.    In your experience, do suspects of crime always flee?

8    A.    No, ma'am.

9    Q.    Have you ever encountered burglary suspects who did not

10  flee the scene?

11    A.    There's been times I've pulled up on a burglary and the

12  burglary suspects are still inside the residence.

13    Q.    When you're at the Columbus Police Department, were you

14  trained on how to approach certain scenes, how to respond to

15  certain crimes?

16    A.    Yes, ma'am.  We call it a tactical approach.

17    Q.    And are you trained to approach every single potential

18  crime the exact same way?

19    A.    No, ma'am.

20    Q.    How are you trained to approach a burglary in progress,

21  specifically?

22    A.    So you'll want to position your car, as you pull up,

23  obviously not straight in front of the residence.  You're going

24  to want to park just a little bit down.  At that time you're

25  looking for any kind of barriers that you can use, and you're

1    wanting to make a tactical approach to the door which you're

2    keeping in mind the door, the window, anything that could be a

3    potential threat.

4        Q.   Does CPD classify its runs or its dispatches at all

5    based on the severity of the crime?

6        A.   They do.  This was a 10-8 which stands for a burglary in

7    progress in our 10 Codes.  Our 10 Codes are something that our

8    radio room uses which makes it easier when you're on the air,

9    you don't have to talk as much.  This was a 10-8, burglary in

10   progress.

11       Q.   What priority of call is that?

12       A.   This is a priority one which is the highest priority of

13   any call that we have.

14       Q.   What does that mean to you as an officer when you

15   receive a call for a priority one response?

16       A.   That means that you are to respond without delay, and

17   you're to respond with lights and sirens.

18       Q.   I want to turn your attention directly to July 7th,

19   2020.  On that day what was your assignment with the Columbus

20   Police Department?

21       A.   On that day I was working on zone one day midwatch.

22       Q.   What does that mean?

23       A.   I was working a cruiser.  Day midwatch was basically the

24   hours I work, was 9 a.m. to 7 p.m.  Zone one is the north end of

25   the city which is pretty much everywhere north of Cooke Road all

1  the way up to the end of the city limits.

2      Q.   How did you first hear about an incident at Edgebrook

3  Drive?

4      A.   Our radio called me and Officer Winchell.

5      Q.   When you say called you and Officer Winchell, did they

6  reach out to you individually on your cell phone or did they do

7  it over the radio?  How did you hear that?

8      A.   They called us over the police radio by our call

9  numbers.

10     Q.   What's a call number?

11     A.   That's our car number also.  When radio calls me --

12  which that day I was 9171, Officer Winchell was 9170.  She

13  called us both at the same time and said there was a 10-8.

14     Q.   Do you know why you and Kevin were contacted

15  specifically?

16     A.   Because we were in that area.  That's our assigned area.

17  That's part of zone one.

18     Q.   If I played that dispatch audio for you, would you

19  recognize it?

20     A.   Yes.

21          MS. PICKERILL:  Maria, can we please get Joint

22   Exhibit VI?  It is an audio file.

23          I'm going to ask you to play it from the beginning and

24   stop it at 1 minute and 20 seconds.

25      (Audio played in open court.)

1    THE COURT:  Can you play until 1:20?  Sorry.

2   BY MS. PICKERILL:

3    Q.   Officer Fihe, is that the dispatch audio that you would

4   have heard on July 7th, 2020?

5    A.   Yes, ma'am.

6    Q.   Did you hear your voice on that recording?

7    A.   I did, yes.

8    Q.   The dispatch audio says that there is a possible 10-8.

9   What did that mean to you?

10    A.   The dispatcher did say possible 10-8.  Of course, we

11   have our runs in our cruiser, we have a screen not far from the

12   size of this that we can read when we get a run.  And they send

13   it to us immediately when they dispatch us.  I read through the

14   run, and it kind of contradicted what the dispatcher said.  I

15   think any run you could probably say it's possible because

16   they're not there to prove that it's actually happening.

17        On this run they did say possible, but the way it read

18   it certainly sounded like a burglary in process when they said

19   forcibly trying to open the door.

20    Q.   Would there be any change in how you should respond to

21   the scene if the dispatcher had said possible versus hadn't said

22   possible?

23    A.   No, ma'am.

24    Q.   I think we heard you on there ask about a 33.  What does

25   that mean?

1    A.    A 33 is our 10 Code for a gun.

2    Q.    And so were you asking the dispatch individual if there

3 was a gun at the scene?

4    A.    Yes, ma'am.  So I wanted that information because that

5 would turn this from a burglary in progress to an aggravated

6 burglary in progress because a burglary with a gun is an

7 aggravated burglary.

8    Q.    What was the dispatcher's response when you asked about

9 that?

10    A.    Not yet.

11    Q.    What did that mean to you?

12    A.    That kind of made me think there's more information they

13 are getting and they hadn't just told me yet.

14    Q.    When you get the audio dispatch information, is that the

15 end of the information that dispatch is receiving?  Does that

16 mean that the 911 call is finished?

17    A.    No, ma'am.

18    Q.    So would it be possible that the dispatcher later got

19 additional information about what was going on --

20    A.    Yes.

21    Q.    -- that --

22    A.    It's possible, yes.

23    Q.    If they did -- actually, scratch that.

24         Were you the only officer responding to this run?

25    A.    No, ma'am.  Officer Winchell was also responding.

1     Q.   Did you know that Kevin was also on his way?

2     A.   I did.

3     Q.   So, when you are on your way to 3359 Edgebrook Drive,

4 what crimes were you going to investigate?

5     A.   So there was two main felonies that I thought of from

6 the beginning. And, of course, felonies are major crimes. The

7 biggest crime was the burglary or possibly aggravated burglary

8 in progress. That's a high degree felony.

9        The second felony that we're going to need to be

10 investigating is whether this guy is really a real police

11 officer. We have information from the caller that he's

12 presenting a badge that doesn't have any numbers or any writing

13 on it. I've never seen a police badge that doesn't have any

14 numbers or any writing on it.

15     Q.   Is a burglary in progress a felony of the second degree?

16     A.   Yes, ma'am.

17     Q.   Is an aggravated burglary in progress a felony of the

18 first degree?

19     A.   I believe it is.

20     Q.   Is a felony of the first degree, is that the most

21 serious felony?

22     A.   It is. That's -- murder is a felony of the first

23 degree.

24     Q.   Did you have any expectation as to how the suspect would

25 behave if he was a federal agent versus if he was impersonating

1  a federal agent?

2      A.   Yes, ma'am.  So we have protocols in law enforcement

3  that we follow.  So I was expecting him to at least follow the

4  protocols that we follow in law enforcement.

5      Q.   What are some of those protocols that you expected him

6  to follow?

7      A.   Number one, of course, is if you're in plainclothes and

8  you know that the police are coming, whether you know what kind

9  of call they're coming on or not, you're going to want to have

10  your badge and your ID visible so when the officer gets there

11  they're going to immediately identify you as one of the good

12  guys.

13      Q.   Did you have any other expectations on how a true law

14  enforcement officer would behave?

15      A.   I would expect them to conduct themselves the way a

16  regular law enforcement would behave while they were in the

17  course of their duties.

18      Q.   Did you expect that person to comply with the commands

19  that you gave them?

20      A.   Absolutely.  Like I said, that goes back to the protocol

21  that all law enforcement follow.

22          MS. PICKERILL:  Maria, could we please pull up Joint

23   Exhibit VIII?

24  BY MS. PICKERILL:

25      Q.   You mentioned, while you're in your cruiser and getting

1  that dispatch audio, there's also a screen that you can look at.

2  I'm going to show you -- it's labeled as a display event but

3  what I would call a run printout. Do you recognize this?

4     A. Yes, ma'am.

5     Q. Is this something that you could have seen in your

6  cruiser on the way to the scene?

7     A. Yes. When they dispatch us, this is what would show up

8  on our computer screen.

9       MS. PICKERILL: Maria, could you scroll down a little

10  bit so we can see the end of the page?

11  BY MS. PICKERILL:

12     Q. When you receive that dispatch call, is all of this

13  information already in there?

14     A. No, ma'am. As you can see, there's actually time marks

15  on the side when they added those runs or added that information

16  to the run.

17     Q. It says on here that the suspect gave his name as Jim

18  Burk and his badge number. Knowing that, would that have

19  changed the way that you were trained and expected to respond to

20  the scene?

21     A. No, ma'am. There is a burglary in progress is what

22  we're being sent on. I mean, I guess I'd like to make it clear

23  that, unfortunately, law enforcement can do a burglary in

24  progress. It's sad and it's hard to believe, but there's times

25  that people, while they're on duty, have committed crimes like

1    theft offenses and stuff like that.

2       Q.    So what does that mean for your initial response to the

3    scene?

4       A.    Well, I mean, what I'm really -- what's going through my

5    mind is nobody is above the law.  And if you're accused of being

6    in -- being in a burglary, then, unfortunately, it's going to

7    have to be investigated.

8       Q.    If you had seen on this run printout Mr. Burk's name and

9    badge number, would that make the call no longer a priority one?

10      A.    No, ma'am.

11      Q.    So, even if you had his name and badge number, would you

12   still have to respond the same way that you would if you didn't

13   have that information?

14      A.    Absolutely.

15      Q.    Why is that?

16      A.    Well, it kind of goes back to nobody is above the law.

17   We have to investigate what's going on.  This lady that lives in

18   this home called the Columbus police to investigate that

19   somebody is trying to get into her home.

20      Q.    So, on your way to the scene, what was the plan in your

21   mind of what you were going to do once you got there?

22      A.    I was going to -- it's a case-by-case basis, of course.

23   But, as I'm pulling up, I'm seeing that there's someone there

24   that completely fits the description that we're responding on.

25   I kind of -- as a test but also kind of for everybody's safety

1  in the neighborhood, I asked him to turn around and let me see

2  his hands.  He didn't do that.

3      So I said it again pretty rapidly, but he didn't do it

4  the first time and he didn't do it the second time.  At that

5  point he started swearing at me.  At this point he's using

6  vulgar language and using aggressive language towards me.  At

7  that point I told him to get on the ground.  I thought, you know

8  what, I'm going to give him one order.  It's easy for him to

9  understand.  I think everybody can understand get on the ground.

10  Q.  I want to walk through your body-cam footage with you

11  and really just ask you why you did the things that you did.

12      Just quickly before we get there, I guess, if you had

13  arrived there and Mr. Burk had complied with your commands, was

14  your plan always to handcuff him and tase him?

15  A.  No, ma'am, not at all.  This did not need to happen.

16  Q.  Who were you going to that residence to help?

17  A.  The caller, Sarah.

18  Q.  Why was it that you were going there to help her and not

19  Mr. Burk?

20  A.  Because she's the one that called and she's the one that

21  is alleging that there is felonies in progress.

22  Q.  Prior to your arrival at 3359 Edgebrook Drive on

23  July 7th, 2020, had you ever met Mr. Burk before?

24  A.  No, ma'am.

25  Q.  Did you have any idea what he looked like?

1    A.    No, ma'am.

2    Q.    Had you ever heard the name Jim Burk before?

3    A.    No.

4         MS. PICKERILL:  Maria, could we pull up Joint

5    Exhibit I which is the body-cam footage?  I just want to play

6    the first couple of seconds initially and ask some questions

7    about it.

8         (Video played in open court.)

9         MS. PICKERILL:  Is this displayed for the jury as

10   well?  They're looking at their screens.  I believe it is.

11   BY MS. PICKERILL:

12   Q.    Officer Fihe, is this the inside of your police cruiser?

13   A.    It is, ma'am.  Those are my hands on the steering wheel.

14   Q.    Sort of in the bottom right-hand corner we see a screen.

15   Is that the screen you were talking about earlier?

16   A.    Yes, ma'am.

17   Q.    What is it displaying right now?

18   A.    Right now I have Google Maps pulled up because when I

19   got sent on the run, I wanted to make sure I was going to the

20   right area, obviously.  I pulled it up.  I knew the area; so it

21   refreshed where I needed to go.

22   Q.    Is that the same screen that would show the run

23   printout?

24   A.    Yes, ma'am.

25   Q.    And that run printout, it's being updated with new

1 information as the 911 call progresses?

2   A.   Correct.

3   Q.   Can that screen show both the GPS directions and the run

4 printout at the same time?

5   A.   No.  You would have to shrink down the Google Maps.

6   Q.   Is that something you would have to do while driving?

7   A.   While running lights and sirens, yes, ma'am.

8       MS. PICKERILL:  Maria, could you please jump ahead to

9 5:05?

10      I'm going to have Maria fast forward to when you

11 actually arrive at the residence.

12      4:55 is okay.  Thank you.

13      If you can go ahead and pause it.  I'm so sorry.

14 BY MS. PICKERILL:

15  Q.   Why not wait in your car for Officer Winchell to arrive

16 before getting out and approaching Mr. Burk?

17  A.   Because this is a felony in progress and it's -- I need

18 to get to where she's at.  She said someone is trying to get in

19 her home.

20  Q.   Is that decision consistent with police practices as

21 you've been taught them?

22  A.   Yes, ma'am.

23  Q.   Why not stay in the car and make a call to ATF to see if

24 Mr. Burk is who he says he is?

25  A.   This is a priority one run that I have to run lights and

1    sirens to.  It's a run -- waiting would be dereliction of duty.

2    I -- there would be no reason for me to stop and wait for

3    anything while I'm trying to get to a woman who is calling that

4    someone is trying to break in her house.

5    Q.   And you've told us that you didn't know who Mr. Burk was

6    before this?

7    A.   Correct.

8    Q.   Did you know who his supervisor was?

9    A.   No, ma'am.

10   Q.   Would you have known that number to call that person and

11   verify his identity?

12   A.   No, ma'am.

13   Q.   Did you know the number to the Cincinnati branch of ATF?

14   A.   I did not.

15        MS. PICKERILL:  If you could play it and stop at 5:17.

16   BY MS. PICKERILL:

17   Q.   Why did you park so far away from the residence?

18   A.   So this is what I was talking about with the tactical

19   approach.  You certainly don't want to pull all the way in front

20   of the residence where that's a much more dangerous area.  I

21   think this is actually a good tactical approach that I used.

22   I've got that truck there that's in between me and him.  As you

23   can see he's facing me, but the truck is a good barrier.  I've

24   got the rims on it on both sides, plus the engine block.  If

25   there is firefight or something that would happen, that would be

1  good cover.

2     Q.   Why is maintaining cover like that a good tactical

3  choice?

4     A.   It's something that we're trained to do.  It's something

5  that -- not only am I worried about my own safety, of course,

6  but this neighborhood is occupied, as you can see by the cars

7  that were here, occupied very well.  So there is a lot of people

8  there.  So when I get on scene, I'm not only responsible for my

9  safety but I'm responsible for everybody's safety.

10     Q.   At this point in the video, have you taken your gun out

11  of the holster?

12     A.   I believe I have.  I believe it's probably down by my

13  leg at this point.

14     Q.   Can we see -- I guess can we see one of your hands in

15  this video?

16     A.   No, ma'am.

17     Q.   In the upper left-hand corner?

18     A.   Maybe I don't get it on my screen.

19     Q.   That's all right.  You believe that you had the gun in

20  one hand down by your side?

21     A.   Yes.  And I remember saying, Turn around, let me see

22  your hands, turn around, let me see your hands.

23     Q.   Why did you take the gun out of the holster once you got

24  out of the car?

25     A.   Because this is the way we were trained in the academy

1  to respond to a felony in progress.

2  Q.  Why did you keep it down at your side initially instead

3  of raising it to a low ready or pointing it at Mr. Burk?

4  A.  So at this point I can't really see what's on his waist

5  or what he's wearing or anything.  Of course, I can see that

6  he's looking at me.  But, as I get closer, I'm saying to myself,

7  wait a minute, there is no badge here.

8        And now I'm also seeing nothing around his neck, nothing

9  to identify him as a police officer.  And now I'm starting to

10  also notice that he's got a bulge on the right side of his

11  undershirt.  And at one point very near to when I get there, he

12  turns and you can see under his shirt the silhouette of a gun.

13  Q.  What did that mean to you?

14  A.  So now this dangerous run turned into a much more

15  dangerous run.  Now we have a man with a gun who is being

16  accused of a felony in progress.  He is being accused of

17  impersonating a police officer.  The normal protocol would be,

18  when I get there, to have his badge in the air and say "I'm with

19  ATF," and he's not doing that at all.  And it's -- these are

20  some major red flags that are going through my mind that, man,

21  this just isn't right.  Something is not right.

22  Q.  Did you entirely discount the possibility that Mr. Burk

23  could have been a federal agent?

24  A.  I didn't discount that possibility, no.

25  Q.  Did you take into consideration the fact that he didn't

1  flee the scene before you got there?

2      A.    No, ma'am.

3      Q.    Why not?

4      A.    Well, I don't know what he's done before I got there.

5  Maybe he has been in the residence.  I don't know that.  I don't

6  know what he's done before I got there.  I do have information

7  that he called approximately seven minutes ago, but I can't tell

8  you what he did before I got there.

9      Q.    Do you know or did you know at that time whether or not

10 Mr. Burk was aware that you were on your way to the scene?

11     A.    I do believe he knew that we were coming.

12     Q.    But on that day did you have any reason to believe that

13 he knew you were coming?

14     A.    Not that I know of.

15     Q.    What were the very first commands that you gave to

16 Mr. Burk?

17     A.    "Turn around and let me see your hands."

18     Q.    Why those commands?

19     A.    So we're trained in the academy to turn the person

20 around so they're facing away from you.  When I said that

21 command, he's facing me so I would think he would understand

22 that would mean turn away from me or turn around.  If he would

23 have done that and turned around, and if he certainly would have

24 had his credentials on him, I probably would have walked around

25 the truck and started walking up to him still in a tactical

1   approach.

2       He also is at this point still a burglary-in-progress

3   suspect.  I am looking at the way he's dressed.  I have seen

4   plainclothes detectives wear stuff like that, but that still is

5   no way an identification of who he is.

6   Q.   What about the fact that he had a plain manila folder in

7   his hand?  Does that prove to you he was a police officer?

8   A.   No, sir -- no, ma'am.

9   Q.   Why give the command to turn around and show your hands

10  a second time?

11  A.   Because he didn't do it the first time.  I felt that he

12  had enough time to turn around.  That's why I said it again.

13  Q.   Typically, when you're in these situations, how long

14  does it take a person to turn around?

15  A.   As soon as he would have started to turn around, I would

16  have realized he was doing it; so a split second.

17  Q.   Did Mr. Burk show you his hands when you ordered him to

18  do that?

