UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES A. BURK, JR., et al.,    )
                               )
  PLAINTIFFS,                  )    CASE NO. 2:20-cv-6256
                               )
        vs.                    )
                               )
THE CITY OF COLUMBUS, et al., )
                               )
  DEFENDANTS.                  )
_____)

        TRANSCRIPT OF JURY TRIAL PROCEEDINGS - VOLUME 4
            BEFORE THE HONORABLE JAMES L. GRAHAM
            THURSDAY, NOVEMBER 7, 2024; 8:32 A.M.
                    COLUMBUS, OHIO

APPEARANCES:

    FOR THE PLAINTIFFS:
        Cooper Elliott, LLC
        By:  Barton R. Keyes, Esq.
             Abigail F. Chin, Esq.
        305 West Nationwide Boulevard
        Columbus, OH  43215

    FOR THE DEFENDANTS:
        Columbus City Attorney's Office
        By:  Alexandra N. Pickerill, Esq.
             Sheena D. Rosenberg, Esq.
             Sarah Feldkamp, Esq.
        77 North Front Street, 4th Floor
        Columbus, OH  43215

                        - - -


    Proceedings recorded by mechanical stenography, transcript
produced by computer.

1      THURSDAY MORNING SESSION

2      NOVEMBER 7, 2024

3                  - - -

4      (The following proceedings were had in open court.)

5            THE COURT:  Good morning, Counsel.

6            All right.  So we're met this morning to look at some

7      objections to the deposition of Ms. Al Maliki; am I right?

8            MS. PICKERILL:  That's correct.

9            MR. KEYES:  Yes, Your Honor.

10           THE COURT:  All right.  So how would you like to

11     proceed, Counsel?  Do you want me to look at anything?  Do you

12     want me to read anything?

13           MR. KEYES:  Your Honor, we have -- so we filed our

14     objection log last night.

15           THE COURT:  Yes, let me look at it.  Perhaps we just

16     go through it.

17           MR. KEYES:  I think that's probably the best way.

18           THE COURT:  All right.

19           MR. KEYES:  Do you have a copy of the transcript up

20     there with you as well?

21           THE COURT:  I don't know about that.

22           MR. KEYES:  We have an extra if you need it.

23           THE LAW CLERK:  If you don't mind, I would appreciate

24     it.  Thank you.

25           THE COURT:  Okay.  First is how Ms. Al Maliki's

1    children reacted was not part of anything communicated to

2    defendant Officer Burk, et cetera, and that is transcript

3    page 8, line 23, to 9:7.

4         So here's some of the concerns I have:  I understand

5    the reason for the objections.  Mr. Burk has testified at some

6    length about his encounter with Ms. Al Maliki, and some of it

7    was connected with his claim that he was -- that when he

8    encountered Officers Fihe and Winchell, that he was concerned

9    one of the reasons why he acted the way he did was his concern

10   for his safety as a result of things that were happening/might

11   be happening behind the door of this residence.

12        The jury has heard all about that, and they have heard

13   him use that as a justification for how he treated them, so I

14   think that in itself is one reason to let some of this

15   testimony in.

16        Another thing that I think might be -- might very well

17   be relevant about this testimony is the overall question of

18   just what Mr. Burk's disposition and attitude was on the

19   morning -- or on the afternoon that these events occurred, and

20   there's a lot of -- and that certainly is relevant to his

21   credibility about the events that ultimately occurred, and it

22   might shed some light on the way Mr. Burk was functioning that

23   morning.

24        There's been testimony that he was acting very odd.

25   One of the officers said, in fact, he giggled during part of

1    this encounter, and there's -- when one watches the video and

2    sees the expressions on his face and hears his voice, I think

3    there is a -- it raises reasonable questions as to how Mr. Burk

4    was functioning that afternoon and his attitude and demeanor.

5    And the attitude and demeanor and way he was functioning at the

6    doorstep is just, you know, minutes away from the arrival of

7    the two officers.

8         So I would like to hear some discussion about that.

9         MR. KEYES:  Thank you, Your Honor.

10        Even if we were to concede the relevance of this type

11   of information based on the issues that the Court just raised,

12   I think when it comes to Ms. Al Maliki testifying that her

13   children felt scared, there's some additional issues to that as

14   well, aside from --

15        THE COURT:  All right.  Let's look at that

16   specifically.

17        MR. KEYES:  Yes, Your Honor.  That's the --

18        THE COURT:  Is that the 8:23 to 9:7?

19        MR. KEYES:  Correct.

20        THE COURT:  Okay.  I'm going to sustain the objection

21   with respect to the testimony --

22        MS. FELDKAMP:  Your Honor, I'm sorry.  If I may?

23        THE COURT:  Go ahead.

24        MS. FELDKAMP:  Under *Old Chief v. The United States,* I

25   believe that if we don't allow for the testimony of Sarah to

1  come in to speak to how she and everyone else in her home were

2  perceiving Mr. Burk's actions, I don't believe the jury will be

3  hearing the full story.  I believe they will be missing a

4  section of the story.

5        Also, I believe that Sarah's children's reactions to

6  Mr. Burk's knocking speak to possibly rebut Mr. Burk's

7  assertion that his knocking was calm or reasonable and that his

8  behavior was calm and reasonable and that he was trying to

9  create a dialogue.  In fact, he was knocking so forcefully that

10 Sarah's children were scared.

11       MR. KEYES:  Your Honor, if I may respond to that

12 point?

13       I think there's an additional issue if that's the

14 purpose for which they're offering it.  We've got some

15 foundation and potential hearsay issues because in that

16 question-and-answer exchange there's no foundation as to why

17 she perceived that the children were scared.  Did they say

18 something?  Was it a look on their face?  Was it a way they

19 physically moved?  There's no indication.  There's no

20 foundation.

21       MS. FELDKAMP:  She explains that later.  It was her

22 active perception of the event.

23       MR. KEYES:  Which portion of the deposition?

24       MS. FELDKAMP:  She says that her children were crying.

25 On page 11 to 12 she said:  They scared because the noise on --

1    he knocked very hard.  They keep -- they start crying after

2    that.

3             MR. KEYES:  And the City's position is that that same

4    foundation is the foundation for her answer at the section

5    we're talking about, 8:23 to 9:7?

6             MS. FELDKAMP:  That he knocked very hard, so

7    forcefully that the children were scared and cried.

8             MR. KEYES:  No, I know.  I'm saying is the City's

9    position that her observing them crying later in the deposition

10   is what serves as the foundation for 8:23 to 9:7?

11            MS. FELDKAMP:  I think it speaks to her ability to

12   perceive her children's reactions to Mr. Burk.

13            MR. KEYES:  And we would still have the same

14   underlying objection to that portion of the testimony, Judge.

15            THE COURT:  Well, I think it may be at least

16   tangentally connected with just how Mr. Burk was acting and

17   relevant to the amount of force he was using in knocking at the

18   door, and it's just a small part of the picture, but I don't

19   think it's -- I just -- I'm going to admit it since it's part

20   of the whole scene, and I -- and certainly if the jury should

21   find that he heard the effect this was having on the children,

22   it might have been another part of an assessment of what his

23   attitude and demeanor and condition and attitude was that

24   morning.

25            So I'm going to let it in.

1    Let me look at the rest of the objection.

2    I see part of this objection at transcript page 25:6

3    to 10 is Ms. Al Maliki's subjective belief that Mr. Burk

4    knocked to confuse her.  Let's take a look at that.

5    Okay.  I'm going to sustain the objection to the part

6    of her answer that says:  And he didn't listen to what I asked

7    of him, just keep knocked to confuse me.

8    MS. FELDKAMP:  Your Honor, may I?

9    THE COURT:  Go ahead.

10   MS. FELDKAMP:  This is what Sarah was perceiving.

11   This is what she was experiencing.  This was her present-sense

12   impression.  She heard the -- the knocking is so loud that you

13   can hear it on the 911 dispatch, and she says that, you can

14   hear the knocking.  Mr. Burk wasn't knocking like a normal

15   person would be knocking on the door.

16   THE COURT:  All right.  Well, she draws some

17   inferences from that which are just her opinions.  And she can

18   say it was loud knocking, but to attribute a specific intent to

19   Mr. Burk I think is something that should not be included.

20   MS. FELDKAMP:  I believe it also speaks to the

21   dialogue.

22   THE COURT:  So I'm going to grant that part of the

23   objection.

24   MR. KEYES:  Your Honor, is that specifically to the

25   third sentence in that answer, so it's the "And he didn't

1    listen to what I asked of him"?

2            THE COURT:  I'll give you the lines.  I thought I did.

3            I'm going to strike these words:  And he didn't listen

4    to what I asked of him, just keep knocked to confuse me.

5            That's stricken.

6            MR. KEYES:  Thank you, Your Honor.

7            THE COURT:  So let's look at the testimony on page 13,

8    lines 6 to 11.

9            Question:  Okay.  So did you feel like you would --

10           well, it starts here:  Does your home have a back

11   door?

12           Yes.

13           Okay.  Did you feel like you would be able to leave

14   through the back door if you needed to?

15           No, I'm afraid.  I'm afraid to leave the room.  Maybe

16   he come back and, like, hurt us.

17           Do you remember --

18           All right.  I'm going to strike -- I'm inclined to

19   strike that part of the testimony.  I don't think it --

20           MS. FELDKAMP:  So Mr. Burk testified that his goal,

21   when he is going to these situations to retrieve a gun, is that

22   he wants to create a dialogue, and he testified that he was

23   acting very calmly.

24           Someone who is creating a dialogue and acting calmly

25   isn't going to cause a person who is in their home to be afraid

1    to leave their home.  Sarah felt like she was trapped, and he

2    said he was trying to create a comfortable situation for her.

3              THE COURT:  Mr. Keyes?

4              MR. KEYES:  Yes, Your Honor.  That rationale is not

5    sufficient to support the testimony because it depends on the

6    subjective fears or beliefs of a person that are not being

7    communicated to the defendant officers, and so it does not at

8    all impeach Mr. Burk's techniques because if Ms. Al Maliki

9    is -- and there's no foundation to establish how she reacted

10   versus somebody else who he might have approached for a knock

11   and talk.

12             THE COURT:  All right.  I'm going to sustain the

13   objection to this part of the testimony.  I'm going to strike

14   starting on line 6 on page 13, the question -- well, actually,

15   let's start at line 3, all of this discussion about whether

16   there's a back door and whether she felt that she could leave

17   it.

18             So I'm going to strike from line 3 on page 13 --

19             MR. KEYES:  I think that's line 4, Your Honor.

20             MS. PICKERILL:  With the question:  Does your home

21   have a back door?

22             THE COURT:  -- to the answer on line 10:  No, I'm

23   afraid.  I'm afraid to leave the room.  Maybe he come back and,

24   like, hurt us.

25             So I'm striking that.

1    MR. KEYES:  Thank you, Your Honor.

2    THE COURT:  All right.  I have read all of the

3 testimony that's been objected to, and I have excluded the

4 parts that I conclude should be excluded.  The rest of it is

5 all part of the picture, which is relevant for reasons that I

6 have stated.

7    I will instruct the jury that this is not something

8 that either of the officers knew about and is -- I don't know

9 how I'm going to phrase it, but that it's not to be used in the

10 jury's determination of whether the amount of force they used

11 was reasonable, but for the purpose of judging Mr. Burk's

12 credibility and his emotional status on the afternoon in

13 question.

14    I may refine that language somewhat, but that's -- I'm

15 going to give a limiting instruction regarding this,

16 emphasizing the fact that it's not something within the

17 knowledge of these officers.

18    All right.  Those are my rulings on the deposition.

19    Are we ready to proceed?

20    MR. KEYES:  Your Honor, if I may, maybe just a brief

21 suggestion about -- I know the Court explained to the jury

22 briefly what a deposition was the first couple times it came up

23 during some testimony.  The jury is used to hearing objections

24 to live testimony being ruled on, perhaps discussions at

25 sidebar.

1          It may be worth it to give a brief instruction on --

2    or clarification that when trial testimony is prerecorded, the

3    lawyers have to make objections on the record to preserve them.

4    So when you hear objections and the testimony goes on, that's

5    why they're not ruled on live, or something along those lines.

6    Otherwise, they're going to hear these objections but the

7    testimony continuing.

8          THE COURT:  Can we get rid of the objections?

9          MR. KEYES:  That would be --

10          MS. PICKERILL:  I think so, Your Honor.

11          MR. KEYES:  If they could redact those, that would be

12    a better alternative, I agree.

13          THE COURT:  I think that would be the way to do it.

14          MR. KEYES:  Yeah, I wasn't sure if they could do that

15    that quickly.

16          MS. PICKERILL:  If we could have just five to

17    ten minutes just to give all this information to Spectrum so

18    they can work on redacting it while we do the next witness?

19          THE COURT:  You're going to have to incorporate my

20    rulings; so while you're doing it, eliminate the objections.

21          MS. PICKERILL:  Absolutely, Your Honor.

22          THE COURT:  All right.  Let us know as soon as you're

23    ready to proceed.

24          MS. PICKERILL:  Thank you.

25          MR. KEYES:  And then before we break, Your Honor, I'm

1  assuming that the first witness is going to be --

2        MS. PICKERILL:  Pat Vehr.

3        THE COURT:  -- Mr. Vehr?

4        MR. KEYES:  So Mr. Vehr is the defendants' local

5  police practices expert that they're tendering.  We would ask

6  that the same admonition that the Court gave the plaintiffs as

7  to the nature of Mr. DeFoe's testimony be given to Mr. Vehr's

8  testimony as well.  Mainly, cautioning the defense that he has

9  to speak in terms of hypothetical facts, not findings of fact,

10  and so forth, sort of along the same lines that we had.

11        MS. PICKERILL:  We absolutely agree with that, Your

12  Honor.

13        THE COURT:  Yes.  Have you given those instructions to

14  him?

15        MS. PICKERILL:  Yes, I have already spoken to him

16  about it.

17        THE COURT:  All right.

18        MR. KEYES:  Thank you.

19        THE COURT:  Very well.

20        Thank you, Counsel.  We'll stand in recess until

21  you're ready to proceed.

22        MS. PICKERILL:  Thank you, Judge.

23        MR. KEYES:  Thank you, Your Honor.

24        THE COURTROOM DEPUTY CLERK:  Please rise.

25        This court will stand in recess.

1      (Recess taken from 8:58 a.m. to 9:21 a.m.)

2      (Jury in at 9:21 a.m.)

3          THE COURT:  Good morning, ladies and gentlemen,

4    Counsel.

5          All right.  Ms. Pickerill, we're ready for your next

6    witness.

7          MS. PICKERILL:  Excellent.  Thank you, Your Honor.

8          The defense calls Pat Vehr.

9          THE COURT:  Sir, please step forward, and the clerk

10   will swear you in.

11     (Witness sworn.)

12         THE COURTROOM DEPUTY CLERK:  You're going to have a

13   seat over here in the blue chair, and pull that microphone

14   close to you so we can all hear you.

15         THE COURT:  You may proceed.

16         MS. PICKERILL:  Thank you, Your Honor.

17                           - - -

18                      PATRICK VEHR

19   Called as a witness on behalf of the Defendants, being first

20   duly sworn, testified as follows:

21                   DIRECT EXAMINATION

22   BY MS. PICKERILL:

23    Q    Could you please introduce yourself to the jury.

24    A    I'm Officer Patrick Vehr with Columbus Division of

25   Police.

1    Q    How long have you been with the Columbus Division of

2  Police?

3    A    I've been employed for about 17-and-a-half years.

4    Q    What's your current role with the CPD?

5    A    I'm a defensive tactics instructor at the Columbus

6  Police Academy.  I've been there for approximately 14-1/2 years;

7  14-1/2 years as a defensive tactics instructor, nine years in my

8  current role as a full-time cadre.

9    Q    What's a cadre?

10   A    It's an instructor at the police academy, so we train

11  both police recruits and current officers.

12   Q    You said that you train in defensive tactics.  What does

13  that mean?

14   A    So we train recruits and officers in all areas of police

15  use of force.  So specifically defensive tactics, anything from

16  officer presence up to lethal force, and that would include

17  hands-on control techniques, joint manipulations, our TASER, our

18  Mace, our intermediate weapons, the baton, in every area of

19  police use of force.

20   Q    What did you do with the police department before you

21  started doing the defensive tactics instruction?

22   A    I was a patrol officer.

23   Q    For how long?

24   A    For about 8-1/2 years.

25   Q    Are you certified as an instructor on any topics?

1    A    Yes, ma'am.

2        So I am a state-certified subject control instructor.

3 Our City of Columbus also has their own defensive tactics

4 instructor certification.  I'm also a master TASER instructor,

5 an impact weapons instructor.  And I think that's it for now,

6 yeah.

7    Q    Who gives you that certification to teach at the state

8 level?

9    A    The Ohio Peace Officers Training Academy.

10    Q    What's that?

11    A    So that's our state governing body around police in law

12 enforcement.  So they provide guidelines and state requirements

13 to properly certify peace officers, as well as to properly

14 certify the instructors that teach the peace officers.

15    Q    How do you get certified to be a master TASER

16 instructor?

17    A    I was a TASER instructor initially, where I was

18 certified to teach TASER to current officers and police

19 recruits.  And then the master TASER course, instructor course,

20 is a week-long course put on by Axon TASER that includes

21 approximately 40 to 50 hours' worth of training to achieve that

22 master TASER cert.

23    Q    Is Axon TASER a national organization?

24    A    It is, as well as international, yes, ma'am.

25    Q    You mentioned that you train recruits.  Is that at the

1  academy?

2      A     Correct.

3      Q     Okay.  You also said that you train current officers.

4  How often are you training officers already out in the field?

5      A     So once a recruit graduates, they go and they serve a

6  probationary period, and then they become full police officers.

7  And we do at minimum an annual eight-hour in-service training

8  that is specific to police use of force and defensive tactics.

9          And then there's also elective type of training

10 throughout the year that we will train current officers in some

11 of our maybe advanced level techniques or just additional

12 training for officers throughout the year, but a mandatory eight

13 hours for every officer.

14     Q     And that training, that mandatory eight hours every

15 year, that's specific to use of force and client control --

16 suspect control?

17     A     That's correct, and that would include a recertification

18 on the TASER annually, as well as a recertification on our

19 impact weapons and our other intermediate options.

20         Generally, that eight-hour day consists of a classroom,

21 one- to two-hour PowerPoint classroom that includes a written

22 test, some sort of mat room or hands-on control techniques,

23 review and refresher for the current officers, and then a

24 scenario-based segment for approximately two to three hours.

25     Q     So does every officer have to be certified to carry and

1  use a TASER?

2  A    That's correct.

3  Q    Okay.  Then there's additional certification to teach

4  people how to use it; is that right?