19  A.   He did, but he still held on to that folder.

20  Q.   Was that concerning to you?

21  A.   It wasn't doing the command of show me your hands.  I

22  would hope that people would understand when you say show me

23  your hands, that means show me your hands.

24       MS. PICKERILL:  Could we play -- start the video from

25   where it is and play until 5:24?

1    (Video played in open court.)

2  BY MS. PICKERILL:

3    Q.    Do we see you raise your gun up in this portion of the

4  video?

5    A.    Yes, ma'am.

6    Q.    Why did you do that?

7    A.    So at this point, as I've said, he's got a bulge on his

8  side.  I do believe he's got a gun on him at this point.  Now

9  he's swearing at me.  I think I said I need to see some ID.

10  That is something that did come out of my mouth.

11      I don't know if you remember earlier in the video, but

12  before these cameras came out in our cruiser, I'm guilty of

13  talking to myself when I go on runs.  It makes it easier for me

14  to know what I'm doing when I get there and what I'm looking

15  for.  So sometimes I do say things out loud.  Also by me saying

16  that, maybe he doesn't realize he doesn't have his credentials

17  available.  I'm hoping if he hears that or he does know that,

18  oh, my gosh, you're right, and hopefully he will start

19  responding.  But he does not.

20    Q.    At this point had he complied with your command to turn

21  around?

22    A.    Not at all.

23    Q.    At this point had he told you, Hey, I'm with ATF?

24    A.    He started swearing at me and using language that was

25  offensive and resistive.

1    Q.    Why did that language concern you?  What did that mean

2  to you?

3    A.    That's just not how police officers conduct themselves

4  when they're conducting official business.  It looks bad.  I try

5  not to cuss.  I mean, it's -- it doesn't help anything.  It

6  actually makes you look worse.

7    Q.    Then you told Mr. Burk to get on the ground.  Why did

8  you switch up the commands that you were giving him?

9    A.    At this point he's not doing what I'm saying.  So I

10  wanted -- the easiest and most -- most understandable command is

11  to get on the ground.  I'm using my command voice that I was

12  taught in the academy.  To be fair it probably sounds like I'm

13  yelling a little more than I am because the body camera is very

14  close to my face or to my mouth.

15        The command voice I'm using, I've used it throughout my

16  entire career for the last 30 years.  It has helped me get out

17  of a lot of situations.  I've used that command voice on

18  homicide suspects and they've got on the ground and they've

19  complied with my orders.  I kind of pride myself on the fact

20  that I'm actually pretty good at getting people to not turn it

21  into a use-of-force situation by my verbal voice.

22        MS. PICKERILL:  Could we play it until 5 minutes,

23   34 seconds?

24     (Video played in open court.)

25

BY MS. PICKERILL:

Q.   What was going through your mind when you told Mr. Burk to get on the ground and he started walking off the porch?

A.   At this point he's walking towards me.  So this very, very dangerous situation, it's even getting dangerous-er [sic].  That's when I got on my microphone and I called 10-3 which is our 10 Code for officer is -- officer needs help, officer is in trouble.

Q.   Why did you air that 10-3 officer in trouble call?

A.   I'm by myself.  I'm with a suspect that's accused of multiple felonies at this point.  At this point there is another felony in play because he does have a concealed weapon.  I'd like to make sure we understand this is before the CCW and all of that stuff was in play.  This was long ago before that.  So now I'm dealing with three felonies in progress, and I've got a guy that's not being compliant and using offensive language and he's also using language that's challenging and not at all the way that an officer, any law enforcement, would conduct themselves.

Q.   Did you think it was helpful for you that Mr. Burk walked into more lighting?

A.   That's not helpful, and it actually was not what I asked him to do.  So it was noncompliance.

Q.   We can kind of -- we've heard a lot about what Mr. Burk was wearing that day.  We can see it sort of here in this still

1  screen.  In your experience and from your perspective, was that

2  a law enforcement uniform?

3     A.    Not at all.  Not at all, ma'am.  And he's standing in

4  kind of a bladed stance towards me which is a bit of what we

5  call an offensive stance.

6     Q.    What does that mean, a bladed stance?

7     A.    Kind of a boxer stance.  He's got his back foot back.

8  That's the stance that somebody would take if they're ready to

9  fight.

10    Q.    Is that something you were trained on while at the

11 various police academies?

12    A.    Yes, ma'am.

13    Q.    How are you responded to -- I'm sorry.  How are you

14 trained to interpret or respond to body language like that?

15    A.    So our training and what we try to do by ordering

16 somebody at gunpoint is to try to deescalate the situation and

17 make it to where it's not going to turn into a use-of-force

18 situation.  That was completely my hope and what I really wanted

19 to do in this situation.

20         I don't want to have a use of force on people.  I don't

21 like fighting with people.  It doesn't help anything.  They get

22 hurt.  I get hurt.  It doesn't help anything.  I try to not let

23 that happen.

24    Q.    At this point is Mr. Burk complying with your commands?

25    A.    Not at all.

1    MS. PICKERILL:  Could we please play it until

2  5 minutes and 43 seconds?

3    (Video played in open court.)

4  BY MS. PICKERILL:

5    Q.   Did you hear Mr. Burk tell you, "I'm not getting on the

6  ground, I'm a federal agent"?

7    A.   Yes, ma'am.

8    Q.   Have you ever been trained or taught that law

9  enforcement agents of any rank are exempted from following

10  commands?

11    A.   No, ma'am.  It goes against any law enforcement training

12  that I've received.

13    Q.   Mr. Burk said that you never asked for his ID.  Why

14  wasn't that the first thing you said to him when you got there?

15    A.   Because I -- and I believe I even say it on the video.

16  If he knew I was coming, he should have had that visible knowing

17  there's police responding to his situation.  If you're

18  conducting official business, you need to have your badge out

19  and visible for everybody to see.

20    Q.   Is that how you typically wear your badge?

21    A.   When I'm going on the scene of a fatal accident, yes,

22  ma'am.

23    Q.   Does it have the agency or your badge number on it?

24    A.   It does.  It says Columbus Police and my badge number is

25  1875.

1     Q.   Why do you wear that when you go to crash scenes?

2     A.   For identification.  The officers on scene, they don't

3 know who I am and none of the public do.  There is 2,800 of us

4 on the Columbus Police Department.  It's a big department.

5 Nobody knows everybody.  I need to be identified.

6     Q.   Maybe I should have asked this up top.  As a detective,

7 do you have like a uniform of the day that you wear?

8     A.   Not for a detective, no, ma'am.

9     Q.   Is that part of why you wear the badge visibly?

10    A.   Yes, ma'am.

11     MS. PICKERILL:  Could we play until 5 minutes and

12 54 seconds?

13    (Video played in open court.)

14 BY MS. PICKERILL:

15     Q.   You told Mr. Burk, "Get on the ground, we'll figure it

16 out."  What did you mean when you said that?

17     A.   He kept saying I'm a federal agent.  So I wanted him to

18 understand that I don't know that, and I can't prove that at

19 this point; so we will figure it out.  Get on the ground so I

20 can at least see your credentials.  And he said it ain't

21 happening.

22     Q.   Why did he need to be on the ground for you to get his

23 credentials?

24     A.   I want to have somewhat control with him.  This man has

25 a gun on his hip.  Like I said it's still in play that he's

1  possibly doing a burglary while he is an ATF agent.

2    Q.   Would you have felt safe at that point asking Mr. Burk

3  to reach into his own pocket and pull out his credentials?

4    A.   Absolutely not.

5    Q.   Why not?

6    A.   He could have come out of any pocket with a gun.  He

7  could have reached for the gun at the same time.  He could have

8  done any number of things.  He's within enough -- very close

9  enough, if he had an edge weapon, our training shows he'd be

10 able to run at me and stab me before I could make it not happen.

11   Q.   What's an edge weapon?

12   A.   A knife or any -- razor blade, anything that would cut

13 you or kill you or hurt you.

14   Q.   At this time did you know that the gun on Mr. Burk's hip

15 was the only weapon he had?

16   A.   No, ma'am.

17   Q.   Are you trained to assume that the weapon you see is the

18 only weapon that a suspect has?

19   A.   No, ma'am.  We're actually trained what they call the

20 plus-one theory.  Usually, if you do find a suspect on a gun --

21 or a gun on a suspect, there's a very good chance they're going

22 to have another weapon.

23   Q.   At this point have you had an opportunity to search

24 Mr. Burk for additional weapons?

25   A.   No, ma'am.  I still have absolutely no control over him.

1    Q.   At the end of the clip we just watched, you told

2  Mr. Burk to stay where he's at.  Why did you switch up your

3  commands this time?

4    A.   Well, that's because he was walking towards me.  And he

5  actually did stop walking towards me.  So that was good because

6  that could have gotten really bad really fast, and I didn't want

7  that to happen.

8    Q.   What do you mean it could have got really bad really

9  fast?

10   A.   If he would have come up while I've got my gun out, he

11  could have grabbed my gun from me.  He could have disarmed me.

12  I've got the whole neighborhood to worry about.  I've got a very

13  populated area.  This is an extremely dangerous run.

14   Q.   At this point did you know how close Officer Winchell

15  was to the scene?

16   A.   I did not, not until I could hear him on my radio saying

17  9170 is pulling up.

18   Q.   What was your plan as you were interacting with Mr. Burk

19  and waiting for Kevin to get there?

20   A.   The plan was, when Kevin got there, hopefully he would

21  start complying with him which, luckily, in this situation, he

22  somewhat complied with what Officer Winchell asked him to do.

23       MS. PICKERILL:  Could we play until 6 minutes and

24   14 seconds, please?

25     (Video played in open court.)

BY MS. PICKERILL:

Q.   Why did you explain to Mr. Burk what was reported in the dispatch audio to you?

A.   I guess because I was hoping maybe that would make him comply, that we're not just out there for fun or no reason. We're here because we were dispatched and they're saying you are impersonating a police officer.  I would hope he would realize, okay, yeah, you're right, I don't have any credentials showing and I'm resisting my detention at this point.

Q.   What was Mr. Burk's response did you hear in the video when you told him about the 911 call?

A.   I don't remember him having a response to it.

Q.   Did he ever tell you why he was at that residence?

A.   No, ma'am, not up to this point anyway.

Q.   By this point has Mr. Burk ever told you that he was fearful of the people inside of the home?

A.   No, ma'am.  And I wish if he was, he would have told me about it.

Q.   Has he -- go ahead.  I'm sorry.

A.   I have no idea why he's here or what he's doing.  If he was fearful that somebody was inside with a gun, I sure wish he would have told me about it because I'm out there trying to respond on a call for service.

Q.   Has he told you that he can't comply with your commands because he feels unsafe?

1   A.   No, ma'am.  He never said that.

2        MS. PICKERILL:  Could we play until 6 minutes and

3  23 seconds, please?

4      (Video played in open court.)

5  BY MS. PICKERILL:

6   Q.   You had previously told Mr. Burk to stay where he was,

7  and then we just heard you switch back to ordering him to get on

8  the ground.  Why did you do that?

9   A.   I asked him to stay where he was because I certainly

10  didn't want him to start running because now I'm going to have

11  to chase him.  He's certainly not free to leave.  He is a

12  burglary suspect, multiple felonies.  He's not able to leave.

13  And it is good that he decided to stay there.

14   Q.   Why did you want Mr. Burk to get on the ground at this

15  point?

16   A.   So, if he would have gotten on the ground even before

17  Kevin Winchell pulled up, Officer Winchell, at this point I

18  would have been able to at least start to secure his hands and

19  at least get his right hand back away from where his gun is.

20   Q.   Why is it important to secure a suspect's hands?

21   A.   Because hands are what can kill you.  It starts with the

22  hands.

23   Q.   What do you mean?

24   A.   If someone were to assault you or pull a gun or a knife,

25  they do it with their hands.

1    MS. PICKERILL:  Could we play until 6 minutes and

2   36 seconds, please?

3      (Video played in open court.)

4  BY MS. PICKERILL:

5    Q.   Why did you give Mr. Burk another command to put his

6  hands up?

7    A.   Because he had started dropping his hands and he started

8  reaching for his waist which was very bad, very dangerous.

9    Q.   Why is that?

10    A.   That's where I saw that he had a gun.  I didn't know

11  which side at this point, but I do remember seeing the

12  silhouette of a gun as he turned, under his shirt.

13    Q.   So did Mr. Burk keep his hands extended out the entire

14  time he was interacting with you?

15    A.   Of course, as we saw, no.  He started to reach for his

16  waist.  And I did give him the lawful orders to not reach for

17  his waist.  But, no, he -- and he is still holding that folder.

18    Q.   Did it matter to you that Mr. Burk said he had an OHLEG

19  sheet?

20    A.   No, ma'am.  Of course, from where I'm at, I cannot read

21  what's on his papers.  I do not know what he is holding.  He

22  could have said he's got whatever and at this point that doesn't

23  matter.  He's got to be detained.  He's got to be detained so

24  that we can start investigating what's going on here.  There's

25  no way we can start investigating it with him acting the way he

1   is.  There's no way we can start investigating it until we can

2   get him detained.

3       Q.   Is that because you need to secure the scene?

4       A.   Yes, ma'am.

5       Q.   If you had been able to see that sheet and you could

6   confirm that it was in fact an OHLEG printout, would that have

7   been proper verification of his status as law enforcement?

8       A.   No, ma'am.  That would not mean that he is a special

9   agent or ATF agent.

10      Q.   What is OHLEG?

11      A.   It's the -- it's basically LEADS printouts.  It's how

12  you can print out an individual's information.  It will show you

13  their picture, their past criminal history, a lot of information

14  about them.

15      Q.   Like their address?

16      A.   Yes, ma'am.

17      Q.   Do only law enforcement officers have access to OHLEG

18  printouts?

19      A.   No, ma'am.  No.  Prosecutors -- I could go down a long

20  list of people that would have those.

21          MS. PICKERILL:  Could we please play until 6 minutes

22   and 53 seconds?

23      (Video played in open court.)

24  BY MS. PICKERILL:

25      Q.   Why place Mr. Burk face down on the ground?

1    A.    That's how we're trained to do it.  If -- believe it or

2  not, some people when they do get on the ground, then they start

3  fighting.  I don't understand why, but it does happen.  When

4  they're face down it makes it a little tougher for him to fight,

5  but they can still put up quite a fight.

6         At this point we want to keep him to where he's off his

7  balance and off his -- where he's ready at because at this point

8  he still has a gun on his side.

9    Q.    We heard Mr. Burk tell you his ID was in his pocket.

10  Why didn't you stop handcuffing him and start checking his

11  pockets?

12    A.    Like I said, we're not going to be able to start to

13  investigate anything until we can get him secured and in a

14  cruiser and disarmed.  Right now our immediate threat is on his

15  right hip.

16    Q.    Why did you tell him to put his arms behind his back?

17    A.    So we could put handcuffs on him to help start getting

18  him secured.

19    Q.    Were you handcuffing him for the reasons that you've

20  already explained, to get him secure and make sure that the gun

21  is away from him?

22    A.    Correct.

23    Q.    And does that have to happen before you're able to

24  investigate either the burglary or the impersonation crime?

25    A.    Absolutely.  At that point we have no verification of

1    who is or what he's doing.  I will say that he's not following

2    protocol.  At this point I'm thinking it's more likely than not

3    that he is somebody impersonating a police officer.

4         MS. PICKERILL:  Could we play until 7 minutes and

5     14 seconds, please?

6        (Video played in open court.)

7    BY MS. PICKERILL:

8      Q.   When Mr. Burk told you to wait a second, why didn't you?

9      A.   We've got to get that gun secured and we've got to make

10   sure he has no other weapons on him.  We can't wait a second.

11     Q.   And is that why you told him that, that you needed to

12   get him secure?

13     A.   Yes.  I did tell him that we're getting him secured

14   first.

15     Q.   Did he cooperate with you after you explained that you

16   needed to secure him first?

17     A.   No, ma'am.  As you can see, he pulled his left hand out

18   of my hand.  I thought I had a pretty good grip.  I did have to

19   take both of my hands off his hand.  When I was reaching back

20   for my handcuffs, I saw that he was watching me and his head was

21   looking at me.  As soon as I did that, he violently pulled his

22   hand out of my hand and started moving it up his body.

23     Q.   How did you interpret that when Mr. Burk's arm moved

24   from within your grasp to up further on his body?

25     A.   I'm hoping he doesn't have another weapon up there that

1  I don't know about.  At this point I don't know that.  The

2  extremely dangerous situation just got more dangerous.

3     Q.  Did you perceive it as resistance when Mr. Burk's arm

4  left your grasp?

5     A.  Absolutely.  We're trained in the academy what resistive

6  tension is.  And part of that was the instructor and us grabbing

7  him, and we can articulate what resistive tension is.  I can

8  guarantee when you're trying to handcuff somebody with a gun and

9  they pull their hand away from you, that is resistive tension.

10          MS. PICKERILL:  Could we play until 7 minutes and

11   31 seconds, please?

12      (Video played in open court.)

13  BY MS. PICKERILL:

14    Q.  I know that the body cam is kind of close up in the

15  action at this part of it.  Can you tell us from your

16  perspective what was going on as you got that first cuff onto

17  Mr. Burk?

18    A.  I'm hoping that we can get his other hand cuffed and get

19  that gun that you can see off of his hip and make this a little

20  safer and start getting him completely patted down to make sure

21  he has no weapon and get him detained so we can start to

22  investigate what's going on here.

23    Q.  It kind of looks in this still screen here that his

24  right hip is up off the cement.  Were you pulling his body that

25  way to get him off the ground?

1    A.    I was not.  He was starting to turn over, which is very

2   dangerous, which is actually moving that gun up in the air to

3   where it's more assessable.  You can see Officer Winchell is

4   trying to hold his leg from doing that, but he is starting to do

5   a whole different type of resisting.  That is starting to get

6   up.  The next step would be if he gets a knee under his body and

7   then he is able to start getting up in the air.

8    Q.    Why is that a problem?

9    A.    Unfortunately, that would make this situation even way

10  more dangerous.

11   Q.    What was your perception of Mr. Burk's behavior while

12  you were trying to get handcuffs on him?

13   A.    It was -- it kept going through my mind that it's just

14  so hard to believe that any law enforcement officer would behave

15  in this manner.

16   Q.    Did you perceive any of that resistive tension that you

17  mentioned earlier as the handcuffing progressed?

18   A.    It got worse.  He -- he started getting extremely wiry,

19  and he was really hard to hold on to.  At this point I think

20  he's starting to get a little sweaty.  He's getting more

21  slipperier.  It's a bad situation.  It's very dangerous.

22        MS. PICKERILL:  Could we play until 7:45, please?

23      (Video played in open court.)