5  A    Yes, ma'am, that's right.

6  Q    Okay.  Do you keep updated or does someone update you on

7  the leading national legal decisions regarding police practices

8  and standards?

9  A    Yes, ma'am.

10  Q    And do you all incorporate that into the training that

11  you give your officers on a yearly basis?

12  A    We do.  We include a legal aspect in our eight-hour

13  training every year, and that focuses around the United States

14  Supreme Court decision *Graham v. Connor,* as well as any

15  potential case law that has came out throughout the year.

16      And then in addition to that eight hours, every officer

17  also goes through a classroom legal update put on by our City

18  legal advisors, taught by the City attorneys; and that is

19  generally two to four hours a year of classroom legal updates

20  for them that they also apply to police use of force.

21  Q    And are those national standards that you're updating

22  the officers on?

23  A    That's correct.

24  Q    A little bit more about you.  Prior to working for the

25  Columbus Police Department, do you have any other law

1   enforcement or military experience?

2       A    I was -- I served 12 years in the United States Army and

3   Ohio Army National Guard.  I was in the military police company

4   here locally in Columbus, as well as the 323rd police academy in

5   Toledo, Ohio, and I served as a military intelligence officer

6   within the Ohio National Guard.  And prior to that I was in my

7   undergrad at University of Toledo.

8       Q    During your time as an instructor with the Columbus

9   Police Department, have you attended any trainings or classes

10  outside of Ohio to learn about policing standards?

11      A    Yes, ma'am, I have.

12           So our master TASER course is a national-level course,

13  but we did host that here in Columbus, but we had agencies from

14  all over the country within that training course.

15           And then I recently, last month, did a specific ground

16  defense for law enforcement class, a weeklong course in Maine

17  that was put on.  It was a law enforcement only for Brazilian

18  jiu-jitsu training class that was approximately a weeklong, and

19  there was officers from all over the country at that training as

20  well.

21      Q    Was that training police training?

22      A    Yes, ma'am, it was specific to law enforcement.

23      Q    All right.  When, I suppose, would law enforcement

24  officers use jiu-jitsu or other types of wrestling techniques?

25      A    So we train -- our hands-on control techniques are

1  jiu-jitsu and wrestling based.

2          So any time that officer were to grab an individual,

3  they're going to utilize some form of jiu-jitsu or wrestling as

4  their base, and specifically when they are on the ground.

5          So whether the suspect is on the bottom and the officer

6  is controlling on the top, or vice versa, an officer is on the

7  bottom and the suspect is on top, they're utilizing jiu-jitsu or

8  wrestling in some manner, and that's how we train them.

9      Q    So those are training techniques?

10     A    Yes, ma'am.

11     Q    Have you ever testified in court as an expert before?

12     A    I have.

13     Q    About how many times?  An estimate is okay.

14     A    I believe I have only testified one other time in court.

15 I've testified in arbitration hearings, in civil court, I'm

16 sorry.  And then I provide grand jury instruction in

17 police-involved shootings, and I have done that maybe a half

18 dozen times.

19     Q    Have you ever testified as an expert in a civil case

20 about use of force, kind of like this one?

21     A    Yes, ma'am.

22     Q    Obviously you work for the Columbus Police Department.

23 Does that influence your ability to come to unbiased opinions on

24 law enforcement principles in this case?

25     A    No, ma'am.

1    Q    Are the opinions that you made in this case based on

2    nationally accepted policing standards?

3    A    Yes, ma'am.

4    Q    Are your opinions made to a reasonable degree of

5    certainty?

6    A    Correct, yes.

7    Q    I know we have already talked a little bit about

8    training, but before we dive into what happened on July 7th I

9    want to talk to you a little bit more specifically about the

10   training Officers Fihe and Winchell would have received.

11   A    Okay.

12   Q    What does CPD, I guess, base its training on?

13   A    So a police recruit is mandated through OPOTA, Ohio

14   Peace Officers Training Academy, to receive a certain number of

15   hours.  And specific to subject control and defensive tactics,

16   the state mandates 70 hours of training within their time at the

17   academy.

18        So we at CPD actually give the recruit approximately 90

19   to 95 hours of defensive tactics training, and that's going to

20   be everything that I mentioned with police use of force, TASER,

21   hands-on control, ground defense, anything related to our gun

22   belt, weapon retention, baton, TASER.  So they complete that

23   training while they're in the academy.

24        That also includes a scenario-based element.  So the

25   final culmination exercise is a scenario for the police recruits

1  in which they have to physically control and arrest a role

2  player who is actively resisting, and may even be assaulting the

3  recruit.  Those are intense scenarios and very physical

4  scenarios.

5        Then upon graduation, the officer will go through -- or

6  the recruit will graduate and go through an FTO period where

7  they're with a coach on patrol learning the finer points of

8  patrol SOP.

9        Then once they complete that, they continue their

10  probationary period.  And throughout that time they will

11  continue to come in to be recertified annually, like I

12  mentioned, in the eight-hour in-service day.

13     Q    What is CLEA?

14     A    CLEA stands for Commission on Accreditation for Law

15  Enforcement Agencies, and that's a federal nonprofit that

16  certifies and accredits local law enforcement.

17        So the City of Columbus is a gold standard -- CPD is a

18  gold standard CLEA, so that means we comply with federal

19  standards on law enforcement, and specifically in my area in

20  police use of force and our policy and in our training.

21     Q    I guess I'll start with this question:  What is force?

22     A    We define force for our officers as the exertion of

23  energy to control another's movements in their course of their

24  duties.

25        And that's a reportable use of force.  Sometimes we will

1    say our officer presence is our lowest level of force.  Although

2    we're not physically controlling the movement, it still is a --

3    officer presence is on our force continuum and reportable in

4    some cases.

5           But our Level 1 use of force, which is our lowest level

6    of actual force and physical control of the subject, is that

7    exertion of energy the officer uses to control another's

8    movement.

9    Q    You mentioned a couple of different levels.  How many

10   levels of force does CPD list out?

11   A    We have actually nine levels of force if we start with

12   Level 0.  It goes from Level 0 up to Level 8.

13          So there's Level 0, officer presence.  Level 1 is our

14   hands-on joint manipulations, low-level physical control of an

15   individual.  Level 2 is our Mace or our chemical spray.  3 would

16   be our TASER.  4 is any strikes or hard empty impacts, punches,

17   elbows, kicks, knees.  Level 5 is our impact weapon, our baton

18   or potentially a flashlight.  6 is a K-9 bite, and then 7 is

19   non-lethal riot control ammunitions like beanbags and baton

20   rounds, and then Level 8 is our lethal force.

21          MS. PICKERILL:  Maria, could we put up on the screen

22    for counsel and the witness right now, I labeled it levels of

23    force.

24          I'll represent this is an excerpt from Defense

25   Exhibit H that we're going to use for demonstrative purposes.

1      THE COURT:  Any objection?

2      MR. KEYES:  No.

3      THE COURT:  All right.  You may.

4  BY MS. PICKERILL:

5      Q    All right.  Are those the levels of force you just

6  talked about?

7      A    Yes, ma'am.

8      Q    Does brandishing or pointing a firearm at a suspect,

9  does that belong anywhere on this list?

10      A    That would fall into our Level 0 category.

11      Q    Was that something that -- is that something that's now

12  been added to this list?

13      A    Level -- brandishing a firearm or pointing a firearm at

14  a subject has always been a Level 0, officer presence, control

15  technique, just by simply pointing a gun.  It is now a

16  reportable Level 0, along with pointing a TASER, are the only

17  two Level 0 techniques that are reported internally with CPD.

18      Q    Okay.  Are officers with CPD required to report every

19  time they use force?

20      A    If it falls into one of those two Level 0 categories,

21  pointing the gun, pointing the TASER, or a Level 1 and beyond --

22      Q    Okay.

23      A    -- are reportable, yes.

24      Q    What's the purpose of reporting those uses of force?

25      A    So any time we use force we want to properly document

1    that force; and ultimately that ensures that our actions are

2    within policy, as there's an investigation completed at the

3    supervisor level.

4         So anything Level 1 and beyond or those two Level 0s I

5    had mentioned, our officers are going to report those to ensure

6    that they are in compliance with policy.

7    Q    Is it possible that an officer could be found outside of

8    compliance with policy?

9    A    It is possible, yes.

10   Q    I think you had said in passing earlier something about

11   *Graham v. Connor.*  I want to talk a little bit more about that.

12        What is *Graham v. Connor?*

13   A    So *Graham v. Connor* was a U.S. Supreme Court case that

14   came out in 1989 that provided guidance on police use of force,

15   and it established what we call now the objective reasonableness

16   test.  And in the case, it outlined how we need to look at

17   police use of force, and specifically excessive force or claims

18   of excessive force.

19        So what the Supreme Court outlined for us is that every

20   police use of force needs to be taken on a case-by-case basis,

21   right?

22        It's all based on the totality of the circumstances

23   involved.  We can't -- as we judge that use of force, we can't

24   use 20/20 hindsight or facts discovered after the event.  We

25   have to rely on what the officers know at the time.

1          The big thing that the Supreme Court provided was a

2     four-prong test for us.  So when we look at the police use of

3     force, we need to consider the four things:  The severity of the

4     crime in question, whether the suspect poses an immediate threat

5     to the safety of officers or others, whether the suspect is

6     actively resisting arrest, and whether the suspect is attempting

7     to evade arrest by flight.

8          It's also important to note that force is not --

9     they have said is not capable of precise definition and that

10    every situation is tense, uncertain, and rapidly evolving.  So

11    we have to consider those facts, that they're tense, uncertain,

12    and rapidly evolving, when we judge the force.

13    Q    So that U.S. Supreme Court case, would that be part of a

14    national standard?

15    A    It would be, correct.

16         MS. PICKERILL:  Could we please pull up Division

17    Directive 2.01.  I believe it is Plaintiffs' 17 that's already

18    entered.

19              If we could scroll down.

20              THE COURTROOM DEPUTY CLERK:  Do you want this

21    published too?

22         MS. PICKERILL:  Yes, please.

23              Right there with policy statements.

24    BY MS. PICKERILL:

25    Q    Officer Vehr, is this one of the division directives for

1    the Columbus Police Department?

2        A    Yes, ma'am.

3        Q    Okay.  What is this directive specifically governing?

4             I guess we could scroll back up to the top if we need

5    to.

6        A    This is our Division Directive 2.01, which is our

7    use-of-force directive.

8        Q    Okay.  So now if we could scroll back down to page 2, in

9    (II)(A)(3), the directive lists some factors to be considered.

10            Could you tell me what those factors are that we find in

11   your directives?

12       A    (II)(A)(3), these are the factors I mentioned from

13   *Graham v. Connor*.  Factors to be considered when determining the

14   reasonableness of a use of force are:  Severity of the crime in

15   question, whether the subject poses an immediate threat to the

16   safety of the officers or others, whether the subject is

17   actively resisting arrest, and whether the subject is attempting

18   to evade arrest by flight.

19       Q    Do you all get those factors directly from that national

20   standard?

21       A    Correct.

22       Q    If officers -- well, let me ask a different question.

23            Could it ever be the case that there's more than one

24   crime at issue in determining the severity of the crime at

25   issue?

1    A    Yes, ma'am, that could be the case.

2    Q    Does that increase the severity potentially?

3    A    It could, depending on the -- if there's multiple crimes

4    suspected, whatever the highest level of crime would be would be

5    considered as a severity of the crime.

6    Q    Do you know what level of offense a burglary is?

7    A    I believe it's a second-degree felony.

8    Q    So if officers are dispatched to respond to a burglary

9    in progress, would that be the crime at issue to consider for

10   this analysis?

11   A    Correct.

12   Q    Would an armed burglary suspect who is not complying

13   with commands present a threat to officers?

14   A    Yes, ma'am.

15   Q    Why is that?

16   A    When our officers are dispatched on a burglary in

17   progress, it's coded in such a way -- we label it as a priority

18   one dispatch run, which is our highest classification of runs,

19   and that involves typically some likelihood of serious physical

20   harm or physical harm to an individual in a life-threatening

21   scenario on the dispatch.

22        So when they respond, they're investigating a burglary

23   in progress.  And if the individual is armed, that poses an

24   immediate threat to them and a life-threatening situation that

25   could potentially become very quickly.

1    And there's also a principle that we use in a situation

2 when responding known as the action versus reaction, or the

3 third of a second reaction time principle, that would apply to

4 dealing with an individual that's armed.

5    Q    Talk to me a little bit more about the importance of

6 understanding action versus reaction when responding to these

7 threatening calls.

8    A    So we train our officers that every action beats a

9 reaction, and that the human body has a reaction time of

10 approximately a third of a second, and they have determined

11 that -- there's an institute called Ford Science Institute that

12 does empirical studies on police use of force, and through their

13 research they have determined the average police officer has

14 approximately one-third of a second reaction time.

15    We train our officers in that annually, that they have

16 to realize that the action has to beat the reaction because they

17 are always, at a minimum, a third of a second behind the threat.

18 There's a lot that could occur within that third of a second.

19    So if somebody is armed or is holding a weapon or even

20 has a gun in their waistband, the act of drawing the firearm and

21 squeezing the trigger takes less than a third of a second.  And

22 that's through many studies through Ford Science, that pulling

23 the gun out of a waistband or pulling the gun out of a holster,

24 pointing it at a target, and pulling the trigger can be done in

25 less than a third of a second.

1    So that means for an officer, when we're dealing with

2 somebody that is armed or potentially armed, the suspect is in

3 control of that situation.  They could potentially have a gun

4 fired in under a third of a second, which means the officer is

5 not even comprehending the threat before the bullet is out of

6 the barrel.

7    So that's why we train our officers to respond in these

8 life-threatening situations with their gun drawn already because

9 we're trying to bring that reaction time back in their favor.

10 And it's also important to point out that the third of a second

11 reaction time is concluded in a controlled environment in which

12 the officer knows his reaction time is being tested.

13    So if we relate it to a common everyday occurrence, our

14 police driving instructors teach our officers that their

15 reaction time while driving is closer to a second and a half to

16 two seconds.

17    So if you're in an emergency braking situation, if

18 you're behind the wheel and you have a lot of things going on,

19 environmental awareness, you're trying to drive, the radio is on

20 or whatever, to be able to react to what's happening to you in

21 front of you is approximately a second and a half.

22    So that's, in my opinion, closer to reality for the

23 officer on the street.  We train them in the third of a second,

24 but that's a perfect scenario.  In reality, because of a lot of

25 different environmental factors and a lot of different stressors

1  that their bodies are going through and the situation at hand,

2  their reaction time is closer to a second and a half.

3  Q    So do you train officers that they can only draw their

4  gun when they're about to use deadly force?

5  A    No, ma'am, our officers are trained to have their gun

6  out when they are responding to a situation that could

7  potentially become life-threatening because of that reaction

8  time.

9        So our officers often search vacant structures with

10  their gun drawn, even if they know the structure to be vacant,

11  for their own safety and the unknown threat involved.  The

12  officer will have the gun drawn because they have to rely on

13  that action beats reaction in a life-threatening situation, and

14  that would also apply to the burglary in progress.

15        We train our officers upon arrival to draw their weapon

16  because they're entering a situation that at least has a

17  likelihood of potentially becoming life-threatening.

18  Q    So an officer having their gun out doesn't mean that

19  they could reasonably use deadly force necessarily?

20  A    That's correct.

21  Q    I got a little sidetracked, but turning back now to this

22  policy.  It also mentions actively resisting arrest.  What is

23  active resistance?

24  A    Active resistance is when the subject uses their muscles

25  to resist the movement of the officer, and we contrast it with

1   passive resistance, and there's a fine line between active and

2   passive resistance.

3       When the subject is actively engaging their muscles to

4   resist the movement of the officer, that would be active

5   resistance.  Passive resistance is generally a refusal to move,

6   or dead weight.  They just go limp sometimes, and that would

7   fall under the passive resistance category.

8       Q    Where do you get those definitions?

9       A    So OPOTA provides definitions in the subject control

10  instructor manual that closely paraphrases what I mentioned.  So

11  that's what I rely on, is the OPOTA definition for active versus

12  passive.

13      And active -- OPOTA also has two categories of active

14  resistance.  Low-level active resistance, which is what I'm

15  mentioning previously, and then aggressive active resistance,

16  and that would be actively assaulting a police officer or some

17  sort of weapon-based attack.

18      Q    Okay.  Do all four of these factors have to be present

19  in order for an officer to reasonably use force?

20      A    No, ma'am.

21      Q    The active resistance, would that by definition only

22  occur when officers are going hands-on?

23      A    Not necessarily.  So, for example, if somebody is

24  running away or is maybe potentially firing a weapon at an

25  officer, that falls under active resistance.  So the line

1    between passive resistance and active resistance occurs when

2    hands-on control.

3              So there is some things, like aggressive active

4    resistance, that is obvious when we observe it.  And that may

5    not be from hands-on control, that may be somebody pulling a

6    weapon, might be somebody running.  That would fall under active

7    resistance, but that would never be confused with passive

8    resistance.

9              MS. PICKERILL:  Okay.  Maria, you can take that down.

10    Thank you so much.

11   BY MS. PICKERILL:

12     Q    Can an officer reasonably use force even if a suspect

13   isn't trying to flee the scene?

14     A    Yes, ma'am.

15     Q    Do you all have anything that sort of guides officers on

16   when to respond with which type of force?

17     A    So we train our officers on a use-of-force continuum.

18              MS. PICKERILL:  Maria, could we get that up, please?

19              This is another excerpt, I'll represent, from the same

20    document that we'll use for demonstrative purposes.

21              MR. KEYES:  That's fine.

22              MS. PICKERILL:  Can we publish to the jury as well?

23    Thank you.

24   BY MS. PICKERILL:

25     Q    Okay.  Is this the continuum that you were talking

1  about?

2      A    Yes, ma'am.

3      Q    Can you kind of explain to us what we're looking at?

4      A    So we train our officers in this exact use-of-force

5  continuum on an annual basis at our in-service training, and

6  this is just a guide for officers on an appropriate or a

7  reasonable level of force based on the individual's actions.

8          And that's an important note in this slide, is that the

9  officers are responding to the individual's actions.  And they

10  don't necessarily need to start at the lowest level of force and

11  then work their way up.  They may enter on the right side of the

12  officer's response anywhere within that continuum, depending on

13  the suspect's actions.

14          And then it's also very important, when we instruct

15  officers, to consider the officer-subject factor and the special

16  circumstances on the right side, and that's because what is

17  reasonable for one officer may not be reasonable for another and

18  vice versa.

19          So that depends on the officer-subject factors and

20  special circumstances:  Age, size, sex, skill level.  Some

21  officers are bigger, stronger, faster, so they may be less

22  likely to use higher levels of force, and then vice versa.  So

23  they need to consider that when determining their use of force.

24      Q    Why are these special circumstances that it lists, why

25  are those important?