24  BY MS. PICKERILL:

25   Q.    Why did you say, "Don't make me tase you"?

1   A.   Well, number one, we're supposed to tell somebody when

2   we're tasing them.  And I wanted to make that clear to him that

3   you need to put your right hand behind your back.

4        Keep in mind that you can hear Officer Winchell saying

5   repeatedly put your right hand behind your back.  He says it

6   over and over.  I'm hoping if he did see me get the TASER out,

7   he's going to realize, okay, now they've got a TASER, maybe I

8   should actually comply with their lawful orders.  But he

9   doesn't.

10  Q.   When are you trained that it's reasonable to use your

11  TASER?

12  A.   In a situation obviously like this, it's warranted.  You

13  can use a TASER for somebody that's running from you.  It's a

14  less lethal weapon.  The way I'm using it is much less intrusive

15  into the body.  I'm not shooting probes into his body.  I'm

16  using it basically as a stun gun.  It's putting a little bit of

17  electric into him to hopefully jolt him to realize this -- you

18  know, why are we doing this?  Why do we keep having to go

19  through this?

20  Q.   Is that why you decided to use your TASER in this

21  instance?

22  A.   Yes, ma'am.  Well, and Officer Winchell told me to get

23  my TASER out.  At that point I could see he could not get

24  control of his right hand.  I'd like to reiterate that right

25  hand is -- when you're carrying a holster, you know how to get

1 your right hand to your holster and get it out in a hurry.  We

2 do it with our firearms training.

3      That is the worst hand for us not to have control of

4 because that is the most dangerous hand that he has with that

5 gun being that close to his hand and being in a position where

6 he can pull that gun out extremely fast.

7           MS. PICKERILL:  I want to play just four seconds this

8  time.  Can we play until 7:49?

9      (Video played in open court.)

10 BY MS. PICKERILL:

11   Q.    What did we hear in that portion of the video?

12   A.    You could hear -- that crackling noise that you hear,

13 that's the actual TASER.  You can see I'm just doing it to what

14 they trained us on is the preferred area to tase him which is to

15 the back.  I'm doing a little bit to the right side.  This is

16 exactly how we were trained to deploy the TASER.

17   Q.    What did Mr. Burk do when you used the TASER?

18   A.    He finally was able to allow Officer Winchell to pull

19 his hand behind his back so we could get it cuffed.

20   Q.    How quickly did that happen?

21   A.    Not quickly.  When I press the trigger on the TASER, it

22 will go for five seconds.  And it was within that five seconds

23 that he finally decided that he would put his hand behind his

24 back.

25   Q.    Does the TASER -- do you have to hold down the button

1   for five seconds, or does it always run for five seconds?

2       A.   When you press the trigger, you let off the trigger and

3   it runs for five seconds.

4       Q.   Automatically?

5       A.   Yes, ma'am.

6       Q.   How many times did you pull the trigger on your TASER

7   this day?

8       A.   Only one time.

9       Q.   Was it effective in getting him handcuffed?

10      A.   It was.

11          MS. PICKERILL:  Could we now play until 8 minutes and

12   33 seconds?

13      (Video played in open court.)

14   BY MS. PICKERILL:

15      Q.   What was the first thing that you all did after Mr. Burk

16   was handcuffed?

17      A.   Well, he's going on and on about getting the creds out

18   of his pocket.  So I did take the creds out of his pocket and

19   look at them, the credentials.

20      Q.   Did you remove his gun first?

21      A.   Yeah.  Officer Winchell took the gun out of his holster,

22   while we were holding his hands, to make sure he wouldn't go for

23   it while we were pulling it out of the holster.

24      Q.   Is it possible for suspects to still reach a gun if

25   their hands are behind their back handcuffed?

1    A.   Yes, ma'am, especially if you're aware of where your

2  holster is and how your holster works and the angles and

3  everything you would need to know about a holster and carrying

4  the gun that you own that you know about.

5         MS. PICKERILL:  Can we play until 9 minutes,

6   16 seconds?

7      (Video played in open court.)

8  BY MS. PICKERILL:

9    Q.   Is Mr. Burk's badge the item that we saw you take out of

10  his pocket there?

11    A.   Yes.

12    Q.   Was that the first thing that you did after removing the

13  gun from his hip?

14    A.   Well, we let him sit up, yes.

15    Q.   Why did you ask Mr. Burk who his supervisor was?

16    A.   That was another question that law enforcement should

17  immediately know.  If you ask me who my supervisor is right now,

18  I'll tell you his name is Eric Moore.  I won't have to say wait

19  a second like I'm maybe making this up or thinking what I can --

20  you know how -- that was also suspect.

21       At one point in this situation, he kind of started

22  giggling.  He was not acting at all like any law enforcement

23  officer that I've ever come in contact.

24    Q.   Why did you need to know who his supervisor was?

25    A.   That was just to see how fast he could answer that.  I

1  did see his credentials.  I will make it clear that obviously

2  you can buy those badges online and make IDs online or at home,

3  however you want to do it.  At this point I am nowhere near

4  believing that he is a real police officer.

5      Q.   When you saw that he had a badge and credentials in his

6  pocket, did that mean your investigation was over?

7      A.   No, ma'am.  No.  Like I said, anybody can have those.

8  We're going to need to get verification from the agency he says

9  he's with.  And we still need to investigate this

10  burglary-in-progress call.

11     Q.   Do you know if someone from CPD eventually called

12  Mr. Burk's supervisor in order to verify his identity?

13     A.   Yes, ma'am.  So other officers started showing up a

14  little bit later, not much later.  But I got on the air and I

15  tell him I need a supervisor for use of TASER.  Sergeant Neal

16  Tolman responded to the scene.  In a situation like this when

17  the sergeant gets on scene, the sergeant will be starting and

18  will be running the investigation from there.

19           MS. PICKERILL:  Could we play until 9:50, please?

20      (Video played in open court.)

21  BY MS. PICKERILL:

22     Q.   Mr. Burk told you, "I just wish you'd asked me to show

23  my creds."  Why wasn't that the very first command you gave when

24  you arrived on scene?

25     A.   I don't think it would have had a whole lot of bearing

1   on this because, like I said, there's nothing to rule out the

2   fact that he's an ATF officer and he is doing a burglary.  We've

3   seen officers break the law while they're on duty.

4       Q.   Why did you all need to secure Mr. Burk inside of the

5   police cruiser?

6       A.   So, as you can see, the hand -- you can just see the

7   back of my fingers.  In that hand I'm still holding my TASER

8   cartridge.  In the other hand I have his gun.  I needed to get

9   that secured on the scene, and we certainly cannot start

10  questioning the resident on whether he broke in or not.

11          At this point I don't know what happened in the

12  residence.  Maybe he's been in there, maybe he's already back

13  out.  I don't know.  I don't know anything, and I certainly

14  won't know anything until we can get him secured.  He's not

15  secured right now.

16          When he is in the cruiser, that's when he would be

17  secured and we can start doing some type of investigation.

18      Q.   If he didn't want to get in the car, why not just let

19  him be detained sitting on the sidewalk?

20      A.   That would make it hard for when we start questioning

21  the resident.  If he's standing there, that would be an

22  intimidation factor.  Maybe she would lie.  We're supposed to

23  separate victims and suspects.

24      Q.   You told him to get in the car and that you could talk

25  about it later.  Why not just talk to him right there?

1    A.    Because he needs to be secure.  We can't even start

2  doing -- we will do an investigation and we will talk about it

3  later.  But right now is not the time to be talking about it.

4  Right now we need to get him secured.

5    Q.    This is the last one, I promise.

6          MS. PICKERILL:  Could we please play until 10:52?

7      (Video played in open court.)

8  BY MS. PICKERILL:

9    Q.    Why did you go around to the other side of the cruiser

10  while getting Mr. Burk in there?

11    A.    That's a trained technique that we learn at the police

12  academy.  If I would have just kept pushing on him, it would

13  have injured him and it would have been really tough to get him

14  in the cruiser.  When you go around to the other side and pull

15  him, you don't have to use hardly any force.  He's on the seats

16  that are actually very slippery.  They're designed for that.

17  And I was able to get him in the car.

18    Q.    When you --

19    A.    I'm sorry.

20    Q.    It's okay.

21    A.    One thing I wanted to make sure is clear is that he

22  asked for a medic.  So we rendered aid.  We called him a medic.

23  He said he needed help breathing.  These are our new cruisers.

24  At the time they were new.  They had just put bars on the

25  windows to where you can actually roll the windows down to get

1  air to people.  It worked out well.  We rendered aid.

2        We certainly didn't want to hurt him.  We don't want to

3  hurt anybody.  I don't want to.  I'm sorry that he got himself

4  into this.

5    Q.    I was going to ask you about the windows, so I

6  appreciate that.

7        When you went around to the other side of the cruiser

8  and pulled Mr. Burk in, was he standing outside the cruiser?

9  Was he already seated in the cruiser?  How was he positioned?

10   A.    He had his butt sitting on the cruiser seat still

11 nowhere near secured.  He could have got up and did like a

12 linebacker and got through us and who knows what at that point.

13 At one point he actually does get up and Officer Winchell has to

14 push him back down.  That's on Officer Winchell's body cam which

15 I know we'll see.  No, he was nowhere near secured.

16   Q.    Do you often have issues with folks not being able to

17 sort of swing their legs around to be fully seated in a vehicle?

18   A.    I have never seen anyone have trouble getting into these

19 cruisers.  The way the seat belts are designed, they're designed

20 to where the officer doesn't have to reach over the top of your

21 body to put the seat belt on you.  They're designed -- and

22 they're special for these cruisers -- where you can actually get

23 the seat belt to where -- not reaching over them and put it up

24 and it actually gets them to where they're seat belted in.

25        It's not hard to get in the cruiser with them on there.

1  They're not in anyone's way.  It doesn't obstruct to how you get

2  in and out of the cruiser.

3      Q.   Does that seat belt, the way it's set up, does that --

4  does it make it harder for people to get into the cruiser?

5      A.   Not at all, no.  It's -- as you can see when he sat

6  down, he wasn't rubbing against or even touching the seat belts.

7      Q.   Do you ever encounter folks who have difficulty getting

8  into the cruiser when they're handcuffed?

9      A.   No, ma'am.

10     Q.   Is there room in the police cruiser in those seats for a

11 person to sit and have their arms behind their back?

12     A.   There are.  These are special seats.  There's actually

13 an area that's cut out behind you so, if you got your handcuffs

14 on, you're not going to be having so much pressure on your body

15 where your hands are.  These are specially designed seats for I

16 guess you could say comfort for the suspect.

17     Q.   You had mentioned the fact that Mr. Burk asked for an

18 ambulance.  Did you all call for a medic to come?

19     A.   Immediately.

20     Q.   Did that medic ever arrive?

21     A.   It did, yes.

22     Q.   Did the EMTs treat Mr. Burk?

23     A.   They did, yeah, yeah.  I don't know why, but after he

24 asked for a medic, we still called it, but he said he didn't

25 need one and the TASER didn't hurt him.

1    Q.    And you didn't call off the medic when he said?

2    A.    We did not.  We kept the medic coming at this point.

3    Q.    After Mr. Burk was placed in the cruiser, was it your

4    decision to keep him detained?

5    A.    Yes, ma'am.

6    Q.    What about when the medics arrived?  Was it your

7    decision for him to remain handcuffed?

8    A.    When the medics arrive and we have somebody that's being

9    detained, they are not going to start treating them while

10   they're handcuffed.  They're going to tell you they want them to

11   stay handcuffed while they treat them.  That's up to the medics.

12       There have been times where somebody is not being

13   aggressive and the medics have asked me to take the handcuffs

14   off so they can treat them.  I don't believe they did that in

15   this situation.  But at this point, Officer Winchell and I, a

16   little bit -- a few more seconds after this I think Officer

17   Winchell and I make the determination that we need to stay away

18   from him.  Our sight, you could tell, was making him upset and

19   making him more agile and being -- he's getting ready to start

20   yelling and screaming and cussing and going on and on.

21       That's kind of what we do with Columbus police.  We try

22   to get the officer that they're upset with the most away from

23   the suspect so they can start settling down.

24   Q.    So, when you all made that decision to sort of take a

25   step back from Mr. Burk, who took over?

1    A.    That was about the time that most of the officers came

2   from 17 that were in roll call.  Most of them got there about

3   the same time.  A lot of them jump in the same cruisers

4   together.

5         When I put that call out of 10-3, that means you're in

6   as bad a situation as you can.  So the officers would -- if

7   they're in the area, will drop everything they're doing and come

8   your way.

9    Q.    Once this sergeant took over, who was making the call

10  about when to uncuff Mr. Burk?

11   A.    So, when Sergeant Tolman got there, we kind of briefed

12  him on what was going on, and he was in charge of the scene

13  after that.

14   Q.    Does that mean it was his decision whether or not to

15  keep Mr. Burk handcuffed?

16   A.    Yes, ma'am.

17   Q.    Was that before or after the medics arrived, if you

18  remember?

19   A.    I believe it was right before the medics arrived or

20  right around the same time.

21        MS. PICKERILL:  Maria, we can take that down.  Thank

22   you very much.

23  BY MS. PICKERILL:

24   Q.    Detective Fihe, I appreciate you walking through that

25  with me kind of slowly.  I think it's important to understand

1  why you made the decisions that you made.

2      A.    You're welcome.

3      Q.    Throughout -- and we've kind of now watched it from your

4  arrival to the point where Mr. Burk is detained in the cruiser.

5  During any of that time, did Mr. Burk tell you why he was at the

6  residence?

7      A.    No, ma'am.

8      Q.    At any time did you know about the gun that Mr. Burk was

9  attempting to retrieve from that house?

10     A.    I did not.  That would have been actually nice-to-know

11  information when I got there if he would have said that.  That

12  would have started to make me believe that maybe he is somewhat

13  official.

14     Q.    At any point did you know who else lived with Sarah in

15  that house?

16     A.    I did not.  No, ma'am.

17     Q.    Did you ever try to deescalate the situation with

18  Mr. Burk?

19     A.    Like I said, our training with putting somebody at

20  gunpoint, that -- that -- the main reason why we do that is to

21  deescalate it so it doesn't turn into a hands-on fight and

22  all-out brawl and stuff like that.  We try to not have that

23  happen.  By putting somebody at gunpoint, that usually gets them

24  to comply, and using your command voice like you heard.

25     Q.    If you had arrived at the residence and Mr. Burk had

1  complied with your commands, would you have needed to handcuff

2  him?

3     A.   I really don't think so especially if he had his

4  credentials.  I've been on calls where I've gone to situations

5  where somebody is with another agency.  It doesn't matter if

6  they're in plainclothes.  If they have credentials on them, as

7  soon as I get there, hey, I'm retrieving a gun, I'm with the

8  ATF, you can see my ID around my head or around my neck, I'm

9  here on official business, at that point I probably would have

10 said, well, you're being accused of a burglary in progress so

11 we're going to need to ask you not to leave at this point.  But

12 there wouldn't have been a reason to handcuff him.  That

13 would -- mind you, they're not using language that's aggressive

14 and making me think that they're not being a real police

15 officer, of course.

16    Q.   If you had arrived at that residence and Mr. Burk had

17 complied with your commands, would you have needed to tase him?

18    A.   No, ma'am.

19    Q.   If you had arrived at the residence and Mr. Burk had

20 complied with your commands, would you have needed to secure him

21 in the back of a police cruiser?

22    A.   No, ma'am.

23    Q.   Why did you need to do all of those things?

24    A.   Because of his actions.

25    Q.   If you had arrived at the residence and Mr. Burk had

1  complied with your commands, would you still have needed to

2  verify his identity?

3      A.   I wouldn't say -- not necessarily, no.  If he's acting

4  like a police officer and he's conducting -- and he's somewhat

5  following the protocol that we're all trained with and that we

6  all know.  I've been in situations where I haven't had to call

7  their agency to make sure they're legit.

8      Q.   You would have still needed to look at his badge?

9      A.   Yes, ma'am.

10     Q.   Would you have still need to investigate both of the

11 crimes that you were called out on?

12     A.   Yes, ma'am.

13         MS. PICKERILL:  Thank you, Detective Fihe.  I have no

14  further questions for you at this time.

15         THE WITNESS:  Thank you.

16         THE COURT:  All right.  You may cross-examine.

17         MR. KEYES:  Your Honor, do you want me to start?  Or

18  should we take our midafternoon break first?

19         THE COURT:  Well, this is probably a good time for a

20  break.  Ladies and gentlemen, we're going to take our

21  midafternoon break.  We'll be in recess for 15 minutes.

22     (Jury out at 2:28 p.m.)

23     (Recess taken from 2:28 p.m. to 2:47 p.m.)

24     (Jury in at 2:47 p.m.)

25         THE COURT:  Mr. Keyes, you may cross-examine.

1          MR. KEYES:  Thank you, Your Honor.

2                         - - -

3                   CROSS-EXAMINATION

4     BY MR. KEYES:

5       Q.   Officer Fihe, as a patrol officer at the time, when you

6     were responding to a situation, you would agree the more

7     information you have the better, correct?

8       A.   If it pertains to the run, yes, sir.

9       Q.   So let's talk a bit about what information you had when

10    you first encountered Jim Burk on July 7th of 2020.  And I want

11    to start with your CAD display that you referenced in your

12    direct exam testimony.  This is Joint Exhibit VIII.

13           Do you have that up on your screen, sir?

14      A.   Yes, sir.

15           MR. KEYES:  Can we publish, please?

16    BY MR. KEYES:

17      Q.   Now, the information on your in-car display, that is

18    specific to the run that you're responding to at the time,

19    correct?

20      A.   That's correct.

21      Q.   And the purpose of the CAD is to give you information

22    visually that will help you respond to the run, true?

23      A.   True.

24      Q.   And in your in-car display while you're on route to

25    Edgebrook Drive, you had information showing that the subject

1  was a white male, gray shirt, tan pants, correct?

2      A.    Yes.

3      Q.    That he had showed some sort of badge, although the

4  caller said no name or number on it, but that he had showed some

5  sort of badge, correct?

6      A.    Correct.

7      Q.    That he was knocking at the front door, yes?

8      A.    Yes.

9      Q.    That he said he was with ATF, true?

10     A.    True.

11     Q.    Says his name is Jim Burk and badge number 4672?

12     A.    That's what is listed here, yes.

13     Q.    All of that information was there in front of you when

14  you were on route to Edgebrook Drive that day?

15     A.    I don't remember all of this information getting to me.

16  When they dispatched me initially, I think it stops at "he is

17  knocking at the door."

18         Okay.  No.  It still goes on a little farther.  I did

19  not -- I don't remember having his name and badge number when I

20  got there.