1    A    Each one of those has kind of specific training value

2    for us as we teach officers.  The closeness of a weapon is,

3    generally speaking, always going to be involved because our

4    officers carry weapons.  So they always have to consider if

5    they're in an altercation, especially on the ground, that they

6    have a gun on their hip as well; and if they were to lose

7    control of that, that's a very serious situation.

8         And then injury, exhaustion, being on the ground, these

9    are all factors that could lead or that should be considered

10   when we're evaluating the use of force.

11        Availability of other options is oftentimes brought up

12   in training.  Like, is there things we can do?  Is there other

13   things available?  And many times there's not.  Because of that,

14   the chosen force was reasonable.

15        So each one of those has kind of specific training value

16   and is considered when the officer chooses what force to use.

17   Q    Are officers trained to consider or to try and figure

18   out what the subjective intent of the suspects that they're

19   dealing with is?

20   A    No.  So they're not -- they're not able to analyze the

21   intent of the suspect, right?

22        So they're responding to the actions, and so it would be

23   unrealistic for us to know the intent of every individual we

24   deal with.  We just don't know many times what the intent of

25   that suspect or that subject is.

1          So the officer is trained to respond to the actions, and

2     then always keeping in mind our action-versus-reaction principle

3     so they can try to stay behind -- or try to stay ahead of that

4     third of a second reaction time.

5          Q    So, for example, here at this lowest level under

6     individual actions, it lists not responding to commands.  Would

7     officers be trained to react to that noncompliance instead of

8     trying to figure out perhaps why that person wasn't responding

9     to commands?

10         A    That's correct, yes, ma'am.

11              MS. PICKERILL:  Thank you, Maria.  We can take that

12     one down.

13     BY MS. PICKERILL:

14         Q    I think you may have already mentioned this.  But when

15     we're considering whether force is reasonable, what

16     circumstances do we have to consider?

17         A    The totality of the circumstances, so that would be

18     everything involved and everything that the officer knows at the

19     time.

20         Q    Do you ever consider what -- do you ever consider what

21     the suspect knew that the officers didn't know?

22         A    I don't know that we would know what the suspects know,

23     right?

24         Q    Yeah.

25         A    We're basing our actions off of the suspect's actions,

1  right?

2       So we may not necessarily know exactly everything the

3  suspect did prior to our interaction, so the officer is

4  analyzing that and evaluating that within the situation.

5  Q   And I guess unless someone -- unless a suspect tells

6  you, you don't have any way of knowing what's going through

7  their head?

8  A   That's correct.  And we're still responding to the

9  actions, even if they say something, because they could say

10  something and do something else.

11       So even if they tell you one thing, that doesn't

12  necessarily mean their actions are -- we are observing what

13  they're saying, so they could say one thing and do something

14  else.  So we're still responding to the actions, whatever they

15  say.

16  Q   Could an example be when a suspect says, "I'm not

17  resisting," but the officers feel resistive tension?

18  A   Exactly.  Yes, ma'am.

19  Q   I want to walk through the force that was used in this

20  case and talk to you about the standards surrounding those types

21  of force.

22  A   Okay.

23       MS. PICKERILL:  I want to go ahead and play the video,

24  Maria, if we could, Joint Exhibit I, just so that we can see

25  and point out the specific uses of force that we're talking

1   about.

2           Can we play it starting at 5:10 and ending at 6:36.

3       (Video was played in open court.)

4   BY MS. PICKERILL:

5       Q    Okay.  When is it reasonable for officers to respond to

6   a crime scene and immediately take their gun out of the holster?

7       A    So we train our officers, on the priority one dispatch

8   runs that I had mentioned, to arrive and draw their weapon, and

9   that's because there's typically a -- it's a life-threatening

10  situation and there's a potential threat to serious physical

11  harm or death involved.

12          Other examples of these high-priority runs are

13  shootings, stabbings, robberies in progress.  They're the

14  highest level of classification for our dispatch system.

15      Q    Are they the highest level because of the threat that

16  they present?

17      A    And the potential risk to the victim as well.

18      Q    The victim being the person who called 911 or the person

19  who was injured?

20      A    Correct.

21      Q    Okay.  Make sure I understood that.

22          If Officer Fihe had responded to a burglary in progress

23  and immediately unholstered his gun, would that be compliant

24  with generally accepted police practices?

25      A    I believe so, yes, ma'am.

1    Q    I think you told us that pointing a firearm is a

2  Level 0.  Is pulling it out of the holster also a Level 0?

3    A    The officer's presence in general would be a Level 0,

4  but it's not actually reportable until we direct another's

5  movements with the gun pointed at the subject.

6    Q    Gotcha.

7        If Officer Fihe had responded to a burglary in progress

8  and upon arrival saw an individual who matched the description

9  and was armed, would it be within generally accepted police

10  practices to then point his firearm at that suspect?

11    A    Yes, ma'am.

12    Q    I guess what -- if Officer Fihe had given Mr. Burk

13  commands to get on the ground and Mr. Burk did not, would it be

14  reasonable for Officer Fihe to interpret that as noncompliance?

15        MR. KEYES:  Objection.

16        THE COURT:  Did I hear an objection?

17        MR. KEYES:  Yes.  I'm sorry, Your Honor.  We had an

18   objection.

19        THE COURT:  Overruled.

20        Go ahead.

21        THE WITNESS:  Yes, that would be reasonable.

22  BY MS. PICKERILL:

23    Q    Okay.  Would that same described noncompliance, if it

24  were there, make it reasonable for Officer Fihe to hold Mr. Burk

25  at gunpoint?

1    A    That's correct, and we would expect that, through

2  training, when we're investigating a felony in progress and our

3  officer is pulling a gun on an individual that is noncompliant,

4  yet they're not running away or actively attacking the officer,

5  we would expect them to hold them at gunpoint and allow for

6  other officers to arrive.

7    Q    So would that be -- why?  Why are they trained that way?

8    A    Because of the seriousness of the offense and the crime

9  they're investigating, especially if the individual is armed.

10  We would prefer that the officers, and we would train our

11  officers to, maintain a position of cover and safety while

12  another officer arrives, and then they can work together to try

13  to control the situation.

14        Any time we have another officer on scene, that adds to

15  our officer presence.  And it is actually -- we would train our

16  officers that an additional officer here is a de-escalation

17  method because we can hold and allow another officer to arrive,

18  and that is intended to help de-escalate the situation because

19  now we have two officers here to help control, and so that's

20  exactly what we would expect our officers to do.

21    Q    Okay.  Is that the same way that Officer Fihe --

22        THE COURT:  Counsel, step forward.

23      (The following proceeding was held at sidebar.)

24        THE COURT:  I'm not clear about something, and I ruled

25  on an objection, and I want to reconsider it.

1                Did you ask him to assume this person was armed?

2           MS. PICKERILL:  Yes.  I said if he arrived at scene

3   and if that person was armed, would this course of action be

4   acceptable?

5           THE COURT:  Well, it would have to be something that

6   the officers knew.  The fact that he may have been armed, they

7   may not have been aware of that at all.

8           MS. PICKERILL:  Well, Officer Fihe has testified that

9   when he arrived at scene he did know Mr. Burk was armed because

10  he saw the gun.  So that was my question, that if he arrived on

11  scene and if at that time he saw a gun, what would the

12  appropriate course of action be.

13          And the jury is entitled to believe or not believe

14  Officer Fihe on that, but the question is just if they do, if

15  they believe his testimony.

16          THE COURT:  Well, we see him in the photograph.  Do we

17  see a gun?

18          MS. PICKERILL:  Yes, Your Honor.

19          THE COURT:  I'm sorry?

20          MS. PICKERILL:  Yes, Your Honor.

21          And you see at the end of the video that it is removed

22  from his hip and placed on the ground.  So once you're up

23  closer, it's much more clear that it is a gun; but you can see

24  it from far away as well.

25          THE COURT:  Well, I think your question has got to be

1    directed towards what he is seeing in this initial

2    confrontation, as to whether that's sufficient.  Later if he

3    found a gun, that's not going to justify it.

4         MS. PICKERILL:  But, your Honor, if I may.  The

5    testimony on the record from Officer Fihe is that he saw the

6    gun as soon as he approached Mr. Burk.  That was his testimony.

7    And I agree a jury is entitled not to believe him, but that is

8    what he testified to.

9         MR. KEYES:  I think the testimony specifically was

10   silhouette.  I don't believe -- but it's framed as -- still has

11   to be framed as a hypothetical either way.

12        THE COURT:  All right.  Could the reporter read back

13   the question that the witness responded to?

14      (Court reporter requests clarification.)

15        MS. PICKERILL:  Your Honor, I think the question was

16   if Officer Fihe told Mr. Burk to get on the ground and he

17   didn't, would it be reasonable for Officer Fihe to interpret

18   that as noncompliance.  I haven't asked about him being armed

19   in a while.

20        THE COURT:  So is it your understanding that he is

21   assuming hypothetically that Mr. Burk -- or that Officer Fihe

22   observed that he had a gun before he gave -- before he pointed

23   his gun at him?

24        MS. PICKERILL:  Yes, Your Honor.  And I can use the

25   word "assume" with Officer Vehr more to make that more clear.

1    THE COURT:  All right.  I think you should.

2    MS. PICKERILL:  Okay.

3      (The following proceedings were had in open court.)

4    MS. PICKERILL:  May I proceed, Your Honor?

5    THE COURT:  Yes.

6    MS. PICKERILL:  Okay.

7  BY MS. PICKERILL:

8    Q    Officer Fihe, if we assume that -- I'm sorry.

9         Officer Vehr, if we assume that Officer Fihe gave

10  Mr. Burk a command to get on the ground, and if we assume that

11  Mr. Burk didn't do that, what would Officer Fihe be trained to

12  do in response?

13    A    Typically Officer Fihe would be trained in that

14  situation to hold him at gunpoint and allow for his backup

15  officers to arrive.

16    Q    Why are officers trained to sort of hold the situation

17  and wait for backup in these circumstances?

18    A    Because there is a -- the level of threat involved in

19  this situation, it's a felony in progress, or suspected felony

20  in progress, and the officer is by himself at the time, and he's

21  in a safe position of cover.

22         So his alternative would be to leave his position of

23  cover and then approach to go hands-on, and we would not train

24  our officers to do that one-on-one unless there was some other

25  circumstances that would require it, and we don't see that in

1 this situation.  We would train the officer, due to the level of

2 threat, to hold and wait for a second officer in that scenario.

3   Q   Are officers trained to arrive at a crime scene and

4 immediately start investigating, or is there stuff that they

5 need to do first?

6   A   That would depend on the crime scene.  So while en

7 route, the officer is deciding a course of action on the active

8 crime scene and if the crime is still suspected of being in

9 progress.  If it is, then the officer is going to respond faster

10 without delay and will try to gather as much information from

11 the dispatcher as possible and then approach cautiously on their

12 way to the scene.

13   Q   Do officers ever need to secure a scene before they can

14 start talking with citizens or doing other investigation?

15   A   Yes, ma'am.

16      So securing the scene includes investigating any

17 possible suspects and potentially detaining a suspect.  So that

18 is part of securing the scene of the crime and detaining

19 witnesses and then potentially setting a perimeter to further

20 investigate.

21   Q   Okay.  Part of that securing the scene, would that

22 include securing any firearms if there's a situation where

23 people on scene have firearms?

24   A   That's correct.

25   Q   Okay.  Why is that an important step to take?

1    A    Because a firearm involved is a deadly weapon, so

2  especially when we're engaged in the public, outside in the

3  public and there's potentially bystanders or other civilians or

4  somebody that's reporting the crime, as, you know, the case of a

5  caller or a victim to that felony in progress.

6        So securing the firearm is part of securing the scene to

7  ensure that everybody is safe in the scene.  Not just the

8  officers, but all parties involved.

9        MS. PICKERILL:  Could we please pull up Division

10   Directive 4.03, and could we publish it to the jury.

11        That's 2.01.  That's okay.

12        Okay.  If we could scroll down to the second page.

13  BY MS. PICKERILL:

14    Q    First, what does this directive cover?

15    A    This is Directive 4.03, which guides our officers in

16  dealing with out-of-uniform law enforcement personnel.

17    Q    Specifically in Section (II)(A), we have heard some

18  testimony that officers are required, pursuant to this

19  directive, to give instructions in the order that they're listed

20  in Part 3 of that.  Is that true?

21    A    No, ma'am.  I mean, this is a guide for officers.

22        So the approaching cautiously should be done initially,

23  right?

24        So that is the first thing we would train our officers,

25  to approach cautiously.

1          Part of identifying yourself as a police officer

2   includes our marked CPD cruiser and our uniforms that the

3   officers wear because now they are easily identifiable to

4   anybody observing their approach.

5          And then the clear, concise, nonconflicting orders, we

6   train our officers to do that.  And then I guess that would

7   occur also after the approach if possible.

8          But the important part of this policy is the last

9   sentence, and that if the individual refuses to comply, then the

10  officer is going to treat the situation as any other encounter

11  with an armed individual.

12         So that noncompliance could occur at any point during

13  the approach.  So that's why this is not necessarily a

14  sequential order; it's a guide for officers.

15         So when they are challenging a possible out-of-uniform

16  law enforcement personnel, that noncompliance may occur before

17  an order is given.

18         And we would train our officers that if a suspect or a

19  subject that we believe to be an out-of-uniform law enforcement

20  personnel observes us and then noncomplies, as if they're

21  running away or maybe they draw a firearm because they're not,

22  in fact, an out-of-uniform law enforcement personnel, they're an

23  actual suspect to a crime, so that may occur prior to the clear,

24  concise, and nonconflicting orders.  If that makes sense.

25     Q     Yeah.

1    Is this policy consistent with generally accepted

2 national policing standards?

3    A    Yes, ma'am, I believe so.

4    Q    Is it ever appropriate for an officer to respond to a

5 plainclothes officer and give initial commands other than show

6 me your ID?  Is it ever okay to start with something different?

7    A    Yes, ma'am.

8    So every situation is different, and we would have to

9 look at the circumstances surrounding that -- a given situation,

10 but there are many different examples I could think of where an

11 officer might say something other than show me your ID.

12    For example, if the individual is holding a weapon, the

13 first command might be drop the gun.  If the individual is

14 facing away or is -- you can't observe their hands, the first

15 command might be let me see your hands.  Or if the individual is

16 doing some other -- something that you need to control prior to

17 the request to see identification, then I would expect our

18 officers to give that initial command first.

19    Q    So if we assume that Officer Fihe responded to a call

20 for a burglary in progress and impersonation of a police

21 officer, would it be appropriate for his first command to be

22 turn around, let me see your hands?

23    A    Yes, ma'am, I believe so.

24    Q    Would that be in compliance with this directive that we

25 just talked about here?

1    A    Yes, ma'am.

2         MS. PICKERILL:  We can take that down, Maria.  Thank

3    you very much.

4    BY MS. PICKERILL:

5    Q    If we assume that Officer Fihe arrived on scene and gave

6    Mr. Burk commands to turn around and show his hands, and if we

7    assume that Mr. Burk ignored those commands, what should Officer

8    Fihe have done?

9    A    So he would assess that as noncompliance.  And if we're

10   seeing noncompliance from a potential out-of-uniform law

11   enforcement personnel, then we would fall to our policy and

12   treat that individual as any other armed suspect.

13   Q    When is it appropriate to place an armed suspect

14   facedown on the ground?

15   A    So we train our officers to -- we call that a prone

16   position -- to prone an individual when you are behind cover and

17   are waiting for backup.  That allows us to have kind of a

18   position of advantage from that cover point if the individual is

19   on their stomach or in the prone position because it makes the

20   threat -- it lessens the threat for the officer because now,

21   remember, the mention of the action versus reaction.

22        That begins to throw the third of a second reaction time

23   in the officer's favor because somebody proned out takes longer

24   to commit an action than somebody standing.  Like, they would

25   have to roll over to their body, they would have to reach into

1    the pocket, and then the officer could observe that behavior

2    better when they are in the prone position.

3         The other thing is that is a control method to decrease

4    the likelihood that somebody might flee as well.  So if we

5    suspect somebody may flee the scene of a crime, if they're

6    complying with the order to get on the ground, then we would

7    give that order and hope for compliance.

8    Q    Thank you.

9         If a suspect claims to be a law enforcement officer in

10   plainclothes, are responding officers ever required to take that

11   person at their word?

12   A    No, ma'am.  We would train the officers that if somebody

13   is claiming to be a law enforcement officer out-of-uniform, that

14   they would need to verify that information of the individual.

15   Q    Would a way to verify that information be showing the

16   responding officers a plain manila folder?

17   A    No, ma'am.

18   Q    Would a way to verify that be to tell the responding

19   officers that you have an OHLEG sheet?

20   A    No, ma'am.

21   Q    Should officers accept either of those as proof that a

22   person is law enforcement?

23   A    No, ma'am.

24   Q    What should officers accept as proof that someone is a

25   law enforcement agent?

1    A    So officers are trained to verify that information

2    through a badge and proper identification or credential because

3    oftentimes -- not one or the other, but both, our officers are

4    trained that way, to observe a badge and then also see the

5    identification because badges can sometimes get lost, IDs can

6    sometimes get lost or stolen.  So the two together is when the

7    verification occurs for the officer.

8    Q    If we assume that Officer Fihe was responding to a

9    burglary and an impersonation call, and if we assume that when

10   he arrived he found a person matching the description given to

11   dispatch, and if we assume that person was armed and not

12   complying with commands, would it be reasonable for Officer Fihe

13   to not want to ask that person to reach into their pockets?

14   A    Yes, ma'am, that's reasonable.

15   Q    Why wouldn't an officer want someone in that situation

16   to be reaching into their pockets?

17   A    Because we go back to our directive and our training on

18   that situation.  If we're observing noncompliance, we're going

19   to treat that individual as any other armed suspect at that

20   point.

21        So we -- if the individual is a suspect out of a crime

22   and armed, we would not want them reaching into the pocket

23   because of the potential threat that could occur.

24        Again, that goes back to our action-versus-reaction

25   principles and our training behind that.  If somebody reaches

1   into the pocket, we can no longer observe the hand, and we don't

2   know exactly what is in that pocket, and very quickly, within a

3   third of a second, a weapon could be drawn and a shot fired.

4          Especially if we already are under the assumption that

5   that person is armed, we're -- that is a reasonable response.

6   We would not expect the officers to tell somebody to reach into

7   a pocket, given those facts.

8   Q      Are CPD officers trained to expect fellow law

9   enforcement who are out of uniform to follow their commands?

10  A      They are.

11  Q      Are they trained to expect fellow law enforcement

12  officers who are out of uniform to treat them with respect?