21     Q.    You're saying you didn't have it or you don't know one

22  way or the other?

23     A.    I don't remember it going through my head as I was

24  pulling up.  As you can hear on the video, I'm saying male

25  white, gray shirt.  I'm saying that out loud because that's

1   what's going through my mind.  I don't remember that going

2   through my mind, his name and his badge number.

3     Q.   Officer Fihe, my question was a little bit different.

4   Are you saying you had the information or not?

5     A.   I don't remember it going through my mind, sir.

6     Q.   Are you saying that it wasn't on your screen when you

7   looked at your screen?

8     A.   I don't remember looking at my screen as I was pulling

9   up to the residence.

10     Q.   What about in the seven minutes that it took you to

11   drive to the residence?

12     A.   Sir, at that time I'm running lights and sirens.  It's

13   dangerous.  Reading while you're running lights and sirens is

14   even more dangerous and too dangerous.  That's an unnecessary

15   risk.

16     Q.   You agree that we heard you reading, though, out loud in

17   your vehicle?

18     A.   Yes.  So I did have the address, and I was going over in

19   my mind the description of the male.

20     Q.   And you had read that description, male white, gray

21   shirt, tan pants from your CAD screen, correct?

22     A.   That's correct.

23     Q.   So the other information on your CAD screen, the more

24   precise identification information, he is with ATF, his name is

25   Jim Burk, badge number 4672, that was there, you just don't

1  recall whether you read it or not.  Is that what you're telling

2  the jury?

3     A.   Yes, sir.

4     Q.   You also talked about responding to I think you

5  mentioned a burglary scene at some point in your career where

6  maybe the burglar was still inside the building; is that right?

7     A.   Yes, sir.

8     Q.   Mr. Burk was not inside the house, was he?

9     A.   That I knew of when I got there, no.  He was standing on

10  the front porch.

11     Q.   In fact, nothing on your radioed dispatch ever told you

12  Mr. Burk was ever inside the house, correct?

13     A.   Correct.

14     Q.   Nothing told you on your CAD display that Mr. Burk was

15  inside the house, correct?

16     A.   Correct.

17     Q.   Setting aside your CAD display and your radio dispatch

18  on that point, everything you heard to that point left him

19  outside of that front door, correct?

20     A.   Correct.

21     Q.   And that was true all the way up until when you pulled

22  up at the condo, correct?

23     A.   Well, I can't speak to what he did before I got there,

24  of course, because I don't know what he did before I got there.

25  I don't have any information that he got inside the house.

1     Q.    That's all I'm asking you.  I understand you were not in

2  his shoes.  I'm asking you for the information that you had.

3  Like we said at the beginning, the more information you have the

4  better, correct?

5     A.    Correct.

6     Q.    So we're clear for the jury, you did not have any

7  information whether from your CAD or from the dispatch radio, no

8  information to suggest that Mr. Burk ever entered the house?

9     A.    Correct.

10    Q.    No information that the door had ever even been opened

11  whether by the resident or by Mr. Burk, correct?

12    A.    That's correct.  But I'd like to say that I never got

13  that close to the door to examine it.

14    Q.    You didn't see whether the door was open or closed?

15    A.    No, but I didn't see if there was a forced entry on the

16  door or if it was busted and closed again.  I wasn't able to get

17  that close to it.

18    Q.    So you're talking about when you were at the scene?

19    A.    When I was pulling up, there certainly is a possibility

20  of anything could have happened, of course.  But, I mean, there

21  is a possibility that the door was -- the frame was broken and

22  the door was closed, pulled back shut.  I don't know that.

23    Q.    That's speculation on your part?

24    A.    Absolutely.  But I am there on an investigative run.

25    Q.    Any evidence that you saw on that body-cam video that

1  you spent a fair amount of time with on direct examination, any

2  evidence that you saw that the door had been forcibly opened and

3  closed again?

4     A.   Not that I saw.

5     Q.   And certainly no information communicated to you either

6  through your in-car display or through your radio that anything

7  like that had happened?

8     A.   Correct.

9     Q.   I'm going to show you a brief clip from your body-cam

10  video from while you're still in your car.

11        Do you see on your screen the time of day stamp is

12  13:59:40?

13     A.   Yes, sir.

14     Q.   In the middle there?

15     A.   Yes.

16        MR. KEYES:  Is this displayed to the jury?  Thank you.

17  The time code in the video player is 1 minute, 16 seconds.  The

18  time of day stamp is 13:59:40.

19  BY MR. KEYES:

20     Q.   Do you see at this moment you have the map up on your

21  screen?

22     A.   Yes, sir.

23        MR. KEYES:  I'm going to play it briefly for a moment

24  here.

25        (Video played in open court.)

BY MR. KEYES:

1  
2    Q.   You just saw the screen switched, correct?

3    A.   Yes, sir.

4    Q.   And that's you manually changing the screen over to the

5  run report, the CAD display?

6    A.   Yes, sir.

7      (Video played in open court.)

8  BY MR. KEYES:

9    Q.   And then we saw you went back on your map after you read

10 the address out loud, correct?

11   A.   Correct.

12   Q.   Now, I'm going to move forward about 13 more seconds.

13 For the record, we're starting at time of day 14:00:00.  You see

14 that, 2 p.m.?

15   A.   Yes, sir.

16   Q.   The video player is at 1 minute, 36 seconds.  I'm going

17 to play this again.

18     (Video played in open court.)

19 BY MR. KEYES:

20   Q.   It starts with the map.  And that right there is, again,

21 you manually switching over to your CAD, correct?

22   A.   Yes.

23   Q.   Do you remember how long you left it up at that point?

24   A.   No, sir.

25   Q.   If I said it was a minute or more, does that sound about

1 right at this point in your response?

2    A.   Are you talking about the CAD data or the mapping?

3    Q.   This display we're looking at right here, the CAD data.

4 At this instance, do you recall watching it -- or excuse me,

5 from watching this video whether today or before today, do you

6 recall at this point in your travels leaving that CAD display up

7 for a minute or more in your vehicle?

8    A.   That sounds fair.

9    Q.   And then I think we saw you pulled it up again and read

10 from it as you were entering the neighborhood?

11    A.   I think that's when I was probably getting the address,

12 yes, sir.

13    Q.   And the CAD stayed up until it -- excuse me, until you

14 got out of your car, correct?

15    A.   I guess I'd have to see it.  That sounds right.  I

16 certainly wouldn't need the map up anymore if I'm on scene.

17    Q.   From the time you first got the call from dispatch till

18 when you arrived at the house, you believe it took you about

19 seven minutes, correct?

20    A.   That sounds fair.

21    Q.   In that seven minutes, did you ever ask anybody over

22 your radio to see if they could verify whether there was an

23 agent named Jim Burk with ATF in the area?

24    A.   I did not.

25    Q.   It was the middle of the afternoon in broad daylight

1    when you pulled up to Edgebrook Drive, correct?

2       A.    Yes.

3       Q.    And this was in northwest Columbus, the Dublin area,

4    true?

5       A.    True.

6       Q.    Not a high crime area, is it?

7       A.    No.

8       Q.    As you pulled up, Mr. Burk did not try to run away, did

9    he?

10      A.    He did not.

11      Q.    Now, you knew he had told the resident inside that he

12    was law enforcement, correct?

13      A.    Yes.

14      Q.    And as you pulled up you saw no imminent threat of harm

15    from Mr. Burk, correct?

16      A.    Yes.  Well, no, I guess I wouldn't say that.  As I was

17    pulling up, I saw he had a gun on his side very close to when I

18    pulled up.

19      Q.    Officer Fihe, do you recall giving deposition testimony

20    in this case before we got here?

21      A.    I do.  I guess I could rephrase it to the imminent

22    threat, I didn't see immediately as I pulled up as I put my car

23    in park, if that's what your question was.

24      Q.    Well, as you pulled up -- excuse me.

25          MR. KEYES:  I can approach.  Your Honor, may I

1  approach?

2      THE COURT:  You can just read it to him.

3      MR. KEYES:  That's fine.  I just didn't know whether

4  he would want to see it as well.

5      THE COURT:  That's fine.  Ask him if he remembers that

6  testimony and read it to him.

7      MR. KEYES:  I will, Your Honor.  Thank you.

8  BY MR. KEYES:

9    Q.    Officer Fihe, do you remember being asked the question:

10  And as you pulled up you saw no imminent threat of harm, true?

11  And answering the question with the word true.

12    A.    Yes.  And like I kind of just reiterated, when I'm

13  putting my car in park, I don't see that he's got a gun on his

14  side.  So that's probably why I answered that way.

15    Q.    From your perspective, when you pulled up to

16  3359 Edgebrook Drive, Mr. Burk, the man on the porch, was not

17  free to go anymore, correct?

18    A.    That is correct.

19    Q.    When you first told Mr. Burk, turn around, let me see

20  your hands, up to that point you had not personally seen

21  Mr. Burk do anything you considered suspicious, correct?

22    A.    I don't know if I would say that.  He's -- he's on the

23  porch where the dispatcher said he was or where the call taker

24  said he was.  I mean, as I pulled up and saw him initially, I

25  wouldn't say I was able to say he's done anything suspicious

1   other than the fact that he's fitting the description of the

2   suspect on the run.

3   Q.   Officer Fihe, do you recall giving testimony in your

4   deposition to this effect?

5        And at this point, referring to when you're walking

6   toward him as you asked him to see his hands -- at this point,

7   the individual in front of the residence had not engaged in any

8   behavior that you had observed that you would consider

9   suspicious, correct?

10       And your answer was:  Correct, other than all the run

11  information we got from the radio room.

12  A.   I believe that's what I just said, sir.

13  Q.   As far as what you observed -- I'm not asking about what

14  the radio room said at this point.  I'm asking what you observed

15  when you walked up to Mr. Burk.  You had not observed him doing

16  anything suspicious?

17  A.   Just like my answer was, I did not, no.  But the radio

18  room obviously had information.

19  Q.   When you approached Mr. Burk and said turn around and

20  let me see your hands, is it your position that he did not

21  follow that request?

22  A.   That's correct.  He was looking right at me and I said

23  turn around, let me see your hands.

24  Q.   Now, you agree that the body-worn video camera that

25  we've seen many times in this case, that's going to show the

1　jury what direction he was facing when you walked up to him and

2　said that, correct?

3　　A.　Yes, sir.

4　　Q.　And Mr. Burk extended his hands to each side, you saw,

5　when he was saying, I'm a federal F-ing agent, correct?

6　　A.　Yes, sir.

7　　Q.　Now, you did not tell him -- we heard on the video and

8　saw the interaction.  Would you agree with me that you did not

9　tell him at that point to do a 180 turn his back to you, turn

10　the other way?

11　　A.　No, sir.

12　　Q.　Now, you had commented earlier about how he had a folder

13　in his hands.  We did not hear you to tell him to drop that

14　folder after you told him to show his hands, correct?

15　　A.　Yes, sir.

16　　Q.　He had not at that point reached for anything, true?

17　　A.　True.

18　　Q.　And he stayed there when you pulled up on the concrete

19　step, correct?  Initially, he stayed there on the concrete step,

20　yes?

21　　A.　Correct.

22　　Q.　And I'm glad to play it if it would help.  I know we've

23　seen it a lot.  Would you agree with me, sir, that between when

24　you first communicate to Mr. Burk turn around, let me see your

25　hands and you have your gun pointed at him, that's about

1   six seconds?

2      A.   I guess that's pretty close.

3      Q.   And the only commands you had given him in that

4   six seconds were turn around, let me see your hands?

5      A.   I believe I said it twice, yes.

6      Q.   Now, once you have your gun pointed at him, you're

7   telling him, okay, let me see your hands, I need to see some ID,

8   get on the ground, correct?

9      A.   Yes, sir.

10     Q.   And those are all rapid fire one after the other in

11  quick sequence, true?

12     A.   I believe when I told him to turn around, let me see

13  your hands, he had time to start turning around.

14     Q.   That wasn't my question, Officer.  My question was those

15  three things - okay, let me see your hands; I need to see some

16  ID; get on the ground - you agree those happened one after the

17  other in quick sequence, correct?

18     A.   Correct.

19     Q.   And those are different instructions, correct?

20     A.   Yes.

21     Q.   Now, I need some clarification, please.  When you said I

22  need to see some ID in that sequence, were you telling that to

23  him or were you just saying that to yourself?

24     A.   I was saying it to myself.  It's also not bad that it

25  got out there.  I'm hoping that he may have realized he didn't

1    have his credentials outward and visible.

2        Q.    Certainly it was loud enough for him to hear?

3        A.    Yes.  I will say, as you watch the video --

4        Q.    Officer, I'm sorry to cut you off.  My question was just

5    was that statement I need to see some ID loud enough for him to

6    hear?

7        A.    I don't know.  I don't know that because -- if you'll

8    let me finish.

9        Q.    Okay.  I want you to be able to clarify.  I just wanted

10   to make sure we had your answer first.  Go ahead.

11       A.    When I said that, he is yelling at the same time.  So I

12   don't know if he heard that or not.

13       Q.    Let's jump to that point in the video, then, since there

14   is a little bit of uncertainty.

15       A.    Yes, sir.

16          (Video played in open court.)

17   BY MR. KEYES:

18       Q.    And, actually, while we're on this point, do you see

19   Mr. Burk at the left of the screen above the red truck there?

20       A.    It looks like you can see his face, yes, sir.

21       Q.    Is it your position that he was already fully facing you

22   at that point?

23       A.    I believe he was.  It's kind of really hard to tell in

24   this video.  I have a much better view without -- my view is

25   going to be better than the body-cam video.  I know that from my

1   experience in watching videos and being at scenes and stuff.

2       Q.   Certainly at the time, if when you told him to turn

3   around and he remained facing you as opposed to if you think he

4   was facing you already and he remained facing you with his hands

5   extended, one way to address that situation is to correct him

6   and say, no, no, turn around with your back to me?

7       A.   Correct.

8       Q.   Let's play from here.

9         (Video played in open court.)

10  BY MR. KEYES:

11      Q.   So seeing this, is it still your position that you don't

12  know whether let me see your hands, I need to see some ID and

13  get on the ground were all loud enough for Mr. Burk to hear

14  them?

15      A.   I do believe he was yelling.  I don't know.  Maybe --

16  can we watch it again if you don't mind?

17      Q.   That's fine.

18        (Video played in open court.)

19          THE WITNESS:  He is -- he is saying something.  He is

20   definitely communicating.  I don't know if he heard me or not.

21  BY MR. KEYES:

22      Q.   When you testified on direct examination, you talked

23  about using your was it command voice?

24      A.   Yes, sir.

25      Q.   You were using your command voice the entire time of

1  this exchange, correct?

2  A.  I wasn't talking as loud, but it was a command voice at

3  the start.  It definitely got a little louder.

4  Q.  The point of the command voice is to assert yourself,

5  your control over the scene to make sure that people can hear

6  you, correct?

7  A.  As we're trained, yes, sir.

8  Q.  Now, up till this point when you see Mr. Burk extend his

9  hands as he says, I'm a federal F-ing agent, at that point, we

10  agreed he has not made any physically aggressive moves, correct?

11  A.  Correct.

12  Q.  Has not reached for anything, correct?

13  A.  Correct.

14  Q.  And it's your belief that you never actually meant to

15  ask him to show you any ID; is that correct?

16  A.  I don't know how it would have helped the situation at

17  this point.  He's clearly not following protocol.  At this point

18  I'm certainly not going to ask him to show his ID.

19  Q.  At no point during the exchange did you, at least based

20  on your intent, ask him to show you any ID, correct?

21  A.  You're saying at no point in the investigation would I

22  ask him to show his ID?

23  Q.  During the portion of the video that we see -- we can go

24  forward a little bit, let's say, from now until he's prone on

25  the ground.  During that portion of your exchange with Mr. Burk,

1  whatever words were or were not said, you agree it was never

2  your intent to ask him to produce any identification?

3     A.  That's correct.  He is a burglary suspect, sir.

4     Q.  You never told him you thought he was a burglary

5  suspect, correct?

6     A.  I don't think I said burglary suspect.  I think I told

7  him that he was -- we got a call that he was impersonating a

8  police officer, which is also a felony.

9     Q.  You never asked him which agency he was with, correct?

10    A.  I did not.

11    Q.  Didn't ask him to tell you his name?

12    A.  Correct.

13    Q.  You never asked him to safely disarm, did you?

14    A.  Correct.

15    Q.  You never asked him to produce his agency's

16  identification, did you?

17    A.  Correct.

18    Q.  Those are all steps that would be required by directive

19  4.03 on encountering and challenging persons claiming to be law

20  enforcement in plainclothes?

21    A.  I don't know if I would say correct on that.

22    Q.  We can look at the document.  Would that be okay?

23    A.  That's fine.

24    Q.  I've got Defendant's Exhibit E up on your screen.  This

25  is CPD Division Directive 4.03.  And I'm looking at Section 2A

1  that says personnel challenging possible out-of-uniform law

2  enforcement personnel.  Personnel challenging possible

3  out-of-uniform law enforcement personnel.

4      You're the personnel challenging in this situation,

5  correct?

6    A.   Correct.

7    Q.   And you see the steps, the procedures listed there.

8  First is approach cautiously and identify yourself as a police

9  officer, correct?

10    A.   That is correct.

11    Q.   Give clear, concise and nonconflicting orders, correct?

12    A.   Correct.

13    Q.   Instruct individuals claiming to be law enforcement

14  personnel whose identity you are not able to immediately confirm

15  to disarm in a safe manner and then produce their agency's

16  identification.

17      Did I read that correctly?

18    A.   You did.

19    Q.   And you did not do that?

20    A.   I did not.  I did not.  If you don't mind, this is a

21  burglary in progress.  This is a felony in progress.  I don't

22  believe this applies to that situation.

23    Q.   Officer Fihe, impersonating a law enforcement official

24  you told us is also a felony, correct?

25    A.   It is.

1  Q.  It's a serious felony, correct?

2  A.  It is.

3  Q.  Any time you are challenging possible out-of-uniform law

4  enforcement personnel, one possibility in that situation is that

5  the challenged person, the person claiming to be law

6  enforcement, is impersonating an officer, correct?

7  A.  That's correct.  But, like I said, I don't really think

8  this directive applies to this situation.

9  Q.  Officer Fihe, after this incident, did Sergeant Yost not

10  review Division Directive 4.03 with you regarding the shared

11  responsibility in these situations and the importance of slowing

12  things down?