13  A      They are.

14  Q      Is that consistent with national policing standards?

15  A      Yes, ma'am.

16  Q      If a suspect who claimed to be a law enforcement officer

17  does not follow commands, would it be reasonable for the

18  responding officers to question whether that suspect is actually

19  a law enforcement officer?

20  A      Yes, ma'am.

21  Q      We watched a bit of the video a moment ago; but if we

22  assume that while Officer Fihe was holding Mr. Burk at gunpoint,

23  if we assume that Mr. Burk lowered his arms and reached towards

24  his waist, how are officers trained to interpret and respond to

25  that behavior?

1    A    If the individual is suspected of being armed and we

2    have given the commands to not reach into the pocket -- is that

3    your question?

4         I'm sorry.  If we have already given those commands --

5    Q    If we assume that the officer has already given a

6    command to show your hands and to stay where you are and that

7    the individual has been complying with those two commands but

8    not -- I'm getting way afoul.  Let me try it again.

9         Are officers given any training on how to interpret the

10   body language of a suspect who they believe to be armed and

11   reaching towards their waist?

12   A    Yes, ma'am.

13        So we train our officers in what's called pre-attack

14   indicators.  So there's a lot of things that an individual or a

15   subject will do that are nonverbal in nature and

16   behavior-related that might cue an officer of an attack.

17        So many of those things include blading of the body, the

18   clinching of the fist if it is an assault, and facial

19   expressions that officers pick up on that they're trained to

20   react to those pre-attack indicators because we're trying to get

21   back on side of that action versus reaction.  So they're

22   responding to those actions.

23        Noncompliance in general is a pre-attack indicator for

24   us, and we train that.  Actually, the most common pre-attack

25   indicator is general noncompliance.

1    So if somebody reaches into a pocket, that could

2  potentially be a pre-attack indicator that our officers are

3  observing and reacting to.  That doesn't necessarily -- what

4  that reaction is depends on the circumstances, right, and their

5  positioning and availability of other options.

6    So that -- whatever that reaction is on the chosen force

7  option goes back to our use-of-force continuum and what would be

8  reasonable given those circumstances.

9    Q    When is it reasonable to place a suspect in handcuffs?

10    A    To detain or arrest an individual.

11    Q    And when is it appropriate or what do officers need

12  before they can detain a suspect?

13    A    An officer would need reasonable suspicion of criminal

14  activity.

15    Q    So if we assume that officers get a dispatched call that

16  describes a burglary suspect, and if we assume that the officers

17  arrive on scene and see someone who matches that description,

18  what would have to happen in order for the officers to have

19  reasonable suspicion that a crime may have occurred?

20        MR. KEYES:  Objection.

21        THE COURT:  Sustained.

22  BY MS. PICKERILL:

23    Q    What is reasonable suspicion?

24    A    Reasonable suspicion is that -- is kind of an analysis

25  an officer does on potential criminal activity.  So it would be

1  less than probable cause but more than just a hunch or a

2  consensual encounter.

3       So it's a -- I can't think of the word, but it's

4  something officers use to detain an individual.  If they have

5  reasonable suspicion that a suspect committed a crime, then they

6  can legally detain that individual.

7  Q    And would that include detaining them in handcuffs?

8  A    It could include that.

9  Q    What level of force is handcuffing a suspect?

10  A    Level 0.

11  Q    Are there times where handcuffing a suspect helps in

12  securing the scene like we talked about earlier?

13  A    Yes, ma'am.

14  Q    When is handcuffing helpful to securing a scene?

15  A    So if the individual is suspected of the crime and an

16  investigation is being completed to further investigate that

17  crime and to talk to the witnesses and talk to any potential

18  victims, we would expect our officers to handcuff the individual

19  to detain them, and especially if the individual is also

20  suspected of being armed.

21  Q    So if we assume here, again, that the officers were

22  responding to a burglary in progress, and if we assume that they

23  saw a firearm on the waistband of that individual, and if we

24  assume that that individual was not complying with commands to

25  get on the ground, would those circumstances make it appropriate

1   to handcuff that suspect?

2     A    Yes, ma'am, I believe so.

3     Q    Once officers have a suspect on the ground facedown in

4   that prone position you talked about, what is the appropriate

5   handcuffing technique?

6     A    We train a variety of techniques in that position

7   because it is a very common position, and there's a lot of

8   different ways a suspect may react in that position or position

9   their hands.

10       So typically we would train our officers to approach and

11   grab the near side arm, the closest arm, and begin to place the

12   hands behind the back.  An officer may even give that verbal

13   command prior to the approach.

14       And what I mean is, from a position of cover, the

15   officer gives a command to get on the ground and then place your

16   hands behind your back, and our officers use that as a

17   compliance gauge.  Like they can -- if the individual complies

18   to that order, then they can make their approach and begin to

19   apply handcuffs.  If the individual does not comply to that

20   order, then the officer can react to whatever resistance that

21   may occur upon first touch.

22       So there's other techniques that officers use in that

23   situation.  We give them training every year in that position,

24   and many different things could occur when somebody is prone and

25   the officer is in control on top.

1    MS. PICKERILL:  Maria, could we put up the levels of

2  force again, please.

3  BY MS. PICKERILL:

4    Q    So how are officers trained to respond if they place a

5  suspect in a prone position and the suspect does not -- how are

6  officers trained to respond if they have a suspect in the prone

7  position and they have ordered them to put their hands behind

8  their back but the suspect does not?

9    A    So at some point the officers are going to need to close

10 the distance to go hands-on control, and that's going to be the

11 decision of the officers at the time based on the totality when

12 that occurs.

13    So they will go to position themselves in a dominant

14 position on top to try to control the suspect in such a way that

15 they can grab the wrist or grab an arm and then put the hand

16 right to the small of the back on both sides and then apply the

17 handcuffs.

18    Q    Would that sort of manipulation of the arms, would that

19 be a use of force on this list?

20    A    It could be if the officer feels resistance.

21    Q    Okay.

22    A    If there's passive resistance, as in the individual is

23 simply refusing to move because they have shown that

24 noncompliance, and the officer is able to grab the wrist and

25 grab the arm and place it into the small of the back and no

1  resistance is offered upon that first touch, that would be

2  Level 0, officer presence.

3       If the officer grabs the arm and they feel the muscles

4  engage in such a way that it's resisting the officer's movement,

5  that would be active resistance, and then that would fall under

6  the Level 1 category.

7       So if the officer feels that resistance and then they

8  react to the suspect's actions and they're able to pry the arm

9  to the small of the back or manipulate the joint, then that

10 would be Level 1.

11   Q    Is that the joint manipulation that we see under

12 Level 1?  Is that what that would be called?

13   A    Yes, ma'am.

14   Q    Okay.

15   A    Or empty-hand control.  They both would fall under that

16 category.

17   Q    Okay.  What about using an officer's body weight to hold

18 a suspect on the ground, what level of force would that be?

19   A    That would be Level 1.

20   Q    When would it be acceptable to use Level 1 force of that

21 type?

22   A    Again, that would depend on the totality of the

23 circumstances.

24       So keep in mind on the use-of-force continuum, where we

25 enter that use-of-force continuum is dependent on

1  officer-subject factors and special circumstances.

2       So it is possible that an officer would -- first touch

3  upon the suspect would include Level 1 control, depending on

4  officer-subject factors and special circumstances.

5       And what I'm thinking of specifically is maybe the

6  closeness of a weapon.  That may require an officer, or an

7  officer may decide, to use Level 1 control method upon first

8  touch because of how close a weapon is.

9       So it varies based on circumstances, but either one.  It

10  could be Level 0 or it could be Level 1 on that initial touch or

11  initial control.

12  Q    If we assume that Mr. Burk moved his -- pulled his arms

13  away from the officers when they initially tried to handcuff

14  him, if we assume that, would it be reasonable to use that joint

15  manipulation we talked about?

16  A    Yes, ma'am, I believe so.

17  Q    If we assume those same facts, would it be reasonable to

18  then place body weight on top of Mr. Burk?

19  A    Yes, ma'am.

20  Q    So we're looking at these levels of force.  What level

21  is the TASER?

22  A    Level 3.

23  Q    Okay.  Is it ever appropriate for officers to skip

24  Level 2, chemical spray, and go straight to Level 3?

25  A    It could be, yes, ma'am.

1    Q    In what types of circumstances would that be reasonable?

2    A    We would, again, base that on the totality of the

3    circumstances involved.  Many times with a Level 2 chemical

4    spray, when it's a very close encounter on the ground, that goes

5    back to our availability of other options on the use-of-force

6    continuum.

7         And the use of a chemical spray in a close environment

8    or a close-encounter grappling range can be dangerous for the

9    officer as well because that chemical spray tends to kind of go

10   into the air and can sometimes affect the officer negatively, as

11   well as the suspect.

12        So oftentimes officers will choose not to use that level

13   because of that, and that may be a reason why an officer goes to

14   Level 3, skipping Level 2.

15   Q    Okay.  When do nationally accepted police standards say

16   that it's appropriate to use a TASER?

17   A    Typically we train our officers to use a TASER in probe

18   or drive-stun mode against an active resister.

19   Q    If an individual pulls their arms away from officers

20   while they're trying to handcuff him, or them, could the

21   officers in that situation reasonably perceive that as active

22   resistance?

23   A    Yes, ma'am.

24   Q    If officers encounter a suspect they're trying to

25   handcuff who moves and turns their body away from the officers,

1  would it be reasonable to perceive that as active resistance?

2      A    Yes, ma'am.

3      Q    When we're determining whether there's active

4  resistance, do we look at what the officers perceived or what

5  the suspect intended?

6      A    What the officers perceive, correct.

7      Q    When is it reasonable to detain a suspect inside of a

8  police cruiser?

9      A    Officers may choose to detain an individual inside of a

10  cruiser when they are further investigating a crime or the

11  individual is under arrest, so both would be reasonable.

12          If we're detaining an individual and then we have to

13  continue the investigation on scene, we train our officers to

14  use their cruiser for that detention; and then obviously when

15  the suspect is under arrest they would also be placed in a

16  cruiser.

17      Q    Why are officers trained to detain suspects in the

18  cruiser while they continue an investigation?

19      A    It's safer for the officer because now the suspect is

20  secure, meaning they can no longer escape.  So they can place

21  them in the cruiser, and that would free up the officer to then

22  verify any potential identity and further investigate the crime,

23  speak to witnesses, or speak to victims involved.

24      Q    Does that change if the suspect would prefer to be

25  detained outside?

1    A    Not necessarily.  That's a decision of the officers on

2  scene based on totality, what they decide.  If they determine

3  that it's reasonable at the time to place them in the cruiser,

4  then they would do so.

5    Q    If a suspect who is being detained during an

6  investigation is causing distress to the victim when they see

7  them, would that be one of those circumstances where it's

8  reasonable to place them in the cruiser?

9    A    That would contribute to the decision, yes, ma'am.

10   Q    If a suspect is told to get inside of a cruiser and

11  refuses to do so, would generally accepted police practices

12  allow officers in that situation to use Level 1 force to get

13  that person into the cruiser?

14   A    Yes, ma'am, I believe so.

15   Q    Okay.  I guess I'll ask this:  In that situation with

16  the police cruiser, pulling someone into the cruiser, what level

17  of force would that be?

18   A    That would be Level 1.

19   Q    Okay.  I wanted to make sure that I assumed correctly.

20   A    Sure.

21   Q    Do you know --

22       MS. PICKERILL:  We can take that down, Maria.  Thank

23  you very much.

24  BY MS. PICKERILL:

25   Q    Do you know of any generally accepted policing standards

1  that would allow a law enforcement officer to disobey commands

2  because they feel that it's best for their personal safety?

3      A    No, ma'am.

4      Q    I'm going to ask you to assume some more things for

5  these questions.

6          If we assume that Mr. Burk matched the description of a

7  burglar and if we assume that he was armed and not complying

8  with verbal commands, would it be within national policing

9  standards to place him facedown on the ground?

10     A    It would be based on totality again, right?

11         So we would have to look at the entire totality of the

12  circumstances on that decision, but, yes, I believe so.

13     Q    Okay.  If we assume that Mr. Burk was the suspect of a

14  burglary in progress, and if we assume that the officers knew

15  him to be armed and not complying with commands, would it be

16  consistent with generally accepted policing practices to place

17  him in handcuffs?

18     A    It would be, yes, ma'am.

19     Q    If we assume that Mr. Burk was being handcuffed and

20  pulled his arms away from the officers as they handcuffed him,

21  would it be reasonable to classify that as resistance?

22     A    Yes, ma'am.

23     Q    Does it matter if Mr. Burk intended to resist?

24     A    No, ma'am.

25     Q    If we assume that Mr. Burk was resisting being

1  handcuffed, is it within national policing standards to use a

2  TASER in order to effectively handcuff him?

3      A    Yes, ma'am.

4          MS. PICKERILL:  Just one moment, Your Honor.

5      (Defense counsel conferring off the record.)

6  BY MS. PICKERILL:

7      Q    Officer Vehr, you had mentioned that there are a couple

8  of different ways to use the TASER.  So in a close-quarters

9  hands-on situation, how would you expect officers, when they

10 need to, to utilize that TASER?

11     A    So we train our officers a couple options in that

12 situation.  This TASER specifically was known as an X26P, so it

13 was equipped with a cartridge on the front that ejects two

14 probes attached to a 25-foot wire, and then those probes enter a

15 subject's body and then produce electricity for the TASER to be

16 effective.

17         The other option that we could use is to remove the

18 cartridge and use what's called a drive stun, where now they're

19 cycling the TASER and it's only a connection at the front of the

20 TASER.  So they're driving that TASER, the front of the TASER,

21 into the body to achieve some sort of pain compliance.

22     Q    Is one of those methods, I guess, less invasive than the

23 other?

24     A    Correct.  And the phrase TASER uses in training is "less

25 intrusive."

1    So the probe -- I'm sorry.  The drive-stun mode we train

2 our officers as being a less intrusive method of using a Level 3

3 TASER.

4    Q    Okay.  So if we assume that in this instance Officer

5 Fihe utilized one cycle of the drive-stun TASER, would that be

6 an appropriate use for the closeness of that situation?

7    A    Yes, ma'am.

8         MS. PICKERILL:  Your Honor, I don't have anything

9  further at this time.  Thank you very much.

10         THE COURT:  Very well.

11         We're going to take our midmorning recess.  We'll be

12  in recess for 15 minutes.

13         THE COURTROOM DEPUTY CLERK:  All please rise.

14         This court will stand in recess.

15    (Jury out at 10:49 a.m.)

16    (Recess taken from 10:49 a.m. to 11:07 a.m.)

17    (Jury in at 11:07 a.m.)

18         THE COURT:  All right.  Mr. Keyes, you may

19  cross-examine.

20         MR. KEYES:  Thank you, Your Honor.

21                        - - -

22                   CROSS-EXAMINATION

23 BY MR. KEYES:

24    Q    Officer Vehr, you told us you were an officer with the

25 Columbus Division of Police, correct?

1     A    Yes, sir.

2     Q    So these two defendants, these are your co-workers,

3 true?

4     A    Correct.

5     Q    They're your fellow officers, in other words?

6     A    Yes, sir.

7     Q    Fellow officers in your own police division, not just

8 fellow officers generally, correct?

9     A    Yes, sir.

10    Q    The city that pays their salary also pays your salary,

11 true?

12    A    That's correct, yes, sir.

13    Q    You told us on direct examination that you had testified

14 as an expert, I believe, in one other civil case like this one,

15 correct?

16    A    Yes, sir.

17    Q    In that case you also testified on behalf of, not these

18 officers, but other of your fellow officers in the city of

19 Columbus, correct?

20    A    That's correct.

21    Q    In this case you agree that if Agent Burk had provided a

22 name and badge number to the person inside the apartment and

23 that was communicated to the officers, that that would have been

24 relevant information to identifying him as an ATF agent?

25    A    That would have been information to pass along to the

1 officers, yes, sir.  However, the officers would still need to

2 verify that information upon arrival.

3    Q    By checking his credentials, correct?

4    A    Yes, sir.

5    Q    You believe that whether or not Mr. Burk complied with

6 Officer Fihe's verbal commands is a factor that weighs on

7 whether Officer Fihe's actions at the home were reasonable,

8 correct?

9    A    It is a factor.

10    Q    In particular, I think we heard you talk about Officer

11 Fihe's initial approach to the house when he exits his patrol

12 car.  Do you remember that?

13    A    Yes, sir.

14    Q    In this case, if Mr. Burk hypothetically had complied

15 with the initial order to turn around and let me see your hands,

16 you agree that that reasonably could have affected Officer

17 Fihe's behavior, correct?

18    A    Any response or any action by the suspect is going to

19 affect Officer Fihe's behavior.  He's responding to those

20 actions.

21    Q    And in particular in this case if hypothetically

22 Mr. Burk had complied with the initial order of turn around,

23 show me your hands, that would likely change the behavior of

24 Officer Fihe on the scene, correct?

25    A    Change from?

1    Q    From what he did.

2    A    That would depend on the circumstances in that approach,

3  and I would have to -- I would have to watch the video to see

4  exactly what behavior is expected to change as a result of that.

5    Q    Well, let me frame it to you the way -- you recall that

6  you and I met before, we took your deposition in the City

7  Attorney's conference room?

8    A    Correct.

9    Q    Okay.  I'm going to ask you if you recall this

10 testimony, and we have the video.  We'll certainly look at it,

11 but I'm going to ask you if you recall this particular

12 testimony.

13        I asked you:  So as far as initial approach, if the

14 responding officer is giving verbal commands and the subject is

15 not complying, then you're saying, well, you have to treat that

16 as any other felony suspect at that point?

17        And you answered:  Correct.

18        Does that sound right so far?

19   A    I recall that, yes, sir.

20   Q    Okay.  And then my follow-up question was:  And if he is

21 complying, how does that affect the situation?

22        And your answer was:  Well, if he is complying, then

23 that changes the potential response of the officer.  So in this

24 case, if he had complied with the initial order of turn around,

25 show me your hands, that would likely change the behavior of

1  Officer Fihe.

2        Does that testimony sound familiar?

3    A    I'm sorry.  Is that --

4    Q    Do you recall giving that testimony to me in your

5  deposition?

6    A    I do, yes.

7    Q    Okay.  If hypothetically Mr. Burk had complied with the

8  initial order to turn around and let me see your hands, Officer

9  Fihe's training would have been to call back to his point of

10  cover or potentially wait for a second officer; is that correct?

11   A    That's correct.

12   Q    And then at that point, to secure Mr. Burk and retrieve

13  his identifying information, correct?

14   A    Correct.

15   Q    Now we'll look at a portion of the video, and I know we

16  have played it a lot.  So it's not my intent to play long chunks

17  of it, but I want to be fair to you.  So if you need to see

18  another portion at any point, please let me know and we can do

19  that.