13  A.  She probably did, yes, ma'am -- or yes, sir.

14  Do you mind if I elaborate a little bit more on that?

15  Q.  Yes.  Go ahead.

16  A.  This entire incident was investigated by my chain of

17  command.  My chain of command is my sergeant, the lieutenant,

18  the commander, the deputy chief and the chief.  Every one of

19  them read this investigation, and not only that, but it was also

20  investigated by our internal affairs.  And a different chain of

21  command but same rank also investigated this entire incident.

22  Every one of them found that me and Officer Winchell were within

23  policy and our justified -- our actions were reasonable and it

24  was okay.

25  Q.  So the CPD's own internal investigation confirmed that

1    the CPD officers involved did not violate any policies.  Is that

2    what you --

3         A.   That's correct, yes, sir.

4         Q.   When we went down this road originally, it was because

5    you were trying to explain to me why you thought Division

6    Directive 4.03 did not cover this situation.  Do you remember

7    that question and answer exchange?

8         A.   Yes, sir.

9         Q.   What I asked you that led to your explanation there was

10   whether Sergeant Yost, after this incident, reviewed Division

11   Directive 4.03 with you regarding the shared responsibility in

12   these situations and the importance of slowing things down.  And

13   you agreed that did happen, correct?

14        A.   That did happen.  And if I remember right, we probably

15   had a conversation of this probably wouldn't apply to this

16   situation because we were found justified in everything we did.

17        Q.   Officer Fihe, are you suggesting that Sergeant Yost

18   reviewed Division Directive 4.03 with you regarding the shared

19   responsibility in these situations and the importance of slowing

20   things down even though that division directive had no

21   application to this situation?

22        A.   I don't think that it applies -- we're talking about

23   having somebody reach into their pockets while they're a felony

24   suspect.

25        Q.   A person who might be impersonating a police officer is

1   a felony suspect.  Do you agree with that?

2      A.   There's two felonies, yes, sir.

3      Q.   And so -- well, I'll leave it at this.  I think we've

4   talked about this directive enough.

5           After everything that I've asked you and that you

6   answered and we talked with Sergeant Yost, is it still your

7   position under oath today that Division Directive 4.03 did not

8   apply to this situation?

9      A.   I don't think that it did.

10     Q.   Now, if defense counsel were to offer expert testimony

11  from another Columbus police division employee who analyzed this

12  case from the point of view of 4.03, does that mean that that

13  testimony in your mind is not relevant to the case?

14          MS. PICKERILL:  Objection.

15          THE COURT:  Sustained.

16  BY MR. KEYES:

17     Q.   It was your testimony on direct that you believed what

18  Mr. Burk should have done was to have out his credentials before

19  you pulled up, correct?

20     A.   Yes, sir.

21     Q.   Now, you saw in the exhibits, you saw a copy or a photo

22  of Mr. Burk's credentials, correct?

23     A.   Yes.

24     Q.   You agree they were in a black wallet billfold and had a

25  metal badge in there, correct?

1    A.    Yes.

2    Q.    That's the item you're saying he should have had in his

3  hand when you were pulling up, true?

4    A.    I didn't say hand, sir.

5    Q.    You're saying he should have had them displayed,

6  correct?

7    A.    Correct.

8    Q.    Your assumption about where credentials can be worn or

9  displayed, that's based on your service as a Columbus police

10  officer, correct?

11    A.    Sure.

12    Q.    You'd agree with me that you have no experience as an

13  ATF agent, correct?

14    A.    Correct.

15    Q.    No knowledge as to how their credentials are carried or

16  displayed, correct?

17    A.    I can tell you that nationally law enforcement carry

18  usually their badge around their neck like this or on their belt

19  right next to their gun, from my experience.

20    Q.    But, as far as what ATF's own protocols are, you don't

21  have any personal knowledge of ATF's own protocols?

22    A.    That's correct.

23    Q.    If there were evidence from ATF itself about its

24  procedures or what's allowed within policy as far as agents

25  carrying their credentials, that would be more accurate evidence

1  about ATF's own procedures, correct?

2          MS. PICKERILL:  Objection.

3                       - - -

4      (The following proceeding was held at sidebar.)

5          THE COURT:  You have objected to the evidence of those

6  rules.

7          MR. KEYES:  No, Your Honor, that's not correct.

8          THE COURT:  Yes, you have.  The best evidence of it is

9  contained in the disciplinary records.  So do you want them to

10  come in?  That's fine.

11          MR. KEYES:  No, Your Honor.  The evidence is in the

12  ATF deposition questions which we have tendered.

13          THE COURT:  There's other evidence.  No.  I'm going to

14  sustain the objection.

15      (The following proceeding was held in open court.)

16  BY MR. KEYES:

17    Q.   The fact that Officer Burk used profanity at you, that

18  in itself is not necessarily proof that he's not a law

19  enforcement agent; is that correct?

20    A.   Correct.

21    Q.   Law enforcement agents use profanity, true?

22    A.   I wouldn't say on a regular basis but, absolutely, I'm

23  sure it's happened.

24    Q.   Certainly in your time as a law enforcement official,

25  you've used profanity with other officers, correct?

1    A.   Yes, sir.

2         MS. PICKERILL:  Objection.

3         THE COURT:  Overruled.

4    BY MR. KEYES:

5    Q.   Sorry.  Was that yes?

6    A.   Yes.

7    Q.   We actually heard you on the video -- well, I think

8    either you or Officer Winchell at some point using profanity

9    while you were on the ground with Mr. Burk; is that correct?

10   A.   I don't remember if I used profanity.

11   Q.   When you called Mr. Burk a moron, is that a standard way

12   that law enforcement officials may communicate?

13   A.   I mean, I think it was warranted in this situation.  He

14   wasn't acting in protocol, and he turned this into a situation

15   it didn't need to be.

16   Q.   When you told him, after he was in the back of the

17   police cruiser -- I'm sorry, I believe it was as you were taking

18   him to the back of the police cruiser when you told him you had

19   your chance?

20   A.   Yes, sir.

21   Q.   What you're referring to was he had his chance to

22   provide his identification, correct?

23   A.   Yes.  What I meant by that was he had his chance to have

24   it out when I got there.  He knew I was coming so...

25   Q.   Once you saw his credentials and once you pulled them

1  out of his left pocket and saw his badge, you saw the photo ID,

2  and you saw the ATF credential, did you still think they were

3  fake at that point?

4      A.   I couldn't verify them.

5      Q.   At that point you at least saw a badge that had more

6  than just a symbol on it, correct?

7      A.   Yes.

8      Q.   It had an agency name, correct?

9      A.   Yes.

10     Q.   It had a number on the badge, correct?

11     A.   Yes.

12     Q.   And so, at least by that point, you knew that some of

13  what the resident had communicated, or what had been relayed to

14  you that the resident had communicated, to 911 may not have been

15  accurate, true?

16          MS. PICKERILL:  Objection.

17          THE COURT:  Sustained.

18  BY MR. KEYES:

19     Q.   Officer Fihe, you agree with me that when it comes to

20  the reasonableness of your actions under either excessive force

21  or detention protocols, you have to take into account the

22  circumstances as they may evolve during your run, correct?

23     A.   Correct.

24     Q.   And you have to consider information not just that tends

25  to confirm suspicions about a subject, but also information that

1    might tend to reduce or remove those suspicions, correct?

2        A.   Are you talking about investigating the run, yes, sir.

3        Q.   I'm talking about as you're on a scene and you're

4    determining whether you have suspicion to detain somebody, for

5    example.  So, yes, as you're on the run and the situation is

6    evolving, you have to consider any new information that comes

7    your way, true?

8        A.   Correct.  We're investigating the felonies, yes, sir.

9        Q.   As far as new information, once you pulled Agent Burk's

10   credentials out of his pocket and you saw that badge, now you

11   have a new piece of information that you didn't have before,

12   correct?

13       A.   That is correct.

14       Q.   And that's his photo identification, correct?

15       A.   Uh-huh.

16       Q.   Yes?

17       A.   Yes.  Yes.

18       Q.   And that's his badge number 4672, correct?

19       A.   That's correct.

20       Q.   And that's -- that he had a badge that actually had an

21   agency identifier and a badge number on it, correct?

22       A.   Correct.

23       Q.   And that information was different than what had been

24   communicated to you on your way on the run?

25       A.   Yes, sir.

1      Q.    When you received -- did you ever receive training from

2    Columbus police about how out-of-uniform personnel should

3    respond when being challenged by uniformed personnel?

4      A.    This direction, the directive does actually touch on

5    that just a little bit, the one we just talked about.

6      Q.    One of the pieces of training is to produce your badge

7    and ID.  This is now to the out-of-uniform personnel, the one

8    being challenged.  One of the instructions is to produce your

9    badge and ID or inform the challenging officer that you are

10   going to retrieve your badge and ID when instructed to do so,

11   correct?

12     A.    Correct.

13     Q.    And you never instructed Mr. Burk to do so?

14     A.    I did not, no.  I certainly did not want him reaching

15   into his pockets.

16     Q.    The OHLEG sheet that you talked about on direct

17   examination, I want a little bit of clarification on who has

18   access to that.  It's not just everybody, correct?

19     A.    No, no, it's not everybody.  It's mainly law

20   enforcement.  Like I said, it could be prosecutors.  I could go

21   down a long list of people that would have some OHLEG -- defense

22   attorneys, judges, a lot of people.

23     Q.    It's not just every random person on the street.  It's

24   people associated with law enforcement and the criminal justice

25   system?

1    A.    That's correct.

2    Q.    Now, when you -- after you had pulled Mr. Burk's badge

3  and credentials out of his pocket, did you ever make an attempt

4  to look at what materials he had in that folder, what paperwork

5  he had in that folder?

6    A.    I don't believe I did.  That certainly wouldn't identify

7  him, if that's what you're asking.

8    Q.    My question was whether you ever looked at the paperwork

9  he had in the folder?

10   A.    I didn't.  I think I might have seen the top that said

11 OHLEG, but that was long after we had gotten him -- I think it

12 was when I was picking the papers up after we got him into the

13 car.

14   Q.    Did you look inside to see if there was any information

15 about his investigation or his claimed purpose for being there?

16   A.    I did not.

17        MR. KEYES:  May I have a moment, Your Honor?

18        THE COURT:  Yes.

19        MR. KEYES:  No further questions at this point, Your

20 Honor.  Thank you.

21        THE COURT:  Ms. Pickerill, any redirect examination?

22        MS. PICKERILL:  Briefly, Your Honor, yes.

23

24

25

- - -

REDIRECT EXAMINATION

BY MS. PICKERILL:

Q.   Detective Fihe, Mr. Keyes talked to you about what you had available in your -- if we need a minute that's totally okay.

Mr. Keyes talked to you about that CAD display in your cruiser and what you may or may not have read from it at this time.  If you had read Mr. Burk's name and badge number, would you have responded any differently to the scene?

A.   No, ma'am.

Q.   If you had Mr. Burk's name and badge number, would you still have been investigating a burglary in progress?

A.   Yes, ma'am.

Q.   Would you still have been investigating an impersonation of a police officer?

A.   Yes, ma'am.

Q.   We talked a little bit about -- I'm sorry.  You and Mr. Keyes talked a little bit about going through Mr. Burk's paperwork or doing any investigation.  Did you or anyone else ever investigate that burglary after Mr. Burk was detained?

A.   I did not.  Like I said, it was the sergeant that got on scene that was doing the investigation once he got there.

Q.   Do you know if Sergeant Tolman did investigate that burglary claim?

1    A.    I believe he -- I believe he did talk to the burglary

2    detectives about it.

3    Q.    Do you know if he investigated the impersonation of a

4    police officer claim?

5    A.    Yes, sir -- or yes, ma'am.

6    Q.    Mr. Keyes asked you about whether or not you called

7    someone else at CPD to have them call ATF and verify Mr. Burk's

8    name and badge number while you were driving to the scene.  Why

9    didn't you do that?

10   A.    So that would be an unnecessary risk for no reason.  At

11   this point, it's already out there that he's a burglary suspect.

12   He's going to need to be detained.  Luckily -- or one way or the

13   other, it would certainly be nice if he would cooperate so he

14   could be detained without being handcuffed and all of that.  But

15   that's not what happened, of course.

16   Q.    Have you ever encountered suspects who are able to turn

17   around and show their hands at the same time?

18   A.    Yes, ma'am.

19   Q.    How long does it take someone to do that?

20   A.    Within a split second they would start turning.

21   Q.    When you arrived on scene, why didn't you ask Mr. Burk

22   to disarm himself?

23   A.    So we're talking about pulling up on the scene of a high

24   priority run, a dangerous felony in progress.  Having him pull

25   his gun out of his holster I'm sure sounds as bad as I just said

1   it, but that's ridiculous.

2           MS. PICKERILL:  Maria, could we get Defense Exhibit E

3    up on the screen real quick, please?  This is the same

4    directive we've been looking at.

5   BY MS. PICKERILL:

6     Q.    If we could go down to Section 2 so we can see A and B.

7           This is that same directive that you were looking at

8   with Mr. Keyes; is that right?

9     A.    Yes.

10    Q.    In Section A, the very last bit talks about if an

11  individual refuses to comply.  If that's the case, what are you

12  all trained to do?

13    A.    Well, we're trained to -- and it says right here if the

14  individual refuses to comply, treat the situation as any other

15  encounter with an armed individual.

16    Q.    Is that what you did in this case?

17    A.    Yes, ma'am.

18    Q.    What does this directive tell you about what to expect

19  when you encounter out-of-uniform police officers?

20    A.    Like I said, nationally, officers are -- certainly, if

21  they know you're coming, they would want to have their badge

22  visible and their ID visible.  That's just normal protocol that

23  law enforcement follow in my experience in the last 30 years of

24  being a police officer.

25           MS. PICKERILL:  Maria, we can take it down.  Thank

1  you.

2  BY MS. PICKERILL:

3  Q.   You talked to Mr. Keyes just a little bit about CPD's

4  internal investigation.  When does CPD investigate uses of

5  force?

6  A.   So, in this situation, I'm on video.  Not long after the

7  TASER was deployed and he was secured, I got on the air and I

8  said I need a supervisor for use of TASER.  That's when the

9  investigation would start.

10  Q.   Does CPD only investigate uses of force involving a

11  TASER?

12  A.   No, ma'am.  Most uses of force.  I would say all uses of

13  force, yes, ma'am.

14  Q.   Is that just standard across the division?

15  A.   Correct.

16  Q.   When you arrived at 3358 Edgebrook Drive, did you find

17  that Mr. Burk matched the description of the burglar?

18  A.   Yes, ma'am.

19      MS. PICKERILL:  I have nothing further at this time.

20  Thank you.

21      THE COURT:  All right.  Anything further, Mr. Keyes?

22      MR. KEYES:  Briefly, Your Honor.

23

24

25

- - -

RECROSS-EXAMINATION

BY MR. KEYES:

Q.   Division Directive 4.03 instructs the conduct of Columbus Division of Police officers, correct?

A.   That's correct.

Q.   We just saw it up on the screen.  Agent Burk was not an out-of-uniform Columbus Division of Police officer, was he?

A.   That is correct.

Q.   I think we started -- and we were talking about some of the information that may or may not have affected your response to the run when Ms. Pickerill was redirecting you.  But do we still agree that it's -- the more information the better, correct?

A.   Yes.

Q.   And it's important for you to use all of the information that's available to you, paying attention to it as it develops, correct?

A.   If you're talking about stuff being added to my display run on my computer, like I said earlier, running lights and sirens and reading at the same time is extremely dangerous.

Q.   That's something we saw you do while you were driving to the scene, correct?

A.   Yes.

Q.   And more generally, as you're responding to a run or

1  trying to figure out what's going on at a scene, do we agree

2  that it's important to use all information and pay attention to

3  it, including information you learn as the situation develops?

4      A.   I would agree with that some.  But, if it's really

5  important information, a lot of times our dispatchers will get

6  on the air and verbally tell us.

7      Q.   Okay.  So the most important information you're saying

8  is verbally communicated?

9      A.   Well, if it's something that's drastic like an officer

10  safety issue or something like that, I think the dispatchers

11  would get on the air.  Of course, I can't answer for exactly how

12  our radio room works.

13      Q.   Going back to the example you raised yourself about

14  whether Mr. Burk had gone into the house or not, that's

15  something that if it had actually happened, probably would have

16  been communicated to you over dispatch it sounds like.  Is that

17  true?

18      A.   I don't know.

19      Q.   That wouldn't have been important information?

20      A.   It would have been important information, but I don't

21  know if the dispatchers would have told us that or not.

22      Q.   Do you want to revise your assumption about important

23  information being communicated verbally over the radio?

24      A.   No.

25           MR. KEYES:  Thank you.

1    THE COURT:  All right.  Officer Fihe, that concludes

2    your testimony.  You may step down.

3         And, Counsel, you may call your next witness.

4         MS. ROSENBERG:  Thank you.  We'll call Officer Kevin

5    Winchell.

6                        - - -

7                    KEVIN WINCHELL

8    Called as a witness on behalf of the Defendants, being first

9    duly sworn, testified as follows:

10                   DIRECT EXAMINATION

11   BY MS. ROSENBERG:

12   Q.   Officer, can you introduce yourself to the jury?

13   A.   Officer Kevin Winchell, Columbus Police Department.

14   Q.   Can you tell the jury a little bit about yourself?

15   A.   I've been a 24-year veteran in the Columbus Police

16   Department.  I was born and raised here in central Ohio.

17   Q.   And do you remember 24 years ago why you decided to

18   become a Columbus police officer?

19   A.   At the time I was working at the old downtown Lazarus

20   store, loss prevention.  We had several plainclothes officers

21   who worked with us.  They suggested it as a good career path for

22   me.  So I took the civil service test and I got on.

23   Q.   And do you remember when you entered the Columbus Police

24   Academy?

25   A.   I do, yes.

1    Q.    When was that?

2    A.    That would have been June 26th of year 2000.

3    Q.    And I know we heard a little bit about it from Officer

4  Fihe.  Tell us a little bit about what you do at the academy

5  during that six months.

6    A.    It's a combination of academic work, legal work,

7  physical fitness, law enforcement tactics, defensive tactics,

8  use of force, things like that.

9    Q.    And after the academy do you receive additional training

10  on defensive tactics?

11    A.    Yes.  Yearly, we have what's called in-service training.

12  Once or twice a year we go back to the academy and we practice

13  scenarios and physical defensive tactics, yes.

14    Q.    Have you ever had any training on those scenarios that

15  you talked about when they're involving challenging

16  out-of-uniform personnel?

17    A.    Yeah, multiple years ago we had a specific scenario

18  where we're responding to a criminal scene.  I don't remember

19  the nature of the crime itself.  We encounter a Columbus police

20  officer who is playing a role.  They are a training officer.