20   A    Okay.  Yes, sir.

21   Q    Thank you.

22        I'm at time-of-day stamp 14:03:29, minute code on the

23  video is 5 minutes and 5 seconds, and we're going to play from

24  here to about 5 minutes, 20 seconds.  This will be about a

25  15-second clip.

1        (Video was played in open court.)

2    BY MR. KEYES:

3        Q    Now, when we viewed that clip, you agree that Agent Burk

4    is not facing Officer Fihe when he first gives the command to

5    turn around, correct?

6        A    I don't recall.  I would have to actually see if I can

7    see his positioning when that command was given.

8        Q    Well, do you recall us talking about that issue in your

9    deposition, sir?

10       A    I do, sir.

11       Q    And I'm going to read you some of the testimony that we

12    covered in your deposition.

13       A    Okay.

14       Q    So if Agent Burk -- we can agree that when Officer Fihe

15    gives the command to turn around, do we agree that Agent Burk is

16    not facing Officer Fihe yet at the time Officer Fihe first gives

17    that command?

18            And your answer:  Yes, sir.

19            Do you recall that testimony?

20       A    I do.

21       Q    Now, at the time where we have frozen this frame, we see

22    Mr. Burk is now facing Officer Fihe; is that correct?

23       A    That's correct.

24       Q    We heard Officer Fihe say turn around, let me see your

25    hands, twice within about one second, correct?

1     A     Okay. Yes, sir.

2     Q     And that was not two different commands to turn around,

3 was it?

4     A     No, sir.

5     Q     Officer Fihe, when he first approaches, is coming from

6 an angle that would have been over Mr. Burk's left shoulder,

7 correct?

8     A     I believe so, yes.

9     Q     While Mr. Burk is still at the front door of the

10 apartment, true?

11     A     True.

12     Q     And then after Officer Fihe gives that command to turn

13 around and show me your hands, Mr. Burk has turned so that he is

14 now facing him, correct?

15     A     That appears so, yes, sir.

16     Q     Now, even though I think you suggested that there may

17 have been some form of noncompliance with that initial command,

18 Officer Fihe never tells Mr. Burk at this point to turn back

19 around or to turn his back to him; is that correct?

20     A     I don't believe that command was given, no, sir.

21     Q     Now, Mr. Burk, he has his hands out and extended,

22 correct?

23     A     Correct.

24     Q     He's not pointing his hands forward, is he?

25     A     Doesn't appear so, no, sir.

1   Q    And he doesn't have his hands hidden behind his back,

2   does he?

3   A    No, sir.

4   Q    So at this point Mr. Burk has shown Officer Fihe his

5   hands, correct?

6   A    Minus the paper in his hands, sir.  So he hasn't --

7   Q    And when you testified at your deposition I asked you

8   that same question, so I'm going to read you your testimony from

9   the deposition.  Okay?

10  A    Okay.

11  Q    And we're talking about -- to be fair, I'll move the

12  video back 1 second because I think it was at 5 minutes,

13  18 seconds in your deposition.  So I want to just move back that

14  1 second, if I can.

15       All right.  So now I'm frozen at 5 minutes, 18 seconds,

16  which was the same time code in your deposition.

17       My question was:  We're frozen on 5:18 again here.  Do

18  you see that?

19       Your answer was:  Yes, sir.

20       And my question:  At this point Officer Burk has shown

21  Officer Fihe his hands, correct?

22       And your answer was:  Correct.

23       Do you recall that testimony from your deposition, sir?

24  A    I do, sir.

25  Q    Now, you mentioned papers in Mr. Burk's hands.  You're

1 talking about what's in his left hand in this frame here?

2     A    Correct.

3     Q    Do you agree from watching the video that Officer Fihe

4 never tells Mr. Burk to drop his papers or drop his folder?

5     A    He never gave that command specifically, no, sir.

6     Q    And you have seen nothing in the video to this point to

7 suggest that Mr. Burk had any kind of weapon in the papers or

8 the file folder, correct?

9     A    Not that I can see, no, sir.

10     Q    I want to play the next few seconds of the clip.

11    (Video was played in open court.)

12 BY MR. KEYES:

13     Q    Now, in those few seconds between when Mr. Burk first

14 puts his hands out and when Officer Fihe points his gun at him,

15 Mr. Burk has kept his hands out, correct?

16     A    Up until this point, sir.

17     Q    Yeah.

18     So up until before -- until the point where Officer Fihe

19 points his gun at him, in those few seconds, he had kept his

20 hands out, correct?

21     A    I believe so, yes, sir.

22     Q    If Agent Burk's ID is anywhere that he would have to

23 reach for it, he couldn't both show Officer Fihe his hands and

24 produce his ID at the same time.  We agree on that?

25     A    Unless he had an ID in his hand, sir.

1    Q    I'm sorry.  My question was if his ID were somewhere

2  where he had to reach for it.

3    A    Oh, I'm sorry.  That's correct, yes, sir.

4    Q    Okay.  Thank you.

5         Assuming that Mr. Burk's ID was in his pocket, any

6  pocket, it would have been unwise at this point for Mr. Burk to

7  reach into a pocket for his ID, correct?

8    A    I agree, yes, sir.

9    Q    And at no point has Officer Fihe, in this encounter up

10  until now, at no point has Officer Fihe instructed Mr. Burk to

11  produce any agency identification from a pocket or anywhere

12  else, correct?

13    A    Correct, sir.

14    Q    You have watched more of the video than what we have

15  shown you in this few seconds.  You have watched the entire

16  video before, correct?

17    A    Yes, sir.

18    Q    And there's a portion in the video -- do you remember

19  hearing a portion at some point where Officer Fihe tells

20  Mr. Burk you had your chance?

21    A    I don't recall that specifically.

22    Q    Okay.

23    A    No, sir.

24    Q    Okay.  That's all right.  We don't need to find it.  The

25  jury will have the video.

1       But as a general matter, once Officer Fihe arrived at

2   the scene, from that point forward, would you agree, from that

3   point all the way through up until he's handcuffed on the

4   ground, Mr. Burk did not have a chance to pull his credentials

5   from his pocket?

6       A    From the point that the officer arrived?

7       Q    Yes.

8       A    To handcuff?

9       Q    Yes.

10      A    I agree that he -- it would be unwise at that point to

11  reach into his pocket.  And so the opportunity is there;

12  however, we didn't see that.  Like, he could still make the

13  action of going into his pocket --

14      Q    But it would be -- oh, I'm sorry.  Go ahead.

15      A    -- but it would be unwise.

16      Q    Thank you, sir.

17          THE COURT:  It would be what, sir?

18          THE WITNESS:  Unwise.

19          THE COURT:  Unwise?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Why would it be unwise?

22          THE WITNESS:  Yes, Your Honor.

23          So for Officer Burk, at that point he is -- Officer

24   Fihe has him at gunpoint, and he also has -- I believe Officer

25   Fihe can recognize what appears to be a weapon on the hip.  So

1 any movement to the pocket could be viewed as threatening to

2 the officer himself.

3          MR. KEYES:  May I continue, Your Honor?

4          THE COURT:  Yes.

5          MR. KEYES:  Okay.  Thank you.

6 BY MR. KEYES:

7    Q    I think that you had mentioned with the City Attorney's

8 examination that the coupling of a badge and a photo ID and

9 credentials, that's what we're looking for for verification of

10 law enforcement officer status, correct?

11   A    Yes, sir.

12   Q    Not just one or the other by itself?

13   A    Correct.

14   Q    That's why, in Directive 4.03, Section (II)(A)(3), under

15 procedures:  Instruct individuals claiming to be law

16 enforcement, whose identity you are not able to immediately

17 confirm, to disarm in a safe manner and then produce their

18 agency's identification.

19          So in that section that I just read, what that is

20 talking about is instruct them to produce not just a badge, but

21 their badge and credentials, correct?

22   A    That's correct.

23   Q    And, again, you have watched not just those clips that

24 we just saw, but more of the video as well.  At no point does

25 Officer Fihe give Mr. Burk the instruction to disarm in a safe

1  manner and then produce his agency's identification; is that

2  correct?

3      A    That's correct, he never made that request or command.

4      Q    You agree that Directive 4.03 -- you agree that in this

5  case Division Directive 4.03 is the foundation for scenarios

6  involving out-of-uniform personnel, correct?

7      A    I believe so, among other resources as well.

8           So it's not the only resource we use when dealing with

9  scenarios; however, it is a resource.

10     Q    I understand.

11          Officer Vehr, do you recall, as part of your work in

12  this case, writing a report that was provided to us as part of

13  discovery?

14     A    Yes, sir.

15     Q    Do you have a copy of your report with you?

16     A    I do not.

17     Q    I can --

18          MR. KEYES:  Your Honor, may I approach to hand him his

19   report?

20          THE COURT:  Yes, you may.

21  BY MR. KEYES:

22     Q    Officer Vehr, I'm going to hand you a copy of your

23  report.  You can see on the cover page that is your report,

24  correct?

25     A    Yes, sir.

1    Q    Page 5, I'm going to ask you to look at Section 2,

2  training specific to this incident.

3    A    Okay.

4    Q    In that paragraph under training specific to this

5  incident, the only division directive that you mention is 4.03,

6  correct?

7    A    That's correct.

8    Q    And in about the middle of the first paragraph under

9  training specific to this incident, that's where you say, in

10  this case, Division Directive 4.03 is the foundation for

11  scenarios involving out-of-uniform personnel; is that right?

12    A    That's correct.

13        MR. KEYES:  May I take that back, Your Honor?

14        THE COURT:  Yes.

15  BY MR. KEYES:

16    Q    Thank you.

17    A    Certainly.

18    Q    So it's your testimony, if I understood correctly, on

19  direct examination, that if -- hypothetically, if a subject

20  failed to comply with an initial command, then that would be a

21  reason that the officer would not then instruct the individual

22  to disarm in a safe manner and produce their agency's

23  identification?

24        In other words, if the individual failed to comply with

25  an initial command, were you saying that that would be a reason

1    or a justification to not follow the first step of paragraph

2    (II)(A)(3)?

3        A    In that -- yes, sir.

4            So we're going to the second sentence of that same

5    paragraph.  If the individual refuses to comply, treat the

6    situation as any other encounter with an armed individual.

7        Q    Understood.

8            And treating the situation as any other encounter with

9    an armed individual would possibly include the officer drawing

10   and training their firearm on the individual, correct?

11       A    That's a possibility, yes, sir.

12       Q    In this case, the only command that Officer Fihe gave

13   before drawing and pointing his gun at -- I'm sorry.  His gun

14   was already unholstered.  Let me rephrase my question.

15           In this case, the only command Officer Fihe gave

16   Mr. Burk before pointing his gun at him was to turn around and

17   let me see your hands, correct?

18       A    I believe so, yes, sir, based on the video.

19       Q    And so whether or not Mr. Burk complied with that

20   command, would you agree with me that based on the procedure in

21   (II)(A)(3), whether or not Mr. Burk complied with that command

22   should inform whether Officer Fihe, on approaching the

23   situation, was to instruct Mr. Burk to disarm in a safe manner

24   and then produce his agency's identification?

25       A    So the pointing of the gun is not necessarily treating

1  the situation as any other encounter with an armed individual.

2      Q     Okay.

3      A     So if somebody fails to comply, or comply, we're

4  using -- the officers are using a Level 0 use of force by

5  pointing the gun, so that could be done with somebody that is

6  complying with orders and not necessarily noncompliance.

7          So those initial orders, like, that doesn't

8  necessarily -- him pointing the gun at the suspect is not

9  necessarily treating the situation as any other encounter with

10 an armed individual.  That's him trying to gain compliance

11 through verbal commands and a Level 0 technique.

12     Q     I think I understand your answer, so I'm going to ask a

13 related question then.

14         I think we looked over your -- or talked about your

15 deposition testimony a moment ago; that if Mr. Burk had complied

16 with the initial order of turn around, show me your hands, that

17 would likely change the behavior of Officer Fihe, correct?

18     A     It could change his behavior.

19     Q     Yeah.  I think your words were "would likely change,"

20 right?

21     A     If he complies, correct.

22     Q     If he complies with the initial order of turn around,

23 show me your hands, that would likely change the behavior of

24 Officer Fihe.  That was your testimony in your deposition,

25 correct?

1    A    Correct.  And I'm speaking specifically to behavior that

2    occurs after the observation.

3    Q    Correct.

4    A    Does that make sense, sir?

5    Q    I believe it does.

6         One of the ways that Officer Fihe's behavior would

7    likely have changed -- by the way, I think we should be very

8    clear when I'm asking this question.  You're speaking about this

9    from the perspective of how you believe Officer Fihe would have

10   been trained.  You're not speaking as if you have personal

11   knowledge of what was going on in his own head, correct?

12   A    That's correct.

13   Q    So as far as how Officer Fihe was trained or how he

14   would have been trained by the Columbus Division of Police,

15   that's what we're talking about here.

16        So my question, then, is, if Mr. Burk's initial reaction

17   to Officer Fihe's command to turn around and show me your hands

18   was to turn around and show him his hands, one way that Officer

19   Fihe's training could have influenced him in that situation is

20   for him then to proceed to follow Division Directive 4.03, to

21   instruct him to disarm in a safe manner and produce his agency's

22   identification, true?

23   A    So I think that's always an option for the officer,

24   right?

25        But yet we don't want to -- like, now we're using

1  hindsight 20/20 when we're looking at what an officer could have

2  done or would have done based on that analysis.

3       So there are other factors that go into that decision

4  for the officer, not just -- so other environmental factors and

5  observation of potential pre-attack indicators and the overall

6  professionalism of challenging an out-of-uniform law enforcement

7  personnel.

8       So those other factors weigh into that decision as well.

9  Q    The jury is going to, in their deliberations, I'm sure,

10  be looking at evidence to try to determine whether or not

11  Mr. Burk complied with that initial command to turn around and

12  show me your hands.  You agree that's a determination for the

13  jury to make, correct?

14  A    Correct.

15  Q    If the jury determines that Mr. Burk reasonably complied

16  with that command to turn around and show me your hands, then

17  one of the things that Officer Fihe's training would have

18  allowed for was for him to then instruct Mr. Burk to disarm in a

19  safe manner and then produce his agency's identification, true?

20  A    Unless the officer is perceiving noncompliance, and then

21  he would -- the officer would fall to the second part of that

22  paragraph.

23  Q    Noncompliance with the command to turn around and show

24  me your hands?

25  A    Correct.

1     Q    More generally, as to any of the opinions you gave on

2     direct examination, you understand that it's the jury who is

3     going to determine -- when there are disputed facts, it's the

4     jury who is going to determine what the facts are in the case,

5     correct?

6     A    Correct.

7     Q    And your opinions are going to be -- or would be

8     affected by what the actual facts are in the case.  That's the

9     nature of expert testimony, correct?

10    A    Yes, sir.

11         MR. KEYES:  I have no further questions, Your Honor.

12         THE COURT:  All right.  Any redirection examination?

13         MS. PICKERILL:  Briefly, Your Honor.

14         MR. KEYES:  Thank you, Officer Vehr.

15         THE WITNESS:  Yes, sir.  Thank you.

16         MS. PICKERILL:  May I proceed?

17         THE COURT:  I'm sorry?

18         MS. PICKERILL:  May I proceed?

19         THE COURT:  You may.

20         MS. PICKERILL:  I'll be louder.

21                              - - -

22                    REDIRECT EXAMINATION

23    BY MS. PICKERILL:

24    Q    I want to just follow up on a couple of questions that

25    Mr. Keyes just asked you.

1        In terms of the initial commands that we hear Officer

2   Fihe give in the video, if Officer Fihe -- let's assume that

3   Officer Fihe intended for Mr. Burk to turn around and put his

4   back towards Officer Fihe.  If Mr. Burk did not do that, would

5   it be reasonable for Officer Fihe to see that as noncompliance?

6        MR. KEYES:  Objection.

7        THE COURT:  Sustained.

8   BY MS. PICKERILL:

9   Q    So hypothetically if an officer is responding to a scene

10  and they're giving commands for someone to turn around, if the

11  person turns in a way counter to what they intended, would it be

12  reasonable to see that as noncompliance?

13       MR. KEYES:  Same objection.

14       THE COURT:  Sustained.

15  BY MS. PICKERILL:

16  Q    If we assume that Officer Fihe arrived on scene and,

17  like Mr. Keyes asked you questions about, if we assume that he

18  complied with those initial commands, would it still be

19  appropriate to point a firearm at him while securing the scene?

20  A    It could be appropriate, given those circumstances, due

21  to the nature of the call for service itself and the fact that a

22  badge or identification wasn't visibly present on the approach,

23  so the officer knows that they would still have to verify any

24  potential claim of law enforcement.

25       And with it being a Level 0 response, it's a low-level

1 response, as well as any potential suspicion of a firearm

2 involved.  So it's a reasonable response to point the firearm

3 because of -- we go back to our action versus reaction and that

4 potential of a deadly threat being imminent of when a weapon is

5 involved.

6     Q    When officers are evaluating whether or not a suspect is

7 compliant or noncompliant, are they trained to assess that based

8 on what they're seeing and observing?

9     A    That's correct.

10     Q    Is it ever reasonable for an officer to disarm a suspect

11 rather than asking the suspect to disarm themselves?

12     A    We would train our officers to physically do the

13 disarming of the weapon and not allow a suspect to disarm

14 themselves, or we would try to prevent that.

15     Q    Okay.  Why?

16     A    Because if they're suspected of a crime, we're trying to

17 control that situation as best we can.  And, again, it's tense,

18 it's uncertain, rapidly evolving.

19     So it's safer for the officer and it's safer for the

20 individual to be controlled in a manner that's usually

21 handcuffed and then the officer retrieve the firearm.  Because

22 if the individual is a suspect of a crime and they reach to try

23 to disarm themselves, we don't know their intent with that.  We

24 wouldn't be able to analyze any potential intent or motivation

25 from that individual.

1    So that puts the officer at severe risk, and that's --

2  you know, there's a risk of serious physical harm or death

3  associated with a suspect actually grabbing a firearm to disarm.

4        MS. PICKERILL:  I'm so sorry.  Is the visual hooked up

5  up here?

6        THE COURTROOM DEPUTY CLERK:  I have it to Maria.

7        MS. PICKERILL:  Maria, could I please get Division

8  Directive 4.03 back up on the screens, please, multiple

9  screens.

10        Could we scroll down to page 2?

11        Perfect.

12  BY MS. PICKERILL:

13  Q    You were asked some more questions about this particular

14  directive.  Is this procedure that we see here in A and B, is

15  that anticipating that the out-of-uniform law enforcement

16  personnel will be the suspect of crimes when you encounter them?

17  A    Not typically, no.

18  Q    So if officers are encountering an out-of-uniform law

19  enforcement officer who is the suspect of a crime, does that

20  change how they should comply with this particular directive?