21  They're in plainclothes.  They tell me they are a police

22  officer, and it's my job at that time to figure out how to

23  determine whether or not they are actually a police officer.

24    Q.    Can you tell me a couple different ways that might go

25  about?

1    A.    Obviously, we can ask for some form of identification, a

2    badge or a Columbus police ID or any law enforcement ID.

3    Barring that, if they say they are a Columbus police officer, I

4    can possibly ask them common-knowledge questions that any

5    Columbus police officer would know.  Depending on the situation,

6    how much time, space, and safety I have, it would be my decision

7    on what I take for proper identification or not.

8    Q.    Let's talk about July 7th, 2020.  What was your

9    assignment that day?

10    A.    I was working cruiser 9170.

11    Q.    What zone were you in?

12    A.    Zone 1.

13    Q.    What time of day were you working?

14    A.    My shift that day was 9A to 7P.

15    Q.    At the time what was Zone 1?  What did it encompass?

16    A.    Zone 1 was the farthest four north precincts which would

17    have been everything from Tuttle Mall to Polaris Mall over to

18    Easton Mall.

19    Q.    Were you operating a marked Columbus police cruiser?

20    A.    I was.

21    Q.    Were you wearing the uniform of the day identifying you

22    as a Columbus police officer?

23    A.    I did.  Back then our uniforms were white.  But, yes, I

24    was wearing the uniform of the day.

25    Q.    Would your cruiser have a cruiser video system in it?

1    A.    It did, yes.

2    Q.    Did you have a body-worn camera on?

3    A.    I did, yes.

4    Q.    At approximately 1:55 p.m., did you receive information

5    about a run to Edgewood Drive address?

6    A.    Yes.  A run came over as a possible burglary in

7    progress, which our 10 Code is 10-8, and it said there was a

8    male on scene claiming to be a police officer trying to gain

9    entry into the residence.

10   Q.    Were you familiar with the address for the run?

11   A.    No, I had never been to that address before.

12   Q.    And did you need to use your GPS to get there?

13   A.    Correct.  Our Google Maps on our computer screen in the

14   cruiser, yes.

15   Q.    And did you receive any information while you were en

16   route to the scene?

17   A.    Only what was verbally communicated over the radio.  I

18   don't remember reading anything from the CAD screen at that

19   time.

20   Q.    Do you know whether or not another officer arrived

21   before you?

22   A.    Yes.  I heard Officer Joseph Fihe mark on scene before I

23   got there.

24   Q.    Did you get any information from him while you were en

25   route?

1    A.   The only thing that I got before showing up is that he
2  put out a 10-3, officer-in-trouble call.

3    Q.   And what priority is a 10-3, officer-in-trouble call?

4    A.   That along with 10-8 are both priority one, highest
5  priority runs.

6    Q.   And did you respond with lights and sirens?

7    A.   I was already responding lights and sirens when the 10-3
8  call went out, yes.

9    Q.   Let's watch your body-worn camera so we can see what was
10  going on from your perspective.  It's Joint Exhibit II.  We can
11  start from the beginning.

12     (Video played in open court.)

13  BY MS. ROSENBERG:

14    Q.   What do we have up on your screen there?

15    A.   That would be the map location that I was headed to.
16  The red dot would be the target address or the address from the
17  call.

18     (Video played in open court.)

19       MS. ROSENBERG:  Stop.

20  BY MS. ROSENBERG:

21    Q.   What do you remember seeing when you arrived?

22    A.   When I arrived I could see, obviously, Officer Fihe's
23  cruiser parked there, and I could see him -- I could see over
24  the top of those vehicles.  I could see him there with his gun
25  drawn and he was shouting commands.

1    Q.    What did you do in response to that?

2    A.    After already responding on a 10-8 burglary in progress

3 and now a 10-3 has been added, I assumed Officer Fihe was in

4 trouble, possibly life-threatening trouble.  So I drew my weapon

5 and trained it on the suspect that he was pointed at.

6    Q.    Where was the suspect at?

7    A.    The suspect is directly over the barrel of my gun.  You

8 can see him standing in front of that minivan there.

9    Q.    What were they wearing?

10   A.    If I remember, a polo shirt, green or gray, and khaki

11 pants.

12   Q.    Did you see any visible markings or badge or anything

13 that would identify the person as a law enforcement officer?

14   A.    No, there was nothing.

15        MS. ROSENBERG:  We can keep playing.

16     (Video played in open court.)

17 BY MS. ROSENBERG:

18   Q.    Tell me what's happened up to this point.

19   A.    At this point the suspect is now at least beginning to

20 comply with our orders to get on the ground, and he's face down

21 on the concrete.  At this time we make our approach in order to

22 take physical control of him, get his hands behind his back and

23 put handcuffs on him.

24   Q.    Now, initially, are you able to have both hands behind

25 his back?

1    A.    Yes.  I was on his right side.  I grabbed his right

2   wrist.  Officer Fihe was on his left side and grabbed his left

3   wrist or arm, and we were able to place his hands behind him in

4   the small of his back.

5         MS. ROSENBERG:  Let's keep playing.

6      (Video played in open court.)

7   BY MS. ROSENBERG:

8    Q.    Now, we can't see what's going on right here.  Do you

9   remember what happened?

10   A.    During the struggle after -- when we first tried to

11   handcuff him, Mr. Burk pulled both his left and right hand away

12   from his back and pulled them in front of him.  That caused us

13   to have a physical struggle with him.  I'm not sure, my body

14   camera bumped into either Officer Fihe or Mr. Burk, I don't know

15   who.  That was able to knock it off the mounting from my uniform

16   shirt.

17   Q.    Now, are you saying stop resisting?

18   A.    That was me shouting that, yes.

19   Q.    Why are you saying that?

20   A.    For many reasons.  One, hopefully, to help us gain

21   compliance over the suspect and also it's something we're

22   trained to do.  If there are bystanders or people looking by and

23   they wonder why we're physically fighting with somebody, by

24   saying stop resisting, it gives us credence, the reason why

25   we're in a physical confrontation is because this person is

1  physically resisting us, not because we're attempting to assault

2  him for any reason.

3     Q.   At any time -- at some point Officer Fihe gets

4  Mr. Burk's hand in the left cuff.  Did you notice that?

5     A.   I did see that, yes.

6     Q.   What happened after that?

7     A.   When he was -- got that cuffed, I was still attempting

8  to pull Mr. Burk's right hand behind his back, but he had pulled

9  it up and he was flexing and holding his arm upwards so I was

10  not able to pull it back and get it behind his back so we could

11  get both hands cuffed together.

12     Q.   What did you do in response to that?

13     A.   While I was continuing to struggle with him and I was

14  not getting anywhere -- like I said earlier, it was a very hot

15  day and we are all kind of sweaty.  Holding on to someone's

16  hands -- while I was continuing to try to control that right

17  arm, at that time I told Officer Fihe, my partner, I said, hey,

18  go ahead and get your TASER out, Joe, get your TASER out.

19     Q.   Why did you say that?

20     A.   I was figuring the TASER may be necessary to use.  I

21  also wanted the suspect to know we were probably going to deploy

22  a TASER, again, hoping that might help him get to comply with

23  our orders and stop resisting being handcuffed.

24     Q.   Did you give any warnings about the TASER?

25     A.   I did tell him that if he didn't put his hand behind his

1  back he was going to get tased.

2  Q.  Now, why couldn't you get his hand behind his back?

3  A.  Because he was physically fighting me.  He was holding

4  it forward.  I had both hands on it trying to pull it back.  He

5  was in a stronger position than I was.  He had his hand cocked

6  up like this.  With all my strength I was not able to physically

7  pull his hand behind his back.

8          MS. ROSENBERG:  Let's keep playing.

9      (Video played in open court.)

10 BY MS. ROSENBERG:

11     Q.  What happens when the TASER is used?

12     A.  When Joe uses the TASER in the drive stun mode on the

13 suspect's back, that -- pretty quickly, within a matter of a

14 second or so, he stopped pulling his arm forward.  He relaxed

15 his arm, and I was able to maneuver to it his lower back where

16 his left hand was already cuffed, and we were able to put the

17 cuff on his right hand also.

18     Q.  Now, did you hear Mr. Burk say, "I have a health

19 condition" and "help me up" and things of that nature?

20     A.  I heard him say several things like that, yes.

21     Q.  What affect did those statements have on what you were

22 doing?

23     A.  Until we had him cuffed, secured, and ultimately

24 disarmed, they really didn't mean anything to me.  My first

25 priority was our safety, his safety, and any other person's

1  safety nearby.

2    Q.   You probably can't see it on your body-worn camera, but,

3  after Mr. Burk was in handcuffs, what did you do?

4    A.   At that time that's when I first recognized that he had

5  a gun in his holster.  So I removed the gun from his holster.  I

6  ejected the magazine, and I believe I also ejected a round from

7  the chamber and got that away from him so that gun was no longer

8  a threat to myself or Officer Fihe.

9       MS. ROSENBERG:  Let's go to Officer Winchell's cruiser

10  video.  I want to do the back seat of it.  I'm sorry.  I wasn't

11  clear.  It's Joint Exhibit V.

12  BY MS. ROSENBERG:

13    Q.   Tell me what happened as you guys took Mr. Burk over to

14  the cruiser.

15    A.   We were going to go ahead, and along with having him

16  handcuffed, make sure he was more secure by putting him in the

17  back of the Columbus police cruiser where there was no chance he

18  could possibly flee or assault or further resist anymore.

19    Q.   Okay.  Now, we're starting here at 10:26 here.  We're

20  still outside the cruiser.

21    A.   The cruiser door was locked.  So I had to get my key

22  out, unlock the front seat door to unlock the back seat door.

23       THE COURT:  Is this being displayed?

24       MS. ROSENBERG:  I believe so, Your Honor.  I don't see

25  it on this screen.  I can only see it on mine.

1          THE COURT:  Do the jurors have it?

2          THE DEPUTY CLERK:  Yes, they do.

3          MR. KEYES:  It's a joint exhibit, Your Honor.  No

4    objection.

5   BY MS. ROSENBERG:

6     Q.    What's happening right here?

7     A.    Mr. Burk is being ordered to get all the way inside the

8   cruiser.

9        (Video played in open court.)

10  BY MS. ROSENBERG:

11    Q.    You asked him verbally to get inside the cruiser?

12    A.    I ordered him.  I didn't ask.  I ordered him.

13    Q.    What happened right there?

14    A.    For a split second, he actually stood up, removed his

15  rear end from the seat and kind of stood up towards me.

16    Q.    Tell me about the positioning of the seat belt.

17          MS. ROSENBERG:  Can we pause it here?

18          THE WITNESS:  Our cruisers, for many years, were like

19   any other automobile where the seat belt would be fastened on

20   the outside shoulder of the passenger where you would pull it

21   across and buckle it on their inside hip.  We had many

22   instances where officers were trying to secure the seat belt

23   on, but, in order to do that, you'd have to lean across the

24   person's body which exposed you to being bitten, head butt or

25   assaulted.

1    These seat belts are reverse.  They actually work on

2  the inside, or the middle of the seat, and they're attached to

3  the cage on the front, so that once the suspect is placed

4  inside, I have to reach right inside the door about six inches

5  and pull it down and attach it on the right side of his hip

6  which is opposite of a normal car's seat belt function.

7  BY MS. ROSENBERG:

8    Q.    So at this point has the seat belt been secured?

9    A.    No, the seat belt is not secured.  It's still attached

10  to the cage because we're not in motion.  We were not driving

11  anywhere at this time so I did not lock the seat belt in yet.

12    Q.    When you say attached to the cage, are you saying --

13    A.    The cage that separates the front seat from the back

14  seat.  You can see that metal mesh.  There is a little hook

15  right there where the seat belt -- the buckle that would

16  normally be inserted into the receptacle is attached to that.

17  When I'm standing outside the cruiser, I can grab that and hook

18  it next to his right hip.  That way I don't have to lean over

19  and expose myself to a possible assault or bite or something

20  like that.

21    Q.    You would take it off that hook and put it on --

22    A.    By his right hip, yeah.

23    Q.    Okay.  So in your view was there anything preventing

24  Mr. Burk from getting inside with the seat belt?

25    A.    No, other than the seat belt touching him.  But it's a

1  cloth seat belt.  It's not hard.  It's not stiff.  It wouldn't

2  stop him from getting in at all, no.

3      Q.   The seat belt certainly wasn't already secured and you

4  needed to unsecure it to get him in?

5      A.   No.  It's done that way tactically so we can quickly put

6  it on real fast once they're in.

7      Q.   Now, I don't think it's on your body-worn camera, but

8  earlier we heard some information about Mr. Burk making

9  complaints about breathing when he was getting into the cruiser?

10     A.   That's correct.

11     Q.   What did you do in response to that?

12          THE COURT:  Just one moment.  Are you going to show

13   any more of the scenes inside the police car?

14          MS. ROSENBERG:  No.  We can take it down, Your Honor.

15          THE COURT:  I need to see all of the footage that you

16   have of Mr. Burk from before he gets in until -- the whole

17   thing.  We need -- I need to see that to understand what

18   happened with regard to his entry into the police car.

19          MS. ROSENBERG:  Okay, Your Honor.  I can back it up a

20   little bit.

21          THE COURT:  I think the jury does too.

22          THE DEPUTY CLERK:  We need a restroom break for one of

23   the jurors.

24          THE COURT:  That's fine.  We'll take a ten-minute

25   recess.

1     (Jury out at 3:53 p.m.)

2     (Recess taken from 3:53 p.m. to 4:11 p.m.)

3     (Jury in at 4:11 p.m.)

4          THE COURT:  Ms. Rosenberg, you may proceed.

5          MS. ROSENBERG:  Thank you, Your Honor.

6          THE COURT:  We're going to see everything about the

7     police car.

8          MS. ROSENBERG:  Yes, Your Honor.

9          THE COURT:  All right.

10          MS. ROSENBERG:  I'm going to start with Joint

11     Exhibit II, which is Officer Winchell's body-worn camera.  I'm

12     going to start it at 2:48.

13     (Video played in open court.)

14          MS. ROSENBERG:  Pause it here at looks like 5:10.

15     BY MS. ROSENBERG:

16     Q.    Did you call a medic during this time?

17     A.    Yeah.  Before he was finally secured in the cruiser, I

18     had radio ask for a medic to respond.

19     Q.    Now, let's go to Joint Exhibit V, which is the rear

20     cruiser video system.

21          MS. ROSENBERG:  Start it at 10:37.

22     (Video played in open court.)

23          MS. ROSENBERG:  We can pause it at 11:26.

24     BY MS. ROSENBERG:

25     Q.    Can you describe how you were able to get Mr. Burk

1  inside the cruiser?

2     A.   We repeatedly ordered for him to get in the car, all the

3  way in the car, put his legs in the car.  At one point he

4  actually stood up.  So I actually grabbed -- put my hands on his

5  chest, pushed him back down into the seat.  At that time Officer

6  Fihe went around to the driver's side of the car, and he began

7  to pull Mr. Burk in by his arm from the other side.  And I was

8  able -- I had to physically grab both of his legs one at a time

9  and put them into the cruiser.

10     Q.   And was there anything about the seat belt itself

11  preventing Mr. Burk from getting inside?

12     A.   No, other than the fact it's touching his neck.  It's a

13  soft cloth seat belt.  It will move with you when you get into

14  the car.  It's on the other side also and Officer Fihe was able

15  to lean over and physically pull.  There's one on both sides of

16  the seat there.

17     Q.   Do you typically have to pull another person into the

18  cruiser to get them inside?

19     A.   If they're being non-compliant, refusing to get into the

20  cruiser.  It's a trained technique, yes.

21     Q.   Are they able to voluntarily get in there on their own?

22     A.   Barring some sort of physical disability or someone

23  extremely large may have some trouble.  But the average person

24  can get in there.  I'm 6 foot 2, 240 pounds, and I can get in

25  the back of a cruiser.

1  Q.  After Mr. Burk was inside the cruiser, did you have any

2  further contact with him?

3  A.  No.  At that point other officers, including supervisor

4  Sergeant Neal Tolman, were arriving.  So we passed off the

5  investigation and everything concerned to them -- or to Sergeant

6  Tolman I should say.

7  Q.  Now, you said you called for a medic.  Did a medic come?

8  A.  A medic did arrive, yes.

9  Q.  Did you have any interaction with the medics?

10  A.  None whatsoever.

11  Q.  Did you ever observe if Mr. Burk was treated by the

12  medics?

13  A.  I saw him removed from the back seat of my cruiser and

14  taken into the medic, but I did not see what treatment he did or

15  did not receive, no.

16  Q.  Did you ever find out if Mr. Burk's identity was

17  verified that day?

18  A.  I do believe I was informed that day that he was indeed

19  an ATF agent, yes.

20  Q.  Do you know who confirmed that?

21  A.  It's my understanding Sergeant Tolman made a phone call

22  or a series of phone calls and was able to verify Mr. Burk's

23  identity, yes.

24  Q.  Were you involved in that process?

25  A.  I was not, no.

1    Q.   Did you see what happened with Mr. Burk after he got out

2  of the medic?

3    A.   I saw him released at the scene.  He came out of the

4  medic.  And I don't know when but, at some time, his handcuffs

5  had been removed.  His property, everything we had taken from

6  him, including his firearm, were returned to him and that was

7  the last I remember seeing Mr. Burk.

8    Q.   Did you remove the handcuffs or have anything to do with

9  removing the handcuffs?

10    A.   No.  Someone else did that.

11    Q.   Why were you not involved in that process?

12    A.   At the point of -- we had the use of force and there was

13  a contentious detention.  And so, at that point, Sergeant Tolman

14  was in charge.  I really wanted nothing else to do with it.  I

15  didn't want any more confrontation to occur.  So I figured I

16  would let Sergeant Tolman and other officers on scene take care

17  of that.

18    Q.   Were there other officers who arrived to the scene

19  besides Sergeant Tolman?

20    A.   Yes.  Multiple patrol officers same rank as I am, which

21  would be one rank under sergeant -- multiple officers responded.

22  I couldn't tell you how many or exactly who, but, yes, multiple

23  officers were on scene.

24    Q.   Do you ever want to use force?

25    A.   No.

1    Q.   Was there anything about this situation that made you

2 upset at Mr. Burk or anything like that?

3    A.   I wasn't personally upset.  When -- any time you're

4 involved in a physical confrontation, it gets your blood

5 pumping.  It gets your adrenaline up.  Your temper can go off.

6 That's why there was some rough words going back and some rough

7 tone of voice.  I wouldn't say I was upset at Mr. Burk.  I was

8 upset at the whole situation that it had transpired the way it

9 had.