21  A    They would treat the individual -- or they should, they

22  are trained, to treat any individual that is suspected of a

23  crime as a suspect and react to their actions.

24        So if it's -- and if there's a claim that there's a law

25  enforcement -- out-of-uniform law enforcement personnel, we

1  would also expect that person, if they were indeed law

2  enforcement, to fall under the B category of this directive,

3  from 1 to 4.  That's what our officers would anticipate, and

4  that's what they would react to if they're actually challenging

5  an out-of-uniform personnel, even if they are a suspect of a

6  crime.

7      Q    So in the instance where officers are encountering an

8  out-of-uniform law enforcement personnel and they have reason to

9  believe that they are the suspect of a crime, would they still

10  be trained to ask that suspect to disarm themselves?

11     A    No, ma'am.

12     Q    Why not?

13     A    Because if they're a suspect of a crime, then we would

14  train our officers to do that disarming themselves so they can

15  secure that individual and then remove the firearm and obtain

16  any potential identification after that.

17     Q    And Mr. Keyes asked you about -- a little bit about the

18  report that you wrote, and you had written in there that this is

19  the foundation.  Does foundation mean only directive that would

20  control in this situation?

21     A    No, ma'am.

22     Q    Okay.  If that -- if the 2.01, for example, the

23  use-of-force directive, would that also govern this particular

24  situation?

25     A    Yes, ma'am.

1    Q    And are both of those directives that we have talked

2    about, 2.01 and 4.03, are those consistent with generally

3    accepted police practicing standards?

4    A    Yes, ma'am, I believe so.

5         MS. PICKERILL:  I have nothing further at this time,

6    Your Honor.

7         THE COURT:  All right.  Anything further, Mr. Keyes?

8         MR. KEYES:  Yes, Your Honor.

9                        - - -

10                 RECROSS-EXAMINATION

11   BY MR. KEYES:

12   Q    Officer Vehr, following up on that redirect, when you

13   first began or were first designated as an expert in this case,

14   or at least shortly after that, you learned or knew that the

15   reason that Officers Fihe and Winchell were responding to the

16   scene was on a call of a possible burglary in progress, correct?

17   A    That's correct.

18   Q    And so you had that information when you wrote your

19   report, correct?

20   A    Yes, sir.

21   Q    And that's a felony, yes?  Burglary would be a felony?

22   A    Yes, sir.

23   Q    And even though you had that information that Mr. Burk

24   apparently was a felony suspect, you still said in your report,

25   under training specific to this incident, that Division

1  Directive 4.03 is the foundation, correct?

2      A    Correct.

3      Q    Impersonating a law enforcement officer is another

4  felony, correct?

5      A    Correct.

6      Q    Any time a person is claiming to be an out-of-uniform

7  law enforcement officer, there's a possibility that they're

8  committing a felony of impersonating an officer, correct?

9      A    Correct.

10     Q    That's why verifying law enforcement status by checking

11 a badge and credentials is important, true?

12     A    Yes, sir.

13     Q    So just so we're entirely clear, Division Directive

14 4.03, those procedures still apply in this case, correct?

15     A    Yes, sir.

16     Q    And I've highlighted the language that I was focusing on

17 earlier.  The instruction that the officer challenging the other

18 person instruct them to produce their agency's identification,

19 that sounds like it presumes there are situations where the

20 agency's identification might not already be visible.  You

21 agree?

22     A    I agree.

23     Q    And as far as Section (II)(B), out-of-uniform personnel

24 being challenged, that instruction in this Columbus Division of

25 Police division directive applies to Columbus Division of Police

1  personnel being challenged as out-of-uniform officers, correct?

2      A     This is a CPD directive.

3      Q     And Columbus Division of Police officers know, or are

4  trained to understand, that there are other law enforcement

5  officials out there besides Columbus Division of Police

6  personnel, correct?

7      A     That's correct.

8          MR. KEYES:  No further questions, Your Honor.

9          THE COURT:  All right.  That concludes your testimony,

10  Officer Vehr, and you may step down.

11          THE WITNESS:  Thank you, Your Honor.

12          THE COURT:  And, Counsel, you may call your next

13  witness.

14          MS. PICKERILL:  Your Honor, it is almost noon.  I

15  don't know if this might actually be an appropriate time to

16  take the lunch break?

17          THE COURT:  I think it would be.  We're going to stand

18  in recess for one hour.

19          THE COURTROOM DEPUTY CLERK:  All please rise.

20          This court will stand in recess.

21      (Jury out at 11:47 a.m.)

22

23

24

25

1    (Recess was taken at 11:47 a.m. to 12:57 p.m.)

2                        - - -

3                              THURSDAY AFTERNOON SESSION

4                              NOVEMBER 7, 2024

5                        - - -

6    (Jury in at 12:57 p.m.)

7         THE COURT:  Defense counsel, you may call your next

8    witness.

9         MS. PICKERILL:  Your Honor, at this time, we're going

10   to play the prerecorded trial deposition testimony of Sarah Al

11   Maliki.

12        THE COURT:  Ladies and gentlemen, I think I gave you a

13   brief explanation of what a deposition is.  It's testimony that

14   has been taken out of court but it's taken under the same

15   formalities as though we were in court.  Both lawyers for both

16   sides are present.  An official court reporter is there to

17   transcribe the testimony.  The witness is under oath.  And, in

18   this case a video recording was made, and you're going to be

19   seeing the video recording.

20        We had to do some editing.  There was some objections

21   made during the recording, and I've ruled on those this

22   morning.  They've done some editing so there may be some

23   interruptions.  But you must treat this testimony and evaluate

24   it for credibility just the same you would as though the

25   witness were here in the courtroom.

1          All right.  You may proceed.

2          MS. PICKERILL:  Thank you, Your Honor.

3                              - - -

4     (Video deposition of Sarah Al Maliki was played in open

5     court.)

6          THE COURT:  Does that conclude the deposition

7     testimony?

8          MS. PICKERILL:  It does, Your Honor.

9          THE COURT:  Members of the jury, I have some brief

10    instructions for you regarding your use of the testimony that

11    you've just watched and listened to.  As you know from what

12    you've already heard, some of the information that Ms. Al

13    Maliki related to the dispatcher, the Columbus police

14    dispatcher, was communicated ultimately to Officers Fihe and

15    Winchell, but not all of it and certainly not any of the

16    details of her interaction with Mr. Burk.

17         So you can use this deposition testimony you just

18    received for some limited purposes.  However, you cannot use it

19    to determine the reasonableness of the actions taken by

20    Officers Fihe and Winchell at the scene because they didn't

21    know about most of the things that you've seen in the

22    deposition.  They only knew the part that they saw or heard was

23    transmitted to them.  And that's the only information that you

24    can properly use in assessing the reasonableness of their

25    actions at the scene.

1      What they did at the scene and their actions at the

2 scene must be judged by you only on what they knew when they

3 arrived on the scene.  And you'll have to determine from what

4 you heard just how much of the information related to the

5 dispatcher about what Ms. Al Maliki said was available and

6 known to them.

7      Now, you may use the other evidence that the officers

8 knew nothing about, you can use it for other purposes other

9 than judging the reasonableness of the officers' actions.  You

10 can use it in determining the credibility of Mr. Burk and what

11 he said about things that he testified about and in judging his

12 credibility in general and in judging his demeanor and attitude

13 that morning.  These events occurred just a few minutes before

14 Officers Fihe and Winchell arrived, and that may help you

15 determine generally how Mr. Burk was conducting himself that

16 day.

17      So those are the limitations on your use of this

18 evidence.  It's not to be used in determining the

19 reasonableness of the officers' actions after they arrive on

20 the scene.  All right.

21      Further witnesses from the defense?

22      MS. PICKERILL:  Your Honor, at this time, barring the

23 admission of a couple of exhibits, defense rests their case.

24      THE COURT:  Very well.  Does the plaintiff -- do the

25 plaintiffs have any rebuttal evidence?

1           MR. KEYES: No rebuttal evidence, Your Honor.

2           THE COURT: So both sides have rested, and that means,

3 ladies and gentlemen, you have heard all of the evidence in

4 this case on the issue of liability. And we're bifurcating the

5 trial considering first the issues relating to liability and

6 the issues relating to your determination of whether or not

7 Officers Fihe and Winchell violated Mr. Burk's federal

8 constitutional rights during their interactions with him that

9 day.

10           The next stage of the trial, after you've made your

11 findings about that, if you should find in favor of Mr. Burk on

12 any of these issues, then we'll have additional evidence to

13 hear on the issue of injury and damages, if any, sustained by

14 Mr. Burk and his wife as a result of any wrongdoing that may

15 have been committed by these defendants, any constitutional

16 violations that they may have committed.

17           So, since at this stage of the case both parties have

18 rested, the Court needs to work with the attorneys to determine

19 all of the instructions on the issues of law that I'm going to

20 be giving to you. So we're going to stay and work on that, and

21 we're going to excuse you folks for the rest of the day.

22 Hopefully, we'll get all of that work done so tomorrow morning

23 we'll be ready for you to hear the final arguments in this case

24 and my instructions on the law. That's the part that the

25 lawyers and I are going to be working on.

1    It's particularly important at this stage of the case

2    that I remind you of my usual instructions. Don't discuss the

3    case with anyone. Don't watch or listen to anything about this

4    case. Don't do any research or investigation of your own about

5    this case. Don't talk to anyone through social media about

6    this case. And we will see you back here tomorrow morning at

7    nine o'clock. Have a nice evening.

8        (Jury out at 1:54 p.m.)

9        THE COURT: Now, Counsel, I'm going to -- now that

10   I've heard all of the evidence in the case, I'm going to

11   revisit my rulings on the defense motions -- motion for

12   judgment as a matter of law.

13       It's my conclusion that Officer Winchell is entitled

14   to judgment as a matter of law as to the use-of-force claim

15   rising out of his aiming of his firearm at Special Agent Burk

16   when he arrived on the scene. After reviewing all of the

17   testimony of the officers and all of the evidence in this case

18   and the body-camera footage, the Court is satisfied that

19   Officer Winchell's aiming of his firearm at Burk was

20   objectively reasonable under the circumstances.

21       Officer Winchell was responding to a 10-3,

22   officer-in-distress, call and that placed him on high alert and

23   making the circumstances, from his perspective, appreciably

24   more dangerous as compared to the circumstances in which

25   Officer Fihe aimed his firearm at Burk. So he was responding

1   both to a 10-8 call and additionally a 10-3 call for officer in

2   distress.  And when he arrived the first thing he saw was

3   Officer Fihe with his gun pointed at Burk and heard him

4   shouting commands at Burk and ordering him to get on the ground

5   and Burk was not complying.

6        And Officer Winchell testified that he pointed his

7   weapon at Burk because he believed Officer Fihe was in trouble,

8   and that belief was reinforced by the fact that he found

9   Officer Fihe pointing his gun at Burk when he arrived.

10       So the Court is finding that his action, in pointing

11  his own gun at Agent Burk, was objectively reasonable under all

12  the facts and circumstances of this case.

13       Now, Mr. Ver Steeg, have you given Counsel copies of

14  our draft instructions of law and proposed jury

15  interrogatories?

16            THE LAW CLERK:  Yes, I have.

17            THE COURT:  All right.  Fine.

18       I don't know you've had an opportunity to read them or

19  reflect on them; so we're going to take a brief recess.  How

20  long would you like?  I'd like for you to work together on this

21  and see if you can come up perhaps with some agreement.  If

22  not, then I want to hear both sides until I settle on the final

23  form of these instructions and interrogatories.

24            MS. PICKERILL:  Certainly.

25            MR. KEYES:  Would an hour be okay, Your Honor?

1    THE COURT:  I hope it won't take that long.  I'm going

2 to give you 30 minutes, but -- and we'll just doublecheck then

3 and see if I can help you.

4    MS. PICKERILL:  Your Honor, just briefly before we

5 break, would I be able to put two or three sentences on the

6 record about the Rule 50 motion and also move some exhibits

7 into evidence?

8    THE COURT:  Certainly.

9    MS. PICKERILL:  Which would you prefer I do first?

10    THE COURT:  All right.  I'm sorry?

11    MS. PICKERILL:  Do you have a preference on which I do

12 first?

13    THE COURT:  No.  Go ahead.

14    MS. PICKERILL:  Your Honor, at this time the

15 defendants would reraise our Rule 50 motion for judgment as a

16 matter of law arguing that the defendant officers are entitled

17 to both qualified immunity on the 1983 claims as well as state

18 law immunity on the state law claim of battery.

19    For the state law claim, plaintiff would need to show

20 that the defendant officers acted a way that was wanton,

21 reckless, or with a malicious purpose, and there's been no such

22 evidence in this case.  Thank you, Your Honor.

23    At this time he would also offer into evidence Joint

24 Exhibits 2, 5, 6, and 7.

25    THE COURT:  Any objection to those exhibits?

1          MR. KEYES:  No, Your Honor.

2          THE COURT:  All right.  Are there any other exhibits

3     that have not been offered into the record yet?

4          MR. KEYES:  Your Honor, just for -- we'll just note it

5     for the record, I don't think we need to separately send it to

6     the jury, but during Ms. Al Maliki's prerecorded testimony

7     there was reference to portions of Sergeant Tolman's body-worn

8     camera video.  That was designated as Plaintiff's Exhibit 3 for

9     the exhibit list.  But only those portion that were used in her

10    deposition we believe are relevant.  So there's no reason to

11    submit the entire probably, what, 45-minute body-worn camera

12    for the jury.  So we're not going to separately put that in a

13    binder for them, just noting that was what was referred to in

14    her deposition.

15         THE COURT:  Is that satisfactory with defense counsel?

16         MS. PICKERILL:  That makes sense to us, Your Honor.

17         THE COURT:  All right.  We'll take a 30-minute recess.

18      (Recess taken from 2:02 p.m. to 3:04 p.m.)

19         THE COURT:  Counsel, who would like to give me a

20    report?

21         MR. KEYES:  Your Honor, we've had a chance to look

22    over the instructions as well as to confer.  We're in agreement

23    on a number of items.  And there are some proposed

24    modifications that both sides agree on, and then there are some

25    modifications that are not agreed, proposed modifications that

1  are not agreed.

2          THE COURT:  Let's start with the ones that are agreed.

3          MR. KEYES:  Probably makes the most sense.

4          THE COURT:  All right.

5          MS. PICKERILL:  The first one is on page 10, I

6  believe.

7          MR. KEYES:  He wants us to start with the ones that

8  are agreed.

9          MS. PICKERILL:  Okay.

10          MR. KEYES:  I'm sorry, Your Honor.  Are you asking us

11  to first state which instructions we all agree on without any

12  modifications, correct?

13          THE COURT:  Tell me which ones you have agreed on

14  modifications.

15          MR. KEYES:  Is it okay if we sit, Your Honor, to walk

16  through this?

17          THE COURT:  I'm sorry?

18          MR. KEYES:  Do you mind if we sit to do this?

19          THE COURT:  That's fine.  Just be comfortable.  This

20  is informal.

21          MR. KEYES:  All right.  So that is right, with the --

22  that clarification.  On page 10, use of deposition testimony,

23  the first paragraph -- there were no depositions read into

24  substantive evidence.  So we thought maybe that should come

25  out.  There were depositions referred to for impeachment with

1  certain witnesses.  And our recall, as we were talking about it

2  together, was that maybe the first couple of times or maybe the

3  first time that happened, Your Honor had actually given some

4  guidance to the jury about what was happening, what a

5  deposition was.  So we were trying to remember -- if that was

6  something you used a written instruction for, that could go in.

7       THE COURT:  I think the only thing we want to tell

8  them is how to use a deposition that's introduced into

9  evidence.

10       MR. KEYES:  All right.  That's fine, Your Honor.

11       THE COURT:  They understood -- they saw how we were

12  using them for impeachment and so forth.  So that's the intent

13  of this instruction.

14       MR. KEYES:  Okay.

15       THE COURT:  And we had a -- we didn't have any written

16  deposition testimony.  Okay.  So do we need to change anything

17  on page 10?

18       MR. KEYES:  That first paragraph about reading

19  depositions would just need to come out.

20       THE COURT:  Okay.  I agree.  We don't need the first

21  paragraph.  We'll just strike it out.  All right.  Next.  That

22  was easy.

23       MR. KEYES:  They're almost all going to be that easy,

24  Your Honor; almost.

25       Number 12, expert testimony.  Both sides think that

1    content that's already there is good.  We did have a

2    question -- and we haven't proposed any specific language yet,

3    but both of the experts that testified, there was a lot of talk

4    about hypothetical facts if the jury concludes X, Y, or Z.  We

5    seemed to remember, although we weren't a hundred percent

6    certain, that when those issues first started coming up, you

7    said something to the jury at that time about experts can

8    testify about hypothetical facts but you are the finders of

9    fact.  We think including that similar concept in here, at

10   least from my point of view, would make sense.

11            I don't think you guys are necessarily opposed to it

12   on the defense side.

13            MS. PICKERILL:  No, we're in agreement.

14            THE COURT:  Do you have any language you would like to

15   suggest?

16            MR. KEYES:  I was trying to remember exactly what you

17   said to them already because that sounded pretty good.

18            MS. PICKERILL:  I wonder if I have it in the

19   transcript.

20            THE COURT:  You're trying to find what I said?

21            MR. KEYES:  Yes, Your Honor.

22            THE COURT:  It was probably in regard to the first

23   witness.  The expert was Mr. DeFoe, and that's probably where I

24   said it.

25            MS. PICKERILL:  I think -- could I read it, Your Honor

1   just what you had said?

2          THE COURT:  Yes.

3          MS. PICKERILL:  And Bart and Abby, I'm reading from

4   page 17, starting at line 10.  You said:  Ladies and gentlemen,

5   you are the ultimate finders of the facts in this case.  And

6   Mr. DeFoe, or perhaps the experts, although he has a lot of

7   experience in police work, he doesn't know what happened in

8   this case other than what he sees on the video and other than

9   what he hears from the witnesses.  And he is not permitted to

10  express an opinion about what really happened in this case.

11  That's your job.  You are the ones that are going to decide

12  what the facts are in this case.  So I want to make it clear

13  that it is your role and only yours.  Any opinion that

14  Mr. DeFoe may have as to what really happened is his own

15  personal opinion.  And he's here to tell you about the

16  principles applied in law enforcement that are involved in this

17  case, not what really happened.

18         We would be okay if we wanted to take something

19  perhaps from like that middle and a little bit of the last

20  paragraph and use some of that language.

21         MR. KEYES:  Would it make sense to see if we can come

22  up to an agreed statement and email it to --

23         THE COURT:  Yeah.  If that's what you're getting at,

24  that's fine.