10    Q.   Why is that?

11    A.   Because I didn't think it was necessary.  After all was

12 said and done, it was confirmed he was a law enforcement

13 officer.  So, in my opinion, it could have been handled without

14 any use of force whatsoever.

15         MS. ROSENBERG:  I don't have any additional questions

16  for you.

17         THE COURT:  Does that conclude your examination?

18         MS. ROSENBERG:  Yes, Your Honor.

19         THE COURT:  Very well.

20         Mr. Keyes, you may cross-examine.

21         MR. KEYES:  Thank you, Your Honor.

22    Can we switch to the lectern, please?

23         Thank you.

24

25

- - -

CROSS-EXAMINATION

BY MR. KEYES:

    Q.    Officer Winchell, I'm going to start with a short
portion of the back seat camera video that we just saw on your
testimony.

            MR. KEYES:  This is Joint Exhibit V.  Can we please
publish to Counsel and the jury?

            I don't know why it always works the second time but
never the first.

BY MR. KEYES:

    Q.    These seat belts that you were discussing -- so I
understand that they're sort of a reverse seat belt but, other
than that, they operate the way a normal shoulder and lap
restraint would.  In other words, if there is a quick
acceleration, they'll lock into place, correct?

    A.    Correct.

    Q.    I'm going to ask you to look at this portion of the
video here for a moment.

        (Video played in open court.)

BY MR. KEYES:

    Q.    We see Officer Fihe opening -- at this point in the
video where I've paused it and we saw Officer Fihe pulling on
Mr. Burk, was the seat belt engaging at that point?

    A.    No.  The seat belt is still in the -- I guess you would

1    call it ready position.  In a normal car, it would just be

2    hanging loosely by your right side.  So I don't have to reach

3    across him, it would be attached -- if I was sitting in the

4    seat, it would be attached in front of my right hand or in front

5    of Mr. Burk's right hand at that time.  It's not engaged at that

6    time, no.

7        Q.   Let's play the video a few more seconds.

8           (Video played in open court.)

9    BY MR. KEYES:

10       Q.   When Officer Fihe had his hand on the belt, on the

11   shoulder bar, you don't believe at that point the seat belt was

12   engaged?

13       A.   You mean as far as locked in position and no longer

14   having any slack, you mean?

15       Q.   Correct.  Initially not giving that slack, initially

16   being engaged?

17       A.   No.  I don't know what the maximum amount of slack is,

18   but there was still slack in the belt when we were putting him

19   in the car.

20       Q.   You do not believe it ratcheted at all?

21       A.   I did not hear or see any ratcheting, no.

22       Q.   When you first arrived at the scene, you saw a man with

23   tan pants and a gray shirt with his hands outstretched, correct?

24       A.   Yes.

25       Q.   That was Mr. Burk we now know, correct?

1    I'm sorry.  We spoke over each other.

2    That was a yes to my first question?

3    A.   Yes.

4    Q.   And that man generally fit the description of what you

5    heard over the dispatch, correct?

6    A.   Correct.

7    Q.   The dispatcher had said that the man was claiming to be

8    law enforcement, true?

9    A.   Correct.

10   Q.   Officer Fihe now was already there with his gun pulled

11   and pointed at Mr. Burk when you got there, correct?

12   A.   Correct.

13   Q.   Now, you did not at any point ask Mr. Burk to disarm or

14   to produce his agency identification, correct?

15   A.   That is correct.

16   Q.   And you never heard Officer Fihe do that either?

17   A.   That is correct.

18   Q.   When you arrived and you saw Officer Fihe with his gun

19   pulled and pointed at Mr. Burk, you saw no imminent threat from

20   Mr. Burk at that point, correct?

21   A.   I saw no imminent threat, no.

22   Q.   He wasn't -- excuse me.  He was standing there just with

23   his arms outstretched, correct?

24   A.   Correct.

25   Q.   He was not moving aggressively toward Officer Fihe, was

1 he?

2    A.   Correct.

3    Q.   Didn't try to run when you arrived, correct?

4    A.   Correct.

5    Q.   He was just standing still?

6    A.   Correct.

7    Q.   When you ordered him to the ground, he went to the

8 ground?

9    A.   Correct.

10    Q.   In other words, you did not have to take him down?

11    A.   Correct.

12    Q.   Now, you never considered him officially arrested in the

13 sense of being read his *Miranda* rights or being taken down to

14 the station, correct?

15    A.   That is correct.

16    Q.   And there was no probable cause to do that at that

17 point, correct?

18    A.   That is correct.

19    Q.   But, as soon as you arrived, you intended for him to go

20 to the ground and to put handcuffs on him, correct?

21    A.   That is correct.

22    Q.   By that point had you ever asked him to identify

23 himself?

24    A.   No, I had not.

25    Q.   Did you ever hear Officer Fihe, once you were there, ask

1  him to identify himself?

2      A.   No, I did not.

3      Q.   You removed his service pistol from the holster on his

4  right hip once he was handcuffed on the ground, correct?

5      A.   Correct.

6      Q.   And this was a semiautomatic pistol, the type used by

7  some law enforcement agencies, true?

8      A.   Correct.

9      Q.   Now, you had never seen him make a move toward his gun

10  either before or after he went to the ground, correct?

11      A.   That is correct.

12      Q.   After he was handcuffed, you and Officer Fihe, you sat

13  him up on the sidewalk, true?

14          I'm sorry.  Yes?

15      A.   Yes.

16      Q.   That's okay.  It's natural to just kind of nod.  We do

17  have to have it out loud, please.

18          Now, at that point once he is on the sidewalk and he sat

19  up, you saw on the video and you remember from being there,

20  Officer Fihe removes his credentials from his left cargo pocket,

21  correct?

22      A.   Correct.

23      Q.   You both saw that?

24      A.   Correct.

25      Q.   The credentials that you saw after they were taken from

1  his pocket, they included a badge that said ATF, correct?

2      A.   Correct.

3      Q.   And that badge had a number on it as well, true?

4      A.   I was not close enough to actually read a number.  I did

5  see ATF, yes.

6      Q.   Just from being here in the courtroom, do you agree,

7  from what we've seen in the evidence, that badge actually had a

8  number on it?

9      A.   Yes.

10      Q.   Had you received the same information over the radio

11  from dispatch that Officer Fihe had on the way to the scene?

12      A.   I received the same verbal dispatches over the radio,

13  yes.

14      Q.   And so one of the things that the verbal dispatch

15  information included was an indication that the resident said

16  that he had -- I'm summarizing.  We can listen to it if you want

17  to hear the exact words.  In general, the resident said he

18  showed her a badge but with no name or number, just a generic

19  badge.  Do you remember that dispatch information?

20      A.   Something to that effect, yes.

21      Q.   Now, once you saw the badge that he had, we saw that it

22  said ATF and it had a number on it, correct?

23      A.   Correct.

24      Q.   So now that's a piece of information indicating that

25  what the resident originally told 911 about the badge was

1 incorrect.  Is that a fair statement?

2     A.   In hindsight I guess it could be seen that way, yes.

3     Q.   Well -- strike that.

4          The identification you saw had an indication with ATF

5 and had Mr. Burk's picture, true?

6     A.   Again, I saw the wallet.  I saw some form of

7 identification.  I did not examine it closely so I did not match

8 a photo or look at any actual wording on the identification.

9     Q.   Was Officer Fihe the one that had it in his hands?

10     A.   Officer Fihe had it in his hand, yes.

11     Q.   So he probably got a better look at it than you did?

12     A.   I would have to assume so.

13     Q.   You heard that he gave his supervisor's name to Officer

14 Fihe, correct?

15     A.   I remember the question Officer Fihe asked him about his

16 supervisor, yes.

17     Q.   And you saw him respond to it, correct?

18     A.   I heard him respond, yes.

19     Q.   He kept saying over and over again he was a federal

20 agent?

21     A.   Correct.

22     Q.   And that portion is consistent with the dispatcher's

23 report that you heard there was a man claiming to be law

24 enforcement at the front door of the house.  Is that fair?

25     A.   Correct.

1    Q.   Yes?

2    A.   Yes.

3    Q.   So, at this point when we add it up, we have a

4    dispatcher saying there is a man at the front door claiming to

5    be law enforcement, and then now we have a handcuffed man with a

6    badge and photo ID credentials saying ATF.  It seemed at this

7    point that he probably was actually law enforcement, correct?

8    A.   It seemed that there was a good possibility that, yes,

9    he may actually be law enforcement.

10   Q.   Just because words are important when it comes to

11   standards and burdens of proof, I believe that the -- and we can

12   pull your testimony if you'd like.  I believe the words we asked

13   you in your deposition -- we asked you if you agreed it seemed

14   he was probably law enforcement.  Is that a correct use of your

15   understanding that, yes, he was probably law enforcement at that

16   time?

17   A.   I don't remember the exact verbiage from my deposition,

18   but that would be pretty close I would imagine.

19   Q.   I'll just -- I know the deposition was a little while

20   ago, Officer Winchell.  So I'll just read from it.  If you need

21   to see a copy, you're welcome to.

22        I'm at page 14, line 3 through 11 of your testimony.  At

23   this point when we add it up -- I'm sorry.  This is the

24   question.  At this point when we add it up, dispatcher saying

25   there was a man at the front door claiming to be law enforcement

1   and now we've got a handcuffed individual with credentials that

2   say ATF, government ID, did it seem more likely than not that

3   the information was pointing to the conclusion that he was in

4   fact law enforcement?

5        And your answer:  It seemed that he probably was, yes.

6   A.   Sounds right, yes.

7   Q.   Yet he wasn't released at this point, correct?

8   A.   That is correct.

9   Q.   Your thinking that it seemed at that point that he

10  probably was law enforcement, did you --

11       THE COURT:  No.  That's not what you said.  Probably

12  pointing to the conclusion.

13       MR. KEYES:  Your Honor, Officer Winchell's testimony

14  was:  It seemed that he probably was, yes.

15       THE COURT:  The question was -- what was your

16  question?

17       MR. KEYES:  Did it seem more likely than not that the

18  information was pointing to the conclusion that --

19       THE COURT:  Pointing to the conclusion.  That's what

20  you asked and that's what he answered.  There is a distinction

21  that lawyers are very familiar with, the difference between

22  probabilities and possibilities.  And pointing to the

23  conclusion strikes me as being a possibility.  So let's

24  continue.

25

1  BY MR. KEYES:

2      Q.   Officer Winchell --

3           THE COURT:  Are you going to ask another question?

4           MR. KEYES:  Yes, Your Honor.

5           THE COURT:  Go ahead.

6  BY MR. KEYES:

7      Q.   Officer Winchell, your conclusion that you testified to

8  in your deposition that we just read, did you communicate that

9  to Sergeant Tolman once he was on the scene?

10     A.   I do not recall my exact words to Sergeant Tolman on the

11 scene.

12     Q.   Do you recall saying those words in any form or

13 substance to Sergeant Tolman?

14     A.   I may have said that it's possible he is an ATF agent,

15 yes.

16     Q.   Now, when he was on the ground prone and we saw the

17 video -- excuse me, the body-cam video a fair amount during the

18 trial.  Were you on his right side at some point?

19     A.   I approached him from his right side.  I was on his

20 right side during the entire struggle, yes.

21     Q.   Were you on top of him on his right side for part of

22 that?

23     A.   I believe part of my left knee might have been on his

24 buttocks or possibly the back of his left -- or his right thigh.

25     Q.   You and Officer Fihe agree that the entire time that you

1 were on scene with Mr. Burk, you prevented him from leaving,

2 correct?

3  A. Correct.

4  Q. And I'm sorry.  I need to reword that question so the

5 record is clear.  You agree with me, correct, that you and

6 Officer Fihe, while you were on scene with Mr. Burk, both of you

7 prevented him from leaving, correct?

8  A. That is correct.

9  Q. And you and Officer Fihe together took him from his

10 location on the sidewalk and put him into the back of your

11 police car, correct?

12  A. That is correct.

13  Q. And he was never charged with a crime?

14  A. That is correct.

15   MR. KEYES:  One moment, if I could, Your Honor.

16   THE COURT:  Yes.

17 BY MR. KEYES:

18  Q. Officer Winchell, Joint Exhibit V -- I'll pull back up.

19 This is your rear seat camera, correct?

20  A. Yes.

21  Q. It's taking a moment to open.

22   All I'm going to do at this point is I'm going to ask

23 you to take a look at the time stamps from when he gets in and

24 out of the car so we have something in the record.

25  A. I don't see a time stamp on my screen.

1      Now, I see it, okay, with the cursor.

2   Q.   This particular video does not have a time and date

3  stamp.  So I'm going to be referring to the time codes in the

4  video player for Joint Exhibit V.

5      You see the door closed on the rear passenger side at

6  11 minutes and 23 seconds?

7   A.   I can't see any time on my screen.  But, yeah, I see the

8  screen.  When you have the cursor on the progress bar, it shows

9  up.  But until then I can't see the time.

10   Q.   If I have it right there?

11   A.   Approximately 11:20-ish, yes.

12   Q.   Thank you.  All right.

13      And then we see him actually leave the car at about

14  20 minutes, 57 seconds?

15   A.   Yes.

16   Q.   Is that generally consistent with your memory of how

17  long he was in your vehicle that day?

18   A.   I do remember, as soon as the ambulance pulled up,

19  someone removed him from the back of my cruiser and took him to

20  the ambulance, yes.

21      THE COURT:  Excuse me.  What was the number?

22      MR. KEYES:  Your Honor, it was -- we can be

23  approximate within a couple of seconds on either side.  But, in

24  the video player, I've got -- at this frame right now, I've got

25  21 minutes and 1 second.

1      THE COURT:  That's the length of time he was in the

2  patrol car?

3      MR. KEYES:  I'm sorry.  That's the time code on the

4  video player of when he gets out.  It's approximately

5  10 minutes.  I can give you the time code of when the door

6  closes and he's in.

7      THE COURT:  Counsel, have you all figured out how long

8  it was?

9      MS. ROSENBERG:  I believe it's approximately

10  10 minutes, I would agree.

11      MR. KEYES:  Everybody agrees roughly 10 minutes, Your

12  Honor.

13      THE COURT:  Thank you very much.

14      MR. KEYES:  Officer Winchell, those are all the

15  questions I have.  Thank you.

16      THE COURT:  All right.  Is there any redirect?

17      MS. ROSENBERG:  Just briefly, Your Honor.  I promise.

18      THE COURT:  Ms. Rosenberg, you may inquire.

19                          - - -

20                  REDIRECT EXAMINATION

21  BY MS. ROSENBERG:

22  Q.   Officer Winchell, was that you removing Mr. Burk from

23  the cruiser?

24  A.   No, that was not me.

25  Q.   And you testified earlier that after Mr. Burk was in the

1  cruiser, you didn't have any further contact with him, correct?

2      A.   That is correct.

3      Q.   And you didn't take him to the medic?

4      A.   I did not.

5      Q.   Did you determine when he could leave?

6      A.   I did not.

7      Q.   You were asked initially about whether or not Mr. Burk

8  was an imminent threat.  Is there a difference between an

9  imminent threat and a threat?

10     A.   I'm not a legal expert as far as the legal terminology.

11  I would classify an imminent threat as someone who is violently

12  assaulting or threating to violently assault somebody, whereas a

13  threat would be, in my situation or this instance, the suspect

14  of a burglary is automatically considered a threat.  We're

15  talking about a person who may or may not be committing a

16  serious felony offense when we arrive.  So we automatically

17  assume that person is a threat.

18     Q.   Now, if a person is an imminent threat, what would you

19  be authorized under your levels to use?

20     A.   Deadly force.

21     Q.   And you did not see Mr. Burk as being an imminent

22  threat, correct?

23     A.   No.  That's why I didn't shoot him.

24     Q.   But you did see him as being a threat when you arrived?

25     A.   Yes.  Anyone who is considered a suspect in a serious

1  felony or serious felony crime ongoing is naturally

2  automatically assumed to be a threat no matter what their

3  behavior is.

4          MS. ROSENBERG:  Nothing further.  Thank you.

5          THE COURT:  Have you now concluded your examination?

6          MS. ROSENBERG:  Yes, Your Honor.

7          THE COURT:  Anything further, Mr. Keyes?

8          MR. KEYES:  Nothing further.

9          THE COURT:  Officer, thank you very much.  That

10  concludes your testimony and you may step down.

11          All right.  Defense counsel, is there another witness?

12          MS. PICKERILL:  Your Honor, it's now 4:40, and I think

13  this might be a good time to break for the day.  We have

14  witnesses lined up to come testify in the morning, but that's

15  the totality of the witnesses we have here today.

16          THE COURT:  All right.

17          Counsel, I'd like to talk to you about scheduling so

18  we can tell the jury what to expect tomorrow.

19                          - - -

20      (The following proceeding was held at sidebar.)

21          THE COURT:  How many for witnesses for defendant?

22          MS. PICKERILL:  This is something I wanted to bring up

23  before we left for the day.  We know that we have two.  Pat

24  Vehr is our local police practices expert, and we have the

25  video of Sarah Al Maliki's prerecorded testimony.  Potentially

1  our third and last witness would be Keith Leighton.  He is the

2  subject of a motion in limine that plaintiff has filed.  So I

3  wanted to get some clarity on perhaps some boundaries of what

4  he may be able to testify to.

5        THE COURT:  We'll stay and do that.

6        MS. PICKERILL:  My answer would be two, potentially

7  three witnesses left, Your Honor.

8        THE COURT:  Very well.  Thank you.

9      (The following proceeding was held in open court.)

10       THE COURT:  Members of the jury, we're going to excuse

11  you.  Counsel and I are going to give some more attention to

12  tomorrow's schedule.  But we will dismiss you folks for the

13  evening.

14       Please remember my usual instructions.  Don't discuss

15  this case with anyone.  Don't permit anyone to discuss it with

16  you.  Don't read or listen to anything connected with this

17  case.  Don't do any research or investigation of your own.  We

18  all have put a lot of time and effort into this, including

19  yourselves, and we wouldn't want anything to occur that would

20  make us have to start all over again.  So it's very important

21  that you keep these instructions.

22       After the case is over, you'll be free to discuss it

23  with whomever you wish.  It will then be entirely up to you.

24  So leave the case in the courthouse tonight.  Have a nice

25  evening.  We'll see you back tomorrow morning at nine o'clock.

1    (Jury out at 4:42 p.m.)

2         THE COURT:  Let's talk about the motion in limine.

3         MR. KEYES:  Your Honor, may we excuse the parties?

4         THE COURT:  Yes, the parties may be excused if they

5    wish to be excused.