25         MS. PICKERILL:  Thank you, Your Honor.

1        MR. KEYES:  That was DeFoe page 17.

2        THE COURT:  Put a note in here about assumed facts.

3        What's next?

4        MR. KEYES:  Excessive force instruction which I

5   believe starts on 19.

6        THE COURT:  Nineteen?

7        MR. KEYES:  Yes.

8        MS. PICKERILL:  Yes.

9        MR. KEYES:  There is an agreement that wherever the

10  instruction refers to "the circumstances" should say "the

11  totality of the circumstances."

12       THE COURT:  The totality of circumstances.

13       MR. KEYES:  And we counted three spots.

14       THE COURT:  We must use *Graham v. Connor*, yes, indeed.

15  I agree.  We'll do that.  If you have a list, give it to me

16  right now.

17       MR. KEYES:  In the second paragraph on page 19, last

18  sentence.

19       THE COURT:  Under the totality of the circumstances.

20       MR. KEYES:  And then the first paragraph -- or the

21  first sentence of the next paragraph.  By the way, while we're

22  on that paragraph, it should say officer.

23       THE COURT:  I'm sorry.  Where?

24       MR. KEYES:  I'm sorry.  I was just making a comment to

25  a typographical error.

1      Back to the totality, that would be in the first

2  sentence of that second paragraph -- I'm sorry, that third

3  paragraph on 19 as well.

4      THE COURT:  It says totality.

5      MR. KEYES:  It appears --

6      MS. PICKERILL:  The one that precedes that list, Your

7  Honor.

8      THE COURT:  Okay.  I'm not seeing that.  Where is it,

9  now, on 19?  I've got the second paragraph, last line, and I've

10  got the next paragraph right in the middle, the sentence in the

11  middle, the totality.

12     MR. KEYES:  That's it.

13     THE COURT:  So there are just two on 19?

14     MS. PICKERILL:  Two on 19, one on page 20.

15     MR. KEYES:  One more on the next page.

16     THE COURT:  Okay.  Line 20.  And which line on 20?

17     MS. PICKERILL:  In the second paragraph, the last

18  sentence.

19     THE COURT:  Under the totality of the circumstances.

20  That's the very last line of that paragraph.  Got it.

21     MR. KEYES:  And then, Your Honor, in that same

22  instruction at the very end of the instruction, I believe both

23  sides agree to adding a paragraph that is -- it's the same

24  paragraph that's currently in the unlawful detention

25  instruction at the end.  So I can read what we're proposing,

1  but it's basically a concluding instruction or concluding

2  paragraph for each instruction.  And we would suggest the same

3  language.

4          THE COURT:  What page is that language on?

5          MR. KEYES:  It would be on probably 21.

6          MS. PICKERILL:  Twenty-one to 22.

7          MR. KEYES:  Page 21 to 22.

8          MS. PICKERILL:  And just sort of mirror that language

9  in the excessive force instruction.

10         THE COURT:  Okay.  I understand.  Yes, indeed.

11         MR. KEYES:  So that's on the excessive force

12  instruction.  That's it for agreed changes to that one, Your

13  Honor.

14         THE COURT:  Wonderful.  Okay.  So are there any more

15  agreed amendments?

16         MR. KEYES:  Yes.  On page 23, Mr. Ver Steeg had asked

17  in his email if the parties would stipulate that the battery

18  claim --

19         THE COURT:  What are we going to do about this battery

20  claim?

21         MR. KEYES:  We agree that it rises and falls -- for

22  purposes of the jury's deliberations, we don't think you need

23  to include a separate instruction for the battery claim or a

24  separate interrogatory because we will concede it rises and

25  falls with the excessive force.

1          THE COURT:  So, if there was an unreasonable use of

2     force, that would be a battery under state law?

3          MR. KEYES:  Yes, Your Honor.  So I don't think we need

4     a separate instruction or a separate interrogatory.

5          THE COURT:  And you both agree?

6          MS. PICKERILL:  We agree.  The only practical

7     difference between those two, in our opinion, is the immunity

8     analysis.  And since that's a question of law, we don't think

9     both need to go in the jury instructions.

10         THE COURT:  Battery is coming out.

11         MR. KEYES:  The next page, 24, the cautionary

12    instruction.

13         THE COURT:  Yes.

14         MR. KEYES:  So both sides are in agreement that we

15    think this could come out because there haven't been other

16    specific instructions as to damages.

17         THE COURT:  I agree.  It's not necessary.  So that

18    comes out.

19         MR. KEYES:  I think that was it for agreed

20    modifications.

21         THE COURT:  All right.  Now, plaintiffs' counsel --

22         MR. KEYES:  Thank you, Your Honor.

23         THE COURT:  -- do you have some suggested

24    modifications or objections that you would like for the Court

25    to consider?

1      MR. KEYES:  We do.  The first one, Your Honor, would

2  be on page 16, nature of the action.  And this is primarily to

3  preserve our objection for the record.  Now that we are

4  preparing jury instructions, we had asked the Court in our

5  original submission to include an instruction relating to the

6  unlawful arrest component of the case.  We believe the evidence

7  still would support allowing that claim to go to the jury.  So

8  for the record we would ask this instruction include a comment

9  about unlawful arrest as well.

10     THE COURT:  I thought about that again when I was

11 preparing these, and I'm going to adhere to my original ruling.

12 But now you've made your record on that.

13     MR. KEYES:  On page 18, the officer authority

14 instruction.

15     THE COURT:  Yes.

16     MR. KEYES:  Yes.  So we have both a general objection

17 and then some specific commentary.  I think we need to renew

18 our general objection now that the evidence is all in because

19 we've never actually had any evidence presented from either

20 side of the case as to what any specific standards, principles,

21 or practices there are that would apply to this case.  There's

22 been no evidence of any written standards, any sources for any

23 uniform nationally applying standards.  And so just as a

24 general matter, we think that even though this instruction was

25 given at the introduction of the case, now that the evidentiary

1    record is complete, we would ask that that instruction come

2    out.

3              THE COURT:  Okay.  I believe there is substantial

4    evidence in the record of some of these standards -- accepted

5    universal standards, and I think some of them came from

6    plaintiffs' own expert witness, Mr. DeFoe.  And I think without

7    any doubt he agreed that under the standard principles of law

8    enforcement, Officers Fine and Winchell were in command and

9    control of the scene, and Mr. Burk was entitled to -- expect

10   him to follow those principles.

11             I had originally included an instruction about the

12   display of credentials before their arrival or having prepared

13   them, and I didn't find anything -- other than the disciplinary

14   records, I didn't find anything to support that.  So I did

15   remove that even though -- well, no one was ever able to give

16   me a written version of these principles.  So all I can rely on

17   is what we got from the expert witnesses.  And so I'm going to

18   limit this instruction to essentially what I got from the

19   plaintiffs' own expert witness.

20             MR. KEYES:  Thank you.

21             THE COURT:  Go ahead.

22             MR. KEYES:  Thank you, Your Honor.  So then -- thank

23   you for that, and then I do have kind of more specific

24   language, specific objections.

25             The sentence that begins -- so, in the second

1  paragraph right after command and control of the scene upon

2  arrival, the proposed instruction gives two -- it gives some

3  specific commentary.  And the first part that we would object

4  to is the concept of the language "he was required to treat the

5  defendant officers with respect."

6        Our objection to that specific language, Your Honor,

7  is that the concept of respect is such a subjective notion that

8  instructing a jury as if that is a requirement found in a

9  broadly accepted standard we would submit is not proper because

10 the idea of treating somebody with respect is going to be so

11 subjective from person to person; so we think that's too vague

12 to include as a standard.

13       THE COURT:  Let me give that some thought.  Anything

14 else?

15       MR. KEYES:  Yes, Your Honor.  The portion about

16 following their commands, we don't have a separate, specific

17 objection to that content about following their commands, but

18 we do feel it needs to be -- that there is an addition that

19 came out in the testimony.

20       THE COURT:  In fact, I may have made a comment about

21 that and gave some qualification.  I may have used the words

22 unless it was impossible under the circumstances.

23       MR. KEYES:  Yeah.  And I think the appropriate

24 standard, Your Honor, to include or to modify would be if they

25 allowed a reasonable opportunity to comply because I believe

1  that is the testimony that addressed the -- so, in other words,

2  if it's given as a general instruction he was required to

3  follow their commands, we think that is an incomplete --

4        THE COURT:  Your phrase again was?

5        MR. KEYES:  If they, meaning the defendant officers --

6  if they allowed a reasonable opportunity to comply.

7        THE COURT:  Plaintiffs' counsel, what do you say about

8  that?

9        MS. PICKERILL:  Your Honor, we would object to that.

10  That particular standard came only from plaintiffs' expert

11  witness and was not corroborated by anyone else.  I do believe

12  that both experts, to the point you made, did talk about

13  whether it would be impossible for the person to comply.  We

14  would be more comfortable with that language since it came from

15  both the witnesses.

16        THE COURT:  Well, impossible or reasonable

17  opportunity.  And I think there is a real issue here about

18  that.  So I'm going to follow plaintiffs' suggestion and

19  qualify it by if they allowed a reasonable opportunity to

20  comply.

21        MR. KEYES:  And that was it for that instruction, Your

22  Honor, from our side.

23        On the excessive force instruction, page 19 --

24        THE COURT:  Yes.

25        MR. KEYES:  -- we believe that it would be appropriate

1   to give the jury guidance on what types of actions can

2   constitute a use of force under the applicable law because that

3   is not something that's immediately apparent to a layperson.

4   And so, at the end of the second paragraph on page 19, we would

5   propose an addition -- some additional language that says a use

6   of force may include pointing a gun at someone, restraining

7   someone in handcuffs, the use of a taser, and force used in

8   putting a person in a police vehicle because those are all

9   examples that are at issue in this case.

10          And our position is that -- and I'll use pointing a

11  gun for an example.  We know that under the case law, pointing

12  a gun at a subject is a use of force and therefore can be

13  unreasonable under the totality of the circumstances depending

14  on what those are.  But, in layman's usage, just pointing a gun

15  but not firing it, I'm not sure that every layperson would

16  automatically understand, oh, that can be a use of force.

17          THE COURT:  I have an instruction on pointing the gun,

18  don't I?

19          MR. KEYES:  It's in an interrogatory, Your Honor.  In

20  other words, the interrogatories ask those questions, but

21  there's nothing in the instructions to link up, okay, each of

22  these could be use of force.  Our proposal is that the way it's

23  framed in the interrogatories, there should be something in the

24  instructions connecting those dots so that the jury understands

25  why those interrogatories are framed that way.

1    THE COURT:  And you're saying pointing the gun?

2    MR. KEYES:  Pointing the gun.

3    THE COURT:  What else?

4    MR. KEYES:  Restraining someone in handcuffs, the use

5    of the -- the use of a taser, and force used in putting a

6    subject in a police vehicle.

7    THE COURT:  All right.  Defense counsel, what do you

8    say about this?

9    MS. PICKERILL:  Your Honor, our position is that those

10   uses of force are already instructed to the jury in the

11   interrogatories, and that the jury won't be confused about

12   whether pointing a gun is a use of force when they are

13   specifically instructed on it in the interrogatories.

14       If Your Honor is inclined to include that list, we

15   would specifically object just to the language of the last one,

16   force used to put someone in a cruiser, just because that's

17   not -- that's not a specific use of force.  We would request if

18   that instruction is going to the jury that we use the phrase

19   joint manipulation or something else that the jury would have

20   heard today.  But our stance is that that inclusion in its

21   entirety is not necessary.

22       THE COURT:  Well, there was only one incident of

23   putting him in a cruiser; so they would understand that that's

24   what this instruction refers to.

25       MS. PICKERILL:  Right.  Our objection to that

1  particular part is not that it's confusing.  It's just that

2  that's not a use of force, whereas pointing a gun is a use of

3  force, striking is a use of force, tasing is a use of force.

4  Putting someone in a cruiser is not a use of force; however,

5  joint manipulation used to achieve that could be.

6          MR. KEYES:  Your Honor, if it will help.  So, if we

7  were going to clarify just on that last one, that's fine if it

8  were -- so instead of force used putting a subject in a

9  vehicle, joint manipulation used in putting a subject in a

10  police vehicle.  We would be fine if that was the addition.

11  That's no problem.

12          MS. PICKERILL:  I would ask that it just say joint

13  manipulation since that is the enumerated use of force that we

14  find in the policies in case law, but for the reasons I've

15  already stated.

16          THE COURT:  All right.  I'll give that some

17  consideration.

18          Anything else?

19          MR. KEYES:  Your Honor, on page 20 in the excessive

20  force instruction, it's the second paragraph, the paragraph

21  starting you must not consider circumstances.

22          THE COURT:  Hold on a second here.

23          MR. KEYES:  Yes.  I'm sorry.  It's the first full

24  paragraph on 20.

25          THE COURT:  Okay.  You must not consider which

1    would -- circumstances would be unknown to a reasonable officer

2    and so on and so on.  Go ahead.

3          MR. KEYES:  We agree with that first sentence.  That

4    is an accurate statement of the law.  Our first objection is to

5    the calling out a specific -- a single, specific example of

6    evidence or testimony regarding something not known to the

7    officers.  And the reason we object to calling out a specific

8    example is that it gives undue weight or priority weight to a

9    specific example.

10          For example --

11          THE COURT:  I understand your point.

12          Defense counsel, what do you say about that?

13          MS. PICKERILL:  Your Honor, we believe that the

14   inclusion of that language clears up for the jury some points

15   of confusion that may have arose during the trial about what

16   the officers did or did not know and what the jury can and

17   can't consider in determining whether the force was reasonable.

18   We think it's appropriate to give the jury that example so that

19   they can understand what it is they can and can't consider.

20          THE COURT:  So have I touched upon this anywhere else

21   in the jury instructions?

22          MS. PICKERILL:  Not that I noticed, Your Honor.

23          MR. KEYES:  I believe this is the only place it's in

24   the instructions.

25          MS. PICKERILL:  Your Honor, we'd also argue that the

1    example there is well supported by the facts in the evidence.

2    So it's not as if it's giving the jury a new spin on things.

3    This is something they already know only Mr. Burk knew.

4            THE COURT:  They heard Mr. Burk testify about it.  And

5    the Court has determined as a matter of law that there's --

6    there was no reasonable basis for -- any reasonable basis in

7    fact for him to have an objectively reasonable belief that

8    there was any threat from the premises.  And I think to avoid

9    any confusion, we need to address that issue.

10           MR. KEYES:  Your Honor --

11           THE COURT:  I can make -- I guess maybe I have.  I

12   just made a finding that that's the case, that -- and I'm

13   satisfied there is no evidence in the record that would support

14   the contention that would -- as a matter of law, that would

15   support a reasonable belief that anything on the premise

16   presented a risk to him.

17           And that's -- I guess it was an administrative knock

18   and talk.  And the person he was looking for wasn't there, and

19   they never had any reason to believe he was there.  They didn't

20   have the authority to seize the weapon or anything like that.

21   He was there to, as he himself described it, to knock and talk.

22   And to suggest ways in which these folks might be able to

23   either find someone to -- in the family to -- other than the

24   husband to purchase it or to find a firearm's dealer that would

25   purchase it or return it to and -- so there was no basis in

1   fact for him to have any concerns about that. But he's given

2   testimony about it.

3         In all fairness to the defendant officers, they need

4   to know whether that was a reasonable concern on his part. And

5   I'm saying as a matter of law it wasn't.

6         MR. KEYES: Your Honor, if I may be heard on that.

7         THE COURT: Yes.

8         MR. KEYES: So -- and we would respectfully disagree

9   that there's no evidence to support an objectively reasonable

10   concern, but it's frankly not a major issue because whether or

11   not it was communicated to the officers --

12         THE COURT: How do we know?

13         MR. KEYES: Your Honor --

14         THE COURT: The jury has heard about it.

15         MR. KEYES: Yes.

16         THE COURT: And they don't know what to do with it.

17   And it could prejudice these officers.

18         MR. KEYES: Your Honor --

19         THE COURT: So that's why it needs to be addressed.

20         MR. KEYES: Okay. I think I understand that point.

21   But, when it's in the context of an example -- and I'll give

22   you a counterexample that comes to mind. Officer Fihe

23   testified that he had concerns --

24         THE COURT: You want me to put this somewhere else?

25         MR. KEYES: No, Your Honor. My concern is about

1  singling out a specific example anywhere in the jury --

2          THE COURT:  That's the only example.  This is the only

3  thing like this that happened.

4          MR. KEYES:  Your Honor, I would disagree because in

5  Officer Fihe's direct exam testimony, one of the things he

6  testified about is thinking that for all he knew Mr. Burk had

7  been inside the house, that he had actually entered the house.

8  And similar to -- that could be similarly prejudicial --

9          THE COURT:  Was there an objection to that testimony?

10         MS. PICKERILL:  No, Your Honor.

11         MR. KEYES:  No, Your Honor.  But the testimony -- but

12  the testimony is not objectionable as an admission.  But the

13  issue is, as Officer Fihe admitted on cross-examination --

14         THE COURT:  Okay.  I've heard enough.  I've made my

15  ruling and I'm going to stick to it.

16         Let me look again.  I think that's the fairest way to

17  describe that issue to Mr. Burk as well.

18         MR. KEYES:  Your Honor, for the record, if I may state

19  what our specific language that we would propose, then, in that

20  instruction, we would propose an addition after that sentence

21  about Mr. Burk's concerns -- we would propose an addition:  As

22  another example, Officer Fihe testified regarding the

23  possibility that Mr. Burk had entered the residence before

24  Officer Fihe arrived.  There was no evidence to support Officer

25  Fihe's thoughts about that possibility and, therefore, it is

1    not objectively reasonable.

2           We would propose that as an additional example

3    because, in fairness, if we're pointing out a specific example

4    about evidence, it should be fair to both sides.

5           And to Your Honor's question about did I object to

6    that testimony when he offered it on direct, I did not because

7    that testimony could have been admissible if there was

8    follow-up evidence that he had an objectively reasonable basis

9    to suspect that.  But what became clear on cross-examination,

10   he admitted that was complete speculation on his part, that he

11   never had any evidence that Mr. Burk had entered the house

12   between when -- at any point, whether when Officer Fihe was on

13   the way or otherwise.

14          So, if we're going to include a specific example about

15   Mr. Burk's subjective beliefs, I think it would be appropriate

16   to include what I believe is a similar example of some

17   testimony that came in from one of the defendants.

18          THE COURT:  All right.  Defense counsel?

19          MS. PICKERILL:  Yes, Your Honor.  The jury is not

20   going to be tasked with determining whether every thought that

21   Officer Fihe had in his mind was objectively reasonable.  So to

22   point out an example where he had a thought that ended up not

23   being true and telling the jury he was wrong about it is

24   neither helpful to them in their analysis of whether his

25   conduct was objectively reasonable.  And what was going through

1  his mind and what he could observe is relevant to that

2  analysis.  What was going through Mr. Burk's mind I think we

3  all agree is not relevant to that analysis.