6         MR. KEYES:  Thank you, Your Honor.

7         THE COURT:  Ms. Pickerill, tell me about the motion.

8         MS. PICKERILL:  It was actually plaintiffs' motion,

9    Your Honor, to exclude the testimony of Keith Leighton.  We

10   responded obviously that we believe his testimony is relevant

11   and will aid the jury in this matter in determining the

12   reasonableness of the defendant officers' actions.

13        THE COURT:  Okay.  Mr. Keyes, tell me about the

14   motion.

15        MR. KEYES:  Your Honor, the couple of the issues that

16   we have with Mr. Leighton -- and I think the Court can address

17   this particular one with a limiting instruction.  But the -- he

18   should not be permitted to testify or give opinions that would

19   relate to any contributory fault or comparative fault defense

20   because, one, it's not been pled, but, two, it's not a defense

21   in a Section 1983 action.  So that was I think one of the

22   prongs of our motion in limine.

23        THE COURT:  Let's look at that right now.  What is the

24   proposed testimony?  Is there something in his report that

25   triggered this concern on your part?

1     MR. KEYES:  It was that he talks -- that he talks

2  about --

3     THE COURT:  Let's see if there's something that I can

4  actually read and something more tangible.

5     MS. PICKERILL:  I don't have it printed, but I have it

6  on my laptop, if that helps to hand it to someone.

7     THE COURT:  It looks like Mr. Ver Steeg may have it.

8     MS. PICKERILL:  Can I approach, Your Honor?  Or did

9  you get a copy?

10    THE COURT:  I may have it.  I have the expert report

11  of Keith Leighton.  And where is the material that is the

12  subject of this matter?

13    MR. KEYES:  Your Honor, our position is that the --

14  that the substance of the opinions themselves, the entire

15  opinion, is in the nature of relating to a comparative

16  negligence defense which we believe is not appropriate in this

17  case.

18       As I mentioned, the Court has already ruled, indicated

19  it would allow evidence of certain federal law enforcement

20  standards to come in.  And while we preserve our objection that

21  that really injects issues of comparative fault into the case,

22  based on the Court's instruction or indication of its

23  evidentiary rulings, so long as Agent -- as long as

24  Mr. Leighton is not suggesting that Agent Burk violated any

25  standard of care or standard of conduct, that would be -- we'd

1    still have our objection more generally, but that would address

2    the specific comparative fault issue.

3           THE COURT:  Is there someplace in his report where he

4    articulates this comparative fault theory?

5           MR. KEYES:  Your Honor, it's -- he doesn't state a

6    legal conclusion of comparative fault.  Our argument -- Your

7    Honor, if I may, it's really an argument that the Court has

8    already indicated that it's rejected.  So the basis for our

9    motion in limine was --

10          THE COURT:  I certainly haven't rejected the

11    proposition that there's no defense of comparative fault.  This

12    is an intentional tort.

13          MR. KEYES:  That's correct.  I chose my words

14    inartfully.  What I was trying to explain was that we believe

15    that by allowing Mr. Leighton to testify as to standards

16    governing federal law enforcement agents, our contention is the

17    only thing that that does is interject a comparative fault

18    issue into the case.  And that's our objection.  And all I was

19    explaining was --

20          THE COURT:  Maybe a curative instruction might be the

21    way to handle this.  Some of this would be relevant, I believe,

22    to the defendants' assessment of the risk that they were -- the

23    risk that Mr. Burk may not be a federal agent but an

24    impersonator.  And that's something -- his failure to comply

25    with standards applicable to law enforcement officers, and

1  he -- his claim that he was at the scene, a federal law

2  enforcement officer, goes to the -- certainly to the element of

3  the risk that they may calculate that he presents to them.  But

4  it's not -- there is no comparative fault.

5          MR. KEYES:  And we still --

6          THE COURT:  There's no proposition that Mr. Burk is

7  prevented from recovery by some defense of comparative fault

8  because he didn't follow the standards.  But it may very well

9  affect the jury's assessment of the judgment that Officers Fihe

10  and Winchell were called upon to make during their encounter

11  with Mr. Burk.

12          MR. KEYES:  Your Honor, so our point on that is that

13  we still think that is -- we still think that improperly

14  interjects comparative fault issues in a backdoor way.  But, as

15  to the specific point about knowledge of standards or

16  expectations of standards, we still have the issue that the

17  Court has raised before -- and this is true of Mr. Leighton's

18  report.  There does not seem to be any citation anywhere as to

19  what the source of the supposed nationally accepted standards

20  are.

21          THE COURT:  Well, we'll have to listen to his

22  qualifications and see if he is qualified to express opinions

23  about that.

24          MR. KEYES:  Yes, Your Honor.

25          THE COURT:  If he is, then I think it comes in.

1      MR. KEYES:  A couple other more specific issues about

2  Mr. Leighton.  They -- in his report, he identifies a number of

3  parts of pieces of information from Mr. Burk's personnel files

4  which to date the Court has not allowed evidence into the

5  record about --

6      THE COURT:  Okay.  Where is that?

7      MR. KEYES:  If we look at page -- these are not

8  paginated, but it would be the --

9      MS. PICKERILL:  It starts on page 6.

10      MR. KEYES:  The sixth page.

11      MS. PICKERILL:  If I may, Your Honor, that was

12  initially included as part of Agent Leighton's report.  We are

13  prepared to not -- instruct him not to testify about any of

14  that, to not mention the ATF findings or anything of that

15  nature.

16      THE COURT:  That solves that part of the problem.

17      MR. KEYES:  Yes, that solves that part, including both

18  prior and after the incident of personnel matters.

19      MS. PICKERILL:  Correct.

20      MR. KEYES:  In that case, Your Honor, then the last

21  thing -- and this would be true as to both Mr. Leighton but

22  also Officer Vehr, the other expert that's expected to testify

23  tomorrow -- well, I'm sorry.  There is one more thing specific

24  to Mr. Leighton; so I have to walk that back.

25      We've had discussions at sidebar at various points in

1 the case as to whether the written deposition questions and

2 answers of ATF are able to be either read to the jury, taken

3 back into deliberations by the jury, or used for impeachment.

4 And, as far as Mr. Leighton is concerned, there are some

5 conclusions that he states in his report where we think that

6 the use of the ATF deposition questions and answers for

7 impeachment will certainly be proper.  For example, he states

8 in his report that he is shocked that Burk was alone.  That's

9 one of the opinions that Mr. Leighton states in his report,

10 that he is shocked that Burk was alone.

11         However --

12         THE COURT:  I would exclude that from his testimony.

13         MS. PICKERILL:  Your Honor, that was one of the things

14 I was going to talk about.

15         THE COURT:  We've heard testimony that Mr. Burk was

16 properly alone.

17         MR. KEYES:  Correct.  Not wearing a tactical vest on

18 or any ATF marks.

19         THE COURT:  Not required to.  So that's not going to

20 come in, in either of these experts' comments.

21         MR. KEYES:  I'm seeing if there were any other

22 specific comments that --

23         THE COURT:  Except the fact that he was in

24 plainclothes is part of the facts that they're going to have to

25 consider, that he was a plainclothes officer.

1          MR. KEYES:  I think an outward display --

2          THE COURT:  To say that they were shocked because he

3    was in plainclothes would have to come out.

4          MR. KEYES:  And any suggestion or opinion that --

5          THE COURT:  That would be excluded.

6          MR. KEYES:  Thank you, Your Honor.

7          Any suggestion or opinion that some standard required

8    Agent Burk to have on outwardly visible badge or credentials

9    upon the officers arriving, I think that was another issue that

10   is excluded based on the ATF written deposition questions.

11         MS. PICKERILL:  Your Honor, if I may.  The ATF written

12   deposition questions specifically state that Mr. Burk was

13   required to have that badge.  We would argue that Mr.

14   Leighton -- that Agent Leighton should be allowed to talk about

15   that particular point, not to reference those documents as --

16         THE COURT:  So you're saying the ATF interrogatory --

17         MS. PICKERILL:  I believe it's Question 43, Your

18   Honor.

19         THE COURT:  Let me see what that is.

20         Question 43 --

21         MS. PICKERILL:  I'm sorry.  It's 38.  I apologize,

22   Your Honor.  It's on page 12.

23         THE COURT:  On page 12?  Question 38, you say?

24         MS. PICKERILL:  Yes.

25         THE COURT:  Was James Burk required to have a visible

1   badge or other ATF insignia when interacting with civilians and

2   attempting to collect evidence to retrieve firearms?  Yes.

3         MS. PICKERILL:  We would argue that is consistent with

4   the internal investigation that ATF conducted that specifically

5   talked about Mr. Burk being out of policy for not having that

6   badge visible.

7         THE COURT:  What do you say about that, Mr. Keyes?

8         MR. KEYES:  A couple of things.  As you correctly

9   reminded me during Officer Winchell's cross-examination, words

10  are important and precision is important.  Question No. 38

11  speaks of interacting with civilians, and it says have a

12  visible badge.  It did not ask ATF whether he had to have it

13  externally displayed at all times, which is what they're trying

14  to say.  Perhaps, more importantly, Question No. 47 is directly

15  on point because now it's not talking about interactions with

16  civilians.  It's talking about being aware that local law

17  enforcement would be arriving at the scene.  It's Question No.

18  47 on page 14.

19        THE COURT:  Okay.  Let me look at Question 38.  Was

20  James Burk required to have a visible badge or other ATF

21  insignia when interacting with civilians and attempting to

22  collect evidence or retrieve firearms?  Yes.

23        MS. PICKERILL:  If I may, Your Honor, we would argue

24  that the term visible necessarily means it could not have been

25  in his pocket because, if it's in his pocket, it's not visible.

1        MR. KEYES:  There is a difference between the word

2  visible and the phrase out and visible which probably explains

3  the distinction and the different answer between Question No.

4  38 and Question No. 47 in which the city used the phrase have

5  his badge out and visible.  And the answer there is completely

6  different.

7        THE COURT:  A badge that's in a pocket is not visible.

8        Now, forty-seven.

9        And 39 seems to also apply here.  Burk was within ATF

10  policy regarding the clothing he was wearing and refers to he

11  had pants and a polo shirt.  This is within policy when

12  conducting fieldwork.  This was not an enforcement operation.

13        So where in his report does Mr. Leighton refer to

14  this?

15        MR. KEYES:  I'm sorry, Your Honor?

16        MS. PICKERILL:  Refer to the document, Your Honor?

17        THE COURT:  Right.

18        MS. PICKERILL:  He mentions that he reviewed it I want

19  to say on page 7.  Actually, I'm not sure that he reviewed the

20  deposition by written question, Your Honor.

21        MR. KEYES:  It's not among the list of materials.

22        MS. PICKERILL:  He reviewed the personnel packet,

23  including Defense Exhibits S and T which also talk about the

24  badge -- where AFT also talks about the badge and other issues.

25  But he did not review the deposition by written question.

1    THE COURT:  All right.  Mr. Keyes, let's go back to

2   your objection.  Tell me again what your objection is.

3    MR. KEYES:  The objection is that Mr. Leighton should

4   not be allowed to testify that there is some standard or rule

5   that requires Agent Burk to outwardly display a badge or

6   credentials when he knows law enforcement may arrive.  And --

7    THE COURT:  I don't think it's clear from any of the

8   answers in these interrogatories that there was such a policy.

9    MR. KEYES:  I would agree, Your Honor.  There is no

10  such policy stated in these interrogatories.

11    THE COURT:  So, if Mr. Leighton testifies about such

12  policy, he can't refer to these materials in order to support

13  his testimony.  He may have some other support for that

14  opinion, and we'll have to consider that when -- if he wishes

15  to give such an opinion.

16    MS. PICKERILL:  So, to clarify, Your Honor, is Agent

17  Leighton permitted to give those conclusions so long as they

18  are not based on any of these ATF documents?

19    THE COURT:  If I determine he's qualified to say that

20  that is part of the standard protocol accepted by federal and

21  state law enforcement, part of these uniform principles that

22  we've heard about and -- so I'll -- I'll have to address that

23  after we've heard some testimony from Mr. Leighton if he

24  expresses such an opinion.

25    MS. PICKERILL:  Yes, Your Honor.

1          THE COURT:  Or if he's asked to express such an

2     opinion.

3          MR. KEYES:  Your Honor, on that point, we would

4     request some brief voir dire of Mr. Leighton outside the

5     presence of the jury because there's not been a basis for that

6     opinion disclosed to us.  If he's going to testify to an

7     opinion that may or may not be supported by any actual, formal

8     standard somewhere, I think we should be entitled to explore

9     that to determine that with him before he's allowed to state

10    that opinion to the jury, because it would be extremely

11    prejudicial if he can state that opinion to the jury and then,

12    if it turns out it's not supported by anything, it would be

13    very difficult to unring that bell, Your Honor.

14         THE COURT:  I think that's fair.

15         MR. KEYES:  Thank you, Your Honor.

16         MS. PICKERILL:  Your Honor, I just ask that we be

17    permitted to lay foundation first before plaintiffs see if they

18    need to voir dire to lay additional foundation.

19         THE COURT:  If you're telling me that you are going to

20    ask him to express an opinion on that subject, then I think

21    it's reasonable to have some preparation before we ever start

22    down that path.

23         MS. PICKERILL:  Understood.

24         THE COURT:  If you are intending to offer such opinion

25    evidence, then we will give plaintiffs' counsel the opportunity

1    to voir dire the witness.

2           MR. KEYES:  Thank you, Your Honor.

3           MS. PICKERILL:  Are those opinions specific to the

4    display of the badge and the ATF insignia?

5           THE COURT:  That's what we're talking about.

6           MS. PICKERILL:  I just wanted to make sure I was on

7    the same page, Your Honor.  Thank you.

8           THE COURT:  Anything else?

9           MS. PICKERILL:  I don't have anything else on the

10   topic of Mr. Leighton, but I did have two other questions I

11   wanted to ask the Court.

12          THE COURT:  Very well.

13          MS. PICKERILL:  The first one, Your Honor, has to do

14   with the jury instructions.  I'm not sure if we'll get all the

15   way to closing arguments tomorrow, but I see it as a

16   possibility.  So I wanted to see if we were going to schedule a

17   time to get together and discuss the jury instructions ahead of

18   that.

19          THE COURT:  We will, and it may be tomorrow.

20          MS. PICKERILL:  Excellent.

21          THE COURT:  So, Mr. Keyes, what do you anticipate?

22          MR. KEYES:  I'm sorry, Your Honor.  I thought I had

23   this turned off.  My apologies.

24          THE COURT:  Are you going to have any rebuttal

25   evidence?

1    MR. KEYES:  To date -- so far based on what's come in,

2  we don't anticipate any need for rebuttal.

3    THE COURT:  It sounds like there is a good chance that

4  we'll need to review our jury instructions tomorrow, and we'll

5  be prepared to do that.

6    MS. PICKERILL:  And then my last question, Your Honor,

7  was I wanted to inquire about whether we could start the day by

8  addressing any objections that plaintiffs' counsel wishes to

9  raise to the prerecorded testimony of Sarah Al Maliki.  I ask

10 that only because we've gotten in contact with Spectrum

11 Reporting who prepared the video, and they let us know they can

12 redact out any of those portions where objections are

13 sustained.  They'll just need about an hour to do it.  So, if

14 we can have them working on that while another witness is

15 testifying, that would be most helpful.

16    THE COURT:  Do we have some objections for me to rule

17 on?

18    MS. PICKERILL:  There were objections made during the

19 deposition.  The basis for those objections have not yet been

20 given to us.

21    MR. KEYES:  That was what Your Honor had instructed us

22 to work on this evening and we could discuss first thing in the

23 morning.

24    THE COURT:  In general, what's the issue?

25    MR. KEYES:  There are some -- in general, Your Honor,

1    portions of Ms. Al Maliki's testimony that relate to items that

2    she perceived subjectively or that she saw inside her house

3    that were not communicated to Officers Fihe and Winchell we

4    would argue are irrelevant.

5          THE COURT:  What kinds of things?

6          MR. KEYES:  For example, when she says that -- when

7    she tells the 911 operator that her husband is not home, that

8    is something that was not conveyed either verbally or through

9    the in-car display to Officers Fihe or Winchell.  So that

10   particular piece of testimony has no relevance on any issue

11   because it was not conveyed to them.

12         That's an example off the top of my head.  There would

13   be a few more that we would likely point out in our submission.

14         MS. PICKERILL:  If I could respond, Your Honor.

15         THE COURT:  Go ahead.

16         MS. PICKERILL:  I believe you've already issued a

17   ruling on this because these are all topics that Mr. Burk

18   discussed during his direct examination.

19         THE COURT:  Mr. Burk talked about it and she's going

20   to talk about it.

21         MS. PICKERILL:  This would give the full story in

22   context to the jury.

23         MR. KEYES:  Yes, Your Honor.  With that caveat based

24   on your ruling earlier today, that's what we'll be doing this

25   evening.  We'll be going back through the objections that were

1    preserved and seeing if there are any --

2         THE COURT:  If Mr. Burk didn't bring it up, then we're

3    not going into it.

4         MR. KEYES:  I know there were some objections

5    preserved by defendants.

6         MS. PICKERILL:  I believe so.  We'll review those and

7    let you know if we intend to withdraw any or stand on them.

8    We'll get those to you tonight as well.

9         THE COURT:  It sounds like you may be able to work

10   most of this out.

11        Anything else, Mr. Keyes?

12        MR. KEYES:  Would you like Counsel here at 8:30 to

13   discuss those items before bringing the jury in?

14        THE COURT:  It's probably a good idea.  We'll see you

15   at 8:30.

16        MS. PICKERILL:  Perfect, Your Honor.  Thank you.

17      (Proceedings concluded at 5:08 p.m.)

18                                    - - -

19

20

21

22

23

24

25

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PLAINTIFFS': | | | | |
| Scott DeFoe | 237 | 289 | 310 | 322 |

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEFENDANTS': | | | | |
| Joseph Fihe | 352 | 402 | 430 | 434 |
| Kevin Winchell | 436 | 454 | 466 | |

1          C E R T I F I C A T E

2

3          We, Crystal Hatchett and Shawna J. Evans, do hereby

4   certify that the foregoing is a true and correct transcript of

5   the proceedings before the HONORABLE JAMES L. GRAHAM, Judge, in

6   the United States District Court, Southern District of Ohio,

7   Eastern Division, on the date indicated, reported by us in

8   shorthand and transcribed by us or under our supervision.

9

10

11                         s/Crystal Hatchett
                           Crystal Hatchett
12                         Official Federal Court Reporter
                           January 2, 2025
13

14                         s/Shawna J. Evans
                           Shawna J. Evans
15                         Official Federal Court Reporter
                           January 2, 2025
16

17

18

19

20

21

22

23

24

25