4         But, when Officer Fihe was asked if he knew what

5  Mr. Burk did while he wasn't there, he said, no, he didn't know

6  whether he left the premises, whether he entered the house.  He

7  just couldn't know.  It's not -- it's not the same as what was

8  going on in Mr. Burk's mind because it goes to the analysis.

9         THE COURT:  Okay.  Are we in agreement as to what

10 Officer Fihe said?

11        MR. KEYES:  My memory -- and we can -- actually, I

12 have a rough of the transcript.  We can pull it up if

13 necessary.  My memory is that on direct examination, Officer

14 Fihe offered some testimony suggesting that he thought it was

15 possible that Mr. Burk had entered the house at some point

16 while he was en route.  And, then, on cross-examination,

17 admitted that he had no reasonable basis and that that was

18 speculative.

19        And so -- and Ms. Pickerill's argument as to why that

20 shouldn't be added sort of makes my original point, Your Honor.

21 When we get to a point of putting into the instruction specific

22 examples of evidence, it's going to confuse the jury as to the

23 significance or relevance of that specific evidence.  And so

24 even having a single example regardless of which -- look, Your

25 Honor, if Ms. Pickerill -- if you had included instead of this

1  objection -- instead of this example, the one I just proposed

2  and Ms. Pickerill objected, I would really have no strong

3  argument as to why that shouldn't be taken out.

4       I think it goes for both sides.  I think it's either

5  got to be there's something that balances it for either side or

6  it's just silent on the point altogether.

7       THE COURT:  All right.  I agree.  That would help

8  eliminate any possible prejudice to Mr. Burk but, nevertheless,

9  get the point made that the jury should consider his testimony

10  about that.  So that's what we're going to do.

11       What was the -- what was the language again?

12  Likewise --

13       MR. KEYES:  Likewise, Officer Fihe testified regarding

14  a possibility that Mr. Burk may have entered the residence at

15  some point.  There was no evidence known to Officer Fihe to

16  support that possibility at any time and, therefore, any

17  concern by Officer Fihe about that point was not objectively

18  reasonable.

19       MS. PICKERILL:  Your Honor, could I propose some edits

20  to that to make it more consistent with the example about

21  Mr. Burk?

22       THE COURT:  All right.

23       MS. PICKERILL:  Just as an initial point, we object to

24  this example being included.  But I would propose -- and the

25  beginning is fine:  At some point Officer Fihe testified to the

1  possibility that Mr. Burk may have entered the home.

2  I would object to the notion that there was -- that he

3  says there's no evidence to support this and would instead

4  propose adding because Officer Fihe could never confirm or deny

5  this, or because Officer Fihe did not know this for sure, this

6  fact cannot be -- this fact does not go to the totality of the

7  circumstances he was considering in whether his conduct was

8  reasonable.

9  THE COURT:  Well, I think that we ought to use the

10  same language in the same construct that we use to tell the

11  jury about Mr. Burk's comments.

12  MS. PICKERILL:  So, yeah.  Maybe to say --

13  THE COURT:  I think we're going to use the same kind

14  of language.

15  MS. PICKERILL:  Okay.  May not affect your

16  determination of the reasonableness of the use of force.

17  THE COURT:  I think that would fit better with the

18  proposition that -- stating it fairly for both of those

19  propositions.  All right.

20  Anything else?

21  MS. PICKERILL:  I think as long as the language

22  matches, we're fine with both of them being in.

23  MR. KEYES:  Your Honor, we had one more proposed

24  addition to that same paragraph.  It's the sentence -- it would

25  be the next sentence after the one we just addressed as the

1  Court has instructed you.

2            THE COURT:  Hold on a second.  What page is this on?

3            MR. KEYES:  Your Honor, it's the same page.  It would

4  be page 20.

5            THE COURT:  Where is that?

6            MR. KEYES:  So right after -- yeah, it's the last

7  sentence in paragraph -- in the top paragraph.  So it currently

8  reads as the Court has instructed you.

9            THE COURT:  As the Court as instructed you, okay.

10            MR. KEYES:  The defendant officers could reasonably

11  expect that Mr. Burk would follow their commands.  We would

12  request the addition at the end of that sentence, or at the end

13  of that clause, if they gave him a reasonable chance to comply,

14  sort of similar to what we added in the officer --

15            THE COURT:  All right.  I agree.

16            MS. PICKERILL:  Your Honor, I would just note we have

17  the same objection as we did the last time we talked about this

18  language.

19            THE COURT:  What was the language?  If they were

20  afforded the reasonable opportunity to comply?

21            MR. KEYES:  Yes.  If they gave him a reasonable

22  opportunity to comply.

23            I'm sorry, Your Honor.  I'm looking back at my notes

24  on the officer authority -- I think the language we added on

25  the officer authority instruction was if they allowed a

1    reasonable opportunity to comply; same language.

2              THE COURT:  All right.  I agree.

3         MR. KEYES:  Your Honor, on page 21, unlawful

4    detention, at the end of the third paragraph --

5              THE COURT:  Okay.

6         MR. KEYES:  And this is more in the realm of

7    preservation, Your Honor, because it relates to the mention of

8    unlawful arrest.  We would request at the end of the third

9    paragraph, at the end of the last sentence, a clause that

10   reads:  But by no event may law enforcement officers seek to

11   verify their suspicions by means that approach the conditions

12   of arrest.

13             And we think that support is found in the *Lopez-Arias*

14   case, 334 F.3d at 627.  I believe the Court has spoken on that

15   issue; so we're just raising it in the additional area of

16   instructions where we think it's relevant.

17             THE COURT:  I think that is in that case.

18        MR. KEYES:  Yes, Your Honor, *Lopez-Arias* does state

19   that.  This is actually not raising an additional claim of

20   unlawful arrest.  What it is is it's defining the bounds of

21   reasonable detention.

22             THE COURT:  How will a jury know what an arrest is?

23        MR. KEYES:  Well, part of the point, Your Honor, is

24   that if there were an instruction regarding unlawful arrest

25   included, then the jury would be instructed on that.  So

1  that -- it's sort of a -- it's a bit of a fundamental issue

2  with not including the unlawful arrest --

3  THE COURT: Well, that's why I didn't put it in. It

4  adds an issue: What's an arrest? Well, we're not considering

5  this an arrest. We're considering it a -- it's either a

6  reasonable or it's not a reasonable temporary detention for ten

7  minutes.

8  No, I'm not going to have that.

9  MR. KEYES: No. That's -- and we -- Your Honor, for

10  the record, the instruction or the information that we would

11  have proposed was whether an investigatory stop turns into an

12  arrest requires looking at the totality of the circumstances.

13  When considering the totality of the circumstances, you may

14  consider such factors as the passage of time, the use of

15  weapons or bodily force, the use of restraints, putting the

16  detainee in the back of a police vehicle, and the physical

17  surroundings of the encounter. And those factors are from

18  *United States v. Lopez-Medina*, and *United States v. Richardson*,

19  for the record.

20  THE COURT: We're talking about a discrete occurrence

21  in this case. After they had received Mr. Burk's credentials,

22  they put him in a police car for ten minutes. And I think

23  that's correctly analyzed as an additional temporary detention

24  which was either reasonable or unreasonable under the totality

25  of the circumstances. And I think that's what this instruction

1    says.  All right.  Anything else?

2              MR. KEYES:  May I have a moment, Your Honor?

3              THE COURT:  Yes, indeed.

4              MR. KEYES:  Your Honor, on the unlawful detention

5    instruction, page 21, we would also propose a -- including in

6    the instruction a statement that whether an officer's suspicion

7    is reasonable must take into account developing information

8    that the officer perceives as the -- as the encounter

9    continues.

10             MS. PICKERILL:  Where is that coming from?

11             THE COURT:  I described the additional circumstance

12   specifically, and that was the receipt of his credentials.  So

13   I think I have addressed that very specifically.

14             MR. KEYES:  It's in the first paragraph.  Thank you,

15   Your Honor.

16             THE COURT:  Okay.  Now, how about the interrogatories?

17             MR. KEYES:  On the interrogatories, Your Honor, I

18   believe we're in agreement on Interrogatory No. 1.

19             MS. PICKERILL:  Yes.

20             MR. KEYES:  On Interrogatory No. 2, as written, we are

21   in agreement, I believe, and then there was going to be a

22   separate one for tasing.

23             MS. PICKERILL:  Yes.  We can handle it that way.

24             MR. KEYES:  Your Honor, Interrogatory No. 2 --

25             THE COURT:  Hold on.  Let me find my interrogatories.

1    Okay.  Here they are.

2              Interrogatory No. 1, any objections to it?

3              MR. KEYES:  No, Your Honor.

4              MS. PICKERILL:  No, Your Honor.

5              THE COURT:  Okay.  And Interrogatory No. 2?

6              MR. KEYES:  No objections to Interrogatory No. 2?

7              MS. PICKERILL:  No objections, Your Honor.

8              THE COURT:  All right.  Interrogatory No. 3?

9              MS. PICKERILL:  We have talked, Your Honor, kind of in

10   between two and three about adding an additional interrogatory

11   to ask if the jury finds that Officer Fihe used excessive force

12   when he tased Plaintiff James Burk.

13             THE COURT:  That happened during the handcuffing,

14   didn't it?

15             MR. KEYES:  Yes, Your Honor.  It was in the same

16   sequence.  The only concern is that the handcuffing and the

17   tasing are, I think, under the case law, treated as distinct

18   uses of force even when they happen in the same sequence of

19   events.  So having a --

20             THE COURT:  So you want a separate one for the tasing.

21             MS. PICKERILL:  Yeah.  From our perspective, Your

22   Honor, if we do move on to the damages portion of this trial,

23   the specific physical injuries that are sustained from

24   handcuffing are different than from tasing.  I think it would

25   be good where the jury is or is not finding excessive force.

1          THE COURT:  That makes a lot of sense to me.  So we'll
2    have an Interrogatory No. 4 for the tasing.
3          MS. PICKERILL:  Yes, Your Honor.
4          MR. KEYES:  Yes.
5          MS. PICKERILL:  That would just be for Officer Fihe,
6    Your Honor, not Officer Winchell.
7          THE COURT:  Yes.  There was only one who --
8          MS. PICKERILL:  Correct.
9          THE COURT:  It was Mr. Fihe who applied the taser.
10   Okay.  All right.  We will do that.
11         MR. KEYES:  And, Your Honor, so -- we do not have
12   agreement on this next point.  Plaintiffs would propose adding
13   an interrogatory specific to Defendant Kevin Winchell asking
14   whether he -- the language might have to be tweaked if the
15   Court will consider it.  But was Defendant Kevin Winchell
16   responsible for excessive force in the course of participating
17   or encouraging the tasing of Agent Burk -- or of
18   Plaintiff James Burk.
19         And the reasoning behind it is while it is Officer
20   Fihe that physically uses the taser, the evidence also shows
21   that Officer Winchell was encouraging him to use the taser by
22   telling him, "Joe, get your taser, Joe, get your taser."
23         And the way that --
24         THE COURT:  I understand your point.
25         Defense counsel?

1    MS. PICKERILL:  Failure to intervene is a separate and

2  discrete 1983 claim.  If plaintiffs want to add in now a claim

3  that Kevin -- for Kevin Winchell and the taser would be to

4  bring a new 1983 claim for failure to intervene.

5    THE COURT:  I think it was pled that way, wasn't it?

6    MS. PICKERILL:  No, Your Honor, it was not.

7    MR. KEYES:  There was not a separate count to

8  intervene.  However, the standard for whether a jury

9  instruction is proper depends on -- first of all, if we're

10  looking all the way back to the pleadings, was there fair

11  notice of the nature of the allegations against the defendants?

12  And then, ultimately, what does the evidence presented at trial

13  show?

14    And so here we have a situation where Officer Winchell

15  may not have been the person that pulled the trigger on the

16  taser, but we can hear him in the body-cam video saying, "Joe,

17  get your taser," or, "Joe, take out your taser."

18    So, in terms of the doctrines of 1983 and failure to

19  intervene, we think there would be enough there to allow the

20  jury to conclude that Officer Winchell also was responsible,

21  under Section 1983, for the use of the taser.

22    THE COURT:  Well, he was involved, obviously.  It was

23  a joint operation.  The force used in handcuffing him was

24  jointly applied by both officers, and the tasing was jointly

25  applied.  So is that enough to -- or is there some -- it seems

1  to me that the combined action should involve the same

2  consequences for each officer.

3      MS. PICKERILL:  Your Honor, while we certainly agree

4  that both officers were there when this happened and that they

5  were communicating with each other, the nature of these

6  excessive force claims is that if it's a force claim that's

7  brought, then the force must be used by the officer.

8      THE COURT:  So which of these officers injured his

9  shoulder?

10     MS. PICKERILL:  I don't believe that the taser injured

11 his shoulder at all.

12     THE COURT:  No.  I'm asking in regard to the use of

13 force.

14     MS. PICKERILL:  I think that that is something

15 plaintiff would have to prove through their -- through

16 causation.

17     MR. KEYES:  Your Honor, this is -- to address the

18 issue defense counsel has raised, this actually goes beyond a

19 failure-to-intervene theory as the Court --

20     THE COURT:  That's what I'm suggesting.  It's a joint

21 thing.  It's not a failure to intervene.  They were both doing

22 it.

23     MR. KEYES:  That is correct, Your Honor.  And the

24 combination of multiple officers in the same action, especially

25 when they are working together and encouraging each other to

1   take the action --

2           THE COURT:  Do we have some law on this, folks?

3           MR. KEYES:  I don't know that we've prepared any

4   briefing or bench research.

5           MS. PICKERILL:  Your Honor, I don't know that there is

6   any case law that talks about this specific issue because I

7   don't think it's physically possible for two agents to use the

8   same taser to tase a suspect at the same time.

9           MR. KEYES:  But it's no different, Your Honor, than if

10  one agent were to tell somebody else, hey, tase that guy, and

11  then the second one does it.  I mean, they're both --

12          THE COURT:  Back to the injury.  They're both applying

13  force together, and I think it would be impossible to determine

14  which one of them actually injured the shoulder.  But, if it's

15  joint activity, then under ordinary tort principles I think

16  they would both be liable.  So I'm wondering if there's any

17  Section 1983 law that addresses this issue.

18          MR. KEYES:  Your Honor, speaking generally since we

19  haven't presented specific research, certainly in the areas of

20  failure to intervene and in combination of conspiracy --

21  combination or conspiracy, both of those concepts are

22  incorporated into Section 1983 law, and they tend to address

23  the issues that the Court is raising.  When you have multiple

24  combined effort --

25          THE COURT:  This is worse than failing to intervene.

1 This is participating.

2          MR. KEYES:  Exactly, Your Honor.

3          MS. PICKERILL:  Your Honor, I --

4          THE COURT:  So, if there is a responsibility for

5 failure to intervene, it seems to follow logically that there

6 would be for joint activity.

7          MS. PICKERILL:  Your Honor, we would argue that

8 failure to intervene, along with the conspiracy, are separate

9 claims that need to be enumerated.  Furthermore, I do know that

10 in the case of *Timothy Davis v. City of Columbus*, the jury was

11 given interrogatories for each of the individual eight

12 officers.  They were not asked to analyze the force as one big

13 group.  They were specifically asked to determine whether the

14 force used by each individual officer was excessive.  Even

15 though that was a ten-minute encounter where eight officers

16 were using force on one individual, the jury was still tasked

17 with analyzing it from each officers' use of force, not from a

18 collective use of force.

19          MR. KEYES:  Your Honor, I think if we were to use the

20 interrogatories of the *Davis* case as precedent or guidance for

21 this case, there would have to be a lot more detail in the

22 record over how the cases were similar or different.  We do

23 think that it's appropriate, when you have such close in time,

24 concerted action between two persons acting under color of law

25 combining to violate the constitutional rights of a single

1    plaintiff, it is appropriate to allow -- and in this case we

2    are presenting separate interrogatories.  We're not lumping

3    them together.

4         What we would be presenting to the jury is do you find

5    Officer Fihe used excessive force in applying the taser?  Do

6    you find Officer Winchell -- and I think we might have to

7    tinker with the specific language because we agree Officer

8    Winchell did not pull the trigger on the taser.  But do you

9    find that Officer Winchell committed excessive force in

10   encouraging or directing the use of the taser?

11        I mean, we could tweak the language, but, as the

12   concept, the law supports that type of analysis, Your Honor.

13        THE COURT:  All right.  I'm going to give that some

14   thought this evening.

15        Any other issues that I'm going to have to rule on?

16        MR. KEYES:  Yes, Your Honor.  So that covered the

17   taser.

18        In the Court's proposed Interrogatories 4 and 5, we

19   have no objection to those instructions as they are presented.

20        MS. PICKERILL:  That's correct.  I'm sorry.

21        MR. KEYES:  Four and five the parties are in agreement

22   on.  But, from the plaintiffs' side, regarding the placement of

23   Mr. Burk into Officer Winchell's patrol car, we do think that

24   an excessive force interrogatory as to each officer is also

25   appropriate for that action.

1    So, with the patrol car placement, there's two

2 concepts at issue.  It's the unlawful detention and it's

3 excessive force.  And so I think we would need interrogatories

4 on excessive force for that segment of the case as well.

5    THE COURT:  All right.  That's similar to the issue we

6 earlier discussed.  All right.  Anything else?

7    MR. KEYES:  Not from the plaintiffs, Your Honor.

8    THE COURT:  Defense counsel?

9    MS. PICKERILL:  Defense has nothing, Your Honor.

10 Thank you.

11    THE COURT:  All right.  Well, give us 20 minutes or so

12 to confer, and we will be returning to the courtroom and give

13 some further attention to these matters.

14    (Proceedings concluded at 4:05 p.m.)

15                        - - -

16

17

18

19

20

21

22

23

24

25

- - -

WITNESS INDEX

- - -

WITNESSES          DIRECT CROSS REDIRECT RECROSS

DEFENDANTS':

Patrick Vehr      499   549    567      572
Sarah Al Maliki   576

# C E R T I F I C A T E

1

2

3          We, Crystal Hatchett and Shawna J. Evans, do hereby

4   certify that the foregoing is a true and correct transcript of

5   the proceedings before the HONORABLE JAMES L. GRAHAM, Judge, in

6   the United States District Court, Southern District of Ohio,

7   Eastern Division, on the date indicated, reported by us in

8   shorthand and transcribed by us or under our supervision.

9

10

11                         s/Crystal Hatchett
                           Crystal Hatchett
12                         Official Federal Court Reporter
                           January 2, 2025
13

14                         s/Shawna J. Evans
15                         Shana J. Evans
                           Official Federal Court Reporter
16                         January 2, 2025

17

18

19

20

21

22

23

24

25